IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

CENTRAL DIVISION


ESTATE OF PATRICK HARMON            )

SR., et al.,                        )

       Plaintiffs,                  )

vs.                                 )        Case No. 2:19-CV-553RJS

SALT LAKE CITY CORPORATION,         )

et al.,                             )

       Defendants.                  )

_____)




BEFORE THE HONORABLE ROBERT J. SHELBY

-------------------------------------

February 6, 2020


Motion Hearing

```
 1                    A P P E A R A N C E S

 2

 3    For Plaintiff:              ANDREW DEISS
                                  COREY RILEY
 4                                10 West 100 South
                                  Suite 700
 5                                Salt Lake City, Utah

 6                                NICHOLAS LUTZ
                                  QUSAIR MOHAMEDBHAI
 7                                2701 Lawrence Street
                                  Suite 100
 8                                Denver, Colorado

 9

10

11    For Defendant:             DAVID MULL
                                  Salt Lake City Corporation
12                                451 South State Street
                                  Suite 505A
13                                Salt Lake City, Utah

14                                CATHERINE BRABSON
                                  Salt Lake City Attorney's Office
15                                451 South State Street
                                  Suite 505
16                                Salt Lake City, Utah

17

18

19

20

21

22    Court Reporter:            Ed Young
                                  351 South West Temple
23                                Room 3.302
                                  Salt Lake City, Utah 84101-2180
24                                801-328-3202
                                  ed_young@utd.uscourts.gov

25
```

```
1    February 6, 2020                              1:30 p.m.

2                    P R O C E E D I N G S

3

4         THE COURT:  Good afternoon, everyone.  Sorry to

5    keep you for a minute.  We have a jury out.  We started a

6    jury trial Monday morning.  Our jury is deliberating and we

7    have had several notes come in today and they may return a

8    verdict and, of course, that is our priority, our jurors'

9    time, so we may find ourselves recessing for a moment and

10   resuming and we'll just ask you to be flexible with us if

11   you would, please.

12         We'll call case number 2:19-CV-553.  This is the

13   Estate of Patrick Harmon versus Salt Lake City and Officer

14   Fox.

15         Counsel, many of you are quite familiar to me, but

16   please take a moment and make your appearances.

17         MR. LUTZ:  Good afternoon, Your Honor.  Nicholas

18   Lutz appearing pro hac vice on behalf of the plaintiffs.

19         MR. MOHAMEDBHAI:  Good afternoon, Your Honor.

20   Qusair Mohamedbhai, also on behalf of the plaintiffs.

21         MR. RILEY:  Corey Riley on behalf of the

22   plaintiffs.

23         MR. DEISS:  Andy Deiss on behalf of the

24   plaintiffs.

25         THE COURT:  Welcome to all of you.
```

1          MS. BRABSON:  Your Honor, Catherine Brabson on

2    behalf of the defendants.

3          MR. MULL:  David Mull on behalf of the defendants.

4          THE COURT:  Welcome everyone.

5          This is the time set for hearing on the

6    defendants' qualified immunity motion and motion to dismiss.

7    It is a motion to dismiss I guess on those two alternative

8    bases.  We have had the benefit of your briefing and I have

9    carefully reviewed the complaint and I have studied the

10   video of the incident from all three officer cams many

11   times.  I have a number of questions for you, but I think I

12   generally understand the positions that you have all taken.

13   I think it is helpful to remind ourselves of the standard

14   through which we view the evidence and from where we take

15   the evidence on this motion at this stage of the

16   proceedings.

17          It is complicated I think by the presence of the

18   video.  It seems to me that if this was a Rule 12 motion

19   based just on this complaint the motion would fail.  We

20   would assume the truth of the well pled factual allegations

21   in the complaint and here they would be sufficient, assuming

22   the truth of those allegations, to survive the motion, I

23   think.

24          Of course we have in this case the video evidence

25   also, and I expect you'll both tell me what you think the

1  video shows or does not show, but I can see it myself and I

2  think the standard is this, that we look to see whether the

3  complaint has enough factual matter accepted as true to

4  state a plausible claim for relief, that familiar language

5  applying Rule 12(b).

6         In evaluating the allegations in the complaint, we

7  look within the four corners of the complaint, of course,

8  but we can also consider the attached exhibits and documents

9  incorporated into the complaint by reference or exhibits

10 that are indisputably authentic and central to the

11 plaintiffs' claim and referred to in the complaint.  The

12 plaintiffs and the defendants both agree that that includes

13 the video evidence.

14        I don't know how persuaded I am about the

15 plaintiffs' objection that we shouldn't or can't consider

16 still photos from that video.  There is no allegation that

17 they have been doctored or manipulated.  To the extent that

18 they help the Court construe what is shown in the video, it

19 seems appropriate to me.  Of course I note the plaintiffs

20 submitted still photos in the complaint so you must think

21 they have some evidentiary value.  I just don't understand

22 that there is an evidentiary basis to accept the one and not

23 the other.  I note that there wasn't a citation in your

24 opposition when you suggest that the Court shouldn't

25 consider the stills.

1          If the exhibit blatantly contradicts the

2     plaintiffs' version of events, then I am instructed to view

3     the facts in the light depicted by the exhibit.  Of course

4     we are all familiar with the instruction from Iqbal and

5     Twombly, and it is relevant here, that the Court gives no

6     weight to legal conclusions or threadbare recitals of the

7     elements of claims.  There are a number of allegations in

8     the complaint that are irrelevant I think for purposes of

9     Rule 12, because they are just entirely conclusory.

10          Whatever is left after all of that, these are the

11    well pleaded, non-conclusory, nonspeculative factual

12    allegations in the complaint.  So long as they are not

13    obviously contradicted or blatantly contradicted by the

14    video, we'll assume those facts to be true and we will view

15    them in the light most favorable to the plaintiff.  I think

16    that is the universe of facts that is before us today.

17          Then, of course, you're all familiar with the

18    Fourth Amendment analysis and the Fourteenth Amendment

19    analysis.  We have the standards you have all briefed in

20    your papers about excessive force and the elements the Court

21    is required to consider under Graham, and then we have the

22    Estate of Larsen I think which informs some part of Graham,

23    and I will be interested to hear what you have to say today.

24          I don't know that it will be helpful for us to

25    spend much time focusing on the state claims initially.  I'm

1    really interested in trying to make sure that I thoroughly

2    understand your arguments on the federal claims.  If those

3    fail, I won't exercise supplemental jurisdiction at this

4    stage of the proceedings and we'll send the state claims

5    back to state court.  I am not signaling one way or the

6    other.  I just mean that that is what I will do consistent

7    with my past practice and the direction, at least the way I

8    construe the direction from the Tenth Circuit, about

9    allowing the state court to decide state issues of law.

10             It is the defendants' motion.

11             Ms. Brabson, maybe we begin with the defense then.

12   What would you like to tell us about the Fourth and

13   Fourteenth Amendment claims?

14             MS. BRABSON:  Thank you, Your Honor.

15             First I think I would like to say that we concur

16   in your discussion of the standard here and certainly the

17   parts relating to how Iqbal ties in with video evidence.  In

18   this case we have alleged that the video evidence blatantly

19   contradicts certain allegations in the complaint such that

20   the Court need not accept those allegations as true.

21             As an example I would like to spend just a few

22   moments talking about a case that I think really is an

23   excellent application of the standard as you have just

24   described it.  That is the Estate of Ronquillo case versus

25   the City and County of Denver.  Now, that case is also a

1  12(b)(6) case and so it is the same procedural posture as

2  this case.  There essentially the police officers had an

3  arrest warrant for Mr. Ronquillo and they pursued him to the

4  point where his car was parked.  At that point the officers

5  approached the vehicle and attempted to take him into

6  custody.

7          As they were attempting to do that, he did not

8  obey the commands to get out of his vehicle and the officers

9  attempted to physically by force remove him from the

10  vehicle.  That was not successful.  As this incident

11  progressed, the vehicle which he was driving collided and

12  moved forward with one of the law enforcement vehicles that

13  was parked in front of it.

14          At that point Mr. Ronquillo put the car in reverse

15  and backed up out of the parking lot and across the median.

16  There was a dash cam video that captured what I have just

17  described, but once the car backed up across the median, it

18  was no longer in the frame of the dash cam video.  It was

19  during the time period that the car was outside of the frame

20  of the dash cam video that the officers fired their shots,

21  ultimately killing Mr. Ronquillo.

22          However, the car did reappear in the dash cam

23  video moving and accelerating rapidly forward across the

24  median back into the parking lot where it then crashed into

25  law enforcement vehicles.

1          The Court analyzed three statements in the

2     complaint, allegations in the complaint and considered

3     whether or not the video evidence blatantly contradicted

4     those allegations.  The first allegation was that Mr.

5     Ronquillo did not know that he was being confronted by law

6     enforcement, that he was simply reacting in self-defense to

7     what would have been unknown assailants.  By review of the

8     video, the court said I am not going to accept that

9     allegation as true because the officers in the video are

10    clearly wearing uniforms, there are marked police vests, and

11    certainly from the perspective of the officers, they would

12    have reasonably been able to conclude that Mr. Ronquillo

13    would have known he was being confronted by law enforcement

14    officers.  So that allegation was not accepted as true.

15         The second allegation was that as Mr. Ronquillo

16    was fending off the officers' attempt to extricate him from

17    his car by force, it was that situation, the force of the

18    officers wrestling with Mr. Ronquillo, that jostled the car

19    forward into the law enforcement officer's vehicle and

20    caused the crash.  It was not the intention of Mr. Ronquillo

21    to move the car forward as essentially the potential

22    dangerous weapon.  The Court, in observing the video,

23    disagreed and said there was no other conclusion that the

24    Court could draw.  His observation -- the Judge's

25    observation of the video was such that the car could not

1    have simply been jostled when it collided with the law

2    enforcement officer's vehicle and, thus, the suggestion that

3    that was an accident rather than an intentional collision

4    with the law enforcement officer's vehicle was rejected and

5    that allegation was not accepted as true and was blatantly

6    contradicted by the video.

7         The last allegation, and I think it is probably

8    the closest by analogy to the case here, was that at the

9    moment that the officer shot Mr. Ronquillo that, indeed, his

10   car was not moving and he did not have his foot on the

11   accelerator.  Of course, that point in the video was not

12   captured because it was outside of the frame of the dash cam

13   video at that point in the interaction.  And so the court

14   looked at the part of the video where the movement of the

15   car was apparent and was able to conclude, based on the

16   speed of the vehicle and how it moved across the median and

17   across the parking lot and crashed into the law enforcement

18   vehicles, that that movement of the car was entirely

19   inconsistent with the allegation that Mr. Ronquillo did not

20   have his foot on the gas before he was shot.  So, again, the

21   court rejected that allegation.

22        I think this case is very instructive for us here,

23   because what we have and the key part of the video, and

24   there are other parts that are certainly relevant, but the

25   key part of the video for this analysis is about a

1    six-second portion.  That interval starts from the time that

2    Mr. Harmon breaks away from the officers and begins to flee

3    and runs north and changes direction and begins to run south

4    and that six seconds end with the moment that Officer Fox

5    fires his weapon.

6          Now, the allegations that we have here are that

7    during that six-second interval that Mr. Harmon was fleeing

8    away from the officers and never turned and faced the

9    officers.  I believe that a review of the video shows in a

10   frame-by-frame mode, and I think it is certainly no

11   different to watch a video in frame-by-frame mode with a

12   software program with pause and hitting start and stop and

13   so forth than it would be to watch the video, and just like

14   the Court mentioned, I don't believe there is an evidentiary

15   basis to object to watching a video in a frame-by-frame

16   mode.  Other courts have also viewed videos in

17   frame-by-frame mode and I provided some citations to that

18   effect.

19         But if you look at the video in a frame-by-frame

20   mode in the instance just before the shots are fired, and if

21   you look at Mr. Harmon's feet, for example, they are pointed

22   back in the direction of the officers.  His head is turned

23   so he is facing the officers.  His upper body and shoulders

24   are turned so that he is facing the officers.

25         Previous to that he is making large leaps and

1    bounds away from the officers, but at that point he is

2    turned and is facing the officers and you can tell that by

3    an examination of his body and also his body language.  His

4    arms, both of them, are raised and they are not down at his

5    side.  Again, he is looking almost directly on at Officer

6    Fox in the video and not over at Officer Smith, who was to

7    his right, or over to Officer Robinson, who at that point

8    has actually fallen down in the grass and is to the left of

9    Officer Fox.  So based on that six seconds of the video, I

10   think it is very easy for the Court to conclude that the

11   allegation that Mr. Harmon was fleeing is blatantly

12   contradicted by the video.

13          The six seconds of the video are not perfect.  It

14   is not without some distortion.  It is not without some

15   blurriness, but that is not the standard.  There were pieces

16   of the video in the Ronquillo case that didn't show what

17   happened at all and yet the Court was still able to make

18   that conclusion.

19          So based on the location of Mr. Harmon's body

20   position, I don't think that that allegation should be

21   treated as true, that he was fleeing.

22          The second allegation --

23          Do you have a question, Your Honor?

24          THE COURT:  It has to be blatantly contradicted

25   for me to reject it, right?

```
1              MS. BRABSON:  Right.

2              THE COURT:  What does it mean that I have to watch

3    all three videos over and over and over again and freeze it

4    and move it and freeze it and go back and look, and I am

5    left with a pretty firm conviction that if I were just a

6    juror, I would have an opinion about what the video shows,

7    but that there is room for disagreement about it.  Whether

8    even Mr. Harmon, after he is -- I get the directions mixed

9    up.

10             Initially he goes in the one direction and comes

11   back the other direction and past the officers, and it

12   appears to me that he is at one point sideways and what

13   seems most likely maybe is that he is shuffling his feet.  I

14   can see even in one frame where it looks like his toes might

15   even be pointed more in the direction towards the officer,

16   but it is unclear in which direction his body is moving at

17   that time.  For sure there is a portion of the video where

18   we can see his torso sort of more open than closed from the

19   angle of one of the officers and his arms are in front of

20   him in the manner that we'll talk about today I'm sure.

21             Does blatantly contradict mean no juror looking at

22   that video could conclude that it shows anything other than

23   what you say?

24             MS. BRABSON:  I do think that that has to be in --

25   certainly there is only one conclusion that a juror can find
```

1   and I agree that that is the standard and I agree that it is

2   a high standard but I think it is met here.  It is met for a

3   couple of reasons.  The reason you have to watch all of the

4   videos is because they are showing you what is going on from

5   a different perspective from each of the officers, and it is

6   the complete picture in this case that is essentially

7   allowing you to find the blatant contradiction.  It is not

8   any one particular moment.  It is not one officer's body cam

9   video.  It is a little different than Ronquillo in that

10  situation.

11          I don't disagree that because this happened in

12  such an instant, it is six seconds and, in fact, from the

13  moment he turns to the moment Officer Fox fires, it is

14  probably, you know, a split second.  That is why this

15  dovetails with the standard.  You cannot judge what the

16  officer is doing from 20/20 hindsight.  You have to evaluate

17  the situation in the circumstances that he is facing, which

18  in this case are tense and rapidly evolving and uncertain.

19  The officer is faced with that split-second decision.

20          THE COURT:  Haven't you just blurred two things --

21          MS. BRABSON:  I did.  You're right.

22          THE COURT:  I'm still trying to figure out what

23  fact I'm required to accept as true.

24          MS. BRABSON:  I understand that.

25          The other fact that you have is Officer Fox's

1   statements and those are actually alleged in the complaint

2   and it is about two pages.

3            THE COURT:  Would you slow down just a little bit?

4            MS. BRABSON:  Sorry.

5            THE COURT:  That is okay.  Mr. Young had a very

6   long day recently and so he could use some help.

7            MS. BRABSON:  There are facts in the complaint

8   that contain Officer Fox's statements to investigators.  It

9   is actually not the complete statement, but there are many

10  of Officer Fox's statements to investigators.  I don't think

11  you can discount those here.  I think that what Officer Fox

12  said is confirmed by what you see in the body cam video.

13           THE COURT:  Officer Fox -- I actually got confused

14  about this initially in your papers.  I think I was not

15  giving you a charitable enough reading of something that you

16  said.  I think what you are urging me to do is to assume the

17  truth of anything that Officer Fox said that is incorporated

18  in the complaint because the plaintiffs put it in there.

19            Is that what you're saying?

20           MS. BRABSON:  Well, that is one aspect of it.  The

21  other aspect of it is that there is not anything in the

22  complaint -- there is no other witness, for example, that

23  makes a contrary statement.  What the plaintiffs are

24  suggesting and what they have offered in the complaint

25  essentially is that the video contradicts Officer Fox's

1   statements.  That is the argument that they are making and

2   that because of that, you have to presume any allegations

3   that are made as true.

4          I think the exact opposite is the case.  I think

5   you can consider Officer Fox's statements.  Normally if we

6   were here on summary judgment, for example, we might have a

7   deposition or sworn testimony from Officer Fox, but what we

8   have here and what is included in the complaint is exactly

9   what he said and what he would say at least to some degree.

10  And I think if you look at some of the other cases I have

11  cited, and I think Johnson is the most prominent one that

12  comes to mind, and the court there -- that was a summary

13  judgment case, but the court --

14         THE COURT:  So was Thomas.

15         MS. BRABSON:  Yes.  But in that case the court

16  looked to see if the video confirmed what the officer was

17  saying.

18         THE COURT:  Do you mean that I should now construe

19  the facts in the complaint in the light most favorable to

20  you and I should review part of the video and if it is

21  consistent with your officer's testimony, I should flip the

22  Rule 12 standard?

23         MS. BRABSON:  That is not what I'm saying.

24  Certainly not.  What is missing from the complaint is any

25  other suggestion other than the video that Mr. Harmon was

1   not turned and facing the officer.  I would also say that if

2   you watch the video carefully, Mr. Harmon actually gets

3   closer in those last few frames.  It does require a careful

4   observation, but it is an addition to the body movement.  He

5   is moving closer and he is moving towards Officer Fox so

6   there is that aspect.

7            THE COURT:  There is a moment in the video where I

8   think that is true.

9            MS. BRABSON:  Yes.

10           THE COURT:  That seems to be the case at one

11   moment in a fluid situation.

12           MS. BRABSON:  Correct.

13           THE COURT:  It is not clear to me that that was

14   his last direction before the shots but who can tell?

15           MS. BRABSON:  Well, again, we may have a

16   disagreement about who can tell, but I don't think that a

17   reasonable jury could conclude otherwise.

18           If it is all right with you, I will move on to the

19   next element, unless you have other questions.

20           THE COURT:  I focus like a laser on standards

21   because I am a pedestrian court.  I am just trying to

22   identify the standard that applies and apply it.  So when

23   you say in your papers that I should consider the statements

24   and testimony of the officers' recounting of the incident,

25   through what lens legally at Rule 12?  I should assume those

1   statements as true?  I should not?  I should just be aware

2   of them?  What use am I required to make of them?

3          MS. BRABSON:  Well, I think just as in the

4   Ronquillo case, the court looked at the video and the

5   officers had given their view that they shot when the car

6   was moving and the court said that the video confirms that.

7          THE COURT:  To aid in my review of what the video

8   shows me, is that what you're saying, to add context?

9          MS. BRABSON:  Correct.

10          THE COURT:  Okay.  Thank you.

11          You were going to move on to another point.  Was

12   it the knife?

13          MS. BRABSON:  The next point I think is the

14   allegation that Mr. Harmon was unarmed.  At the point in

15   time that Officer Fox fired his weapon -- sorry.  I have a

16   tendency to speak too fast.

17          THE COURT:  We hadn't noticed.

18          MS. BRABSON:  At the point in time that Officer

19   Fox fired his weapon, the video does not show whether or not

20   Mr. Harmon was armed.

21          THE COURT:  I agree with that.

22          MS. BRABSON:  So what do we know?  What we do know

23   is that Mr. Harmon, after the shots were fired we can

24   observe his body and how it moved.  He spun around to the

25   right.  He fell to the ground.  His right arm and hand

1    landed in the grass at about a 45-degree angle from his

2    body.  In the ensuing five or six seconds Officer Robinson

3    walked toward Mr. Harmon.  He picked up his right hand and

4    moved his arm in line with his body in order to restrain him

5    in handcuffs, which is our standard procedure in a deadly

6    force situation.  At that point the knife is clearly visible

7    in the video.  I believe plaintiffs have conceded that a

8    knife was found next to Mr. Harmon's body at the end of the

9    video.

10             THE COURT:  I see it there.  There is a knife.

11             MS. BRABSON:  Right.

12             Then how do you get the knife from that point back

13   into his hand at the moment that Officer Fox fired?  Again,

14   I'm going to use the analogy --

15             THE COURT:  Let me propose how we might do that.

16   We might draw an inference in your favor.

17             MS. BRABSON:  I'm sorry?

18             THE COURT:  Is there a different way?  Let's cut

19   to the chase.  Am I not required to draw an inference in

20   your favor in order to determine that Mr. Harmon was armed

21   or the officers reasonably -- I don't know which.  I think

22   we are dealing still with the facts in the complaint --

23             MS. BRABSON:  I agree.

24             THE COURT:  -- so to contradict the facts in the

25   complaint, am I not required to draw an inference in your

1   favor that the knife on the ground was in fact held by Mr.

2   Harmon and dropped when he was shot and collapsed?

3           MS. BRABSON:  I don't believe it requires an

4   inference, but I do think that the Court is permitted to

5   find that no reasonable jury could conclude otherwise and I

6   think the conclusion is inescapable here.  Again, I am going

7   to circle back to the Ronquillo case and --

8           THE COURT:  Is it possible that one of the

9   officers on the scene became immediately concerned about

10  what happened and threw the knife forward to where Mr.

11  Harmon was on the ground or that there was a knife, as

12  improbable as it may seem, there was a knife already there

13  from earlier in the evening?  Are any number of explanations

14  possible and what does that mean?

15          MS. BRABSON:  I don't think any of those are

16  rational explanations.  Number one, the knife was inches

17  from his hand.  It was not out in the grass.  It wasn't

18  several feet away.  I don't think that that is a rational

19  inference a jury could draw.

20          With respect to whether an officer planted it,

21  there are three body cam videos watching Officer Robinson.

22  Officer Robinson was actually on the ground and didn't see

23  what happened before.  Officer Fox, as you can see from the

24  video, is still standing there covering Officer Robinson.

25  There is absolutely no evidence of how a knife would have

1   been planted with three body cam videos on the scene.

2           You can also see clearly that it is Officer

3   Robinson's left hand that grabs Mr. Harmon's hand and his

4   right hand is holding handcuffs.  So I don't see any

5   rational inference or conclusion that can be drawn by a jury

6   in that case.  I'm sure the plaintiffs will disagree with

7   me, but that is our view.

8           THE COURT:  I think you skipped the first part

9   though.  I mean, we don't clearly see the knife in Mr.

10  Harmon's possession prior to the shots being hired.

11          MS. BRABSON:  Correct.

12          THE COURT:  Aren't you asking me in the first

13  instance to draw an inference that the knife that is seen in

14  Officer Robinson's video was in fact held by Mr. Harmon

15  prior to being shot?  He exhibited the knife prior to being

16  shot.  That is an inference I have to draw because I can't

17  see it on the video clearly.

18          MS. BRABSON:  Okay.

19          THE COURT:  Am I permitted to draw that inference?

20          MS. BRABSON:  I would not describe it as an

21  inference so much, because I think that does sound incorrect

22  in view of the --

23          THE COURT:  What would you call it?

24          MS. BRABSON:  The Court can draw no other

25  conclusion.  No rational jury could reach that conclusion.

1    There is no other inference that can be drawn.  It is not

2    reasonable to say it was planted.  It is not reasonable to

3    say it was there by chance.  So that leaves one conclusion

4    that can be drawn by the Court and that is that it was in

5    Mr. Harmon's hand.  That is not unlike the Ronquillo case.

6             THE COURT:  Stop.  You're going really fast.

7             MS. BRABSON:  Sorry.

8             THE COURT:  That is all right.

9             Did you just hear what you said?  It is reasonable

10   for me to conclude.  It is reasonable for me to think.  Is

11   that not the work of a jury?  Are you not inviting me to do

12   the thing I'm not permitted to do?

13            MS. BRABSON:  Maybe I misspoke.  What I meant to

14   say and what I should be saying is that there is no other

15   conclusion that the Court can draw because no reasonable

16   jury could find any other possibility than that this knife

17   was Mr. Harmon's and it was in his hand.

18            THE COURT:  Are you sure that you're not saying to

19   me that it is so much more likely that that knife landed

20   right there because of the events that we see unfold,

21   including the raised arm so it looks like maybe he is

22   opening a knife, and then the way he falls to the ground

23   after he is shot, and the proximity of his arm to the knife

24   and the timing, and it would just be so fortuitous if the

25   knife was there for any other reason that it is just

```
 1    unlikely that that is the case, and I should weigh the

 2    probabilities and determine that there is no possibility?

 3    You don't actually mean no possibility, you just mean that

 4    it is so remote, the possibility that there was a knife

 5    there or that it got thrown there or planted, that I should

 6    discount it entirely.  No?

 7              MS. BRABSON:  I wouldn't say so much discounted,

 8    but that there is no other conclusion that the Court can

 9    draw.

10              THE COURT:  Okay.

11              MS. BRABSON:  If that makes sense.

12              Again, it is like Ronquillo, because arguably in

13    the Ronquillo case maybe Mr. Ronquillo already had his foot

14    on the gas or he put his foot on the gas after he was shot

15    by some kind of reflex.  There are certainly speculative

16    arguments that can be made, but I don't think speculation is

17    enough.

18              THE COURT:  Do you mean to say, and what you have

19    just said at the end, and plaintiffs' counsel and I will

20    talk about this, but do you mean that the allegation in the

21    complaint is speculative?

22              MS. BRABSON:  What is interesting to me is that

23    they don't make any suggestion about how that knife got

24    there.

25              THE COURT:  Well, let's see.
```

```
 1              MS. BRABSON:  They don't argue that it was

 2    planted.  They don't allege that it was planted by one of

 3    our officers and that is not even an allegation in the

 4    complaint.

 5              THE COURT:  They say he is unarmed is what I mean.

 6              Is that a speculative allegation?

 7              MS. BRABSON:  I think it is blatantly contradicted

 8    by the video, yes, and speculative.

 9              THE COURT:  If it is speculative, what do I do

10    with it?

11              MS. BRABSON:  I don't think you can consider it.

12    I don't think it is supported by facts.  That is Iqbal and

13    Twombly and the plausibility standard.  It is not plausible.

14              THE COURT:  That is not what I think plausibility

15    means.  This is a fine point maybe, but I think it is an

16    important one.  I think plausibility is used in the context

17    of the plausibility of a claim, not the plausibility of a

18    fact.  The Court is not supposed to be in the position of

19    independently evaluating whether a fact might be true or not

20    true or how likely it is.  I mean, there may be some absurd

21    facts and you may say President Lincoln was not in fact

22    assassinated and lives among us today.  I don't know what

23    standard the Court would apply to say, well, I am not going

24    to consider that, but short of that I am not in the business

25    of deciding whether I think the fact is true or not, right,
```

1    or plausible?

2              MS. BRABSON:  Well, that is not entirely true

3    because you have folks that allege a conclusion that is a

4    combination of a mix of law and fact, for example.  This

5    case is one of them.  In the equal protection context, the

6    plaintiffs have alleged that Officer Fox had some racial

7    animus when he employed deadly force in this case.  There

8    are no underlying facts for that.  That is complete

9    speculation and I don't think the Court can accept that as

10   true.  It is conclusory and speculation, but it is a little

11   of both, if that is an example I may offer.

12             THE COURT:  Okay.

13             MS. BRABSON:  Okay.  Any other questions?

14             Do you want me to address equal protection?

15             THE COURT:  Why don't we do this one claim at a

16   time.

17             MS. BRABSON:  Okay.

18             THE COURT:  Thank you.  I think that is probably

19   helpful, so I can keep it all in my little brain.

20             MS. BRABSON:  Thank you.

21             THE COURT:  Thank you.

22             Mr. Lutz.  Did I say that right?

23             MR. LUTZ:  You did.  Thank you, Your Honor.

24             Good afternoon, Your Honor.

25             THE COURT:  Good afternoon.

1           MR. LUTZ:  Before I begin, I just wanted to note

2     that the plaintiffs are not in the courtroom today, though

3     they desired to be here very much, but circumstances just

4     didn't allow them to travel out of state to be here today.

5     Obviously they take this matter very seriously and would

6     have liked to have been here to hear the Court's

7     consideration.

8           THE COURT:  Thank you.

9           The guardrail, such as it is, I think for our Rule

10    12 standard that we apply to complaints is Rule 11.  I don't

11    raise Rule 11 like a threat or even an implied threat.  I

12    just mean that the reason that we can take comfort, assuming

13    the truth of factual allegations in a complaint, is that we

14    know as officers of the court we have some independent duty

15    to investigate the facts and believe that there is a good

16    faith basis for them before you assert them.

17          On what basis could anybody who was not at the

18    scene make an allegation in a complaint that Mr. Harmon is

19    unarmed?

20          MR. LUTZ:  That is a fair question, Your Honor.

21    I, like you, have watched these videos a myriad of times,

22    hundreds of times.  Everyone on my team has done the same.

23    We spent weeks and months investigating this case and trying

24    to determine what allegations would go into that complaint.

25    The fact remains that none of us were able to come to the

1    conclusion that there was any evidence from the video that

2    Mr. Harmon was armed.  And we went about trying to find

3    anything that would disprove that notion in our own minds

4    before we brought this before the Court.  What we discovered

5    were simply more questions about the alleged knife.

6           Now, as the Court and my colleagues have noted, we

7    acknowledge and affirmatively pled that a knife was found at

8    the scene.  However, it is not seen on the video and it is

9    not clear that any of the officers even perceived a knife.

10   So even if Mr. Harmon had it, which I don't think that we

11   see at all, that is not clear.

12          Moreover, the knife itself raises some incredible

13   questions.  For one it is an EMT style rescue knife, right,

14   which features a seat belt cutter and a window breaker,

15   because this is the type of tool used by our law enforcement

16   and our emergency medical personnel.  Mr. Harmon was none of

17   these things.

18          That knife that was found on the scene is branded

19   Castleview Hospital which, as far as I know, and I think as

20   pled in the complaint, is a hospital about 100 miles outside

21   of town here in Price.  Mr. Harmon has no connection to this

22   town.  It is clean.  It is pristine.  There is no evidence

23   of fingerprints.

24          THE COURT:  Aren't you asking me to do now what I

25   said I was not prepared to do with Ms. Brabson, which is to

1  draw conclusions based on facts that you are submitting?

2  I'm confined to the record in your complaint, am I not, and

3  the facts that you have alleged and the information I see in

4  the video?

5        For example, I can't consider anything you just

6  said in deciding this motion, can I?

7        MR. LUTZ:  Well, Your Honor, all of these facts

8  about the knife are facts that are pled in the complaint,

9  and what we are asking you to do is draw the inference in

10  support of another allegation that Mr. Harmon was unarmed,

11  and all of these facts together lend to the fact that it is

12  simply not the case that Mr. Harmon actually possessed this

13  knife.

14        THE COURT:  I'm sorry.  I apologize.

15        I was thinking that those facts on page 27 of your

16  complaint were from your brief.  I think they are recited in

17  your brief.  I forgot they were also in the complaint.

18        Go ahead.

19        Well, I still don't know if you have answered my

20  question.  Maybe indirectly.  Are you saying that the reason

21  that you allege Mr. Harmon was unarmed is because you have

22  considered and evaluated all of the available information,

23  including your own personal review of the video, the reports

24  after the fact and the fact that there was no additional

25  weapon found on Mr. Harmon, that it is not clearly shown in

1    the video, so there is a good faith basis to allege that he

2    was unarmed at the time of the incident?

3              Is that what you're saying?

4              MR. LUTZ:  It is, Your Honor.

5              THE COURT:  Okay.  What about fleeing, what do I

6    do with that allegation in view of what I see in the video?

7    There is at least one point in the video where it seems

8    pretty clear to me there is movement back towards the

9    officer, some movement.

10             MR. LUTZ:  Certainly, Your Honor, and some

11   movement is also alleged in the complaint.  What the

12   plaintiffs have alleged is supported by the video, that Mr.

13   Harmon decided to flee from these officers because he was

14   scared of being arrested.  He took off and he ran.  Does he

15   maintain a perfectly straight direction in the opposite

16   direction of the officers through his entire travel away

17   from them?  That is not entirely clear.

18             It is clear that there is some movement of his

19   body.  We contend that what was happening there and the

20   reasonable examination for that is that he was looking

21   backward towards Officer Smith who was coming up on his left

22   side, the closest officer to him at that point in the chase.

23   His body motion continues away and the video will support

24   this.  The allegation is well pled and the video will

25   support that his body motion is away from the officers

1    throughout the duration, and we have acknowledged in the

2    complaint that there may be some bodily motion in a

3    rotational direction, but he was fleeing the entire time as

4    pled in the complaint and as supported by the video of the

5    events.

6              THE COURT:  Let's walk through the Graham factors

7    for a moment.  Let's assume the --

8              MR. LUTZ:  Certainly.

9              THE COURT:  -- truth of the allegations in the

10   complaint.  I don't recall that either party briefed this

11   question in the papers.  The first Graham factor, the

12   severity of the crime at issue, you'll tell me that the

13   crime at issue is a traffic infraction.

14             MR. LUTZ:  I will, Your Honor.

15             THE COURT:  Let me give you a hypothetical.  I'm

16   going to guess that you're going to tell me it may be

17   relevant to the second factor but not the first.  The

18   officers have stopped somebody for the very same reason they

19   have stopped Mr. Harmon and they are conducting a records

20   check and they discover that this person that they have

21   stopped, or they believe that this person that they have

22   stopped is wanted for aggravated bank robbery, attempted

23   murder, a convicted felon with a record, known gang

24   affiliations and is believed to be armed and dangerous and

25   with an outstanding warrant that they are now going to

1    execute.

2           Is that relevant to the first factor or the second

3    or not at all?

4           MR. LUTZ:  I would contend that it is relevant to

5    the second factor.  I would not say that it is irrelevant

6    entirely.

7           What I am really keying in on with what the Court

8    has just said is the point that you raised about finding

9    information that this suspect in particular in the

10   hypothetical is armed and dangerous.  Certainly officers can

11   consider that in the second Graham factor analysis in

12   assessing to what degree they need to be in fear of violence

13   from the suspect.

14          THE COURT:  So the severity of the crime at issue

15   means the reason that law enforcement come into contact with

16   the suspect?

17          MR. LUTZ:  That is how I would interpret it and I

18   think in this case it is particularly appropriate to read it

19   that way because of how minor the infraction was.  That,

20   coupled with the second factor, and you have the most minor

21   traffic infraction, right?  It is alleged in the defendant's

22   motion that the reason Chris Smith stopped Mr. Harmon was to

23   discuss bicycle safety.  Right?  It is not even, you know, a

24   municipal fraction or whatever it was.  They needed to have

25   a conversation about bicycle safety.  Then they had that

1    conversation for more than 20 minutes while Mr. Harmon was

2    being calm, cooperative, contrite and scared.

3            THE COURT:  Is it really going to matter, because

4    I am required I think to consider the totality of the

5    circumstances, so however we categorize some of this

6    information it is all part and parcel with the information

7    available to the officer on the scene through an objective

8    lens.

9            Is that right?

10           MR. LUTZ:  I agree with that, Your Honor.  It is

11   the totality of the circumstances and we are forced with no

12   other choice but to wade through the factual morass.

13           THE COURT:  What do I do with information that is

14   clear on the video to an observer relevant to the Graham

15   factors but not pled in the complaint?  What is the legal

16   framework do you think for analyzing that?

17           For example, immediate threat to the safety of the

18   officers.  Suppose, and you may disagree with this, but

19   suppose in watching the video someone were left with the

20   firm conviction that Mr. Harmon had already assaulted one of

21   the officers by running by and had knocked one of the

22   officers or impacted one of the officers so firmly that it

23   knocked the officer off his feet.  That is not in the

24   complaint.  That fact may be relevant to determining whether

25   the suspect posed an immediate threat to the officers.

1              Can I evaluate it or am I not permitted to?

2              MR. LUTZ:  I appreciate the question, Your Honor.

3    At this stage in the litigation the standard that we're

4    evaluating does not inform the Court what to do as to what

5    is un-alleged, so nothing can contradict what is un-alleged.

6    So I don't think that the Court has an avenue to bring it.

7              Now, later down the line, you know, if that is in

8    fact true and these officers had an independent reason that

9    we are not aware of at this stage in the litigation they can

10   certainly present that at the summary judgment state.

11             THE COURT:  You're starting to do what Ms. Brabson

12   was doing, and I know that it is just human nature, but

13   you're taking good pauses and then you are rolling really

14   fast.

15             What about Ronquillo?  Even if it was implied

16   instead of express, in Ronquillo the plaintiffs didn't

17   include those facts in the complaint because they are not

18   helpful to the plaintiffs' theory of the case and the Court

19   relied on facts observed from the videos.

20             MR. LUTZ:  Certainly, Your Honor.  I am very

21   familiar with the Ryan Ronquillo case, it being litigated in

22   the District of Colorado where we hail from.  This case is

23   simply not that.

24             THE COURT:  I'm just asking about the treatment of

25   the un-alleged facts.  How did that court deal with that?

1          MR. LUTZ:  So I believe in Judge Arguello's

2    analysis there, she did not eliminate any of the plaintiff's

3    well pled allegations from contention based on anything but

4    what was affirmatively on the video.  I don't think that

5    what she did was to go as far as to take and basically

6    create new allegations from the video.

7          THE COURT:  You don't think her findings were

8    dependent on facts that she concluded were evident from the

9    video but not pled?

10         MR. LUTZ:  From her analysis it appears to me that

11   her decisions on the facts were based on taking the

12   allegations and evaluating the video evidence to see whether

13   or not they were contradicted.

14         THE COURT:  I see.  Okay.

15         Is there more you wanted to say about the Fourth

16   Amendment claim before we turn to the Fourteenth Amendment?

17         MR. LUTZ:  Certainly.

18         THE COURT:  We have not talked about the knife, or

19   did we?

20         MR. LUTZ:  We did submit on that, but I'm happy to

21   comment on that again if the Court would like.

22         There are a few comments that came up during the

23   defense colloquy that I would like to comment on if I have

24   the Court's permission to do so.

25         THE COURT:  Please.

1    MR. LUTZ:  One of the most important things that I

2  think that was said today and that the Court acknowledged is

3  that there is no point in the video where Mr. Harmon is

4  shown with the knife.

5    THE COURT:  At least not clearly.

6    MR. LUTZ:  At least not clearly.  At least not in

7  the way that the video will allow that allegation in the

8  complaint that Mr. Harmon was unarmed to be disregarded, and

9  that tells us everything that we need to know about where we

10  start the legal analysis, and that is that we have an

11  unarmed fleeing suspect, because those allegations must be

12  taken as true and that places us in the world of Tennessee

13  v. Garner.

14    THE COURT:  Why is Ms. Brabson incorrect?  She

15  says, Judge, I mean, there is a legal standard and then

16  there is absurdity.  Watch the video.  Look where the knife

17  is.  Look at everything before that.  Could you really doubt

18  that Mr. Harmon brandished that knife?

19    MR. LUTZ:  Absolutely, Your Honor.  That is why we

20  are here.  It is not absurd.  It is supported by the video

21  and the standards are what they are and we are bound by

22  them, and the fact that the video does not even get close to

23  the level of blatantly contradicting the well pled

24  allegations in the complaint, they must be taken as true,

25  and their motion of the reasonableness of the Fourth

1  Amendment violation must be denied.

2          THE COURT:  We see a knife inches away from Mr.

3  Harmon's right hand.  I think he is right-handed.  How do I

4  know that?  I think you all agree with that.  It is right

5  there on the ground.  The most likely explanation at a

6  minimum is that he was carrying the knife when he was shot.

7  Do I just ignore that?  How do I deal with that when I am

8  applying the Rule 12 standard?

9          MR. LUTZ:  Well, Your Honor, you apply it the way

10  you would with any other allegation.  There is a knife on

11  the ground.  There are no allegations in the complaint about

12  how it got there and there is nothing in the video to

13  indicate how it got there.  We don't see it coming from Mr.

14  Harmon's hand.  The officers themselves don't appear to have

15  perceived it and no one mentions a knife.  Officer Fox does

16  not say, Chris, knife.  Watch out, Mr. Harmon has a knife.

17  He is down.  Be careful while you are approaching him as he

18  is still alive because he has a knife in arm's reach.  There

19  is no mention of it whatsoever.

20          In fact, when they found it, and I say found

21  because it was the first time they appeared to have

22  perceived it, well after the shooting, they thought it was

23  Officer Robinson's knife because of the style.  There are

24  simply no answers from the evidence that we have here.  When

25  we proceed to discovery in this matter we'll get some, and

1    if it is as clear as the defendants would like to make it

2    out, perhaps there are fingerprints on it, only discovery is

3    going to tell us that.

4            THE COURT:  Is the problem the one that I

5    identified with Ms. Brabson or is it a different problem?

6    It seems to me that the defense is inviting me to draw an

7    inference in favor of the defendant as the moving party.  Is

8    that the issue or is it a different one?

9            MR. LUTZ:  That is precisely the issue, is that

10   the defendants' motion -- the argument is not made on the

11   facts alleged taken in conjunction with the video.  It is

12   made on their own factual assertions about what the video

13   shows.  At this stage, because we have this blatant

14   contradiction of the standard, we are just not going to get

15   to the point where their motion can prevail.  If it is

16   unclear and if it is ambiguous or, as they mentioned, you

17   know, distorted or shaky, that tie at this stage goes to the

18   plaintiff.

19           THE COURT:  What more about excessive force, if

20   anything?

21           MR. LUTZ:  I think I will rest on that, Your

22   Honor.

23           THE COURT:  Why don't we begin our Fourteenth

24   Amendment question with you, though, so that I can try to

25   better understand your position.

```
 1              MR. LUTZ:  Certainly.

 2              THE COURT:  Can you help me understand your

 3    theories with respect both to the officer and -- it sounds

 4    to me like you're alleging -- well, it is a little confusing

 5    to me.  I think you're alleging a training claim against the

 6    department and an overt discrimination claim against the

 7    officer.

 8              MR. LUTZ:  That is correct, Your Honor.

 9              There are two pieces to this.  There is the

10    municipal liability, the Monell failure to train, custom and

11    policy and practice, but --

12              THE COURT:  One moment.  I'm sorry.

13              MR. LUTZ:  May I have one moment to confer with my

14    co-counsel?

15              THE COURT:  With apologies, I can see that we have

16    a verdict from our jury.  We'll actually continue our

17    argument while we're getting the lawyers here, but if you

18    will give us a moment to contact them.  Why don't we keep

19    going until I see the lawyers get here and then we'll recess

20    for a few minutes and take the verdict.

21              Go ahead.

22              MR. LUTZ:  To unpack the Fourteenth Amendment

23    analysis, so there is the Monell claim and then there is the

24    equal protection claim.  The Monell claim would be against

25    the City of Salt Lake for their custom, policy and practice
```

1   and failure to train leading to a custom, policy and

2   practice of excessive force and racially biased policing.

3           The equal protection claim is about the custom,

4   policy and practice of racially biased policing.  There is

5   the claim against the individual defendant, Fox, and there

6   is the claim against the city for allowing that to prevail.

7           THE COURT:  One more time.  The Monell claim,

8   custom and practice and training concerning racially biased

9   policing --

10          MR. LUTZ:  That is correct.

11          THE COURT:  -- and then as applied to Officer

12  Fox --

13          MR. LUTZ:  It is an individual claim against

14  Officer Fox as well.

15          THE COURT:  Racial discrimination?

16          MR. LUTZ:  Correct.

17          THE COURT:  What well pled factual allegations are

18  in the complaint that -- well, let me step back.

19          The defendants say, and I think this is right,

20  that if there is not a constitutional violation for the

21  officer, then there is not a Monell claim that follows.

22          Is that right?

23          MR. LUTZ:  That is correct, Your Honor.  We need

24  to have an individual violation of a civil right to make an

25  action out against the city for having created that

1   violation through its policy, custom or practice.

2         THE COURT:  And there needs to be a correlation

3   between the two, right?  What is your view about that?  If

4   the excessive force claim goes forward but the Fourteenth

5   Amendment claim as to Fox fails, then what do you see as the

6   viability of the Monell claim?

7         MR. LUTZ:  Well, the Monell claim as to the

8   general excessive policy and practice claim against the

9   city -- there is the excessive force component, right, and

10  an equal protection component.  If we have a valid Fourth

11  Amendment violation against Officer Fox, then the excessive

12  force custom, policy and practice against the city can

13  survive.

14        It is exactly the same on the other side.  If we

15  can demonstrate that Officer Fox violated Mr. Harmon's

16  rights to equal protection under the law, similarly the

17  Monell claim for the racially biased policing practice

18  against the city can go forward as a threshold, not in its

19  entirety, but as a threshold matter.

20        THE COURT:  So with respect to the equal

21  protection claim and Officer Fox, what well pled factual

22  allegations are in the complaint that support that claim?

23        MR. LUTZ:  As for Officer Fox -- so I would point

24  the Court toward the pertinent allegations which are at

25  pages 6 and 7 and paragraphs 125 through 133.  I think the

1   most important thing here is that we acknowledge the full

2   context --

3           THE COURT:  Say that again.  Where?

4           MR. LUTZ:  Pages 6 through 7, paragraphs 125

5   through 133.  I apologize, Your Honor.  I think those page

6   numbers may not be correct.

7           THE COURT:  I have got it.  Page 29, paragraph

8   125.

9           MR. LUTZ:  That is correct.  I apologize.

10          THE COURT:  I am asking about Officer Fox.

11          MR. LUTZ:  I understand that these allegations are

12  a little bit more general, but the reason that they are

13  appropriate to consider right now is because what we are

14  alleging, and I think what has been demonstrated by the

15  facts as pled in the complaint, is that we have a police

16  department that engages in a highly systemic, racially

17  biased pattern of policing.  The way that we know that is we

18  know that through anecdotal evidence about the use of force

19  and we know that through the city's own statistical evidence

20  of the use of force against minorities.

21          So in 2018 four of the seven police shootings that

22  occurred in Salt Lake City involved victims of color.  In

23  2018 all fatal police shootings in the City of Salt Lake

24  involved victims of color.  In the City of Salt Lake as pled

25  in the complaint, a black person is five times more likely

1   to be subjected to the use of force than their white

2   counterpart.

3            Now, are these individual statements about Officer

4   Fox's state of mind?  No.  But why they are important is

5   because you cannot have a culture and a system that allow

6   this kind of pattern without individual officers

7   participating in it.

8            Going back to the incident in question, we have a

9   black man being pulled over to have a conversation about

10  bicycle safety by three white officers that ends up with

11  that black man dead, in a city where the statistics tell us

12  that this police department will use force against black

13  persons five times more likely than white persons, and where

14  every fatal police shooting in the year 2018 was a person of

15  color.  It does not strain the mind to think that Officer

16  Fox might have had a racial motivation in his decision to

17  shoot and kill Mr. Harmon.  We also know critically that

18  Officer Fox drew his firearm the very moment that Mr. Harmon

19  fled.  That is consistent with the video and it is pled in

20  the complaint.

21           Now, at that point even Officer Fox's statements

22  don't support that he saw a knife so it raises the question

23  why?  I don't think it is any stretch of the imagination to

24  say that Mr. Harmon's race was a substantially motivating

25  factor in the situation.

1          THE COURT:  Have you not pulled us a country mile

2     from the Rule 12 standard I'm required to apply?  I am

3     required to confine myself to your factual allegations that

4     are supported by a reasonable Rule 11 basis, right?  Isn't

5     there one in the complaint?  Isn't the answer to my question

6     paragraph 176?  That is the only allegation in the complaint

7     concerning Officer Fox and race.

8          MR. LUTZ:  That is the only allegation in he

9     complaint that alleges Officer Fox's state of mind with

10    regard to Mr. Harmon's race, but all of the other well pled

11    allegations about the system can be used to generate other

12    inferences about what Officer Fox was thinking.  At this

13    stage in the litigation that is entirely what is

14    appropriate.

15         THE COURT:  I mean I agree with you that I'm

16    required to evaluate the complaint in its entirety, and when

17    considering the reasonable inferences to draw, I consider

18    all of the allegations in the complaint.  Even in paragraph

19    176, Mr. Harmon's race was a substantial motivating factor

20    in Defendant Fox's decision to use excessive force against

21    him.  That is either conclusory -- let me ask this a

22    different way.  Isn't that entirely conclusory?

23         MR. LUTZ:  Taken in a vacuum it could read as

24    conclusory, but at this stage in the litigation what is

25    appropriate is to read it in conjunction with the other

1    allegations in the complaint that led to the conclusion.

2            THE COURT:  I'm going to just assume that there is

3    a Rule 11 basis for making that allegation in the complaint.

4    You have alleged that a Salt Lake City officer was racially

5    motivated in shooting and killing a black man in Salt Lake

6    City.

7            MR. LUTZ:  Yes.

8            THE COURT:  That is an extraordinary allegation.

9    I assume that you have no evidence of any kind and you're

10   aware of no information that would suggest that Officer Fox

11   was substantially motivated by the defendant's race when he

12   chose to exercise excessive force in this instance.  There

13   are no past incidents involving Officer Fox that you're

14   aware of.  There are no statements made by Officer Fox.

15   There is nothing like that, right, that you're aware of?

16           MR. LUTZ:  Well, Your Honor, this is precisely

17   why -- these are difficult claims to plead because what

18   we're asked to do is to get inside of the mind of the

19   defendant, and at this point the information that we have is

20   purely what happened and the context in which it happened.

21           THE COURT:  So we just infer that this officer

22   shot and killed someone because of his color?

23           MR. LUTZ:  It is not merely an inference --

24           THE COURT:  Isn't it?

25           MR. LUTZ:  -- in this context.  I mean that is a

1    fair inference, but obviously what is pled in the complaint

2    does not prove Officer Fox's motivation in doing this, but

3    through discovery we can absolutely do that, and things such

4    as Officer Fox's personnel file and whether or not he has

5    been involved in other use of force incidents, his

6    deposition, all of these things will assist us in proving up

7    that claim.

8         THE COURT:  Am I permitted, in considering a claim

9    like this, to go backwards, that is to say do I look at

10   evidence that there might be a problem in a department and

11   then infer that the officer acted consistent with evidence

12   about a departmental problem?  Am I not required to go the

13   other way around?

14        MR. LUTZ:  So for the Monell standard, it is

15   exactly that backwards looking analysis that you just

16   mentioned, that the policy of the department caused the

17   violation.  So in alleging the Monell claim, we are

18   necessarily also alleging that the City of Salt Lake caused

19   the racially motivated use of force.  That is precisely what

20   you can do, what the Court can do.  I'm sorry.

21        THE COURT:  I know that I'm not supposed to reach

22   beyond the allegations in the complaint, but I don't know

23   what to do with this.  I just know, because I'm a citizen of

24   Salt Lake County, that one of the allegations you rely on

25   for your evidence of racial animus in the department

 1   involved the shooting of a white suspect.

 2          MR. LUTZ:  Yes.

 3          THE COURT:  What do I do with that?

 4          MR. LUTZ:  That is fair, Your Honor.  That

 5   allegation was intended -- sorry if I included it in that

 6   pin cite that I provided.  That allegation was intended to

 7   be read as part of the allegations of the general policy of

 8   excessive force.

 9          THE COURT:  Paragraph 130 in the complaint does

10   not mean to relate to paragraphs under the heading Salt Lake

11   City's pattern of racially biased policing and the

12   discussion about shooting people of color and the preceding

13   paragraphs were intended to be unrelated to 130?

14          MR. LUTZ:  I wouldn't say that they are unrelated,

15   because part and parcel of the racially biased policing is

16   deploying excessive force disproportionately.  So it is

17   excessive force -- it is departmentalized excessive force in

18   general and disproportionately against minorities.  These

19   things are completely related, and I think when we get to

20   evidence of what the training is, there will be substantial

21   relationships there.

22          THE COURT:  Okay.  What else, if anything,

23   relating to the equal protection claim?

24          MR. LUTZ:  That is all from the plaintiff at this

25   time.

1        THE COURT:  Thank you.

2        MR. LUTZ:  Thank you, Your Honor.

3        THE COURT:  Ms. Brabson, I think this is probably

4   a good time for us to take a recess.

5        You can leave your materials here, but maybe just

6   put them on the back tables if you would, please.  You're

7   welcome to go stretch your legs or take a break if you would

8   like.  This will take at least 15 or 20 minutes, so we won't

9   begin until sometime after 3:00.

10       Thank you, counsel.

11       MR. LUTZ:  Thank you, Your Honor.

12       (WHEREUPON, another matter was heard.)

13       THE COURT:  Ms. Brabson, I know we just concluded

14  a lengthy equal protection discussion, but I wonder if you

15  and I ought to circle back to excessive force for any

16  additional comments that you have in view of my discussion

17  with Mr. Lutz.

18       MS. BRABSON:  Yes, I do have just a few points to

19  make on that, Your Honor.

20       The first point I would make is that Mr. Lutz

21  talked about the officer's movement being perhaps sideways

22  or towards one officer or another or maybe it wasn't

23  completely clear, and I would just note that the standard is

24  could a reasonable officer in the position of Officer Fox

25  have concluded that that movement was toward him and I think

1    the answer is yes based on the video.

2            THE COURT:  But doesn't that require me to

3    disregard the allegations in the complaint?  I mean this is

4    the starting point, isn't it?  If the allegation is that the

5    defendant was fleeing, and I cannot conclude that the

6    video --

7            MS. BRABSON:  Yes.  It is both, Your Honor.  Both

8    parts of the analysis apply here.  The first part is is it

9    wholly inconsistent?  The second part is could a reasonable

10   officer in the position of Officer Fox have concluded that

11   that movement was toward him?

12           Let me explain just a little bit about this.  This

13   is not a case where, at the end of the video, next to Mr.

14   Harmon's hand was a cell phone and we are arguing about

15   whether the officer made a reasonable interpretation but a

16   mistaken one.  That is not where we are here.  We're at a

17   place where at the end of the circumstances there is a knife

18   in the video which actually is consistent with what Officer

19   Fox said occurred.

20           I have had the opportunity since we had the break

21   to pull out my copy of the Ronquillo case and I just want to

22   read a portion of it for the Court.  Now, this is the

23   court's analysis and the portion of the video that shows the

24   car moving and how that can be interpreted with respect to

25   the events that occurred outside of the frame of the video.

1          THE COURT:  Not too quickly, please, when you

2     read.

3          MS. BRABSON:  Yes.  I will try to read this

4     extremely slowly for the benefit of the reporter.  The

5     court's review of the video surveillance, however,

6     contradicts the plaintiffs' allegation that Mr. Ronquillo

7     was shot as soon as he put or was putting his car in gear to

8     move forward.  The video instead shows Mr. Ronquillo's car

9     rapidly accelerating forward over a median into the parking

10    lot and crashing into the SUV wedge, and this is the key

11    part of the opinion, the car movement is wholly inconsistent

12    with the notion that Mr. Ronquillo was shot before ever

13    pressing on the gas.  The Court cannot, therefore, take that

14    allegation as true.

15          So I think Your Honor's concern was whether I was

16    asking you to draw an inference and it might be a matter of

17    semantics, but I do think it is permissible for the Court to

18    conclude whether or not the video is wholly inconsistent

19    with the allegation.  As applied here, the video that shows

20    the knife inches from Mr. Harmon's hand is wholly

21    inconsistent with the allegation that he was unarmed.  I

22    think that that is an appropriate conclusion for the Court

23    to draw.  I remind the Court that Ronquillo was affirmed

24    before the Tenth Circuit.

25          Lastly, Your Honor, I would just point out that

1    there have been no allegations -- I'm sure if they could

2    have met Rule 11, there would have been -- that one of the

3    officers planted the knife, and there have been no

4    allegations even that the knife was randomly there, and for

5    you to conclude -- make either of those conclusions would

6    require the Court to speculate as to either of those things.

7    There have been no allegations on either of those topics.

8            Unless you have any questions about equal

9    protection, I don't have anything else to present at this

10   time.

11           THE COURT:  I do have a question about equal

12   protection.

13           MS. BRABSON:  All right.

14           THE COURT:  I will circle back to Mr. Lutz, too.

15   I think I was becoming a little distracted as our jury was

16   coming back.  I just want to make sure, and I think we're

17   all speaking the same language, but when we talk about the

18   municipal liability flowing from or being dependent upon the

19   individual officer's liability, we consider that discretely

20   with respect to excessive force and separately with respect

21   to equal protection, I think.

22           For example --

23           MS. BRABSON:  Correct.

24           THE COURT:  -- if the excessive force claim

25   proceeds as to Officer Fox, and I'm not saying it does, but

1    if it does, but I find that there is not an adequate basis

2    to proceed with the equal protection claim as to Officer

3    Fox, then the municipal liability equal protection claim

4    necessary fails.

5          Is that true?  Did I say that correctly?  That is

6    the excessive force claim against the city relating to

7    training, supervision, practice and policy is dependent on

8    the excessive force claim going forward with respect to

9    Officer Fox.

10         MS. BRABSON:  Yes.

11         THE COURT:  And vice versa with equal protection.

12         MS. BRABSON:  Correct.

13         THE COURT:  The plaintiffs cannot go forward on an

14   equal protection claim against the municipality, only on an

15   excessive force claim as to Officer Fox.

16         MS. BRABSON:  That is correct.  I would agree with

17   that analysis.  There may be other reasons that the

18   municipal liability claim would fail, but those are not

19   before the Court in this motion.

20         THE COURT:  Give me one moment, will you, please.

21         MS. BRABSON:  Sure.

22         THE COURT:  Mr. Lutz says that the equal

23   protection claim against Officer Fox is adequately pled

24   because I have to read all of the allegations in concert and

25   in connection with one another and in the totality of the

1   four corners of the pleading, not just in isolation with

2   paragraph 176.

3          And you say what?

4          MS. BRABSON:  I say if you read the Blackwell vs.

5   Strain case, that would suggest otherwise.  Blackwell vs.

6   Strain involved some statistics that involved some traffic

7   stops at a point of entry.  Those statistics were found to

8   be not enough to plead a claim against that officer, in part

9   because they didn't have an adequate basis of comparison.

10  We don't even have that much alleged here.  Those statistics

11  were directed specifically against the officer who was named

12  as a defendant.  We don't have a single fact, direct or

13  circumstantial, that would allow a plausible inference to be

14  drawn that Officer Fox was motivated by racial animus.

15         THE COURT:  I think Mr. Lutz disagreed with me

16  when I asked whether he had inverted the analysis.  If we

17  just focus exclusively on equal protection for a moment, I

18  can't look to allegations about departmental racial animus

19  or bias or equal protection problems and infer those

20  problems to supplement allegations concerning the individual

21  officer.

22         Is that true or not true?

23         MS. BRABSON:  That is true.  I would cite the

24  court to Blackwell vs. Strain and Columbia that are cited in

25  our materials.

```
 1              THE COURT:  Thank you, Ms. Brabson.

 2              Mr. Lutz, any last words?  Come on up if you have

 3     any.  I can tell that you and your colleague disagreed with

 4     some of what was just said.  This is the time for oral

 5     argument and I'm here to hear anything you would like to

 6     say.

 7              MR. LUTZ:  Thank you, Your Honor.

 8              THE COURT:  Better snow in Salt Lake or in Denver?

 9              MR. LUTZ:  Hard to say at this point.  It is a

10     little whiter here.  It is kind of dirty in Denver.

11              THE COURT:  Good.

12              MR. LUTZ:  Your Honor, thank you for the

13     opportunity to offer one additional comment.  It is not

14     exactly a legal comment, and what it is in regard to the

15     equal protection claim I think there is something that is

16     very important that we talk about and it is the lens in

17     which we view the equal protection claim.

18              Racism is different today than it was when they

19     passed the Fourteenth Amendment.  The equal protection claim

20     requires that we plead a lot of things that are going to be

21     very difficult to prove from the outset and begs for

22     evidence that is not likely to exist at the outset anymore.

23     The days are gone when racist behavior is going to be

24     predicated by unapologetic indications of it like slurs.

25     Racism is more sophisticated than it has been before.
```

1          Now, this does not exactly inform the legal

2    analysis, but I think it is important that we make this

3    point.  When this video came out in the community, the

4    community reacted that this was an incident of racial

5    injustice and it should be the community that this goes back

6    to to decide whether or not that is in fact the case.

7          Thank you, Your Honor.

8          THE COURT:  Let me say that I think I largely

9    concur with what you're saying about racism in our society

10   today and I think that there seems to be ample support for

11   that view.  There may be large societal considerations

12   implicated by this case and others.  It is not just lip

13   service when I say that I'm a pedestrian court.  I am not a

14   policy making court.  I am not a jury.  I go searching for

15   the legal standard that I think applies and I do my very

16   best to apply that standard as I understand it to the facts

17   in front of me.

18         What you just said I don't understand to be a

19   basis to amend a Rule 12 analysis.  I can't now off the top

20   of my head come up with an analogy, an analogous kind of a

21   claim, but just on a basic Rule 12 plausibility basis, a

22   sentence in a complaint that is -- I don't know how to view

23   it other than conclusory.  It can't carry a claim across the

24   line of plausibility, whatever I think about it.

25         MR. LUTZ:  I completely understand the legal,

1   technical aspect of that, but from our perspective and from

2   the community's reaction to these events and everything that

3   we have seen in bringing this case forward, it is just

4   absolutely unplausible to us that we could put this case

5   before a jury of 12 black people from the city of Salt Lake

6   who would return a verdict other than anything that this was

7   an equal protection violation.  I appreciate that that is

8   not going to fit within the technical bounds of what the

9   Court is asking for, but I think it is important that we

10  note that.

11          THE COURT:  Well, it also ignores the reality of

12  the video.  I don't know how this is going to come out yet.

13  I have not prejudged the outcome of this motion, but it also

14  ignores the fact that a suspect who is told that the

15  officers are going to execute a warrant and take the

16  individual into arrest, who then flees, who then turns

17  around and runs back through the officers knocking one to

18  the ground, who is disregarding and disobeying commands, I

19  mean, this is different than some of the videos we have all

20  seen circulating about shootings that I think more clearly

21  implicate a question about what is motivating the officers.

22  I am not unsympathetic to what you're saying.  I hear what

23  you're saying and I appreciate your argument today.

24          Thank you.

25          MR. LUTZ:  Thank you, Your Honor.  We appreciate

1   the Court's consideration.

2          THE COURT:  Anything more, Ms. Brabson?

3          MS. BRABSON:  No, Your Honor.  Thank you.

4          MR. DEISS:  Your Honor, I would like to be heard

5   for a moment.

6          THE COURT:  Come on up, Mr. Deiss.

7          MR. DEISS:  I don't need to.  I can stay here.

8          I just would like to say that if the Court feels

9   like it is inclined and feels like there is more information

10  needed on the Fourteenth Amendment case, we believe we have

11  subsequent information that can tie in to show that Officer

12  Fox has at least a history at this point of further racial

13  acts.  We would welcome the opportunity to amend if that is

14  the case.

15         THE COURT:  Okay.

16         MR. DEISS:  I will also say that we just learned

17  this.

18         THE COURT:  We'll go a step at a time.  I mean I

19  have a motion before me that is drawn to a pleading before

20  me, and I see a bunch of smart lawyers in this courtroom and

21  you know what is available in your toolbox.  If there is a

22  motion you need to file in view of a ruling, then we'll find

23  the standard and we'll apply it.  I appreciate what you're

24  saying, Mr. Deiss.  I think it may turn on -- if the equal

25  protection claim fails, it may turn on what basis it fails.

1    I don't know.  I just don't know how to do this except one

2    step at a time.

3           Let me say, counsel, that I appreciate your

4    consideration and your patience as we had the interruption

5    this afternoon.  Thank you.  I appreciate your argument.

6           We'll be in recess.

7           (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25