Katherine R. Nichols (#16711)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone:  (801) 535-7788
Facsimile:  (801) 535-7640
katherine.nichols@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

---

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr.,<br><br>Plaintiffs,<br><br>vs.<br><br>SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity,<br><br>Defendants. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:19-cv-00553-HCN-CMR<br><br>District Judge Howard C. Nielson, Jr.<br>Magistrate Judge Cecilia M. Romero |

Pursuant to Federal Rule of Civil Procedure 56, Defendants Salt Lake City Corporation and Officer Clinton Fox (together, "**Defendants**") submit this *Motion for Summary Judgment* and respectfully request the Court grant summary judgment dismissing Plaintiffs' remaining claims with prejudice and on the merits.

# TABLE OF CONTENTS

INTRODUCTION AND RELIEF REQUESTED ........................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................ 2

I.     Patrick Harmon's Criminal History ...................................................................................... 2

II.    Officer Fox's Extensive Military and Law Enforcement Background. .............................. 3

III.   The Subject Incident. .......................................................................................................... 4

     A.     The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony
           Aggravated Assault Warrant ..................................................................................... 4

     B.     Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and
           Threatens the Officers. .............................................................................................. 6

     C.     Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife..... 8

     D.     Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm.................... 13

     E.     Procedural History. ................................................................................................. 16

LEGAL STANDARD ................................................................................................................ 17

ARGUMENT ............................................................................................................................. 18

I.     PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW......... 18

     A.     The Undisputed Evidence Establishes Officer Fox's Use of Force Was
           Objectively Reasonable Under the Circumstances. ................................................. 18

           1.     Mr. Harmon engaged in multiple serious crimes...................................... 19

           2.     Mr. Harmon posed an immediate threat of safety to the Officers. ........... 19

                 a.     Officer Fox did not feasibly have time to issue an order to Mr.
                     Harmon .......................................................................................... 21

                 b.     Mr. Harmon made hostile motions toward Officer Fox. .............. 21

                 c.     Mr. Harmon was approximately five to seven feet from Officer
                     Fox when he turned back toward him with the knife.................... 23

          d.     Mr. Harmon manifested the intention to attack the Officers with his knife.......................................................................................... 24

          e.     Officer Fox was faced with tense, rapidly evolving circumstances. ................................................................................................... 25

      3.     Mr. Harmon was actively resisting arrest ................................. 26

  B.     Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time. ................... 27

II.     PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW ........................... 28

III.    PLAINTIFFS' STATE-LAW CLAIMS FAIL AS A MATTER OF LAW ................... 29

  A.     Plaintiffs' Wrongful Death Claim Against Officer Fox Fails as a Matter of Law. ................................................................................................................... 29

      1.     Officer Fox is immune from suit under sovereign immunity. .................. 29

      2.     Officer Fox's use of force did not constitute a wrongful or neglectful act. ................................................................................................................... 30

  B.     Plaintiff's Unnecessary Rigor Claim Against Defendants Fails as a Matter of Law. ................................................................................................................... 31

      1.     The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights. ........................................................... 31

      2.     Officer Fox's Use of Force Did Not Constitute a Flagrant Violation of Mr. Harmon's Constitutional Rights. ............................................................. 32

CONCLUSION.................................................................................................................... 34

# TABLE OF AUTHORITIES

## Cases

*Ainsworth v. Park City Police Dep't*,
  No. 2:19-CV-00462-HCN, 2021 WL 288579 (D. Utah Jan. 27, 2021) .................................. 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................. 17

*Bott v. DeLand*, 922 P.2d 732 (Utah 1996) ................................................................... 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................. 17

*City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9 (2021) ................................................. 27

*Coronado v. Olsen*, No. 20-4118, 2022 WL 152124 (10th Cir. Jan. 18, 2022) ........................ 23

*Dettle v. Richfield City*, No. 2:13-CV-357-DAK, 2014 WL 4354424 (D. Utah Sept. 2, 2014) ... 33

*Dexter v. Bosko*, 2008 UT 29, 184 P.3d 592 .................................................... 31, 32, 33

*Estate of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2009) ........................... 20, 23, 25, 28

*Estate of Taylor v. Salt Lake City*, 16 F.4th 744 (10th Cir. 2021) ................................ 24

*Estate of Valverde v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) ............................... 17, 21

*Farrell v. Montoya*, 878 F.3d 933 (10th Cir. 2017) ...................................................... 27

*Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011) ......................................................... 25

*Hinton v. City of Elwood, Kan.*, 997 F.2d 774 (10th Cir. 1993) ................................... 29

*Holland v. Harrington*, 268 F.3d 1179 (10th Cir. 2001) ............................................... 18

*Jensen v. IHC Hosps., Inc.,* 944 P.2d 327 (Utah 1997) ................................................. 31

*Kuchcinski v. Box Elder Cty*., 2019 UT 21, 450 P.3d 1056 ............................................. 32

*Lennen v. City of Casper*, No. 21-8040, 2022 WL 612799 (10th Cir. Mar. 2, 2022) .................. 24

*Mullenix v. Luna*, 577 U.S. 7 (2015) .................................................................... 27, 28

*Phillips v. James*, 422 F.3d 1075 (10th Cir. 2005) ....................................................... 18

*Porter v. Daggett Cnty.*,
  No. 2:18-CV-00389-DBB, 2022 WL 558295 (D. Utah Feb. 24, 2022) ................................... 33

*Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) ....................................................................... 27

*Rowell v. Bd. of Cty. Comm'rs. of Muskogee Cty., Okla.*, 978 F.3d 1165 (10th Cir. 2020) ......... 17

*Saucier v. Katz*, 533 U.S. 194 (2001) .............................................................................. 18, 20

*Scott v. Harris*, 550 U.S. 372 (2007) ............................................................................................. 17

*Spackman v. Bd. of Educ. of Box Elder Cty.*, 2000 UT 87, 16 P.3d 533 ............................... 31, 33

*State v. Newland*, 2010 UT App 380, 253 P.3d 71 ....................................................................... 33

*Tennessee v. Garner*, 471 U.S. 1 (1985) ....................................................................................... 21

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010) ................................................................. 17

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021) ............................................ 20

*White v. Pauly*, 137 S. Ct. 548 (2017) .......................................................................................... 27

## Statutes

42 U.S.C. § 1983 .............................................................................................................................. 1

Article I, § IX of the Utah Constitution ..................................................................................... 2, 31

Salt Lake City Code §§ 12.80.065, -.140, -.200 ........................................................................... 19

Utah Code § 63G-7-101 ........................................................................................................... 29, 30

Utah Code Ann. § 63G-7-102 ......................................................................................................... 30

Utah Code Ann. § 63G-7-202 ......................................................................................................... 30

Utah Code Ann. § 76-2-408 ............................................................................................................ 15

Utah Code Ann. § 76-5-103 ............................................................................................................ 19

Utah Code Ann. § 76-8-305 ............................................................................................................ 19

Utah Code Ann. § 78B-3-106 .................................................................................................... 2, 30

## Rules

Fed. R. Civ. P. 56 .................................................................................................................... 17

## <u>INTRODUCTION AND RELIEF REQUESTED</u>

In his nearly ten years of law enforcement experience, Salt Lake City Police Officer Clinton Fox had never been as terrified as he was on the evening of August 13, 2017. During what should have been a routine arrest for an outstanding warrant, the suspect Patrick Harmon suddenly took off running. Officer Fox and the two other officers on scene gave chase. As Mr. Harmon was running, Officer Fox saw him reach for his right pocket and heard him say he would "cut" the officers. Officer Fox thought Mr. Harmon might have a knife and drew his service weapon. One officer grabbed Mr. Harmon's shirt, but Mr. Harmon threw him to the ground and kept running. As Officer Fox continued to give chase, Mr. Harmon stopped running and looked back toward the Officers. He then planted his right foot, brought his arms together in front of his body, and turned back toward Officer Fox with his right arm raised in the air. The Officers' shaky bodycam videos do not quite capture what Officer Fox clearly saw at that moment: A knife in Mr. Harmon's hand.

As he came to a quick stop approximately five feet away, Officer Fox heard Mr. Harmon say, "I'll fucking stab you." Officer Fox reflexively shouted, "I'll fucking shoot you," as he fired his weapon three times. Mr. Harmon fell to the ground, and the knife lay next to his outstretched right hand. The Officers rendered first aid until medical arrived, but Mr. Harmon died from the gunshot wounds. From the time Mr. Harmon fled from the Officers until the moment Officer Fox fired his weapon, a mere six seconds elapsed.

Mr. Harmon's estate and heirs filed suit asserting five causes of action: (1) Section 1983 claim for excessive force under the Fourth Amendment against Officer Fox; (2) Section 1983 claim for municipal liability against Salt Lake City; (3) Section 1983 claim under the Equal Protection

Clause against Officer Fox and the City[1]; (4) Wrongful death claim under Utah Code section 78B-3-106 against Officer Fox; and (5) Unnecessary rigor claim under Article I, section IX of the Utah Constitution against Officer Fox and the City. Chief Judge Shelby granted Defendants' motion to dismiss, holding the evidence from the Officers' bodycam videos established there was no constitutional violation. The Tenth Circuit reversed, concluding that "at this stage" and "with the standards for ruling on a motion to dismiss," the Court was obligated to accept as true Plaintiffs' allegation that Mr. Harmon was unarmed and did not start back toward the Officers.

On summary judgment, however, Plaintiffs cannot rest on their allegations. They must come forward with evidence. Plaintiffs deposed all three Officers on scene and took written discovery. For the reasons stated below, Plaintiffs do not have evidence to sustain their qualified immunity burden on summary judgment. The loss of Mr. Harmon's life is undeniably tragic. But Officer Fox was given little option. Officer Fox saw Mr. Harmon had pulled a knife on him from five feet away and reasonably believed Mr. Harmon intended to stab him. In the terrible and chaotic circumstances he faced, Officer Fox's split-second decision to use deadly force was objectively reasonable. Plaintiffs' remaining claims should be dismissed with prejudice.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I.    Patrick Harmon's Criminal History.

1.      In the 1990s, in his home state of Missouri, Mr. Harmon was charged and pled guilty to felony stealing, and was sentenced to five years in prison.[2]

2.      In Utah, from 2000 to 2015, Mr. Harmon was arrested and charged with numerous

---

[1] This Court dismissed Plaintiffs' Equal Protection claim, and Plaintiffs did not appeal. *See* ECF No. 29.
[2] Docket, Case No. 22901-02614-01 (Mo. 21st Cir. Ct.), Exhibit 1.

crimes, including felony burglary and felony robbery involving a firearm, and served several years in prison as a result. After being released, Mr. Harmon was charged with several more crimes; he pled guilty to felon in possession of a firearm, was convicted of assault, and was sentenced to 51 months in federal prison.[3]

3.      In 2015 and 2016, Mr. Harmon was again charged with multiple crimes. In particular, in October 2016, Mr. Harmon was charged with second-degree felony aggravated assault and providing false information to a peace officer. Mr. Harmon twice struck an individual in the face, such that the individual sustained multiple facial fractures and required reconstructive surgery. Mr. Harmon pled guilty to the former charge in exchange for the latter being dismissed. After receiving his guilty plea, the Court released Mr. Harmon from custody; however, Mr. Harmon failed to appear for his sentencing hearing in April 2017, and the Court issued a $10,000 cash-only warrant for his arrest. Mr. Harmon faced a sentence of 1-15 years.[4]

4.      On August 13, 2017, Mr. Harmon had three active warrants, including for the felony aggravated assault, two counts of providing false identity, and six class A and B misdemeanor drug charges.[5]

## II.   Officer Fox's Extensive Military and Law Enforcement Background.

5.      In 1999, after graduating high school, Officer Fox enlisted in the Marines. He served six years active duty and one year in the reserves. Officer Fox deployed four times—including twice to Ramadi, Iraq—for a total of two years and was engaged in active combat.[6]

---

[3] *See* Docket, Case No. 001901372 (Utah 2d Dist. Ct.), Docket, Case No. 001902478 (Utah 2d Dist. Ct.); Docket, Case No. 061906238 (Utah 3d Dist. Ct.), Docket, Case No. 1:07-CR-00113 (D. Utah), Exhibit 2.
[4] Criminal Information & Docket, Case No. 161402877 (3d Dist. Ct.), Exhibit 3.
[5] Active Warrants, Aug. 14, 2017 (SLCC_001327), Exhibit 4.
[6] Deposition of Officer Fox, June 17, 2022 ("**Fox Deposition**"), at 10:5–11:20, Exhibit 5.

6.      Upon retirement from the military, Officer Fox joined law enforcement, serving in the Tooele County Sheriff's Office for nearly seven years as a dispatcher, corrections officer, and deputy sheriff on patrol.[7]

7.      Officer Fox participated in sniper school and joined the Tooele County sniper cadre. He also trained to become a firearms instructor and developed and ran a firearms training program for Tooele County's correctional officers. He continues to serve as a firearms instructor.[8]

8.      Officer Fox then served as a patrol officer in West Valley City from June 2013 until joining the Salt Lake City Police Department ("**SLCPD**") in March 2016, where he served on patrol and continues to do so. Officer Fox also volunteers for the SWAT team.[9]

9.      At the time of the incident, Officer Fox had served in the military and law enforcement for 17 years.[10] The present incident is the only time Officer Fox has ever fired his weapon as a law enforcement officer.[11]

## III.   **The Subject Incident.**

### A.   **The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony Aggravated Assault Warrant.**

10.     On the evening of August 13, 2017, SLCPD Officer Kris Smith was on patrol in downtown Salt Lake City. Just after 10:00 p.m., Officer Smith observed Mr. Harmon commit traffic violations on his bicycle; in particular, Mr. Harmon crossed all six lanes of traffic and the median without using a hand signal and without having the required rear taillight on his bicycle.

---

[7] *Id.* at 19:15–25, 22:7–21, 29:6–13.
[8] Declaration of Officer Fox ("**Fox Declaration**"), ¶ 3, <u>Exhibit 6</u>.
[9] Ex. 5, Fox Deposition at 38:18–39:21, 48:2–6, 56:21–57:7.
[10] *Id.* at 10:16–19, 20:15–19.
[11] *Id.* at 26:10–14, 47:5–7, 61:12–62:9; *see also id.* at 61:25–62:2 (Officer Fox's only other use of his service weapon in law enforcement was to dispatch an injured deer).

In fact, Officer Smith nearly struck Mr. Harmon with his vehicle. Officer Smith therefore initiated a stop with Mr. Harmon on the west side of State Street at approximately 1000 South.[12]

11.    Officer Smith asked Mr. Harmon his name. Mr. Harmon gave Officer Smith several incorrect names, including the first name "Peace." Each time, Officer Smith returned to his vehicle to run a warrant check in the electronic database against the name Mr. Harmon provided.[13]

12.    After several unsuccessful attempts to identify Mr. Harmon, Officer Smith requested backup. Within approximately two minutes, Officers Fox and Scott Robinson arrived.[14]

13.    Officer Robinson went to the passenger-side window of Officer Smith's vehicle while Officer Fox proceeded directly to speak with Mr. Harmon, who at the time was straddling his bicycle next to the curb in front of Officer Smith's vehicle.[15]

14.    As Officers Smith and Robinson attempted to identify Mr. Harmon in the database, Officer Fox asked Mr. Harmon to step off his bike and he put the bike's kickstand down.[16]

15.    Officer Fox engaged Mr. Harmon in a discussion. Mr. Harmon told Officer Fox he was trying to get right with God and was trying to take care of his warrants. Officer Fox noted that Mr. Harmon appeared "normal" at first but then became more "anxious or agitated."[17]

16.    Mr. Harmon asked Officer Fox if he could have a cigarette, to which Officer Fox

---

[12] Deposition of Officer Smith, June 16, 2022 ("**Smith Deposition**"), at 58:5–61:5, Exhibit 7; Declaration of Officer Smith ("**Smith Declaration**"), ¶ 4, Exhibit 8; *see also* Officer Smith Body-worn Camera ("**Smith BWC**") at 0:00, Exhibit 9. For each of the bodycam videos, there is no audio recording during the first 30 seconds. This is because each bodycam takes video (not audio) continuously, and when an officer activates the bodycam, it then stores the 30 seconds of video that occurred prior to activation and begins recording audio at the time of activation.

[13] Ex. 7, Smith Deposition at 64:8–65:16; Ex. 9, Smith BWC at 0:00–4:00.

[14] Ex. 9, Smith BWC at 4:05–6:50.

[15] *Id.* at 6:50; Officer Robinson Body-worn Camera ("**Robinson BWC**") at 0:00–0:30, Exhibit 10.

[16] Ex. 5, Fox Deposition at 123:1–10; Ex. 9, Smith BWC at 6:58–7:40; Ex. 10, Robinson BWC at 0:00–0:05.

[17] Ex. 5, Fox Deposition at 124:13–125:16.

agreed. In Officer Fox's experience, it is common for individuals who believe they are going to be arrested to attempt to have a last cigarette before being taken to jail.[18]

17.   Officer Smith eventually located an outstanding second-degree felony warrant for aggravated assault for Mr. Harmon. He informed Officer Robinson, "We're going to go 82, 99, Fox 2," indicating they would take Mr. Harmon into custody for a second-degree felony warrant.[19]

18.   Both Officers Smith and Robinson put on their patrol gloves and walked back to where Officer Fox and Mr. Harmon were standing.[20]

19.   When they came alongside him, Officer Fox noted the two Officers had put on their patrol gloves, which Officer Fox understood to mean the Officers were going to put Mr. Harmon in handcuffs and arrest him. Officer Fox was also aware that, at this time, the county jail was only accepting arrests for felony warrants.[21]

20.   Officer Smith informed Mr. Harmon he was under arrest for the outstanding warrant. Mr. Harmon became visibly upset and begged the officers to let him go.[22]

**B.     Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and Threatens the Officers.**

21.   Officer Smith asked Mr. Harmon to take off his backpack, and Officer Robinson helped Mr. Harmon place the backpack on the ground.[23]

22.   Officers Smith and Robinson moved into position behind Mr. Harmon to place him

---

[18] Ex. 5, Fox Deposition at 124:13–125:16; Ex. 6, Fox Declaration ¶ 4.
[19] Ex. 7, Smith Deposition at 74:1–6; Ex. 9, Smith BWC at 6:50–7:15; Ex. 10, Robinson BWC at 0:12–25; Deposition of Officer Robinson, June 16, 2022 ("**Robinson Deposition**"), at 21:2–8, Exhibit 11.
[20] Ex. 9, Smith BWC at 7:20–26.
[21] Ex. 6, Fox Declaration ¶ 6.
[22] Ex. 9, Smith BWC at 6:50–7:15; Officer Fox BWC ("**Fox BWC**") at 0:22–1:01, Exhibit 12.
[23] Ex. 9, Smith BWC at 7:55–8:10; Combined Officers Body-worn Cameras ("**Combined BWC**") at 0:00–0:12, Exhibit 13.

in handcuffs. Officer Smith ordered Mr. Harmon to place his hands behind his back, and Mr. Harmon initially complied.[24]

23.     Officer Robinson grabbed Mr. Harmon's left hand and Officer Smith grabbed his right hand. As Officers Robinson and Smith were bringing Mr. Harmon's hands together behind his back to apply handcuffs, Mr. Harmon suddenly broke free of their grasp and ran north, toward the sidewalk and away from the Officers.[25]

24.     All three Officers gave chase.[26] Officer Fox initially believed he could get to Mr. Harmon in time to tackle him.[27]

25.     As Mr. Harmon ran, Officer Fox saw him reach for his right pocket.[28]

26.     Officer Robinson also saw Mr. Harmon reach toward his right pocket.[29]

27.     Officer Smith saw Mr. Harmon reach toward his waist as he ran.[30]

28.     Officer Fox heard Mr. Harmon use the word "cut" and say something to the effect of "I'll cut you."[31]

29.     Officer Smith heard Mr. Harmon say, "I'm going to stab or cut," but could not remember whether Mr. Harmon said "stab" or "cut" first. Officer Smith did not process Mr. Harmon's statement until after the fact.[32]

---

[24] Ex. 9, Smith BWC at 8:10–8:13; Ex. 12, Fox BWC at 0:55–1:01; Ex. 10, Robinson BWC at 1:10–1:15; Ex. 13, Combined BWC at 0:12–0:15.
[25] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[26] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[27] Ex. 5, Fox Deposition at 206:14–22.
[28] *Id.* at 133:11–17.
[29] Ex. 11, Robinson Deposition at 29:13–15, 30:6–11.
[30] Ex. 7, Smith Deposition at 85:17–23.
[31] Ex. 5, Fox Deposition at 133:12–14.
[32] Ex. 7, Smith Deposition at 85:16–23.

30.     Officer Robinson heard Mr. Harmon say, "I'll stab or I'll cut or I'll fucking stab you, something along those lines."[33]

31.     Officer Robinson managed to grab Mr. Harmon's shirt as he fled. As a result, Mr. Harmon spun around to his left and faced Officer Robinson.[34]

32.     Officer Robinson attempted to grab Mr. Harmon around the neck, but Mr. Harmon shoved Officer Robinson, causing Officer Robinson to fall backward approximately ten feet onto the grass to the west of the sidewalk.[35]

33.     Because Officer Fox saw Mr. Harmon reaching for his pocket and heard him say he would "cut," he believed Mr. Harmon intended to stab Officer Robinson with a knife.[36]

34.     Officer Fox therefore drew his weapon and was determining how to fire without harming Officer Robinson. When Officer Robinson fell to the side and Mr. Harmon kept running, Officer Fox was relieved because he believed he would not have to use his weapon.[37]

**C.      Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife.**

35.     After shoving Officer Robinson, Mr. Harmon started running again, heading south on the sidewalk. Officers Fox and Smith pursued while Officer Robinson got up off the ground.[38]

36.     Officer Fox observed Mr. Harmon continuing to reach for his right pocket.[39]

37.     As he ran, Mr. Harmon started turning back toward the Officers. He then slowed

---

[33] Ex. 11, Robinson Deposition at 30:6–11.
[34] Ex. Smith BWC at 8:15–16; Ex. 10, Robinson BWC at 1:15–17; Ex. 11, Robinson Deposition at 23:9–23, 45:5–21.
[35] Ex. 9, Smith BWC at 8:15–8:17; Ex. 12, Fox BWC at 1:02–1:04; Ex. 10, Robinson BWC at 1:16–1:19; Ex. 11, Robinson Deposition at 23:9–17.
[36] Ex. 6, Fox Declaration ¶¶ 7–9; Ex. 5, Fox Deposition at 206:14–22.
[37] Ex. 6, Fox Declaration ¶¶ 9–10; Ex. 5, Fox Deposition at 135:9–12.
[38] Ex. 9, Smith BWC at 8:15–18; Ex. 12, Fox BWC at 1:03–1:05.
[39] Ex. 5, Fox Deposition at 134:13–16.

and started to side-shuffle south along the sidewalk as he turned his head and shoulders back in the direction of the Officers.[40]

38.    Mr. Harmon brought both his hands together in front of his chest.[41]

 

**Ex. 15, Smith still-frame photo (SLCC_002715); Ex. 14, Fox still-frame photo (SLCC_002607).**

39.    Mr. Harmon side-shuffled several more steps to the south and continued rotating his torso back toward the Officers. Mr. Harmon dropped his left arm and kept his right arm raised at chest-height with his elbow bent.[42]

40.    Mr. Harmon then planted his right foot perpendicular to the sidewalk, so that his right foot was in a 9 o'clock position from the Officers and his left foot was at a 7 o'clock position. Mr. Harmon bent his knees slightly into a crouching position.[43]

---

[40] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Officer Fox BWC still-frame photos, Exhibit 14; Officer Smith BWC still-frame photos, Exhibit 15.
[41] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[42] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[43] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.



**Ex. 15, Smith still-frame photo (SLCC_002744); Ex. 14, Fox still-frame photo (SLCC_002640).**

41.     Officer Fox, who had been pursuing Mr. Harmon, saw Mr. Harmon plant his right foot and begin turning back toward him. In response, Officer Fox also came to a quick stop approximately five feet away from Mr. Harmon.[44]

42.     Officer Smith likewise saw Mr. Harmon plant his foot and begin turning back toward him. Because Mr. Harmon was no longer running away and had presented his chest toward Officer Smith, Officer Smith determined he could prevent Mr. Harmon from fleeing again by utilizing his Taser. He therefore drew his Taser.[45]

43.     At this point, Officer Robinson was still getting up off the ground, and he saw Officers Smith and Fox stop moving "because Mr. Harmon had turned around" and "had turned back towards Officer Fox."[46]

44.     Officer Robinson began drawing his firearm. He testified he did so "because I saw something and heard something that made me think that I needed my gun, including I'll fucking

---

[44] Ex. 5, Fox Deposition at 136:15–22; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames.
[45] Ex. 7, Smith Deposition at 83:6–84:19.
[46] Ex. 11, Robinson Deposition at 24:1–22.

stab or I'll cut or whatever he was saying, reaching for his pocket. Those are the things that I remember very clearly."[47]

45.     Officer Fox believed Mr. Harmon had stopped and was turning back because he had retrieved the object he had been reaching for in his pocket. He scanned Mr. Harmon and located Mr. Harmon's hands in front of his body. At that moment, Officer Fox saw that Mr. Harmon had a knife in his right hand pointed toward Officer Fox:

> So as soon as he planted his right foot, as he was doing that, he yelled at me and he said I'll fucking stab you. As he planted that right foot and he said that, I thought oh, no, whatever was in his pocket, he got out. So from seeing his foot, I looked, I was trying to see if his hand was still in his pocket, it wasn't. By the time I was able to track and find his hand, his hand was up somewhere chest to shoulder heighth and he was holding a knife.[48]

46.     Officer Fox was a "[h]undred percent" certain he saw a knife in Mr. Harmon's right hand.[49]

47.     At this point, Mr. Harmon was around five to seven feet away from Officer Fox.[50]

48.     Officer Fox believed Mr. Harmon intended to use the knife to harm him and using his firearm was "[p]robably the only option to defend myself to stop him from stabbing me."[51]

49.     Officer Fox also believed that neither Officer Smith nor Officer Robinson was aware Mr. Harmon had a knife. Officer Fox was afraid one of the other Officers would attempt to tackle Mr. Harmon and that Mr. Harmon would stab him with the knife.[52]

---

[47] Ex. 11, Robinson Deposition at 24:1–5, 26:18–24, 43:12–44:4.
[48] Ex. 5, Fox Deposition at 137:12–20.
[49] *Id.* at 137:23–138:6.
[50] Ex. 9, Smith BWC at 8:19–8:20; Ex. 12, Fox BWC at 1:05–1:07; Ex. 10, Robinson BWC at 1:20–1:22; Ex. 13, Combined BWC at 0:23–0:23; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[51] Ex. 5, Fox Deposition at 172:6–15.
[52] *Id.* at 140:4–7; Ex. 6, Fox Declaration ¶ 12.

50.     Officer Fox heard Mr. Harmon say, "I'll fucking stab you."[53]

51.     Officer Fox reflexively shouted, "I'll fucking shoot you" and fired three shots in quick succession.[54]

52.     At the same time, Officer Smith fired his Taser.[55] Officer Fox did not learn Officer Smith had fired his taser until later that night.[56]

53.     When asked if he intended the statement, "I'll fucking shoot you" to be an opportunity for Mr. Harmon to surrender, Officer Fox testified:

> I did not intend for it to be anything. I think it was more of a response to the "I'll fucking stab you," and I think that it was just something that through the split second it was happening hearing that, it was just, as I'm trying to perceive everything, just what came out.[57]

54.     Officer Fox testified he did not give Mr. Harmon more time to surrender because Mr. Harmon "was turning back at me with a knife in his hand and he said he would stab me."[58]

55.     From the time Mr. Harmon broke free to the time Officer Fox fired his weapon, approximately six seconds elapsed.[59]

56.     Officer Robinson testified, "It was a chaotic six seconds."[60]

57.     Even with over 15 years of law enforcement experience, the encounter with Mr. Harmon was the scariest situation Officer Fox has faced.[61]

---

[53] Ex. 5, Fox Deposition at 137:12–14, 140:8–15.
[54] Ex. 9, Smith BWC at 8:18–8:20; Ex. 12, Fox BWC at 1:05–1:06.
[55] Ex. 9, Smith BWC at 8:18–8:20.
[56] Ex. 5, Fox Deposition at 141:13–18, 139:3–4.
[57] *Id*. at 140:8–15.
[58] *Id.* at 140:4–7.
[59] Ex. 9, Smith BWC at 8:13–8:19; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:21; Combined BWC at 0:15–0:21.
[60] Ex. 11, Robinson Deposition at 30:16.
[61] Ex. 6, Fox Declaration ¶ 14.

**D.    Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm.**

58.    After Officer Fox fired his weapon, Mr. Harmon spun to the right and fell to the ground with his right arm outstretched.[62]

59.    Officer Smith immediately radioed, "Priority, shots fired. Start medical."[63]

60.    Officer Robinson cautiously approached Mr. Harmon and told Officer Fox, "Hey cover him, I'm going to go in [inaudible] assist." Officer Fox responded, "I got him," and remained in position with his weapon trained on Mr. Harmon.[64]

61.    As Officer Robinson approached Mr. Harmon, he passed an open knife lying in the grass a few inches from where Mr. Harmon's right hand landed as he fell.[65] The knife next to Mr. Harmon's right hand is depicted in still-frame photos from Officer Robinson's bodycam:



**Ex. 16, Robinson still-frames with knife circled (SLCC_002669, SLCC_002689).**

---

[62] Ex. 12, Fox BWC at 1:06–1:10; Ex. 10, Robinson BWC at 1:22–1:37; Ex. 13, Combined BWC at 0:22–0:25.
[63] Ex. 9, Smith BWC at 8:20–8:25; Ex. 12, Fox BWC at 1:10–1:12.
[64] Ex. 10, Robinson BWC at 1:28–1:31; Ex. 9, Smith BWC at 8:27–8:30; Ex. 12, Fox BWC at 1:14–1:16; Ex. 13, Combined BWC at 0:24–0:31.
[65] Ex. 10, Robinson BWC at 1:33–35; Ex. 13, Combined BWC at 0:35–0:36; Robinson BWC still-frame photos, Exhibit 16.

62.     Officer Robinson applied handcuffs to Mr. Harmon, observed that he was bleeding from his arm, and rolled him onto his side in a recovery position.[66]

63.     The Officers began to administer aid to Mr. Harmon, repeatedly telling Mr. Harmon to "stay with us." Officer Fox ran back to his patrol car to retrieve medical gloves and his knife, which he used to remove Mr. Harmon's clothes to expose the gunshot wounds.[67]

64.     When additional officers responded to the scene, they asked who had fired the shots and instructed Officer Fox to go wait by his patrol car while they took his place rendering aid to Mr. Harmon. Officer Fox complied and exhorted the other officers to "[g]o help, go help." Officer Fox then walked to his car and placed his knife on the hood.[68]

65.     While rendering aid to Mr. Harmon, Officer Robinson told an officer who had just arrived "[t]here was a knife somewhere" that should be collected for evidence and that "he pulled out the knife." A little while later Officer Robinson asked Officer Fox, "Did you grab the knife?" to which Officer Fox responded, "No, I have my knife where I tried to cut his pants off. They were covered in blood, so I just left my knife on the hood of my car."[69]

66.     At the time of his deposition—nearly five years after the incident—Officer Robinson could not recall whether he saw the knife in Mr. Harmon's hand. He recalled observing the knife lying next to Mr. Harmon's right hand when he approached Mr. Harmon.[70]

67.     Mr. Harmon later died from the gunshot wounds.

68.     After the incident, a team from the Unified Police Department ("**UPD**") arrived at

---

[66] Ex. 10, Robinson BWC at 1:34–2:05.
[67] Ex. 12, Fox BWC at 1:49–3:12; Ex. 9, Smith BWC at 8:44–10:30; Ex. 10, Robinson BWC at 1:46–5:50.
[68] Ex. 12, Fox BWC at 3:12–3:18; Ex. 9, Smith BWC at 10:22–45.
[69] Ex. 10, Robinson BWC at 3:55–4:03; Ex. 9, Smith BWC at 13:19–29; Ex. 12, Fox BWC at 6:06–19.
[70] Ex. 11, Robinson Deposition at 29:19–31:1.

the scene to perform an investigation of the officer-involved critical incident ("**OICI**").[71] They

observed and documented a knife near where Mr. Harmon fell in the grass area.[72]

69.     UPD submitted its OICI report to the Salt Lake County District Attorney to screen

for criminal charges. The DA concluded that "Officer Fox's use of deadly force was 'justified'

under Utah State law."[73] The Federal Bureau of Investigation in concert with the Civil Rights

Section of the U.S. Department of Justice also reviewed the incident and "determined the evidence

did not establish a prosecutable violation of federal criminal civil rights statutes."[74]

70.     While pursuing Mr. Harmon, Officer Smith did not know Mr. Harmon had a knife,

and he did not learn Mr. Harmon had a knife until finding out from the media weeks later.[75]

71.     When asked what went through his mind at the moment he heard Officer Fox fire

his weapon, Officer Smith testified: "Truthfully? What the fuck."[76]

72.     Officer Smith explained: "[W]hat I perceived was different than what he [Officer

Fox] saw and in my head I had not seen a knife or any other reason, so I was trying to figure out

exactly what he saw and why he felt it was appropriate to fire his pistol."[77]

---

[71] *See* Unified Police Department OICI Report (excerpts due to length and file size), <u>Exhibit 17</u>. UPD is a separate department from SLCPD. It serves eight cities and communities but does not have jurisdiction over Salt Lake City, which is instead served by the SLCPD. *See* Unified Police Department, *About UPD, available at* <u>https://www.updsl.org/page_about.php</u>. Utah law requires an outside agency to conduct the OICI investigation. Utah Code Ann. § 76-2-408.

[72] *See, e.g.*, Ex. 17, UPD OICI Rep. at SLCC_001093–94 (report that "[n]ear the blood was a folding silver colored knife"); *id.* at SLCC_001105–12 (Forensic Investigator Ryan Andrews reporting that he photographed "a silver 'Castleview Hospital' brand folding knife" in the "lawn area," which was marked as evidence item number 12); *id.* at SLCC_001887–89 (OICI investigator's photograph of the knife near where Mr. Harmon fell).

[73] District Attorney Screening Letter, Oct. 4, 2017 (SLCC_000653), <u>Exhibit 18</u>.

[74] F.B.I. Screening Letter, Dec. 8, 2017 (SLCC_000646), <u>Exhibit 29</u>.

[75] Ex. 7, Smith Deposition at 85:24–86:24, 88:22–25.

[76] *Id.* at 86:12–14.

[77] *Id.* at 86:15–20.

73.     If Officer Smith had known Mr. Harmon had a knife, he would have used his service weapon instead of his Taser.[78]

74.     A toxicology report indicated that at the time of his death, Mr. Harmon had THC (the active ingredient in marijuana), amphetamine, and methamphetamine in his system. According to the independent lab that performed the analysis, "[b]lood levels of 200 - 600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior." Mr. Harmon's methamphetamine blood level was 270 ng/mL.[79]

**E.     Procedural History.**

75.     Plaintiffs filed the Complaint in state court, asserting five causes of action. Defendants removed the matter to this Court.[80]

76.     The Court granted Defendants' motion to dismiss, dismissing Plaintiffs' claims for excessive force, equal protection, and municipal liability, and declining to exercise supplemental jurisdiction over the state-law claims. The Court remanded the state-law claims to state court.[81]

77.     Plaintiffs appealed their claims for excessive force and municipal liability, and the Tenth Circuit reversed and remanded those claims to this Court.[82]

78.     On May 16, 2022, the Court vacated its order of remand and exercised supplemental jurisdiction over Plaintiffs' state-law claims.[83]

---

[78] Ex. 8, Smith Declaration ¶ 5.
[79] NMS Labs Toxicology Report, Aug. 29, 2017 (SLCC_000207), Exhibit 20.
[80] ECF Nos. 2-1, 2.
[81] ECF Nos. 29, 34.
[82] ECF No. 40. Plaintiffs did not appeal the equal protection claim. *See id.*
[83] ECF Nos. 60, 61.

## **LEGAL STANDARD**

The Court "shall" grant summary judgment if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, as movants, bear the initial burden of showing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden shifts to Plaintiff to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Judgment is required if the party bearing the burden of proof "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Moreover, while generally all reasonable inferences are drawn in Plaintiffs' favor, "that is not true to the extent that there is clear contrary video evidence of the incident at issue." *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010). The Supreme Court mandates that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court *should not* adopt that version of the facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (emphasis added); *see also Rowell v. Bd. of Comm'rs. of Muskogee Cty.*, 978 F.3d 1165, 1171 (10th Cir. 2020) ("[W]e cannot ignore clear, contrary video evidence in the record depicting the events as they occurred."); *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1055 (10th Cir. 2020) ("To the extent that the synchronized video unmistakably establishes facts, we are to apply them, even if they are contrary to other evidence, such as testimony."). The Court must therefore disregard Plaintiffs' story if it amounts to a "visible fiction" and instead "view[] the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 381.

## ARGUMENT

### I.   PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs allege Officer Fox violated Mr. Harmon's rights under the Fourth Amendment. Plaintiffs' claim fails because the undisputed evidence establishes that Officer Fox's use of deadly force was objectively reasonable given the circumstances. Additionally and alternatively, any alleged violation of Mr. Harmon's constitutional rights was not clearly established at the time, and thus Officer Fox is entitled to qualified immunity as a matter of law.

When a defendant raises a qualified immunity defense a plaintiff must satisfy a heavy two-part burden for the claim to survive summary judgment. *Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005). First, the plaintiff must establish that the facts, viewed in the light most favorable to plaintiff, show that the challenged conduct violated a constitutional right. *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Second, the plaintiff must demonstrate the right at issue was clearly established on the date in question. *Id.* at 1080. The Court may consider these two questions in either order, but a failure to establish either inquiry is fatal to a plaintiff's claim. *Holland v. Harrington*, 268 F.3d 1179, 1186 (10th Cir. 2001). Here, Plaintiffs cannot satisfy their burden under either part of the inquiry.

### A.   The Undisputed Evidence Establishes Officer Fox's Use of Force Was Objectively Reasonable Under the Circumstances.

Claims of excessive force are analyzed under the Fourth Amendment's objective reasonableness standard, judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. In *Graham*, the Supreme Court articulated three factors courts should consider in making this assessment: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. Ultimately, however, "the inquiry is always whether, from the perspective of a reasonable officer on the scene, the totality of the circumstances justified the use of force." *Id.* Here, all three factors weigh in favor of Officer Fox's use of force.

### 1.      Mr. Harmon engaged in multiple serious crimes.

The first *Graham* factor considers the severity of the crime. A reasonable officer in Officer Fox's position would have probable cause to believe multiple crimes occurred. Mr. Harmon committed traffic infractions. *See* Salt Lake City Code §§ 12.80.065, -.140, -.200. Mr. Harmon had an outstanding warrant for aggravated assault, a second-degree felony. Mr. Harmon also fled from the Officers attempting to arrest him, a class B misdemeanor. *See* Utah Code Ann. § 76-8-305(1)(a). Mr. Harmon then assaulted Officer Robinson, a class A misdemeanor. *See id.* § 76-8-305(1)(a). Finally, Mr. Harmon committed aggravated assault by making a threat to do bodily injury to Officer Fox with a dangerous weapon and an accompanied show of immediate force, a first-degree felony. *See id.* § 76-5-103. This factor—severity of the crime—therefore weighs in favor of a finding of objective reasonableness. *See Arnold v. City of Olathe*, 35 F.4th 778, 792 (10th Cir. 2022) (recognizing felonies constitute "serious crime[s]" under the first *Graham* factor).

### 2.      Mr. Harmon posed an immediate threat of safety to the Officers.

The second factor considers "whether the suspect poses an immediate threat to the safety of the officers or others." *Graham*, 490 U.S. at 396. The Tenth Circuit has held this factor "is

undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) (citations omitted).

"Deadly force is justified under the Fourth Amendment if a reasonable officer in Defendants' position would have had probable cause to believe that there was a *threat of serious physical harm to themselves* or to others." *Est. of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (citations omitted) (emphasis in original). Additionally, "[b]ecause police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Saucier*, 533 U.S. at 205 (citations omitted). For this reason, "[i]f an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed." *Id.* In other words, "[a] reasonable officer need not await the 'glint of steel' before taking self-protective action; by then, it is often . . . too late to take safety precautions." *Est. of Larsen*, 551 F.3d at 1260 (second alteration in original) (citations omitted).

In *Larsen,* the Tenth Circuit set forth the following non-exclusive factors to assess the degree of threat facing an officer in cases involving the use of deadly force: "(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect." 511 F.3d at 1260. Considering these factors and the totality of the circumstances, a

reasonable officer in Officer Fox's shoes would have probable cause to believe Mr. Harmon presented a threat of serious physical harm to himself or the other officers.

      a.    <u>Officer Fox did not feasibly have time to issue an order to Mr. Harmon.</u>

The first *Larsen* factor considers whether the Officers ordered Mr. Harmon to drop the knife and whether Mr. Harmon complied. Tenth Circuit precedent holds this factor is neutral in circumstances where, as here, the suspect was not "already holding a weapon when first observed by officers." *Est. of Valverde v. Dodge*, 967 F.3d 1049, 1061 (10th Cir. 2020). In other words, a "warning need be given *only when feasible*." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)) (emphasis added). Here, the evidence shows it was not feasible for Officer Fox to give a command or warning to Mr. Harmon once he produced the knife. During the chaotic chase, which lasted a total of six seconds, Mr. Harmon did not produce the weapon until he had already stopped and was turning back toward Officer Fox from a few feet away. The most Officer Fox could muster was to shout, "I'll fucking shoot you" as he simultaneously fired his weapon, which he explained was a reflexive reaction immediately mirroring Mr. Harmon's threat of "I'll fucking stab you." This factor is therefore neutral.

      b.    <u>Mr. Harmon made hostile motions toward Officer Fox.</u>

The second factor addresses whether a reasonable officer could believe Mr. Harmon made "any hostile motions" with the weapon toward the Officers. This factor weighs heavily in favor of the use of force. The evidence establishes that Mr. Harmon stopped running away from the Officers, planted his right foot, and began turning back toward Officer Fox with his right hand raised in the air and his body slightly crouched. At that moment, Officer Fox saw the knife in Mr. Harmon's hand and believed Mr. Harmon was going to stab him.



**Ex. 15, Smith still-frames (SLCC_002744).**



**Ex. 14, Fox still-frames (SLCC_002640).**

Planting his foot, turning back toward the Officers, and raising his arm in the air with a

knife in hand—all from a few feet away—constitute hostile motions. Additionally, as with the

other factors, "[w]e do not look at whether [the suspect] actually intended to harm the officers . . .,

but rather whether a reasonable officer could have believed a threat of serious physical harm existed at the time." *Coronado v. Olsen*, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. Jan. 18, 2022). In light of Mr. Harmon's conduct, a reasonable officer would believe Mr. Harmon had made hostile motions with a knife. This factor weighs in favor of Officer Fox's use of force.

      c.    <u>Mr. Harmon was approximately five to seven feet from Officer Fox when he turned back toward him with the knife.</u>

The next factor is the distance between Mr. Harmon and the Officers at the time force was used. This factor weighs heavily in favor of Officer Fox. The uncontroverted video evidence shows that at the time Officer Fox fired his weapon, he was only a few feet away from Mr. Harmon, having attempted to come to an abrupt stop when Mr. Harmon unexpectedly planted his foot and started to turn back. At the time of the shots, Mr. Harmon was approximately five to seven feet away and possibly even closer, as shown in the still-frame photo below.



**Ex. 10, Robinson bodycam at 1:20:06.**

The Tenth Circuit has held this distance (and even distances significantly longer than what existed here) weighs in favor of an officer's use a deadly force. For example, in *Larsen*, the Court held this factor weighed in the officer's favor where a suspect was holding a knife from "somewhere between 7 and 20 feet" from the officers. 511 F.3d at 1261; *see also Lennen v. City*

*of Casper*, No. 21-8040, 2022 WL 612799, at *8 (10th Cir. Mar. 2, 2022) (unpublished) (holding factor weighed in favor of deadly force where suspect held sword "approximately a car length away from" officer and was "within a stride or two of being able to strike").

d.    <u>Mr. Harmon manifested the intention to attack the Officers with his knife.</u>

The final *Larsen* factor considers the "manifest intentions" of the suspect. The Tenth Circuit has explained that "[t]he term 'manifest' is of central importance to the understanding and application of this factor" because reasonableness under the Fourth Amendment "must be judged from the perspective of a reasonable officer on the scene, who is often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 770 (10th Cir. 2021) (citations omitted). Thus, "a key lesson here is that the focus of the inquiry is not on . . . what [the suspect] *subjectively* intended" but "how a reasonable officer on the scene would have assessed the manifest indicators of [the suspect's] intentions—that is, [the suspect's] actions." *Id.* (citation omitted) (first alteration and emphasis in original).

Here, Mr. Harmon's actions manifested an intent to avoid arrest by any means necessary, including violent confrontation with the Officers. From the outset of the encounter, Mr. Harmon sought to avoid arrest by providing a false name. When the Officers located the outstanding felony warrant Mr. Harmon knew existed, he begged them to let him go. He then fled from the Officers as they attempted to place him in handcuffs, threw Officer Robinson to the ground when he tried to grab Mr. Harmon, and threatened to "cut" and "fucking stab" the Officers. Finally, Mr. Harmon stopped fleeing but did not take any actions to manifest surrender or acquiescence. Rather, his body position—from his planted right foot, turned shoulders, and raised right arm—and the knife

in his hand all manifested an intent to violently square off with the Officers. Indeed, Officer Fox believed, from all of Mr. Harmon's actions, that Mr. Harmon intended to stab him with the knife.

These intentions are corroborated by information outside the knowledge of the Officers that night. In particular, Mr. Harmon had a number of controlled substances in his system, including THC and methamphetamine—the latter in an amount the laboratory indicated has "been reported in methamphetamine abusers who exhibited violent and irrational behavior." Additionally, Mr. Harmon already had significant interactions with the criminal justice system, including years-long stints in both state and federal prison. Only a few months before this encounter, Mr. Harmon pled guilty to aggravated assault—which carried a prison sentence of up to 15 years—but had failed to appear at his sentencing. He therefore had a substantial motivation to avoid arrest. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (holding an officer could "reasonably conclude" a suspect posed an immediate threat to safety because "a driver caught with a stolen vehicle has strong incentive to evade arrest, given the seriousness of the crime"). This factor therefore heavily weighs in favor of Officer Fox.

e.   <u>Officer Fox was faced with tense, rapidly evolving circumstances.</u>

The Tenth Circuit has explained the *Larsen* factors are non-exhaustive, and the relevant inquiry remains the totality of the circumstances. *See Larsen*, 511 F.3d at 1260. In addition to the factors discussed above, this Court should consider the rapidly evolving and uncertain situation Officer Fox faced. In particular, while Mr. Harmon initially complied with his arrest, the situation rapidly changed when he determined to flee from the Officers. The resulting chase lasted only six seconds, and a lot happened during that incredibly short time. All three Officers chased after Mr. Harmon from different directions. Officer Robinson tried to tackle Mr. Harmon but was thrown to

the ground 10 feet away. Mr. Harmon changed direction not once, not twice, but three times. This chaotic scene culminated with Mr. Harmon pivoting back toward the Officers and raising his arm with a knife in his hand only a few feet away from Officer Fox. This was the proverbial "glint of steel" to which Officer Fox had only an instant to respond to. The fact that Officer Fox had to perceive, process, and react to everything that occurred in those six seconds—in what turned out to be a life-or-death situation—weighs heavily in favor of his use of force.

Analysis of these factors demonstrates that Officer Fox reasonably believed that Mr. Harmon posed immediate threat of serious harm to himself and the other Officers.

### 3. Mr. Harmon was actively resisting arrest.

The third *Graham* factor considers whether the suspect "is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Plaintiffs conceded Mr. Harmon was evading arrest by flight. *See, e.g.*, Compl. ¶¶ 28–50 (alleging the Officers told Mr. Harmon he was going to be arrested and that Mr. Harmon pulled his arms away, strained to break free, and ran from the Officers). The undisputed video evidence confirms that Mr. Harmon deliberately fled and sought to evade the Officers. Therefore, this factor also weighs in favor of Officer Fox.

*     *     *

In sum, Officer Fox faced a terrifying situation in which Mr. Harmon went from compliant arrestee to deadly threat in mere seconds. We do not know what would have happened if Officer Fox had not fired his weapon at the exact moment he did. Mr. Harmon may have stood in place. He may have surrendered. Or he may have killed Officer Fox. The Constitution did not require Officer Fox to wait to find out before protecting his own life and the life of his fellow officers. Based on the factors above and given the totality of circumstances, Officer Fox's decision to use

deadly force was objectively reasonable. Plaintiff's excessive force claim fails as a matter of law.

**B.    Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time.**

Plaintiffs' claim also fails for the independent reason that Officer Fox did not violate any clearly established law at the time of the encounter. To survive summary judgment as to the second qualified-immunity prong, Plaintiffs must show violation of a clearly established right that is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (*per curiam*) (citations omitted). In other words, "for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (citations omitted). "Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (citations omitted). "[T]o show that a right is clearly established, the plaintiff must point to a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Farrell v. Montoya*, 878 F.3d 933, 937 (10th Cir. 2017).

Additionally, the Supreme Court has recently reaffirmed that "[t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021) (citations omitted). And that "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (alterations in original) (citations omitted); *accord City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 12 (2021).

Here, Plaintiffs cannot carry their burden to show Officer Fox's use of force was a clearly

established constitutional violation. Defendants are aware of no binding precedent indicating it was a constitutional violation to use deadly force where an individual being arrested on a second-degree felony warrant breaks free from officers to evade arrest, physically assaults an officer, verbally threatens the officers, and then stops fleeing, turns back toward the officers, and wields a knife from only a few feet away.

To the contrary, Tenth Circuit precedent establishes that the use of deadly force in similar circumstances *was* objectively reasonable. For example, in *Larsen*, officers responded to an emergency call that a suspect had threatened to kill someone or himself. 511 F.3d at 1260. As officers approached the suspect's home, the suspect stood alone on the front porch with a large knife. *Id.* Officers gave repeated commands to drop the knife. *Id.* Appearing agitated, the suspect raised the knife above his shoulder with the blade pointed outward. *Id.* The suspect took a step towards an officer who was somewhere between 7 and 20 feet away, and the officer fired his weapon. *Id.* at 1260–61. In affirming the district court, the Tenth Circuit held that the officer was faced with an armed suspect who appeared willing and able to attack with a knife, and reasonably concluded the suspect posed an immediate threat to his safety. *Id.* at 1263.

Plaintiffs thus cannot prove the law was "sufficiently clear that every reasonable official would have understood that what he is doing violates" the Fourth Amendment. *Mullenix*, 577 U.S. at 11. Because Plaintiffs cannot carry their burden to show Officer Fox violated clearly established law, he is entitled to qualified immunity.

## II.   PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

Plaintiffs' *Monell* municipal liability claim against Salt Lake City fails. It is well-established that "[a] municipality may not be held liable where there was no underlying

constitutional violation by any of its officers." *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993). Because Plaintiffs cannot establish a constitutional violation as a matter of law, they likewise cannot maintain a cause of action against the City. *See Ainsworth v. Park City Police Dep't*, No. 2:19-CV-00462-HCN, 2021 WL 288579, at *10 (D. Utah Jan. 27, 2021). The municipal liability claim should therefore be dismissed with prejudice and on the merits.

## III.   PLAINTIFFS' STATE-LAW CLAIMS FAIL AS A MATTER OF LAW.

Plaintiffs asserted two claims grounded in Utah state law: (1) statutory wrongful death against Officer Fox, and (2) violation of the Utah Constitution's Unnecessary Rigor Clause against Officer Fox and Salt Lake City.[84] Each claim fails on the merits.

### A.   <u>Plaintiffs' Wrongful Death Claim Against Officer Fox Fails as a Matter of Law.</u>

Plaintiffs' claim for wrongful death against Officer Fox fails for two independent reasons. <u>First</u>, Officer Fox is immune from suit because the Utah Legislature has not waived sovereign immunity for claims against an employee and the undisputed evidence shows Officer Fox did not act with willful misconduct. <u>Second</u>, Plaintiffs failed to show, as required by the wrongful death statute, that Officer Fox committed a wrongful or neglectful act.

#### 1.   Officer Fox is immune from suit under sovereign immunity.

Plaintiffs' statutory wrongful death claim fails as a matter of law because it is barred by the Governmental Immunity Act of Utah ("**GIAU**"). Utah Code Ann. §§ 63G-7-101 *et seq*. Lawsuits brought against governmental entities or their employees are governed by the GIAU. *Id.* § 63G-7-101. Governmental entities and employees retain sovereign immunity unless the

---

[84] Compl. ¶¶ 181–88, 189–94, ECF No. 2-1.

Legislature has "expressly waived" that immunity in the GIAU. *Id.* § 63G-7-101(3). As it relates

to a governmental employee, the GIAU provides that "a plaintiff's exclusive remedy" for an injury

caused in the performance of an employee's duties is an action against the governmental entity.

*Id.* § 63G-7-202(3)(a). Thus, a "plaintiff may not bring or pursue any civil action or proceeding

based upon the same subject matter against the employee . . . whose act or omission gave rise to

the claim, unless: (i) the employee acted or failed to act through fraud or willful misconduct." *Id.*

§ 63G-7-202(3)(c). "Willful misconduct" is defined as "the intentional doing of a wrongful act, or

the wrongful failure to act, without just cause or excuse, where the actor is aware that the actor's

conduct will probably result in injury." *Id.* § 63G-7-102(11).

Here, for the same reasons stated above in Part I, Officer Fox did not intentionally commit

a wrongful act without just cause or excuse. To the contrary, Officer Fox's use of force was not

wrongful but reasonable under the circumstances. The conduct likewise was *with* just cause or

excuse, in light of the threat of immediate harm Mr. Harmon posed to the Officers. Because

Plaintiffs cannot establish that Officer Fox acted with willful misconduct, the GIAU precludes any

statutory claim against him.

> ### 2.     Officer Fox's use of force did not constitute a wrongful or neglectful act.

Plaintiffs' statutory wrongful death claim also fails because they cannot establish the

elements of their claim. To maintain a cause of action for wrongful death, Plaintiffs must show

that "the death of a person is caused by the wrongful act or neglect of another." Utah Code Ann.

§ 78B-3-106(1). In other words, a "wrongful death cause of action is based on the underlying

wrong done to the decedent," meaning Plaintiffs must establish an underlying theory of civil

liability that constitutes a "wrongful act or neglect." *Jensen v. IHC Hosps., Inc.,* 944 P.2d 327, 332

(Utah 1997). Here, Plaintiffs claim the "wrongful act or neglect" is unnecessary rigor against Mr. Harmon. Plaintiffs' statutory wrongful death claim thus rises and falls with their unnecessary rigor claim. Therefore, because their unnecessary rigor claim fails for the reasons discussed below, *see* Part III.B, so too does their wrongful death claim.

**B.**     **Plaintiff's Unnecessary Rigor Claim Against Defendants Fails as a Matter of Law.**

Plaintiffs' claim that Defendants violated Mr. Harmon's rights under Utah's Unnecessary Rigor Clause fails for two independent reasons. First, the undisputed evidence establishes that Officer Fox's use of force when faced with an armed individual threatening him with a knife from only a few feet away did not constitute unnecessary rigor. Second, and alternatively, Plaintiffs cannot carry their burden to establish that even if Officer Fox violated Mr. Harmon's right, that the violation was flagrant. Plaintiffs' claim therefore fails as a matter of law.

**1.**     **The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights.**

Article I, section 9 of the Utah Constitution states, in relevant part, "Persons arrested or imprisoned shall not be treated with unnecessary rigor." The Utah Supreme Court has explained "the guarantee against unnecessarily rigorous treatment . . . protects [prisoners and arrestees] against unnecessary abuse." *Dexter v. Bosko*, 2008 UT 29, ¶ 8, 184 P.3d 592 (alterations in original) (citations omitted). And the "applicable definition of 'abuse' focuses on 'needlessly harsh, degrading, or dehumanizing' treatment of prisoners." *Id.* (citations omitted). Crucially, the Utah Supreme Court has "emphasize[d] that unnecessary rigor must be treatment that is clearly excessive or deficient and unjustified." *Bott v. DeLand*, 922 P.2d 732, 741 (Utah 1996), *abrogated on other grounds by Spackman v. Bd. of Educ. of Box Elder Cty.*, 2000 UT 87, 16 P.3d 533. In

other words, "a constitutional violation is made out only when the act complained of presented a substantial risk of serious injury *for which there was no reasonable justification at the time*." *Dexter*, 2008 UT 29, ¶ 19 (emphasis added).

Here, the undisputed evidence establishes Officer Fox had a "reasonable justification at the time" for his use of force against Mr. Harmon. Mr. Harmon was being arrested for a violent felony, he begged the Officers not to return him to jail, he forcibly evaded arrest, he verbally threatened that he would cut the Officers, he threw Officer Robinson to the ground, and then he stopped fleeing and turned back toward the Officers with a knife in his hand from only a few feet away. Officer Fox believed that Mr. Harmon intended to use the knife against the Officers and that their lives were in danger. Additionally, approximately six seconds elapsed from when Mr. Harmon broke free of the Officers to when he turned and crouched with a knife in his hand, requiring that Officer Fox make a life-or-death decision in a split second. Had Officer Fox declined to shoot or even hesitated another second, Mr. Harmon could have closed the distance between himself and Officer Fox with one step and attacked Officer Fox with his knife. Because Mr. Harmon posed a real and immediate danger to the Officers, Officer Fox's decision to fire his weapon was reasonably justified and did not constitute unnecessary rigor.

Plaintiffs' claim against the City also fails as a result. "The first prong of our common law test for assessing municipal liability requires the court to determine whether the plaintiff's constitutional rights were violated." *Kuchcinski v. Box Elder Cty.*, 2019 UT 21, ¶ 39, 450 P.3d 1056. Because Mr. Harmon's rights were not violated, Plaintiffs' claim against the City fails.

### 2. Officer Fox's Use of Force Did Not Constitute a Flagrant Violation of Mr. Harmon's Constitutional Rights.

Plaintiffs' unnecessary rigor claim fails for the additional, independent reason that Officer

Fox's use of deadly force was not a "flagrant violation." The Utah Supreme Court has held that damages for a constitutional violation "are permitted only under appropriate circumstances." *Spackman*, 2000 UT 87, ¶ 22 (citation omitted). In particular, "a plaintiff must establish that he or she suffered a 'flagrant' violation of his or her constitutional rights." *Id.* ¶ 23. The Court explained:

> The flagrant violation element means that a defendant must have violated clearly established constitutional rights of which a reasonable person would have known. To be considered clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that [constitutional] right. The requirement that the unconstitutional conduct be flagrant ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [himself] liable for a constitutional violation.

*Dexter*, 2008 UT 29, ¶ 23 (quoting *Spackman*, 2000 UT 87, ¶ 23) (alterations in original). In other words, "simple negligence is not sufficient justification for a damage claim." *Bott*, 922 P.2d at 738. Indeed, even "an 'unreasonable mistake alone is insufficient to establish flagrant misconduct.'" *Dettle v. Richfield City*, No. 2:13-CV-357-DAK, 2014 WL 4354424, at *10 (D. Utah Sept. 2, 2014) (quoting *State v. Newland*, 2010 UT App 380, ¶ 22, 253 P.3d 71); *see also Porter v. Daggett Cnty.*, No. 2:18-CV-00389-DBB, 2022 WL 558295, at *14 (D. Utah Feb. 24, 2022) (recognizing the Utah standard "uses identical language as the standard" for the second prong of federal qualified immunity analysis).

Plaintiffs cannot meet their burden to show Officer Fox's use of force was a flagrant violation of Mr. Harmon's constitutional rights. A "reasonable official" placed in Officer Fox's position—with a wanted felon threatening him and fellow Officers with a knife from five feet away—would not understand that use of his weapon would violate a constitutional right. Officers are permitted "the ordinary human frailties of forgetfulness, distractibility, or misjudgment." *Dexter*, 2008 UT 29, ¶ 23. Here, however, Officer Fox's decision was not only reasonable but

necessary under the circumstances. Plaintiffs' claim that Officer Fox's use of force to protect himself from Mr. Harmon constituted a flagrant violation of Mr. Harmon's constitutional rights fails as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request the Court grant the Motion and enter summary judgment for Defendants and against Plaintiffs on all remaining causes of action.

DATED: August 26, 2022.

SALT LAKE CITY CORPORATION


/s/ *Katherine R. Nichols*
Katherine R. Nichols

*Attorney for Defendants Salt Lake City and Officer Clinton Fox*

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

Qusair Mohamedbhai
Nicholas A. Lutz
RATHOD MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
qm@rmlawyers.com
nl@rmlawyers.com

*Attorneys for Plaintiffs*

*/s/ Heidi Medrano*