Corey D. Riley (16935)
Andrew G. Deiss (7184)
Deiss Law PC
10 West 100 South, Suite 425
Salt Lake City, Utah 84101
(801) 433-0226
criley@deisslaw.com
deiss@deisslaw.com

Nicholas A. Lutz (51299 - Colorado) (admitted *pro hac vice*)
Qusair Mohamedbhai (35390 – Colorado) (admitted *pro hac vice*)
Rathod Mohamedbhai LLC
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
nl@rmlawyers.com
qm@rmlawyers.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DISTRICT

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon Sr., <br><br> Plaintiffs, <br><br> v. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 19-cv-00553-HCN-CMR <br><br> District Judge Howard C. Nielson, Jr. <br> Magistrate Judge Cecilia M. Romero |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 1

INTRODUCTION ........................................................................................................... 1

  I.    Response to Statement of Undisputed Material Facts ("RSUMF") .................................... 1

  II.   Statement of Additional Disputed Facts ("SADF") ......................................................... 9

APPLICABLE LEGAL STANDARDS ................................................................................. 16

    I.    Summary Judgment ................................................................................................ 16

    II.   Scott v. Harris "Blatant Contradiction" Standard ....................................................... 17

ARGUMENT ............................................................................................................... 19

  I.    There is a Genuine Dispute of Material Fact as to the Severity of the Crime at Issue . 20

  II.   There is a Genuine Dispute of Material Fact as to Whether Mr. Harmon Posed a
Serious and Immediate Threat to the Officers .................................................................. 21

    A.    Neither Officer Fox nor the Other Officers Ordered Mr. Harmon to Drop Any
Weapon .......................................................................................................................... 22

    B.    There is Genuine Dispute of Material Fact as to Whether Mr. Harmon was Armed
22

      i.    Only Officer Fox Claims to Have Seen a Knife in Mr. Harmon's Hands ............. 22

      ii.  The Officers' Behavior at the Scene Indicates That They Did Not Perceive Mr.
Harmon to Be Armed ..................................................................................................... 25

      iii.  The Recovered Knife Likely Belonged Emergency Personnel ............................ 25

      iv.  Mr. Harmon's DNA was Not Present on the Recovered Knife ........................... 26

    C.    There is a Genuine Dispute of Material Fact as to Whether Mr. Harmon Made
Hostile Motions Towards the Officers ............................................................................. 26

    D.    There is a Genuine Dispute of Material Fact as to Mr. Harmon's Manifest
Intentions ....................................................................................................................... 27

  III.   The Law was Clearly Established that Officer Fox's Conduct Violated Mr. Harmon's
Rights Under the Fourth Amendment ............................................................................... 31

  IV.   Plaintiffs' Monell Claim Against Salt Lake City Should Not Be Summarily
Adjudicated .................................................................................................................... 32

  V.   Plaintiffs State Law Claims Should Not Be Summarily Adjudicated ......................... 33

    A.    Plaintiffs' Wrongful Death Claim is Not Barred by the UGIA .............................. 33

    B.    Plaintiffs Have Presented Sufficient Evidence to Support their Unnecessary Rigor
Claim .............................................................................................................................. 36

CONCLUSION ................................................................................................................ 37

**TABLE OF AUTHORITIES**

**Cases**

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)...................................................................... 16

*Adkins v. Uncle Bart's, Inc.*, 1 P.3d 528 (Utah 2000).................................................................. 34

*Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) .................................................... 18, 30, 31, 32

*Bell v. Wolfish*, 441 U.S. 520 (1979) ............................................................................................ 17

*Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670 (Utah 1985) ...................................... 35

*Bott v. DeLand*, 922 P.2d 732 (Utah 1996)................................................................................. 36

*Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407 (10th Cir. 1984). ............................................ 16

*Bybee v. Abdulla*, 189 P.3d 40 (Utah 2008)................................................................................. 35

*Carr v. Castle*, 337 F.3d 1221 (10th Cir. 2003).......................................................................... 17

*Celotex Corp. v. Catrett*, 477 U.S. 317(1986) ............................................................................ 16

*Cf. Colman v. Utah State Land Bd.*, 795 P.2d 622 (Utah 1990) ................................................. 36

*Cordova v. Aragon*, 569 F.3d 1183 (10th Cir. 2009).................................................................. 18

*Cunningham v. Weber County*, 2022 UT 8.................................................................................. 34

*Dexter v. Bosko*, 184 P.3d 592 (Utah 2008)................................................................................. 37

*Est. of Harmon v. Salt Lake City*, No. 20-4085, 2021 WL 5232248 (10th Cir. Nov. 10, 2021)
.............................................................................................................................................. passim

*Estate of Booker v. Gomez*, 745 F.3d 405 (10th Cir. 2014). ....................................................... 28

*Fisher v. Shamburg*, 624 F.2d 156  (10th Cir. 1980).................................................................. 16

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................................ passim

*Jiron v. City of Lakewood*, 392 F.3d 410 (10th Cir.2004).......................................................... 18

*Pauly v. White (Pauly I)*, 814 F.3d 1060 (10th Cir. 2016).......................................................... 18

*Penunuri v. Sundance Partners, Ltd.*, 423 P.3d 1150 (Utah 2017) ............................................ 35

*Riggs v. Georgia-Pac. LLC*, 345 P.3d 1219 (Utah 2015)............................................................ 35

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................................................... 17

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000)............................................. 17

*Simms v. Oklahoma*, 165 F.3d 1321 (10th Cir. 1999).................................................................. 16

*Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533 (Utah 2000)...................... 36

*Thomson v. Salt Lake County*, 584 F.3d 1304 (10th Cir. 2009) ................................................. 18

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006); ......................................................... 18

*Zuchel v. City & County of Denver*, F.2d 730 (10th Cir.1993)............................................... 31, 32

*Zuchel v. Spinharney*, 890 F.2d 273 (10th Cir.1989).................................................................. 19

**Statutes**

Utah Code § 63G-7-101(2)(b). ...................................................................................................... 34

Utah Code § 63G-7-101(3) ............................................................................................................ 34

Utah Code § 63G-7-301(2)(i) ........................................................................................................ 34

Utah Code § 78B-3-106 ................................................................................................................. 33

Utah Code Ann. § 76-8-305(1)(a) ................................................................................. 4

Utah Const. Art 1, § 9 ................................................................................................. 36

Utah Const. art. 16, § 5. ............................................................................................. 35

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................... 16

Federal Rule of Civil Procedure 56 ............................................................................. 1

Plaintiffs, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 56, hereby respond to Defendants' Motion for Summary Judgment, [ECF No. 66].

### INTRODUCTION

Defendants' Motion repackages arguments that have already been thoroughly litigated in this case. Defendants' Motion for Summary Judgment on the Fourth Amendment excessive force claim at issue here relies in large part on body-camera video. But, as the Tenth Circuit stated when viewing the very same evidence, "Based on the totality of the circumstances, **a reasonable trier of fact could view Officer Fox's actions as objectively unreasonable**. Accordingly, the Estate has established a plausible claim that Mr. Harmon's right to be free from excessive use of force under the Fourth Amendment was violated." *Est. of Harmon v. Salt Lake City*, No. 20-4085, 2021 WL 5232248, at *5 (10th Cir. Nov. 10, 2021) (unpublished) (emphasis added). While the Tenth Circuit's order came at the motion to dismiss stage, the presence of video evidence in the appeal (and the Tenth Circuit's review of such evidence) makes it more akin to summary judgment review. After additional discovery, the evidentiary record is even more replete with genuine material disputes of fact. Such material disputes include: whether Mr. Harmon was armed with a knife that cannot be seen in his hand in the video; whether Mr. Harmon shoved Officer Robinson, whether Mr. Harmon was making hostile motions, and, ultimately, whether Mr. Harmon posed a risk of serious and imminent danger to Officer Fox or the other officers.

### I.     Response to Statement of Undisputed Material Facts ("RSUMF")

1-4.     **Admit.** Plaintiffs object that this recitation of Mr. Harmon's criminal history prior to the incident is not supported by admissible evidence. Mr. Harmon's criminal history was unknown to the officers at the scene of August 13, 2017, killing of Mr. Harmon, with the exception of the

felony warrant described in SUMF ¶ 4.  As such, the facts alleged in RSUMF ¶¶ 1-4 have no probative value and constitute impermissible character evidence under Fed. R. Evid. 404(a).

5-14.  **Admit.**

15.     **Admit in part.**  Officer Fox engaged Mr. Harmon in a discussion.  The video exhibit speaks for itself as to Mr. Harmon's demeanor which Officer Fox characterizes as "normal" then "anxious or agitated."

16.     **Admit in part deny in part.**  Mr. Harmon did request to have a cigarette. Deny as to any implication that this is true as Officer Fox has not been qualified as an expert to opine on the common behavior of individuals who are being taken to jail.

17-18.  **Admit.**

19.     **Admit.**  Critically, however, even if Officer Fox was assumed that his fellow officers believed that Mr. Harmon was being arrested due to a felony warrant, he was never informed and never knew what alleged crime the warrant related to.  *See* Statement of Additional Disputed Facts ("SADF") at ¶ 2.

20-23.  **Admit.**

24.     **Admit in part, deny in part.** While Officer Fox claimed in his deposition that he believed he could reach Mr. Harmon in time to tackle him, the video evidence shows that Officer Fox drew his service weapon almost immediately after Mr. Harmon broke free from Officers Smith and Robinson, demonstrating his intent to use lethal force merely because Mr. Harmon began to flee. Nor did Officer Fox actually attempt to tackle Mr. Harmon.  *See* **Ex. 1**, *Fox Deposition* at 206:14-17; **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:16; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

25.     **Deny.** Officer Fox claims to have seen Mr. Harmon reach for his right pocket.  Mr. Harmon did not reach for his right pocket. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:19*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:22.

26.     **Deny.** Officer Robinson claims to have seen Mr. Harmon reach for his right pocket.  Mr. Harmon did not reach for his right pocket. **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:17. The video does not show Mr. Harmon reaching for his right pocket.  *Id.*  Officer Robinson then fell to the ground and was not in a position to see if Mr.  Harmon reached for his right pocket thereafter.  *Id.* at 1:17-1:22.

27.     **Deny.** Officer Smith claims to have seen Mr. Harmon reach toward his waist as he ran. However, Mr. Harmon cannot clearly be seen reaching toward his waist on Officer Smith's body camera footage.  **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20.

28.     **Deny.**  Officer Fox claims that he heard Mr. Harmon use words to the effect of "cut" or "stab."  Such statements cannot be heard on any of the body camera videos because Mr. Harmon did not in fact say any such words.  *See* **Ex. 2,** *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,** *Fox Body Camera Footage* at 0:29-3:15.  Moreover, numerous other statements and comments from Mr. Harmon and the Officers can be clearly heard and easily discerned in all of the officers' body-camera footage, which shows that there was no failure in the body camera to pick up audio.  *See* SADF at ¶¶ 4-6.

29.     **Deny.**  *See supra*, RSUMF at ¶ 28.

30.     **Deny.**  *See supra*, RSUMF at ¶ 28.

31.     **Admit.**

32.    **Deny.**  Mr. Harmon did not shove Officer Robinson causing him to fall to the ground.[1]
Rather, Officer Robinson fell.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:04*;* **Ex. 2,** *Smith*
*Body Camera Footage* at 8:12-8:15*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:16-1:19.  *See*
*also* **Ex. 1,** *Fox Deposition* at 133:14-17 ("At some point whatever Scott [Robinson] had going on,
he ends up falling down. . . ."); 133:23-25 ("[E]ither he Scott [Robinson] fell or he pushed Scott,
or however that happened, I don't know."); **Ex. 5**, *Smith Deposition* at 81:1-8 (Mr. Harmon "runs
south, but I think Officer Robinson – so when he ran, I don't know where – how Officer Robinson
ended up, where he did, but after he ran in between us all, I remember Officer Robinson being
behind him and – it was me, Officer Fox, and then Officer Robinson.  So I don't know how he
ended up there, but at some point Officer Robinson falls and then that's when Mr. Harmon continue
to run south.").

  Although Officer Robinson testified that he believed Mr. Harmon had shoved him, **Ex. 6,**
*Robinson Deposition* at 23:15-17, he also described his physical encounter as more complicated
than simply being shoved to the ground.  Officer Robinson testified, "At that point I had made the
plan in my mind that I was going to tackle [Mr. Harmon] to the ground because we were on grass,
but as I went to tackle him, I heard him say I'll stab or I'll cut or I'll fucking stab you, something
to that effect, which made me not want to tackle him.  And so he was running out of room, kind
of hung a left which would have been heading southbound, and kind of gave me a shove, and I fell
to the ground. . . . I was chasing him and I grabbed a hold of his clothing.  And even though I was

---

[1] Defendants later characterize this interaction as "Mr. Harmon "assault[ing] Officer Robinson, a
class A misdemeanor."  Defendants' Motion for Summary Judgment, [ECF No. 66] at 19 (citing
Utah Code Ann. § 76-8-305(1)(a)).

behind him, he needed to turn because the iron gate was there and so we kind of got tangled up right there." **Ex. 6**, *Robinson Deposition* at 23:10-23.  Finally, the Tenth Circuit Court of Appeals held, "One can hardly conclude that the encounter could only be characterized as an assault based on the body-cam footage." *Est. of Harmon*, 2021 WL 5232248 at *3.

33.     **Deny.**  Officer Fox did not see Mr. Harmon reaching for his pocket.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06; **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20; **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.  Officer Fox did not hear Mr. Harmon issue any threats, including the word, "cut." *See supra* RSUMF, ¶ 28.

34.     **Admit in part, deny in part.**  Plaintiff is not in a position to agree or disagree with Officer Fox's mental state or that he was "relieved" at this particular moment.  Officer Fox did not actually re-holster his weapon after Mr. Harmon began running.  **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06.

35.     **Admit in part, deny in part.**  Mr. Harmon did not shove Officer Robinson.  *See supra* RUSMF at ¶ 32.  Admit the remainder of paragraph 35.

36.     **Deny.**  Mr. Harmon did not reach for his right pocket and cannot be seen on any of the body camera videos reaching for his right pocket.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06; **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20; **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.  Defendants only cite Officer Fox's deposition testimony for this assertion.  *See* SUMF, ¶ 36.

37.     **Admit in part.**  As a point of clarification, Mr. Harmon was side-shuffling **away** from the direction of the officers.

38-39.  **Admit.**

40.    **Admit in part, deny in part.** While Mr. Harmon's feet turned and he turned his torso to look backward at Officers Robinson and Fox, Mr. Harmon did not assume a "crouching position." **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.

41.    **Admit in part, deny in part.** [2] It is not clear from the body-camera video that Mr. Harmon ever stopped moving away from the officers.  **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Mr. Harmon turned his body and slowed down.  Admit that Officer Fox came to a quick stop. Admit that there was a distance of approximately five to seven feet between Officer Fox and Mr. Harmon.  Officer Fox shot Mr. Harmon and Officer Smith fired his taser at Mr. Harmon before Mr. Harmon had a chance to change direction.  **Ex. 5,** *Smith Deposition* at 85:5-12.

42.    **Admit.**

43.    **Admit in part, deny in part.**  Mr. Harmon had turned his upper body towards the officers, not his lower body.  *See* **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

44.    **Admit in part, deny in part.**  Officer Robinson did not hear Mr. Harmon say, "'I'll fucking stab' or 'I'll cut' or whatever he was saying."  *See supra* RSUMF at ¶ 28.

---

[2] This and many of Defendants' purported statements of fact regarding Mr. Harmon's body language illustrate why this case is not appropriate for resolution on Summary Judgment.  There are multiple plausible interpretations of the video evidence and the events depicted therein. Defendants' assert their subjective interpretation as fact.  However, on summary judgment, in the absence of a clearly contradictory record, it is Plaintiffs' account that must be accepted by the Court.

45.     **Deny.**  Officer Fox did not observe a knife in Mr. Harmon's hands because there was no knife in Mr. Harmon's hands.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.  *See Est. of Harmon, 2021 WL 5232248* at *11 ("There was no knife visible in the video . . . .").   Officer Fox had not seen Mr. Harmon reaching for his right pocket.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.

46.     **Deny.**  Officer Fox did not observe a knife in Mr. Harmon's hands because there was no knife in Mr. Harmon's hands.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21; *see also* SADMF at ¶¶ 18-23, 26-35.  *Est. of Harmon*, 2021 WL 5232248 at *11 ("There was no knife visible in the video . . . .").

47.     **Admit.**

48.     **Deny.**  Officer Fox could not have believed that Mr. Harmon was armed as he had not observed a knife in Mr. Harmon's hands and such a knife is not visible from his or the other officers body camera footage.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. *See also Est. of Harmon v. Salt Lake City*, No. 20-4085, 2021 WL 5232248, at *4 (10th Cir. Nov. 10, 2021) (unpublished). ("There was no knife visible in the video.").  Moreover, Mr. Harmon had not threatened Officer Fox or the other officers.  *See supra* RSUMF at ¶ 28.

49.     **Deny.**  Officer Fox could not have believed that Mr. Harmon was armed as he had not observed a knife in Mr. Harmon's hands and such a knife is not visible from his or the other

officers' body camera footage.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Moreover, Mr. Harmon had not threatened Officer Fox or the other officers.  *See supra* RSUMF at ¶ 28.  Therefore, Officer Fox had no reasonable basis to believe that Mr. Harmon was armed, and the other officers were unaware of that fact.

50.      **Deny.**  Mr. Harmon did not say "I'll fucking stab you," and that statement is not audible on any of the officers' body-camera footage.  *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. *See also supra* RSUMF at ¶ 28.  *See also Est. of Harmon, 2021 WL 5232248* at *4 ("No verbal threats made by Mr. Harmon can be heard on the video.").

51.      **Admit in part, deny in part**.  Admit that Officer Fox shouted, "I'll fucking shoot you!" and fired three shots in quick succession.  Deny that Officer Fox acted "reflexively."

52-56. **Admit.**

57.      **Admit in part, deny in part.**  Paragraph 57 accurately summarizes the self-serving statement contained in Officer Fox's declaration.  Plaintiffs are not in a position to comment on Officer Fox's true subjective beliefs.  This is a matter of credibility that must be submitted to a jury.

58-68. **Admit.**

69.      **Admit.**  Plaintiffs object that the District Attorney documents referenced in paragraph 69 are inadmissible and are irrelevant to the determination of this matter.

70.      **Admit in part, deny in part**.  Admit that Officer Smith did not believe that Mr. Harmon was armed and never observed a knife in Mr. Harmon's hands or even at the scene.  Deny that

Officer Smith later learned that Mr. Harmon "had a knife." *See* **Ex. 5**, *Smith Deposition* at 85:24-86:1; 86:12-20; 86:21-24; 88:22-25; 89:1-8.

71-78. **Admit.**

## II.      Statement of Additional Disputed Facts ("SADF")

1.      After being stopped by Officer Smith, Mr. Harmon volunteered to Officer Fox that he probably had an outstanding warrant for his arrest. **Ex 1**, *Fox Deposition* at 124:13-18.

2.      Officer Fox was never aware of the type of warrant for which Mr. Harmon was being placed under arrest. **Ex. 1**, *Fox Deposition* at 129:8-130:1.

3.      Mr. Harmon complied with all of the officers' orders including pulling over for Officer Smith, stepping off of his bicycle, removing his backpack, and placing his hands behind his back to be handcuffed. **Ex. 2**, *Smith Body Camera Footage* at 7:45-8:12; **Ex. 4,** *Robinson Body Camera Footage* at 0:56-1:13; **Ex. 3,** *Fox Body Camera Footage* at 0:42- 1:00.

4.      Many statements by all three officers and Mr. Harmon are audible and discernible. *See* **Ex. 2**, *Smith Body Camera Footage* at 2:00-2:30 (Officer Smith asks Mr. Harmon to spell his last name for him because he spelled it wrong and Mr. Harmon spells his name out multiple times and provides his birthday), 4:40-4:50 (Officer Smith tells Mr. Harmon that he cannot find his ID and asks Mr. Harmon how he spells his name on his ID. Mr. Harmon responds by spelling his name), 4:52-4:58 (Mr. Harmon tells Officer Smith "I think I got a warrant"), 5:05-5:32 (Officer Smith asks Mr. Harmon what his warrant is for and Mr. Harmon replies that it was for drug charges. Officer Smith asks if it was a misdemeanor and Mr. Harmon replies that he thought it was a felony), 6:52-6:55 (Officer Smith tells Officer Robinson he was having a hard time identifying Mr. Harmon), 7:45-8:13 (Officer Smith says, "Patrick, you know you already know about your

warrant, right . . .  I need you to take your backpack off for me, okay?" Mr. Harmon pleads "please man" to the officers before being arrested), 8:18-8:20 (Officer Fox states, "I'll fucking shoot you"), 8:22-8:54 (Officer Smith makes a call to dispatch that shots were fired. Mr. Harmon is moaning and crying on the ground after being shot. Officer Robinson states twice that Mr. Harmon had one shot in the arm), 8:56-9:08 (Officer Robinson tells Mr. Harmon to "roll on your left side, bro" and repeats again to roll on his left side. **Ex. 4,** *Robinson Body Camera Footage* at 0:56-0:59 (Officer Smith tells Mr. Harmon, "I need you to take your backpack off for me, okay?", 1:11-1:14 (Officer Smith says "Put your hands behind your back for me"), 1:24-1:26 (Officer Smith making a call to dispatch that shots were fired), 1:33-1:53 (Mr. Harmon crying and moaning after being shot and Officer Robinson states twice, "One shot in the arm"), 1:56-2:07 (Officer Robinson says, "Roll on your left side, bro . . . Stay with me. Roll on your left side." Officer Robinson tells Mr. Harmon to "stay with us" and repeats to him to roll on his left side), **Ex. 3,** *Fox Body Camera Footage* at 0:34-1:00 (Officer Smith says, "Patrick you know about your warrant, right . . . I need you to take your backpack off for me, okay?" Mr. Harmon pleads, "please man" to the officers before being arrested), 1:05-1:07 (Officer Fox states, "I'll fucking shoot you"), 1:09-1:12 (Officer Smith makes a call to dispatch that shots were fired), 1:14-1:28

5.     None of the three officers' body-worn cameras capture Mr. Harmon stating any words to the effect of "stab" or "cut" or issuing any other threat at any point during the incident. *See* **Ex. 2,** *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,** *Fox Body Camera Footage* at 0:29-3:15.

6.     Mr. Harmon did not threaten the officers.  *See* **Ex. 2,** *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,**

*Fox Body Camera Footage* at 0:29-3:15; *see also Est. of Harmon v. Salt Lake City*, 2021 WL 5232248, at *4. ("No verbal threats made by Mr. Harmon can be heard on the video.").

7.      Only two seconds after Mr. Harmon began to flee, Officer Fox drew his service weapon. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:16.

8.      Once Officer Fox drew his service weapon with his right hand, he only had his left hand to attempt use in subduing Mr. Harmon. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:22.

9.      Officer Robinson attempted to tackle Mr. Harmon and placed himself in Mr. Harmon's way. *See* **Ex. 2,** *Smith Body Camera Footage* at 8:15-8:18.

10.     Officer Robinson collided with Mr. Harmon and fell backward. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:15-8:18.

11.     Mr. Harmon did not assault Officer Robinson. *See generally* **Ex. 4,** *Robinson Body Camera* footage; *see also Est. of Harmon*, 2021 WL 5232248, at *3 (based on *de novo* review of all three body-camera videos).

12.     While Officer Robinson attempted to tackle Mr. Harmon, he had a view of Mr. Harmon's hands, which were empty. **Ex. 4**, *Robinson Body Camera* at 1:15-1:19.

13.     As Mr. Harmon ran northward after colliding with Officer Robinson, Officer Smith had a clear view of Mr. Harmon's right hand, which was empty. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:18.

14.     Officer Fox took aim at Mr. Harmon while Mr. Harmon was rapidly moving away from the officers in a southward direction. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:19; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

15.     Officer Fox intentionally and purposefully closed the distance between himself and Mr. Harmon after drawing his service weapon, without the ability to safely tackle Mr. Harmon, and without providing any warning that he might use deadly force.  *See* **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

16.     Mr. Harmon began to turn backward to after hearing Officers Fox and Smith behind him.  **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

17.     Mr. Harmon slowed and appeared to brace for impact.  **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

18.     Officer Smith had an unimpeded view of Mr. Harmon's torso and both of Mr. Harmon's hands.  **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18.

19.     From that vantage point, Officer Smith observed that Mr. Harmon was unarmed.  **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18.

20.     Of the three officers, Officer Smith had the best vantage point to observe Mr. Harmon's hands in the moments before he shot was and killed.  **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:18; **Ex. 5**, *Smith Deposition* at 84:3-11.

21.     Officer Fox was also able to view Mr. Harmon's torso and both of his hands when Mr. Harmon turned, as Officer Fox rapidly closed the distance between them.  **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:06.

22.     No weapons are visible in Mr. Harmon's hands from Officer Fox's body camera footage.  **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:06.

23.     After Mr. Harmon turned towards the officers, Officer Smith did not believe that Mr. Harmon represented a threat to the officers justifying the use of deadly force. **Ex. 5**, *Smith Deposition* at 86:21-24.

24.     After Mr. Harmon turned towards the officers, Officer Smith elected to use his TASER on Mr. Harmon. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:20; **Ex. 5**, *Smith Deposition* at 84:15-19. Officer Smith observed Mr. Harmon's torso turn towards him. *Id.* at 83:9-84:2. Officer Smith was able to see Mr. Harmon's torso "below the nipple line and above the knees," *id.* at 84:7-10, which he identified as an "optimal target area" for deploying his TASER. *Id.* at 84:10-11. Having a clear view of the "optimal target area" of Mr. Harmon's body "below the nipple line and above the knees" and aiming at "his chest in his nipple line," Officer Smith deployed his TASER. *Id.* at 84:7-19.

25.     Officer Smith fired his taser virtually simultaneously to Officer Fox firing his service weapon at Mr. Harmon. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:18; **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:07.

26.     Officer Smith never observed any weapon in Mr. Harmon's hands. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:19; **Ex. 5**, *Smith Deposition* at 85:3-23. When asked, "Did you believe that Mr. Harmon was armed at the time that you fired your taser?" Officer Smith responded, "I did not." **Ex. 5**, Smith Deposition at 85:24-86:1 (emphasis added). When asked to explain what went through his mind when he heard Officer Fox's gunshots, Officer Smith testified, "Truthfully?  What the fuck. . . . [I]n my head I had not seen a knife or any other reason, so I was trying to figure out exactly what [Officer Fox] saw and why he felt that it was appropriate to fire

his pistol." *Id.* at 86:12-20. When asked whether he thought deadly force was necessary, Officer

Smith testified, "If I was basing it solely off of what I could see at that time, no." *Id.* at 86:21-24.

27.     Despite his post-incident statements to the contrary, Officer Fox never observed a

weapon in Mr. Harmon's hands. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:19; **Ex. 3**, *Fox*

*Body Camera Footage* at 1:01-1:07.

28.     In the immediate moments after he shot and killed Mr. Harmon, Officer Fox made

no mention of a knife to his fellow officers. **Ex. 2**, *Smith Body Camera Footage* at 8:20 – 9:19;

**Ex. 3**, *Fox Body Camera Footage* at 1:06-1:53; **Ex. 5**, *Smith Deposition* at 89:13-15; **Ex. 1**, *Fox*

*Deposition* at 143:8-10, 144:22-145:3, 147:9-11. Only after the emergency had abated and there

was time for contemplation was there mention of a knife. **Ex. 6**, *Robinson Deposition* at 30:17-

31:1.

29.     Officer Fox testified that despite his total certainty that he saw a knife in Mr.

Harmon's hands, he was not sure why did not warn Officers Robinson or Smith about such knife

as they approached Mr. Harmon, who remained alive. **Ex. 1**, *Fox Deposition* at 143:5-7, 144:22-

145:17.

30.     As Officer Robinson approached Mr. Harmon, he made no efforts to look for or

secure a knife. **Ex. 3**, *Fox Body Camera Footage* at 1:13-1:48 and 2:22-3:15; **Ex. 4**, *Robinson*

*Body Camera Footage* at 1:18- 5:49; **Ex. 6**, *Robinson Deposition* at 30:17-31:1; 31:19-32:1; 36:6-

14.

31.     At his deposition, Officer Robinson testified that he could not remember whether

or not he saw a knife in Harmon's hands before Officer Fox opened fire. **Ex. 6**, *Robinson*

*Deposition* at 29:22-30-11; 38:13-14; 43:10-11.

32. While a knife can be seen laying in the grass near Mr. Harmon as Officer Robinson approached, Officer Robinson had not seen it prior to that point, and he did not react to it if he indeed noticed it on the ground. **Ex. 4**, *Robinson Body Camera Footage* at 1:31-1:35; **Ex. 6**, *Robinson Deposition* at 27:14-18; 30:17-31:1; 31:19-32:1; 36:6-14.

33. Mr. Harmon's DNA was **not** present on the knife. Following the shooting death of Mr. Harmon, the Unified Police Department conducted a forensic examination of the scene and the physical evidence. *See generally* **Ex. 7**, *Unified Police Department Investigation Report*. As part of that forensic investigation, the Castleview hospital knife collected from the scene, was processed with UPD forensic Investigator Brobeck to search for the presence of DNA. **Ex. 8**, *Laboratory Analysis Report*. According to Investigator Brobeck, "I first swabbed the handle of the knife for any potential touch DNA (item 1)[.] I then processed the knife with black powder. Nothing of value was recovered." *Id.*

34. The knife found at the scene is a manually opening folding-style knife that requires two hands to open. **Ex. 9**, Castleview Knife Photo.

35. The knife found at the scene is a tactical style knife often used by law enforcement and first responders. **Ex. 9**, Castleview Knife Photo.

36. All three officers were and are close colleagues and friends with one another. *See* **Ex. 1**, *Fox Deposition* at 74:20-78:23; **Ex. 5**, *Smith Deposition* at 67:15-70:8; **Ex. 6**, *Robinson Deposition* at 13:10-14:19.

37. Only Officer Fox describes Mr. Harmon as making hostile motions towards him, and Officer Smith affirmatively testified that Mr. Harmon did not make hostile motions towards Officer Fox or the other officers. *See* **Ex. 5**, *Smith Deposition* at 86:25-87:4 (Mr. Harmon did not

manifest hostile intentions toward any of the officers); 87:15-18 (Officer Smith does not remember if Mr. Harmon was doing anything with his hands before he fired his taser).

## APPLICABLE LEGAL STANDARDS

### I.     Summary Judgment

To obtain summary judgment the movant must show the absence of a genuine issue of material fact through materials in the record. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Evidence is viewed in the light most favorable to the nonmovant. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999). "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984). "The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment . . . . Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of even handed justice." *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980); Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U.L. Rev. 982, 1134 (2003) ("Taking decisionmaking authority from juries runs counter to basic and long-cherished principles of our system.").

It bears emphasizing that all inferences must be drawn in the nonmoving party's favor and credence given to evidence supporting such party's positions. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000). Plaintiffs are not required to win their case at the

summary judgment stage, but rather must establish only that genuine issues of material fact remain, and that a reasonable jury could infer from the disputed facts that he is able to prove his claims. *See Carr v. Castle*, 337 F.3d 1221, 1228 n.9 (10th Cir. 2003) ("In the summary judgment context, of course, ***[the plaintiff's] burden is only that of creating reasonable inferences***, not one of proof as such.") (emphasis added).

## II.   Scott v. Harris "Blatant Contradiction" Standard

Defendants also heavily rely on the rule announced by the United States Supreme Court in *Scott v. Harris*, 550 U.S. 372, 372 (2007), for the proposition that where video evidence "blatantly contradict[s]" Plaintiffs' account, "so that no reasonable jury could believe it," the Court must accept the facts depicted by the video.  This precise issue was front and center in the appeal, wherein the Tenth Circuit unequivocally found that Plaintiffs' version of events was **not** blatantly contradicted by the video evidence.  *Est. of Harmon*, 2021 WL 5232248.

## III.   Unreasonable Force Under the Fourth Amendment

"The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application."  *Graham v. Connor*, 490 U.S. 386, 396 (1989) (quoting *Bell v. Wolfish*, 441 U.S. 520, 559 (1979)).  In analyzing a claim of excessive force under the Fourth Amendment, courts must carefully assess the particular facts of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Graham*, 490 U.S. at 396.  "[T]he reasonableness inquiry in an excessive force case is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and

circumstances confronting them, without regard to their underlying intent or motivation.  *Id.* at 397 (internal quotations omitted).

In analyzing whether the use of deadly force was objectively reasonable under the Fourth Amendment, the second *Graham* factor, whether the suspect poses an immediate threat to the safety of the officers or others, is the most important.  Indeed, "an officer's use of [deadly] force is reasonable only 'if a reasonable officer in Defendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or others.'" *Pauly v. White (Pauly I)*, 814 F.3d 1060, 1070 (10th Cir. 2016), *overruled on other grounds*, 137 S.Ct. 548 (2017); *see also Tenorio v. Pitzer*, 802 F.3d 1160, 1164 (10th Cir. 2015) ("The Fourth Amendment permits an officer to use deadly force only if there is 'probable cause to believe that there [is] a *threat of serious physical harm to [the officer]* or to others.'") (quoting *Estate of Larsen*, 511 F.3d at 1260) (emphasis and alterations in original); *Cordova v. Aragon*, 569 F.3d 1183, 1192 (10th Cir. 2009) (same); *Thomson v. Salt Lake County*, 584 F.3d 1304, 1313 (10th Cir. 2009) (same).

To assist in their analysis of the second *Graham* factor, courts in this circuit often turn to the four-factor test established in *Estate of Larsen ex rel. v. Murr*.  Those non-exclusive factors are:

> (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F. 3d 1255, 1260 (10th Cir. 2008) (citing *Walker v. City of Orem*, 451 F.3d 1139, 1159 (10th Cir. 2006); *Jiron v. City of Lakewood*, 392 F.3d 410, 414-15 (10th Cir. 2004); *Zuchel v. Spinharney*, 890 F.2d 273, 274 (10th Cir. 1989)).  While the *Estate of Larsen* factors are arguably inapplicable to cases like this one, in which the suspect was unarmed, Defendants have couched

their argument in terms of the *Larsen* factors.  As such, Plaintiffs respond to those arguments below.  It bears repeating, however, that the Fourth Amendment reasonableness inquiry is a totality of the circumstances analysis.  *Graham*, 490 U.S. at 397.

## ARGUMENT

Defendants move for summary judgment against Plaintiffs based on their own subjective account of what the body-camera videos show.  The Tenth Circuit's order reversing the earlier dismissal of this case is highly instructive here.   The Tenth Circuit held that none of the Complaint's allegations material to the Fourth Amendment claim were blatantly contradicted by the videos after its own *de novo* review of those videos.  The Tenth Circuit order compels the same conclusion here, as those allegations are now facts supported by the record evidence. "Accordingly, the Estate has established a plausible claim that Mr. Harmon's right to be free from excessive use of force under the Fourth Amendment was violated."  Order and Judgment, *Est. of Harmon*, 2021 WL 5232248 at *5. As such, Defendants are not entitled to summary judgment.

As explained below, the Tenth Circuit's Order and Judgment have effectively removed from contention the following facts: (1)  Mr. Harmon was initially stopped for riding a bicycle without a red taillight, but was later determined to have an outstanding felony warrant; (2) based on the video, one can hardly conclude that Mr. Harmon assaulted Officer Robinson; (3) Mr. Harmon was unarmed; (4) Mr. Harmon made no verbal threats; (5) the officers never ordered Mr. Harmon to drop a weapon; (6) Mr. Harmon's behavior manifested the intent to escape; and (7) based on the video it would not be reasonable to interpret Mr. Harmon's movements as hostile motions posing an immediate threat to the officers' safety.  *Est. of Harmon*, 2021 WL 5232248. Based on these factual findings, the Tenth Circuit Court of Appeals held that "a reasonable trier of

fact could view Officer Fox's actions as objectively unreasonable." *Id.* at 12.  Defendants' Motion asks this Court to take a position contrary to the Tenth Circuit Court of Appeals on all of these facts based largely on the same evidence that the Circuit already reviewed *de novo*.  *See generally* Defendants' Motion for Summary Judgment, [ECF No. 66].  It is clear, then, that genuine disputes over these material facts preclude summary judgment here.   Plaintiffs will address these disputes with specificity in turn below.

## I.      There is a Genuine Dispute of Material Fact as to the Severity of the Crime at Issue

As to the first *Graham* factor, the severity of the crime at issue, Defendants argue that Mr. Harmon engaged in multiple serious crimes, which purportedly weighs in favor of the use of deadly force.  *See* Defendants' Motion for Summary Judgment, [ECF No. 66] at 19.  Plaintiffs concede that Mr. Harmon committed minor traffic infractions, was the subject of an outstanding felony warrant, and ultimately attempted to flee from the officers.   As the Tenth Circuit stated, the outstanding felony warrant "**slightly** favors the use of force."  *Est. of Harmon*, 2021 WL 5232248 at *7-8 (emphasis added).   Critically, Officer Fox – the shooter – **did not know what crime was specified in the warrant at all**.   SAMF at ¶ 2.  He merely assumed it was a felony warrant according to other circumstantial evidence.  *See* **Ex. 10,** *Fox Declaration* at ¶¶ 5-6.

With respect to the other crimes that Defendants invoke, such arguments are meritless in light of the Circuit's Order.  The Tenth Circuit has already reviewed the body-camera footage on *de novo* review and stated: "One can hardly conclude that the encounter could only be characterized as an assault based on the body-cam footage."  *Est. of Harmon*, 2021 WL 5232248 at *8. The deposition testimony in this case casts further doubt on Defendants' assertion that Mr.

Harmon assaulted Officer Robinson.  Indeed, Officers Fox and Smith did not believe or otherwise claim that Mr. Harmon assaulted Officer Robinson.  SADF at ¶¶ 9-11; RSUMF at ¶32.  While Officer Robinson testified that Mr. Harmon "shoved" him, even he was confused as to what transpired when the two men collided.  RSUMF at ¶ 32 ("I was chasing him and I grabbed a hold of his clothing.  And even though I was behind him, he needed to turn because the iron gate was there and so *we kind of got tangled up right there*.") (emphasis added).  The video evidence and the deposition testimony, at minimum, give rise to a genuine dispute of fact as to whether Mr. Harmon assaulted Officer Robinson.

Defendants also assert that Mr. Harmon committed the additional crime of aggravated assault because he purportedly threatened Officer Fox with a weapon after the chase ensued. Defendants' Motion for Summary Judgment, [ECF No. 66] at 19.  Because that contention is more relevant to second *Graham* factor, it is analyzed with the other disputed facts pertaining to that factor.

## II. There is a Genuine Dispute of Material Fact as to Whether Mr. Harmon Posed a Serious and Immediate Threat to the Officers

Applying *Estate of Larsen ex rel. v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008), Defendants argue that Mr. Harmon presented a threat of serious physical harm to the officers. However, the facts material to that assertion are all in genuine dispute, including whether and to what extent Mr. Harmon complied with the officers' orders, whether Mr. Harmon was armed, whether the officers perceived or could have perceived that Mr. Harmon was armed, whether Mr. Harmon's movements towards the officers were hostile, and whether under the totality of the circumstances Mr. Harmon manifested violent intentions.

**A. Neither Officer Fox nor the Other Officers Ordered Mr. Harmon to Drop Any Weapon**

"As to the first *Estate of Larsen* factor, the officers never ordered Mr. Harmon to drop a weapon." *Est. of Harmon*, 2021 WL 5232248 at *10. While Defendants argue that Officer Fox did not have time to issue an order or warning prior to opening fire on Mr. Harmon, the Tenth Circuit Court of Appeals did not credit that defense in its *de novo* review of the video evidence. *See id.* This factor unquestionably weighs in favor of Plaintiffs.

**B. There is Genuine Dispute of Material Fact as to Whether Mr. Harmon was Armed**

The second *Estate Larsen* factor is whether the suspect made any hostile motions with a weapon towards the officers. *Estate of Larsen*, 511 F.3d at 1260. Here, are there are genuine disputes of fact as to whether Mr. Harmon was even armed at all, and whether Mr. Harmon's movements would reasonably be considered "hostile motions . . . towards the officers." *Id.* At no time is a knife visible in Mr. Harmon's hands in any of the body-camera videos. *See* RSUMF at ¶¶ 45-46, 48-50; SADF at ¶¶ 13, 18-23. On this point, the Tenth Circuit Court Appeals, reviewing the video *de novo*, agreed. *Est. of Harmon*, 2021 WL 5232248 at *11 ("There was no knife visible in the video . . . ."). While it should be sufficient that no knife is visible in Mr. Harmon's hands in any of the body-camera videos, other record evidence also demonstrates that none of the officers at the scene ever saw or otherwise perceived a knife.

    *i.*    <u>Only Officer Fox Claims to Have Seen a Knife in Mr. Harmon's Hands</u>

After Mr. Harmon began to flee, Officer Smith drew his TASER. SADF at ¶ 24. When Officer Smith elected to use his TASER, Officer Smith had clear view of Mr. Harmon's torso and arms and hands. *Id.* at ¶¶ 24-26. The evidence also shows that Officer Smith fired his TASER virtually simultaneously to Officer Fox's firing his handgun. *Id.* at ¶ 25. Thus, at the time Officer

Smith deployed his TASER, he had a clear view of Mr. Harmon's upper and mid body during the precise time period that Defendants' claim that Mr. Harmon turned toward Officer Fox and threatened him with a knife in his raised hand.  *Id.* at ¶ 24.  **But Officer Smith did not see a knife.**

When asked, "Did you believe that Mr. Harmon was armed at the time that you fired your taser?"  Officer Smith responded, "**I did not.**"  SAMF at ¶ 26 (emphasis added).  When asked to explain what went through his mind when he heard Officer Fox's gunshots, Officer Smith testified, "**Truthfully?  What the fuck**. . . . [I]n my head **I had not seen a knife or any other reason**, so I was trying to figure out exactly what [Officer Fox] saw and why he felt that it was appropriate to fire his pistol." *Id.* (emphasis added).  When asked whether he thought deadly force was necessary, Officer Smith testified, "If I was basing it solely off of what I could see at that time, no."  *Id.* Finally, Officer Smith testified that he never saw the knife that Defendants allege was near Mr. Harmon's body, nor did he hear about it from the other officers.  When asked, "Did you ever see any weapon in Mr. Harmon's possession?" he testified, "I didn't see the weapon until the news published it two weeks later", **Ex. 5**, *Smith Deposition* at 88:22-25, and shared the following colloquy with Plaintiffs' counsel:

> Q. You didn't see a knife on the ground at all?
> A. I did not.
> Q. Do you know what knife I'm talking about?
> A. I've seen the pictures since then, so I can assume that it's the one that they took the photograph of.
> Q. But you never saw it?
> A. Never saw it.

*Id.* at 89:1-8.

While Officer Smith maintains a clear recollection of the events and testified that he never saw a knife in Mr. Harmon's hands or even on the ground after the shooting, Officer Robinson

testified that he could not remember whether he saw a knife in Mr. Harmon's hands, even after refreshing his memory by watching the body-camera footage of all three officers before his deposition. *See* **Ex. 6**, *Robinson Deposition* at 29:19-30:11; 31:5-11; *see also id.* at 42:18-43:6; 80:6-81:15. When pressed, Officer Robinson attempted to explain his inability to remember whether he saw Mr. Harmon with a knife by downplaying the shooting as just one of many significant incidents on the job:

> Q.    Do you recall if you had seen a knife in his hand?
> [Counsel objects]
> Q.    It seems like something you would remember.
> A.    It's five years ago.
> Q.    It's a significant event.
> A.    I've had a few.

**Ex. 6**, *Robinson Deposition* at 29:22-30:4. Officer Robinson's nonchalant recollection of shooting stands in stark contrast to Officer Fox's recitation of events. *See* Defendants' SUMF, ¶ 57 ("Even with over 15 years of law enforcement experience, the encounter with Mr. Harmon was the scariest situation Officer Fox has faced.").

In sum, at no point in any of the body-camera footage is a knife visible in Mr. Harmon's hands. Officer Smith, who had the best vantage point and clearest view of Mr. Harmon's hands and torso as he turned just seconds before being shot, did not observe a knife in Mr. Harmon's hands. Officer Robinson maintains that he cannot remember whether he saw a knife in Mr. Harmon's hands. Therefore, the only evidence provided to support the allegation that Mr. Harmon actually possessed a knife are Officer Fox's own self-serving statements. Those statements cannot by themselves place the evidentiary issue beyond debate. Officer Fox's testimony, even if it is presumably the same as his deposition testimony, must be evaluated for its credibility by a jury— and weighed against the contradictory evidence in the record (namely, the body camera footage

and the other officers' testimonies).

ii.     <u>*The Officers' Behavior at the Scene Indicates That They Did Not Perceive Mr. Harmon to Be Armed*</u>

In addition to the evidence discussed above, ample circumstantial evidence also leads to the inference that Officer Fox did not see a knife.  First, Officer Fox never warned Officers Smith or Robinson that Mr. Harmon was armed with a knife prior to opening fire.  *See generally* **Ex. 3**, *Fox Body Camera Footage*.  Second, Officer Fox did not warn the other officers that Mr. Harmon had a knife as they approached Mr. Harmon after he had been shot.  SADF at ¶¶ 28-29.  Mr. Harmon was still alive at that time, and a reasonable officer would have warned his colleagues if he believed the subject was armed.  *Id.* at ¶ 29.  Third, Officer Robinson made no mention of the knife to the other Officers when he reached Mr. Harmon, and he did not appear to notice a knife. *Id.* at ¶¶ 30-32.  Fourth, Officer Robinson did not attempt to secure the knife, move it away from Mr. Harmon, or move it at all. *Id.*  Neither did Officer Fox.  Officer Robinson was not able to offer a cogent explanation as to why he did not attempt to secure the knife, even though he acknowledged that Mr. Harmon still presented a safety risk to the officers with a knife in close proximity to his reach.  *Id.* at ¶ 29.

iii.     <u>*The Recovered Knife Likely Belonged Emergency Personnel*</u>

The characteristics of the knife found at the scene also lead to the reasonable inference that it was never in the possession of Mr. Harmon, and certainly was not in his hand when he was shot and killed.  First, the knife is a tactical rescue knife commonly carried by law enforcement personnel and first responders.  *See* **Ex. 9**, *Castleview Knife Photo*; *cf.* **Ex. 11**, *Fox Knife Photo*. In fact, the knife found on the ground was originally mistaken for Officer Fox's knife due to the similar style.  **Ex. 12**, *Report of Alma Sweeney* at 121.  Similarly, the knife is branded "Castleview

Hospital," **Ex. 9**, *Castleview Knife Photo*, leading to the inference that it belonged to an employee of Castleview Hospital.  The forensic photos of the knife show that it has a glossy silver finish.  *Id.* However, it does not appear to show any signs of having been held, such as smudges or fingerprints.  *Id.*

   iv.   <u>*Mr. Harmon's DNA was Not Present on the Recovered Knife*</u>

   Finally, and most critically, when the Unified Police Department tested the knife for the presence of DNA, none was recovered.  *See* SADF at ¶ 33; **Ex. 8**, *Laboratory Analysis Report*. These facts, by themselves and together, lead to the reasonable inference that Mr. Harmon did not possess or handle the knife in the moments before Officer Fox opened fire on him and therefore Officer Fox's claimed justification is self-serving pretext.

**C. There is a Genuine Dispute of Material Fact as to Whether Mr. Harmon Made Hostile Motions Towards the Officers**

   Also in regard to the second *Estate of Larsen* factor, Defendants claim that Mr. Harmon made hostile motions toward Officer Fox.  Defendants argue that Mr. Harmon "stopped running away from the Officers, planted his right foot, and began turning back toward Officer Fox with his right hand raised in the air and his body slightly crouched. . . . Officer Fox saw the knife in Mr. Harmon's hand and believed that Mr. Harmon was going to stab him."  Defendants' Motion for Summary Judgment, [ECF No. 66] at 21.  However, as discussed above, Mr. Harmon was unarmed and there is a genuine dispute between the parties as to that material fact.  There is also dispute as to whether Mr. Harmon made **any** hostile motions towards Officer Fox or the others.

   Defendants' description of Mr. Harmon's body language in the moments before he was shot and killed is simply inaccurate and contradicted by the video evidence.  While Mr. Harmon did begin to slow and turn toward Officers Smith and Fox as they chased him, these actions cannot

be reasonably interpreted as Mr. Harmon preparing himself to attack the officers.  Mr. Harmon slowed and turned to look at his pursuers.  As he was running and turning, Mr. Harmon's arms naturally raised above his waist.  But just because Mr. Harmon's arms raised as he turned, it is not fair to say that that motion could only be interpreted as assuming a fighting stance.  Indeed, according to the Tenth Circuit, based on its own *de novo* review of the video, "the fact that Mr. Harmon stopped running with his right arm raised does not clearly constitute 'a threatening, stabbing stance.'"  *Est. of Harmon*, 2021 WL 5232248 at *10. Moreover, only Officer Fox describes Mr. Harmon as making hostile motions towards him, and Officer Smith affirmatively testified that Mr. Harmon *did not* make hostile motions towards Officer Fox or the other officers. *See* SADF at ¶ 37 (Mr. Harmon did not manifest hostile intentions toward any of the officers); (Officer Smith does not remember if Mr. Harmon was doing anything with his hands before he fired his taser).

**D.  There is a Genuine Dispute of Material Fact as to Mr. Harmon's Manifest Intentions**

As to the final pertinent *Estate of Larsen* factor, the manifest intentions of the suspect, a genuine dispute between the parties remains.  Defendants contend that Mr. Harmon manifested his intent to "avoid arrest by any means necessary, including by violent confrontation."  Defendants' Motion for Summary Judgment, [ECF No. 66], at 24.  Here, the Tenth Circuit Court of Appeals decision is once more instructive.  The Tenth Circuit found that the fourth *Estate of Larsen* factor favored Defendants, but not because the record revealed that Mr. Harmon was ready for a violent showdown, but rather because, "Mr. Harmon manifested the intention to evade arrest by running and pushing past an officer." *Est. of Harmon*, 2021 WL 5232248 at *9. While manifesting the intent to evade arrest weighs in favor of some use of force it certainly does not, by itself, justify

the use of deadly force.

There is also a dispute as to whether Mr. Harmon threatened the officers.  Defendants have long maintained that in the process of fleeing from arrest Mr. Harmon made threatening statements towards the officers.  All three officers testified in their depositions that Mr. Harmon made statements to the effect that he would "cut" or "stab" the officers.  However, no such threats or like statements can be heard on any of the three body-camera videos.  SAMF at ¶¶ 4-5. In fact, Mr. Harmon did not threaten the officers.  *Id.* at ¶ 6.  *See also Est. of Harmon*, 2021 WL 5232248 at *9 ("no verbal threats made by Mr. Harmon can be heard on the video.").  This dispute must be resolved in Plaintiffs' favor at this stage.  *Estate of Booker v. Gomez*, 745 F.3d 405, 412 n.3 (10th Cir. 2014).

Defendants also seek to rely upon Mr. Harmon's toxicology report.  *See* Defendants' Motion for Summary Judgment, [ECF No. 66] at 25.  Defendants argue that the presence of controlled substances including THC and methamphetamine in Mr. Harmon's body corroborate Mr. Harmon's intention to "violently square off with the Officers."  *Id.*  However, none of the officers had any knowledge whatsoever at the time about what substances were or were not in Mr. Harmon's body.  None of the officers stated in their IA interviews after the fact they suspected that Mr. Harmon was under the influence of any substance.  And none of the officers testified in their depositions that they their actions were motivated by the alleged presence of drugs in Mr. Harmon's system.  As such, the report itself and its contents are irrelevant and inadmissible.  The inclusion of the toxicology report, like the inclusion of Mr. Harmon's years old and irrelevant criminal record, serves only to disparage Mr. Harmon's character in front of the Court.  Defendants are aware these facts have no significance within the applicable legal framework, and yet they

have included them all the same for illegitimate purpose.

Accepting Plaintiffs' well-supported account of the events and drawing all inferences in Plaintiffs' favor, Mr. Harmon can prove a Fourth Amendment violation under the well-established law in this circuit. For example, in *Larsen*[3] the plaintiff was armed with a knife. 511 F.3d at 1258. The Tenth Circuit held that the use of force was reasonable based, in part, on the following undisputed facts:

> (1) Larsen had already threatened violence against himself and others; (2) the officers responded to an emergency call late at night; (3) when the officers arrived, they encountered a man armed with a knife; (4) both officers repeatedly told Larsen to put down the knife; (5) the knife was a large weapon with a blade over a foot in length rather than a mere pocket knife or razor blade; (6) Larsen refused to cooperate with the officers' repeated orders to drop his weapon; (7) Larsen held the high ground vis-a-vis the officers; (8) Larsen raised the knife blade above his shoulder and pointed the tip towards the officers; (9) Officer Brase was also prepared to use force and was moving into position to be able to do so; (10) Larsen turned and took a step toward Officer Murr; (11) the distance between Murr and Larsen at the time of the shooting, though disputed, was somewhere between 7 and 20 feet.

*Id.* at 1260–61. The facts of the instant case could hardly be more different. Mr. Harmon did not threaten himself or others. SADF at ¶¶ 4-6. Mr. Harmon was unarmed. *Id.* at ¶¶ 24, 26. The officers issued no verbal commands for Mr. Harmon to drop any alleged weapon (undisputed). Mr. Harmon and the officers were on equal level and Mr. Harmon made no hostile motions. *See supra* Section I(C), (D). Unlike in *Estate of Larsen*, Officer Fox was the only officer who prepared to use lethal force. SADF at ¶ 24. In sum, Larsen was clearly armed with a large knife,

---

[3] A substantially similar analysis was submitted to the Tenth Circuit Court of Appeals as part of Plaintiffs-Appellants' Opening Brief.

disobeyed orders to drop it, made threats, and then moved towards officers with the knife raised and pointed at the officers. *Estate of Larsen*, 511 F.3d at 1260. Mr. Harmon, by contrast, was not armed, made no threats, was not ordered to drop a knife (or given any warnings prior to being shot) and was not making hostile motions or manifesting violent intentions.

In *Tenorio v. Pitzer*, an officer shot Russell Tenorio in Tenorio's home. 802 F.3d at 1161. The officers were responding to a 9-1-1 call made by one of Tenorio's relatives, disclosing that Tenorio had a knife to his own throat, that he had been violent in the past, that he was drunk, and that he was waving the knife in close proximity to others. *Id.*

Officer Pitzer entered Tenorio's home and ordered the occupants to step out into the living room. *Id.* Tenorio's wife entered the living room, followed by Tenorio, "who had a blank stare and was carrying a santoku-style kitchen knife with a three-and-a-quarter-inch blade." *Id.* at 1163. As Tenorio continued to walk, "Pitzer saw the knife and yelled, 'Sir, put the knife down! Put the knife down, please! Put the knife down! Put the knife down!' When Tenorio was about two and one-half steps into the living room, Pitzer shot him, [another officer] tased him, and he fell to the floor." *Id.* The Tenth Circuit affirmed the district court's denial of qualified immunity, observing that:

> [T]he record supports some potential jury findings that would establish Tenorio's claim—in particular, that Tenorio did not refuse to drop the knife because he was not given sufficient time to comply with Pitzer's order; that Tenorio made no hostile motions toward the officers but was merely holding a small kitchen knife loosely by his thigh and made no threatening gestures toward anyone[]; that Tenorio was shot before he was within striking distance of [Pitzer]; and that, for all Pitzer knew, Tenorio had threatened only himself and was not acting or speaking hostilely at the time of the shooting.

*Id.* at 1164–65 (alterations and internal quotations omitted). In denying qualified immunity, the *Tenorio* court cited to *Zuchel v. City & County of Denver*, 997 F.2d 730, 735–37 (10th Cir.1993),

to establish that the law applied to Mr. Tenorio was clearly established. *Tenorio,* 802 F.3d at 1165. Indeed, *Zuchel* specifically established that where an officer had reason to believe that a suspect was only holding a knife, not a gun, and the suspect was not charging the officer and had made no slicing or stabbing motions toward him, that it was unreasonable for the officer to use deadly force against the suspect. *Id.* at 1165-66 (citing *Zuchel*, 997 F.2d at 735-37).

### III.     The Law was Clearly Established that Officer Fox's Conduct Violated Mr. Harmon's Rights Under the Fourth Amendment

In addition to their argument that Plaintiffs cannot prove a Fourth Amendment violation, Defendants once again invoke the qualified-immunity defense on behalf of Defendant Officer Fox on the basis Officer Fox's conduct did not violate clearly established law. Defendants' Motion for Summary Judgment, [ECF No. 66] at 27-28. Defendants' argument misses the mark for the same reasons as it did on Defendants' Motion to Dismiss – it applies the clearly-established prong of the qualified immunity analysis only to its own account of the underlying facts – which are genuinely disputed here. *See generally* RSUMF; SADF.

Defendants argue that there was no binding precedent prohibiting the use of deadly force where "an individual being arrested on a second-degree felony warrant breaks free from officers to evade arrest, physically assaults an officer, verbally threatens the officers, and then stops fleeing, turns back toward the officers and wields a knife from only a few feet away." Defendants' Motion for Summary Judgment, [ECF No. 66] at 27-28. However, Plaintiff has produced admissible evidence that Mr. Harmon did not assault an officer, did not verbally threaten any officers, did not stop fleeing, and did not turn back to the officers wielding a knife. These factual disputes must be resolved in favor of the non-moving party. Under Plaintiffs' set of facts, it was indeed clearly

established by numerous precedents that an officer is not justified in shooting an unarmed, fleeing suspect who did not present a serious and immediate threat to the officers.  In overturning the prior district court's ruling as to the clearly established prong, the Tenth Circuit Court of Appeals accurately stated, "There have been numerous cases in this circuit involving an officer shooting of an unarmed (or knife-wielding) person." *Est. of Harmon*, 2021 WL 5232248 at *13. In support of its decision that the law was clearly established at the time of the incident, the Court cited *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) (citing *Zuchel v. City and Cnty. of Denver*, 997 F.2d 730 (10th Cir. 1993)), and *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015).  The Tenth Circuit's view is plainly correct, and the cases it cited satisfy the second prong of the qualified immunity analysis under the facts of this case.  Moreover, many of these cases also stand for the proposition that even where a suspect is armed with a knife, so long as that suspect does not make hostile motions with that knife such that the lives of the responding officers or others are in danger, deadly force is not justified.  *See, e.g.*, *Tenorio,* 802 F.3d at 1164.  Even assuming then, *arguendo*, that Mr. Harmon possessed a knife, but made not hostile motions or threats and did not otherwise present a serious and immediate threat to the officers, deadly force would still amount to a clearly established Fourth Amendment violation.  *Id.*

### IV.   Plaintiffs' *Monell* Claim Against Salt Lake City Should Not Be Summarily Adjudicated

Defendants' sole argument that the Court should enter judgment against Plaintiffs on their *Monell* claim is that Plaintiffs cannot establish an underlying constitutional violation.  Defendants' Motion for Summary Judgment, [ECF No. 66] at 28-29.  As the record evidence presented here and in Defendants' Motion demonstrates clear disputes of material fact regarding whether Officer

Fox's use of deadly force against Mr. Harmon was justified, Plaintiffs' *Monell* claim must survive along with their individual capacity claim.

### V.      Plaintiffs State Law Claims Should Not Be Summarily Adjudicated

In their effort to obtain the dismissal of the entirety of this action, Defendants also ask this Court to enter judgment against Plaintiffs on their state law claims. Defendants raised similar arguments in their Motion to Dismiss. *See* Defendants' Motion to Dismiss, [ECF No. 12], at 21-23. Defendants argue that Officer Fox is immune from Plaintiffs' wrongful death claim under the Governmental Immunity Act of Utah (UGIA) and that Plaintiffs' unnecessary rigor claims cannot proceed because Officer Fox's actions were justified, and his violation was not "flagrant." Defendants' Motion for Summary Judgment, [ECF No. 66], at 29-34. Plaintiffs address these arguments in turn.

### A.  Plaintiffs' Wrongful Death Claim is Not Barred by the UGIA

Defendants ask this Court to enter judgment against Plaintiffs on their wrongful death claim on the grounds of governmental immunity. Defendants claim that Officer Fox is immune because he did not commit a wrongful or neglectful act. Defendants' Motion for Summary Judgment, [ECF No. 66] at 29-30. Defendants focus on Plaintiffs' claim that the wrongful act Officer Fox committed was violating Mr. Harmon's rights under the Utah State Constitution's unnecessary rigor clause.

Plaintiffs' wrongful death claim is brought under Utah Code § 78B-3-106, which states: "when the death of a person is caused by the wrongful act or neglect of another, his heirs, or his personal representatives for the benefit of his heirs, may maintain an action for damages against the person causing the death[.]" The plain language of the statute provides that the wrongful death

must be the result of a "wrongful act" or "neglect" by the defendant.  Thus, the wrongful death statute is "fault based." *Adkins v. Uncle Bart's, Inc.*, 1 P.3d 528, 530 (Utah 2000).  "It must be shown that a defendant negligently breached some duty owed to the [decedent] and that the breach proximately caused the death." *Id.*

The UGIA provides the circumstances in which the government has waived immunity from liability.  *See* Utah Code § 63G-7-101–904.  "The scope of the waivers and retentions of immunity [under the UGIA] governs all claims against governmental entities or against their employees or agents arising out of the performance of the employee's duties, within the scope of employment, or under color of authority."  Utah Code § 63G-7-101(2)(b).  The UGIA provides that "[a] governmental entity and an employee of a governmental entity retain immunity from suit unless that immunity has been expressly waived . . . ." Utah Code § 63G-7-101(3).

For at least three reasons, the City is not entitled to sovereign immunity. First, the negligence waiver applies to the wrongful death claim. As the Utah Supreme Court discussed in *Cunningham v. Weber County*, "[t]he GIA waives immunity for "'*any* injury proximately caused by a negligent act or omission of an employee' committed within the scope of her employment." 2022 UT 8, ¶ 33 (quoting Utah Code § 63G-7-301(2)(i)). Officer Fox's use of unnecessary rigor against Mr. Harmon in the course of making an arrest breaches the standard of care set forth in the Utah Constitution.

Second, the Utah Supreme Court has held that gross negligence or "reckless indifference" is included in the negligence waiver for the purposes of the UGIA.  *Bingham v. Roosevelt City Corp.*, 235 P.3d 730, 743 (Utah 2010).  "In Utah, gross negligence is 'the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the

consequences that may result.'" *Penunuri v. Sundance Partners, Ltd.*, 423 P.3d 1150, 1159 (Utah 2017). Officer Fox's conduct showed a careless disregard to the life of another, which meets the gross negligence standard.

Third, the wrongful death cause of action arises from the constitutional tort of unnecessary rigor, which is not (and, as discussed below, cannot be) listed as an exception to the waiver. Because the unconstitutional conduct is not included in the exceptions stated in § 201, immunity is not reinstated and the negligence waiver applies to Plaintiffs' wrongful death claim.

The Utah Constitution bars immunity for wrongful death claims against a city employee for unconstitutional misconduct. Under the Utah Constitution, "[t]he right of action to recover damages for injuries resulting in death, shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation, except in cases where compensation for injuries resulting in death is provided for by law." Utah Const. art. 16, § 5. "[T]he protection for wrongful death contained in article XVI, section 5 of the Utah Constitution places it in a 'position of privilege among torts' and entitles it to 'special protection against attempts to pare back its scope.'" *Riggs v. Georgia-Pac. LLC*, 345 P.3d 1219, 1225 (Utah 2015) (quoting *Bybee v. Abdulla*, 189 P.3d 40, 45-46 (Utah 2008). "The plain meaning of the constitutional provision . . . is to prevent the abolition of the right of action for a wrongful death, whether in a wholesale or piecemeal fashion." *Berry ex rel. Berry v. Beech Aircraft Corp.,* 717 P.2d 670, 684 (Utah 1985).

The wrongful death claim in this case arises from a type of misconduct for which the government is never immune from liability: unconstitutional conduct. *Cf. Colman v. Utah State Land Bd.*, 795 P.2d 622, 634–35 (Utah 1990) ("The people of Utah established the Utah Constitution as a limitation on the power of government. It can hardly be maintained that the

doctrine of sovereign immunity, alone among all doctrines, is outside of the limitations the people established."). The framers of the Utah Constitution guaranteed that "[p]ersons arrested . . . shall not be treated with unnecessary rigor." Utah Const. Art 1, § 9. This provision provides an express and unequivocal limitation on the government's power. Only the government and its employees have the authority to make an arrest, and thus only they can be held accountable for the use of unnecessary rigor against an arrestee. Thus, the Utah Constitution overrides any invocation of immunity by the government in a wrongful death stemming from unconstitutional conduct. Accordingly, Defendants are not immune from the wrongful death claim and the motion should be denied.

## B. Plaintiffs Have Presented Sufficient Evidence to Support their Unnecessary Rigor Claim

Article 1, Section 9, of the Utah Constitution provides: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. *Persons arrested or imprisoned shall not be treated with unnecessary rigor*." (emphasis added). "Article I, section 9 is a self-executing provision. This provision does more than state general principles; it prohibits specific evils that may be defined and remedied without implementing legislation." *Bott v. DeLand*, 922 P.2d 732, 737 (Utah 1996), *abrogated on other grounds by Spackman ex rel. Spackman v. Bd. of Educ. of Box Elder Cty. Sch. Dist.*, 16 P.3d 533 (Utah 2000).

"If an official knowingly and unjustifiably subjects an [arrestee] to circumstances previously identified as being unnecessarily rigorous, that is obviously a flagrant violation." *Dexter v. Bosko*, 184 P.3d 592, 598 (Utah 2008). Conversely, where there is no prior case law establishing a prohibition on the conduct at issue, a plaintiff can establish "a flagrant violation of

the unnecessary rigor clause . . . whenever the following two elements are established:  First, the nature of the act presents an obvious and known serious risk of harm to the arrested or imprisoned person; and second, knowing of that risk, the official acts without other reasonable justification." *Id.*

Defendants assert Defendant Fox's conduct was objectively reasonable and, alternatively, that Fox did not violate a clearly established constitutional right.  In review of the standard set forth in *Dexter*, Defendants' argument must be rejected.  First, Defendant Fox violated a clearly established constitutional right.  Namely, the right to be free from excessive force, which "was well established in this circuit at the time of the events in question."  *Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006). As discussed at length in the proceeding sections, the record evidence produces genuine disputes of material fact as to whether Defendant Fox violated Mr. Harmon's rights under Fourth Amendment.  *See infra* Argument (I).  Second, even if the Court concludes there was not a violation of a clearly established right, Defendant Fox's conduct was still a flagrant violation.  It cannot be disputed that the shooting "present[ed] an obvious and known serious risk of harm to" Mr. Harmon.  *See Dexter*, 184 P.3d at 598.  The risk of death was clear when Defendant Fox fired his weapon.  Moreover, there is no reasonable justification for shooting an unarmed arrestee.

## **<u>CONCLUSION</u>**

Based on the foregoing, Defendants' Motion for Summary Judgment should be denied in its entirety.  The disputed issues of fact herein can only fairly and consistently with the interests of justice be decided by a jury.  Mr. Harmon's family and the community of Salt Lake City deserve

their day in court.


DATED this 27th day of October 2022.


RATHOD │ MOHAMEDBHAI LLC

*s/ Nicholas A. Lutz*
Nicholas A. Lutz
Qusair Mohamedbhai
2701 Lawrence Street, Suite 100
Denver, Colorado 80205
(303) 578-4400
(303) 578-4401 (f)
nl@rmlawyers.com
qm@rmlawyers.com

DEISS LAW PC

*s/ Corey D. Riley*
Corey D. Riley
Andrew G. Deiss
10 West 100 South, Suite 425
Salt Lake City, UT 84101
criley@deisslaw.com
adeiss@deisslaw.com

ATTORNEYS FOR PLAINTIFF