In the Matter of:

ESTATE OF PATRICK HARMON, SR., et al.

vs

SALT LAKE CITY CORPORATION, et al.

CLINTON FOX

June 17, 2022



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022

**Page 3**

```
1   CLINTON FOX, WITNESS
2   INDEX OF EXAMINATION                        PAGE
3   Examination by Mr. Lutz                        5
4   Reporter Certificate                        209
5   Witness Certificate                         211
6
7   INDEX OF EXHIBITS
    EXHIBIT                                     PAGE
8
    No. 8     Training Report History Bates-stamped   51
9             SLCC000561-573
10  No. 9     Compilation of Photos and General       66
              Offense Reports Bates-stamped
11            SLCC000576-000603
12  No. 10    Taser X26P CEW User Manual              88
13  No. 11    Salt Lake City Police Department Polices 112
              and Procedures Manual
14
    No. 12    Hand Drawn Diagram                     132
15
    No. 13    Salt Lake City Police Department General 156
16            Offense Hardcopy Bates-stamped
              SLCC000121
17
    No. 14    Color Photo Bates-stamped SLCC001590    162
18
    No. 15    Color Photo Bates-stamped SLCC001592    167
19
    No. 16    Color Photo Bates-stamped SLCC001619    168
20
    No. 17    Color Photo Bates-stamped SLCC001610    168
21
    No. 18    Internal Affairs Unit Complaint         178
22            Disposition Form Bates-stamped
              SLCC000635
23
    No. 19    Police Department Memorandum            180
24            Bates-stamped SLCC000647-648
25
```

---

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

     – – –

```
ESTATE OF PATRICK HARMON,  )
SR.; PATRICK HARMON II,    )  No. 2:19-cv-00553-HCN-CMR
as Personal Representative )
of the Estate of Patrick   )
Harmon, Sr., and heir of   )  District Judge:
Patrick Harmon Sr., TASHA  )  Howard C. Nielsen, Jr.
SMITH, as heir of Patrick  )
Harmon, Sr.,               )  Magistrate Judge:
                           )  Cecilia Mr. Romero
       Plaintiffs,         )
                           )
vs.                        )
                           )
                           )
SALT LAKE CITY CORPORATION,)
a municipality; and OFFICER)
CLINTON FOX, in his        )
individual capacity,       )
                           )
       DEFENDANTS.         )
---------------------------
```

DEPOSITION OF
CLINTON FOX
DEISS LAW
SALT LAKE CITY, UTAH
JUNE 17, 2022

**Page 2**

```
1   APPEARANCES OF COUNSEL:
2   FOR PLAINTIFFS:
3        Nicholas A. Lutz
         RATHOD MOHAMEDBHAI, LLC
4        2701 Lawrence Street, Suite 100
         Denver, Colorado 80205
5        303.578.4400
         Nl@rmlawyers.com
6
         Corey D. Riley
7        DEISS LAW PC
         10 West 100 South, Suite 425
8        Salt Lake City, Utah 84101
         801.433.0226
9        801.433.0226
10
11  FOR DEFENDANTS:
12        Katherine Nichols
          SALT LAKE CITY ATTORNEY'S OFFICE
13        35 East 500 South, Second Floor
          Salt Lake City, Utah 84111
14        385.468.7900
          Katherinenichols@slcgov.com
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1   INDEX OF EXHIBITS (Cont.)
    EXHIBIT                                     PAGE
2
    No. 20    Internal Affairs Case Routing and Flow  180
3             Bates-stamped SLCC000652
4   No. 21    Body Cam Footage Bates-stamped HARMON24 183
5   No. 22    Body Cam Footage Bates-stamped HARMON28 190
6   No. 23    Body Cam Footage Bates-stamped HARMON36 195
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID.1139  Page 3 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                    5 to 8

Page 5

1    SALT LAKE CITY, FRIDAY, JUNE 17, 2022, 9:08 A.M.
2                        - - -
3                    CLINTON FOX,
4    called as a witness herein, having been first duly
5    sworn, was examined and testified as follows:
6                    EXAMINATION
7  BY MR. LUTZ:
8     Q.   Good morning, Officer.
9     A.   Good morning.
10    Q.   I introduced myself off record, but I will
11   say it again.  For the record, I'm Nick Lutz.  I'm the
12   attorney for the Plaintiffs which are Patrick Harmon
13   II, Tasha Smith, and the Estate of Patrick Harmon.
14   I'll be taking your deposition today.
15        Have you ever been deposed before?
16    A.   I've been present for one deposition, but it
17   was not mine.  It was my wife's.
18    Q.   Okay.  What sort of case was that?
19    A.   It was for like a traffic accident.
20    Q.   Okay.  You've testified in court?
21    A.   Yes.
22    Q.   Okay.  So I assume you're going to be pretty
23   familiar with this process, but I'm just going to go
24   through kind of procedural background.  So because we
25   have a court reporter here taking down everything we

Page 6

1   say, it's important for the transcript and the record
2   that we don't talk over one another, so I will wait for
3   you to finish your answer before I ask another question
4   and if you could just do the same, that would be great.
5   It's also important to give verbal answers, so gestures
6   and things that aren't words like mms don't come across
7   well on the record.  So if we could avoid those, that
8   would be great.
9        So right before we began, the court reporter
10  swore you in and had you take an oath; right?
11    A.   (Nods head.)
12    Q.   Can I get a verbal answer?
13    A.   Yes.
14    Q.   And you understand that that's the same oath
15  that you would take in any court of law when you're
16  testifying under --
17    A.   Yes.
18    Q.   -- penalty of perjury?
19    A.   Yes.
20    Q.   Are you suffering from any illness or other
21  condition that could make it difficult to testify
22  today?
23    A.   No.
24    Q.   Okay.  Under the influence of any medications
25  or anything that would impair your ability to tell the

Page 7

1   truth?
2     A.   No.
3     Q.   Okay.  I'm sure you saw this in your wife's
4   deposition.  Occasionally Ms. Nichols's, your attorney,
5   will object to the questions that I ask.  As a general
6   rule, you can still answer the question and you still
7   have to answer the question.  The exception is if she
8   tells you not to.  And these are generally going to be
9   matters of attorney-client privilege or things like
10  that.
11       So I never want to know -- she's your
12  attorney.  Yeah, I never want to know what you two
13  discussed or what you discussed with your other
14  attorneys in this case.  So if she objects on that
15  basis, she'll instruct you not to answer and you will
16  follow.  Make sense?
17    A.   Yes.
18    Q.   When were you made aware that we would be
19  taking your deposition today?
20    A.   Maybe a month ago.  I don't remember.
21    Q.   Okay.  And since that time, what have you
22  done to prepare for today?
23    A.   Met with my attorney.
24    Q.   Okay.  How many times?
25    A.   I'd say twice.

Page 8

1     Q.   Okay.  When?
2     A.   Once earlier this week, and I don't know if
3   it was necessarily in preparation for the deposition,
4   but once a few weeks ago.
5     Q.   Okay.  Did you review any documents?
6     A.   Like as far as paperwork and stuff?
7     Q.   Anything that you might have reviewed to
8   prepare for today.
9     A.   Yes.
10    Q.   What did you review?
11    A.   The body cam footage and I think the, I don't
12  know if it counts, the inquiries or whatever the papers
13  that you had sent over once before.
14    Q.   Interrogatories?
15    A.   Interrogatories.  That's what it is.
16    Q.   Yeah.  What body cam footage?
17    A.   Mine, Kris's, and Scott's.
18    Q.   How many times would you say you reviewed the
19  footage?
20    A.   The other day.
21    Q.   Let's start there.
22    A.   I think we just watched through each video
23  twice.  We kind of rewound a couple of parts a couple
24  of times.  I'm not sure if I could put a number on how
25  many times the little clips, but twice at least.

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID.1140  Page 4 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          9 to 12

Page 9

1    Q.   Okay.  Since the incident that we're here
2  today, how many times would you say you watched the
3  body camera footage from the incident?
4    A.   I don't know that there's any way I could put
5  a number on it.  I tried not to as often as possible,
6  and so it's not a lot, but it could be anywhere from 10
7  to 15.
8    Q.   Okay.  And have you watched -- does that
9  apply to all three?
10   A.   I would say Scott specifically only a couple
11 of times.  Kris's is the clearest.  That's probably the
12 one where somewhere between 10 and 15, and even my own
13 is 5 or less probably.
14   Q.   Okay.  Are you still working for the Salt
15 Lake City Police Department?
16   A.   I am.
17   Q.   In what capacity?
18   A.   Just patrol.  I work at the airport.
19   Q.   Is that the same capacity that you were
20 working in in 2017?
21   A.   No.
22   Q.   Were you promoted, transferred?  What
23 happened there?
24   A.   I've been transferred three times since.
25   Q.   Okay.  What made you want to have a career in

Page 10

1  law enforcement?
2    A.   Just kind of one of those hero kid things I
3  think, right.  Just growing up as a kid it was either
4  military or law enforcement.
5    Q.   And did you join the military?
6    A.   I did.
7    Q.   Can you kind of walk me through what led you
8  to that.
9        MS. NICHOLS:  Objection, vague.
10       THE WITNESS:  Same thing.  Just as a kid,
11 family-type thing.
12   Q.   (BY MR. LUTZ) When did you enlist?
13   A.   I enlisted in 2019.
14   Q.   What branch?
15   A.   Marine Corps.
16   Q.   And how long were you -- or how long did you
17 serve?
18   A.   Six years active duty and just under maybe
19 just exactly a full year as a reservist.
20   Q.   Okay.  What did you do before the military?
21   A.   High school.
22   Q.   Straight through?
23   A.   Yeah.
24   Q.   Okay.
25   A.   Yeah.  Yes.  Sorry.  I don't know if yeah is

Page 11

1  appropriate.
2    Q.   Yeah's okay.
3    A.   Okay.
4    Q.   Do you mind if I ask how old you are?
5    A.   I'm 40.
6    Q.   Were you ever deployed during your time in
7  the Marine Corps?
8    A.   Yes.
9    Q.   Where?
10   A.   I was deployed in supportive operations while
11 I'm in MEU in 2001.  I was deployed to Kuwait in 2003
12 for the beginning of the year after the war and I was
13 deployed to Ramadi in 2000 -- sorry.  After my
14 deployment to -- for the beginning of the war I was
15 deployed to the Republic of Georgia for training
16 operation and then I came back from that and I deployed
17 to Iraq in Ramadi in 2004.
18   Q.   How long did those deployments last?
19   A.   Anywhere from six to seven months.  It
20 wouldn't be any longer than seven months.
21   Q.   I'm not sure.  What was your initial title in
22 the Marine Corps?
23   A.   I was just in infantry.
24   Q.   Were you ever promoted?
25   A.   Yes.

Page 12

1    Q.   Can you walk me through any of the promotions
2  that you had in the Marine Corps as in --
3    A.   To, like, how I got promoted or to what rank?
4    Q.   Ranks and at what time you achieved that
5  rank.
6    A.   So in boot camp I was -- I had two
7  meritorious promotions going from PFC.  I guess it goes
8  Private to PFC, PFC to Lance Corporal, so I left boot
9  camp as a Lance Corporal.  I was promoted to Corporal
10 at -- I graduated in 2000.  By the time I was on flow
11 in 2001 I was a corporal, so that was within a year,
12 year and a half-ish, and then I was promoted to
13 Sergeant after -- almost right after my last deployment
14 in 2004.  So either earlier mid 2004 to 2005-ish.
15   Q.   Is it common to be promoted in rank during
16 boot camp?
17   A.   Not necessarily during boot camp, but right
18 after boot camp, yes.
19   Q.   Okay.
20   A.   Yeah.
21   Q.   In any of these deployments did you see
22 combat?
23   A.   Yes.
24   Q.   And which ones?
25   A.   So definitely the last one, the one that I

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1141  Page 5 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              13 to 16

Page 13

1   was in Ramadi.  The one where we were at the beginning,
2   I believe that it was qualified for a combat action,
3   but I don't know that it would meet my qualifications.
4   I don't know what definition somebody could or would
5   use, but I believe the company I was with got approved
6   for a combat action ribbon, so technically it would be
7   those two.
8       Q.   Okay.  I would use your definition.
9       A.   Yeah.  It would -- it would -- the first one
10  was not really -- we took a couple of pot shots and a
11  rocket hit near our base, and that was about the extent
12  of it.  That qualified, but I didn't think that it did.
13  I did at the time and then the second go around in
14  Ramadi I was like oh, that's what actual combat looks
15  like.  So it was different.
16      Q.   What was the mission in Ramadi?
17      A.   We were the force protection unit for Camp
18  Blue Diamond which was right outside of Camp Ramadi
19  which is right outside the City of Ramadi.  So anything
20  that had to do with any kind of base security, force
21  security, doing convoy securities, anything like that
22  we were in charge of that.
23      Q.   What did an average day look like there?
24      A.   Long.  Pretty much for about the extent of
25  the full six months we had two operations a day.

Page 14

1   Either one is going to be a foot patrol or one would be
2   a convoy unless the convoys took more than half a day
3   at which point we would just do the convoy and then try
4   to get sleep and then start the rotation again the
5   second day.
6       Q.   What's involved in the foot patrol?
7       A.   So pretty much the planning process is going
8   to be a few hours, right, of planning, figuring out
9   what is going to be the purpose of what we want to go
10  and accomplish that day.  If it's either just a show of
11  force in a particular neighborhood, if it was
12  reconnaissance of something that we wanted to do in the
13  future, something like that.
14           It just depended upon kind of what the end
15  mission was, right.  Like, I mean, you don't just
16  necessarily do it for no reason.  You gotta have that
17  reason.  So if the operation line would give us
18  whatever reason they wanted us to do, or if there were
19  an objective, we would tailor that foot patrol to that
20  objective.
21      Q.   How often did you do reconnaissance work?
22      A.   I mean, I don't know.  For the six months it
23  was -- it was, at minimum, one to two foot patrols a
24  day, so, I mean, however many you can do in a day.  I
25  had only a couple weeks off when I ended up with

Page 15

1   stitches in the back of my leg and couldn't do anymore
2   walking for a couple of weeks.
3       Q.   What happened there?
4       A.   I got tangled up in the concertina wire
5   during a mortar attack.
6       Q.   Bad injury?
7       A.   It looked gruesome, but it wasn't really bad.
8   It was all superficial.  Pretty much stitches cleaned
9   it up.
10      Q.   So did they take you off duty for a little
11  while for that?
12      A.   Off duty is a hard term when you're in a
13  place like that, so, yeah, I wasn't leaving the base
14  and I wasn't doing patrols anymore, but I was still
15  expected to work if that makes sense.
16      Q.   Okay.  Did you ever discharge your weapon?
17      A.   Yes.
18      Q.   How many times?
19      A.   There's no way to know.  I have no idea.
20      Q.   Many times?
21      A.   Many times.
22      Q.   And I guess we're just talking about Ramadi
23  right now?
24      A.   At no point other than that did I discharge
25  my weapon, so only in Ramadi.

Page 16

1       Q.   Like --
2       A.   Or other areas surrounding Iraq.  Again, I
3   can't -- you could go weeks without doing it and then
4   you could go a couple of days with just bad things
5   happening, so.
6       Q.   Remind me what time period this was.
7       A.   So in 2004.  I deployed in July of 2004 and I
8   came home sometime December to January-ish.
9       Q.   Okay.  At that time Ramadi was an active war
10  zone?
11      A.   It was.
12      Q.   Basically?
13      A.   Yeah.
14      Q.   Okay.  Can you tell me about your work with
15  protecting convoys.
16      A.   Like what specifically?
17      Q.   Just describe to me what that entailed.
18      A.   So, I mean, it depends on what unit we were
19  doing the security for.  Most -- so you got Motor T.
20  Motor T are the truck divers and they're the ones that
21  are going to manage their own trucks, right.  Some of
22  those trucks have guns on them.  They have some of
23  their own people that are armed and have, like, ready
24  response teams.
25           As the infantry unit, our sole responsibility

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID.1142   Page 6 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                    17 to 20

Page 17

1  is to -- if we make contact, we would either try to
2  protect or, you know, engage to take, you know, the
3  brunt of that so that we could get them off the exit
4  and we could actually get them back on their way and
5  out of the way, and then we could either (a) deal with
6  a response of like trying to go after the people that
7  were attacking our convoys or just continue to move on
8  with the convoy.
9          But we would -- anything that took us away
10 from the convoy, it would be to go and either counter
11 an assault that was against us or to go and try to stop
12 something that was happening to the convoy itself.
13     Q.   In your work protecting convoys, were you
14 ever fired upon?
15     A.   Yes.
16     Q.   How many times?
17     A.   I don't know.
18     Q.   Too many to count?
19     A.   Yeah.  I mean, I couldn't put a number on it.
20     Q.   And forgive me if I'm taking you back to a
21 time you don't remember fondly, but was it like a
22 monthly occurrence?
23     A.   Yeah, like the same thing.  I mean, we could
24 go days or weeks and it's -- and it turns boring and
25 it's mundane, and then just, you know, all the sudden

Page 18

1  they had a happy weekend and they wanted to do crazy
2  stuff for a few days or something, you know.  It just
3  didn't matter.  There was no rhyme or reason to it.
4  You get, you know, you could go a while without seeing
5  anything and then you could all the sudden it'd be like
6  oh, wow, this has been a crappy two days, you know.  So
7  it just depends.
8      Q.   Okay.  Did you receive any accommodations
9  during your time in the military?
10     A.   Just like a good conduct medal, combat
11 ribbon, stuff like that, but nothing beyond the -- kind
12 of the basics.
13     Q.   Any other awards?  Anything like that?
14     A.   No.
15     Q.   So you left the military what year?
16     A.   2005 I think.
17     Q.   Why did you decide to move on?
18     A.   I wanted to get married.  I had a girlfriend
19 and the rate of deployments was too much.
20     Q.   Sure.  Were you with your girlfriend the
21 whole time for all of your deployments?
22     A.   Three of them.
23     Q.   That's a lot.
24     A.   It was.
25     Q.   So after you came out of the military, what

Page 19

1  was your next professional move?
2      A.   So I immediately started -- or tried selling
3  cars for a dealership there in my hometown.
4      Q.   Where was that?
5      A.   In Tooele.
6      Q.   Which is here in Utah --
7      A.   Yeah.
8      Q.   -- I've learned.
9      A.   Yes.
10     Q.   How far away is it from here?
11     A.   37, 38 miles.
12     Q.   Okay.  How long did that last?
13     A.   Only a handful of months.
14     Q.   And what was next?
15     A.   After that I got hired, I was basically
16 building and repairing, upgrading cellphone towers, so.
17     Q.   What company?
18     A.   Called Western Telecom.
19     Q.   How long did that last?
20     A.   Year and a half I think.  I think.
21     Q.   So at this point, your post military career,
22 were you still trying to figure out what you wanted to
23 do next?
24     A.   No.  I knew I wanted to become a cop, but
25 being a police officer is very organized, uniform,

Page 20

1  haircut, you know, have to shave, have to -- or we used
2  to have to shave, and I wanted a break from kind of
3  that real rigid type lifestyle, so I just -- I think it
4  was maybe a total of two years maybe-ish.
5      Q.   Okay.  This beard policy changed between the
6  incident and today, didn't it?
7      A.   Yes.
8      Q.   Officer Smith also has a significant beard
9  now.
10     A.   His is very phenomenal, mine is not, I would
11 argue, yeah.
12     Q.   So what other jobs were you doing during this
13 period?
14     A.   That's it.
15     Q.   And when did you first apply for a law
16 enforcement position?
17     A.   I think it was 2008 and my first job I
18 applied for within law enforcement was to be a
19 dispatcher.
20     Q.   For what agency?
21     A.   The Tooele County Sheriff's Office.
22     Q.   Okay.  And were you hired into that job?
23     A.   Yes, I was.
24     Q.   How long did you work in that capacity?
25     A.   Roughly, 11 months.

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1143  Page 7 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                    21 to 24

Page 21

1   Q.   And what does dispatch involve?
2   A.   Sitting, staring at computer screens, typing
3   much like she's doing, and basically handling all the
4   communication from any of the officers, fire EMTs, or
5   anybody that uses the dispatch service, being the radio
6   communications back and forth.
7   Q.   Okay.  Are you taking -- you're not taking
8   911 calls?
9   A.   Yes, I was.
10  Q.   Okay.  And then directing those out to the?
11  A.   Yeah, I mean, you would rotate through the
12  different posts throughout the shift, right.  So it was
13  12-hour shifts for Tooele County, so I would either be
14  doing fire EMS calls or like, you know, anybody can
15  take the 911 calls, especially if we're getting busy or
16  we're just taking regular nonemergency phonecalls
17  dispatching for fire, dispatching for police,
18  dispatching for the different agencies or whatever.
19       We usually had I think it was like crews of
20  four and then it just depended on the position what you
21  were doing at that time.
22  Q.   Did you enjoy that work?
23  A.   Not really.
24  Q.   Was it sort of a foot in the door --
25  A.   Yes.

Page 22

1   Q.   -- kind of thing?
2   A.   Yes.
3   Q.   Okay.  How long -- I think I've seen your job
4   history.  How long before you moved into your next
5   position?
6   A.   I was a dispatcher for about 11 months.
7   Q.   And what was your next position?
8   A.   I was a corrections officer for the same
9   agency.
10  Q.   Were you working out of the same facility
11  there?
12  A.   It's the same building, just a different
13  office type thing.
14  Q.   Okay.  What led you to apply for that
15  particular position in corrections?
16  A.   Just one step closer being on patrol.
17  Q.   Patrol was always the goal?
18  A.   Yes.  Yes.
19  Q.   How long did you stay in your position as a
20  corrections officer?
21  A.   Almost exactly two years.
22  Q.   Was that a better experience than dispatch?
23  A.   Yeah, much so.
24  Q.   Can you tell me what an average day was like
25  as a corrections officer.

Page 23

1   A.   Yeah.  So there's, you know, a handful of
2   different postings.  You do work within the jail,
3   right, so you either intake, processing, housing.  If
4   you're working with the, kind of the day workers that
5   would do like the laundry or the cooking or whatever,
6   you know, it just depended on what you would do.
7        So, I mean, if you're in intake, anybody that
8   gets arrested you're coming, you're searching and
9   entering them into the system, and you could be doing
10  both the intake and assisting with processing or vice
11  versa.  So once you process -- or once you intake them
12  in, they get put into a holding cell and then you gotta
13  actually book them, right.
14       So you go through the whole process of
15  booking them into the jail, allowing them to have the
16  phonecall with their attorneys.  And then if they
17  either (a) don't bail out or it's not something they're
18  going to get OR'd for, then we would house them, and
19  then that's where the housing officer and the inmates
20  working with the trustees will kind of take over at
21  that point.
22       If you're the housing guy, then you're just
23  basically waiting for them to get housed.  You gotta
24  bring them in, you put them in their cells, you make
25  sure they're in all the logs, start kind of doing all

Page 24

1   that stuff.
2   Q.   You said OR'd?
3   A.   Own cognizance, so yeah.
4   Q.   So cognizance, bond released?
5   A.   Yeah, pretty much.  Where they don't have to
6   pay any money or whatever it is.  They're just OR.
7   Q.   And you said trustee.  What does that mean?
8   A.   So, you know, the jail works with a lot of
9   the inmates that can have jobs within the facility and
10  they have the ability to kind of work off some of their
11  time, so I don't know why they call it a trustee, but
12  the trustees are just people that have proven that they
13  have the capability of working and we can pull them out
14  of their cells, trust them to go and do the laundry, do
15  that kind of stuff and they can work off their time and
16  it kind of benefits them, benefits us.
17  Q.   Okay.  At some point during your work as a
18  corrections officer there in the jail, did you meet
19  Scott Robinson?
20  A.   No.
21  Q.   Or Kris Smith?
22  A.   No.
23  Q.   We'll come back to that.
24  Q.   Okay.
25  Q.   So I take it that I think you said it was --

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1144   Page 8 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                        25 to 28

Page 25

1  that position was better than dispatch, but still not
2  the goal, so --
3      A.   Right.
4      Q.   -- were you ever going to stay there
5  longterm?
6      A.   I mean, if I had to, I probably would have,
7  but no.  The goal was to definitely get to patrol.
8      Q.   Okay.  Did you ever need to use force on the
9  inmates there?
10     A.   I think only a couple of times, but yeah.
11     Q.   How many times would you say?
12     A.   I have no idea.
13     Q.   Less than five?
14     A.   Probably more than five.
15     Q.   Less than ten?
16     A.   Maybe.  I don't know.  I mean, honestly, I
17  don't know.  It's two years' worth and I -- I don't
18  know.  I mean, it could be anywhere from -- I would say
19  probably no more than 10 to 15-ish if you want to guess
20  a number, yeah.
21     Q.   While you were there, was there a reporting
22  requirement for a use of force instance kind of the
23  same way there is when you're a patrol officer?
24     A.   I mean, yes and no there was some.  It
25  depends on what the qualification is for use of force.

Page 26

1  If we had people that was during intake, they were
2  becoming aggressive and we ended up having to, you
3  know, either pin them against the wall or use the wrist
4  lock, twist lock, stuff like that, we didn't
5  necessarily have to write a report for that, no.
6          I think, you know, I was there when one
7  inmate got tased.  I think that the initial officer
8  wrote a report for that, but, like, I wouldn't write a
9  report for that.
10     Q.   Okay.  In terms of I guess weapons, what were
11  you -- what would you carry in the jail?
12     A.   Nothing.
13     Q.   At all?
14     A.   I had OC, but no knives, no guns, no nothing.
15     Q.   Handcuffs?
16     A.   I think I had handcuffs, yeah.
17     Q.   What else would be on your duty belt?
18     A.   Radio.
19     Q.   Okay.
20     A.   That's pretty much it.
21     Q.   Were there weapons available in the facility?
22     A.   Like an armory rack or something?
23     Q.   Sure.
24     A.   No.
25     Q.   You mentioned somebody was tasered once.

Page 27

1  Were some officers carrying tasers?
2      A.   So the sergeant might have had the taser.  I
3  don't think I had a taser.  I don't remember where the
4  taser would be held, honestly.  I don't remember.  I
5  know that we had access to a taser, so, yeah, I
6  think -- that was either with a sergeant, but I don't
7  think we had them.  Maybe it was staged in the housing
8  unit.  I don't remember.  Sorry.
9      Q.   Did you ever have to use the taser while you
10  were working there?
11     A.   Not while I was in corrections, no.
12     Q.   Did you ever have inmates file grievances
13  against you?
14     A.   I think so, yes.
15     Q.   Do you know how many?
16     A.   No.
17     Q.   Do you remember the circumstances of any of
18  them?
19     A.   I remember -- the one that I remember the
20  most was a female that filed a grievance because she
21  was violating some of the jail policies and so I
22  basically put her in what they call lockdown which if
23  they're in a unit that's open and they have their
24  jail -- the cell open, right, and they have the freedom
25  to come in and out, use the day room, use everything

Page 28

1  else, if they get that freedom taken away, it's called
2  lockdown where they just basically have to go into
3  their cell and they have to shut the door and they
4  don't get the opportunity to kind of use the day room
5  as everybody else does.  She didn't agree with it.
6      Q.   Was that 23-hours a day lockdown?
7      A.   No.  So it would have been, I mean, it could
8  have been halfway through the day and then at the end
9  of the night, I mean, it basically would rotate it over
10  the next morning and add, you know, like 0700 or 0800.
11  Whenever they opened the cells and had everybody come
12  out, she would then have had the opportunity to come
13  out.
14     Q.   Okay.  Do you remember her name?
15     A.   I think it was Nicole, but I don't remember
16  for sure.
17     Q.   At any time were you the subject of
18  disciplinary action while you worked at the jail?
19     A.   No.
20     Q.   Any other grievances that you can tell me
21  about?
22     A.   No.  I mean, I'm sure that there were some.
23  You know, when you work housing, a lot of the guys get
24  mad at you and they file grievances as often as they
25  can.  So I know there are probably some, but I don't

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID.1145  Page 9 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    29 to 32

Page 29

1  remember any specific.  The only reason I remember that
2  one specific is she really hated me after that.
3      Q.   Was she housed there for some time?
4      A.   Yes, she was.  She was a frequent flier at
5  the jail, yeah.
6      Q.   When did you apply for your next law
7  enforcement position?
8      A.   Like I said, it was almost exactly two years
9  in the jail.
10      Q.   And what was the next position?
11      A.   Just patrol with the same agency.
12      Q.   The sheriff's department?
13      A.   Yeah.
14      Q.   When you were working as a corrections
15  officer, were you technically a sheriff's deputy?
16      A.   I mean, I guess, yeah.  I mean, we were
17  working underneath the authority from the sheriffs at
18  the sheriff's office, so if corrections officers are
19  qualified as deputies, whatever the definition of a
20  deputy would be, I guess yeah.
21          We just called ourselves corrections
22  officers.  There's corrections officers and then
23  there's patrol deputies, so.
24      Q.   Were you POST certified at that time?
25      A.   Corrections certified which, through POST, is

Page 30

1  the same qualifying kind of agency or authority and
2  they're the ones that give the ability for the state,
3  right.  So in the State of Utah you either have to have
4  the POST certification or you'd be a cat 1 or cat 2.
5  So cat 1 is LEO, cat 2 I think is corrections
6  certified.  And then there's a step though below that
7  which can be bailiffs or other things.
8      Q.   Do you know what that stands for, SFO?
9      A.   Special functions officer.
10      Q.   So what year was it when you were hired as a
11  patrol deputy?
12      A.   2009, but I am not certain.
13      Q.   Okay.  I think we have that somewhere in the
14  documents.
15      A.   I think it was 2009.
16      Q.   Okay.  And what were your duties in that
17  position?
18      A.   Just regular patrol duties.
19      Q.   As in out on the streets, patrol car?
20      A.   Yeah.  Yes.
21      Q.   Did you have your own car?
22      A.   Yes.
23      Q.   And did you work with a partner?
24      A.   Nobody did.  Like partnered in a vehicle all
25  the time?  No.  We had four-man crews and, I mean, we

Page 31

1  would kind of partner up and hang out together, but we
2  were always in our own cars.  We never really worked
3  two-man.
4      Q.   Can you tell me about the first major call
5  you responded to in that position?
6      A.   Major as in like what?
7      Q.   What stands out to you as your first
8  significant experience?
9      A.   It was either the first or the second day
10  there was a lady that shot herself in the chest and
11  then survived, crawled into her front room and was
12  having foamy flood come out of her mouth in front of
13  her kids which was pretty traumatizing for probably me
14  and the kids.
15      Q.   What was the nature of the call you received?
16      A.   The husband was actually home.  She drove
17  into wherever she bought the gun from.  It was a Bursa
18  .380, she bought the gun brand new, box of bullets.  I
19  believe it was just lead, but it was jacketed lead, and
20  drove home, parked in front of her house, loaded five
21  or six rounds, I can't quite remember a hundred percent
22  if that's accurate, but it was a couple -- it was more
23  than the one that she needed.
24          And she ended up pointing the gun at her
25  chest, shot herself, missed her heart, punctured her

Page 32

1  lungs, exited, and she immediately decided that she did
2  not want to hurt herself anymore, crawled inside,
3  husband called, and we responded.
4      Q.   Did she survive?
5      A.   She survived that time, but I actually think
6  that she did successfully end her life later.  I never
7  got confirmation if that was her or not, but I was told
8  like that -- the other gentleman that was on the call
9  with me who was my FTO at the time, we both were to the
10  understanding that it was her that ended up actually
11  successfully taking her life later.
12      Q.   Sorry to hear that.  So that was day one or
13  two?
14      A.   Yeah.  If it wasn't the very first day, it
15  was the second day I think.
16      Q.   That did not turn you off from the job?
17      A.   No.
18      Q.   Can you walk me through an average day as a
19  patrol officer?  Or patrol deputy, rather.
20      A.   So Tooele County does 12-hour shifts.  If I
21  check on -- technically they're from 5:00 to 5:00, but
22  it was a well received courtesy to check on about 30
23  minutes early so that way, right, if anybody kind of is
24  going off and they have paperwork that they've got to
25  get in, that they don't have to stay over if a call

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID.1146   Page 10 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                    33 to 36

Page 33

1  comes up.
2          So we don't have to quite go out, but we do
3  go get coffee in the morning, right.  Typically at
4  4:30, 5:00 o'clock in the morning, not a lot of
5  traffic, nobody's calling reporting things broken or
6  anything yet.  So we can go get coffee, go by the
7  office, you get whatever you need to start the day, and
8  then make sure your gas is -- or your truck is all
9  gassed up.
10         From there, you know, probably around
11 8:00-ish, 9:00-ish things start picking up either doing
12 traffic enforcement.  If you want to do -- it's kind of
13 whatever you wanted to do.  You could go do traffic,
14 you could go, you know, hang out in school zones if
15 kids are walking to school.  Calls start coming in
16 about that time, so you start trying to keep up on
17 that.
18         And then, I mean, you just gotta -- the cycle
19 repeats.  You know, if you get dispatched to a call,
20 you take it.  If not, you go try to find either civil
21 papers to serve with the sheriff's office, they do a
22 lot of civil paper service.  Yeah, it was 7200 square
23 miles is the size of Tooele County, so if you felt so
24 inclined and the sergeant would allow it, then you
25 could have one guy go out to the west desert and do

Page 34

1  some patrolling out there if you wanted.
2     Q.   Okay.  Tooele County, how would you say the
3  crime rate is there?
4     A.   After having worked in Salt Lake,
5  significantly lower than where I work now.
6     Q.   A little bit sleepier?
7     A.   A lot sleepier, yeah.
8     Q.   What sort of -- what sort of calls would you
9  ordinarily be responding to?
10    A.   Any type of police related call.  I mean, we
11 did a lot of medicals because we'd roll with medical
12 because we were kind of out there.  We would
13 potentially be closer than an ambulance, so we could
14 respond and assist domestics.  Traffic accidents were
15 pretty heavy.  DUIs, fights, disturbances.  Really
16 anything that you could think of.
17    Q.   Were you carrying a service weapon?
18    A.   Yes.
19    Q.   What else were you carrying when you were on
20 duty?
21    A.   I carried a taser, carried OC, and I think at
22 the sheriff's office I carried my ASP with me.
23    Q.   Which is like a baton?
24    A.   It's an expandable baton, yes.
25    Q.   How many times did you have to use your

Page 35

1  taser?
2     A.   At the sheriff's office?
3     Q.   Uh-huh.
4     A.   I think once.
5     Q.   Do you remember that incident?
6     A.   Yes.
7     Q.   Can you tell me what happened?
8     A.   I was on -- so there was a overlap of being
9  patrol, but where I was also assigned to the motor
10 squad, so I would still just do basic patrol functions,
11 just from a motorcycle.  I had seen a vehicle, it was
12 double parked.  The passenger was acting very
13 suspicious on the porch of the house they were double
14 parked on, and the way that she came running off it
15 seemed as if I had spooked her off the porch.  So I
16 didn't know what was going on, stopped the car for the
17 offense of the double park.
18         As soon as I walked up to the diver's window
19 I could smell the odor of marijuana, so I ended up
20 getting the owner's information which is actually the
21 female in the passenger seat, got her out, started
22 talking to her, asked her about the odor.  She said she
23 didn't have any idea what I was talking about and I
24 told her all right, cool, I'm just going to, you know,
25 put you in handcuffs real quick and I'm going to

Page 36

1  you kind of hang out until I can get like a partner
2  here, you know.
3          And kind of the moment I said that, I went to
4  actually put handcuffs on her, she started to fight.
5  She tried punching me, clawing me.  She actually tried
6  to bite me at one point.  I finally almost got her kind
7  of like in a point where she was almost in custody and
8  then her boyfriend came out.  And they had a really big
9  dog.  It was a massive American Bulldog I think.
10         And he came out of the car, dog was trying to
11 get out of the car, so as I kind of engaged with him,
12 she was able to get up, take off running.  I took off
13 running behind her, he took off running behind me, and
14 then just now there was a two on one, she'd already
15 physically assaulted me and everything, so I ended of
16 tasing her and then he ended up -- seeing her get
17 tased, he ended up giving up, and I was able to take
18 them both into custody.
19    Q.   When was this?
20    A.   2010.  2011 maybe.  I'm not sure.  It was
21 right around there.
22    Q.   Tooele being a little sleepier, was a
23 situation like that where you had to use physical force
24 uncommon?
25    A.   Yeah, not nearly as common as when I worked

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1147  Page 11 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    37 to 40

Page 37

1   for Salt Lake where we deal with that on a pretty
2   regular basis.  It was somewhat uncommon for Tooele,
3   yeah.
4       Q.   Were there other times when you had to use
5   force on suspects?
6       A.   Yes.
7       Q.   How often did that happen?
8       A.   Not often at all at Tooele County.
9       Q.   Could you give me a ballpark of how many
10  times you had to use force against -- use physical
11  force against a suspect?
12      A.   Ten, twenty.  Yeah, I can't, I mean, there's
13  no way I could remember how many.  No less than 10, no
14  more than 20.  Double that.  Or 25, 30 maybe.  Just
15  depending.  I don't know.  Sorry.
16      Q.   Did the Tooele County Sheriff's Department
17  have a use of force reporting requirement?
18      A.   Yes.
19      Q.   So in each of these you would have filled out
20  a report?
21      A.   Oh, yes, for sure.
22      Q.   Any disciplinary action ever taken against
23  you for an inappropriate use of force with the
24  sheriff's department there?
25      A.   No.

Page 38

1       Q.   What about complaints?  Were you ever subject
2   to citizen complaints for excessive use of force?
3       A.   No.
4       Q.   Would you always have been informed if a
5   citizen filed a grievance or a complaint against you?
6       MS. NICHOLS:  Objection, calls for speculation.
7       THE WITNESS:  I don't know.
8       Q.   (BY MR. LUTZ) Just wondering if there was a
9   policy?
10      A.   I don't know if there was a policy or not.
11      Q.   Okay.  But to your knowledge, no citizen
12  complaints?
13      A.   Yeah, to my knowledge.
14      Q.   And was it from -- directly from the Tooele
15  County Sheriff's Department to Salt Lake City Police
16  Department?
17      A.   No.
18      Q.   What was your next step?
19      A.   West Valley City.
20      Q.   Where is that?
21      A.   Just south of here.
22      Q.   Is that basically a suburb of Salt Lake City?
23      A.   Basically, yeah, I think you'd understand it
24  that way.
25      Q.   Okay.

Page 39

1       A.   Yeah.
2       Q.   When did you -- what was that position?
3       A.   Patrol.
4       Q.   When did you apply for it?
5       A.   So I got hired there 2013.  I don't remember
6   exactly when in 2013, but it was early.  Yeah, 2013.
7       Q.   What inspired you to make that change?
8       A.   Tooele County was going broke and they
9   actually said they were going to restructure our pay
10  scale and take money away, so knowing that I wanted to
11  be in law enforcement for a long time, I wasn't willing
12  to take a pay cut, so I went to a new agency, better
13  money.
14      Q.   Is West Valley a more populous area?
15      A.   By far, yes.
16      Q.   A little more excitement?
17      A.   Yeah.
18      Q.   How long were you there?
19      A.   Almost exactly three years.  Apparently I'm
20  really good at making it like right to the, like right
21  on point.
22      Q.   Three to five years if you look?
23      A.   Yeah.
24      Q.   Okay.  So your title was?
25      A.   Patrol Officer.

Page 40

1       Q.   Same as in Tooele.  Well, I guess you were a
2   deputy in Tooele.
3       A.   I mean, same job description, just different
4   titles I think.
5       Q.   Did your duties change very much when you
6   moved to West Valley?
7       A.   How so?
8       Q.   I'm just asking you if it was basically the
9   same patrol kind of job?
10      A.   I mean, yeah, we weren't taking cows getting
11  hit on the highway anymore, but other than that, the
12  day to day like response to emergency type situations,
13  anything like domestics and all that, yeah, same thing.
14      Q.   Okay.  In your day to day in West Valley were
15  you responding to more serious calls?
16      A.   Yes.
17      Q.   Can you kind of walk me through what the
18  variety of calls you responded to?
19      A.   I mean, it would have been the same thing.
20  Either domestics or fights.  Significantly more, like,
21  shots fired type calls.  A lot more gang activity, so
22  that kind of -- anything that would be gang related.
23  We'd have to deal with a lot more, a lot more
24  robberies.  First time I ever handled a bank robbery,
25  first time I was ever actually, I think, at a homicide

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1148   Page 12 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    41 to 44

Page 41

1  scene would have been at West Valley.
2         Yeah, car jackings, all the, like, that all
3  significantly increased.  But, I mean, it's all pretty
4  much like either, you know, crime or violent crime,
5  kind of the same.  Just who's doing it, how they're
6  doing it is different, you know.
7     Q.   Did you enjoy the different environment?
8  MS. NICHOLS:  Objection, vague.
9  MR. LUTZ:  That's vague.
10    Q.   (BY MR. LUTZ) Were you more satisfied in a
11 higher intensity environment?
12 MS. NICHOLS:  Objection, vague.
13        You can answer.
14    THE WITNESS:  I mean, not really.  It was -- I
15 actually genuinely missed working for the sheriff's
16 office.  If they paid me better, I would probably still
17 be there.  Yeah, not -- I guess the answer would be no
18 probably.  Not anymore than what I was when I was at
19 the sheriff's office, so it was equal.
20    Q.   (BY MR. LUTZ) Just to put a finer point on
21 that, would you say that in West Valley, given it's
22 more populous and the crime rate was higher, it was a
23 higher intensity job than in Tooele?
24    A.   Yeah, I would -- yes.
25    Q.   Was that stressful?

Page 42

1     A.   I never noticed it if it was, but I would
2  imagine yeah.  I mean, I'd probably say yeah.
3     Q.   That didn't bother you though?
4     A.   No.
5     Q.   In terms of your career, like as far as I can
6  see so far, Tooele was almost like a break in the
7  intensity from really high, you know, military, jail,
8  Tooele, West Valley, and then Salt Lake and somewhere
9  in there.
10    A.   Sure.
11    Q.   It's just interesting to me that you would
12 also enjoy Tooele.
13    A.   Yeah.  I love Tooele, yeah.
14    Q.   Do you still have family there?
15    A.   Yes.
16    Q.   Go back frequently?
17    A.   I still live there.
18    Q.   Oh, okay.
19    A.   Yeah.
20    Q.   Let's talk about use of force incidents in
21 West Valley.  How often were you involved in the use of
22 force during your service in West Valley?
23    A.   There it was a significant uptake.  I would
24 say, minimum, every couple of weeks, every other week
25 or so I guess.  I mean, you could have a couple of days

Page 43

1  where things were calm or quiet and then you would have
2  a couple days that things weren't, but it was
3  significantly more than Tooele.
4     Q.   And were you ever subject to disciplinary
5  action for a use of force incident there?
6     A.   No.
7     Q.   Ever subjected to a disciplinary action for
8  any other policy infraction?
9     A.   No.
10    Q.   Any citizen complaints against you?
11    A.   Not that I know of, but I -- I think somebody
12 called a complaint about my driving on the way to work
13 one day, but I don't even know for sure they did.  I
14 don't remember.  I feel like that's a conversation I
15 had with the sergeant at one point, but I don't
16 remember for sure.
17    Q.   Possibly a driving complaint?
18    A.   Maybe.  But I don't know.
19    Q.   Nothing sustained?
20    A.   No.
21    Q.   Did you ever have to use your taser when you
22 were on duty in West Valley?
23    A.   Yes.
24    Q.   How many times?
25    A.   At least three, maybe four or five.

Page 44

1     Q.   Do you remember the first time?
2     A.   Ooh, the first time?  I don't remember the
3  first time.  I don't remember.
4     Q.   Tell me about the first incident where you
5  deployed your taser that you can remember in West
6  Valley.
7     A.   So the one that definitely stands out in my
8  mind we were responding to a young man, they lived in a
9  trailer park.  There was a double wide trailer, we came
10 in through the side entrance.  Mom -- I think it was
11 mom and grandma or his aunt and grandma or his mom and
12 aunt, either way there was two ladies, they were like
13 yeah, he's in his bedroom.  You know, I think he had
14 warrants.  And I don't remember exactly what he was
15 doing, but he was basically like they were afraid of
16 him at the time.
17        So me and my partner go to his door, he was
18 there.  I don't remember if he had a T-shirt on, but I
19 think he was in boxers and he might have not had a
20 T-shirt on, but I don't remember.  Kind of a smaller
21 bedroom, had a bed, some shelves, real cluttered area,
22 and then he had a chair.  He was sitting in the chair
23 and at the time was kind of not compliant with our
24 instructions.  He stood up real quick, he grabbed
25 something off the shelf.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1149   Page 13 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              45 to 48

Page 45

1          It was -- I don't remember what it was. I
2    think it might have been a flashlight, but he tucked it
3    behind his back and he was trying to get us to perceive
4    it as a weapon. At the time I didn't know exactly what
5    it was and so I ended up -- my partner ended up going
6    with his gun and I ended up going with my taser. I
7    said whatever that is, drop it. He responded to
8    something probably not friendly, and then I immediately
9    tased him. Immediate incapacitation. He fell down.
10         And I remember now that it was a flashlight
11   for sure, but at the time I didn't know what he had
12   grabbed off the shelf, so it was just a black shiny
13   object that he tucked behind his back real quick, so.
14   Q.    Okay. You weren't worried that it was like a
15   gun or another weapon?
16   A.    I thought for sure it was a weapon. It did
17   not look like it was a gun. It was long and
18   cylindrical, so at worst it could have been a knife,
19   but it was just a black shiny object that he grabbed
20   real quick. He didn't present it at us as if it was
21   going to hurt us. He actually attempted to hide it
22   behind his back and then refused to drop whatever it
23   was. So I definitely perceived it as a weapon, but I
24   just didn't know what kind of weapon it was.
25   Q.    And you already had your taser drawn by the

Page 46

1    time you saw that?
2    A.    No. It was after he did that I think I went
3    taser and my partner went gun.
4    Q.    Is there a reason your partner drew his
5    service weapon versus his taser?
6    A.    I think he --
7    MS. NICHOLS: Just a second. Objection, calls for
8    speculation.
9    THE WITNESS: Sure. Sorry. I don't know why he
10   did, but we both actually drew our guns first, and then
11   I communicated to him that I was going to go to a
12   taser.
13   Q.    (BY MR. LUTZ) Why did you make that decision?
14   A.    He was hiding it behind his back and he
15   wasn't presenting it. And so whatever he was trying to
16   do, he was trying to potentially get us to shoot him,
17   and without the active aggression at us, I communicated
18   to him. He knew what he was going to do, and he knew
19   what I was going to do, and so that way I felt
20   confident enough I could put my taser away. Regardless
21   what he had or what he was doing, in that moment I knew
22   he was going to cover.
23   Q.    Okay. And you said that was effective, he
24   was incapacitated?
25   A.    Yeah.

Page 47

1    Q.    Okay. Any other incidents that you remember
2    deploying your taser in West Valley?
3    A.    West Valley. I know I did, but I don't
4    remember. Sorry.
5    Q.    Okay. Did you ever have to use your service
6    weapon in West Valley?
7    A.    No.
8    Q.    Did you ever have to draw it?
9    A.    Yes.
10   Q.    How many times did that happen?
11   A.    A lot.
12   Q.    Under what circumstance did you ordinarily
13   need to do that?
14   A.    Any time, I mean, conducting a felony stop,
15   any time you're clearing a building, any time you're
16   making contact with somebody who you think there's a
17   weapon, the weapon comes out.
18   Q.    On all felony stops, you're going to draw?
19   A.    You're going to draw and cover the car. I
20   mean, yeah.
21   Q.    And you did those on a daily basis?
22   A.    I mean, very regularly.
23   Q.    Okay. I think we covered it, but to your
24   knowledge, you didn't have any citizen complaints
25   against you in West Valley?

Page 48

1    A.    Not that I know of.
2    Q.    Okay. And what was your next move or when
3    did you decide to move on from West Valley?
4    A.    So I know that I was -- this one I remember
5    more accurately is March I believe 16th of 2016 is when
6    I started from West Valley to Salt Lake.
7    Q.    And what motivated your move?
8    A.    Money. There was a friend of mine. We
9    worked together, actually, at the sheriff's office in
10   Tooele. Again, with the financial struggles that they
11   were having, a lot of people left. Me and another guy
12   went to West Valley together, this other guy went to
13   Salt Lake. He kept talking it up, it's the greatest
14   agency, this and that. I looked into it, it actually
15   made like $6 an hour more. So literally chasing the
16   same bad guys and just crossing the street made me $6
17   an hour more, so it made sense.
18   Q.    Okay. Made sense. Other than the money, was
19   there a reason that you wanted to be on patrol in Salt
20   Lake City?
21   A.    No. That was pretty much it.
22   Q.    Okay.
23   A.    I would say probably staffing. I think Salt
24   Lake City was staffed better and so it was kind of
25   easier to get time off, it was, you know, less call to

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1150   Page 14 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                            49 to 52

Page 49

1   call, maybe a little bit more opportunity for proactive
2   work.  But I was satisfied with West Valley well enough
3   that I would have stayed.  Had they paid $6 an hour
4   more, probably so.
5        Q.   Do you recall about how many patrol officers
6   West Valley employed?
7        A.   Of the department I think 60 to 70, but I
8   don't know.
9        Q.   And same thing for Salt Lake, when you
10  started for SLCPD.
11       A.   Oh, it's probably anywhere from as low as 80
12  up to 120 and it fluctuates pretty dramatically
13  depending.
14       Q.   Taking a step back, I asked you about Scott
15  Robinson earlier.
16       A.   Okay.
17       Q.   Mistakenly thinking that you had been with
18  him at the jail.  When did you meet him?
19       A.   Not until I started working at Salt Lake.
20       Q.   Okay.  What about Kris Smith?
21       A.   So I am not a hundred percent sure, but I
22  believe that there was somebody that I think it was
23  Kris that I was at court.  I might have been working
24  for West Valley.  I was at court, and I think he worked
25  at the courthouse, and me and him had a conversation.

Page 50

1   He actually said he was going to apply for Salt Lake
2   City and then I applied for Salt Lake City, but I think
3   he had already gone there.
4        So I cannot say a hundred percent certain,
5   but I'm pretty certain that me and Kris met in court
6   one time in a hallway.  Other than that, it was Salt
7   Lake City.  If it wasn't him, it was definitely at Salt
8   Lake City, but if it was him that I'm thinking, we met
9   at the courthouse.
10       Q.   So you didn't really know either --
11       A.   No.
12       Q.   -- Scott or Kris --
13       A.   No.
14       Q.   -- until Salt Lake?
15       A.   Yeah.
16       Q.   Okay.
17            Do you want to take five minutes?
18       MS. NICHOLS:  That would be great.  Thanks.
19       (Recess taken from 10:01 a.m. to 10:12 a.m.)
20       Q.   (BY MR. LUTZ) We're back on the record.  I
21  think where we left off we were kind of tracking your
22  career up to Salt Lake City which I believe you said
23  was in 2016 that you joined Salt Lake City Police
24  Department?
25       A.   Yeah.

Page 51

1        Q.   And your first position was what?
2        A.   Patrol.
3        Q.   And how long did you stay in the patrol
4   division?
5        A.   Maybe it was a year and a half-ish.  I think.
6        Q.   Okay.  I'm going to hand you Exhibit 8.
7            (Exhibit 8 marked.)
8        Q.   (BY MR. LUTZ) Do you recognize this document?
9        A.   No.  I've never seen any of these before.
10       Q.   Okay.  This was disclosed to us as part of
11  your personnel file, I presume, which is it's your
12  Training History Report --
13       A.   Gotcha.
14       Q.   -- from Utah.
15            Do you see up at the top of page 1 of Exhibit
16  8?  It kind of -- it tracks your employment history.
17  Can you just take a look at that and the dates.
18       A.   Which part?
19       Q.   Right here under the Employment heading
20  (indicating).
21       A.   Right.
22       Q.   And then below that organization dates;
23  right?
24       A.   Right.
25       Q.   Is this all accurate, these dates and the

Page 52

1   organizations that you were with?
2        A.   (Peruses document.)
3            Yeah, so, I mean, I'm assuming that the
4   sheriff's office, that actually looks probably more
5   accurate than even what I described early, yes, because
6   that seems right.
7            The West Valley time I think, I mean,
8   obviously it's probably more accurate.  It definitely
9   seems that it would make sense from -- the time of
10  staging, I don't know if that's what the city is
11  considering my time in their lateral academy that they
12  have, but that is also . . .
13            (Peruses document.)
14            Yeah, I mean, I'm guessing that's probably
15  accurate.
16       Q.   Okay.  What's the lateral academy?
17       A.   So it's just a training period that they try
18  to acclimate us to Salt Lake City policies, procedures,
19  their computer equipment, their kind of evidence
20  processing, stuff like that.
21       Q.   How long is it?
22       A.   I'm assuming whatever that -- if that says .
23  . .
24            (Peruses document.)
25            I don't even think that that is -- I think it

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1151   Page 15 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              53 to 56

Page 53

1  was six weeks.  And that's the part I don't know what
2  they're considering staging, but I think that the
3  actual lateral academy was only six weeks.
4      Q.  Okay.  During that time that you're in the
5  lateral academy, are you also working on patrol?
6      A.  No.
7      Q.  You're in the academy and that's what you're
8  doing for that period of time?
9      A.  Just training.
10     Q.  Okay.  I saw you flip through it a little
11 bit, but can we -- can you just take a general look at
12 the subsequent pages of the history and training
13 report.  And what you'll see here is there's a course
14 title, there's training dates, there's the Status
15 Training category and number of hours.
16         Does this, as you flip through it, look like
17 an accurate reflection of the trainings that you've
18 completed with the Salt Lake City Police Department?
19     MS. NICHOLS:  Objection as to the term trainings,
20 but -- to the extent it's vague and ambiguous.
21     THE WITNESS:  (Peruses documents.)
22         Sorry.  Can you just repeat whatever the
23 actual question was.
24     MR. LUTZ:  Yeah.  Can you read it back (to the
25 reporter).

Page 54

1             (The record was read as follows:
2         "Q   Does this, as you flip through
3     it, look like an accurate reflection of the
4     trainings that you've completed with the
5     Salt Lake City Police Department?")
6     THE WITNESS:  I would say that these are probably
7  accurate, but not a full and total account of all of
8  the trainings that I've participated in.
9      Q.  (BY MR. LUTZ) Based on how we're using the
10 term training?
11     A.  Probably.
12     Q.  Okay.  What would you call these?  Courses?
13     A.  Some yes, some no.
14     Q.  Okay.  So, for example, like where we see
15 it'll read SLCPD Cornerstone, what is that?
16     A.  (Peruses documents.)
17     Q.  Just go ahead and look at page 4 of Exhibit 8
18 and just look at the very top right-hand corner.
19 You'll see the course or training "ADT Annual Recert,
20 July 1, 2019, completed," and then this category title
21 is SLCPD Cornerstone.
22     A.  I think Cornerstone is just the software that
23 we use to track them.
24     Q.  Oh, I see.  That's not like an online
25 training system?

Page 55

1      A.  Some of it -- I want to say all of our
2  training is -- I thought it was the database that they
3  were all stored in, but I don't know.
4      Q.  Okay.
5      A.  But I know they do have some videos and stuff
6  like that, the training opportunities to do that, yeah.
7      Q.  So you said you had never seen this before;
8  right?  This whole document of your training.
9      A.  No.
10     Q.  Was there a way for you to access your own
11 training records when you were at SLCPD?
12     A.  Yes.
13     Q.  How would you do that?
14     A.  On Cornerstone.
15     Q.  Okay.  Did you ever do that?
16     A.  No.
17     Q.  You were never required to check what was
18 completed or not completed, things of that nature?
19     A.  There's like an in-box and I would check
20 that.
21     Q.  Okay.  Would you just be alerted to when
22 additional courses --
23     A.  Yes.
24     Q.  -- were required?
25     A.  Yeah.

Page 56

1      Q.  Okay.  Did you track the hours?  Anything of
2  that nature?
3      A.  No.
4      Q.  Can you flip to page 3.
5      A.  (Witness complies.)
6      Q.  And you'll see down here at the very bottom,
7  the bottom two rows, bottom four rows rather, "SWAT
8  training, SWAT sniper training, monthly SWAT training,
9  SWAT sniper training."  Do you see that?
10     A.  Yes.
11     Q.  Do you remember those trainings?
12     A.  Specifically?
13     Q.  Any of the SWAT training that you did.
14     A.  Like specifically those SWAT trainings or any
15 SWAT trainings I've completed?
16     Q.  Any of the SWAT trainings that you did in
17 Salt Lake City.
18     A.  Yeah, I remember a lot of them.
19     Q.  Were those voluntary?
20     A.  Yes.
21     Q.  Why did you volunteer to do SWAT training?
22     A.  So, I mean, in order to be a member of the
23 SWAT team you have to complete your training hours, so
24 it is voluntary to be on the team, but, I mean, it's
25 mandatory to go to trainings.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1152   Page 16 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              57 to 60

Page 57

1    Q.   So when did you volunteer for the SWAT team?
2    A.   So I got hired on March of, yeah, March 2016,
3    so it would have been March 2017, one year later.
4    Q.   Okay.  What motivated you to join the SWAT
5    team?
6    A.   I'd been on two other teams prior to that and
7    I wanted to continue that.
8    Q.   Is it just something you enjoy?
9    A.   Oh, yes.
10   Q.   What do you enjoy about it?
11   A.   The guys, the training.  Better gear, better
12   training.
13   Q.   Were you ever deployed as a SWAT officer in
14   an actual incident?
15   A.   Yes.
16   Q.   How many times?
17   A.   A lot.  I have no idea.
18   Q.   Could you give me a ballpark?
19   A.   No.  There's no way I would give an accurate
20   number of times I've been deployed as SWAT.
21   Q.   Is the SWAT team deployed often, in general?
22   A.   It's just like everything else.  I mean, it
23   kind of comes and goes in waves.
24   Q.   What's the purpose of the SWAT team?
25   A.   To --

Page 58

1    MS. NICHOLS:  Just a second.  Objection.
2    THE WITNESS:  Sorry.
3    MS. NICHOLS:  Vague and calls for speculation.
4    THE WITNESS:  The purpose of the SWAT team?
5    MR. LUTZ:  Yeah.
6    THE WITNESS:  To respond to anything that would
7    potentially be outside of the capability of a patrol
8    officer.  Also, within Salt Lake City, to serve any
9    search warrants that are served by the city.
10   Q.   (BY MR. LUTZ) So give me some examples.  Give
11   me an example of the scenario of what you just
12   described there.  First, not serving a search warrant,
13   but something that would be outside the capabilities of
14   the ordinary patrol officers.
15   A.   A man barricaded in a building with a gun.
16   Q.   Were you ever -- did you ever participate in
17   a SWAT call like that?
18   A.   Yes.
19   Q.   Multiple times?
20   A.   Yes.
21   Q.   How many?
22   A.   Again, there's no way for me to know.
23   There's just no way.
24   Q.   Is it hundreds?
25   A.   Hundreds of SWAT deployments potentially, but

Page 59

1    not hundreds of men with guns inside buildings.
2    Q.   Okay.
3    A.   So.
4    Q.   Do you recall your -- actually, let's go
5    back.  Now, in your capacity as airport patrol, are you
6    still serving on the SWAT team?
7    A.   Yes, I am.
8    Q.   When was the last time that you were deployed
9    on the SWAT team?
10   A.   If I can look at my phone, I might be able to
11   tell you.
12   Q.   Sure.
13   A.   (Peruses cellphone.)
14        June 4th, potentially.  I can't think of
15   anything that was more recent than that last op.
16   Q.   And what happened on June 4th?
17   A.   So June 4th we served two search warrants.
18   One was for narcotics, I think the other one was for
19   guns, but I don't remember a hundred percent.  I would
20   have to read my report.
21   Q.   Can you walk me through your memory of that
22   narcotics call?
23   MS. NICHOLS:  Objection, vague and calls for a
24   narrative.
25   THE WITNESS:  So you want me to walk you through

Page 60

1    like the totality of the beginning to end for the SWAT
2    operation?
3    Q.   (BY MR. LUTZ) Yeah.  Just tell me what you
4    did in the SWAT operation.
5    MS. NICHOLS:  Same objections.
6    THE WITNESS:  Yeah, so, I mean, we attended a
7    briefing, obviously went to the location.  My
8    particular assignment I believe on the one, at least
9    the one that I'm thinking of, that one definitely had
10   our adviser from the narcotics unit, so I'm pretty sure
11   it was an arrest warrant.
12        So, anyways, I was a part of the clear team
13   and so we ended up getting to the location, clearing
14   the location, I think we took a few suspects into
15   custody, and then we immediately turned it over to the
16   detectives.
17   Q.   (BY MR. LUTZ) Okay.  So you also have this
18   training record that, this part of your SWAT training,
19   you do SWAT sniper training?
20   A.   I did.  I don't anymore.
21   Q.   Okay.  Why not?
22   A.   Just didn't want to anymore.
23   Q.   Were you ever actually deployed as a sniper
24   position on a SWAT team?
25   A.   Yes.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1153   Page 17 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    61 to 64

Page 61

```
 1      Q.   How many times?
 2      A.   Dozens.
 3      Q.   Did you ever have to -- in general in your
 4  time being deployed with SWAT, did you ever have to use
 5  a firearm?
 6      A.   Define used.
 7      Q.   Fire.
 8      A.   No.
 9      Q.   You can put this aside.  We might come back
10  to it.
11      A.   (Complies.)
12      Q.   In general in your time as a Salt Lake City
13  police officer, how many times have you discharged your
14  firearm?
15      MS. NICHOLS:  Do you mean outside of training?
16      MR. LUTZ:  While on duty outside of training.
17      THE WITNESS:  I'm glad you said that because that
18  could have been hundreds.  Outside of training?
19      MR. LUTZ:  Yes.
20      THE WITNESS:  I think it's only been two.
21      Q.   (BY MR. LUTZ) Do you remember those two
22  incidents?
23      A.   Yes.
24      Q.   And which were they?
25      A.   One there was a deer that needed to be
```

Page 62

```
 1  dispatched and one was in the incident that we're here
 2  for.
 3      Q.   With Mr. Harmon?
 4      A.   Yes.
 5      Q.   Those were the only two times you've ever
 6  discharged your service weapon as a police officer on
 7  duty with Salt Lake City?
 8      A.   Yeah, I think so.  I don't think there's been
 9  anything else.
10      Q.   And never in your capacity on the SWAT team?
11      A.   No.
12      Q.   What precipitated your transfer to airport
13  police?
14      MS. NICHOLS:  Objection, vague.
15      Q.   (BY MR. LUTZ) Was it your decision?
16      A.   Yes.  Sorry.
17      Q.   Did you put in for a transfer for that?
18      A.   Yes.
19      Q.   Can you tell me why.
20      A.   I wanted to.
21      Q.   Why did you want to?
22      A.   Change of scenery.  Yeah, sorry.  I don't
23  understand.
24      Q.   I'm just wondering what motivated the change?
25      A.   Yeah, just that.
```

Page 63

```
 1      Q.   Okay.  Is it accurate that that was in
 2  October 2017?
 3      A.   No.  I felt like it was before that.  I felt
 4  like it was -- I think it was in June.
 5      Q.   Okay.  If you go back to Exhibit 8 --
 6      A.   This one (indicating)?
 7      Q.   Yeah.
 8      A.   Yeah.
 9      Q.   The date that we have here on page 1.
10      A.   I didn't notice that before, but I don't --
11      Q.   You don't think this is accurate?
12      A.   I don't think that's accurate.
13      Q.   It's not October 2017?
14      A.   I don't think so.
15      Q.   You think it was June 2017?
16      A.   I think so.
17      Q.   Do you remember when the incident with
18  Mr. Harmon occurred?
19      A.   August.
20      Q.   Was your transfer -- were you working with
21  the airport police?
22      A.   Sorry.  Hold on a second.  I didn't
23  realize -- yeah, this is -- this is -- that's
24  significantly wrong.  I've only been out to the airport
25  since last June.
```

Page 64

```
 1      Q.   Last June?
 2      A.   Yeah.  That's not accurate even remotely.
 3      Q.   Okay.  So June 2021 you went out to the
 4  airport?
 5      A.   I think so.  It was definitely just last
 6  year.  I've only been out there -- to qualify, I've got
 7  a badge that gets me in through the doors and I think
 8  it says like June something as my expiration date, and
 9  so I think it was June when I got it, so I think it was
10  June when I went out there.  Does that make sense?
11      Q.   Uh-huh.
12      A.   Other than that, I think I've been there
13  since June of last year, so yeah.
14      Q.   Okay.  And the reason I ask is because these
15  dates on your training history report which you believe
16  are inaccurate, you know, this would only be a period
17  of weeks after the incident with Mr. Harmon, and so
18  what I was wondering was did that precipitate the
19  change?
20      A.   No.
21      Q.   It sounds like no.
22      A.   No.
23      Q.   Okay.  You can put that aside.
24      A.   (Complies.)
25      Q.   Can we talk a little bit about your
```

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1154  Page 18 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    65 to 68

Page 65

1  disciplinary history at SLCPD?
2      A.   Sure.
3      Q.   So what I've seen from your file, just a
4  couple things.  Can you tell me what discipline you've
5  been subject to in your time with the Salt Lake City
6  Police Department?
7      A.   I think the only thing -- the only thing that
8  I've actually, and I don't think I was, I mean, I guess
9  it would depend on your qualification of what
10 discipline means.  I was found at an at-fault accident,
11 so I was, I mean, basically at fault for that, but
12 other than that, I haven't been disciplined outside of
13 that.
14     Q.   Were you issued any kind of reprimand for the
15 at-fault accident?
16     A.   Like nothing in writing or anything, but,
17 yeah, basically told not to do it again.  It was an
18 at-fault accident, so it just goes on my record as
19 such, and then it kind of affects like your safe
20 driving record within the department I think.  Too many
21 of those could be negative.
22     Q.   Okay.  So were those -- were you accused of a
23 policy violation in that incident?
24     A.   No.  No.
25     Q.   And there's two driving incidents, right, on

Page 66

1  your record?
2      MS. NICHOLS:  Objection to the extent that you
3  have his record and he could review it to answer.
4          But you can answer to your best recollection.
5      THE WITNESS:  Yeah, so I've only had one at-fault
6  accident.  I believe there's been multiple incidents in
7  my vehicle, yes.
8      Q.   (BY MR. LUTZ) And there was another one in
9  West Valley?
10     A.   Might have been one, but that was not an
11 accident.
12     Q.   Oh, right.  That was the citizen complaint,
13 possibly?
14     A.   That I'm not even a hundred percent sure that
15 even -- yeah.
16     Q.   Yeah.  But you're not -- that's your entire
17 disciplinary history in Salt Lake City is these driving
18 infractions?
19     MS. NICHOLS:  By disciplinary history, do you mean
20 where he was issued discipline?
21     MR. LUTZ:  Yeah.
22     THE WITNESS:  Yeah, I think in those terms the
23 only thing I've ever had is that one at-fault accident.
24     MR. LUTZ:  Okay.
25          (Exhibit 9 marked.)

Page 67

1      Q.   (BY MR. LUTZ) Okay.  So I've just handed you
2  what's been marked as Exhibit 9.  Can you tell me
3  what's on the front page of Exhibit 9?
4      A.   I believe that that is the front right fender
5  of my patrol car.
6      Q.   Okay.  And can you describe its condition?
7      A.   Damaged.
8      Q.   Does this picture reflect what we were just
9  talking about?
10     A.   I believe so, yes.
11     Q.   Okay.  Flip to the next page which is
12 SLCC577.
13     A.   (Complies.)
14     Q.   Have you seen this before?
15     A.   No.  Maybe.
16     Q.   It's addressed to you.
17     A.   (Peruses document.)
18          Yeah, I think I got this in an email.  I
19 don't know if I've received a copy of it before.
20     Q.   So this is from Brian Purvis, Captain of
21 Internal Affairs; right?
22     A.   Yes.
23     Q.   And you see at the bottom it says cc: IA File
24 and it says you were involved in a preventable accident
25 which is a violation of SLCPD policy?

Page 68

1      A.   Okay.
2      Q.   So you were accused of a policy violation
3  because of this incident?
4      A.   Correct.
5      Q.   If you go to these little numbers on the
6  bottom, SLCC580.
7      A.   (Complies.)
8      Q.   And you see under the Bureau Commander
9  Comments here it says "Accident reviewed by the
10 Accident Review Board and determined to be preventable
11 by a unanimous vote.  This is the subject officer's
12 first preventable accident.  He was directed by his
13 division to complete an online driving course.  This
14 case is now closed."
15     A.   Yes.
16     Q.   So this policy violation, you were determined
17 to have violated a policy here?
18     A.   Yes.
19     Q.   And the penalty, if you want to call it that,
20 was an online driving course?
21     A.   I actually had forgotten about that, but yes.
22     Q.   Okay.  If you flip to 582.
23     A.   (Complies.)
24     Q.   Do you recognize this image?
25     A.   (Peruses document.)

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID.1155   Page 19 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                    69 to 72

Page 69

1      No.
2  Q.  How about 583?
3  A.  (Peruses document.)
4      Oh, yes.
5  Q.  What's this?  What do we see in 583?
6  A.  583 is a Dodge Durango.
7  Q.  And does this spark your memory --
8  A.  Yes.
9  Q.  -- about another incident?
10 A.  Yes.
11 Q.  Or the same incident as before?
12 A.  No.  This is a different incident.
13 Q.  Okay.  What happened in this incident?
14 A.  This guy made a U-turn and hit my car.
15 Q.  Okay.  Go ahead and flip to 587.
16 A.  (Complies.)
17     Sure.
18 Q.  What does 587 show?
19 A.  That's damage to the rear left fender of my
20 patrol car.
21 Q.  Okay.  Same thing on 588?  Or it's not the
22 same thing, but what does 588 show?
23 A.  Same damage from a different angle.
24 Q.  Okay.  So do you remember this incident where
25 the guy made a U-turn and hit your car?

Page 70

1  A.  Yes.
2  Q.  And did you have to attend a predetermination
3  hearing about this incident as well?
4  A.  No.
5  Q.  And the incident with the Durango, was that
6  before or after the first incident that we talked
7  about?
8  A.  After.
9  Q.  Can you flip to 592.
10 A.  592?
11 Q.  Uh-huh.
12 A.  (Peruses document.)
13 Q.  Okay.  So we have here it's Concise Officer
14 History, Officer Clinton Fox, and then three sort of
15 descriptions.  "Involved officer vehicle accident
16 January 14th, 2017."  Was one of the incidents that we
17 just talked about this January 2017 incident?
18 A.  I think the first one we talked about might
19 have been the January 17th one.
20 Q.  Okay.  January 14th?
21 A.  14th, sorry.  I'm not a hundred percent sure.
22 Q.  Okay.  So down here at the very bottom we
23 have "Incident Type, Vehicle Accident 3, Total 3."
24 What is the third incident we haven't talked about that
25 this refers to?

Page 71

1  A.  Which one?  Sorry.  Where are you seeing?
2  Q.  So if you look down at the bottom of 592 --
3  A.  Right.
4  Q.  -- we have -- it says "Incident Type."
5  A.  Right.
6  Q.  Below that "Vehicle Accident."
7  A.  Right.
8  Q.  "Received 3, Total 3."
9  A.  Okay.
10 Q.  We've talked about two.
11 A.  Right.
12 Q.  What's the third one?
13 A.  I got rear ended.
14 Q.  Okay.  When was that?
15 A.  I'm assuming if this -- if these are correct,
16 then the initial one is potentially the January 14th of
17 2017.  This one in November 25 of 2017 I'm assuming --
18 oh, I'm sorry, no.  You know what.  The one in January
19 of 2017 is the one where I think is the one we're not
20 talking about.  The one in November of 2017 may be the
21 one that -- I think that was the one, the first one we
22 talked about, and I think the last one is the one with
23 the Durango.
24 Q.  Okay.
25 A.  I think.  Sorry.

Page 72

1  Q.  And the one that we're missing is one where
2  you were rear ended?
3  A.  Yeah, well, technically the Durango, as it
4  turned, kind of rear ended me as well, but then the
5  other one the guy actually rear ended me and then
6  actually pushed my car into the car in front of me.
7  Q.  Okay.  Was that the incident with Officer
8  Silva?
9  A.  That was the first one.  The first pictures
10 that you showed me?
11     Yeah.
12 A.  That was that one.
13 Q.  Okay.  You can put that aside.
14 A.  (Complies.)
15 Q.  So other than what we just talked about with
16 these driving incidents and the one sustained as a
17 policy violation, you're not aware of any other policy
18 violations that were sustained against you at your time
19 with the SLCPD?
20 A.  None that I'm aware of.
21 Q.  Okay.  Can we talk about your relationship
22 with Officer Robinson, Scott Robinson?
23 A.  Sure.
24 Q.  I think you mentioned it before, but when did
25 you first meet Scott Robinson?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1156   Page 20 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                            73 to 76

Page 73

1     A.   So I'm assuming you don't intend, like, the
2  very first time I ever met him passing in the hall,
3  that kind of incident like meeting him in like a work
4  capacity on a regular basis.  Or what do you mean?
5     Q.   Yeah.  When's the first time you met him?
6     A.   I mean, I have no idea when the first time I
7  met him was.
8     Q.   When was the first time you worked with him?
9     A.   So when I moved to the squad at the beginning
10 of that rotation, that was the first time -- I think
11 that's the first time we were ever actually working
12 like the same squad together.  We were actually, I
13 believe, beat partners.  We were released in the same
14 zone if not the same beat, and so that would be the
15 first time we ever worked together.
16    Q.   How many officers are in a zone?
17    A.   It depends.
18    Q.   How many officers were in the zone that you
19 two were in?
20    A.   Four of us I think.
21    Q.   Who were the other two?
22    A.   So there was me, Scott, Kris, and Josie.
23    Q.   Okay.  Kris is Kris --
24    A.   Smith.
25    Q.   -- Smith?  Okay.

Page 74

1          How long did the three of you, as in Scott
2  Robinson and Kris Smith, all work in that zone
3  together?
4     A.   For that rotation.
5     Q.   How long is rotation?
6     A.   Four months I think.
7     Q.   And did you work with Officer Robinson again
8  outside of that rotation?
9     A.   I don't know when he got to bikes, but we
10 were never on the same squad again that I can remember
11 anyways.
12    Q.   Okay.  What do you mean when you say when he
13 got to bikes?
14    A.   So I ended up on the bike squads and I was
15 there for a while.  I think he was still in patrol.
16 While it's -- the bikes are technically a subdivision
17 of patrol, we just had yellow shirts, bikes, and he
18 eventually made it to bikes, but I don't know if we
19 were ever on the same squad together.
20    Q.   Okay.  How closely did you work with Officer
21 Robinson?
22    MS. NICHOLS:  Objection, vague.
23    THE WITNESS:  The first time?
24    Q.   (BY MR. LUTZ) I mean, over the course of your
25 time, did you guys work together frequently?

Page 75

1     A.   Yeah, so once we were on the squad together,
2  it was every night.
3     Q.   And that was for how long?
4     A.   Probably two to three months of that
5  rotation.
6     Q.   And then you were on different squads?
7     A.   Yes.
8     Q.   Did you ever work with him on a daily basis
9  again?
10    A.   No.  I don't think I did.
11    Q.   Did you see him on a daily basis?
12    A.   No, not really.  Like in passing maybe.
13 Maybe in the building or something, but no.
14    Q.   Did you speak with him regularly?
15    A.   Yeah.
16    Q.   Were you friends?
17    A.   Yes.
18    Q.   Are you friends today?
19    A.   Yeah.
20    Q.   Did you talk to him yesterday?
21    A.   I did not.
22    Q.   Have you ever been to his house?
23    A.   Yes.
24    Q.   How many times?
25    A.   Two or three times.

Page 76

1     Q.   Any of the places that he's lived.
2     A.   Five, six.
3     Q.   Is he married?
4     A.   Yes.
5     Q.   You met his wife?
6     A.   Yes.
7     Q.   Does he have kids?
8     A.   Yes.
9     Q.   Have you met his kids?
10    A.   Yes.
11    Q.   What are their names?
12    A.   Oh.  If I say I don't remember, are you guys
13 going to tell him?
14    Q.   I will give him this transcript if he asks
15 for it.
16    A.   Oh.  I'm going to hate it because I don't
17 remember.
18    Q.   Do you know how old they are?
19    A.   One of them starts with a C I believe.  Oh,
20 I'm going to hate this.  How old are they?
21    Q.   (Nods head.)
22    A.   One is close to 10, maybe slightly older.  I
23 think the other one is close to 14-ish plus or minus a
24 couple years.
25    Q.   Boy and girl?

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          77 to 80

Page 77

1    A.    Two girls.
2    Q.    Two girls.  What's his wife's name?
3    A.    I don't know.
4    Q.    Have they ever had you over for dinner?
5    A.    We had a barbecue once.  I was invited to a
6    barbecue.
7    Q.    Okay.  Have you ever hosted Officer Robinson
8    at your home?
9    A.    Yes.
10   Q.    How many times?
11   A.    Two or three.
12   Q.    Ever been to a bar with him?
13   A.    Yeah.  Yeah.
14   Q.    Still plan on socializing in the future?
15   A.    Well, he's a sergeant now, so he may not want
16   to associate with a lowly patrol guy, but I would like
17   to with him, yes.
18   Q.    That's a pretty recent change; right?
19   A.    Yes.
20   Q.    His promotion to sergeant?
21   A.    Yeah.
22   Q.    Have you socialized with him since his
23   promotion?
24   A.    No.
25   Q.    Seems like you had to think about it.  Are

Page 78

1    you guys texting?
2    A.    I -- so, genuinely, the last time I saw him
3    was actually on a call, and he was off in the distance,
4    and I literally had to shout at him and say hi, so I
5    haven't talked to him in a while.
6    Q.    But do you text message with him?
7    A.    Not recently in a long time.
8    Q.    What's a long time?
9    A.    Long enough I don't remember the last time I
10   texted with him.
11   Q.    Want to check?
12   A.    I can check.
13         (Peruses cellphone.)
14         I think I just figured out what his wife's
15   name is.
16   Q.    What is it?
17   A.    I believe it's Amber.  Am I correct?  Do you
18   know?
19   Q.    I don't know.
20   A.    Dammit.  I'm still going to wonder about
21   that.  So this has May 30th I think is the last time
22   that we've texted.  I have nothing after that, so I
23   would assume that's accurate.
24   Q.    What did you text him?
25   A.    It says --

Page 79

1         MS. NICHOLS:  And just a second.  I'm going to
2    object.  To the extent that there's any discussion of
3    privileged information, I direct you not to answer as
4    to any discussions that either of you had with me.
5         MR. LUTZ:  It wouldn't be privileged between the
6    two.
7         MS. NICHOLS:  It's joint counsel representation.
8         MR. LUTZ:  It doesn't matter if you're not
9    involved in the communication.  Are you on these text
10   messages?
11        MS. NICHOLS:  If they're forwarding -- if they're
12   forwarding and relaying information that I provided,
13   it's privileged.
14        MR. LUTZ:  I don't think that's right if you're
15   not on the communication, but we can get to it when we
16   address the particular communication.
17        THE WITNESS:  So I don't know what he is referring
18   to, but he said, "Probably working on my yard.  You?"
19   I don't know.
20   Q.    (BY MR. LUTZ) Do you guys ever text about the
21   case?
22   A.    No.
23   Q.    Can I see?
24   A.    I mean, no.
25   Q.    I mean, well, you can say no now, but we'll

Page 80

1    put in a discovery request and it will be discoverable.
2    A.    Yeah, that's fine.
3    Q.    Okay.
4    A.    Okay.
5    Q.    Don't delete it.
6    A.    Delete what?
7    Q.    Any of your communications.
8    A.    Okay.
9    Q.    What about Officer Smith?  You guys friends?
10   A.    Yes.
11   Q.    Kris Smith?
12   A.    Yes.
13   Q.    They both described you as friends, and
14   colleagues, obviously.  So have you socialized with
15   Kris Smith out of work?
16   A.    Yes, outside of work.
17   Q.    Has he ever been to your house?
18   A.    Yes.
19   Q.    How many times?
20   A.    At least once.  I don't -- at least once.  I
21   don't know how many times.
22   Q.    Have you ever been to his?
23   A.    I don't think I have.
24   Q.    Ever been to a bar together?
25   A.    Kris doesn't drink.  We've been to a

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1158   Page 22 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              81 to 84

Page 81

1   restaurant together.  I had a beer, he didn't.
2       Q.   How many times have you guys been out to eat
3   together?
4       A.   Outside of work?
5       Q.   Let's start with outside of work.
6       A.   Maybe -- maybe two.  Yeah.
7       Q.   How about at work?
8       A.   Well, at work we probably go to dinner quite
9   a bit.  We were on the same squad.  We probably ate
10  every night that we could, yeah.
11      Q.   And Kris has been there about the same time
12  that you have, right, at Salt Lake City Police
13  Department?
14      MS. NICHOLS:  Objection, calls for speculation.
15      THE WITNESS:  Yeah, I think he's been there longer
16  than I have.
17      Q.   (BY MR. LUTZ) Yeah, I thought you said
18  earlier that you had some inclination -- inkling that
19  he had applied right before you.  Is that right or am I
20  misstating that?
21      A.   I think you're misstating it.  I think we had
22  a conversation that we both intended to apply.  When
23  that actually happened, I have no idea what the, like,
24  sequence of events that would have had happened.
25      Q.   Do you remember if you started before him?

Page 82

1       A.   He started before me.
2       Q.   Okay.  So the three of you are friends?
3       A.   Yeah.
4       Q.   Do you have any idea if Kris and Scott are
5   friends with each other?
6       MS. NICHOLS:  Objection, calls for speculation.
7       THE WITNESS:  I think so.
8       Q.   (BY MR. LUTZ) Do the three of you all hang
9   out together?
10      A.   Again, I think the interactions between,
11  like, either work and off work; right?
12      Q.   As to both.
13      A.   Yeah, I mean, on duty obviously we were on
14  the same squad, we'd hang out all the time.  Off duty I
15  think we've all been -- we've all, like, had dinner
16  together or hung out at least a couple of times.  I
17  don't know about, I mean, probably at least once if not
18  two times where it's all three of us or one at a time
19  otherwise, if that makes sense.
20      Q.   Okay.  Have you met Kris Smith's family?
21      A.   Yes.
22      Q.   Does he have children?
23      A.   Yes.
24      Q.   Do you know their names?
25      A.   No, because he has more kids and there's no

Page 83

1   way I'm going to remember his kids' names.
2       Q.   How many kids does he have?
3       A.   Is it four?  I don't know.
4       Q.   What are their -- do you have any idea what
5   their approximate ages are?
6       A.   I know that there's one, again, roughly,
7   around 10-ish, plus or minus a few years, and then
8   another one closer again about 14.  I think that
9   there's one below, middle, and above that, but I
10  don't -- I can't remember.  Around there I think.
11  That's a lot of guessing on my part.
12      Q.   Is he married?
13      A.   Yes.
14      Q.   Do you know his wife's name?
15      A.   Yes.  I believe her name's Laura.  I hope I
16  don't get that wrong too.
17      Q.   And you're married?
18      A.   Yes.
19      Q.   What's your wife's name?
20      A.   I know my wife's name.  I can be a hundred
21  percent about her name being Brittany.  I think.
22  Sorry, just kidding.
23      Q.   Have you and Brittany ever been out with Kris
24  and his wife as couples?
25      A.   Yeah.  I mean, yeah.  Yes.

Page 84

1       Q.   How many times?
2       A.   Once, twice.
3       Q.   Have your kids ever met?
4       A.   Yes.
5       Q.   Are your kids friends with one another, any
6   of them?
7       A.   I mean, they were friendly to each other at
8   the time, but they don't -- I mean, I doubt that even
9   they may remember meeting them.  So not friends, but
10  they were friendly.
11      Q.   Okay.  They have met though?
12      A.   Yeah.
13      Q.   So that's sort of outside of work.  Did you
14  have a close relationship with Officer Robinson as a
15  colleague?
16      MS. NICHOLS:  Objection, vague.
17      THE WITNESS:  So, like, what do you mean?
18      Q.   (BY MR. LUTZ) You worked together frequently,
19  you care about him?
20      A.   Yeah.
21      Q.   You care about his professional career?
22      A.   Yeah.
23      Q.   Do you think he cares about yours?
24      MS. NICHOLS:  Objection, calls for speculation.
25      THE WITNESS:  I would hope so.

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                85 to 88

Page 85

1    MR. LUTZ:  He says he does.
2    THE WITNESS:  (Nods head.)
3    Q.  (BY MR. LUTZ) When I asked Officer Robinson
4  yesterday about August 13, 2017, and when you two took
5  a call to go help Kris Smith, I asked why you two
6  jumped on that call together and he said it's just what
7  we do or what we did.  Does that sound right to you?
8    A.  Yeah.  Sorry.
9    MS. NICHOLS:  You're good.  Go ahead.
10    Q.  (BY MR. LUTZ) I mean, to me that describes a
11  close personal working relationship.  Is that accurate?
12    A.  Yeah.
13    Q.  I think it sounds like he believes he had
14  your back and you had his back.  Is that accurate?
15    A.  Yes.
16    Q.  Same thing with Kris?
17    A.  Yes.
18    Q.  We talked a little bit about your military
19  combat experience at the very beginning of the day.
20  Can we go back, and I just want to ask you some
21  additional details.  I do honestly apologize if it's
22  sensitive.  I don't mean to cause unnecessary stress.
23        But you were involved in combat you said
24  numerous times and you discharged your weapon several
25  times?

Page 86

1    A.  (Nods head.)
2    Q.  Were you -- did you ever shoot other
3  combatants?
4    A.  Yes.
5    Q.  Can you tell me how many times?
6    A.  One time that I know for sure.  Other than
7  that, it would just be speculating whether I actually
8  hit what I was aiming at.
9    Q.  You had one confirmed kill?
10    A.  It doesn't -- in terms of saying like a
11  confirmed kill, that doesn't quite qualify --
12    Q.  Okay.
13    A.  -- as you would potentially understand.  You
14  know what I'm saying?
15    Q.  You'll have to -- you'll have to correct me
16  on military terminology.
17    A.  Yeah.
18    Q.  I don't know --
19    A.  So, no, there would be absolutely no record
20  of me actually doing it.  There's no confirmed kills
21  for just general fighting, if that makes sense.
22    Q.  But you know you hit someone at some point?
23    A.  It's more than likely that it was me that hit
24  him, so that's always weighed on my conscious that I
25  believe that I did.

Page 87

1    Q.  Okay.  Just that one time?
2    A.  I mean, there was more than that, but it was
3  also less likely that -- I mean, yeah, I mean, there's
4  just no way to know sometimes.  You know what I mean?
5    Q.  Yeah, well, because it sounds like you were
6  involved in a lot of gunfights.  Is that what you're
7  saying?
8    A.  Yeah, more than a couple.
9    Q.  Do you have any idea how many?
10    A.  No.
11    Q.  You have significant combat experience?
12    MS. NICHOLS:  Objection, vague.
13    THE WITNESS:  Yeah, comparatively, no.
14  Comparatively it was very light.  I have friends that
15  actually had lots of combat experience.  I had very
16  minor combat experience.  So it's hard to say.  You
17  know what I mean?
18    Q.  (BY MR. LUTZ) I do.  When was the incident
19  that we just talked about?
20    A.  I have no idea.  What do you mean when?
21    Q.  At least, during which deployment?
22    A.  It was the one to Ramadi.
23    Q.  Okay.  Sometime within that deployment?
24    A.  Yeah.
25    Q.  And I understand that these things can blend

Page 88

1  together and it was also a long time ago.  Was Ramadi
2  your last deployment?
3    A.  Yes.
4    Q.  Did that incident have anything to do with
5  your decision not to go back?
6    A.  No.
7    Q.  Okay.  We can talk about something less
8  intense if you want --
9    A.  I'd appreciate it.
10    Q.  -- which is tasers.
11        This already marked as Exhibit 1 I
12  believe.  Let's just mark the whole manual as an
13  exhibit.
14        (Exhibit 10 marked.)
15    MR. LUTZ:  Okay.  Don't worry.  We're not going to
16  look through this whole thing.
17    THE WITNESS:  I got it.
18    Q.  (BY MR. LUTZ) Okay.  Have you ever seen
19  Exhibit 10 before?
20    A.  No.
21    Q.  Do you recognize the device pictured on the
22  front?
23    A.  Yes.
24    Q.  What is that?
25    A.  That is a taser.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1160   Page 24 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                           89 to 92

Page 89

1    Q.   Does that look like the model of taser that
2  you carried around 2017?
3    A.   I believe so.
4    Q.   Okay.  Do you remember the model number?
5    A.   I believe it was X26.
6    Q.   Okay.  So is it safe to say this is the user
7  manual for the taser that you were carrying in 2017?
8    MS. NICHOLS:  Objection, foundation.
9    THE WITNESS:  I would say it's safe to say that if
10  in fact I was carrying the X26, it does look like the
11  user manual for the X26 taser.
12    Q.   (BY MR. LUTZ) Okay, great.  We can document
13  that in your record later.
14    A.   Okay.
15    Q.   Okay.  So we'll go through this in a little
16  bit more detail, but before we do, can you just
17  describe for me what a taser is used for?
18    MS. NICHOLS:  Objection, vague.
19    Q.   (BY MR. LUTZ) Let me rephrase.  What's its
20  purposes?
21    MS. NICHOLS:  Objection, vague.
22    THE WITNESS:  Ultimately the taser is just a
23  nonlethal option for attempting to gain compliance,
24  yeah.
25    Q.   (BY MR. LUTZ) And how does it help you gain

Page 90

1  compliance?
2    A.   Like, can you -- how does it help me to gain
3  compliance?
4    Q.   Yeah.
5    A.   I mean, if there's somebody that's combative
6  and I use my taser, normally we can get them in
7  handcuffs easier.
8    Q.   What's the cause and effect there?
9    A.   What do you mean?
10    Q.   How does the taser help you gain compliance?
11    A.   Typically it should incapacitate somebody
12  where they no longer have like the physical ability to
13  like run, fight, do that kind of thing.
14    Q.   Okay.  So it helps you gain compliance by
15  physically incapacitating someone?
16    A.   Yes.
17    Q.   And do you know what CEW stands for?
18    A.   Conducted weapon -- or no, sorry.  Conducted
19  energy.  I don't think it's weapon.  Conducted energy
20  something.  I can't remember.  Does it say?
21    Q.   It does say there somewhere.
22         Okay.  Can you flip to page 4 of Exhibit 10.
23    A.   (Witness complies.)
24    Q.   I think this will help illustrate what I'm
25  getting at.  Sorry.  There's some introductory pages.

Page 91

1  Page 4.  Okay.  Looking at page 4, the lowest header
2  down here is titled Neuro Muscular Incapacitation, NMI.
3    A.   Yes.
4    Q.   Have you heard that term before?
5    A.   Yes.
6    Q.   And where have you heard that term before?
7    A.   In training.
8    Q.   Training with regard to anything in
9  particular?
10    A.   Yeah, I believe with tasers.
11    Q.   Okay.  So let's just read this bottom
12  paragraph here which is "Taser technology is designed
13  to use electrical impulses similar to those in your
14  body's nervous system to cause stimulation of the
15  sensory and motor nerves.  Neuro muscular
16  incapacitation (NMI) occurs when a CEW is able to cause
17  involuntary stimulation of both the sensory nerves and
18  the motor nerves.  It is not dependent on pain and can
19  be effective on subjects with a high level of pain
20  tolerance."
21         Is that your understanding of how a taser
22  works?
23    A.   More or less, yes.
24    Q.   What's the less?
25    A.   I mean, I think it goes -- there's a pretty

Page 92

1  big policy here.  Or manual.  I think that is an
2  overgeneralization of how a taser can be effective.
3    Q.   Can you elaborate?
4    MS. NICHOLS:  Objection, vague.
5    Q.   (BY MR. LUTZ) What are the other ways it can
6  be effective?
7    A.   Well, so my point is, I mean, two different
8  deployment methods.  There's, I mean, like I say, it's
9  just a very simplified generalization of what I would
10  be able to explain, but I don't have, like, the actual
11  probably verbiage that would be better.
12    Q.   It sounds like you know the taser well from
13  experience?
14    A.   Well enough, yes.  Yeah.
15    Q.   What are the two deployment methods?
16    A.   So you can either deploy where you actually
17  discharge it and it shoots the two prongs out or you
18  can do what they call a drive stun.
19    Q.   Okay.  Describe that first method in a little
20  more detail.
21    A.   So taser makes small different cartridges,
22  they have different distances that they can shoot,
23  there's different angles for the spread of the probes,
24  and I believe there's like a C02 cartridge or something
25  that actually launches the probes out.  If they make

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1161   Page 25 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                        93 to 96

Page 93

1  contact with the subject, then that is what makes the
2  connection for the taser to actually be able to send
3  the -- or to perform the NMI.
4       Q.  Okay.  Is the cartridge the thing that
5  contains the probes?
6       A.  Yes.
7       Q.  And then the probes are connected by some
8  sort of conductive wire back to the handle?
9       A.  Yes.
10      Q.  Are the cartridges reloadable?
11      A.  Yes.
12      Q.  Are they -- I should ask this first.  Are
13 they one-time use?
14      A.  So each individual cartridge is one-time use.
15 You can't take those prongs/wire and roll them up and
16 put them back in and reload it that way, no.
17      Q.  But can you put a new cartridge in?
18      A.  Yes.
19      Q.  So that's -- roughly, that's the probe
20 deployment?
21      A.  Yes.
22      Q.  What's the range on the probes?
23      A.  I believe the ones that we were issued are 25
24 feet, but like I said, there's multiple different
25 cartridges you can get.

Page 94

1       Q.  Okay.  Do you think the one -- you think 25
2  feet was what you carried?
3       A.  I think so.
4       Q.  And then what's the drive stun?  How is that
5  different?
6       A.  So on kind of the end of the taser there's at
7  least two, I think there's four different little metal
8  contacts that -- almost like the stun guns that you see
9  in the movies.  It kind of acts the same.  You actually
10 have to make contact with that to be able to close the
11 circuit to perform that on them.
12      Q.  Okay.  Does it have a different effect on the
13 probes?
14      A.  No.  I mean, it's the same electrical
15 connectivity.  It's just less effective.
16      Q.  I'm trying to see how to phrase this
17 question.  But in terms of, you know, it has these two
18 different deployment methods, which I'm assuming one is
19 appropriate for some situations and the other for
20 others.  Does that make sense?
21          Like, when would be a good situation,
22 hypothetically, to use the probe deployment?
23      A.  I mean, if you had distance and standoff, you
24 could.
25      Q.  Is that all that we're really thinking about?

Page 95

1       If you pulled your taser and you decided between the
2  two methods, is it really just the distance of the
3  subject that you would use to determine?
4       A.  I mean, there's probably -- obviously the
5  totality of the situation is going to dictate which
6  one.
7       Q.  Okay.
8       A.  So, yeah, it can't just be one thing that you
9  go oh, now I'm going to do it.
10      Q.  Fair enough.  I guess, just to clarify, you
11 can use the probe -- you can deploy the probes at a
12 distance.  With the drive stun you're going to be in
13 close quarters, arm's reach?
14      A.  You'd have to be able to touch them to use
15 the drive stun.
16      Q.  Okay.  This next paragraph in Exhibit 10
17 under the one we just read, this is obviously Tasers,
18 it's a description of what this model does, but it's
19 "Previous generations of stun guns primarily affected
20 the sensory nerves only resulting in pain compliance.
21 A subject with very high tolerance to pain (e.g., a
22 drug user, person in serious psychological distress, or
23 a trained focus fighter) may not be affected by the
24 pain or might be able to fight through the pain of a
25 traditional stun gun."

Page 96

1          And it sounds like what they're -- the
2  distinction they're making here is this model will
3  incapacitate you through more than just pain?
4          MS. NICHOLS:  Objection, calls for --
5          THE WITNESS:  Correct.
6          MS. NICHOLS:  Sorry.  Calls for speculation,
7  foundation.
8       Q.  (BY MR. LUTZ) I mean, that's how it reads to
9  me.  Is that how it reads to you?
10      A.  Sure, yes.
11      Q.  And is it your understanding that it
12 operates -- it physically incapacitates people not only
13 by causing pain, but by causing NMI?
14          MS. NICHOLS:  Objection, calls for speculation and
15 expert testimony.
16          THE WITNESS:  Sorry.  Say it again.
17      Q.  (BY MR. LUTZ) So our understanding of
18 neuromuscular incapacitation is that is different
19 than pain compliance; right?
20          MS. NICHOLS:  Same objections.
21          THE WITNESS:  I believe so.
22      Q.  (BY MR. LUTZ) Okay.  At the end of the day
23 the taser, if used correctly, will incapacitate someone
24 physically; right?
25          MS. NICHOLS:  Objection, calls for speculation.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1162   Page 26 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                     97 to 100

Page 97

1    THE WITNESS:  Potentially.
2    Q.    (BY MR. LUTZ) That's why you would attempt --
3    A.    I would attempt to use it, yeah, to attempt
4  to take them down.
5    Q.    How many --
6    A.    Not for the pain compliance.
7    Q.    Right.  How many times have you physically
8  incapacitated somebody with a taser?
9    A.    Somewhere between eight to ten.
10    Q.    Have you ever used a taser against somebody
11  that was carrying a weapon?
12    A.    No.  Just the one incident I gave you before.
13  That's the only time I thought there was a perceived
14  weapon, potentially, and it ended up being a
15  flashlight.  So other than that, I think -- I think no.
16    Q.    Have you deployed a taser against someone who
17  was being physically combative?
18    A.    Yes.
19    Q.    Can you tell me about one of those
20  situations?
21    A.    Yeah, so there was a gentleman passed out on
22  a porch.  He actually came with balled fists, didn't
23  obey commands, started coming at us as if he wanted to
24  fight, we tased him.
25    Q.    Was he able to fight after you tased him?

Page 98

1    A.    No, he was not.
2    Q.    And is that generally your experience with
3  deploying your taser on combative folks?
4    A.    All but --
5    MS. NICHOLS:  Objection, vague.
6    THE WITNESS:  Sorry.  I think all but one that I
7  can think of in this moment.
8    Q.    (BY MR. LUTZ) What's the one you're talking
9  about?
10    A.    That one we were in close proximity, I tried
11  to use the drive stun and it was completely
12  ineffective.
13    Q.    Can you tell me more about that situation?
14  What was the behavior of the subject that led you to
15  use the drive stun?
16    A.    He told me he was going to beat me to death.
17    Q.    Was he otherwise being physically combative?
18    A.    At that point not physically combative, but
19  he was failing to follow any commands.  Until my backup
20  got there, we didn't engage physically.
21    Q.    How did you come into contact with this
22  person?
23    A.    He was trespassing on someone's property.
24    Q.    Did you get a call to go out to there?
25    A.    No.

Page 99

1    Q.    You just discovered him just trespassing?
2    A.    Uh-huh.
3    Q.    How did that situation end up getting
4  resolved?
5    A.    We finally got him in handcuffs and he
6  actually continued to fight after handcuffs, but yeah.
7    Q.    But in that case the drive stun was not
8  effective?
9    A.    It was not effective.
10    Q.    Okay.  You can put Exhibit 10 away.
11    A.    What's that?
12    Q.    You can put Exhibit 10 away.
13    A.    (Complies.)
14    MS. NICHOLS:  Nick, we've been going a little over
15  an hour.  If you're going to launch into a whole new
16  thing, can we take a quick break?
17    MR. LUTZ:  Yeah.
18    MS. NICHOLS:  Okay.  Thanks.
19    (Recess taken from 11:20 a.m. to 11:33 p.m.)
20    Q.    (BY MR. LUTZ) Okay.  We're back.  In
21  performing your duties as a Salt Lake City police
22  officer on patrol, are you equipped with a body camera?
23    A.    Yes.
24    Q.    Always?
25    A.    Yes.

Page 100

1    Q.    Where is it equipped on your body?
2    A.    Currently right in the middle of my chest
3  (indicating).
4    Q.    Okay.  Do you know what brand it is?
5    A.    It's a Taser.  Or an Axon taser, whatever
6  they call it.
7    Q.    Axon.  So you said right now it's placed on
8  your chest and you were motioning towards your chest?
9  Was it placed somewhere different in the past?
10    A.    Yes.
11    Q.    Where was it placed in the past?
12    A.    On a little -- like there was a little
13  U-shaped collar piece that had a little magnet thing
14  that would attach right here on your collar
15  (indicating).
16    Q.    You're just motioning towards the collar of
17  your shirt?
18    A.    Yeah.
19    Q.    Okay.  In 2017 what was the placement?
20    A.    I think it was the one above my collar and so
21  it would have been the little U-shaped magnet attached
22  to the side of your neck or somewhere in that area I
23  think (indicating).
24    Q.    Okay.  And when you're gesturing up towards
25  your collar, are we talking about where the lens of the

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1163   Page 27 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                              101 to 104

Page 101

1  camera is placed?
2      A.   Yeah.  So it's like a little piece of metal
3  like I said, U-shaped, right.  It's got a little magnet
4  on the one side, so it goes under your collar, I think,
5  and then the magnet from the side of the camera goes
6  right on the collar and the lens would be pointed
7  whichever way I'm facing.
8      Q.   Okay.  So the camera lens is basically
9  attached to, like, your lapel and pointed in the
10  direction you're looking?
11     A.   Pretty much.
12     Q.   Okay.  And where's the -- where's the control
13 module located on the body?
14     A.   Now or then?
15     Q.   Then in 2017.
16     A.   So there was a cord that I would run down and
17 I would usually try to put right on my belt, so right
18 here on the front of my belt (indicating).
19     Q.   Okay.  And what is the -- what is the module?
20 Like, can you describe it?
21     A.   They're little square -- imagine the size of
22 like a deck of playing cards.  Maybe the same rough
23 width and size-ish, big button in the middle.
24     Q.   And does it have controls on it?
25     A.   It's got a little slider switch I think.

Page 102

1      Q.   And what does that control?
2      A.   On and off.
3      Q.   Is that the only thing you can control on it?
4      A.   No.  There's a button you can activate to
5  turn it off.
6      Q.   Under what circumstances, per SLCPD policy,
7  are you required to utilize your body camera as in use
8  it to record?
9      MS. NICHOLS:  Objection to the extent that you're
10 asking him to recall a lengthy policy manual.
11     But you can testify as to what you recall.
12     THE WITNESS:  Yeah, I don't remember exactly what
13 the policy says, but the way that I understand it is if
14 I'm going to make contact with the public I think.
15     Q.   (BY MR. LUTZ) As in interact with someone on
16 the street?
17     A.   There's been different iterations of it.  It
18 was only ever on a call and then it became something
19 else, then it became something else, and so on and so
20 forth.
21     Q.   So sitting in your car by yourself, probably
22 not supposed to be recording?
23     A.   Not just generally, no.
24     Q.   But if you're going to make an arrest, should
25 you be recording?

Page 103

1      A.   Yes.
2      Q.   If you're going to question someone, should
3  you be recording someone?
4      A.   There are exclusions for when you're doing
5  interviews.  I can't think of exactly what they are,
6  but I know there are some that you can actually turn it
7  off if -- if it's within the policy.
8      Q.   Can you give me an example of that?
9      A.   I can't remember.  I know that there is
10 something that exists for turning it off if you need
11 to.  I can't remember exactly when or how.
12     Q.   And do you know where that exclusion is
13 today?
14     A.   I can't think of it right now.  I would have
15 to review the policy to tell you.
16     Q.   Do you upload the body camera footage at the
17 end of every shift?
18     A.   I mean, you can plug it in.  Is that what you
19 mean?
20     Q.   Yeah, I mean, what do you do with the footage
21 that it records?
22     A.   Label it.
23     Q.   And store it somewhere?
24     A.   Yeah, I mean, I guess when you plug it in, it
25 uploads.

Page 104

1      Q.   What do you plug it into?
2      A.   A little docking station.
3      Q.   At the station?
4      A.   Yes.
5      Q.   And then are you in control of what happens
6  with the footage after that?
7      A.   No.
8      Q.   Who is?
9      A.   I have no idea.
10     Q.   Do you plug it in to upload at the end of
11 every shift?
12     A.   No.  I mean, there's shifts that run long and
13 then maybe you plug it in the next day.  But yeah, I
14 mean, 99 percent of the time at the end of your shift
15 you don't want to take that home with you, there's no
16 reason to, just plug it in.
17     As far as I do, I just plug it in so that the
18 battery works the next day so I don't run out of juice.
19     Q.   Okay.  To your knowledge, has your body
20 camera ever malfunctioned?
21     A.   Yes.
22     Q.   How often has that happened?
23     A.   Like total?
24     Q.   Yeah.  How many times has any body camera
25 that you utilized malfunctioned?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1164   Page 28 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    105 to 108

Page 105

1    A.   Five or ten.
2    Q.   And what was the result of the malfunction?
3    A.   What do you mean the result of?
4    Q.   So what happens?  How have they
5  malfunctioned?
6    A.   I had -- so the one that goes up your collar,
7  there's a cord that would run down to the control pack.
8  If I've been like kind of going over fences and
9  rooftops and that cord is broken, obviously we can't
10  control it when there's no battery power, no recording.
11       I've had it kicked off of my chest before
12  where the one that I had that was a magnet controlling
13  that got booted off.  I've had it while I was actually
14  in a physical altercation with somebody that the little
15  power switch that was on my belt, that actually got
16  swiped and just turned the unit off.  I've had it run
17  out of battery power on me.
18    Q.   Have you ran into a situation where the
19  footage was damaged or corrupted or anything like that?
20    A.   Not that I know of.  I have no idea.
21    Q.   Do they record audio?
22    A.   Yes.
23    Q.   Does it always record audio?  If it's
24  activated, is it recording audio?
25    A.   You can turn it off.

Page 106

1    Q.   The audio specifically?
2    A.   Like you could mute it so it doesn't record
3  audio.
4    Q.   Okay.  How would you describe the quality of
5  the footage produced by the body cameras that you've
6  utilized?
7    MS. NICHOLS:  Objection, vague.
8    Q.   (BY MR. LUTZ) Let's be more specific.  Is it
9  generally clear?
10    A.   Sometimes.  Sometimes not.
11    Q.   Do you believe that it can be -- the footage
12  that body cameras produce can be helpful in
13  understanding the events that it's recorded?
14    A.   Yes.
15    MS. NICHOLS:  Objection, vague and calls for
16  speculation.
17    Q.   (BY MR. LUTZ) Is body camera footage ever
18  used to help in criminal prosecutions?
19    MS. NICHOLS:  Objection, calls for speculation.
20    MR. LUTZ:  I think you know that from personal
21  experience.  It's not speculation.
22    THE WITNESS:  Yes.
23    Q.   (BY MR. LUTZ) Has your body camera footage
24  ever been -- or body camera footage that was recorded
25  from the unit you were wearing ever been used to assist

Page 107

1  in a criminal prosecution?
2    A.   Probably.
3    Q.   Have you ever sat on the stand and testified
4  as to --
5    A.   No.
6    Q.   -- your own body camera footage?
7    A.   No.
8    Q.   Really?  I'm just surprised.  I'm not
9  questioning your answer.
10       But to your knowledge, that footage gets
11  admitted in court sometimes, right, as evidence?
12    MS. NICHOLS:  Objection, calls for speculation.
13    THE WITNESS:  I actually have no idea.  I've never
14  had my camera be admitted into a court case I've been a
15  part of.
16    MR. LUTZ:  Okay.  Can we talk about the --
17  actually, scratch that.  Can we actually break now?
18    MS. NICHOLS:  For lunch?
19    MR. LUTZ:  And then, yeah, just kind of shift that
20  back?
21    MS. NICHOLS:  Sure.
22       Is that all right with you (to the witness)?
23    THE WITNESS:  (Nods head.)
24    MR. LUTZ:  That would just work better for
25  organization if that's all right.

Page 108

1    THE WITNESS:  Yeah.
2    (Recess taken from 11:44 a.m. to 12:34 p.m.)
3    Q.   (BY MR. LUTZ) Officer Fox, I want to talk to
4  you about -- in your time with Salt Lake City Police
5  Department, have you been trained in the department's
6  policy for the use of deadly force?
7    A.   Yes.
8    Q.   What is your understanding of what -- under
9  what circumstance you as an officer are permitted to
10  use deadly force?
11    MS. NICHOLS:  Objection, calls for a legal
12  conclusion.
13    MR. LUTZ:  According to Salt Lake City Police
14  Department policy.
15    THE WITNESS:  If it's in defense of myself or
16  others.
17    Q.   (BY MR. LUTZ) Is there anything more than
18  that?
19    A.   I mean, defense of myself and others if
20  there's -- I can't remember the words they use, but
21  if -- I think it says to prevent serious harm or death.
22  I'm not sure exactly what words it is, but basically
23  harm or death in defense of myself and others.
24    Q.   Okay.  Are you introduced to that policy at
25  the academy stage?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1165   Page 29 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    109 to 112

Page 109

1      A.   Yes.
2      Q.   And is it your understanding that that policy
3  is based on a legal standard?
4      MS. NICHOLS:  Objection, calls for speculation.
5      THE WITNESS:  I believe that it mirrors very, very
6  closely to the statute here in Utah.
7      Q.   (BY MR. LUTZ) Which statute are you referring
8  to?
9      A.   I mean, there's a statute that covers the use
10 of deadly force.  I can't remember what the actual
11 statute number is.
12     Q.   The use of deadly force by a police officer
13 or by a civilian in self defense?
14     A.   I can't -- I want to say that there's just
15 one policy for both.  Or not policy, but the statute
16 would dictate both.  And then I think the policy is
17 just mirrored off for police policy.  I don't --
18 honestly, I just don't remember if there is a separate
19 policy for police or civilians.  I think there's just
20 one for the use of deadly force.
21     Q.   Okay.  Have you received training on the
22 federal Fourth Amendment standard?
23     A.   Yes, in the police academy.
24     Q.   Can you describe what the federal Fourth
25 Amendment prohibits?

Page 110

1      MS. NICHOLS:  Objection, calls for a legal
2  conclusion.
3      MR. LUTZ:  In terms of use of force.
4      THE WITNESS:  Like in reference to search and
5  seizure or am I thinking of the right Fourth Amendment?
6      Q.   (BY MR. LUTZ) I'm referring to the federal
7  Fourth Amendment of the federal Constitution.
8      A.   Right.
9      Q.   Let me clarify.  Actually, let's go somewhere
10 else.  Have you been trained on the Graham factors?
11     A.   Graham v. Connor.
12     Q.   Uh-huh.
13     A.   Yes.
14     Q.   Do you know what those factors are?
15     A.   I don't think I would be able to tell you
16 right off my head, no.
17     Q.   Are you familiar with Tennessee v. Gardner?
18     A.   I am.  Same thing.  I don't think I could
19 tell you right off my head.
20     Q.   Do you recall if you've been trained on the
21 holding of Tennessee v. Gardner?
22     A.   I am aware of Tennessee v. Gardner, so I'm
23 sure that I've attended trainings for that.  Like I
24 said, I just can't recall right now.
25     Q.   As a Salt Lake City Police Department

Page 111

1  officer, you are required to undergo continuous
2  training; correct?
3      A.   Yes.
4      Q.   Are any of these trainings basically
5  refreshers for things that you may have already learned
6  at the academy?
7      A.   Yes.
8      Q.   Are you required to undergo continuous
9  training on the use of deadly force standard?
10     MS. NICHOLS:  Objection, vague and ambiguous.
11 Ambiguous as to the term continuous.
12     THE WITNESS:  So are you asking if there's like a
13 minimum number of hours or time spent every year
14 covering specifically the use of deadly force?
15     Q.   (BY MR. LUTZ) Is there?
16     A.   I don't believe there is.
17     Q.   But certainly you've encountered refreshers
18 on the federal Fourth Amendment standard and the use of
19 force standards; right?
20     A.   I mean, I would imagine that I've been to
21 some trainings, sure.
22     Q.   Any idea how many?
23     A.   No.
24     Q.   In your time with the Salt Lake City Police
25 Department, have you been trained on specific scenarios

Page 112

1  where it would be appropriate to use deadly force?
2      A.   Yes.
3      Q.   And have you ever done trainings, for
4  example, in your SWAT trainings where you would role
5  play scenarios that might involve the use of deadly
6  force?
7      A.   Yes.
8      Q.   Is that a common theme of some of these
9  trainings?
10     MS. NICHOLS:  Objection, vague.
11     THE WITNESS:  Like what do you mean a theme?
12     Q.   (BY MR. LUTZ) When you're training for
13 different SWAT scenarios, for example, you're training
14 on circumstances where you would encounter armed
15 suspects, for example?
16     A.   Yeah.
17     Q.   That would be a typical subject that some of
18 your trainings would touch on?
19     A.   Yes.
20     Q.   Okay.
21          (Exhibit 11 marked.)
22     Q.   (BY MR. LUTZ) Okay.  Officer Fox, I've handed
23 you what's been marked as Exhibit 11.  Do you recognize
24 this document?
25     MS. NICHOLS:  If I could just note for the record,

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1166   Page 30 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                113 to 116

Page 113

1  it appears to be an excerpt starting at page 185 and I
2  understand counsel's going to print a cover page to add
3  momentarily.
4       MR. LUTZ:  Correct.
5       THE WITNESS:  (Peruses document.)
6       MR. LUTZ:  Go ahead and take a look.
7       THE WITNESS:  What was the question?
8       Q.  (BY MR. LUTZ) Do you recognize this document?
9       A.  I recognize what's in the document.  It's a
10  printout of policies, but it isn't fashioned in the
11  normal way that I review policies, no.
12      Q.  Okay.  Do you recognize the content though?
13      A.  Yeah, I mean, I would agree it's probably the
14  policies; right?  I mean, I have no idea if this is
15  actually from our policy book or not.
16      Q.  Okay.  So safe to say you haven't committed
17  what you see here to memory?
18      A.  I mean, I've -- not verbatim, no.
19      Q.  Take a look under the heading Authority to
20  Use Deadly Force and then it says "Peace officer's use
21  of deadly force: A peace officer, or any person acting
22  by his command, in his aid and assistance, is justified
23  in using deadly force when," and there's five bullet
24  points there, and you see the fifth bullet point there?
25      It says "The officer reasonably believes that

Page 114

1  the use of deadly force is necessary to prevent death
2  or serious bodily injury to the officer or another
3  person."
4       See that?
5       A.  Yes.
6       Q.  Is that what you were referring to when you
7  were explaining your understanding to me of the
8  department's policy on use of deadly force?
9       A.  Yes.
10      MS. NICHOLS:  Objection, foundation.
11      Go ahead.
12      THE WITNESS:  Sorry.  Yes, I do.  Or that's what I
13  was recalling from memory, yes.
14      Q.  (BY MR. LUTZ) I'm going to hand you a cover
15  page to the exhibit.  So we've just added a cover page
16  to the excerpt.
17      A.  Sure.
18      Q.  What's the title of that cover page?
19      A.  Are you asking me?
20      Q.  Yes.
21      A.  Salt Lake City Police Department Policies and
22  Procedures Manual Updated on October 13th, 2017.
23      Q.  Okay, great.  So safe to say the excerpt of
24  the policies we just looked at were the ones in effect
25  on October 2017?

Page 115

1       MS. NICHOLS:  Objection, foundation.
2       THE WITNESS:  I would say yeah, probably.
3       Q.  (BY MR. LUTZ) Okay.  You can put Exhibit 11
4  to the side.
5       A.  (Complies.)
6       Q.  What does the Salt Lake City Police
7  Department's use of force -- use of deadly force policy
8  prohibit?
9       MS. NICHOLS:  Objection, vague.
10      THE WITNESS:  I'm not sure what -- if I have the
11  policy right here, can I read it and I can tell you
12  exactly what it says in the policy?
13      MR. LUTZ:  I'd like to know your understanding in
14  your experience.
15      THE WITNESS:  I guess I'm not understanding what
16  it prohibits.  I'm struggling to recall what it says
17  about prohibiting anything.  I'm sure there's plenty of
18  stuff it prohibits, but I'm not sure.
19      Q.  (BY MR. LUTZ) Phrased another way, what does
20  the policy require?
21      A.  In order to use deadly force?
22      Q.  Uh-huh.  Yes.
23      A.  I think it says something that I would have
24  to have reasonable belief that I'm in fear for my
25  safety or the safety of others to prevent serious

Page 116

1  bodily harm.  It goes back to that same paragraph that
2  we pointed out.
3       Q.  Are there other circumstances where you're
4  permitted to use deadly force other than the one you
5  just described?
6       A.  I know that, you know, again, that would be
7  convoluting between what I know the statute reads and
8  what our policy reads.  I'm not sure where it
9  differentiates.  And there's four other bullets that I
10  can't a hundred percent say from memory exactly when
11  the other times, but I believe that at least within the
12  state statute, that it covers other times.  So I don't
13  know.  I'm not sure.
14      Q.  So if you are evaluating whether or not it
15  would be appropriate to use deadly force, are you
16  thinking about the state statute or are you thinking
17  about the departmental policy or are you thinking about
18  something else?
19      A.  If I'm attempting?
20      Q.  Yes.
21      A.  The only time that I've ever been faced with
22  a question of whether using deadly force or not it's
23  been in that one specific category, so I'm probably
24  weighing it against what policy matches the state
25  statute on, so it would essentially, I think, be

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                                117 to 120

Page 117

1  covering both.  I'm not trying to pick one or the
2  other.  I'm just focusing on that one particular
3  paragraph, if that's the most prudent one to decide at
4  the moment.
5      Q.  Okay.  All right.  Let's talk about August
6  13th, 2017.  Were you working that day as a patrol
7  officer?
8      A.  I believe so, yes.
9      Q.  What shift?
10     A.  I believe I was on the graveyard shift.
11     Q.  What hours is the graveyard shift?
12     A.  I work graveyards right now, but we do 12s
13  and it's 6:00 to 6:00.  I think it's 9:00 to 7:00.  Or,
14  I'm sorry, it was 9:00 to 7:00.  I actually don't know
15  if it's still 9:00 to 7:00, but I think the hours of
16  that shift was 9:00 to 7:00 p.m.
17     Q.  9:00 p.m. to 7:00 a.m.?
18     A.  Yes.  Sorry.
19     Q.  Okay.  Can you walk me through what happened
20  after you started your shift that day on August 13th,
21  2017?
22     MS. NICHOLS:  Objection, vague, calls for a
23  narrative.
24     THE WITNESS:  So I know on that night, I mean,
25  every shift, most every shift begins with a lineup, so

Page 118

1  we had lineup.  We cleared lineup and then I ended up
2  in the, what we call P1.  It's just the first level of
3  our parking garage.  And me and Scott Robinson were, I
4  think, just having a conversation.
5      Q.  (BY MR. LUTZ) Okay.  Going back, what's
6  lineup?
7      A.  Morning briefing.
8      Q.  Do you recall anything in particular about
9  that morning briefing?
10     A.  Like as far as in?
11     Q.  Just anything that stands out in your mind.
12     A.  Not really.  It was just a normal briefing.
13  I mean, you show up after briefing.
14     Q.  Okay.  Nothing out of the ordinary?
15     A.  No.
16     Q.  Okay.  So you're having a conversation with
17  Scott Robinson.  About what time was that?
18     A.  I have no idea.  Immediately -- if we're
19  there at 9:00, and that's if 9:00, I don't remember
20  exactly what time the briefing went to, but it would
21  have been following immediately after that.  If it
22  wasn't 9:00, it might have been 10:00.  I don't
23  remember.
24     Q.  Okay.
25     A.  But, yeah, so whatever the duration was, then

Page 119

1  we went out.  I think we were having a conversation in
2  the parking lot.  Honestly, I don't remember.
3      Q.  Okay.  So at this point you're still at the
4  PSB?
5      A.  Yes.
6      Q.  Okay.  At some point did you leave?
7      A.  Yes.
8      Q.  Why did you leave?
9      A.  So Officer Smith had requested for a back and
10  so me and Kris, or sorry, me and Scott left to go back
11  him.
12     Q.  Okay.  So by that, just to clarify, Officer
13  Kris Smith radioed for backup patrol officers?
14     A.  Yes.
15     Q.  And you and Officer Scott Robinson decided to
16  respond to that request?
17     A.  Yes.
18     Q.  What did you do next?
19     A.  We ended up driving to the scene and ended up
20  backing Kris.
21     Q.  Okay.  Did Officer Smith provide any more
22  information in the call about why he was calling for a
23  backup?
24     A.  Not that I recall, no.
25     Q.  Do you recall what the request was or what

Page 120

1  words were used?
2      A.  I think he called for a 1078.
3      Q.  What is that?
4      A.  It's just I need a backup.  So if you call
5  for a 1078, it's just like saying hey, I need somebody
6  to come back me.
7      Q.  Okay.  So that's all the information you had
8  heading out there --
9      A.  I believe so.
10     Q.  -- to go meet Officer Smith?  Okay.
11         How long did it take you to arrive at Officer
12  Smith's location?
13     A.  A minute or two.
14     Q.  Okay.  What happened when you got there?
15     A.  As soon as we got there, I walked up and I
16  met with Patrick Harmon.
17     Q.  Okay.  Can you help me lay the scene a little
18  bit as you arrive.  So where was Officer Smith when you
19  arrived?
20     A.  If he wasn't walking to his car, then he was
21  already in his car when I pulled up, but I am not a
22  hundred percent certain.  I think he was in his car
23  already.
24     Q.  Okay.
25     A.  But I'm not -- I don't remember a hundred

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1168   Page 32 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                   121 to 124

Page 121

1  percent.  He might have been on his way to his car,
2  getting into his car as I pulled up.  I don't remember.
3      Q.   You mentioned Patrick Harmon.
4      A.   Yeah.
5      Q.   Did you see Patrick Harmon somewhere in that
6  area?
7      A.   Yes.
8      Q.   Where was he in relation to Officer Smith?
9      A.   You'd call it 1:00 o'clock.  Off the tip of
10 his car.
11     Q.   Okay.  And what was Patrick Harmon doing?
12     A.   He was straddling a bicycle.
13     Q.   And did you know who that was at that time or
14 do you only now know that that's Patrick Harmon?
15     A.   I did not know who that was at the time.
16     Q.   Okay.  Where did you -- you drove up in your
17 patrol car; correct?
18     A.   Yes.
19     Q.   Where did you park it?
20     A.   Directly behind Kris's car.
21     Q.   Okay.  And where was Officer Robinson in
22 relation to you when you arrived?
23     A.   I think he was directly behind me.
24     Q.   Okay.
25     A.   I'm pretty sure that's where he was.

Page 122

1      Q.   Okay.  So the three patrol cars are in a
2  line; is that right?
3      A.   Yeah.  As far as I can remember, yeah, I
4  believe so.
5      Q.   Officer Smith is in the front closest to
6  Patrick Harmon followed by you, followed by Officer
7  Robinson --
8      A.   Yes.
9      Q.   -- behind you?
10     A.   Yes.
11     Q.   After you pulled up behind Officer Smith,
12 what did you do next?
13     A.   Like I said, I walked up and met with
14 Patrick.
15     Q.   Did you stop and talk to Officer Smith first?
16     A.   I don't believe I did.
17     Q.   And what was the distance between Mr. Harmon
18 and Officer Smith's car?
19     A.   A couple of feet.
20     Q.   And what was Mr. Harmon doing when you
21 approached him?
22     A.   He was straddling his bicycle.
23     Q.   And did you say anything to him?
24     A.   Yeah, I probably said hi.
25     Q.   Anything else?

Page 123

1      A.   Um, so I don't know.  I mean, I don't know
2  exactly what the interaction we had was, but one of the
3  first things I did was ask him to just kind of step off
4  his bicycle.
5      Q.   Okay.  And he had been straddling it up to
6  that point?
7      A.   Yes.
8      Q.   After you asked him to step off of his
9  bicycle, did he comply with you?
10     A.   Yes, he did.
11     Q.   Do you recall what he was wearing?
12     A.   It was a black t-shirt, dark colored.  I
13 don't think they were black jeans, but super dark blue
14 jeans, backpack, glasses, and he had a necklace of some
15 sort.
16     Q.   Did he have anything else on his person?
17     A.   What do you mean?
18     Q.   Did he have a backpack?  Sorry.  Go ahead.
19     A.   Yeah, I said backpack.
20     Q.   Oh.  Okay.  So Mr. Harmon gets off the bike.
21 What did you say to him next?
22     A.   I have no idea.
23     Q.   Under the circumstances is there something
24 that you ordinarily would have done?
25     A.   No, not really.

Page 124

1      Q.   Did Mr. Harmon say anything to you?
2      A.   So I don't know.  I mean, at some point we
3  engaged each other back and forth.  What was said I
4  don't know, but we definitely had a conversation, but I
5  just don't know what it was about.
6      Q.   And had you activated your body camera at
7  this point?
8      A.   So as I came walking up, I thought I had
9  double tapped my button.  Apparently it hadn't
10 activated.  It was later on the stop I activated it.
11 So at that point, no, I don't think it was recording
12 any audio or video.
13     Q.   Okay.  So do you recall anything that Patrick
14 Harmon said to you?
15     A.   So I know during that interaction, like I
16 say, I don't know if I said something to him or if he
17 said something to me, but through the interaction he
18 started telling me something about warrants.  He told
19 me he was trying to get right with God.  He told me
20 that he was trying to take care of his stuff.  I mean,
21 for the most part it was a lot of him saying he was
22 trying to get right with God.
23          And I remember telling him, I was like all
24 right, cool, man.  I was like if that seems to be the
25 case, you know, we can try to help you take care of the

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1169   Page 33 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          125 to 128

Page 125

1   warrants if that's going to help you get your life in
2   order and do whatever else.  I don't know exactly what
3   was said, but something along those lines.
4       Q.  Okay.  Can you describe his demeanor?
5       A.  Yeah.  At the beginning he seemed what
6   appeared -- I mean, he seemed more in line with what is
7   considered to be normal on a stop like that, what I
8   would think is normal.  He didn't seem frantic or
9   emotional.  As it kind of developed, he did become
10  emotional and he seemed very either anxious or
11  agitated, or whatever the right word would be to
12  describe.
13          But he definitely got -- he wanted a
14  cigarette, so I let him have a cigarette, and that was
15  to try to calm his nerves because he was getting a
16  little bit more kind of antsy if that makes sense.
17      Q.  Okay.  And when you say as it developed,
18  just -- do you mean just as the time continued to pass?
19      A.  Yes.  Yes.
20      Q.  Okay.  And at some point -- well, let's go
21  back.  Where are Officers Smith and Robinson at that
22  point in relation to you and Mr. Harmon?
23      A.  So I believe Kris is in the driver seat of
24  his car and I think Scott is actually standing next to
25  the window on the passenger side.

Page 126

1       Q.  Okay.  And do you know if they're having a
2   discussion?
3       A.  I don't know what they were doing.
4       Q.  Okay.  At some point did either or both of
5   the officers come to where you and Mr. Harmon are?
6       A.  Yes.
7       Q.  About how long were you standing there with
8   Mr. Harmon before the other officers approached you
9   both?
10      A.  Honestly, I think it was only like a minute,
11  maybe two, but I don't -- I'm not a hundred percent
12  sure.  I think it was just a couple minutes though.
13  Not long.
14      Q.  Did you have any sense that Mr. Harmon was
15  intoxicated?
16      A.  No.
17      Q.  And did -- up to this point in the
18  interactions, so before the other officers had come to
19  join you, had he done -- had Mr. Harmon presented any
20  sort of threatening behavior?
21      A.  No.
22      Q.  Were you concerned about what you were
23  describing as sort of his growing, how did you describe
24  it?
25      A.  Either anxious or agitated.  I can't remember

Page 127

1   exactly what words I just used, but, yeah, anxious.  He
2   was a little bit more -- he was becoming a little bit
3   more emotional.
4       Q.  Were you concerned about that?
5       A.  Not at the time, no.
6       Q.  Okay.  That didn't make you feel that your
7   safety was -- that your safety was under some kind of
8   threat?
9       A.  No.
10      Q.  Okay.  So some amount of time passes, I think
11  you said a minute or two, Officers Smith and Robinson
12  approach you.  What does Officer Smith do?
13      A.  I believe he just immediately started to
14  engage Patrick.
15      Q.  Verbally?
16      A.  Yes.
17      Q.  Do you recall what he said?
18      A.  Something about him having a warrant I think.
19  I don't remember exactly what it was, but he said
20  something about him having a warrant.
21      Q.  Where are you standing in relation to
22  Mr. Harmon at this point?
23      A.  I would have been between the patrol car.
24  Like if this is the bumper of the patrol car, I would
25  have been just directly in front, maybe a little bit

Page 128

1   right of center, wherever the -- I think at one point I
2   was actually sitting on the hood of the car.  I might
3   have just like leaned back against it just kind of
4   hanging out.
5       Q.  Okay.  Facing Mr. Harmon?
6       A.  Yes.
7       Q.  Okay.  And then where is Officer Smith when
8   he begins to verbally engage Mr. Harmon?
9       A.  So he comes up off of my left side and would
10  have positioned himself at some point -- I think a
11  little bit of the conversation happened almost as he's
12  like right in line, maybe just a little bit forward of
13  being on line with me, and that's where he kind of
14  starts to actually talk to Patrick I think.
15      Q.  So sort of to your side and to Mr. Harmon's
16  side?
17      A.  A little bit, yeah.
18      Q.  Would it be to the right side and your left
19  side?
20      A.  Yeah.
21      Q.  Okay.  And at the same time, where is Officer
22  Robinson?
23      A.  So he came from, again, the passenger side,
24  and he walked up, and I think he walked a little bit
25  more forward of what would have been like on line with

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1170   Page 34 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    129 to 132

Page 129

1   us, so he ended up just going to my right and forward a
2   little bit which would have been Patrick's left and
3   just almost directly to his side.  I think somewhere in
4   that area.
5       Q.   Okay.  And did Officer Robinson say anything
6   during this time?
7       A.   I don't think so.
8       Q.   I think that you said that Officer Smith said
9   something to Mr. Harmon about having a warrant?
10      A.   (Nods head.)
11      Q.   Prior to that, did you know anything about a
12  warrant with Mr. Harmon?
13      A.   So I believe, in the conversation that I was
14  having with him, he mentioned something about either
15  charges or a warrant.  I don't remember exactly how the
16  conversation went.  He mentioned that he was trying to
17  take care of something.  And I can't remember if he
18  said I'm trying to take care of my charges which
19  doesn't necessarily mean a warrant, but he also might
20  have said something about I'm trying to take care of my
21  warrant.  I just don't remember how the conversation
22  went.  But I believe it was something to that effect
23  either way, but I don't remember.  I don't recall.
24      Q.   And did Officer Smith mention to you or
25  Mr. Harmon what the warrant was for?

Page 130

1       A.   No.
2       Q.   Did Officer Smith mention to you or
3   Mr. Harmon what the crime was of the warrant?
4       A.   No.
5       Q.   Okay.  They have this exchange.  What happens
6   next?
7       A.   So at that point I think Kris goes a little
8   bit more directly to Patrick's right side and attempts
9   to, like, take the backpack off and starts to, I think,
10  try to grab his right hand to take control of it to be
11  able to handcuff.
12      Q.   And what did Officer Robinson do around this
13  same time?
14      A.   So he approached from the other side and I
15  either tried to help with the backpack or something.  I
16  think he was also trying to get the left hand to take
17  that under control.
18      Q.   Okay.  Where is the bicycle?
19      A.   So, I mean, where I was standing it would
20  have been maybe just a little bit forward and to the
21  right of me.
22      Q.   Okay.
23      A.   Just like right along the gutter.
24      Q.   Was the bicycle in between you and Mr. Harmon
25  at this point in your interaction?

Page 131

1       A.   So he would have been like here and the bike
2   would have been somewhere right here (indicating).
3       Q.   Okay.  So you're motioning --
4       A.   Sorry.  Yeah, so he was . . .
5       Q.   Want to draw it?
6       A.   I mean, I'm a terrible artist.
7       Q.   You can just mark it with circles and lines.
8       A.   So if the red line is the gutter and that is
9   the car, I would have been right there (indicating).
10      Q.   Near the X?
11      A.   I believe I -- yeah, I would be the X.  I can
12  write "me" if that helps.  Bike is about right there
13  (indicating).
14      Q.   Okay.
15      A.   And I'm just going to draw a big circle to
16  that general area because that's about where Patrick
17  would have been.
18      Q.   Okay.
19      A.   So something --
20      Q.   And can you mark on there where the other two
21  officers were.
22      A.   At which point?
23      Q.   At the point where Officer Smith has told
24  Mr. Harmon he's -- something about a warrant, he --
25  Officer Smith has taken control of the left arm and

Page 132

1   Officer Robinson has taken control of the other arm.
2       A.   (Indicating.)
3            That's KS for Kris Smith and that's SR for
4   Scott Robinson.
5       Q.   Okay, great.  Thank you.
6            (Exhibit 12 marked.)
7       Q.   (BY MR. LUTZ) Okay.  And I understand what
8   happens next is fast.  Can you just walk me through
9   your memory of the next several seconds.
10      A.   So as they start to pull the backpack off, I
11  know that they -- so they've got his hands, they've
12  gotta get the backpack off, they gotta disconnect,
13  reconnect, backpack comes off, and at about that point
14  Patrick rips his hands out of the control from what
15  Kris and Scott had and then he takes off running.
16      Q.   Where does he run?
17      A.   He ran between the bicycle and Scott towards
18  the sidewalk.
19      Q.   Okay.  And about -- did he change direction
20  at some point?
21      A.   Yes.
22      Q.   About how far did he run before he changed
23  direction?
24      A.   I mean, from wherever he was standing to
25  almost exactly where the sidewalk is.  I just can't

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1171   Page 35 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    133 to 136

Page 133

1  remember if there's a grass park strip or if it just
2  goes gutter, sidewalk, and then grass because I know
3  there's grass on the other side.  I don't -- I don't
4  remember.  Five to ten feet-ish.  I don't know.
5      Q.   What did you do when Mr. Harmon kind of broke
6  free of the other two officers?
7      A.   I started to try to chase him.
8      Q.   Did you reach out and try to grab him?
9      A.   At one point I think I did, yes.
10     Q.   Okay.  Walk me through what happened next.
11     A.   So as soon as Patrick started to run, he was
12  reaching for his right pocket.  He said something to
13  the effect of I'll cut you, or he used the word cut,
14  and I believe what he said is I'll cut you.  At some
15  point whatever Scott had going on, he ends up falling
16  down, and then that's when Patrick changes direction
17  and starts running south on the sidewalk.
18     Q.   So Officer Robinson fell down and then
19  Mr. Harmon turned south?
20     A.   Yeah, so the way that at least I perceived it
21  was as soon as he took off running, he was running more
22  what would be west towards the sidewalk.  He didn't
23  really break either direction until after he -- either
24  Scott fell or he pushed Scott, or however that
25  happened, I don't know.  But once he was no longer

Page 134

1  trying to engage with Scott, he ended up going south on
2  the sidewalk.
3      Q.   Okay.  And you said you had let him have a
4  cigarette to calm his nerves?
5      A.   Yes.
6      Q.   At the time you broke away, did he still have
7  that cigarette in his mouth?
8      A.   I believe so, yes.
9      Q.   So after he makes that turn that we just
10  discussed in a southward direction I believe; correct?
11     A.   I believe so, yes.
12     Q.   What did he do then?
13     A.   So once he -- once Scott wasn't holding on to
14  him anymore, he started kind of running.  He was
15  stilling digging in his right pocket as he ran south on
16  the sidewalk.
17     Q.   Okay.  And where were you in relation to him?
18     A.   At that point I had kind of pulled in
19  directly behind him on the sidewalk as he was running.
20     Q.   Okay.  But you could see him reaching into
21  his right pocket?
22     A.   For a second, yeah.
23     Q.   Where is Officer Smith?
24     A.   Honestly, at that point I have no idea.  He
25  was off to the left.  As soon as we took running right,

Page 135

1  he was no longer in my field of vision.  And then even
2  when I turned left as we started moving south along
3  that sidewalk, I had yet to see him or see where he
4  was.  I just -- through the commotion I could hear that
5  he was somewhere right here.  I just -- he was off to
6  my left and behind my field of view, so I don't really
7  know what his position was (indicating).
8      Q.   Okay.  At what point did you draw your gun?
9      A.   So I believe I drew my gun as we -- again,
10  where Patrick started to run from moving past the bike
11  through the curb, when he said I'll cut you, that's
12  when I drew my gun.
13     Q.   How close were you physically to him at that
14  point?
15     A.   Arms length to arm and a half.
16     Q.   Were you attempting to grab him while you
17  attempted to draw your gun?
18     A.   I don't think so.  Honestly, at that point
19  I'm not a hundred percent sure if I was actually
20  grabbing him, if it happened simultaneous or one or the
21  other, but, I mean, just through a snapshot of a
22  moment, it was -- it could have -- those two things
23  could have overlapped.
24         I do believe I reached out and tried to grab
25  him at one point.  You know, not a hundred percent sure

Page 136

1  exactly what was going on in that specific moment, but,
2  yeah, those two things might have overlapped; if I was
3  actually trying to reach out and grab him or whatever
4  and then drawing my gun.
5      Q.   Okay.  And how much time has elapsed since
6  Mr. Harmon initially broke free from the other
7  officers?
8      A.   Fraction of a second.  Half a second.
9      Q.   Okay.  So Mr. Harmon is running southward,
10  you've lost sight of Kris.  Where is Robinson?
11     A.   Last I saw him he was on the ground.  I'm not
12  sure.
13     Q.   Okay.  What happened in those next several
14  seconds?
15     A.   So as Patrick was running, he starts to turn
16  his feet.  I know that as he was running, the one thing
17  I was able to perceive was his right foot turning,
18  planting, and him changing directions from now running
19  away from me to now turning to try to come back at me.
20     Q.   Okay.  What did you do in response to that
21  motion?
22     A.   So I tried to stop.
23     Q.   And did Mr. Harmon actually start moving back
24  towards you?
25     A.   I don't think he actually started moving back

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1172  Page 36 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    137 to 140

Page 137

1  at me yet.
2      Q.   Had he turned around to face you?
3      A.   I believe he was turning to face me.  I don't
4  know if he ever actually got squared up with me, if it
5  was a half turn, quarter turn, but he was turning back
6  at me.
7      Q.   What's happening with the rest of his body
8  language in this moment?
9      A.   What do you mean?
10     Q.   What's he -- is he doing anything with his
11 hands?
12     A.   Yeah.  So as soon as he planted his right
13 foot, as he was doing that, he yelled at me and he said
14 I'll fucking stab you.  As he planted that right foot
15 and he said that, I thought oh, no, whatever was in his
16 pocket, he got out.  So from seeing his foot, I looked,
17 I was trying to see if his hand was still in his
18 pocket, it wasn't.  By the time I was able to track and
19 find his hand, his hand was up somewhere chest to
20 shoulder heighth and he was holding a knife.
21     Q.   Up until this point you had not seen anything
22 in his hands?
23     A.   Up until that point, he did not have anything
24 in his hands.
25     Q.   But in this moment that you're saying that he

Page 138

1  turned, you saw a knife in his hand?
2      A.   Yes.
3      Q.   Are you certain?
4      A.   Hundred percent.
5      Q.   Could you be mistaken?
6      A.   Nope.
7      Q.   What color was the knife?
8      A.   I don't know what the color the handle was,
9  but the blade was silver-grayish as a knife blade would
10 be.
11     Q.   Okay.  What did you do next?
12     A.   I shot him.
13     Q.   How many times?
14     A.   Three times.
15     Q.   Where were you aiming?
16     A.   So as his hand came back around and I was
17 able to -- at one point I know, as my gun was coming
18 up, I was covering just center mass as we're trained.
19 I tracked where his pocket was and his hand wasn't in
20 his pocket anymore.
21          By the time I saw his hand, his hand had the
22 knife in it, so I came back to my front sight post and,
23 as far as I could tell, I was trying to aim center
24 mass.  That was -- that was, I think, my intent when I
25 was aiming at him.  But, yeah, like, with the black

Page 139

1  shirt and everything, it just -- I don't know exactly.
2  Like, center mass.
3      Q.   Did you hear Officer Smith's taser go off?
4      A.   I did not.
5      Q.   Walk me through the next few seconds after
6  you fired the three shots.
7      A.   So as soon as I shot, Patrick fell down and I
8  maintained cover, and Scott had called backup and he --
9  so first -- so Patrick goes down, I stay on gun, Kris
10 actually calls out on the radio, and then Scott says
11 that he'll handcuff him.  I can't remember exactly what
12 the exchange was, but he said he would cuff him, or
13 whatever he said, and then I kind of confirmed to him
14 that I would stay to cover Patrick.
15     Q.   Okay.  And you and the other -- all three
16 officers approached Mr. Harmon on the ground and began
17 emergency medical procedures; right?
18     A.   So I believe that those two do.  I had not
19 got rubber gloves to put in my pocket for that shift,
20 so I actually had to go back to my car to get my rubber
21 gloves to go back up, and then yes, I did.
22     Q.   Okay.  Let's go -- let's go back to the
23 seconds before you fired on Mr. Harmon.  What did you
24 say?
25     A.   I said I'll fucking shoot you.

Page 140

1      Q.   And how soon after he said that did you fire
2  your shot?
3      A.   Almost instantaneous I think.
4      Q.   Why didn't you give Mr. Harmon more time to
5  surrender?
6      A.   He was turning back at me with a knife in his
7  hand and he said he would stab me.
8      Q.   Did you intend "I'll fucking shoot you" to be
9  an opportunity for him to surrender?
10     A.   I did not intend for it to be anything.  I
11 think it was more of a response to the "I'll fucking
12 stab you," and I think that it was just something that
13 through the split second it was happening hearing that,
14 it was just, as I'm trying to perceive everything, just
15 what came out.
16     Q.   After you said that, is there anything that
17 Mr. Harmon could have done to prevent you from opening
18 fire on him?
19          MS. NICHOLS:  Objection, calls for speculation.
20          THE WITNESS:  At that point probably not.
21     Q.   (BY MR. LUTZ) What was the lapse in time
22 between when you say Mr. Harmon said I'll stab you?
23     A.   He said I'll fucking stab you.
24     Q.   Fucking stab you and you saying I'll fucking
25 shoot you?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1173   Page 37 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          141 to 144

Page 141

1      A.   He said that and I think my
2   brain just immediately was like well, what the hell's
3   going on.  So I think that happened.  I don't know that
4   there was -- if you're able to measure that amount of
5   time, I don't know what that measurement is.  So it's
6   so close that it was almost instantaneous after.
7      Q.   Do you know where you hit Mr. Harmon?
8      A.   I believe he was hit once in the hip, once in
9   the butt cheek, or buttocks somewhere, and I think once
10  in the arm.
11     Q.   All three shots landed on his body?
12     A.   I believe so.
13     Q.   And you know now that Officer Smith's taser
14  probes also impacted Mr. Harmon?
15     A.   After the fact, yes.
16     Q.   Okay.  You did not know that, but you know it
17  now?
18     A.   I did not know then, yeah.
19     Q.   You fire the shots, you stay essentially the
20  same position as where you shot from in those first
21  moments?
22     A.   Yes.
23     Q.   Officer Smith continues towards Mr. Harmon on
24  his left side, Officer Robinson then has gotten up on
25  your right side and is coming towards where

Page 142

1   Mr. Harmon's laying, correct, as you stayed in place?
2      A.   Sorry.  Say that again.
3      Q.   In the seconds right after you fired the
4   shots --
5      A.   Right.
6      Q.   -- you stop moving?
7      A.   Yeah.
8      Q.   Officer Smith is on your left side and he
9   begins to approach Mr. Harmon.  He says -- he says,
10  "Priority shots fired" on the radio and he starts
11  walking towards Mr. Harmon kind of where his feet are
12  and, at the same time, Officer Robinson is coming
13  around from your right side also towards Mr. Harmon?
14     MS. NICHOLS:  Objection, compound.
15     THE WITNESS:  So, genuinely, I don't remember a
16  hundred percent how far Kris moved forward once the
17  shots were fired.  I do remember Scott being on this
18  side and him communicating to me, so I actually looked
19  at him (indicating).  Kris's communication was
20  basically to the radio while it's to everybody that's
21  got radios, right?  That's -- that was to everybody, so
22  I didn't necessarily focus on him.
23         I focused on Scott who, again, I don't
24  remember exactly what he said, but it was something to
25  the effect of I'll cuff him or I'll cover him or

Page 143

1   something.  I gave him an affirmative that I would do
2   whatever he was asking me to do or I was going to cover
3   him with my gun still, and then he -- I moved up first.
4   I'm not a hundred percent sure when Kris does.
5      Q.   (BY MR. LUTZ) At this point in time you're
6   absolutely certain Mr. Harmon has a knife?
7      A.   A hundred percent.
8      Q.   But you didn't warn Officer Robinson about
9   that knife as he approached Mr. Harmon?
10     A.   No.
11     Q.   And Mr. Harmon is still alive at this point?
12     A.   Yes.
13     Q.   And you don't know where that knife is?
14     A.   No.
15     Q.   And you didn't see it fall out of his hand?
16     A.   No.
17     Q.   So Mr. Harmon very well was -- he was alive
18  and he very well could have been armed with that knife
19  as Officer Robinson approached?
20     MS. NICHOLS:  Objection, calls for speculation.
21     THE WITNESS:  Yes.
22     MR. LUTZ:  Can we change these to just form
23  objections and if I want to fix the question, I will
24  ask Mr. Harmon.  These are coaching.
25     MS. NICHOLS:  These are just regular objections.

Page 144

1      MR. LUTZ:  Can we just object to form and then I
2   can clarify.  It's a signal to him to have to rephrase
3   the question.
4      MS. NICHOLS:  That -- I mean, if you think the
5   questions are objectionable, I'll switch to form, but I
6   think they're, you know, certainly objectionable.
7      MR. LUTZ:  Thank you.  Make your objection.
8      Q.   (BY MR. LUTZ) Same time, Officer Robinson
9   approaches Mr. Harmon from the right, places the
10  handcuffs, you don't mention a knife to him.  Right
11  around that same time period, or shortly thereafter,
12  Officer Smith approaches Mr. Harmon from your left
13  side; correct?
14     MS. NICHOLS:  Objection as to form.
15     THE WITNESS:  So, again, I don't -- I don't
16  remember a hundred percent as to when Kris actually
17  approached.
18     Q.   (BY MR. LUTZ) Okay.  But --
19     A.   So I can definitely say yes to the part with
20  Scott.  I'm not a hundred percent sure when Kris comes
21  up off the left side.
22     Q.   But Officer Smith did approach Mr. Harmon on
23  the ground at some point?
24     A.   Eventually.  I think so, yeah.
25     Q.   And you didn't warn Officer Smith about a

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1174   Page 38 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                         145 to 148

Page 145

1  knife?
2       A.   No.  I think what -- no, I did not.
3       Q.   Okay.  Why not?
4       A.   So I think everything had happened so fast
5  that I was still trying to process what happened.  As
6  Kris was giving the communications and Scott said that,
7  Patrick was, I believe, had fallen over and was almost
8  completely face down, was not moving, his breathing was
9  not normal, and so in that particular moment he was not
10 a threat.  He was not moving.
11      It's definitely a tactical error on my part
12 where I maybe should have said something, but other
13 than it happened so quick, he seemed incapacitated, and
14 I didn't see in the moment where there was any further
15 danger to Scott.  If there was I think I would have
16 tried to stop him from moving up, but in that moment I
17 didn't see that that was necessary.
18      Q.   And Officer Robinson didn't secure the knife
19 either; right?
20      A.   I have no idea.
21      Q.   Okay.  Let's do a hypothetical.  Suppose he
22 did.  In your training and experience, would he have
23 also been making a tactical error?
24      MS. NICHOLS:  Objection.
25      THE WITNESS:  So I think, and this is the problem

Page 146

1  with hypotheticals, right, it's how far we gonna
2  hypothetical.  If there was the opportunity for him to
3  secure a knife while we're dealing with somebody who is
4  still combative, yes, that's a tactical error.
5  Somebody who's compliant, somebody who has just been
6  shot, somebody who is no longer a threat and has been
7  incapacitated, no.
8       I think the priority changes from if we can
9  get him into handcuffs quickly, then we can start life
10 safety treatment.  At that point securing the knife, if
11 he's incapacitated and compliant, then that's just
12 prolonging, even by seconds, the opportunity to start
13 the life-saving measures.  So, no, I don't think that
14 would be a tactical error.
15      Q.   (BY MR. LUTZ) Okay.  So you went back to your
16 patrol car?
17      A.   Yes.
18      Q.   And retrieved gloves; correct?
19      A.   Yes.
20      Q.   Like black latex gloves?
21      A.   Yes.
22      Q.   What did you do once you retrieved your
23 gloves?
24      A.   I re-approached where Patrick was so that I
25 could also help with the aid that at this point now I

Page 147

1  believe Kris was assisting with Patrick and that's what
2  I went to do as well.
3       Q.   Okay.  So both of them are there.  Did you
4  see the knife that you believe Mr. Harmon was holding?
5       A.   Not at that point, no.
6       Q.   Were you concerned about it being in the
7  area?
8       A.   No.
9       Q.   And did you say at that point anything to
10 either officer about a knife?
11      A.   No.
12      Q.   Okay.  With respect -- once you arrived back
13 at the scene and back at Mr. Harmon, what did you do
14 next?
15      A.   I want to say he might have still been face
16 down.  I immediately started thinking if there was
17 somewhere we could do a tourniquet.  You know, with any
18 mass hemorrhaging, that's one of the first things you
19 want to try to control is massive bleeding, so I
20 started to kind of ask like, okay, have we figured that
21 out.  You know what I mean?  And that was -- that was
22 my number one concern at the time.
23      Q.   Okay.  Did you cut Mr. Harmon's clothing off?
24      A.   I started to, yeah.
25      Q.   And at some point in this interaction another

Page 148

1  officer arrives; is that right?
2       A.   Yes.  All sorts of people were showing up.
3       Q.   Who was that?  Who was the first one there?
4       A.   I don't have -- I don't have any idea.
5       Q.   About how much time passes before you are, I
6  guess, relieved from the scene?
7       A.   Relieved from the treatment I was giving
8  Patrick?
9       Q.   Yeah.
10      A.   I mean, I didn't get all the way through the
11 pants.  I cut through the belt, top of the pants, as I
12 was trying to get them off so that we could actually
13 continue the evaluation.  At some point I was pulled
14 off to be isolated.
15      Q.   Okay.  And as you say to be isolated, is that
16 part of protocol when there's an officer involved
17 shooting?
18      A.   Yes.
19      Q.   Okay.  To isolate the officer whose fired?
20      A.   Yes.
21      Q.   Okay.  Was Mr. Harmon wearing gloves at any
22 point during this incident?
23      A.   I don't know.
24      Q.   So after you saw the knife in Mr. Harmon's
25 hand before you shot, you never saw it again?

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1175  Page 39 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          149 to 152

Page 149

1    A.   No.
2    Q.   Okay.  Let's go through this a little bit
3   more.  Okay.  So you're pulled off to be isolated by
4   another officer who arrives at the scene; right?  Not
5   Officer Smith or Officer Robinson; right?
6    A.   Was I pulled off or were they pulled off?
7    Q.   You were pulled off; right?
8    A.   Yes.
9    Q.   Okay.  To be isolated?
10   A.   Yes.
11   Q.   What did you do?
12   A.   So I ended up walking back towards my car.  I
13  had my knife which I put somewhere on the hood of my
14  car, took my gloves off.  I think I just went and sat
15  on a rock, yeah.
16   Q.   Your body camera is still running all the way
17  up until when you went and sat on the rock; right?
18   A.   I believe.
19   Q.   Okay.  And then what happened after you sat
20  down?
21   A.   Nothing.  I was eventually taken to the
22  police department.
23   Q.   Do you remember who came up and talked to you
24  while you were sitting on the rock?
25   A.   I think at some point I think Scott and Kris

Page 150

1   did.  I know there was somebody in a yellow shirt.  No
2   idea who it was.  There may have even been another
3   person there that I don't know who it was, but I think
4   at some point, as officers responded to replace me,
5   Kris and Scott, we all got isolated.
6    Q.   Okay.  And did you have any conversations
7   with any of these folks who approached you --
8    A.   No.
9    Q.   -- while you were sitting?
10   A.   They asked me if I was okay and I just said
11  yes.
12   Q.   But you didn't discuss the circumstance?
13   A.   No.
14   Q.   And eventually were you -- somebody came and
15  escorted you out of the scene?
16   A.   Yes.
17   Q.   Who was that?
18   A.   At the time he was a sergeant.  He's a
19  lieutenant now.  It was Alma Sweeney.
20   Q.   Okay.  So you went with Sergeant Sweeney?
21   A.   Yes.
22   Q.   Where did you go?
23   A.   Straight back to the police department.
24   Q.   Okay.  Sergeant Sweeny's driving?
25   A.   Yes.

Page 151

1    Q.   Is that also part of protocol?
2    A.   I believe so.  I don't know if it's written
3   in protocol, but it should be if it's not.
4    Q.   Did you know Sergeant Sweeny well at that
5   time?
6    A.   We have been on SWAT together, so I knew him.
7   I can't say that I would know him well, no.
8    Q.   Okay.  Was he also a friend?
9    A.   Work friend.  Like I said, I didn't know him.
10   Q.   What did you guys talk about on your way to
11  the station?
12   A.   I asked him if it would be appropriate to
13  call my wife.
14   Q.   How did he respond?
15   A.   He said that we'll cross that bridge when we
16  get to it and he would try to let me know as soon as he
17  thought it would be an appropriate time.
18   Q.   So you weren't able to call her on the way
19  back to the station?
20   A.   I don't think he would have stopped me, but
21  he was making suggestions and I think I listened to
22  them.
23   Q.   Sure.  What happened when you got back to the
24  PSB?
25   A.   I was put into an office.  I was allowed to

Page 152

1   contact an attorney.  I spoke to my attorney who asked
2   me --
3        MS. NICHOLS:  Oh.  I'm going to --
4        THE WITNESS:  Sorry.
5        MS. NICHOLS:  -- direct you not to discuss
6   anything --
7        THE WITNESS:  Yeah.
8        MR. LUTZ:  -- we talked about on this.
9        MS. NICHOLS:  Sorry.
10       Spoke to my attorney and I was put into a
11  conference room, waited in the conference room until
12  detectives and chiefs and deputy chiefs and other
13  people show up.
14   Q.   (BY MR. LUTZ) Okay.  Which attorney did you
15  contact?
16   A.   Rebecca Skordas was the attorney who helped
17  me.
18   Q.   Okay.  And at that time, was she employed
19  like counsel for the police unit?
20   A.   I think so.  I think that's why she ended up
21  getting contacted is because I was a member of the
22  union and I was giving her information to contact, so.
23   Q.   It's not your personal attorney?
24   A.   No.
25   Q.   Okay.  How did you get her number?

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    153 to 156

Page 153

1      A.   I think it was furnished to me -- sorry.
2  It's Lieutenant now, but Sergeant Sweeny at the time.
3      Q.   Did he hand you a card or something?
4      A.   Wrote it down on a piece of paper probably.
5  I honestly don't know.
6      Q.   Did Sergeant Sweeny tell you to call an
7  attorney?
8      A.   I think he asked me if I wanted to.  He asked
9  me if I wanted to and I was like yeah, I do.
10     Q.   Okay.
11     A.   So.
12     Q.   Okay.  And then you were placed in a
13 conference room, so you had this conversation with your
14 attorney first?
15     A.   Yes.
16     Q.   And then these other folks come into the
17 conference room to talk with you?
18     A.   Yes.
19     Q.   Who's all there?
20     A.   A lot of people came in and out.  I can't
21 even -- I believe deputy chiefs, I think -- honestly, I
22 have no idea if Chief Brown even showed up.  I want to
23 say -- who was it that was the deputy chief that just
24 left.  Dowdt.  I think Dowdt was there.
25     Q.   How do you spell that?

Page 154

1      A.   D-o-w-d-t.  I think that may not even be
2  accurate, but he was there.  I think there was a
3  captain that was there.  I think a guy who's now a
4  deputy chief who at the time I think was just a captain
5  was Van Dongen.  I think he was there.  A handful of
6  other people in and out of the office, or the
7  conference, to check see if I needed water, whatever.
8      Q.   Okay.  Did anyone ask you to make a statement
9  at that time?
10     A.   Not at that time, no.
11     Q.   When was the first time somebody asked you to
12 make a statement?
13     A.   When the UPD detectives were questioning me.
14     Q.   When was that?
15     A.   So, I mean, I have no idea what the frame of
16 time was from when I got to the PSB to them actually
17 arriving.  So whatever -- however that time frame was,
18 they took me down to an interview room.  I think that's
19 where all the questions happened.
20     Q.   Is that like days later?
21     A.   No.  This is the same night.
22     Q.   Did you answer questions?
23     A.   I think I -- they asked me I believe -- I
24 don't even know if it was UPD that asked me, but I
25 think I was asked how many times I fired.  I can't

Page 155

1  remember.  There might have been one other question
2  that was asked.  If there was anything else outstanding
3  or something.
4           There's like some basic questions that our
5  police department goes through and that's why I'm not
6  sure if it was our guys was asking that or it was the
7  UPD guys.  They asked if I wanted to make a statement
8  and I told them not until later.  But I was asked how
9  many times I fired and I think one other question I
10 don't remember.
11     Q.   So you answered a couple basic questions, but
12 declined to make a statement?
13     A.   Yes.
14     Q.   Why didn't you want to make a statement?
15     A.   I wanted to talk with my attorney first.
16     Q.   Let's just continue on this line.  Did you
17 watch your body cam footage before you made a
18 statement?
19     A.   I believe I did, yeah.
20     Q.   With your attorney?
21     A.   Yes.
22     Q.   Is that standard protocol?
23     A.   Yes.
24     Q.   Really?
25     A.   Yes.

Page 156

1           (Exhibit 13 marked.)
2      Q.   (BY MR. LUTZ) Okay.  So I assume you've never
3  seen this before.  Or you may have as part of your job,
4  but have you?
5      A.   No.
6      Q.   So this is a -- it reads to me as an
7  investigator followup by Investigator Bench, Zach
8  Bench, from August 22nd, 2017, so more than a week
9  after the OIS with Mr. Harmon.
10     A.   Yes.
11     Q.   It reads "On Friday, August 18, 2017,
12 Detective Brown and I responded to the Law Office of
13 Rebecca Skordas who is representing Officer Fox.  We
14 showed Officer Fox and Rebecca a portion of his body
15 cam footage from the incident.  I did not leave a copy,
16 nor did I show Officer Fox or Rebecca any other
17 officers' body camera footage from that evening.  On
18 August 22nd, 2017, I met with Officer Fox and Rebecca
19 at the sheriff's office building to obtain a statement
20 from Officer Fox.  The interview was audio recorded.
21 Please refer to the transcript for further.  Detective
22 Brownlee and Investigator Kotrodimos were also
23 present."
24           So in that first paragraph, Investigator
25 Bench describes that he -- that on August 18th he met

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1177   Page 41 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                            157 to 160

Page 157

1  with you and your attorney and showed you your body cam
2  footage.  Is that accurate?
3      A.  Yes.
4      Q.  And then it was not until four days later on
5  August 22nd, 2017, that you gave a statement in this
6  case?
7      A.  Yes.
8      Q.  So you had seen your body camera footage
9  before you made any statement in this case?
10     A.  Yes.
11     Q.  Okay.  You can put that aside.
12     A.  (Complies.)
13     Q.  I'm going to fire up some media over here, so
14  can you just bear with me for a sec?
15     A.  Uh-huh.
16     Q.  Actually, let's just hang on a sec.
17         We have some, what's going to be some
18  multi-media exhibits.  We can go off record.
19         (Discussion held off the record.)
20     MR. LUTZ:  For the record, this is Bates-stamped
21  Audio File SLCC 001924.
22     Q.  (BY MR. LUTZ) Okay.  I'm just going to play
23  this for you and ask you to identify it, and we're
24  going to see the whole thing and then I'll have some
25  followup questions.  Does that sound okay?

Page 158

1      A.  Yeah.
2          (Audio file played.)
3      Q.  (BY MR. LUTZ) Okay.  Do you remember giving
4  that statement?
5      A.  Yes.
6      Q.  And is that an accurate, complete copy of the
7  statement that you gave on August 18th, 2017?
8      A.  I believe so, yes.
9      Q.  Okay.  Who all's in the room with you?
10     A.  There was me, my attorney, two UPD
11  detectives.  I think there was somebody else in the
12  room, but I'm not a hundred percent who was in the
13  room.  It might be somebody from the district
14  attorney's office.  I'm not sure.
15     Q.  Is the woman's voice we heard on there your
16  attorney?
17     A.  I don't remember.
18     Q.  Do you remember there being another woman
19  there?
20     A.  That's the one I'm not sure of.  There might
21  have been another female in there, but I'm not a
22  hundred percent sure.
23     Q.  Okay.  Do you know who was asking you
24  questions at the beginning of the tape?
25     A.  From the voices, I don't remember which one

Page 159

1  of those two detectives.  Just to this day I couldn't
2  tell you who they are.
3      Q.  Was Bench there?
4      A.  Again, there was two detectives from UPD.  I
5  have no idea what their names were.
6      Q.  I mean, if we look at 13, Bench says he was
7  there.
8      A.  Yeah.
9      MS. NICHOLS:  Objection.
10     THE WITNESS:  Could have been.  I honestly don't
11  know.  I don't remember.
12     Q.  (BY MR. LUTZ) Okay.  Were you looking at
13  notes when you gave that statement?
14     A.  No.
15     Q.  Have you heard that full recording before
16  today?
17     A.  I believe -- I believe the full recording,
18  yes.
19     Q.  How many times?
20     A.  Once.
21     Q.  When was that?
22     A.  Earlier this week.
23     Q.  And where did you give this statement?  Was
24  that at the PSB?
25     A.  No.  That was at the sheriff's office.  I

Page 160

1  think their main building.
2      Q.  Okay.  What did you do to prepare for this
3  interview?
4      A.  I know I spoke with my attorney.
5      Q.  Did you review any documents?
6      A.  Well, like I said --
7      MS. NICHOLS:  I'm going to just direct you not to
8  reveal any communications with your attorney, but you
9  can answer that question.
10     THE WITNESS:  Yeah, the only thing we did was
11  watch the video.
12     Q.  (BY MR. LUTZ) Your body cam footage?
13     A.  Uh-huh.
14     Q.  Okay.
15     A.  I don't even know if it was the full video.
16  I just know when the detectives came to the office, we
17  watched at least a portion of it.  I don't remember
18  exactly how much of it.
19     Q.  Okay.  In that statement you refer to
20  Mr. Harmon's body language as if he was performing, I
21  think you used the phrase a concealed draw?
22     A.  Yes.
23     Q.  Can you tell me what that is?
24     A.  So what I was attempting to describe was the
25  ability -- so when we teach concealed draws, typically

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1178  Page 42 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                      161 to 164

Page 161

1  if you have like a weapon tucked into a waistband or
2  somewhere else, right, you have your t-shirt over the
3  side, then you take one hand, clear the t-shirt, and it
4  gives you free access to whatever you're trying to go
5  to, and that would be what would be a concealed draw
6  (indicating).
7      Q.   Drawing a concealed weapon?
8      A.   Yeah.
9      Q.   Yeah, okay.  Let's go briefly back to the
10  13th, August 13, 2017, after you were taken back to the
11  PSB.  Did somebody -- I know you said you answered a
12  few questions.  Did somebody else though take
13  possession of your gun?
14     A.   Yes.
15     Q.   And your body camera?
16     A.   Yes.
17     Q.   And then any other equipment?
18     A.   Yes.
19     Q.   Did they take your whole duty belt?
20     A.   No.
21     Q.   Did they take your taser?
22     A.   Yes.
23     Q.   Okay.  Anything else you can remember?
24     A.   My two magazines were in my mag holsters.
25     Q.   Okay.  And did somebody come and take

Page 162

1  pictures of you?
2      A.   Yes.
3      Q.   Okay.  Who was that?  Do you recall who that
4  was?
5      A.   I do not.
6            (Exhibit 14 marked.)
7      Q.   (BY MR. LUTZ) Okay.  So you've just been
8  handed what's been marked as Exhibit 14.  Do you
9  recognize the person in this photograph?
10     A.   I do.
11     Q.   Who is it?
12     A.   That is me.
13     Q.   So this is -- is this a photograph of you at
14  the PSB following your interaction with Mr. Harmon on
15  the 13th of August 2017?
16     A.   Yes, it is.
17     Q.   Okay.  Who are the two gentleman behind you
18  through the window?
19     A.   I believe that's a reflection in a piece of
20  glass that's there and the gentleman in the Salt Lake
21  City uniform I believe is Pete Saures and I have no
22  idea who the other guy is.
23     Q.   Pete Saures?
24     A.   Yeah.
25     Q.   S-o-w-e-r-s?

Page 163

1      A.   S-a-u-r-e-s I think.
2      Q.   And what's his position or what was it?
3      A.   I think he was just there to babysit me for
4  lack of better words.
5      Q.   You don't know who the gentleman in the --
6      A.   I don't.
7      Q.   -- who's not in uniform is?
8      A.   I don't.
9      Q.   Did you have any discussions with those
10  gentlemen while you were in the PSB?
11     A.   Nope.
12     Q.   So this is obviously before they took your
13  equipment --
14     A.   Yeah.
15     Q.   -- for processing?
16     A.   Right.
17     Q.   Under your uniform here, are you wearing some
18  sort of body armor?
19     A.   What do you mean?  Like -- so I'm wearing a
20  vest carrier, so the underpart is what's actually
21  holding my body armor right there (indicating).
22     Q.   Which?
23     A.   So do you see this line that's right here?
24  That's the bottom edge of my vest.  My vest just looks
25  like a shirt that is worn on that.  It's an external

Page 164

1  vest carrier.
2      Q.   Oh, I see.  I gotcha.
3      A.   So that bit that you see down there is just a
4  regular t-shirt that's actually under and you can see
5  where my collar pops out through the neck hole.
6      Q.   Well designed.  And that's your body camera
7  up there on what is your left shoulder of the lens?
8      A.   Yeah, which obviously, now looking at it,
9  there's actually a secondary clip, so I didn't have the
10  horseshoe on which is one that I used to wear.  There
11  was one that -- I actually forgot that I used to have
12  this vest.  I have a completely different one now.
13         But that actually just clips up to the lapel
14  of the vest and then just can sit right there.  So it's
15  basically one inch over from the questions that you
16  were asking me earlier just to clarify.
17     Q.   Okay.  So it's lapel rather than collar here;
18  is that right?  Am I understanding that right?
19     A.   The anatomy from the shirt is from the
20  shoulder to here (indicating).  That is the lapel;
21  right?  Or what is that?
22     Q.   Well, on your uniform you have that strap --
23     A.   Yes.
24     Q.   -- on the shoulder?
25     A.   And then the lapel.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1179   Page 43 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              165 to 168

Page 165

1    Q.   That's the lapel; right?
2    A.   If we can agree that that's the lapel, that
3  is where that is.  It's a piece of plastic attached to
4  my -- I have no idea what they call that piece --
5    Q.   That will do fine for --
6    A.   -- on the shirt.  I don't know.  Okay.
7    Q.   What is the vest made of?
8  MS. NICHOLS:  Objection.
9  THE WITNESS:  Which?
10   Q.   (BY MR. LUTZ) Do you know what the vest is
11 made of?
12   A.   Which vest?
13   Q.   Your exterior vest on the outside of your
14 shirt.
15   A.   I have no idea.
16   Q.   Is it body armor?
17 MS. NICHOLS:  Objection.
18 THE WITNESS:  Like -- okay.  So that's a vest
19 carrier, so there's a carrier that has the body armor
20 in it.
21   Q.   (BY MR. LUTZ) Okay.  Is there body armor in
22 this carrier?
23   A.   Yes.
24   Q.   Okay.  At the time?
25   A.   Yes.

Page 166

1    Q.   What kind of body armor?
2  MS. NICHOLS:  Objection.
3  THE WITNESS:  I have no idea.  Like brand name or
4  what do you mean?
5    Q.   (BY MR. LUTZ) Let's break it down more.  So
6  for a layperson like me, I don't understand anything
7  about this.  Are you wearing a bulletproof vest?
8    A.   Yes.
9    Q.   Okay.
10   A.   Sorry.
11   Q.   Okay.  And was that a standard part of your
12 patrol uniform at that time?
13   A.   Yes.
14   Q.   Okay.  So you always went out with the
15 bulletproof vest on?
16   A.   Yes.
17   Q.   What area does it protect on your anatomy?
18   A.   So you're going to have a portion that comes
19 up and it basically -- it has like a little, you know,
20 cutout collar so that it doesn't ride too high.  So
21 it's going to cover from what should just be almost
22 your collarbones to either just above or below your
23 bellybutton-ish.
24        The panel should wrap around and a proper
25 fitting vest should actually overlap with the panels in

Page 167

1  the back and the back is going to almost mirror the
2  front, just have a different collar area, and that
3  rises maybe just a little bit more evenly across the
4  back of your neck if that makes sense.
5    Q.   Okay.  And is there protection for your
6  backside too?
7    A.   Yes.
8    Q.   In, roughly, the same dimensions, just on
9  your back instead of your front torso?
10   A.   Roughly, yes.
11   Q.   Okay.  What about under your arms?
12   A.   Yes.  That's where the panels should overlap.
13   Q.   Okay.
14        (Exhibit 15 marked.)
15   Q.   (BY MR. LUTZ) Okay.  Do you recognize the
16 person in that image 15?
17   A.   Yes.
18   Q.   And who is that?
19   A.   Me again.
20   Q.   Just the back angle of you?
21   A.   Yes, sir.
22   Q.   So you can also see the vest carrier on your
23 backside here?
24   A.   Yes.
25   Q.   Okay.  That's all for that.  I've give you

Page 168

1  one more.
2        (Exhibit 16 marked.)
3    Q.   (BY MR. LUTZ) Do you recognize the person in
4  this photo?
5    A.   Yes, I do.
6    Q.   Who's that?
7    A.   That is Officer Kris Smith.
8    Q.   And that is from the night of August 13th,
9  2017?
10 MS. NICHOLS:  Objection.
11   Q.   (BY MR. LUTZ) At the PSB?
12   A.   I can assume so, yeah.
13   Q.   Okay.  And, obviously, you didn't take this
14 picture.  Do you see Officer Smith also wearing the
15 vest carrier?
16   A.   Yes, sir.
17   Q.   Okay.  Okay.  We can put that aside.
18        (Exhibit 17 marked.)
19   Q.   (BY MR. LUTZ) Okay.  Taking a look at Exhibit
20 17 there, do you recognize what's in this picture?
21   A.   Yes, I do.
22   Q.   What is it?
23   A.   That is, I believe, an X26 taser.
24   Q.   Is that the same model that you were carrying
25 in August of 2017 while you were out on patrol?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1180   Page 44 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          169 to 172

Page 169

1   A.   I believe it is.
2   Q.   Okay.  Do you believe this one is yours?
3   MS. NICHOLS:  Objection.
4   THE WITNESS:  Probably.
5   Q.   (BY MR. LUTZ) The one that you were carrying
6   on August 17, 2017?
7   A.   It's labeled as such, but there's no way --
8   honestly, without reading the serial number, you can't
9   tell a hundred percent if that's it or not.
10  Q.   Sure.  Can you tell whether it's been
11  deployed just from looking at it?
12  A.   I think so.  So with my limited knowledge, I
13  believe I could look at that and say that that has not
14  been deployed.
15  Q.   How can you tell?
16  A.   So typically -- so the green parts that you
17  can see should be the door panels that are on the front
18  end of the cartridge, those will actually blow off, and
19  so the fact that those -- I mean, not looking at the
20  front, that's one thing that could be wrong is they
21  could, I guess, break off right there, but then also
22  just where the circle is there is where the wire is
23  coiled around there.
24       So, again, I mean, it's not necessarily --
25  I'm not good enough to say 100 percent, but I would

Page 170

1   look at that and say well, if the coils still look like
2   they're wrapped up and that panel hasn't blown off,
3   then that's probably not been used.
4   Q.   Okay.  Thank you.  You can put that aside.
5   A.   (Complies.)
6   Q.   Oh.  One more.  This is exhibit -- do you
7   recognize the person in Exhibit 6?
8   A.   I do.
9   Q.   Who's that?
10  A.   That is Officer Scott Robinson.
11  Q.   And is he also wearing the plate carrier that
12  we talked about earlier?
13  MS. NICHOLS:  Objection.
14  Q.   (BY MR. LUTZ) Can you tell?
15  A.   It does not look like he is, but I can't
16  tell.  He might have his body armor -- so some of them
17  wear it under their shirts still.
18  Q.   Okay.  That's good.
19       You mentioned in the interview that we
20  listened to earlier that one of -- and I'm
21  paraphrasing, so obviously if I say something
22  incorrectly, let me know.  But you basically indicated
23  that one of your main concerns about the dangers that
24  was posed by Mr. Harmon was the distance between you at
25  a certain point in time.  Is that right?

Page 171

1   A.   Yes.
2   Q.   So at the time that you fired, what do you
3   estimate that distance to be?
4   A.   Six feet, seven at most.
5   Q.   You also mentioned in that statement that you
6   like to be in control of, I'm going to paraphrase
7   badly, but that you like to be in control of the
8   choices that you're going to make and something about
9   that situation limited your ability to decide what to
10  do; right?
11  MS. NICHOLS:  Objection.
12  THE WITNESS:  Yeah, I mean, I understand the part
13  that you're driving at, yes.
14  Q.   (BY MR. LUTZ) Is what you're referring to
15  there that the situation involved such that the only
16  thing that you could do at a certain moment was fire
17  your gun?
18  MS. NICHOLS:  Objection.
19  THE WITNESS:  Sorry.  Say the question one more
20  time.
21  Q.   (BY MR. LUTZ) I just need your testimony just
22  to clarify it.  Let's just go back and break it down
23  more fundamentally.
24       How far away were you from Mr. Harmon when
25  you drew your gun?

Page 172

1   A.   So when I originally drew my gun, probably
2   only two to three feet.
3   Q.   What do you mean originally?
4   A.   Sorry.  That's probably bad words.  When I
5   drew my gun, I was probably two to three feet.
6   Q.   At that distance once your gun is drawn, if
7   he's going to come back at you, is your only option to
8   use your firearm?
9   MS. NICHOLS:  Objection.
10  THE WITNESS:  I think I could probably let him
11  stab me first.
12  Q.   (BY MR. LUTZ) So you would say that's the
13  only option?
14  A.   Probably the only option to defend myself to
15  stop him from stabbing me, yes.
16  Q.   Is there ever a situation where -- is there a
17  distance between you and a potential suspect that is
18  too close for it to be appropriate for you to draw your
19  firearm?
20  MS. NICHOLS:  Objection.
21  THE WITNESS:  So like if he was so close that I
22  couldn't?  No, there's never a moment that would be
23  inappropriate.
24  MR. LUTZ:  Okay.
25  THE WITNESS:  Like, again, it would be the

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1181   Page 45 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                          173 to 176

Page 173

1  totality of the situation; right?  Hypotheticals is a
2  dangerous world because you can give reasons why it
3  would be or reasons why it would not be appropriate,
4  but in my opinion, if you were to just generalize it,
5  no, there's never a time it's too close.
6       Q.  (BY MR. LUTZ) You can fire your weapon from
7  any distance, basically?
8       A.  Yeah.  Potentially, yes.
9       Q.  Or potentially from a very close range?
10      A.  Yes.
11      Q.  Earlier we talked about how at the moment
12  that you told Mr. Harmon I'll fucking shoot you, I
13  believe you said that there was probably nothing that
14  he could have done to avoid being shot at that point.
15      MS. NICHOLS:  Objection.
16      Q.  (BY MR. LUTZ) Is that right?
17      A.  Yeah, I mean, that's probably accurate.
18      Q.  Does that have something to do with the fact
19  that you already have your gun in your hand and the
20  quickest way you can react to anything he does is fire
21  the gun?
22      MS. NICHOLS:  Objection.
23      THE WITNESS:  No.
24      Q.  (BY MR. LUTZ) Can you say why?
25      A.  If he had continued to run away, I could have

Page 174

1  done something different.
2       Q.  I see.  That's a little bit different than
3  what you said before about that particular moment.
4       MS. NICHOLS:  Is there a question?
5       THE WITNESS:  What do you mean?
6       Q.  (BY MR. LUTZ) Well, I'll reask the question
7  from before.  At the moment that you told Mr. Harmon
8  I'll fucking shoot you, was there something that -- is
9  there a way that he could have responded that would
10  have resulted in you not shooting him?
11      MS. NICHOLS:  Objection, asked and answered.
12      THE WITNESS:  In that moment, no.
13      MR. LUTZ:  Okay.
14      MS. NICHOLS:  Mr. Lutz, we've been going about an
15  hour 50.  Could we take a break soon?
16      MR. LUTZ:  Yeah.
17      MS. NICHOLS:  Would that be all right?  Okay.
18      (Recess taken from 2:25 p.m. to 2:40 p.m.)
19      Q.  (BY MR. LUTZ) Okay.  Officer Fox, so at this
20  point in time you've seen the body camera footage of
21  Officer Smith; correct?
22      A.  Like as of right now?
23      Q.  Yeah.
24      A.  Yes.
25      Q.  And you've also seen Officer Robinson?

Page 175

1       A.  Yes, but I am not sure that I've seen the
2  totality of either of their videos.
3       Q.  Okay.
4       A.  As a whole.
5       Q.  Okay.  At what point were you made aware that
6  your shooting with Mr. Harmon was being investigated by
7  the Internal Affairs Unit?
8       MS. NICHOLS:  Objection.
9       THE WITNESS:  I don't know if I was ever notified
10  that it was being investigated.  I think it was just
11  assumed they would do it on every case I think.
12      Q.  (BY MR. LUTZ) Okay.  So from your
13  understanding, what was happening in terms of the
14  internal investigation was just standard protocol for
15  any officer involved shooting?
16      A.  Yeah.
17      Q.  Okay.  At what point were you made aware of
18  the results of the internal investigation involving you
19  and the shooting with Mr. Harmon?
20      A.  I don't even know.  Like, I don't know.  I
21  don't remember.
22      Q.  Did you ever read the report that the
23  Internal Affairs Unit issued?
24      MS. NICHOLS:  Objection.
25      THE WITNESS:  I don't know that it -- no.  No.  I

Page 176

1  don't remember doing so if I did, but I don't believe I
2  did.
3       Q.  (BY MR. LUTZ) While the investigation was
4  pending, the internal investigation, were you worried
5  about it?
6       A.  About what?
7       Q.  About what the potential result could be.
8       A.  Yes.
9       Q.  Who were you worried about?
10      A.  Everything.
11      Q.  Potential discipline?
12      A.  Sure.
13      Q.  Your career?
14      A.  Yes.
15      Q.  Anything else?
16      A.  Yeah, I mean, everything.  There's no way for
17  me to explain how worried I was about everything that
18  could potentially come with that.
19      Q.  But you don't remember the result coming
20  down?
21      A.  I mean, no.  No.
22      Q.  I just ask because it must have been a
23  relief.
24      A.  So I remember where I was when I found out
25  that the DA had cleared it.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1182   Page 46 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    177 to 180

Page 177

1     Q.   Okay.
2     A.   As far as IA, I don't remember.
3     Q.   Okay.  Because the DA's decision came down
4  first?
5     A.   I believe so.
6     Q.   That makes sense.  So were you also -- well,
7  when were you made aware that the district attorney was
8  looking at the incident?
9     A.   I don't think I was made aware that he was.
10 I think, again, just standard procedure.
11    Q.   For all officer involved shootings?
12    A.   I believe so.
13    Q.   Did you know that Officer Robinson was
14 involved in some officer involved shootings?
15    MS. NICHOLS:  Objection.
16    THE WITNESS:  I know of one other that he was
17 involved in.
18    Q.   (BY MR. LUTZ) Do you know if the DA
19 investigated Officer Robinson?
20    A.   I can't think of a single one he hasn't
21 investigated, so.
22    Q.   Okay.  So your understanding is that's
23 procedure?
24    A.   I thought so.
25    Q.   In every instance?

Page 178

1     A.   I thought so.
2          (Exhibit 18 marked.)
3     Q.   (BY MR. LUTZ) Okay.  Have you -- you've just
4  been handed what's been marked as Exhibit 18.  Have you
5  ever seen this before?
6     A.   Not that I can recall.
7     Q.   What does it appear to be?
8     MS. NICHOLS:  Objection.
9     THE WITNESS:  It says it's a Complaint Disposition
10 Form.
11    Q.   (BY MR. LUTZ) And do you see the allegation
12 reads "Officer use of deadly force."  Finding reads
13 "In-Policy" and follows "The actions of the subject
14 officer were reasonable, appropriate, did not violate
15 police department policy."
16         See that?
17    A.   Yes.
18    Q.   Knowing that, is this a document -- is this
19 document the fact that the IA complaint was concluded
20 and they determined that you did not violate policy in
21 your shooting of Patrick Harmon?
22    MS. NICHOLS:  Objection.
23    THE WITNESS:  I don't know that this concludes any
24 of it.  I mean, I just see that it says what the
25 finding is and then it's signed by one of the, at the

Page 179

1  time, Captain Purvis.
2     MR. LUTZ:  Okay.
3     THE WITNESS:  I don't think that concluded
4  anything with regards to anything else.  I don't know.
5     Q.   (BY MR. LUTZ) Can we briefly flip to the next
6  page --
7     A.   Sure.
8     Q.   -- SLCC 366.  Have you ever seen this before?
9     A.   I have not.
10    Q.   Okay.  Can you flip to the next page.
11    A.   (Complies.)
12    Q.   Does any of that look familiar?
13    A.   Nope.
14    Q.   Okay.  You can put it aside.
15    A.   (Complies.)
16    Q.   Did you ever request from anyone in the
17 department to review any of the IA investigation
18 materials?
19    A.   No.
20    Q.   Were you ever curious about what was in them?
21    A.   No.
22    Q.   Did you ever read any of the investigation
23 materials from the district attorney's office?
24    MS. NICHOLS:  Objection.
25    THE WITNESS:  No.

Page 180

1     Q.   (BY MR. LUTZ) Did you ever read the district
2  attorney's determination letter exonerating you?
3     A.   Yes.  Parts of it.  Not front to back, but
4  parts of it.
5          (Exhibit 19 marked.)
6     Q.   (BY MR. LUTZ) Okay.  You've been handed
7  what's been marked Exhibit 19.  Take a look at that,
8  please.
9     A.   (Complies.)
10    Q.   Do you recognize this document?
11    A.   Sort of.  I mean, it just looks like a
12 standard memo thing that they would issue out.
13    Q.   Who is it addressed to?
14    A.   Me.
15    Q.   But you don't remember ever reading this?
16    A.   (Peruses document.)
17         I don't remember ever reading it, no.
18    Q.   Okay.  You can put that aside.
19    A.   (Complies.)
20         (Exhibit 20 marked.)
21    Q.   (BY MR. LUTZ) Okay.  So you've just been
22 handed what's marked as Exhibit 20.  Just take a minute
23 to look at that.
24    A.   (Complies.)
25    Q.   Do you recognize this document?

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    181 to 184

Page 181

1    A.   No.
2    Q.   Do you believe that you've ever come across
3  this in your training or anything like that?
4    A.   No.
5    Q.   Okay.  You can put it aside.
6    A.   (Complies.)
7    Q.   Going back to your testimony from a few
8  minutes ago regarding the knife that you believe was in
9  Mr. Harmon's possession, I believe you said that after
10  you had shot Mr. Harmon, you didn't see the knife again
11  on the scene.  Is that right?
12    A.   Yes.
13    Q.   Okay.  Do you believe you've seen photos of
14  it later after the shooting?
15    A.   I mean, I know that I have.  Yeah.
16    Q.   Do you recall in what context you've seen
17  those?
18    A.   I don't.
19    Q.   Did an investigator ask you about, like show
20  you a photo of it and ask you about it?
21    A.   No.  I don't remember.  I don't think so.
22    Q.   Could it have been in the DA's clearance
23  letter?
24    A.   It could have.  I don't remember.
25    Q.   You never had a copy or like a photo of the

Page 182

1  knife in your own possession, did you?
2    A.   No.
3    Q.   And you don't recall whether or not you
4  reviewed the DA's determination letter?
5    MS. NICHOLS:  Objection.
6    THE WITNESS:  The determination letter?
7    MR. LUTZ:  (Nods head.)
8    THE WITNESS:  So that's the one I think I had
9  reviewed most of it.
10    MR. LUTZ:  Okay.
11    MR. RILEY:  So I don't show that the video's were
12  Bates-stamped, the ones that you guys attached to your
13  Motion to Dismiss.
14    MS. NICHOLS:  I think the Bates-stamped videos
15  should be in our most recent production was my
16  understanding.
17    MR. RILEY:  They are.
18    MR. LUTZ:  We also gave you Bates-stamped
19  versions.
20    (Pause in the proceedings.)
21    Q.   (BY MR. LUTZ) Okay.  For the record, the
22  video that I just pulled up is Bates-stamped HARMON24.
23  Just from the screen shot that's pulled up right there
24  at one second, do you recognize this video?  I can play
25  it more.  I just --

Page 183

1    A.   Is this Kris's?
2    (Video played.)
3    MR. LUTZ:  Just pause that.
4    THE WITNESS:  I'm going to move this.  I can't see
5  the timestamp.
6    MS. NICHOLS:  That's okay.
7    MR. LUTZ:  So pause this at 54 seconds.  We will
8  enter this as Exhibit, so pause it 54 seconds,
9  Exhibit 21.
10    (Exhibit 21 marked.)
11    Q.   (BY MR. LUTZ) Do you recognize this video
12  now?
13    A.   Yes.
14    Q.   What is it?
15    A.   I believe it's my body cam footage.
16    Q.   And so far does this appear to be a fair and
17  accurate representation of your body cam footage from
18  October 2017?
19    A.   I believe so.
20    Q.   Okay.  I'm going to play this through once
21  and then go back.
22    A.   (Nods head.)
23    (Video played.)
24    Q.   (BY MR. LUTZ) Okay.  Have you seen all of
25  that exhibit before?

Page 184

1    A.   Yes.
2    Q.   Have you seen any longer version of it?
3    A.   I think that's it.
4    Q.   Okay.  So we're at 9 seconds here.  There's
5  no audio.  Is that because there's a delay in when you
6  hit record and when it starts recording audio on your
7  body cam?
8    A.   I believe so.
9    (Video played.)
10    MR. LUTZ:  Pause it for a second here.
11    Q.   (BY MR. LUTZ) This is Mr. Harmon directly in
12  front of you; correct?
13    A.   Yes.
14    (Video played.)
15    MR. LUTZ:  Pause it there, 32 seconds.
16    Q.   (BY MR. LUTZ) The audio seems that it came on
17  at 30 seconds.  Would that be the normal amount of time
18  for that audio to start?
19    A.   Yes.
20    (Video played.)
21    Q.   (BY MR. LUTZ) We paused it at 36 seconds.  Do
22  you recognize who just said, "Patrick, you already know
23  about your warrant; right?"
24    A.   Yes.
25    Q.   Who was that?

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    185 to 188

Page 185

1      A.   Officer Scott Robinson.
2           (Video played.)
3      MR. LUTZ:  Pause it at 45 seconds.
4      Q.   (BY MR. LUTZ) On the right side of the frame,
5  who is that?
6      A.   That's Officer Robinson.
7           (Video played.)
8      MR. LUTZ:  Pause it at 48 seconds.
9      Q.   (BY MR. LUTZ) Looks like there's an arm
10 reaching across touching Mr. Harmon's arm.  Whose arm
11 is that?
12     A.   I believe it to be Officer Smith's.
13     Q.   Okay.
14          (Video played.)
15     MR. LUTZ:  Pause at 103.
16     Q.   (BY MR. LUTZ) At this point do you believe
17 you had drawn your gun?
18     MS. NICHOLS:  Objection.
19     THE WITNESS:  Is there any way I could watch it
20 again up to this point?
21     MR. LUTZ:  Sure.  Actually, why don't I go back
22 to -- tell me -- I'll let it play forward.  Tell me, if
23 you can, at what point you believe you drew your gun
24 while we're watching.
25     MS. NICHOLS:  Objection.

Page 186

1           (Video played.)
2      THE WITNESS:  I wouldn't be able to tell you when
3  I drew my gun.
4      MR. LUTZ:  Okay.  Let's play through one more
5  time.  Just a couple more questions.  Pause along the
6  way and we'll put this one away.
7           (Video played.)
8      Q.   (BY MR. LUTZ) So pausing in 116.  On the
9  right of the frame who is that on the right?
10     A.   Officer Robinson.
11     Q.   Okay.  And at 116 how far away is he from
12 Mr. Harmon?
13     A.   Reach out touch him.  I have no idea.
14          (Video played.)
15     Q.   (BY MR. LUTZ) Pausing at 224.  Who's on that
16 the far right?
17     A.   On the what?
18     Q.   On the far right of the frame.
19     A.   It should be Officer Robinson.
20     Q.   And the left of Officer Robinson?
21     A.   The officer?
22     Q.   Yeah.
23     A.   Is Officer Smith.
24     Q.   Okay.
25          (Video played.)

Page 187

1      Q.   (BY MR. LUTZ) Okay.  I'm pausing it at 244.
2  At this point have you seen a knife anywhere in this
3  footage?  Let me rephrase that.
4           Paused at 244, since you opened fired on
5  Mr. Harmon, do you see a knife anywhere in the video?
6      A.   In this frame right here?
7      Q.   In any of the frames that we watched so far.
8      A.   I believe, if you go back as Officer
9  Robinson's approaching, there's something in the grass
10 that is, I believe, a knife.
11     Q.   Okay.  We can go back.
12          (Video played.)
13     Q.   (BY MR. LUTZ) Pausing right there at 3
14 minutes 6 seconds.  Was that just you using your knife
15 to cut some of Mr. Harmon's clothing?
16     A.   Yes.
17          (Video played.)
18     Q.   (BY MR. LUTZ) Pausing at 314.  There's now
19 another person here.  Do you know who this is on the
20 right side of the screen?
21     A.   I think that that's Sergeant Sweeny, but I'm
22 not a hundred, like, not sure.
23     Q.   Okay.  And we can't really see from that
24 angle?
25     A.   From his voice it sounds like him, and I know

Page 188

1  that he was there super early.  So if the person that's
2  on screen is the one that's talking, then that's
3  Sergeant Sweeny, or now Lieutenant, but I feel weird
4  calling him by the wrong rank, but yeah.
5      Q.   Okay.
6           Play again at 314.
7           (Video played.)
8      Q.   (BY MR. LUTZ) We just flashed over another
9  person, so I'm going back.  It's between 315, 314, and
10 315.  There's another person now.  Do you know who that
11 is?
12     A.   I don't.
13          (Video played.)
14     Q.   (BY MR. LUTZ) Paused at 3 minutes 34 seconds.
15 Do you know who is in this frame that just asked if
16 you're good?
17     A.   I think that's Officer Smith.
18     Q.   Okay.
19          (Video played.)
20     Q.   (BY MR. LUTZ) Paused at 4 minutes 21 seconds.
21 Do you know who is standing right here to the right of
22 the frame?
23     A.   No.  If I saw their face, I probably would
24 recognize it, but no.
25          (Video played.)

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1185   Page 49 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    189 to 192

Page 189

1    Q.   (BY MR. LUTZ) Paused at 428.  Is that you who
2   said, "Can I call Brittany?"
3    A.   Yes.
4    Q.   That's your wife?
5    A.   Yes.
6        (Video played.)
7    Q.   (BY MR. LUTZ) Paused at 4 minutes 38 seconds.
8   Do you know who's standing in front of you right here
9   or remember who's standing in front of you right here?
10   A.   I mean, just by tracking it through the
11  individual, I believe the person on the left is still
12  Officer Smith.  I don't know who the person on the
13  right is.
14   Q.   Okay.
15       (Video played.)
16   Q.   (BY MR. LUTZ) Okay.  Paused it at 5 minutes
17  18 seconds.  We just hear "Where the fuck's the
18  ambulance at." Was that you or who was that?
19   A.   I don't think that was me.  I don't know who
20  that was, but I don't think it was me.
21   Q.   Okay.
22       (Video played.)
23   Q.   (BY MR. LUTZ) Okay.  Paused it at 6 minutes
24  even.  Do you know who that is who just walked up right
25  in the center?

Page 190

1    A.   Officer Robinson.
2        (Video played.)
3    Q.   (BY MR. LUTZ) Paused at 6 minutes 14.  Was
4   that you just saying, "I'll grab my knife?"
5    A.   Yes.
6    Q.   And what was the other knife that you guys
7   were talking about?
8    A.   That was the one that Patrick had.
9        (Video played.)
10   MR. LUTZ:  Okay.
11       I'm going to pull up HARMON28 which we'll
12  mark as Exhibit 22.
13       (Exhibit 22 marked.)
14       (Video played.)
15   Q.   (BY MR. LUTZ) I've shown you a minute of
16  Exhibit 22.  Do you recognize this video?
17   A.   Probably this is Officer Smith's.
18   Q.   Okay.  I'm going to let it play again here at
19  one minute.
20       (Video played.)
21   Q.   (BY MR. LUTZ) I'm going to pause here at 147.
22  The computer screen in the middle of the frame, do you
23  know what Officer Smith is doing on the computer during
24  this sequence?
25   A.   I'm assuming that he's attempting to look up

Page 191

1   whoever it is that he believes he has stopped.
2        (Video played.)
3    Q.   (BY MR. LUTZ) Just pausing here at 7 minutes
4   1 second.  Is that you who just walked up in the middle
5   of the frame?
6    A.   Yes.
7        (Video played.)
8    Q.   (BY MR. LUTZ) Can you explain that, "We're
9   going to go?"
10   A.   I'm sorry?
11   Q.   I think it was we're going to go 89 Fox 2?
12   A.   We're going to go 82 which is 1082.  It's
13  part of the code for taking somebody into custody.  Fox
14  2 is for a felony 2 warrant.
15   Q.   Okay.
16   A.   And, yeah, I don't know if there's anything
17  else he said.
18   Q.   Okay.  Thank you.
19       (Video played.)
20   Q.   (BY MR. LUTZ) Okay.  And I paused at 7
21  minutes 46 seconds.  We're looking at Officer Robinson
22  directly in the center of the frame; right?
23   A.   Yes.
24   Q.   To Patrick's right.
25       (Video played.)

Page 192

1    MR. LUTZ:  Okay.  Pause there and go back.  Pause
2   at 832.  Play at 754.
3        (Video played.)
4    Q.   (BY MR. LUTZ) It's difficult to tell, but
5   we're paused at 815.  Was that you coming from the
6   right side of the frame?
7    A.   Yeah, I believe so.
8        (Video played.)
9    Q.   (BY MR. LUTZ) Paused at 816.  On the left
10  side of the frame there we're looking at Officer
11  Robinson and Patrick's back?
12   A.   Yes.
13       (Video played.)
14   Q.   (BY MR. LUTZ) And just a second there, 816,
15  that's Officer Robinson kind of in the distance over
16  there; right?
17   A.   Yes.
18   Q.   Patrick running to the right there?
19   A.   Yes.
20       (Video played.)
21   MR. LUTZ:  Okay.  Paused right there at 849.
22   Q.   (BY MR. LUTZ) We're looking at the
23  outstretched arm on the left side of the frame which
24  should be Officer Smith's arm; right?
25   A.   Yes.

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1186   Page 50 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                        193 to 196

Page 193

1    Q.   And that's his taser --
2    A.   Yes.
3    Q.   -- in his hand?
4    A.   Yes.
5    Q.   And you can tell it's been deployed because
6  you can see the coils out; correct (indicating)?
7    A.   I believe so.
8    Q.   I'll play a second of the video so you can
9  see the motion.
10        (Video played.)
11   Q.   (BY MR. LUTZ) That's a yes?
12   A.   Yes.
13        (Video played.)
14   Q.   (BY MR. LUTZ) Paused at 10 minutes 6 seconds.
15  At this point you've returned with your gloves on?
16   A.   Yes.
17   Q.   Okay.
18        (Video played.)
19   Q.   (BY MR. LUTZ) Paused at 10 minutes 19
20  seconds.  That's you on the right side of the frame
21  cutting Mr. Harmon's clothes?
22   A.   Yes.
23        (Video played.)
24   Q.   (BY MR. LUTZ) Paused at 10 minutes 36
25  seconds.  That's you walking in front of Officer

Page 194

1  Smith's camera?
2    A.   Yes.
3        (Video played.)
4    Q.   (BY MR. LUTZ) Paused at 11 minutes 1 second.
5  The frame we paused on is not very good, but just a
6  moment ago was that you leaning against the car?
7    A.   Can you go back.
8    Q.   Yeah.
9    A.   Sorry.  I wasn't focused on that part.
10        (Video played.)
11   Q.   (BY MR. LUTZ) Right there.
12   A.   Yeah, that's me.
13        (Video played.)
14   Q.   (BY MR. LUTZ) Paused at 11 minutes 30
15  seconds.  Do you recognize this gentleman in the yellow
16  iridescent shirt?
17   A.   His face is too blurry right there.  I'm not.
18   Q.   You don't have any independent recollection
19  of who that was?
20   A.   No.
21   Q.   Okay.
22        (Video played.)
23   Q.   (BY MR. LUTZ) Okay.  Have you seen any
24  versions of that video that are longer than what we
25  just watched?

Page 195

1    A.   I have not.
2    Q.   Okay.  Okay.  We're going to mark HARMON36 as
3  Exhibit 23.
4        (Exhibit 23 marked.)
5        (Video played.)
6    Q.   (BY MR. LUTZ) Okay.  Having played 36 seconds
7  of this exhibit, do you recognize this video?
8    A.   It should be Officer Robinson's video.
9    Q.   Okay.  You've seen it before?
10   A.   Yes.
11   Q.   Okay.
12        (Video played.)
13   Q.   (BY MR. LUTZ) Okay.  Pausing that here at
14  152, having heard the audio up to this point, does it
15  sound distorted to you?
16   A.   Yeah.
17   Q.   Has that ever happened in your experience
18  with your body cam audio?
19   A.   Not that I'm aware of, but I hardly ever
20  listen to my own video, so I don't know.
21   Q.   Okay.  At least on this video it doesn't
22  sound very clear?
23   A.   No.
24        (Video played.)
25   Q.   (BY MR. LUTZ) Okay.  Pause right there at 27

Page 196

1  minutes 16 seconds.  Have you been able to see up to
2  this point the wires connected to the taser barbs from
3  Officer Smith's taser on Mr. Harmon?
4    A.   I can see what looks look wires.  I don't
5  know if they're connected to the barbs or his taser.  I
6  mean, yeah, that's clearly a wire there, but.
7    Q.   Okay.
8        (Video played.)
9    Q.   (BY MR. LUTZ) Same thing.  Does that right
10  there paused at 220 look like a taser barb in
11  Mr. Harmon's chest area?
12   A.   Yeah, that looks like an actual barb.
13   Q.   So --
14   A.   Yes.
15   Q.   -- this barb made contact with his chest
16  area?
17   A.   Looks like it.
18        (Video played.)
19   Q.   (BY MR. LUTZ) Pause right there at 350.  Up
20  in the top left corner of the screen you see these two
21  hands surrounding Mr. Harmon?  What is that officer
22  doing?
23   MS. NICHOLS:  Objection.
24   THE WITNESS:  Can you -- can I -- yeah.
25   Q.   (BY MR. LUTZ) Play a little more?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1187   Page 51 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    197 to 200

Page 197

1      A.   Sure.
2           (Video played.)
3      THE WITNESS:   Yeah, that's a tourniquet.
4      MR. LUTZ:   Pause it right there at 354.
5      Q.   (BY MR. LUTZ) That officer is applying a
6 tourniquet to Mr. Harmon's thigh?
7      A.   It looks like it.
8      Q.   Okay.
9           (Video played.)
10     Q.   (BY MR. LUTZ) Pausing again here at 4 minutes
11 32 seconds.   Right there, dead center of the frame,
12 that's the same taser probe we were looking at, right,
13 in the middle of Mr. Harmon's chest; right?
14     A.   I believe so.
15     Q.   Okay.   Play again.
16          (Video played.)
17     MR. LUTZ:   Back 10 seconds.   Again, playing it
18 forward to 350, pay attention to where the taser barb
19 is.
20          (Video played.)
21     MR. LUTZ:   Right there.
22     Q.   (BY MR. LUTZ) Did you see -- could you see
23 the taser barb connected under his shirt into his skin?
24     A.   Yes.
25     Q.   Okay.

Page 198

1           (Video played.)
2      Q.   (BY MR. LUTZ) Okay.   So you said you've seen
3 that before.   Have you seen any longer version of
4 Officer Robinson's body cam footage from that night?
5      A.   No.
6      Q.   The area where you encountered Mr. Harmon
7 where all the officers and kind of Mr. Harmon is on
8 State Street there, is that a relatively high crime
9 area for this city?
10     MS. NICHOLS:   Objection.
11     THE WITNESS:   I mean, if you go further -- it's
12 all relative.   If you go further south, it's worse on
13 that particular spot.   I mean, not really, but that
14 whole length of State Street is worse than other parts
15 of the city or state.   It just depends on how far away
16 from it you get.
17     Q.   (BY MR. LUTZ) Okay.   Makes sense.   And I
18 don't mean -- to just clarify, I don't mean
19 statistically.   I just mean in your experience as an
20 officer.
21     A.   That was the first time I'd ever been on that
22 block probably on any kind of stop.
23     Q.   Okay.   So the encounter with Mr. Harmon took
24 place on August 13th, 2017; right?
25     A.   Yes.

Page 199

1      Q.   You gave your first statement as to what
2 happened on August 18th; is that right?
3      A.   If you're asking me, I don't know the actual
4 date.   There's the paperwork if you want me to check
5 it, but I don't remember, yeah.
6      Q.   Let's go back to the exhibit if I have it.
7 Yeah, August 18th, 2017.   I'm looking at SLCC121.   Who
8 did you talk to about what happened on the night of
9 August 13th, 2017?   Between that night and August 18th,
10 2017.
11     A.   My attorney.
12     Q.   That's it?
13     A.   That's it.
14     Q.   Talk to your wife?
15     A.   I talked to my wife, but I didn't really want
16 her to know what had happened.   So she knows that I was
17 involved in a shooting.   She didn't know -- I didn't
18 know how anything was going to turn out, so kind of
19 wanted her to not know much.
20     Q.   Okay.   Did you talk to Officer Robinson?
21     A.   No.
22     Q.   No phonecalls?
23     A.   No.   So we met the day after.   No phone
24 calls, no text.   We didn't talk about the case.
25     Q.   Okay.   Text messages?

Page 200

1      A.   No.
2      Q.   What about with Officer Smith?
3      A.   Same thing.
4      Q.   So you and Officer Robinson met the next day?
5      A.   All three of us did.
6      Q.   Okay.   What prompted that?
7      A.   They wanted to check and make sure I was
8 doing okay I think.
9      Q.   Where did you guys meet?
10     A.   At my house.
11     Q.   Okay.   Who initiated that meeting?
12     A.   I think they did.
13     Q.   Okay.   Do you remember what time it was that
14 they came over?
15     A.   Early morning.   I don't remember what time.
16     Q.   Just the three of you?
17     A.   Uh-huh.
18     Q.   Okay.   And you did not talk about this?
19     A.   Did not.
20     Q.   Okay.   In August of 2017 who else was on your
21 squad at that time?
22     A.   Like I said, I know it was us three.   There
23 was Josie and I know there was at least two others, but
24 I couldn't give you names.
25     Q.   Okay.   Who's Josie?   Do you have a last name?

Case 2:19-cv-00553-HCN-CMR  Document 80-1  Filed 10/28/22  PageID 1188  Page 52 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                        201 to 204

Page 201

1       A.   Oh.  It was "Frout" at the time.  She's since
2   married.  I'm not sure.  Collins.  Sorry.  I think her
3   last name's Collins now.
4       Q.   We've talked about it many times, but you
5   never saw the knife you believe Mr. Harmon had at the
6   scene after you shot him?
7       MS. NICHOLS:  Objection, asked and answered.
8       THE WITNESS:  Sorry.  Can I make one correction?
9       MR. LUTZ:  Yeah.
10      THE WITNESS:  I don't think Josie was actually on
11  my squad.  She was on a covering squad.  So we just
12  actually worked the same area, but she was for a
13  different sergeant.  Sorry.
14      Q.   (BY MR. LUTZ) Okay.  No problem.  I
15  appreciate the correction.  What is a covering squad,
16  just for clarification?
17      A.   So my sergeant at the time was Bret Hatch and
18  so I bid that shift and he's got certain days off;
19  right?  So I'm assigned to that particular zone within
20  a beat, or the beat within a zone, and me, Kris and
21  Scott were all on the same squad, just bid different
22  beats, but same zone.
23           She worked for I believe it was actually
24  Sergeant Sweeny and happened to bid the same -- I think
25  she was the same beat as one of the three of us in the

Page 202

1   same zone, but she was actually for a different
2   sergeant.  We just worked the same area.  So we
3   frequently worked together the same area, but on the
4   same squad.  Sorry.
5       Q.   Okay.  Do you know if any testing was done on
6   the knife recovered at the scene to determine the
7   presence of fingerprints?
8       A.   I have no idea.
9       Q.   And do you know if any testing was done on
10  the knife recovered at the scene to determine the
11  presence of any DNA?
12      A.   I have no idea.
13      Q.   Okay.  Give me just a second.  Want to take a
14  short break?
15      MS. NICHOLS:  That's great.
16           3:53-406.
17      (Recess taken from 3:53 p.m. to 4:06 p.m.)
18      Q.   (BY MR. LUTZ) On the night of the 13th of
19  August 2017 when you first arrived and contacted
20  Mr. Harmon, did you pat him down?
21      A.   I did not.
22      Q.   Did any of the other officers pat him down?
23      MS. NICHOLS:  Objection.
24      THE WITNESS:  At the time I had no idea if Kris
25  had prior to me getting there.  Obviously nobody did

Page 203

1   after the fact, so.
2       Q.   (BY MR. LUTZ) Is there a policy or procedure
3   that applies to that situation?
4       A.   No, not that requires it.
5       Q.   Okay.  Would you ordinarily pat a suspect
6   down before handcuffing them and taking them into
7   custody?
8       MS. NICHOLS:  Objection.
9       THE WITNESS:  No.
10      Q.   (BY MR. LUTZ) Would you pat them down after
11  you handcuff them and were taking them into custody?
12      A.   Yes.
13      Q.   What's the rationale for that, you doing it
14  after, but not before?
15      MS. NICHOLS:  Objection.
16      THE WITNESS:  I think a lot of it is, I mean,
17  dealer stories; right?  If I wanted to try to do it
18  prior to, I could.  My rationale would be if I can get
19  you into handcuffs sooner, then pat you down, any
20  potential for you to get weapons is negated by you
21  being in handcuffs.  So, I mean, that's one potential
22  reason that you would potentially apply to it.
23      Q.   (BY MR. LUTZ) Okay.  I noticed in the body
24  cam footage that we watched earlier that you were
25  wearing glasses.

Page 204

1       A.   Yes.
2       Q.   You're not today.
3       A.   Uh-huh.
4       Q.   Are you wearing contacts?
5       A.   No.
6       Q.   Lasik?
7       A.   No.
8       Q.   Just your vision's fine?
9       A.   Yes.
10      Q.   What's your prescription?
11      A.   I am slightly nearsighted, so I use them to
12  read license plates and street signs.
13      Q.   Okay.  Do you know what numerically your
14  prescription is?
15      A.   No.  It's minor.
16      Q.   Okay.  You're not required to wear
17  prescription lenses to drive?
18      A.   No.
19      Q.   Okay.  In your patrols today do you have
20  access to the Axon app on your phone?
21      A.   Yes.
22      Q.   And does that allow you to view body camera
23  footage immediately?
24      A.   Yes.
25      Q.   Did you have access to an app like that in

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1189   Page 53 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                    205 to 208

Page 205

1   August of 2017?
2       A.   Not on my phone I don't think.
3       Q.   In some other capacity?
4       A.   I think if I plugged it into a computer, I
5   could have watched it.
6       Q.   Okay.  Have you ever done that?
7       A.   I think I've viewed body camera before, yeah.
8       Q.   And there was no prohibition on it by policy
9   of just plugging in and watching your own body cam
10  footage?
11      A.   There was no what?
12      Q.   Prohibition.
13      A.   No.  I think it was actually encouraged.
14      Q.   Okay.  Have you ever been to Price, Utah?
15      A.   Probably -- I don't know.  Honestly.  I don't
16  know where Price is.
17      Q.   You never lived in Price, Utah?
18      A.   No.
19      Q.   Did your wife?
20      A.   No.
21      Q.   Do you know anyone who's ever worked in
22  Price, Utah?
23      MS. NICHOLS:  Objection.
24      THE WITNESS:  No.
25      Q.   (BY MR. LUTZ) To your knowledge, do you know

Page 206

1   anyone whose ever worked for Castleview Hospital?
2       MS. NICHOLS:  Objection.
3       THE WITNESS:  No.
4       Q.   (BY MR. LUTZ) Have you ever worked for
5   Castleview Hospital?
6       A.   No.
7       Q.   Has your wife ever worked for Castleview
8   Hospital?
9       A.   No.
10      Q.   Do you have any idea if either Officer
11  Robinson or Officer Smith worked for Castleview
12  Hospital at any point in time?
13      A.   I have zero idea.
14      Q.   Okay.  The moment Mr. Harmon took off, why
15  didn't you try a taser?
16      A.   I thought I was going to be able to get to
17  him and tackle him.
18      Q.   If that's the case, then why did you draw
19  your gun?
20      A.   Because he said he was going to cut Scott and
21  then started reaching for his pocket, so I believed he
22  was armed with something that would cut somebody.
23      Q.   And in that situation, that calls for deadly
24  force?
25      MS. NICHOLS:  Objection.

Page 207

1       THE WITNESS:  Yes.
2       Q.   (BY MR. LUTZ) In your training and
3   experience?
4       A.   Yes.
5       Q.   Now, I know we talked about totality of the
6   circumstances and the context of independent responses;
7   right?  That's a big part of your training.  But is
8   deadly force called for at any time that you're going
9   to encounter a suspect with a knife?
10      MS. NICHOLS:  Objection.
11      THE WITNESS:  Yes.
12      Q.   (BY MR. LUTZ) Okay.  What are the core values
13  at the Salt Lake City Police Department?
14      MS. NICHOLS:  Objection.
15      THE WITNESS:  I have no idea.  I think they all
16  start with Cs for some ease of reference, but I don't
17  remember them.
18      Q.   (BY MR. LUTZ) After the incident, the Patrick
19  Harmon incident, were you put on -- were you removed
20  from patrol?
21      A.   I mean, if the question is whether I was put
22  on administrative leave, yes.
23      Q.   Okay.  And what did administrative leave
24  entail?
25      A.   Like as far as?

Page 208

1       Q.   What were you doing at work?
2       A.   So for the first few weeks, nothing.
3       Q.   Were you at work at all?
4       A.   I was required to check in every day, and I
5   would check in at the beginning of the day and check
6   off at the end of the day.
7       Q.   Literally nothing between?
8       A.   Literally nothing in between.  I was -- I was
9   meant to be the head of the immediate response of the
10  department.  I was at will to them any time they needed
11  me between those hours, but I did nothing.  I worked
12  out quite a bit.
13      Q.   Okay.  When did you come off administrative
14  leave?  Go ahead.
15      A.   Sorry.  That was only for one week.
16      Q.   Okay.
17      A.   I actually went to a training that I had
18  signed up for prior to that at the beginning of the
19  second, roughly, the second week of my leave.  So I
20  actually did, but that was only for about a week that I
21  did it, and then I started the training.
22      Q.   What was the training on?
23      A.   Basic narcotics investigation.
24      Q.   Do you have any regrets about what happened
25  with Mr. Harmon?

Case 2:19-cv-00553-HCN-CMR   Document 80-1   Filed 10/28/22   PageID 1190   Page 54 of 54
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
CLINTON FOX - 06/17/2022                                              209 to 211

Page 209

1      MS. NICHOLS:  Objection.
2      **THE WITNESS:  Yes.**
3      MR. LUTZ:  Okay.  That's all I have.  Thank you
4   for being here today.
5      **THE WITNESS:  Thank you.**
6      MS. NICHOLS:  I have no questions.  The witness
7   would like to read and sign, please.
8          (The proceedings ended at 4:15 p.m.)
9                  - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 210

1   STATE OF UTAH        )
                          ) ss.
2   COUNTY OF SALT LAKE )
3              REPORTER'S CERTIFICATE
4      I, Amanda Richards, certified shorthand reporter
5   for the State of Utah, certify:
6      That the deposition of the witness herein was
7   taken before me at the time and place herein set forth,
8   at which time the witness was by me duly sworn to
9   testify the truth; that the testimony of the witness
10  and all objections made and all proceedings had of
11  record at the time of the examination were
12  stenographically reported and transcribed by me.
13     That the foregoing transcript, as transcribed by
14  me, is a full, true and correct record of my
15  stenographic notes so taken; that review of the
16  transcript by the witness was requested pursuant to
17  Rule 30(e) of the Utah Rules of Civil Procedure.
18     I further certify that I am neither counsel for
19  nor related to any party to said action, nor in anywise
20  interested in the outcome thereof.
21     IN WITNESS WHEREOF, I have subscribed my name
22  below this 5th day of July 2022.
23
            *Amanda Richards*
24
            Amanda Richards, CSR
25

Page 211

1              WITNESS CERTIFICATE
2      I, CLINTON FOX, HEREBY DECLARE:
3      That I am the witness referred to in the
4   foregoing deposition, and that I have read the
5   foregoing deposition testimony and have made any
6   changes/corrections  I deem necessary below and
7   together the same truly and accurately reflect my
8   testimony.
9   PAGE-LINE:    CHANGE/CORRECTION        REASON:
10  _____-_____   _____   _____
11  _____-_____   _____   _____
12  _____-_____   _____   _____
13  _____-_____   _____   _____
14  _____-_____   _____   _____
15  _____-_____   _____   _____
16  _____-_____   _____   _____
17  _____-_____   _____   _____
18  _____-_____   _____   _____
19     I, CLINTON FOX, hereby declare under the penalties
20  of perjury of the laws of the United States of America
21  and the laws of the State of Utah that the foregoing is
22  true and correct.
23     DATED _____, 20_____.
24              _____
                     CLINTON FOX
25