In the Matter of:

# ESTATE OF PATRICK HARMON, SR., et al.

## vs

# SALT LAKE CITY CORPORATION, et al.

## KRIS SMITH

June 16, 2022



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022

---

**Page 3**

```
 1   KRIS SMITH, WITNESS
 2   INDEX OF EXAMINATION                              PAGE
 3   Examination by Mr. Lutz                              4
 4   Reporter Certificate                              112
 5   Witness Certificate                               114
 6
 7   INDEX OF EXHIBITS
     EXHIBIT                                           PAGE
 8
     No. 1    Taser X26P CEW User Manual                39
 9
     No. 2    Color Photograph Bates-stamped           107
10            SLCPD001769
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

IN THE UNITED STATES DISTRICT COURT
STATE OF UTAH, CENTRAL DIVISION

— — —

```
ESTATE OF PATRICK HARMON,    )
SR.; PATRICK HARMON II,      )  No. 2:19-cv-00553-HCN-CMR
as Personal Representative   )
of the Estate of Patrick     )
Harmon, Sr., and heir of     )  District Judge:
Patrick Harmon Sr., TASHA    )  Howard C. Nielsen, Jr.
SMITH, as heir of Patrick    )
Harmon, Sr.,                 )  Magistrate Judge:
                             )  Cecilia M. Romero
      Plaintiffs,            )
                             )
vs.                          )
                             )
SALT LAKE CITY CORPORATION,  )
a municipality; and OFFICER  )
CLINTON FOX, in his          )
individual capacity,         )
                             )
      DEFENDANTS.            )
---------------------------
```

DEPOSITION OF
KRIS SMITH
DEISS LAW
SALT LAKE CITY, UTAH
JUNE 16, 2022

---

**Page 2**

```
 1   APPEARANCES OF COUNSEL:
 2   FOR PLAINTIFFS:
 3          Nicholas A. Lutz
            RATHOD MOHAMEDBHAI, LLC
 4          2701 Lawrence Street, Suite 100
            Denver, Colorado 80205
 5          303.578.4400
            Nl@rmlawyers.com
 6
            Corey D. Riley
 7          DEISS LAW PC
            10 West 100 South, Suite 425
 8          Salt Lake City, Utah 84101
            801.433.0226
 9          801.433.0226
10
11   FOR DEFENDANTS:
12          Katherine Nichols
            SALT LAKE CITY ATTORNEY'S OFFICE
13          35 East 500 South, Second Floor
            Salt Lake City, Utah 84111
14          385.468.7900
            Katherinenichols@slcgov.com
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 4**

```
 1        SALT LAKE CITY, UTAH, JUNE 16, 2022, 9:04 A.M.
 2                       * * * * *
 3                       KRIS SMITH,
 4   called as a witness herein, having been first duly
 5      sworn, was examined and testified as follows:
 6                      EXAMINATION
 7   BY MR. LUTZ:
 8        Q.  Good morning, Officer Smith.  Are you still
 9   employed with the Salt Lake City Police Department?
10        A.  I am not.
11        Q.  Are you still a police officer?
12        A.  Yes.
13        Q.  Okay.  Should I go ahead and refer to you as
14   Officer Smith?
15        A.  That's fine.
16        Q.  I briefly introduced myself off record, but
17   my name's Nick Lutz.  I'm the attorney for the
18   plaintiffs in this case which are Patrick Harmon, Tasha
19   Smith, and the Estate of Patrick Harmon Sr.
20            Can you please state and spell your name for
21   the record.
22        A.  My name is Kris Smith and it's spelled
23   K-r-i-s, last name is S-m-i-t-h.
24        Q.  And have you ever been deposed before?
25        A.  Yes.  Once.
```

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1196   Page 3 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                    5 to 8

Page 5

1    Q.   Okay.  So a lot of this is going to be
2  familiar to you, but I want to go over sort of the
3  protocols first, so there are just a couple of ground
4  rules, the most important being that because we have a
5  court reporter here taking down everything that we say,
6  it's important that we don't talk over each other.
7        So I will wait for you to finish your answer
8  before I start asking another question and if you could
9  do the same, wait for me to finish the question before
10 you answer, that will be very helpful.
11   A.   Okay.
12   Q.   Along the same lines, it's important that we
13 give verbal answers for every question.  So things like
14 nodding or mm-hms don't come across on the transcript
15 well, so using yes, no, and verbal language is
16 important.
17   A.   (Nods head.)
18        Okay.
19   Q.   If you don't know the answer to something I
20 ask, just tell me.  It's perfectly okay if you really
21 don't know.  I'll try to take breaks pretty regularly.
22 I think we're only scheduled for half day today, so I
23 don't think you're in for the long run, but all the
24 same, it's, you know, we'll take breaks as needed.  If
25 you want to take a break at any time, just say so and

Page 6

1  we'll do it.  The only exception to that is if there's
2  a question pending.
3        Your attorney, Ms. Nichols, will probably
4  occasionally object to some of the questions I ask.
5  Generally speaking, you can just still answer the
6  question.  The exception to that is if she instructs
7  you not to answer, that will happen usually in matters
8  of privilege like attorney-client privilege.  As a
9  general rule, I don't ever want to know conversations
10 that you have had with Ms. Nichols or any of your other
11 lawyers in this matter.
12        You've testified in court before; correct?
13   A.   Yes.
14   Q.   And you understand that the oath that you
15 took is the same oath that you would take in a criminal
16 court to tell the truth under penalty of perjury?
17   A.   Yes.
18   Q.   Okay.  And are you suffering from any
19 illnesses or medical conditions that might make it
20 difficult to testify today?
21   A.   No.
22   Q.   Under the influence of any medications or
23 anything of that nature that would make it difficult --
24   A.   No.
25   Q.   -- to remember?

Page 7

1    A.   No.  None at all.
2    Q.   Okay.  Can I ask you what you did to prepare
3  for your deposition today?
4    A.   I met with our attorney and re -- not rehash,
5  but reviewed everything from the events from that
6  night.
7    Q.   Okay.  Did you review any documents?
8    A.   No.
9    Q.   Did you speak to anyone other than
10 Ms. Nichols?
11   A.   In preparation for this?
12   Q.   Yeah.
13   A.   No.
14   Q.   Neither of the other officers?
15   A.   No.
16   Q.   And by that I mean Officers Fox or Robinson.
17   A.   Yeah.  No, I haven't spoken to any of them in
18 preparation for this.
19   Q.   Okay.  You said you had been deposed once
20 before.  What was that case?
21   A.   It was a traffic accident.
22   Q.   And what was your role?
23   A.   I was the investigating officer.
24   Q.   Okay.  And so there was a civil case that
25 came out of that?

Page 8

1    A.   Correct.
2    Q.   Okay.  When was that?
3    A.   I don't remember, but easily five, six years
4  ago.
5    Q.   Okay.  Do you recall what court?
6    A.   It was here in Salt Lake.
7    Q.   Do you have any idea what the outcome of the
8  case was?
9    A.   I do not.
10   Q.   You mentioned that you have testified before
11 as a witness in criminal court.  How many times would
12 you say you've done that?
13   A.   I don't know.  Too many.
14   Q.   I'm guessing it's a lot.
15   A.   Yeah.  A fair amount.
16   Q.   How long were you with the SLCPD?
17   A.   Six years.
18   Q.   Okay.  So would you say you've testified in
19 hundreds of cases?
20   A.   Potentially.
21   Q.   And then any other -- have you given any
22 other testimony as a witness?
23   A.   Just in criminal cases and then that one
24 deposition.
25   Q.   Okay.  So you mentioned that you had met with

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1197   Page 4 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    9 to 12

Page 9

1  Ms. Nichols to kind of review or rehash sort of the
2  circumstances of this case.  Have you read the
3  Complaint?
4      A.   No.
5      Q.   Have you read any of the legal filings?
6      A.   No.
7      Q.   Or listen to any of the hearings?
8      A.   I have not.
9      Q.   What is your understanding of what the
10 primary allegations of the case are?
11     MS. NICHOLS:  Objection, vague.
12         You can answer.
13     THE WITNESS:  From what I understand, that we
14 violated Mr. Harmon's rights and the family is suing
15 over the alleged violations.
16     Q.   (BY MR. LUTZ) Okay.  And you understand that
17 you're not a defendant?
18     A.   Yes.
19     Q.   Okay.  And do you know what conduct is
20 alleged to have violated Mr. Harmon's rights?
21     A.   I'm going to assume that it was when Officer
22 Fox shot him.
23     Q.   Okay.  I'd like to talk to you a little bit
24 about your background as a law enforcement officer.
25     A.   Okay.

Page 10

1      Q.   Was Salt Lake City Police Department your
2  first law enforcement job?
3      A.   It was not.
4      Q.   When did you enterer law enforcement?
5      A.   2008.
6      Q.   And in what capacity?
7      A.   I worked for the Salt Lake City Sheriffs
8  Office as a correctional officer.
9      Q.   Okay.  And how long did you stay in that
10 position?
11     A.   Six years.
12     Q.   And were you ever promoted?
13     A.   No.
14     Q.   When did you move on?
15     A.   That would be 2014.
16     Q.   What made you decide to do that?
17     A.   Money.  Moved to Salt Lake City Police
18 Department.  They were paying better, better
19 opportunities.
20     Q.   Okay.  Did you like being a police officer
21 more than a corrections officer?
22     A.   Yes and no at the same time.  There's
23 differences.
24     Q.   Yeah.  Can you tell me anything about that?
25     MS. NICHOLS:  Objection, vague.

Page 11

1      THE WITNESS:  It would -- they're different jobs,
2  so it's hard to explain.  They each have their own
3  function, and one has different opportunities than the
4  other, and they're just kind of different roles.  So
5  there were things I liked about being a correctional
6  officer, there are things that I didn't like, and the
7  same goes for being out on the road.
8      Q.   (BY MR. LUTZ) What facility did you work for
9  as a --
10     A.   The Salt Lake City correctional facility.
11     Q.   Okay.  The reason I ask is just I know that a
12 lot of correctional officers get tired of being in the
13 facility all day every day, that sense of confinement.
14 I'm sort of curious if you experienced that.
15     A.   I was lucky because I was able to move around
16 in different positions within the facility, so it
17 wasn't, you know, it wasn't really confined because I
18 was able to have a little bit more movement than most.
19     Q.   Okay.  Do you recall which positions you
20 held?
21     A.   I was housing officer, I was a booking
22 officer, booking/intake officer, and then I was a video
23 arraignment officer, and also IS liaison officer.
24     Q.   And were you ever involved in any of those
25 capacities in, like, inmate disciplinary matters?

Page 12

1      A.   No.
2      Q.   Okay.  Did you ever have any complaints filed
3  against you by inmates?
4      A.   By the inmates, not that I recall.  I know I
5  had one complaint filed after somebody was released
6  from jail, but not that I'm aware of of anybody in
7  custody.
8      Q.   What was the nature of that complaint?
9      A.   It was that I cut a gentleman's dreadlocks.
10 He had some beads that were the size of softballs and
11 the -- the rules of the facility are you can't take
12 anything that was -- can be used as a weapon into the
13 facility.  And the individual was intoxicated, was
14 fighting with us, and because of that I removed his two
15 beads that were, again, the size of softballs, put them
16 in his property bag, and he filed a complaint that I
17 cut his hair.
18     Q.   Okay.  How did you cut the beads out?
19     A.   Just with a pair of scissors.  Cut them right
20 above the top so that I could remove them and . . .
21     Q.   Was this inmate just coming into the
22 facility?
23     A.   Correct.
24     Q.   Okay.  And there was a physical altercation?
25     A.   I wouldn't really call it a physical

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1198   Page 5 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                          13 to 16

Page 13

1  altercation.  He's still in handcuffs.  We had to use
2  force to hold him against the wall to complete the
3  search, but, you know, there were no strikes or
4  anything like that.
5      Q.   How many other corrections officers were
6  present?
7      A.   I don't remember, but easily three.
8      Q.   Do you remember their names?
9      A.   I don't.
10     Q.   Sorry.  Will you remind me what year you
11  moved on to Salt Lake City Police Department.
12     A.   2014.
13     Q.   Okay.  And what was your original capacity
14  with that department?
15     A.   Patrol officer.
16     Q.   And did you change positions every time?
17     A.   I did.
18     Q.   Can you kind of walk me through your
19  progression there.
20     A.   I was a patrol officer, and then I was
21  assigned to the bike patrol squad, and then after I
22  left the bike patrol squad.  I was assigned to canine
23  squad.
24     Q.   Do you recall the approximate time frames of
25  those positions?

Page 14

1      A.   I don't remember when I got assigned to the
2  bike squad.  It was probably after I'd been there about
3  three years.  I was on the bike squad for about a year,
4  and then was about two years, just under two years on
5  the canine squad.
6      Q.   Okay.  What are the differences in those
7  positions?
8      A.   Between?
9      Q.   Let's say the bike squad and the canine
10  squad.
11     A.   Their job rules.  So the bike squad's primary
12  function was patrolling the parks like Liberty, Liberty
13  Park, Sugar House Park, some of the bigger parks that
14  don't have a lot of access by vehicle, and so we were
15  assigned bicycles to ride through the different parks
16  and patrol those areas.
17     Q.   Okay.  Are you still functioning as a patrol
18  officer in that capacity or is there a difference?
19     A.   So the only difference is we're not call
20  responsive like the regular patrol officers were.
21     Q.   Can you explain what that means.
22     A.   So the call responsive means that the patrol
23  officer, if somebody calls 911, says I need this
24  assistance, that patrol officer gets assigned that call
25  and has to respond to that specific location and

Page 15

1  address whatever that situation was.
2           The bike patrol officers, unless it was a
3  call that specifically occurred inside one of the
4  parks, we were not answering those calls for service
5  because our primary job was to be proactive and
6  essentially be visible through the parks and help in
7  those capacities.
8      Q.   I see.  So you were on the bike patrol first,
9  then you said canine patrol?
10     A.   Correct.
11     Q.   Which I assume means you were in a car with
12  one of the canine officers?
13     A.   Yeah, correct.
14     Q.   Same canine the whole time?
15     A.   Same canine.
16     Q.   Do you remember its name?
17     A.   Goose.  It started out with -- I started with
18  T-bone.  His name was T-bone.  He was a blood hound.
19  He was older and ended up retiring him, then was given
20  a single purpose narcotics detection dog.  He was a
21  little Jagdterrier terrier (indicating).  His name was
22  Dante.  And then I traded my sergeant because my
23  sergeant was not using his patrol dog, and so he took
24  Dante and then I took his patrol dog named Goose and
25  handled Goose.

Page 16

1      Q.   Goose was quite a handful?
2      A.   Yes.
3      Q.   I imagine that was probably difficult to --
4      A.   It's a lot of work.
5      Q.   -- let him go.
6      A.   Yeah.  It's a lot of work.
7      Q.   Maybe you don't feel that way, but I'm
8  assuming you're a dog person if you love working with
9  the canine unite.
10     A.   I am.
11     Q.   So were all those dogs specifically narcotic
12  detection dogs?
13     A.   So T-bone was not a narcotics detection dog,
14  he was a tracking dog, so his only job was to find
15  people.  Dante was that single purpose narcotics
16  detection dog and then Goose was a dual purpose dog.
17  He was used for narcotics and also patrol work, so
18  anything from searching for people, searching for
19  articles, apprehension if needed.  He was kind of the
20  Jack of all trades.
21     Q.   When you say apprehension if needed, is
22  that -- what does that mean?
23     A.   It means letting the dog physically apprehend
24  the suspect or prevent him from either fleeing or
25  fighting any further.

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID.1199  Page 6 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022
17 to 20

Page 17

1    Q.   Did you ever have to do that?
2    A.   Yes.
3    Q.   How many times?
4    A.   Three.
5    Q.   And, similarly, did any of them ever help you
6    track down a suspect?
7    A.   Yes.
8    Q.   How many times would you say?
9    A.   Easily triple that amount.
10   Q.   That's pretty impressive.  Were you involved
11   in the training at all?
12   A.   Yes.
13   Q.   What did that entail?
14   A.   A lot of work.  A lot of our primary focus is
15   finding people because 95 percent of the time the dogs
16   were used as a search tool to try and locate somebody
17   and so there was -- most of our training involved us,
18   the handlers, going to someplace and hiding and then
19   waiting and letting one of the other handlers use their
20   dog to try and locate us.
21   Q.   What's the method that they used?
22   A.   The method as far as?
23   Q.   Well, I have a vague understanding from TV
24   and movies that you give clues about the suspect or
25   individual that you're looking for like scent.  Is that

Page 18

1    right?
2    A.   Yes and no.  So there's people that buy into
3    the scent article theory and there's a lot of people
4    that don't.  It's pretty hard to get -- to teach a dog
5    to be called what's -- what is called scent
6    discriminatory, meaning I give the dog a specific item
7    that belonged to the individual and that's the only
8    odor that he's supposed to track.  It's pretty
9    difficult to teach a dog that.
10        Most of our dogs, not most but all of the
11   Salt Lake dogs were not scent discriminatory meaning
12   that they -- we'd get into an area and we would say
13   hey, where's the last known direction that this person
14   went and they, you know, would give us a direction and
15   that's the direction that we let the -- allow the dog
16   to go, and then the dog would just eventually pick
17   in -- pick up on different odors and we'd have to go
18   through all those odors and identify, you know, if we
19   find too many people, you know, it's going to be
20   incredibly difficult to say well, this is the guy that
21   ran or this is the guy that ran.
22        But typically we're using them in the middle
23   of the night and you're going to find one person hiding
24   underneath a car or in a back yard or something and the
25   dog takes you to them.  That's usually going to be the

Page 19

1    individual that you're looking for.
2    Q.   I see.  Okay.  So you eventually moved on
3    to -- was the canine patrol your last position?
4    A.   Yes.
5    Q.   And why did you move on from Salt Lake City
6    Police Department?
7    A.   Poor leadership.  That's the short answer for
8    it.
9    Q.   When was that?
10   A.   That would be 2020.
11   Q.   And when you say poor leadership, who are we
12   talking about?
13   A.   The chief.
14   Q.   And who was that at the time?
15   A.   Mike Brown.
16   Q.   What was it that you found poor about his
17   leadership?
18   A.   His lack of spine.
19   Q.   Can you elaborate?
20   A.   So he would -- he would never make a decision
21   and stand by it.  He would always try to -- he very
22   much, for lack of a better term, it was a forked
23   tongue.  He would tell you what you wanted to hear, but
24   then any time that he took some sort of action, he
25   would do something completely different.

Page 20

1    Q.   Can you give my any examples of that?
2    A.   Well, before I left he stood and was involved
3    in a river res -- I was involved in a river rescue.  He
4    stood and said that me and the other officers that were
5    involved were the epitome of what every Salt Lake City
6    officer should be and that if we all the officers
7    strive to be like us, then Salt Lake is going to be a
8    phenomenal department.
9         And, literally, two weeks later he stood and
10   said that I was the stain on the department because we
11   had one of the canine handlers get charged with an
12   aggravated assault, and he -- the chief lumped us all
13   into the same boat as that officer.  And when
14   confronted, I tried to confront him about his
15   statements, and he was like didn't want to deal with
16   it, was very -- avoided me, and so I was like I'm out,
17   I'm not -- you can't pick both sides and tell me that
18   I'm both sides without some sort of justification.  So
19   I decided to leave.
20   Q.   Do you remember the name of the officer, the
21   other canine handler that was charged with the assault?
22   A.   Nick Pearce.
23   Q.   Did you have anything to do with that
24   assault?
25   A.   Nope.

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID.1200  Page 7 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    21 to 24

Page 21

```
 1     Q.   Why do you think that Chief Brown lumped you
 2   in together?
 3     MS. NICHOLS:  Objection, calls for speculation.
 4     THE WITNESS:  I have no idea why he would.  That
 5   would be a question for him.
 6     Q.   (BY MR. LUTZ) Was that the only incident with
 7   Chief Brown that was part of your motivation to leave
 8   the department?
 9     A.   There were many others, but that was the
10   final straw.
11     Q.   Can you tell me about any of the others?
12     A.   I don't remember any of them specifically.
13   It was conglomerate of several things over, but very
14   similar circumstances.  He would, you know, say hey,
15   you're doing a great job and then turn around and
16   bad-mouth you right after, so got tired of it.
17     Q.   Was Chief Brown the acting police chief your
18   entire time with SLPD?
19     A.   No.  We had — I had one other police chief
20   and he left, and then Brown became interim, and then
21   the permanent chief.
22     Q.   Who was the previous chief?
23     A.   Burbank.
24     Q.   And from your perspective, did the department
25   change in any way when Chief Brown took control?
```

Page 22

```
 1     MS. NICHOLS:  Objection, vague.
 2     THE WITNESS:  Yes and no.  I mean fundamentally it
 3   was the same.  I would say it was — it'd probably be a
 4   little bit worse just from the lack of support from the
 5   administration after Brown took over.
 6     Q.   (BY MR. LUTZ) It sounds like you're sort of
 7   talking about a cultural change.  Is there any truth to
 8   that from your perspective?
 9     A.   I guess you could say that, but yeah, you
10   know, a cultural change, and we had — when Mike Brown
11   took over, there was large amounts of officers that
12   left and I just don't think he knew how to handle it
13   appropriately.
14     Q.   Did you have any previous experience with
15   Mike Brown before he became chief?
16     A.   I think he was — I can't remember if he was
17   captain or deputy chief before that.  I don't remember
18   his exact position.
19     Q.   Was he ever your supervisor?
20     A.   Not directly, no.
21     Q.   Speaking of that, can we go back and just
22   have you help me with something fundamental.  I'm sure
23   this is on the org chart, but can you describe for me
24   how the supervisory structure works?
25     A.   So your patrol officers report to a sergeant.
```

Page 23

```
 1   That sergeant — essentially there's two different
 2   lieutenants they can report to.  The on-duty lieutenant
 3   which is called watch commander.  And then at the time
 4   the city was broken up to an east and west division,
 5   you had — the west was called the Pioneer Precinct,
 6   you had a Pioneer lieutenant, and then the east is the
 7   Liberty Precinct and then you had the Liberty
 8   lieutenant.
 9     Above them were captains respectively over
10   each side of town and then you had a — they changed it
11   a couple times, how they worded it, but then you had
12   like a deputy chief that was over like the patrol
13   bureau and then you had a deputy chief like over the
14   investigations bureau.  And then above that was the
15   assistant chief and then the chief.
16     Q.   Okay.  Thank you.  What is the relationship
17   between the Unified Police Department and the SLCPD?
18     MS. NICHOLS:  Objection, vague.
19     Q.   (BY MR. LUTZ) Let me give you some context.
20   So in the investigation of the Harmon matter, for
21   example, which is the only investigation I've ever
22   looked into involving the SLCPD, the Unified Police
23   Department appears to have carried out a lot of
24   investigation, basically.
25     A.   Yes.
```

Page 24

```
 1     Q.   A lot of interviews, a lot of the crime scene
 2   processing, and so I'm just wondering is that standard
 3   procedure that — is there a contractual relationship?
 4     A.   So the way that Utah operates is that any
 5   time that there's a critical incident like this case
 6   that me working for Salt Lake City cannot investigate
 7   it, you know, for obvious reasons.  So the county has
 8   an agreement that if one agency is involved, then they
 9   get — they get another agency to do the formal
10   investigation of it.
11     And as far as I understand it, it's kind of
12   like a rotation, so all of the major agencies, West
13   Valley, Unified Police Department, Salt Lake City, and
14   they're — as one of these incidents occurs, whoever is
15   on top of that list is the agency that comes in and
16   investigates it unless it involves that agency.  Then
17   one of the other ones will come in and do it.
18     Q.   Okay.  Thank you.  That's helpful.
19     Do you know what their geographic
20   jurisdiction is; UPDs?
21     A.   The County of Salt Lake.
22     Q.   Okay.  So while Salt Lake City's limited to
23   the city limits, Unified is —
24     A.   Correct.
25     Q.   — just like a sheriffs department?
```

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1201   Page 8 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                    25 to 28

Page 25

1   A.   Yeah.  So they used to be the Salt Lake City
2   Sheriffs Office and then eight, ten years ago they
3   separated from the sheriffs office and created their
4   own police department.
5   Q.   Okay.  Do you know why?
6   A.   Money.  I think that was the biggest factor.
7   The sheriff at the time was trying to get more funding
8   for everything and the county council at the time
9   wasn't giving him any sort of funding, and so he pushed
10  to separate the sheriffs office and create the Unified
11  Police Department so that they could get more funding.
12  Q.   Okay.  Is the sheriff elected?
13  A.   Yes.
14  Q.   What was the highest rank that you attained
15  at the Salt Lake City Police Department?
16  A.   Officer.
17  Q.   And what year did you say you moved on?
18  2020?
19  A.   2020.
20  Q.   Where are you now?
21  A.   Weber County Sheriffs Office.
22  Q.   Where about is that?
23  A.   North of here probably 40 miles, 50 miles.
24  Q.   And what's your position?
25  A.   I'm a corporal.

Page 26

1   Q.   How are you liking it?
2   MS. NICHOLS:  Objection, vague.
3   THE WITNESS:  It's different.
4   MR. LUTZ:  Too late.
5   THE WITNESS:  It's different.  It's not as busy as
6   Salt Lake, but it's -- it's much more mellow up there.
7   Q.   (BY MR. LUTZ) So I imagine Salt Lake City is
8   the busiest highest volume law enforcement agency in
9   the state.  Do you think that's right?
10  A.   One of them.
11  Q.   You probably worked in the most intense
12  environment here?
13  A.   Yeah, I would say between Salt Lake, West
14  Valley City and Ogden City, they're all pretty similar
15  call volume wise and for the types of incidents that
16  they have to deal with.
17  Q.   Do you have any plans to return here?
18  A.   Not at the moment.
19  Q.   And when you were an officer here, did you
20  live in the city?
21  A.   No.
22  Q.   Where were you living?
23  A.   The south end of Salt Lake County.
24  Q.   Going back to your time as an officer here, I
25  guess starting with bike patrol, can you walk me

Page 27

1   through what an average day looked like.
2   A.   Average day would be we'd attend briefing.
3   If we -- oftentimes we'd get assigned different tasks.
4   If they had a transient camp that popped up in one of
5   the parks or something, we would be tagged to go down,
6   make contact with the transients, try and get them to,
7   you know, get involved with the different resources
8   that are available to them, and then potentially look
9   for any sort of criminal violations and address those
10  as needed.
11  If we didn't get assigned a specific task
12  like that, then we'd get on our bikes and we'd ride to
13  Liberty Park or we'd ride to Sugar House Park or we'd
14  go up to the east bench along all the bike trails and
15  we would just patrol those areas until otherwise
16  needed.
17  Q.   Being on the bikes, what would you do if you
18  needed to make an arrest?
19  A.   Call for patrol to assist.  If we were close
20  enough, let's say -- typically we would drive our cars
21  with our bikes.  Let's say we went to Liberty Park.  We
22  would park our cars at Liberty Park and then we'd ride.
23  And then if we made an arrest that needed us to take
24  somebody to jail, then one of our bike patrol guys
25  would go back and get his vehicle, drive it over, and

Page 28

1   then we would get in ours.  But if we were up -- if we
2   went from Liberty Park to Sugar House Park and then
3   down, you know, up towards Foothill and our cars were
4   still at Liberty Park, we would call for patrol to come
5   and help us with the transport to the jail and we would
6   just meet that officer at the jail.
7   Q.   Okay.  Did you have a partner while you were
8   in bike patrol?
9   A.   We didn't have assigned partners, but
10  typically we always made sure that we were riding in
11  pairs.
12  Q.   In an average week in the bike patrol, how
13  many arrests were you making on average?
14  A.   Custodial arrests or citations?
15  Q.   I suppose first one, then the other.
16  A.   Custodial arrests maybe -- maybe two or three
17  in a week.  Citations daily.  You know, it really
18  depends on -- depended on the volume of who's in the
19  park and what we were dealing with that day, so I don't
20  know an exact number for that.
21  Q.   Sure.  Yeah, I'm just trying to get a general
22  kind of understanding.  What sort of things were you
23  citing folks for?
24  A.   Trespassing, smoking in the park, possession
25  of narcotics, drug paraphernalia, open containers,

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID.1202  Page 9 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                29 to 32

Page 29

1  minors in possession of alcohol.  Yeah, a lot.
2      Q.   So in 2017 you were not on the bike patrol
3  and not on canine patrol; right?
4      A.   Correct.
5      Q.   What was that position or capacity called?
6      A.   Patrol Officer.
7      Q.   Can you walk me through an average day as a
8  patrol officer.
9      A.   Again, go to -- go to briefing.  We would
10 receive any sort of information from the previous shift
11 from our supervisors.  And then there was always calls
12 pending and the sergeant would kind of direct us and
13 say let's take care of this specific call, whatever it
14 was, it's been handling a long time.  You know, whoever
15 area that is, I need you to go to that one first.  And
16 then he'd release us from briefing and we'd start
17 handling all the calls for service.
18     Q.   Who was your sergeant at that time?
19     A.   Sergeant Hatch.
20     Q.   And was that your supervising sergeant?  Was
21 he your supervising sergeant the entire time that you
22 were in that patrol capacity?
23     A.   No.
24     Q.   How many times did that person change?
25     A.   Pretty much every bid.  So we would -- we

Page 30

1  would bid for our shifts every four months and most
2  often it was a new sergeant every single four months.
3      Q.   Okay.  That's a lot.
4      A.   Yeah.
5      Q.   Taking a step back, did you attend training
6  academy with Salt Lake City Police Department?
7      A.   Yes.
8      Q.   When was that?
9      A.   That would be 2014.
10     Q.   What did that entail?
11     A.   A lot of class time, a lot of scenario
12 training, a lot -- a lot that you can't really detail.
13     Q.   How long does the whole training academy
14 process take?
15     A.   The entire academy I think is like six
16 months.  After you complete the academy, then you're
17 assigned to a field training program and the field
18 training program is about another four months, four to
19 five months.
20     Q.   And what exactly is the field training
21 program?
22     A.   Well, you're assigned a senior officer and
23 that senior officer's sole job is to ride with you and
24 essentially teach you the correct ways to do it to make
25 sure that you're not doing things inappropriately and

Page 31

1  to kind of guide you on how to essentially be a police
2  officer.
3      Q.   In the training academy did they train you on
4  the policies contained in the police department
5  handbook?
6      A.   Yes.
7      Q.   All of them?
8      A.   I would like to say they trained us on all of
9  them, but they kind of gave us the policies and said
10 you need to know these, read them, and that was pretty
11 much it.
12     Q.   Have you read the SLCPD policy manual?
13     A.   The majority of it.
14     Q.   Did you review it periodically?
15     A.   Every so often, yeah.  They would give out --
16 they would say hey, this policy is changing and so they
17 would push out, send out an email saying, you know, you
18 need to acknowledge this policy that it's changed.  And
19 so the program that they used you could compare the old
20 policy to the new policy and see the changes, so you'd
21 go through and see what changed and then click that you
22 acknowledge that the policy has been changed.
23     Q.   In their training database, I assume?
24     A.   Yeah.
25     Q.   So I'm assuming that they trained on use of

Page 32

1  force --
2      A.   Yes.
3      Q.   -- is that correct?
4      A.   Correct.
5      Q.   Can you tell me what the training looks like
6  on use of force?
7      A.   In what regards, because there's everything
8  from, you know, defensive tactics to, you know, proper
9  positioning, to different arrest control techniques to
10 all the way up and including, you know, deadly force
11 and . . .
12     Q.   What is your understanding of what the policy
13 says -- what the Salt Lake City Police Department's
14 policy says about reasonable force?
15     MS. NICHOLS:  Objection, foundation.
16     THE WITNESS:  Okay.  So I don't understand your
17 question.
18     Q.   (BY MR. LUTZ) I may have to go back and
19 unpack this a little bit.  So there's a policy about --
20 or there's many policies about use of force --
21     A.   Correct.
22     Q.   -- in the policy manual.  And is there a
23 prohibition against unreasonable or excessive force?
24     A.   Yes.
25     Q.   According to the policy, what is unreasonable

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                              33 to 36

Page 33

1  or excessive force?
2       MS. NICHOLS: And I'm just going to object to the
3  extent that you're asking him to remember exactly what
4  the policy says and if you have it, we can take a look
5  at it.
6            But you can answer to the best of your
7  recollection.
8       THE WITNESS: Honestly, I don't recall what their
9  policy says. I would imagine that it's in regards to
10 excessive or unreasonable use of force. I do remember
11 that it -- other officers, if they see something that
12 they consider is unreasonable or excessive, they have
13 the duty to intervene, but I don't recall the exact
14 language that's written into the policy.
15      Q.   (BY MR. LUTZ) Were there any guidelines in
16 the policy as to what things should be considered
17 excessive or unreasonable?
18      MS. NICHOLS: Same objection.
19      THE WITNESS: Not that I recall. I know most of
20 the policy is based on Graham vs. Connor and they don't
21 go through and list a specific item for what they would
22 deem as excessive in the specific policy.
23      Q.   (BY MR. LUTZ) So there are no specific
24 situations detailed in the policy?
25      A.   No, not that I remember.

Page 34

1       Q.   And you said you were -- they're based on the
2  factors in Graham v. Connor?
3       A.   Correct.
4       Q.   Were you trained on the Graham factors?
5       A.   Yes.
6       Q.   Do you remember what they are?
7       A.   So the type of the crime that is alleged to
8  be committed and then the security -- not security, but
9  the threat to either the officer or the general public,
10 and then the individual has to be actively resisting
11 attempts to be taken into custody.
12      Q.   Okay. In your role now, are there policies
13 regarding unreasonable force?
14      A.   Yes.
15      Q.   Are they substantially different than the
16 policies that were implemented with the SLCPD?
17      A.   I would say they're pretty similar. I
18 haven't compared the verbiage word for word, but
19 fundamentally I would say they're the exact same.
20      Q.   Okay. What training did you receive at SLCPD
21 regarding how to make decisions as to what is
22 appropriate force in a given situation?
23      A.   In all of the defensive tactics, all the
24 arrest techniques. They put us through a lot of, for
25 lack of a better term, live action scenarios where, you

Page 35

1  know, we would be given the scenario and based off of
2  what the role player's response was to our stimulus,
3  then we would have to take that necessary action,
4  whatever it may be, whether it's simply putting
5  handcuffs on somebody or if it becomes a force on force
6  scenario to try and recognize that and deal with that
7  appropriately.
8       Q.   What is force on force?
9       A.   So, like, if somebody points a gun at you,
10 they don't necessarily want you pulling out a baton to
11 try and take them into custody. They want you to
12 protect yourself and those around you and use your
13 weapon the same as -- as they are because if somebody's
14 trying to kill you, then you have the ability to defend
15 yourself.
16      Q.   I see. Were you trained on -- scratch that.
17           It sounds like there was some sort of
18 proportionality factor --
19      A.   Sure.
20      Q.   -- in your training. Is it the higher the
21 threat, the higher -- the more reasonable it is to use
22 a greater degree of force? Is that accurate?
23      A.   Yes.
24      Q.   And in what circumstance can an SLCPD officer
25 use deadly force?

Page 36

1       A.   I would say that they can use it in any -- at
2  any time that they are -- they're in significant fear
3  for themselves, that their life is either about to end
4  or be seriously injured, or in the defense of others,
5  other officers, other -- the public, with those same
6  standards.
7       Q.   Have you ever had to employ deadly force?
8       A.   No.
9       Q.   While you were working as an officer with
10 SLCPD, what kind of gear were you carrying?
11      A.   On my vest and duty belt or?
12      Q.   Yes.
13      A.   Obviously my service pistol, I had a taser,
14 OC spray, handcuffs, and a first aid kit. Pens, paper.
15      Q.   Did you have a baton?
16      A.   I had one issued to me. I didn't carry it
17 most of the time because the policy was you either had
18 to have your -- you had to have one less than lethal
19 option and that was either -- or excuse me two. You
20 had taser, OC, or your baton. You had to have two of
21 those three somewhere on you, and typically I did not
22 carry my baton.
23      Q.   Because you carried the taser instead?
24      A.   I carried a taser and my OC spray.
25      Q.   On what side of your body was your service

Case 2:19-cv-00553-HCN-CMR Document 80-5 Filed 10/28/22 PageID 1204 Page 11 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                          37 to 40

Page 37

1  weapon?
2      A.   Right side.
3      Q.   And your taser?
4      A.   It was also on the right side.
5      Q.   Is that how most officers arrange that
6  equipment?
7      A.   It varies by officer.  So mine deliberately
8  was set on my right side so that if I was making that
9  conscious decision to retrieve my taser, I had to do it
10 with my nondominant hand, my left hand, and produce it
11 that way and use it that way.  That way there was —
12 for me in my head there was a distinction between I'm
13 pulling my pistol or I'm pulling my taser.
14     Q.   Based on the direction you had to reach
15 across your body?
16     A.   Correct.
17     Q.   Was it important to you to be able to access
18 your service weapon more quickly than your taser?
19     A.   Yes.
20     Q.   Did you see that among other officers as
21 well?
22     A.   That they wanted to access their pistol or
23 their taser or — I don't quite understand what you're
24 asking.
25     Q.   Other officers employing the same sort of

Page 38

1  thinking and arranging those on their bodies and that
2  the service pistol would be easier to draw closer to
3  the dominant hand than the nonlethal action like the
4  taser.
5      MS. NICHOLS:  Objection, calls for speculation.
6      Q.   (BY MR. LUTZ) I'm asking if you saw that
7  among other officers?
8      A.   I would say that it would be unwise to not
9  put your pistol next to your dominant hand.  Nobody —
10 there's not any officer out there that's going to cross
11 draw their pistol from their weak side, their
12 nondominant side.  So I would say almost everybody has
13 their service weapon on their dominant side, so whether
14 it's right or left.
15     Q.   So basically placed directly below the
16 dominant hand?
17     A.   Yeah, depending on where they position.  Some
18 position a little bit forward, some position a little
19 bit backwards.
20     Q.   Correct.
21     A.   But somewhere close to their dominant hand,
22 yes.
23     Q.   Okay.  Thank you.
24          Can we talk a little bit about — a little
25 more about tasers.  Do you recall the model or brand of

Page 39

1  the taser you carried?
2      A.   I don't remember the model.  I know that it's
3  a taser brand.  I think it's Taser International is the
4  company.  I don't remember exactly.
5      Q.   I'm going to hand you a document here which I
6  think we'll mark as Exhibit 1.
7          (Exhibit 1 marked.)
8      Q.   (BY MR. LUTZ) Okay.  So Exhibit 1 is labeled
9  Taser at the top.  It's the user manual for the taser
10 X26P CEW.  Do you see that?
11     A.   I do.
12     Q.   Does that model number look familiar to you?
13     A.   Yes.
14     Q.   And the image of the taser on the front of
15 the manual?
16     A.   Yes.
17     Q.   Do you believe that this was the brand and
18 model of the taser that you carried?
19     A.   It looks like it.
20     Q.   Okay.  Can you walk me through how the X26P
21 works?
22     MS. NICHOLS:  Objection, vague and calls for a
23 narrative.
24     THE WITNESS:  In regards to?
25     Q.   (BY MR. LUTZ) Suppose you have a suspect.

Page 40

1      A.   Okay.
2      Q.   We can —
3      A.   Sure.
4      Q.   — so we can nail it down better.
5          You have a suspect, you've determined there's
6  some need to use force, you've elected to go with the
7  nonlethal taser.  How does this work?  Does it — do
8  you fire it at a suspect?  Do you use the stun drive on
9  them?  Can you do both?
10     A.   So the short answer is yes, you can fire it
11 and you can also drive stun somebody.  When you fire
12 it, it produces two different probes.  The probes have
13 to make contact with the individual's body to complete
14 a circuit.  If one of those probes does not contact
15 with the individual, then the circuit is not closed and
16 the taser has absolutely no effect.
17          The way around that is if you have one probe
18 in the individual, then you can take the physical taser
19 and on the end of the taser there's two little, I don't
20 know what they're called, but they're little metal
21 connectors that you then can touch it on the lower
22 portion of the individual's body, or on the opposite
23 end of wherever that other connected probe is, and
24 deploy the trigger again and then that will close that
25 circuit causing the desired incapacitation effect.

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1205   Page 12 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                              41 to 44

Page 41

1    Q.   And what you're talking about there when
2    you're touching the actual pistol shape of the taser to
3    the subject's body, is that called the drive stun
4    function?
5    A.   Yes.
6    Q.   Can you use the drive stun function even if
7    you haven't deployed the prong function?
8    A.   Yes, you can, but that requires you to remove
9    the cartridge and then apply the taser to use the drive
10   stun.  If you still have the cartridge in, as soon as
11   you pull the trigger, the probes are going to go out
12   and so you can't -- if I try to -- tried to drive stun
13   her with that cartridge, then it's going to shoot both
14   of those probes in first and then do the drive stun
15   function.
16   Q.   The record should reflect --
17   A.   My attorney.
18   Q.   -- the gesture is towards Ms. Nichols.
19   A.   She was the closest individual.
20   MS. NICHOLS:  I don't know how I feel about that.
21   Q.   (BY MR. LUTZ) And as a clarification, when
22   you say the cartridge --
23   A.   Uh-huh.
24   Q.   -- does that refer to the tip of the taser
25   that contains the prongs?

Page 42

1    A.   Correct, it does.
2    Q.   And how many of those are there?
3    A.   The prongs or the cartridges?
4    Q.   The cartridges.
5    A.   Only one.
6    Q.   Are they single use?
7    A.   Single use.
8    Q.   Did you carry additional cartridges?
9    A.   Not on my person.
10   Q.   But it is reloadable?
11   A.   Yes.
12   Q.   And to your knowledge -- let me try to phrase
13   this correctly.  Does the taser itself maintain a
14   record of when and how it's used?
15   A.   Yes.
16   Q.   Is that called anything in particular?
17   A.   I know when they -- I don't know if it has a
18   specific name, but after any time that we -- for Salt
19   Lake City after any time that we used it, used the
20   taser, it required they called it a download.  They had
21   to download all the data from that taser, and it gives
22   them the duration.  I believe it gives them the date
23   and the time that it was used as well and for how long.
24   Q.   And when you say duration, to clarify, are we
25   talking about how long the current is being issued from

Page 43

1    the taser?
2    A.   Correct.  So the way that the taser functions
3    is that I deploy the trigger, it gives five seconds
4    that it runs its cycle.  After that five seconds, it
5    shuts off.  If the probes are still connected and --
6    you can pull the trigger again and it'll run an
7    additional five seconds.  If you hold the trigger down,
8    it will run in continuous and it won't stop that cycle
9    unless you loose the trigger.
10   Q.   Have you ever received training on what the
11   appropriate duration is with a suspect?
12   A.   Again, it goes back to, you know, that
13   reasonable.  It's all going to be -- we're taught that
14   it's going to be dependent on that specific set of
15   facts in that scenario, but we're also taught that if I
16   have to tase somebody four and five times, then I'm
17   probably using the wrong tool because if it's not being
18   effective, then why are we going to continue to use the
19   same thing over and over and over again when it's not
20   being effective.  We need to look for other options at
21   that point.
22   Q.   I see.  Broadly, what is the purpose of the
23   taser?
24   A.   Broadly it is to incapacitate an individual
25   so that we can take them into custody without having to

Page 44

1    fight them, you know, and prevent -- prevent injury to
2    them and prevent injury to the officers involved.
3    Q.   This may seem basic, but can you explain what
4    you mean by incapacitate?
5    A.   Make them unable to move.  The way that the
6    taser's designed is to -- it produces an electrical
7    current that causes motor dysfunction in the person's
8    body and makes it to where they are unable to
9    physically move their -- their extremities allowing us,
10   as the officers, to step in and move those extremities
11   for them and put them in handcuffs.
12   Q.   Okay.  Can you turn to page 4 of Exhibit 1.
13   A.   (Witness complies.)
14   4, okay.
15   Q.   You see here in the middle of the page it
16   describes what it's calling neuromuscular
17   incapacitation?
18   A.   Okay.
19   Q.   Is that what we're talking about?
20   A.   Yes.
21   Q.   And in the manual in the description of the
22   impact of neuromuscular incapacitation it says that
23   "Neuromuscular incapacitation occurs when a CEW is able
24   to cause involuntary stimulation of both sensory nerves
25   and the motor nerves.  It's not dependent on pain and

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1206   Page 13 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    45 to 48

Page 45

1  can be effective on subjects with a high level of pain
2  tolerance."
3         Going further down it says "A subject with a
4  very high tolerance of pain, e.g., a drug abuser, a
5  person with serious psychological distress, or a
6  trained focus fighter may not being affected by pain or
7  might be able to fight through the pain of a
8  traditional stun gun."
9         Is that all accurate to you?
10  **A.   In my experience, yes.**
11  Q.   Okay.  Hypothetically using a taser against a
12  suspect with a weapon, would the incapacitation
13  produced by a taser limit their ability to use that
14  weapon?
15  MS. NICHOLS:  Objection, calls for speculation.
16  **THE WITNESS:  In a hypothetical it should, but**
17  **it's also my experience that tasers fail more often**
18  **than they are successful.**
19  Q.   (BY MR. LUTZ) Okay.  Let's talk about that.
20  How many times have you deployed your taser against a
21  suspect?
22  **A.   When I was with Salt Lake, probably six to**
23  **eight times.  I don't remember an exact number.**
24  Q.   And what about in your other law enforcement?
25  **A.   In Weber, once.**

Page 46

1  Q.   Okay.  Any other times?
2  **A.   No.**
3  Q.   So approximately nine times.  How many times
4  would you say it failed?
5  **A.   About half of those.**
6  Q.   Can we talk through those?
7  **A.   I don't remember the majority of them, but I**
8  **would say, um I can tell you that the times that they**
9  **did fail it was -- the individuals were either**
10  **incredibly intoxicated off of some sort of narcotic or**
11  **alcohol and/or had ultra excessive baggy clothing.**
12  Q.   Okay.  Are any of the failures that you're
13  describing the result of one of the prongs missing the
14  target?
15  **A.   I did have one that the prongs missed, yes.**
16  **And he was -- he was a subject that was running from me**
17  **and I fired, and he decided he wanted to turn at the**
18  **same time, and only one of the probes connected.**
19  Q.   What's the range on the probes?
20  **A.   It depends on the cartridge.  There's some**
21  **cartridges that have 15 feet and there's others that**
22  **have 30 feet.**
23  Q.   What did you carry?
24  **A.   I think the ones Salt Lake issued were the**
25  **ones at 30 feet.**

Page 47

1  Q.   Were you ever trained on the appropriate
2  distance for considering using the taser as an option?
3  **A.   I don't recall anything specific about it,**
4  **but I would image, you know, they went over something**
5  **to the extent of anything over 30 feet, you're not**
6  **going to get a good connection.**
7  Q.   Right.
8  **A.   The other consideration is that both prongs**
9  **do not fire straight.  The lower prong is at an angle**
10  **and so the further you are away from that subject, then**
11  **the more likelihood that the prong is going to hit the**
12  **ground before it gets to the subject.**
13  Q.   Okay.  Going back to page 4 of the exhibit,
14  we have this little illustration under Neuromuscular
15  Incapacitation and we can see here that these lines
16  represent presumably the prongs.
17  **A.   Yes.**
18  Q.   Is that what you're describing, this
19  expanding angle --
20  **A.   Yes, correct.**
21  Q.   -- between the prongs as the distance
22  increases?
23  **A.   Right, because the desired effect -- to**
24  **obtain the desired effect for the taser, you have to**
25  **incapacitate large muscle groups.  So meaning that if I**

Page 48

1  deploy the taser and both prongs go in, but I only have
2  like a two to three-inch separation between those
3  prongs, I'm only going to get incapacitation in those
4  two to three inches which is going to be painful, but
5  it's not going to do that desired effect.
6         So what I'm looking for as far as
7  incapacitation is the first prong to go into one
8  location and the further, the wider I can get two,
9  three feet apart from that second prong is going to
10  allow a wider group of muscles to be affected,
11  therefore, in essence, making that taser more
12  effective.
13  Q.   So, ideally, something like one prong in the
14  chest, one prong in the thigh?
15  **A.   Yes.**
16  Q.   Do you know what CEW stands for?
17  **A.   It is controlled electronic something or**
18  **other.  I don't remember.  It's their nice way of**
19  **saying taser instead of -- because there's more than**
20  **one brand of taser.  Taser International owns the word**
21  **taser and so they're like controlled or conducted**
22  **energy weapons or something like that is what they're**
23  **actually called.**
24  Q.   Okay.  You can put Exhibit 1 away.
25  **A.   Okay.**

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID 1207  Page 14 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    49 to 52

Page 49

1       MS. NICHOLS:  We've been going a little over an
2   hour.  Can we take a break soon?
3       MR. LUTZ:  Yeah.  Absolutely.  Why don't we stop
4   and come back.
5       MS. NICHOLS:  Great.  Thanks.
6       (Recess taken from 10:10 a.m. to 10:24 a.m.)
7   Q.    (BY MR. LUTZ) Okay.  So we just got done
8   talking about tasers and their implementation and you
9   had mentioned earlier that you have never had to use
10  delayed force on the job.
11  A.    Correct.
12  Q.    Have you ever had to discharge your service
13  weapon?
14  A.    Only for putting down animals.
15  Q.    How many times has that occurred?
16  A.    Now that I'm in Weber, fairly often, but in
17  Salt Lake, I never had to put an animal down in Salt
18  Lake.
19  Q.    Did you otherwise have to draw your service
20  weapon?
21  A.    Yes.
22  Q.    How many times?
23  A.    Too many.  Fairly regularly, especially when
24  I went to the canine squad.  But starting out in
25  patrol, probably not nightly, but the further I got in

Page 50

1   my career, the more I used it with felony stops with
2   stolen vehicles and burglars and things like that
3   fairly regularly.
4   Q.    Would you say hundreds of times?
5   A.    Yeah.
6   Q.    And for a felony stop in particular, would
7   that be standard procedure?  If you had a felon who
8   stole a vehicle, you'd draw a weapon?
9   A.    Yeah, absolutely, because it's -- because of
10  the type of offense that you're using your -- you're
11  pointing your service pistol at them and giving them
12  commands to exit the car and taking them into custody.
13  Just because of the high hazard that it presents.
14  Q.    Other than the case that we're discussing
15  today, have you ever been present when another officer
16  has discharged a firearm?
17  A.    Yes.
18  Q.    How many times?
19  A.    I'm trying to think of -- I think the
20  majority of them I was there after the fact, but at
21  least one other that I was there as he was discharging
22  his firearm.
23  Q.    Do you recall what happened in that situation
24  specifically?
25  A.    It was a 911 call that was abandoned, meaning

Page 51

1   somebody called 911 and then hung up.  That same
2   individual texted her friend and said help me, he's
3   going to kill me, so the friend also called in and said
4   my friend sent me this text message.  And he -- she
5   didn't know the address, so we had to -- we were given
6   a -- every time you call 911, it gives you a geo
7   location, but it gives a range.
8       So we get the range and it was like a
9   thousand meters, so we showed up and we were just kind
10  of wandering through the apartment complexes trying to
11  hear as they were working on additional information.
12  One of the other officers found it, found the
13  apartment, heard a struggle, breached the window, and
14  saw an individual strangling his girlfriend.
15      He drew his pistol, gave her -- gave him
16  command to let her go, he did, he retreated, and then
17  came back around the corner, shot his girlfriend, and
18  then started shooting at officers, and they exchanged
19  gun fire with each other.
20  Q.    Was the suspect hit?
21  A.    Yes.
22  Q.    Do you know if they lived?
23  A.    He did.  Yeah, he did.
24  Q.    Were any of the officers hit?
25  A.    One.

Page 52

1   Q.    And was that survived?
2   A.    Yeah, he was hit in the leg.
3   Q.    Do you recall who these other officers were?
4   A.    The officer that was shot was -- his name was
5   Officer Miller and the one that was at the window with
6   me was Officer Simpson.
7   Q.    Okay.  And when about was this?
8   A.    2020.
9   Q.    You mentioned that in that scenario the
10  officer who was pointing his service weapon at the
11  suspect was issuing commands for that suspect to drop
12  his weapon.  Is that procedure something that's
13  prescribed by SLCPD policy?
14  A.    Again, I don't remember what the policy
15  specifically states, but it's -- the language is
16  somewhere along the lines of, you know, commands should
17  be given, if prudent, to try to gain that suspect's
18  compliance first.  It doesn't -- it's not a shall, you
19  know, always, because, again, you can't really plan for
20  every single situation.
21  Q.    And so in some situations it's just not
22  possible to issue a command?
23  A.    Correct.
24  Q.    What factors would affect your decision
25  whether or not to issue a command prior to using your

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1208   Page 15 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    53 to 56

Page 53

1  service weapon on a suspect?
2       A.   What the suspect is doing.  His behavior
3  before, his behavior during, and whatever threat he
4  presents.  You know, if we're going hypotheticals, I'm
5  on a traffic stop dealing with one individual and
6  another car stops and a gentlemen jumps out, produces a
7  pistol and goes to point it at me.
8       I may not have enough time to appropriately
9  recognize that threat and give him a command.  I may
10 only have enough time to recognize that's a gun, I'm
11 about to get shot, and draw my weapon and end that
12 threat before he's able to inflict harm to me or the
13 person that I'm on the traffic stop with.
14      Q.   I see.  Okay.  Suppose you're in a situation
15 hypothetically where you did have the opportunity to
16 tell an armed suspect to drop their weapon and they
17 comply.  What do you do next?
18      A.   If they --
19      MS. NICHOLS:  Sorry.  Objection, calls for
20 speculation.
21      THE WITNESS:  Again, dealing with a hypothetical,
22 the whole point of using force on somebody is to
23 determine their level of compliance.  If they now
24 become compliant, then my level of force is going to
25 lower to the appropriate level of resistance that they

Page 54

1  are doing.
2       So in this scenario, if I somebody produces a
3  weapon, I challenge them, say hey, drop it, and they
4  do, I'm going to continue to keep my pistol on them
5  while I am going to give them additional commands to
6  either move away from the weapon, go into a prone
7  position where I lay them -- have them lay on the
8  ground, and then once they're on the ground, have
9  additional officers approach and then take them into
10 custody all while holding some sort of lethal coverage.
11      Q.   (BY MR. LUTZ) What do you do with the weapon?
12      A.   After the person's in custody, secure it and
13 take possession of it.
14      Q.   Only after the person's in custody?
15      A.   Correct.  Because if he's -- we're going to
16 move him, try to remove him away from that -- that
17 item, whatever it is.  If it's a gun or a knife or a
18 chainsaw, whatever, we're going to try to give him
19 commands to move away from it.  If he doesn't, then as
20 we make that approach, an officer is going to have that
21 task to secure that weapon to make sure that he does
22 not have an opportunity to grab it again.
23      Now, in a perfect world we'd have, you know,
24 five, ten officers trying to take one person into
25 custody to eliminate any sort of contingency, you know,

Page 55

1  to have multiple contingencies going.  Your job is
2  this, your job is this.  But sometimes you're not
3  always able to secure that weapon until after that
4  individual is in custody.
5       Q.   I think you alluded to it, but can you tell
6  me again why it's important to move a suspect away from
7  the weapon that they were previously holding?
8       A.   So that they don't have an opportunity to
9  grab it and now pose a deadly threat again.
10      Q.   And would that be the same reason that you
11 would secure the weapon in your own possession?
12      A.   Yes.
13      Q.   And is this procedure dictated by SLCPD
14 policy and training?
15      A.   By policy, no.  Again, the training is -- is
16 very broad and they can only, you know, we can only
17 train for so many scenarios because we don't know all
18 of the variables that go into each scenario, so they
19 try to give us as much information as they can and say
20 best practice is this.  However, not every scenario is
21 going to fall within those best practice parameters.
22      Q.   Sure.  This particular scenario though is a
23 usual and recurring one, is it not?
24      MS. NICHOLS:  Sorry.  What particular scenario are
25 you talking about?

Page 56

1       MR. LUTZ:  Where you've disarmed a suspect and
2  then you need to take the suspect into custody and/or
3  secure their weapon.
4       THE WITNESS:  Again, you know, it's -- there's so
5  many other variables.  I would not say that it's
6  normal.  There are parts of it that are normal that,
7  you know, if that -- if we're unable to remove them
8  from that weapon, then we just kind of have to deal
9  with that and, you know, I may make an approach.  I may
10 not be able to get him, he's not compliant, he's not
11 moving away from that weapon, but he's compliant enough
12 that I feel like we can take him into custody.
13      As we make that approach, me securing it may
14 be as much as stepping on that weapon with my foot as
15 we manipulate his hands and take him into custody.  It
16 may not always be me physically picking it up and
17 putting it in a pocket or, you know, throwing it a
18 distance away.
19      MR. LUTZ:  All right.
20      THE WITNESS:  There's just a lot of variables that
21 go with that.
22      Q.   (BY MR. LUTZ) Sure.  But you have been
23 trained on specific scenarios where you're securing a
24 suspect's weapon that they've relinquished and taken
25 the person into custody?

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID 1209  Page 16 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                              57 to 60

Page 57

1    A.    Correct.
2    Q.    But there's no policy that addresses that
3 specific scenario?
4    A.    No.
5    Q.    Are there any policies that go into that
6 level of detail --
7    A.    Not that I know.
8    Q.    -- in a particular scenario?
9    A.    Not that I'm aware of.
10   Q.    Okay.  Let's talk about Patrick Harmon.  Do
11 you recall the events of August 13, 2017?
12   A.    Yes.
13   Q.    And what shift were you working?
14   A.    Graveyards.
15   Q.    And in your patrol capacity?
16   A.    Correct.
17   Q.    And what time is the graveyard shift?
18   A.    21:30.  Sorry.  9:30 p.m.
19   Q.    And what time does it end?
20   A.    At 07:30, so 7:30 in the morning.
21   Q.    Okay.  Can you walk me through what happened
22 around 10:00 p.m. that evening.
23   MS. NICHOLS:  Objection, vague and calls for a
24 narrative.
25   THE WITNESS:  That night we completed briefing and

Page 58

1 our assigned area was along State Street and the
2 Liberty area of the city, and I left the police
3 department and started driving to my area to start
4 patrolling.
5    Q.    (BY MR. LUTZ) Okay.  And prior -- so around
6 10:00 p.m. you come into contact with Patrick Harmon;
7 correct?
8    A.    Correct.
9    Q.    Prior to that had you made contact with any
10 other individuals, stopped anyone, written a citation,
11 anything of that nature?
12   A.    I had not.
13   Q.    Okay.  So what drew your attention to
14 Mr. Harmon?
15   A.    I observed that he was riding his bike south
16 along State Street, and he did not have a rear bike
17 light, and then he cut across all six lanes of traffic
18 without using a hand signal as required when riding in
19 the lanes of travel.  Then he started riding in front
20 of me.
21   Q.    Okay.  And you were driving in which
22 direction?
23   A.    South.
24   Q.    Do you recall which lane you were in?
25   A.    No, I don't.

Page 59

1    Q.    What did you do once you saw Mr. Harmon ride
2 across the lanes of traffic on his bicycle?
3    A.    I activated my overhead emergency equipment
4 and conducted essentially a traffic stop with him.
5    Q.    And to go back, is it a crime to not have the
6 bicycle taillight?
7    A.    Yes.
8    Q.    Do you know what level crime?
9    A.    I believe it's an infraction.  I don't
10 remember specifically, but I — it could be a
11 misdemeanor C which is the lowest level of misdemeanor,
12 but I'm fairly confident it's an infraction.
13   Q.    And what's the difference between an
14 infraction and a low-level misdemeanor?
15   A.    Low-level misdemeanor carries a penalty of
16 jail time and infraction does not.
17   Q.    Is an infraction sort of a way to describe a
18 civil offense?
19   MS. NICHOLS:  Objection, calls for a legal
20 conclusion.
21   Q.    (BY MR. LUTZ) Is it something that comes from
22 a municipal code?
23   A.    No.  So that one's actually a state code.
24   Q.    Okay.  I understand.  Okay.
25         Obviously we're going to go into what

Page 60

1 happened next.  I know that this is not fun to talk
2 about and I know you probably don't want to talk about
3 it, and I don't bring it up lightly, but it's, you
4 know, the entire reason we have this case and we're
5 here.  But I appreciate this is probably emotional for
6 you and I don't intend, through this line of
7 questioning to exacerbate that in a way that's
8 unnecessary in any way.
9         So going back, you used your -- did you say
10 you used your intercom to --
11   A.    My overhead emergency equipment.  So my
12 lights.
13   Q.    Okay.  Did you use your intercom at all?
14   A.    I don't recall.  I don't think so.
15   Q.    The reason I ask is because some of the
16 witness statements that were later collected by other
17 officers, one or two of them report that they think
18 they heard police on a loud speaker.
19   A.    I don't know.
20   Q.    Okay.  What happened after you activated your
21 emergency lights?
22   A.    I made contact with Mr. Harmon.  I identified
23 who I was and said -- explained to him the reasons that
24 I was making contact with him.
25   Q.    So he responded to your emergency lights by

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID 1210  Page 17 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022
61 to 64

Page 61

1  pulling over to the side of the street and stopping?
2      A.    Correct.
3      Q.    Okay.  Did he get off his bicycle at that
4  time?
5      A.    No.  He stayed on his bicycle.
6      Q.    Okay.  And which direction was your car
7  facing?
8      A.    South.
9      Q.    And was his bicycle facing the same
10 direction?
11     A.    It was initially when I turned on my lights,
12 he kind of stopped and kind of turned it so it would be
13 facing east towards the roadway.
14     Q.    Okay.  Do you recall any of the nearby
15 businesses that were there where you stopped?
16     A.    I can't think of the name, but I know right
17 where -- right in front of where we stopped it's a --
18 it's an old motel that is now subsidized housing for
19 homeless individuals, and we were right in front of
20 their east entrance just south of their -- their
21 physical driveway.
22     Q.    Okay.  Any other residences, businesses, in
23 that block that you recall?
24     A.    I don't remember the name of the business,
25 but I know we were just north of another brick building

Page 62

1  that was right on the street.  I don't remember all the
2  rest of the businesses that are now there.
3      Q.    Okay.  In the area where you stopped, was
4  that an area that you were regularly patrolling --
5      A.    Yes.
6      Q.    -- as an officer?
7            Is it a high crime area?
8      A.    Yes.
9      Q.    What sorts of things would you typically
10 encounter in this area?
11     A.    Everything from prostitution to narcotics,
12 stolen vehicles, robberies.  Pretty much everything
13 that you could -- you can potentially deal with, we
14 dealt with it.
15     Q.    And to your recollection, was there a lot of
16 homelessness in this area?
17     A.    It's Salt Lake, so yes.  But yeah, I mean,
18 there was homeless everywhere.
19     Q.    Do you recall specifically if there were ever
20 encampments or homeless folks living in tents around
21 this area?
22     A.    At that time -- I don't think there was any
23 at that time, but they would pop up.  There's a little
24 grassy knoll area and they would pop up and then the
25 managers and properties owners of the motel would come

Page 63

1  out and say hey, you gotta leave, and they would remove
2  them from their property.  I think at that point.
3  Usually during the winter, like the fall and the
4  winter, they wouldn't just because it's cold, but every
5  so often they would see it popped up.
6      Q.    Okay.  None present that night?
7      A.    No.
8      Q.    But possibly in the past?
9      A.    Yeah, in the past, but none that night.
10     Q.    Okay.  So you get out of your car, you
11 approach Mr. Harmon?
12     A.    Uh-huh.
13     Q.    Does he say anything to you?
14     A.    I don't remember what exactly he said, but I
15 asked him for the information -- his information after
16 giving him the reasons for the stop, and we went from
17 there, so.
18     Q.    Did you explain to him that you had stopped
19 him for a taillight infraction?
20     A.    Yes.  And for not signaling as he came across
21 the lanes of traffic.
22     Q.    And what was his demeanor in his response to
23 you?
24     A.    He was fairly calm with me.  He didn't seem,
25 for lack of a better term, upset.  I've experienced

Page 64

1  people that as soon as I pull them over, they're like
2  screw you, and it turns into profanity laced, you know,
3  interaction.  You know, I had no reason to believe that
4  he was angry with me or anything like that.
5      Q.    So he wasn't hostile towards you when you
6  stopped him?
7      A.    Not to me, no.
8      Q.    Okay.  What did he do when you asked him for
9  his information?
10     A.    He provided me with a name and then I asked
11 him for his date of birth.  And I also asked him for
12 his ID, but he stated that he didn't have it, and so I
13 took that information and went, that he did provide me,
14 and went to go try and verify who he was.
15     Q.    Do you recall which -- what the name was that
16 he gave you?
17     A.    I remember the first name that he gave me was
18 Peace.  I don't remember the last name what he gave me,
19 but it was, I want to say it was Peace Harmon, but it
20 was something very similar to Harmon.  I don't recall
21 exactly.  But I do remember that the first name that he
22 told me was Peace.
23     Q.    Okay.  What did you do after he gave you his
24 name and date of birth or told you, rather, that his
25 name was Peace and then gave his date of birth?

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1211   Page 18 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                              65 to 68

Page 65

1    A.    I went back to my patrol vehicle, I attempted
2  to verify that information through the state databases,
3  tried to find some sort of form of identification, who
4  he was and what his name was.
5    Q.    And were you successful in that effort?
6    A.    No.
7    Q.    What did you do next?
8    A.    I returned back to him, had him, again,
9  provide that information, had him verify spellings and
10  the date of birth and so that in the event, because we
11  are on the side of the road, if I misheard and I wrote
12  it down wrong or something like that, I want to afford
13  him that opportunity to, you know, correct me.  And he
14  provided me the information again and I again returned
15  to my car in an attempt to try and locate his ID or
16  some form of identification.
17    Q.    At some point you called for backup?
18    A.    Yes.
19    Q.    Was that before or after you were able to
20  identify Mr. Harmon in the database?
21    A.    Before.
22    Q.    Okay.  Why did you call for backup?
23    A.    Because based off of my experience, if
24  somebody -- I can tell somebody's lying to me by how
25  they avoid the types of questions.  Like if I were to

Page 66

1  ask you, you know, for your name and birthdate and your
2  social security number, you're going to be able to at
3  least identify what your social security number is.
4  It's pretty uncommon for people to either not know
5  their driver's license number or their social security
6  number.
7          And when he was unable to provide me with
8  his -- with an ID, without an ID number or his social
9  security number, for me that -- that raises red flags
10  that he's trying to conceal his identity and that more
11  than likely he's got some sort of warrant for his
12  arrest.
13    Q.    I see.  Prior to this date, had you ever
14  encountered Mr. Harmon before?
15    A.    I had not.
16    Q.    How did you contact back up?
17    A.    With my radio.
18    Q.    And how does that work?
19    A.    I push the button and say hey, send me an
20  additional officer.
21    Q.    And that puts a call out to -- is it
22  broadcast?
23    A.    Puts it over -- yeah, broadcasts it over the
24  air to -- typically I'm talking to dispatch, but it
25  broadcasts it at the exact same time, and then dispatch

Page 67

1  will, you know, say can any unit come back the other
2  unit.
3    Q.    Okay.  And can any officer respond to a call
4  like that?
5    A.    Yes.
6    Q.    And did any other officers respond?
7    A.    Yes.
8    Q.    Who were they?
9    A.    Officer Clinton Fox and Officer Scott
10  Robinson.
11    Q.    And did you know those officers beforehand?
12    A.    Yes.
13    Q.    How well?
14    A.    Pretty well.
15    Q.    Let's talk about Officer Fox.  Were you
16  friends with Officer Fox?
17    A.    Yes.
18    Q.    How long had you known him at that point?
19    A.    Since he started with Salt Lake City.  So I
20  don't remember when he exactly started, but I believe
21  it was 2015, so about two years, roughly.
22    Q.    Okay.  Did you work together?
23    A.    Yes.
24    Q.    How often?
25    A.    Every night.  We were on the same squad

Page 68

1  together.
2    Q.    So every night over the course of years?
3    A.    Yeah.
4    Q.    Did you spend time with Officer Fox socially?
5    A.    A few times.
6    Q.    How many would you say?
7    A.    Maybe two or three.  We just live so far
8  apart that it's kind of a pain in the butt to drive.
9    Q.    Okay.  So had you ever been to his house?
10    A.    Yes.
11    Q.    How many times would you say?
12    A.    I've been to his house once.
13    Q.    Had he ever been to yours?
14    A.    No.
15    Q.    Did you ever spend time together after work?
16  Anything like that?
17    A.    No.  Usually after we got off, we -- it was
18  bedtime.  We all just went home.
19    Q.    Okay.  But there was some social time that
20  you guys spent together over the years?
21    A.    Yes.
22    Q.    Okay.  And what about Officer Robinson?  How
23  well did you know him?
24    A.    Pretty well.
25    Q.    How long had you known him on the day that

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1212   Page 19 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    69 to 72

Page 69

1  we're talking about?
2      A.   So he used to work at the Salt Lake County
3  Jail with me and that's where I met him.  I don't
4  remember when he started down there, but since -- since
5  his employment with Salt Lake County.
6      Q.   Okay.  And did you ever spend time with
7  Officer Robinson socially?
8      A.   Yes.
9      Q.   How often?
10     A.   After we moved out of Salt Lake County,
11 fairly often because we moved -- ended up moving close
12 to each other.  We have kids that are the same age and
13 so our -- my kids ended up playing with his kids fairly
14 regularly.
15     Q.   Still friends?
16     A.   Yes.
17     Q.   How often do you see Officer Robinson today?
18     A.   Now maybe once every couple of months.  I
19 again moved and due to the difference, I'm going to
20 chew on that word too, difference in schedules and the
21 fact that I live more than an hour away from him, not
22 very often.
23     Q.   Okay.  Are your children still friends with
24 his children?
25     A.   Yeah.

Page 70

1      Q.   How old are your kids?
2      A.   They range from 6 to 14.
3      Q.   Okay.  How many?
4      A.   Four.
5      Q.   And what about Officer Robinson?
6      A.   He has -- he's got the two girls from his
7  previous marriage and then he's got a stepdaughter and
8  two stepsons on his wife's side.
9      Q.   Okay.  Going back to the night in question,
10 August 13th, you put the call in for backup.  Did
11 the -- did Officers Fox and Robinson respond to you
12 over the radio?
13     A.   I would imagine that they did because that's
14 how dispatch knows who's going where.  If nobody
15 responds, then dispatch would continue to ask until I
16 got somebody at least acknowledge that they were
17 coming.
18     Q.   Okay.  Do you have any sense that these --
19 that officers -- either Officer Fox or Robinson would
20 have responded to your call because they have a
21 personal relationship with you and they personally want
22 to come help you out?
23     MS. NICHOLS:  Objection, calls for speculation.
24     THE WITNESS:  Because we all work on the same
25 squad and we all work the same area.

Page 71

1      Q.   (BY MR. LUTZ)  And you said you were friends
2  at that point?
3      A.   Right.  But I would say that, yeah, any time
4  that any of us would call out, typically we were going
5  to go because we're the officers that know the area,
6  and in the event that I have to chase somebody down an
7  alley, they're the officers that know that area better
8  than anybody else and so they are best suited to come
9  and help.
10     Q.   Okay.  Which officer arrived first?
11     A.   I don't know.  I don't remember.  They were
12 both there pretty close to the same time.
13     Q.   Okay.  And what happened after they arrived?
14     A.   I continued to try and sort out Mr. Harmon's
15 information.  I re-approached him.  If I remember
16 correctly before they arrived, I re-approached him and
17 that's when he gave me his correct information.  And
18 then I returned to my car and as I was verifying his
19 identity, that's when they -- they arrived.
20          Officer Fox went up, made contact with him,
21 and Officer Robinson came to my window and, essentially
22 to gain information, and he asked me, he's like hey,
23 what do you got.  Explained to him what was going on,
24 that he was providing me with false information, I was
25 trying to figure out who he was.

Page 72

1          And then found his -- a recent booking photo
2  of him, found that he had an active second degree
3  felony warrant for aggravated assault with serious
4  bodily injury, told Officer Robinson that, and then
5  exited my car so that we could go take him into
6  custody.
7      Q.   Did your system tell you when that warrant
8  was issued?
9      A.   It would have.
10     Q.   Do you recall when?
11     A.   No.
12     Q.   Do you recall whether it was old?
13     A.   I don't.
14     Q.   Would that matter in your estimation?
15     A.   No.  I mean, the things that we're looking
16 for on the warrant is -- so it tells us active or
17 served.  If it shows up as served, that means that I
18 cannot arrest that individual because they've already
19 gone to the judge and addressed that warrant and the
20 court has not removed that warrant from the system yet.
21          If it shows its active, that means that the
22 judge wants to speak to this individual and they want
23 me to take him into custody.
24     Q.   Was it Salt Lake City Police Department
25 policy to arrest any individual that had an active

Case 2:19-cv-00553-HCN-CMR Document 80-5 Filed 10/28/22 PageID 1213 Page 20 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                              73 to 76

Page 73

1   warrant?
2       A.    No.
3       Q.    Can you explain how you would make that
4   determination.
5       A.    A lot of how would you make that
6   determination depends, (a), on the level of the crime.
7   So if you have a felony warrant, you are more than
8   likely going to be booked into jail on that warrant
9   regardless of what the offense was.  The caveat to that
10  is the Salt Lake City County Jail deals with a lot of
11  overcrowding issues, so oftentimes the jail will not
12  accept certain types of warrants.  However, if it's —
13  they will always accept a second degree felony or a
14  first degree felony warrant of any kind.
15      Q.    Okay.  Other than what the jail is telling
16  you about who they can and cannot accept, did you have
17  discretion in whether or not you arrest an individual
18  who had an active warrant?
19      A.    Yes.
20      Q.    What degree of discretion?
21      A.    If it's misdemeanor defenses, traditionally
22  like nonviolent like if you have a retail theft, that's
23  more like — depending on how many times you've been
24  convicted, it's usually a class B misdemeanor.
25  Something like that we're not going to take somebody

Page 74

1   and book them into jail.
2           The caveat is, you know, if I pull somebody
3   up and they have 10 different warrants all for the same
4   offense, then I may take that individual in.
5   Especially if I'm at the Wal-Mart and I'm rearresting
6   them on an additional offense and I look and I see hey,
7   they've got 10 misdemeanor warrants for all the same
8   offense, then yeah, I'm probably going to arrest that
9   person and take them and book them into jail.
10          If you pull over because you have a
11  taillight and you have that same one retail theft case
12  that's a warrant, I may — I may just advise you and
13  say hey, you do have a warrant out for your arrest,
14  it's with this court, you need to contact this court to
15  get it taken care, and — and release them.
16      Q.    So are you making an assessment on the
17  seriousness of the offenses presented?
18      A.    Yes.
19      Q.    So why did you decide to arrest Mr. Harmon?
20      A.    Because it was a second degree felony for an
21  aggravated assault.
22      Q.    Have you ever come across an individual with
23  that type of warrant and decide not to arrest them?
24      A.    No.
25      Q.    You believed that Mr. Harmon had lied to you

Page 75

1   earlier in the evening?
2       A.    Yes.
3       Q.    Did that upset you?
4       A.    No.
5       Q.    Did that have anything to do with your
6   decision to arrest him?
7       A.    Yes, because I've always taken the stance if
8   you're honest with me, then I'll be honest with you and
9   be more fair and forgiving if you're honest.  But early
10  in my career if you tried to conceal your identity and
11  lie to me about who you are, then you get booked into
12  jail.
13      Q.    Had Mr. Harmon just presented you a valid ID
14  with his accurate name on it initially, would you still
15  have arrested him?
16      A.    On that warrant, yes.
17      Q.    Okay.  Okay.  So you told Officer Robinson
18  that there was a warrant out and that you were going to
19  arrest Mr. Harmon?
20      A.    Correct.
21      Q.    Where was Officer Fox at this time?
22      A.    Still with Mr. Harmon.
23      Q.    And that's in front of your car with his
24  bike?
25      A.    Yes.

Page 76

1       Q.    Okay.  What's the distance there between the
2   car and the bike?
3       A.    I don't — I don't know.  I don't remember.
4       Q.    Was it less than 20 feet?
5       A.    I think so.  It didn't take me very long to
6   walk to him from my car, so I, mean, a rough number,
7   sure.
8       Q.    Okay.  Ten to 20 feet?
9       A.    Yeah.  Again, I don't remember.  It was
10  close.  If I'm conducting the stop, I want to — I've
11  always tried to give myself a little bit of space
12  because there's a reactionary distance, plus you're
13  taught that when you pull somebody over on a traffic
14  stop, your car needs to be positioned in such a way
15  that if somebody comes and rear ends you, that the car
16  doesn't come and — my car that's parked doesn't hit me
17  and, you know, who you're talking to.
18          So yeah, again, I don't remember the exact
19  feet.
20      Q.    Okay.  So you get out of the car on the
21  driver's side, obviously?
22      A.    Uh-huh.
23      Q.    Officer Robinson is on the passenger side of
24  the car?
25      A.    Uh-huh.

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                            77 to 80

Page 77

1    Q.    You walk up to Officer Fox, the bicycle, and
2  Mr. Harmon who's facing back towards you?
3    A.    Yes.
4    Q.    You told Mr. Harmon he has a warrant?
5    A.    Uh-huh.
6    Q.    Did you say anything else to him?
7    A.    I directed him, I said hey, you've got a
8  warrant, I need you to take the backpack off and put
9  your hands behind your back.
10   Q.    And how did he respond to that?
11   A.    He started to cry and I don't remember
12 exactly what he said, but along the lines of, you know,
13 don't do this.  Essentially, don't do this to me, man.
14 Again, reiterated it's nothing personal, just the judge
15 really wants to see you, you've got the warrant, and
16 again directed him to put your hands behind your back.
17   Q.    And he was wearing a backpack at that time?
18   A.    Correct.
19   Q.    Do you recall what else he was wearing?
20   A.    Not specifically.  I know he was clothed,
21 but, yeah, I don't -- I don't remember anything
22 specific about his clothing.
23   Q.    Okay.
24   A.    He did have a Mardi Gras necklace on.  I do
25 remember that.

Page 78

1    Q.    Like a beaded?
2    A.    Yeah.  It was a beaded with a clown on it.
3    Q.    Okay.  Okay.  So did you and either of the
4  other officers discuss how you were going to arrest
5  Mr. Harmon as in which of you is going to apply the
6  handcuffs, things of that nature?
7    A.    Discuss, no.  We'd worked around each other
8  long enough that if I'm -- if I'm the arresting
9  officer, then I'm going to be doing all that physical
10 work.  So placing the handcuffs on him is going to come
11 from me because I'm the one that's "arresting" him.
12   Q.    Were you the arresting officer?
13   A.    I would be, yes.
14   Q.    What is that based on?
15   A.    Whoever -- essentially whoever's going to
16 take the case and book them into jail.
17   Q.    Did you decide that that would be you because
18 you were the one to stop him in the first place?
19   A.    Yeah, that's typically how it goes is whoever
20 initiates the contact is traditionally going to be the
21 arresting officer.
22   Q.    Officer Fox is in front of Mr. Harmon?
23   A.    Uh-huh.
24   Q.    You walk around Mr. Harmon's right side?
25   A.    Yes.

Page 79

1    Q.    Officer Robinson walks around his left side,
2  Mr. Harmon's left side, so you and Officer Robinson are
3  now behind Mr. Harmon?
4    A.    Uh-huh.
5    Q.    You take Mr. Harmon's -- well, he removes his
6  backpack?
7    A.    Yes.
8    Q.    He's compliant in that way?
9    A.    Correct.
10   Q.    You take Mr. Harmon's right arm and move it
11 behind Mr. Harmon's back?
12   A.    Correct.
13   Q.    Officer Robinson does the same thing with his
14 left arm?
15   A.    (Nods head.)
16   Q.    Moves it behind Mr. Harmon's back, Officer
17 Robinson starts applying the handcuffs to his left arm
18 correct?
19   A.    I don't remember.  I do remember that I was
20 reaching for my handcuffs and it was when I touched my
21 handcuff case that he decided that he was going to
22 bolt.
23   Q.    So some seconds after you and Officer
24 Robinson pulled Mr. Harmon's hands behind his back,
25 you're beginning to apply the handcuffs, or at least

Page 80

1  Officer Robinson is, you are reaching for your
2  handcuffs, Mr. Harmon brings his arms back to the front
3  of his body and begins running away from you?
4    A.    Correct.
5    Q.    And where is Officer Fox in relation to
6  Mr. Harmon when that action starts?
7    A.    Still in front of him.
8    Q.    So Mr. Harmon runs directly away from you
9  past Officer Fox a short distance and then turns to his
10 own left; correct?
11   A.    Yes.
12   Q.    And effectively makes a 180-degree turn?
13   A.    I would say when he -- we're in the road, he
14 turns to his left and is now running west.  When he got
15 to the sidewalk, he began -- turned to his left and was
16 now running south.  So, I mean, 290, he's making 180
17 degrees, but yes.
18   Q.    Sure.  Exactly.  And during this time
19 Mr. Harmon has a cigarette in his mouth, a lit
20 cigarette?
21   A.    Yes.
22   Q.    So Mr. Harmon has made this wide 90-degree
23 turn, he's now facing Officer Robinson who's more or
24 less in front of him, you are in front of Mr. Harmon to
25 Mr. Harmon's left, Mr. Harmon runs south?

Case 2:19-cv-00553-HCN-CMR  Document 80-5  Filed 10/28/22  PageID 1215  Page 22 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    81 to 84

Page 81

1    A.    He runs south, but I think Officer
2  Robinson — so when he ran, I don't know where — how
3  Officer Robinson ended up, where he did, but after he
4  ran in between us all, I remember Officer Robinson
5  being behind him and — and it was me, Officer Fox, and
6  then Officer Robinson.  So I don't know how he ended up
7  there, but at some point Officer Robinson falls and
8  then that's when Mr. Harmon continues to run south.
9    Q.    Okay.  So Mr. Harmon runs south, Officer
10 Robinson ends up on his but on the grass to
11 Mr. Harmon's right?
12   A.    Correct.
13   Q.    During this time Officer Fox is reaching for
14 Mr. Harmon on his left side, Officer Fox draws his gun
15 about the same time you draw your taser.  Mr. Harmon
16 makes it past you about 12 feet?
17   MS. NICHOLS:  Objection.  Compound, vague and
18 ambiguous, assumes facts not in evidence, potentially
19 misstates evidence.
20         You can answer.
21   Q.    (BY MR. LUTZ) How far away was he?  How far
22 away from him, Mr. Harmon, were you when you released
23 your taser?
24   A.    When I drew my taser?
25   Q.    Uh-huh.

Page 82

1    A.    I have no idea.  Close enough that I felt
2  that it was going to be an effective tool, but yeah,
3  I — I honestly don't remember.
4    Q.    But we know it would have been between -- it
5  wouldn't have been more than 15 feet.  Or could it have
6  been up to 30 based on --
7    A.    It could have been up to 30, but I would say
8  it would be to the lower end of that spectrum because
9  at 30 feet the likelihood of that taser working
10 effectively is low, and so I don't think I would have
11 chosen that tool in that scenario.  If he was that far
12 out, I probably would have tried to gain distance on
13 him and then applied that tool.
14   Q.    If he's moving away from you and your goal is
15 to gain distance, would you stop and let him create the
16 distance?
17   A.    If I'm trying to — I guess I need to
18 rephrase.  Not gain distance, but close the distance to
19 get close enough to him that I can appropriately apply
20 that tool.  So if he starts out at 30 feet, I know that
21 my taser's going to be less than effective at that 30
22 feet, so I'm going to try to get closer to him maybe
23 20, maybe 15 feet, maybe 10 depending on how fast he's
24 running, how fast I have to run to get close enough
25 that I feel like that I can effectively deploy that

Page 83

1  taser.
2    Q.    Okay.  So you deploy your taser?
3    A.    Yes.
4    Q.    Did it impact him?
5    A.    I believe so.
6    Q.    Was he moving away from you when you deployed
7  your taser?
8    A.    No.
9    Q.    What was he doing?
10   A.    Right before he — right before I deployed
11 the taser, I watched him stop and turn, try to — try
12 to turn and face back towards us.
13   Q.    Now, did he actually stop moving away from
14 you?
15   A.    Again, I saw him plant and try to turn back
16 towards us.
17   Q.    And what do you mean by plant?
18   A.    So using — when you're running or doing
19 anything — like if I want to pivot on my feet, I'm
20 going to have to put a foot out in front to turn and
21 stop that forward momentum enough that I can change
22 direction.
23   Q.    Okay.  So he planted and pivoted?
24   A.    Yes.  He started to.
25   Q.    In what direction?

Page 84

1    A.    Started turning towards me, so over — that
2  would be over his left.
3    Q.    Okay.  What else did you observe?
4    A.    As soon as that occurred, I saw a good target
5  area because as he's turning, I saw an opportunity to
6  deploy the taser and so I did.
7    Q.    What's the target area that you're
8  describing?
9    A.    So essentially below the nipple line and
10 above the knees.  So anywhere in between there is the
11 optimal target area.
12   Q.    So you were aiming your taser at what area of
13 his body?
14   A.    Towards his chest in his nipple line.
15   Q.    Okay.  Because he had turned in your
16 direction?
17   A.    He had started to, yeah.
18   Q.    Started to do that, you fired the taser?
19   A.    Correct.
20   Q.    When did Officer Fox fire the shots?
21   A.    At the same time that I deployed my taser.
22   Q.    Do you have any sense of whether your taser
23 was deployed first?
24   A.    No, I don't.
25   Q.    In your memory they're basically the same

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1216   Page 23 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                        85 to 88

Page 85

1   time?
2       A.   Simultaneous, yes.
3       Q.   Did you see anything in Mr. Harmon's hands?
4       A.   No.
5       Q.   Did Mr. Harmon move back towards you?
6       A.   What do you mean?
7       Q.   You said that he planted and began to pivot.
8   Did he actually move back towards you or Officer Fox?
9       A.   He did not have the time to.
10      Q.   Why not?
11      A.   Because I had tased him and Officer Fox had
12  fired his service weapon.
13      Q.   Okay.  And at no point in the interaction up
14  to this time did you observe anything in Mr. Harmon's
15  hands?
16      A.   I did not.
17      Q.   When Mr. Harmon began running away from you,
18  did you see Mr. Harmon reaching for his pockets?
19      A.   I saw him start reaching towards his waist.
20  I also heard him say that I'm going to stab or cut.  I
21  don't specifically recall what was first, the stab or
22  cut, but I remember hearing that but not processing
23  that until after the fact.
24      Q.   Okay.  Did you believe that Mr. Harmon was
25  armed at the time you fired your taser?

Page 86

1       A.   I did not.
2       Q.   And at the time that Mr. Harmon said words to
3   the effect of I'll stab or I'll cut you, you don't
4   remember which one it is?
5       A.   Correct.
6       Q.   And he had a cigarette in his mouth during
7   that portion of the interaction?
8       A.   I don't -- I don't remember if it -- if he
9   had taken it out or if it had fallen or what, but I
10  know we started with a cigarette.  I don't know where
11  it ended up or where he lost it.
12      Q.   Okay.  What did you think when you heard the
13  shots from Mr. Fox?
14      A.   Truthfully?  What the fuck.
15      Q.   What made you think that?
16      A.   Because what I perceived was different than
17  what he saw and in my head I had not seen a knife or
18  any other reason, so I was trying to figure out exactly
19  what he saw and why he felt it was appropriate to fire
20  his pistol.
21      Q.   At that time did you think that deadly force
22  was necessary?
23      A.   If I was basing it solely off of what I could
24  see at that time, no.
25      Q.   Okay.  Prior to firing your taser, did you

Page 87

1   see Mr. Harmon manifest hostile intentions?
2       A.   Towards me, no.
3       Q.   Towards anybody?
4       A.   No.
5       Q.   Can you describe his body language in the
6   moments prior to you firing your taser?
7       A.   I mean, what do you mean describe his body
8   language?  I mean, he's actively running, he's, you
9   know, he was distraught.  We went from being calm
10  during the majority of our interaction to now he's
11  distraught, now he's actively trying to flee and resist
12  efforts to go, he doesn't want to go to jail.  Nobody
13  wants to go to jail.  I don't know what much more in
14  regards to body language.
15      Q.   Is he doing anything with his hands or arms
16  at the moment that he pivoted and turned to his left
17  prior to you deploying a taser?
18      A.   I don't remember.
19           (Mr. Riley entered the proceedings.)
20      Q.   (BY MR. LUTZ) What happened after -- well,
21  first, how many times did Officer Fox fire his weapon?
22      A.   Three.
23      Q.   Did all of those shots impact Mr. Harmon?
24      A.   As far as I know.
25      Q.   Okay.  And what happened then?

Page 88

1       A.   After he went to the ground, Officer Fox --
2   not Officer Fox, Officer Robinson went and applied
3   handcuffs, I called on the radio for additional
4   assistance and to start an ambulance that we had one
5   individual that had been shot.
6       Q.   So Officer Robinson approached -- well, let's
7   lay the scene a little bit.  All three officers are
8   facing what direction?
9       A.   It would be south.
10      Q.   And Mr. Harmon hit the ground directly in
11  front of Officer Fox, you are to your left, Robinson is
12  to Fox's right?
13      A.   Correct.
14      Q.   Robinson gets there first, you and Fox also
15  approach.  Did you or Officer Fox reach Mr. Harmon
16  first while he was lying on the ground?
17      A.   I don't remember.
18      Q.   Up to this point that you're approaching
19  Mr. Harmon, had you seen any weapons in his possession
20  at all?
21      A.   No.
22      Q.   Did you ever see any weapon in Mr. Harmon's
23  possession?
24      A.   I didn't see the weapon until the news
25  published it two weeks later.

Case 2:19-cv-00553-HCN-CMR Document 80-5 Filed 10/28/22 PageID.1217 Page 24 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                          89 to 92

Page 89

1    Q.    You didn't see a knife on the ground at all?
2    A.    I did not.
3    Q.    Do you know what knife I'm talking about?
4    A.    I've seen the picture since then, so I can
5    assume that it's the one that they took the photograph
6    of.
7    Q.    But you never saw it?
8    A.    Never saw it.
9    Q.    During this prior to opening fire, did
10   Officer Fox say anything to Mr. Harmon or you or
11   Officer Robinson about a weapon?
12   A.    Not that I recall.
13   Q.    Did he say anything to Officer Fox -- I'm
14   sorry, Mr. Harmon or Officer Robinson about a knife?
15   A.    Not that I recall.
16   Q.    Did Officer Fox say anything at all prior to
17   opening fire?
18   A.    Having watched the video after the fact, yes.
19   Q.    Do you recall what he said?
20   A.    Something to the extent of I will fucking
21   shoot you or I will fucking kill you.  Something like
22   that.
23   Q.    And how soon after he said that did he open
24   fire?
25   A.    From watching the video, pretty close after

Page 90

1    that.
2    Q.    Was it less than five seconds?
3    A.    Yes.
4    Q.    Less than three seconds?
5    A.    Less than three seconds, I don't know.  I
6    didn't time it.
7    Q.    Or is it at the same time?
8    A.    Pretty close to the same time.  I don't know
9    the exact time.
10   Q.    All three officers approach Mr. Harmon?
11   A.    Uh-huh.
12   Q.    He's laying on the ground on the sidewalk?
13   A.    Uh-huh.
14   Q.    Was he still alive?
15   A.    He was breathing, albeit, very agonal
16   breathing.  But at first contact, yes.
17   Q.    Was he making any noises or saying anything?
18   A.    Again, the agonal breathing.  He did -- there
19   were a couple cries.  Not like crying sad cry, but he
20   like kind of moaned, that kind of cry a couple times.
21   Q.    By the time that you approached him, did you
22   suspect that he had been fatally wounded?
23   A.    As we started trying to remove articles of
24   clothing so that we could find out where he was hit,
25   initially, no, but then as we rolled him over onto his

Page 91

1    back and started really cutting his other pant leg off,
2    the large amounts of blood I knew that it was not going
3    to be a high likelihood of survivability.
4    Q.    Where had he been hit?
5    A.    I remember seeing one in the arm, one in the
6    butt cheek, and one in the leg.
7    Q.    Do you recall which arm?
8    A.    I think it would be his left.  Yeah, his left
9    arm.
10   Q.    And which butt cheek?
11   A.    I don't remember.
12   Q.    Do you recall which leg?
13   A.    I think the right.  I don't -- I don't
14   remember.
15   Q.    Okay.  Who cut his clothes off?
16   A.    Officer Fox.
17   Q.    Walk me through what happened as you're
18   trying to apply emergency medicine.
19   A.    We've called for additional help at that
20   point.  I remember telling both Officer Fox and Officer
21   Robinson hey, we need to start trying to find -- I
22   think I said in the video hey, we need to find the
23   holes.  Officer Fox starts cutting his pants because I
24   had tried to pull them down and that wasn't working, so
25   Officer Fox just used his knife, cut them, and then we

Page 92

1    had additional officers start to show up.
2         And then I don't remember who it was, but one
3    started to apply a tourniquet to his leg.  And then at
4    that time the on-duty supervisor showed up, and a ton
5    of other officers, and they took over rendering aid and
6    the supervisor moved us off.
7    Q.    Okay.  Who was the supervisor?
8    A.    His name was Sergeant Sweeney.
9    Q.    Okay.  That's Alma?
10   A.    Yeah.
11   Q.    Were you very familiar with Sergeant Sweeney?
12   A.    Just from work, but yes.
13   Q.    Any social relationship?
14   A.    No.
15   Q.    How long after the shots were fired did
16   Sergeant Sweeney arrive?
17   A.    I have no idea.  Pretty quick.
18   Q.    Okay.
19   A.    Because I know he was one of the first people
20   there.
21   Q.    Stepping back, at the time that you begin
22   emergency medical procedures on Mr. Harmon, all three
23   of you, as in yourself, Officer Fox, Officer Robinson,
24   are within reaching distance of Mr. Harmon?
25   A.    Yes.

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1218   Page 25 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                    93 to 96

Page 93

1    Q.   And Mr. Harmon is alive at that time?
2    A.   When we initially contacted him, yes, but
3  having dealt with similar circumstance, he wasn't there
4  for much longer.
5    Q.   At any point in the time that you guys are
6  applying emergency medical procedures in close
7  proximity to Mr. Harmon, did Officer Fox mention a
8  knife?
9    A.   No.
10   Q.   During that same time period, did Officer
11 Robinson mention a knife?
12   A.   Not that I remember.
13   Q.   Did either officer ever mention a knife?
14   A.   While we're trying to give aid, no.
15   Q.   Before you left the scene, did anyone mention
16 a knife to you?
17   A.   No.
18   Q.   Given what we discussed earlier about
19 securing weapons from suspects who have relinquished
20 them, had those officers -- had Officer Fox known there
21 was a knife in your, you know, within reaching distance
22 of Mr. Harmon who was alive at the time, would you have
23 expected him to mention it?
24   A.   It would have been nice to know, but for
25 whatever reason, he didn't.

Page 94

1    Q.   Would you have expected him to secure it?
2    A.   In a perfect scenario, yes, but now we're
3  moving from simply trying to take somebody into custody
4  to now we have to render aid to this individual and so
5  our focus shifts.  You know, I think the higher
6  priority becomes trying to maintain this individual's
7  life over securing the weapon specifically since he's
8  not making -- taking any sort of active action to try
9  and reacquire that item.
10        So, again, I never saw it, so I can't -- I
11 don't know why they didn't.  All I can tell you is that
12 after it was fired, all of our attention was to try and
13 render aid to get him taken care of as best as we
14 could.
15   Q.   Want to take a break?
16   A.   Yes, please.
17   Q.   Okay.  Thank you.
18        (Recess taken from 11:33 a.m. to 11:53 a.m.)
19   Q.   (BY MR. LUTZ) I have some questions now about
20 your body camera.
21   A.   Okay.
22   Q.   It's the Axon brand?
23   A.   Yes.  I think.
24   Q.   The one that you're wearing?
25   A.   Yeah.

Page 95

1    Q.   Can you describe for me what the physical
2  layout is on your body.
3    A.   So at -- so at the time it was the collar
4  cameras, so you had a battery pack that you had to put
5  inside your shirt and then you had to run a wire
6  through your shirt up and around, and then there was
7  like a little magnet strip that you clip to your
8  collar, and then the camera sat up here on your neck
9  (indicating).
10   Q.   Okay.  And where's the control module?
11   A.   On that battery pack.
12   Q.   Okay.  At what point in your interaction with
13 Mr. Harmon did you activate yours?
14   A.   I think it was like the second time, close to
15 the second time that I went up and started talking to
16 him.
17   Q.   Okay.  Is there a policy or procedure that
18 applies to when you were supposed to activate it?
19   A.   There is.
20   Q.   When is that?
21   A.   When you make contact with anybody.
22   Q.   Okay.  So it's -- the camera, how big is the
23 camera?
24   A.   I mean, that one is only like three inches
25 long and maybe like an half inch by half an inch wide

Page 96

1  and tall.
2    Q.   And it sits on the lapel of your collar?
3    A.   Yeah.  Just had the magnet and then it sat
4  right here (indicating).
5    Q.   Okay.  So it's pretty close to your eye
6  level?
7    A.   Yes.
8    Q.   It's not -- there are versions of these
9  cameras that cover the chest; right?
10   A.   Correct.
11   Q.   Okay.  So the view that you're getting from
12 the lapel camera is only a few inches down from your
13 eye line; right?
14   A.   Typically.
15   Q.   Okay.
16   A.   Oftentimes you'd get -- because the wire,
17 sometimes if you moved wrong or you sat in the car
18 wrong, then the wire had a tendency to get pulled on
19 and so then you'd have the camera and it'd be pointing
20 up like at your cheek or at the ground if you bumped it
21 wrong.
22   Q.   Okay.  You've reviewed your body camera
23 footage from the incident with Mr. Harmon; right?
24   A.   Yes.
25   Q.   How many times?

Case 2:19-cv-00553-HCN-CMR Document 80-5 Filed 10/28/22 PageID 1219 Page 26 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                          97 to 100

Page 97

1    A.  Maybe half a dozen.
2    Q.  From your view, does it appear to you that
3  that your camera was in the correct position?
4    A.  Looks like it.
5    Q.  Pretty much in line with your eye level?
6    A.  Yeah.
7    Q.  Okay.  When did you first see the video?
8    A.  When they released it to the media, so 10
9  days after.
10   Q.  That was the first time you saw your own?
11   A.  Yes.
12   Q.  Did you watch either of the other officers?
13   A.  Yeah.  All the -- all the footage that they
14 released.
15   Q.  Did you give a statement to investigators
16 after the incident?
17   A.  I did.
18   Q.  Had you seen the footage prior to giving that
19 statement?
20   A.  I had not.
21   Q.  What date did you provide a statement to
22 investigators?
23   A.  The same day.
24   Q.  And who interviewed you?
25   A.  Unified Police.

Page 98

1    Q.  Do you remember which officers?
2    A.  I don't.
3    Q.  Was that investigation recorded?  Or, I'm
4  sorry, that interview recorded?
5    A.  I would imagine, yes.
6    MR. LUTZ:  I don't know that we have audio of --
7    MS. NICHOLS:  I think there might be a technical
8  issue because it's from Unified, so maybe we can chat
9  about that.  I think we produced what we have, but
10 there might be an issue in being able to play it, so
11 maybe we can chat about that.
12   MR. LUTZ:  Okay.  Sounds good.  Thank you, Katie.
13   Q.  (BY MR. LUTZ) Is there anything that you
14 explained to the investigators in that interview with
15 UPD that you haven't told me today?
16   A.  Not that I recall.
17   MR. LUTZ:  Can we get -- there are photos of the
18 officers from that evening.  Can we get a printout of
19 the photo of Officer Smith?
20   MR. RILEY:  I'm not sure I have that.
21   MR. LUTZ:  Is there an issue with identifying an
22 exhibit, a digital exhibit, so long as we put the Bates
23 number on the record?
24   MS. NICHOLS:  I think that's fine from my
25 perspective.

Page 99

1    A.  (BY MR. LUTZ) While I try to deal with this,
2  have you ever been to Price?
3    A.  Price, Utah?
4    Q.  Uh-huh.
5    A.  I've driven through it.
6    Q.  Have you ever been to Castleview Hospital?
7    A.  No, not that I can think of.
8    Q.  Do you know anyone who works for Castleview
9  Hospital?
10   A.  Huh-uh.
11   Q.  Or have you ever?
12   A.  Hm-mm.
13   Q.  Any idea if Officer Fox ever worked there?
14   A.  Huh-uh.
15   Q.  Same thing for Officer Robinson?
16   A.  Yeah, I have no idea.
17   Q.  Do you know if either Officer Fox or Officer
18 Robinson worked as an EMT in their previous careers?
19   A.  I know Officer Fox does the volunteer fire
20 department.  I don't know -- I would imagine being on
21 the volunteer fire department, but I don't know
22 specifically.
23   Q.  Okay.  You've never worked as an EMT?
24   A.  I have.
25   Q.  You have?

Page 100

1    A.  Yes.
2    Q.  Okay.  Where?
3    A.  For the Unified Fire.
4    Q.  And when was that?
5    A.  2003-2004.  I don't remember.
6    Q.  And where were they located?
7    A.  They're here in town.
8    Q.  What sort of tools did you carry as an EMT?
9    A.  So I was assigned as one of the wildland
10 firefighters.  I wasn't the assigned EMT.  I was EMT
11 certified.  I was just kind of a backup, so I didn't
12 carry any of it or -- the team EMT carried it all.
13   Q.  Did you carry a rescue knife?
14   A.  I mean, we carried a pocketknife, but
15 everybody carried a pocketknife.
16   Q.  Okay.  Going back to some training material,
17 we talked about how you regularly drew your firearm and
18 aimed it at suspects for felony stops and things of
19 that nature.
20   A.  Uh-huh.
21   Q.  Did you -- is there any training that you
22 received on what an appropriate distance is between you
23 and a suspect for drawing or using your firearm?
24   A.  You're taught that distance is your friend,
25 but to that same accord, you're also taught to know

Case 2:19-cv-00553-HCN-CMR Document 80-5 Filed 10/28/22 PageID 1220 Page 27 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                101 to 104

Page 101

1  your limitations.  I'm not going to go back a hundred
2  yards and try to use my pistol because even world class
3  competition shooters are not going to be accurate at a
4  hundred yards with a pistol.
5      Q.  Right.
6      A.  So it was more understanding your limitations
7  on where you're confident and shooting to be able to
8  accurately address the threat that's posed to you.
9      Q.  Conversely, can you be too close for the
10 proper use of your firearm to a suspect?
11     A.  I would say no.
12     Q.  If a suspect's standing right in front of
13 you, still appropriate to draw?
14     A.  If I -- if he presents a deadly or lethal
15 force situation, then yes, we're taught that you can
16 draw from the holster and instead of coming out and
17 presenting at a full draw, meaning arms all the way
18 extended putting, I can come out of the holster and
19 still accurately put rounds on -- on the individual
20 while keeping the gun close to my side so that I'm
21 maintaining control over that lessening the opportunity
22 he has to try and obtain my weapon from me
23 (indicating).
24     Q.  And you were just demonstrating by holding
25 your hand kind of up against your rib cage close to the

Page 102

1  chest?
2      A.  Yes.
3      Q.  In a situation like that is there any risk of
4  being disarmed by the suspect?
5      A.  Yes.
6      Q.  In your experience once you've drawn your
7  fire arm and are, you know, engaging with a suspect,
8  does having your firearm drawn then limit the force
9  options you have in front of you?
10     A.  Limit them in what regard?
11     Q.  Well, what I'm getting at is once the firearm
12 is drawn, are you able to, say, tackle or use control
13 holds or draw your taser?
14     A.  Not without reholstering your weapon.  It
15 would be very unwise to try and tackle somebody with my
16 pistol out.  If I know that I'm going to go hands on
17 with somebody and have it become a physical
18 confrontation, then I'm not going to have my pistol
19 out.
20     Q.  Okay.
21     A.  But I'm also not going to try to go hands on
22 with somebody that is presenting a lethal force
23 scenario.
24     Q.  I see.  Okay.  So we talked a little bit
25 about how it was later and how there was a knife out

Page 103

1  near Mr. Harmon on the ground.
2      A.  Uh-huh.
3      Q.  Are you aware that that knife was tested for
4  latent fingerprints and DNA?
5      A.  I'm not aware.
6      Q.  Have you ever seen lab reports?
7      A.  I have not.
8      Q.  I'm sorry, let me specify.  A lab report
9  addressing a latent fingerprint test or a DNA test?
10     A.  In regards to that knife?
11     Q.  In regards to any, in any of your criminal
12 investigations.
13     A.  Not that I can think of.
14     Q.  Okay.  So that's never come up in any case
15 that you've testified in, a weapon or a piece of
16 evidence with the suspect's fingerprints or DNA?
17     A.  Off the top of my head, no.  I know there's
18 been cases that involved that, but I'm not the one
19 that's doing the testing.  And so I know that when that
20 has been involved, it's usually the crime lab
21 technician that's -- that's testified to that, so.
22     Q.  Okay.  When was the last time you watched any
23 of the live body cam footage from that day?
24     A.  Last Wednesday.
25         Is that when we met (to Ms. Nichols)?

Page 104

1          Last week when I met with Katie.
2      Q.  And which footage did you watch?
3      A.  All of it.
4      Q.  All?
5      A.  All three of them.
6      Q.  Did you watch any enhanced or alternative
7  angles?
8      A.  No.
9      Q.  Did you ever issue a written report in this
10 case?
11     A.  No, because I -- because we gave the
12 statement to the investigators that night.  I don't
13 believe they had us do a written report.
14     Q.  What conversations did you have with Officer
15 Fox about the incident with Mr. Harmon after it
16 happened?
17     A.  We talked about the entire thing and what
18 he -- his version of events and my version of events.
19     Q.  What did he tell you about his version of
20 events?
21     A.  I remember he asked if I had seen the knife
22 and I told him no.
23     Q.  Did he tell you that he did?
24     A.  Yes.
25     Q.  Did he explain why he didn't tell you about

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1221   Page 28 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                    105 to 108

Page 105

```
 1   it?
 2       A.   No.
 3       Q.   Did you ask?
 4       A.   No.
 5       Q.   Why not?
 6       A.   I don't know.  Probably because I was still
 7   trying to process everything that -- that's happened.
 8       Q.   Did you feel any obligation to look out for
 9   him?
10       MS. NICHOLS:  Objection, vague.
11       THE WITNESS:  Look out for him in what regard?
12       Q.   (BY MR. LUTZ) I mean, if there's a piece of
13   evidence on the scene that could presumably justify a
14   shooting had he seen it, did you feel any obligation as
15   his friend to go with that version of events that would
16   justify the shooting keep him out of trouble?
17       A.   If I did, I would have said that I saw the
18   knife.
19       Q.   I see.  When did you have this first
20   conversation with Officer Fox?
21       A.   The following day.
22       Q.   How many additional conversations did you
23   have on that subject?
24       A.   Going over everything that occurred, probably
25   just that one.  Everything since then has been
```

Page 106

```
 1   notifications of litigation and things along that
 2   nature.
 3       Q.   So you and Officer Fox had a conversation
 4   about what had happened prior to your statement to
 5   investigators?
 6       A.   No.  My statement was that night.
 7       Q.   I see.
 8       A.   And I talked to him the following day.
 9       Q.   Okay.  And you have discussed the litigation
10   with Officer Fox?
11       A.   Yeah.
12       Q.   What all have you talked about?
13       A.   What else have you heard, when's, you know,
14   what's the attorneys told you, when's, you know, I know
15   this has been to court and been dismissed and then it
16   was appealed and brought back and things along that
17   nature.
18       Q.   Have you talked about it often?
19       A.   No.
20       Q.   What about with Officer Robinson, have you
21   discussed the litigation?
22       A.   The same thing, yeah.  Yeah, what have you
23   heard.  Hey, the attorney really wants you to call her
24   back, don't ignore her number.  Things like that.
25       Q.   In your conversation about the facts of the
```

Page 107

```
 1   case with Officer Robinson, did Officer Robinson ever
 2   mention the presence of a knife?
 3       A.   I don't remember.
 4       Q.   Do you know whether or not Officer Robinson
 5   believes he saw a knife?
 6       A.   That I don't know.
 7       Q.   It's never come up in any of your
 8   conversations?
 9       A.   Huh-uh.
10       Q.   Despite not having seen a knife at the scene
11   at any time, you said you became aware that one was
12   found when it was released on the news?
13       A.   Correct.
14       Q.   Did you see a picture of it?
15       A.   Yes.
16       Q.   I'm just going to hand you -- this will be 2.
17            (Exhibit 2 marked.)
18       Q.   (BY MR. LUTZ) Please take a look at Exhibit 2
19   here which is SLCPD 001769.  Does that look like the
20   picture that you saw of the knife that was allegedly
21   recovered?
22       A.   Yes.
23       Q.   Do you recognize the knife depicted in
24   Exhibit 2 from anywhere else?
25       A.   No.
```

Page 108

```
 1       Q.   Have you ever seen it before?
 2       A.   No.
 3       Q.   Okay.  Do you recognize any of the features
 4   of that knife?
 5       MS. NICHOLS:  Objection, vague.
 6       THE WITNESS:  I mean, it's a handle and a blade.
 7   Looks like a folding knife.
 8       Q.   (BY MR. LUTZ) If I just circle that
 9   component, do you recognize what that feature is?
10       A.   It looks like a seatbelt cutter.
11       Q.   Okay.  And same thing, it's hard to see here.
12   What about that feature (indicating)?
13       A.   (Peruses document.)
14            I'm not really seeing.  To me it just looks
15   rounded.
16       Q.   Okay.  That's fine.  Okay.
17            Corey, do you want to step out for a second?
18       MR. RILEY:  Sure.
19       MR. LUTZ:  We'll just take two minutes.
20       MS. NICHOLS:  Yeah.
21       (Recess taken from 12:15 p.m. to 12:20 p.m.)
22       Q.   (BY MR. LUTZ) Going back to your career with
23   the Salt Lake City Police Department, were you ever
24   accused of violating departmental policies?
25       A.   I had at least -- there were two IA cases
```

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1222   Page 29 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                        109 to 112

Page 109

1 that were presented in relation to some of my canine
2 bites both which the disposition on those was I was
3 exonerated from any sort of policy violation or any
4 sort of wrongdoing.
5     Q.   Were those citizens initiated complaints?
6     A.   No.  Those were department issued.
7     Q.   Okay.  When were these two incidents?
8     A.   2020 was when they were, I think, initiated.
9     Q.   And starting with the first one in time, do
10 you remember when in 2020 it was?
11    A.   It would have been September of 2020 is when
12 they were initiated.
13    Q.   Okay.  And what were the allegations?
14    A.   Excessive use of force.
15    Q.   What happened?
16    A.   Both canine deployments used the canine to
17 apprehend suspects and take them into custody.  It all
18 related to that -- the other canine handler issue that
19 we talked about earlier.  The department went through
20 and reviewed everything for the last five years and
21 said we feel like these two are possible violations, so
22 they submitted them to internal affairs to review.
23    Q.   No disciplinary action --
24    A.   None.
25    Q.   -- taken for that?

Page 110

1     A.   No.
2     Q.   Were the suspects injured in those incidents?
3     A.   Yes.
4     Q.   Can you describe the injuries.
5     A.   Dog bite.
6     Q.   To where?
7     A.   One was on the arm and then the other one was
8 a leg.
9     Q.   Did either of those incidents require the
10 suspect's hospitalization?
11    A.   No.  They're -- by protocol they're taken to
12 the hospital and evaluated because the jail will not
13 accept anybody that's been untreated that has open
14 wounds and things like that, so they're taken to the
15 hospital and then after they're released, then booked
16 into jail.
17    Q.   Okay.  Have you ever been the subject of a
18 citizen complaint of excessive force?
19    A.   Not that I know of.
20    Q.   Have you ever been the subject of a citizen
21 complaint of another departmental policy violation?
22    A.   Yes.
23    Q.   Can you tell me about that.
24    A.   So I just barely learned about them
25 because -- but apparently rudeness was a couple of them

Page 111

1 that I had no idea that they had even been filed.
2     Q.   Was that recently?
3     A.   No.  That was -- I don't remember the exact
4 dates, but it's been several years.
5     Q.   How did you learn about them recently?
6     A.   In our trial prep.  Or deposition prep.
7     Q.   Okay.  At the time they were filed, nobody
8 from the department informed you that a complaint was
9 filed against you?
10    A.   None.
11    Q.   So, I take it, none of those complaints were
12 sustained against you?
13    A.   No.
14    Q.   Okay.  I think that's all that I have for you
15 today.  We'll turn it back to your attorney.
16        MS. NICHOLS:  Yeah.  Could I take a three-minute
17 break and just confer and I'll see if I have any
18 questions?
19        MR. LUTZ:  Sure.
20        MS. NICHOLS:  Thanks.
21        (Recess taken from 12:25 p.m. to 12:31 p.m.)
22        MS. NICHOLS:  I don't have any questions.  We
23 would like to read and sign.
24        MR. LUTZ:  Just one final thought.  We'll talk
25 about the IA interviews.

Page 112

1         MS. NICHOLS:  Okay.
2         MR. LUTZ:  In the event that there's a new one
3 there that we weren't able to discuss today, can we
4 open this again for that purpose?
5         MS. NICHOLS:  We can talk about it.  I mean, I
6 might object to that, but.
7         MR. LUTZ:  I just want to put it on the record
8 that we're going do that, so we'll confer.
9         MS. NICHOLS:  Yeah, that sounds great.  Okay.
10        (The proceedings ended at 12:32 p.m.)
11              - - -
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID 1223   Page 30 of 44
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                          113 to 114

Page 113

```
 1   STATE OF UTAH        )
                          ) ss.
 2   COUNTY OF SALT LAKE )
 3               REPORTER'S CERTIFICATE
 4       I, Amanda Richards, certified shorthand reporter
 5   for the State of Utah, certify:
 6       That the deposition of the witness herein was
 7   taken before me at the time and place herein set forth,
 8   at which time the witness was by me duly sworn to
 9   testify the truth; that the testimony of the witness
10   and all objections made and all proceedings had of
11   record at the time of the examination were
12   stenographically reported and transcribed by me.
13       That the foregoing transcript, as transcribed by
14   me, is a full, true and correct record of my
15   stenographic notes so taken; that review of the
16   transcript by the witness was requested pursuant to
17   Rule 30(e) of the Utah Rules of Civil Procedure.
18       I further certify that I am neither counsel for
19   nor related to any party to said action, nor in anywise
20   interested in the outcome thereof.
21       IN WITNESS WHEREOF, I have subscribed my name
22   below this 5th day of July 2022.
23              Amanda Richards
24
                 Amanda Richards, CSR
25
```

Page 114

```
 1               WITNESS CERTIFICATE
 2       I, KRIS SMITH, HEREBY DECLARE:
 3       That I am the witness referred to in the
 4   foregoing deposition, and that I have read the
 5   foregoing deposition testimony and have made any
 6   changes/corrections  I deem necessary below and
 7   together the same truly and accurately reflect my
 8   testimony.
 9   PAGE-LINE:      CHANGE/CORRECTION      REASON:
10   _____-_____    _____  _____
11   _____-_____    _____  _____
12   _____-_____    _____  _____
13   _____-_____    _____  _____
14   _____-_____    _____  _____
15   _____-_____    _____  _____
16   _____-_____    _____  _____
17   _____-_____    _____  _____
18   _____-_____    _____  _____
19       I, KRIS SMITH, hereby declare under the penalties
20   of perjury of the laws of the United States of America
21   and the laws of the State of Utah that the foregoing is
22   true and correct.
23       DATED _____, 20_____.
24              _____
                 KRIS SMITH
25
```

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                        1

**Exhibits**

**Exhibit 01** 39:6,7,8
44:12 48:24
**Exhibit 02** 107:17,18,
24

**(**

**(a)** 73:6

**0**

**001769** 107:19
**07:30** 57:20

**1**

**1** 39:6,7,8 44:12 48:24
**10** 74:3,7 82:23 97:8
**10:00** 57:22 58:6
**10:10** 49:6
**10:24** 49:6
**11:33** 94:18
**11:53** 94:18
**12** 81:16
**12:15** 108:21
**12:20** 108:21
**12:25** 111:21
**12:31** 111:21
**12:32** 112:10
**13** 57:11
**13th** 70:10
**14** 70:2
**15** 46:21 82:5,23
**16** 4:1
**180** 80:16
**180-degree** 80:12

**2**

**2** 107:16,17,18,24
**20** 76:4,8 82:23
**2003-2004** 100:5
**2008** 10:5
**2014** 10:15 13:12 30:9
**2015** 67:21
**2017** 29:2 57:11
**2020** 19:10 25:18,19
52:8 109:8,10,11

**2022** 4:1
**21:30** 57:18
**290** 80:16

**3**

**30** 46:22,25 47:5 82:6,
7,9,20,21

**4**

**4** 44:12,14 47:13
**40** 25:23

**5**

**50** 25:23

**6**

**6** 70:2

**7**

**7:30** 57:20

**9**

**90-degree** 80:22
**911** 14:23 50:25 51:1,6
**95** 17:15
**9:04** 4:1
**9:30** 57:18

**A**

**a.m.** 4:1 49:6 94:18
**abandoned** 50:25
**ability** 35:14 45:13
**absolutely** 40:16 49:3
50:9
**abuser** 45:4
**academy** 30:6,13,15,16
31:3
**accept** 73:12,13,16
110:13
**access** 14:14 37:17,22
**accident** 7:21
**accord** 100:25
**accurate** 35:22 45:9
75:14 101:3
**accurately** 101:8,19

**accused** 108:24
**acknowledge** 31:18,22
70:16
**acting** 21:17
**action** 19:24 34:25
35:3 38:3 80:6 94:8
109:23
**activate** 95:13,18
**activated** 59:3 60:20
**active** 72:2,16,21,25
73:18 94:8
**actively** 34:10 87:8,11
**actual** 41:2
**additional** 42:8 43:7
51:11 54:5,9 66:20 74:6
88:3 91:19 92:1 105:22
**address** 15:1 27:9 51:5
101:8
**addressed** 72:19
**addresses** 57:2
**addressing** 103:9
**administration** 22:5
**advise** 74:12
**affairs** 109:22
**affect** 52:24
**affected** 45:6 48:10
**afford** 65:12
**age** 69:12
**agencies** 24:12
**agency** 24:8,9,15,16
26:8
**aggravated** 20:12 72:3
74:21
**agonal** 90:15,18
**agreement** 24:8
**ahead** 41:2
**aid** 36:14 92:5 93:14
94:4,13
**aimed** 100:18
**aiming** 84:12
**air** 66:24
**albeit** 90:15
**alcohol** 29:1 46:11
**alive** 90:14 93:1,22
**allegations** 9:10
109:13
**alleged** 9:15,20 34:7
**allegedly** 107:20
**alley** 71:7

**allowing** 44:9
**alluded** 55:5
**Alma** 92:9
**altercation** 12:24 13:1
**alternative** 104:6
**ambiguous** 81:18
**ambulance** 88:4
**amount** 8:15 17:9
**amounts** 22:11 91:2
**and/or** 46:11 56:2
**angle** 47:9,19
**angles** 104:7
**angry** 64:4
**animal** 49:17
**animals** 49:14
**answering** 15:4
**answers** 5:13
**apartment** 51:10,13
**apparently** 110:25
**appealed** 106:16
**appears** 23:23
**applied** 82:13 88:2
**applies** 95:18
**apply** 41:9 78:5 79:25
82:19 91:18 92:3
**applying** 79:17 93:6
**apprehend** 16:23
109:17
**apprehension** 16:19,
21
**approach** 54:9,20 56:9,
13 63:11 88:15 90:10
**approached** 88:6 90:21
**approaching** 88:18
**appropriately** 22:13
35:7 53:8 82:19
**approximate** 13:24
**approximately** 46:3
**area** 18:12 29:15 58:1,
2,3 62:3,4,7,10,16,21,
24 70:25 71:5,7 84:5,7,
11,12
**areas** 14:16 27:15
**arm** 79:10,14,17 91:5,
7,9 102:7 110:7
**armed** 53:16 85:25
**arms** 80:2 87:15
101:17
**arraignment** 11:23

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    2

arrange 37:5
arranging 38:1
arrest 27:18,23 32:9
34:24 66:12 72:18,25
73:17 74:8,13,19,23
75:6,19 78:4
arrested 75:15
arresting 78:8,11,12,21
arrests 28:13,14,16
arrive 92:16
arrived 71:10,13,16,19
article 18:3
articles 16:19 90:23
assault 20:12,21,24
72:3 74:21
assessment 74:16
assigned 13:21,22
14:1,15,24 27:3,11 28:9
30:17,22 58:1 100:9,10
assist 27:19
assistance 14:24 88:4
assistant 23:15
assume 9:21 15:11
31:23 89:5
assumes 81:18
assuming 16:8 31:25
attained 25:14
attempt 65:15
attempted 65:1
attempts 34:11
attend 27:2 30:5
attention 58:13 94:12
attorney 4:17 6:3 7:4
41:17 106:23 111:15
attorney-client 6:8
attorneys 106:14
audio 98:6
August 57:11 70:10
average 27:1,2 28:12,
13 29:7
avoid 65:25
avoided 20:16
aware 12:6 57:9 103:3,
5 107:11
Axon 94:22

**B**

back 18:24 22:21 26:24
27:25 30:5 32:18 43:12

47:13 49:4 51:17 59:5
60:9 65:1,8 66:16 67:1
70:9 77:2,9,16 79:11,
16,24 80:2 83:12,15
85:5,8 91:1 92:21
100:16 101:1 106:16,24
108:22 111:15
background 9:24
backpack 77:8,17 79:6
backup 65:17,22 70:10
100:11
backwards 38:19
bad-mouth 21:16
bag 12:16
baggy 46:11
barely 110:24
based 33:20 34:1 35:1
37:14 65:23 78:14 82:6
basic 44:3
basically 23:24 38:15
84:25
basing 86:23
Bates 98:22
baton 35:10 36:15,20,
22
battery 95:4,11
beaded 78:1,2
beads 12:10,15,18
bedtime 68:18
began 80:15 85:7,17
begin 92:21
beginning 79:25
begins 80:3
behavior 53:2,3
believed 74:25
believes 107:5
belonged 18:7
belt 36:11
bench 27:14
bicycle 59:2,6 61:3,5,9
77:1
bicycles 14:15
bid 29:25 30:1
big 95:22
bigger 14:13
biggest 25:6
bike 13:21,22 14:2,3,9,
11 15:2,8 26:25 27:14,
24 28:8,12 29:2 58:15,
16 75:24 76:2

bikes 27:12,17,21
birth 64:11,24,25 65:10
birthdate 66:1
bit 9:23 11:18 22:4
32:19 38:18,19,24
76:11 88:7 102:24
bite 110:5
bites 109:2
blade 108:6
block 61:23
blood 15:18 91:2
boat 20:13
bodies 38:1
bodily 72:4
body 36:25 37:15
40:13,22 41:3 44:8 80:3
84:13 87:5,7,14 94:20
95:2 96:22 103:23
bolt 79:22
book 74:1,9 78:16
booked 73:8 75:11
110:15
booking 11:21 72:1
booking/intake 11:22
brand 38:25 39:3,17
48:20 94:22
breached 51:13
break 5:25 49:2 94:15
111:17
breaks 5:21,24
breathing 90:15,16,18
brick 61:25
briefing 27:2 29:9,16
57:25
briefly 4:16
bring 60:3
brings 80:2
broad 55:16
broadcast 66:22
broadcasts 66:23,25
Broadly 43:22,24
broken 23:4
brought 106:16
Brown 19:15 21:1,7,17,
20,25 22:5,10,15
building 61:25
bumped 96:20
Burbank 21:23
bureau 23:13,14

burglars 50:2
busiest 26:8
business 61:24
businesses 61:15,22
62:2
busy 26:5
butt 68:8 91:6,10
button 66:19
buy 18:2

**C**

cage 101:25
call 12:25 14:19,22,24
15:3 26:15 27:19 28:4
29:13 50:25 51:6 65:22
66:21 67:3 70:10,20
71:4 106:23
called 4:4 18:5 23:3,5
29:5 40:20 41:3 42:16,
20 48:23 51:1,3 65:17
88:3 91:19
calling 44:16
calls 14:23 15:4 21:3
29:11,17 38:5 39:22
45:15 53:19 57:23
59:19 70:23
calm 63:24 87:9
cam 103:23
camera 94:20 95:8,22,
23 96:12,19,22 97:3
cameras 95:4 96:9
camp 27:4
canine 13:22 14:5,9
15:9,12,14,15 16:9 19:3
20:11,21 29:3 49:24
109:1,16,18
capacities 11:25 15:7
capacity 10:6 13:13
14:18 29:5,22 57:15
captain 22:17
captains 23:9
car 15:11 18:24 50:12
53:6 61:6 63:10 65:15
71:18 72:5 75:23 76:2,
6,14,15,16,20,24 96:17
care 29:13 74:15 94:13
career 50:1 75:10
108:22
careers 99:18
carried 23:23 36:23,24

RED ROCK REPORTING
385.707.7254

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1226   Page 33 of 44

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                           3

39:1,18 100:12,14,15
**carries** 59:15
**carry** 36:16,22 42:8
46:23 100:8,12,13
**carrying** 36:10
**cars** 27:20,22 28:3
**cartridge** 41:9,10,13,22
46:20
**cartridges** 42:3,4,8
46:21
**case** 4:18 7:20,24 8:8
9:2,10 24:5 50:14 60:4
74:11 78:16 79:21
103:14 104:10 107:1
**cases** 8:19,23 103:18
108:25
**Castleview** 99:6,8
**causing** 40:25
**caveat** 73:9 74:2
**certified** 100:11
**CEW** 39:10 44:23 48:16
**chainsaw** 54:18
**challenge** 54:3
**change** 13:16 21:25
22:7,10 29:24 83:21
**changed** 23:10 31:18,
21,22
**changing** 31:16
**charged** 20:11,21
**chart** 22:23
**chase** 71:6
**chat** 98:8,11
**cheek** 91:6,10 96:20
**chest** 48:14 84:14 96:9
102:1
**chew** 69:20
**chief** 19:13 20:12 21:1,
7,17,19,21,22,25 22:15,
17 23:12,13,15
**children** 69:23,24
**chosen** 82:11
**cigarette** 80:19,20
86:6,10
**circle** 108:8
**circuit** 40:14,15,25
**circumstance** 35:24
93:3
**circumstances** 9:2
21:14

**citation** 58:10
**citations** 28:14,17
**citing** 28:23
**citizen** 110:18,20
**citizens** 109:5
**city** 4:1,9 10:1,7,17
11:10 13:11 19:5 20:5
23:4 24:6,13,23 25:1,15
26:7,14,20 30:6 32:13
42:19 58:2 67:19 72:24
73:10 108:23
**City's** 24:22
**civil** 7:24 59:18
**clarification** 41:21
**clarify** 42:24
**class** 30:11 73:24
101:2
**click** 31:21
**Clinton** 67:9
**clip** 95:7
**close** 27:19 38:21
40:24 69:11 71:12
76:10 82:1,18,19,24
89:25 90:8 93:6 95:14
96:5 101:9,20,25
**closed** 40:15
**closer** 38:2 82:22
**closest** 41:19
**clothed** 77:20
**clothes** 91:15
**clothing** 46:11 77:22
90:24
**clown** 78:2
**clues** 17:24
**code** 59:22,23
**cold** 63:4
**collar** 95:3,8 96:2
**collected** 60:16
**command** 51:16 52:22,
25 53:9
**commander** 23:3
**commands** 50:12
52:11,16 54:5,19
**committed** 34:8
**company** 39:4
**compare** 31:19
**compared** 34:18
**competition** 101:3
**complaint** 9:3 12:5,8,
16 110:18,21 111:8

**complaints** 12:2 109:5
111:11
**complete** 13:2 30:16
40:13
**completed** 57:25
**completely** 19:25
**complexes** 51:10
**compliance** 52:18
53:23
**compliant** 53:24 56:10,
11 79:8
**complies** 44:13
**comply** 53:17
**component** 108:9
**Compound** 81:17
**conceal** 66:10 75:10
**conclusion** 59:20
**conditions** 6:19
**conduct** 9:19
**conducted** 48:21 59:4
**conducting** 76:10
**confer** 111:17 112:8
**confident** 59:12 101:7
**confined** 11:17
**confinement** 11:13
**confront** 20:14
**confrontation** 102:18
**confronted** 20:14
**conglomerate** 21:13
**connected** 40:23 43:5
46:18
**connection** 47:6
**connectors** 40:21
**Connor** 33:20 34:2
**conscious** 37:9
**consideration** 47:8
**considered** 33:16
**contact** 27:6 40:13,14
58:6,9 60:22,24 66:16
71:20 74:14 78:20
90:16 95:21
**contacted** 93:2
**contained** 31:4
**containers** 28:25
**context** 23:19
**contingencies** 55:1
**contingency** 54:25
**continue** 43:18 54:4
70:15

**continued** 71:14
**continues** 81:8
**continuous** 43:8
**contractual** 24:3
**control** 21:25 32:9
95:10 101:21 102:12
**controlled** 48:17,21
**conversation** 105:20
106:3,25
**conversations** 6:9
104:14 105:22 107:8
**Conversely** 101:9
**convicted** 73:24
**Corey** 108:17
**corner** 51:17
**corporal** 25:25
**correct** 6:12 8:1 12:23
15:10,13 24:24 29:4
30:24 32:3,4,21 34:3
37:16 38:20 42:1 43:2
47:20 49:11 52:23
54:15 57:1,16 58:7,8
61:2 65:13 71:17 75:20
77:18 79:9,12,18 80:4,
10 81:12 84:19 86:5
88:13 96:10 97:3
107:13
**correctional** 10:8 11:5,
10,12
**corrections** 10:21 13:5
**correctly** 42:13 71:16
**council** 25:8
**county** 24:7,21 25:8,21
26:23 69:2,5,10 73:10
**couple** 5:3 23:11 69:18
90:19,20 110:25
**court** 5:5 6:12,16 8:5,
11 72:20 74:14 106:15
**cover** 96:9
**coverage** 54:10
**create** 25:10 82:15
**created** 25:3
**cries** 90:19
**crime** 24:1 34:7 59:5,8
62:7 73:6 103:20
**criminal** 6:15 8:11,23
27:9 103:11
**critical** 24:5
**cross** 38:10
**cry** 77:11 90:19,20

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                                    4

**crying** 90:19
**cultural** 22:7,10
**curious** 11:14
**current** 42:25 44:7
**Custodial** 28:14,16
**custody** 12:7 34:11
  35:11 43:25 50:12
  54:10,12,14,25 55:4
  56:2,12,15,25 72:6,23
  94:3 109:17
**cut** 12:9,17,18,19 58:17
  85:20,22 86:3 91:15,25
**cutter** 108:10
**cutting** 91:1,23
**cycle** 43:4,8

——————

**D**

**daily** 28:17
**Dante** 15:22,24 16:15
**data** 42:21
**database** 31:23 65:20
**databases** 65:2
**date** 42:22 64:11,24,25
  65:10 66:13 97:21
**dates** 111:4
**day** 5:22 11:13 27:1,2
  28:19 29:7 68:25 97:23
  103:23 105:21 106:8
**days** 97:9
**deadly** 32:10 35:25
  36:7 55:9 86:21 101:14
**deal** 20:15 26:16 35:6
  56:8 62:13 99:1
**dealing** 28:19 53:5,21
**deals** 73:10
**dealt** 62:14 93:3
**decide** 10:16 74:19,23
  78:17
**decided** 20:19 46:17
  79:21
**decision** 19:20 37:9
  52:24 75:6
**decisions** 34:21
**deem** 33:22
**defend** 35:14
**defendant** 9:17
**defense** 36:4
**defenses** 73:21
**defensive** 32:8 34:23

**degree** 35:22 72:2
  73:13,14,20 74:20
**degrees** 80:17
**delayed** 49:10
**deliberately** 37:7
**demeanor** 63:22
**demonstrating** 101:24
**department** 4:9 10:1,
  18 13:11,14 19:6 20:8,
  10 21:8,24 23:17,23
  24:13,25 25:4,11,15
  30:6 31:4 58:3 72:24
  99:20,21 108:23 109:6,
  19 111:8
**Department's** 32:13
**departmental** 108:24
  110:21
**depended** 28:18
**dependent** 43:14 44:25
**depending** 38:17 73:23
  82:23
**depends** 28:18 46:20
  73:6
**depicted** 107:23
**deploy** 40:24 43:3 48:1
  82:25 83:2 84:6
**deployed** 41:7 45:20
  83:6,10 84:21,23
**deploying** 87:17
**deployments** 109:16
**deposed** 4:24 7:19
**deposition** 7:3 8:24
  111:6
**deputy** 22:17 23:12,13
**describe** 22:23 59:17
  87:5,7 95:1 110:4
**describes** 44:16
**describing** 46:13 47:18
  84:8
**description** 44:21
**designed** 44:6
**desired** 40:25 47:23,24
  48:5
**detail** 30:12 57:6
**detailed** 33:24
**detection** 15:20 16:12,
  13,16
**determination** 73:4,6
**determine** 53:23
**determined** 40:5

**dictated** 55:13
**difference** 14:18,19
  59:13 69:19,20
**differences** 10:23 14:6
**difficult** 6:20,23 16:3
  18:9,20
**digital** 98:22
**direct** 29:12
**directed** 77:7,16
**direction** 18:13,14,15
  37:14 58:22 61:6,10
  83:22,25 84:16 88:8
**directly** 22:20 38:15
  80:8 88:10
**disarmed** 56:1 102:4
**discharge** 49:12
**discharged** 50:16
**discharging** 50:21
**disciplinary** 11:25
  109:23
**discretion** 73:17,20
**discriminatory** 18:6,11
**discuss** 78:4,7 112:3
**discussed** 93:18
  106:9,21
**discussing** 50:14
**dismissed** 106:15
**dispatch** 66:24,25
  70:14,15
**disposition** 109:2
**distance** 47:2,21 56:18
  76:1,12 80:9 82:12,15,
  16,18 92:24 93:21
  100:22,24
**distinction** 37:12
**distraught** 87:9,11
**distress** 45:5
**division** 23:4
**DNA** 103:4,9,16
**document** 39:5 108:13
**documents** 7:7
**dog** 15:20,23,24 16:8,
  13,14,16,23 17:20 18:4,
  6,9,15,16,25 110:5
**dogs** 16:11,12 17:15
  18:10,11
**dominant** 38:3,9,13,16,
  21
**download** 42:20,21

**dozen** 97:1
**draw** 38:2,11 49:19
  50:8 53:11 81:15
  101:13,16,17 102:13
**drawing** 100:23
**drawn** 102:6,8,12
**draws** 81:14
**dreadlocks** 12:9
**drew** 51:15 58:13 81:24
  100:17
**drive** 27:20,25 40:8,11
  41:3,6,9,12,14 68:8
**driven** 99:5
**driver's** 66:5 76:21
**driveway** 61:21
**driving** 58:3,21
**drop** 52:11 53:16 54:3
**drug** 28:25 45:4
**dual** 16:16
**due** 69:19
**duly** 4:4
**duration** 42:22,24
  43:11
**duty** 33:13 36:11
**dysfunction** 44:7

——————

**E**

**e.g.** 45:4
**earlier** 49:9 75:1 93:18
  109:19
**early** 75:9
**easier** 38:2
**easily** 8:3 13:7 17:9
**east** 23:4,6 27:14
  61:13,20
**effect** 40:16,25 47:23,
  24 48:5 86:3
**effective** 43:18,20 45:1
  48:12 82:2,21
**effectively** 80:12
  82:10,25
**effort** 65:5
**efforts** 87:12
**elaborate** 19:19
**elected** 25:12 40:6
**electrical** 44:6
**electronic** 48:17
**eliminate** 54:25

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022

5

**email** 31:17
**emergency** 59:3 60:11, 21,25 91:18 92:22 93:6
**emotional** 60:5
**employ** 36:7
**employed** 4:9
**employing** 37:25
**employment** 69:5
**EMT** 99:18,23 100:8, 10,12
**encampments** 62:20
**encounter** 62:10
**encountered** 66:14
**end** 26:23 36:3 40:19, 23 53:11 57:19 82:8
**ended** 15:19 69:11,13 81:3,6 86:11 112:10
**ends** 76:15 81:10
**energy** 48:22
**enforcement** 9:24 10:2,4 26:8 45:24
**engaging** 102:7
**enhanced** 104:6
**entail** 17:13 30:10
**entered** 87:19
**enterer** 10:4
**entire** 21:18 29:21 30:15 60:4 104:17
**entrance** 61:20
**environment** 26:12
**epitome** 20:5
**equipment** 37:6 59:3 60:11
**essence** 48:11
**essentially** 15:6 23:1 30:24 31:1 59:4 71:21 77:13 78:15 84:9
**Estate** 4:19
**estimation** 72:14
**evaluated** 110:12
**evening** 57:22 75:1 98:18
**event** 65:10 71:6 112:2
**events** 7:5 57:11 104:18,20 105:15
**eventually** 18:16 19:2
**evidence** 81:18,19 103:16 105:13
**exacerbate** 60:7

**exact** 22:18 28:20 33:13 34:19 45:23 66:25 76:18 90:9 111:3
**EXAMINATION** 4:6
**examined** 4:5
**examples** 20:1
**exception** 6:1,6
**excessive** 32:23 33:1, 10,12,17,22 46:11 109:14 110:18
**exchanged** 51:18
**excuse** 36:19
**exhibit** 39:6,7,8 44:12 47:13 48:24 98:22 107:17,18,24
**exit** 50:12
**exited** 72:5
**exonerated** 109:3
**expanding** 47:19
**expected** 93:23 94:1
**experience** 22:14 45:10,17 65:23 102:6
**experienced** 11:14 63:25
**explain** 11:2 14:21 44:3 63:18 73:3 104:25
**explained** 60:23 71:23 98:14
**extended** 101:18
**extent** 33:3 47:5 89:20
**extremities** 44:9,10
**eye** 96:5,13 97:5

---

**F**

**face** 83:12
**facility** 11:8,10,13,16 12:11,13,22
**facing** 61:7,9,13 77:2 80:23 88:8
**fact** 50:20 69:21 85:23 89:18
**factor** 25:6 35:18
**factors** 34:2,4 52:24
**facts** 43:15 81:18 106:25
**fail** 45:17 46:9
**failed** 46:4
**failures** 46:12
**fair** 8:15 75:9

**fairly** 49:16,23 50:3 59:12 63:24 69:11,13
**fall** 55:21 63:3
**fallen** 86:9
**falls** 81:7
**false** 71:24
**familiar** 5:2 39:12 92:11
**family** 9:14
**fast** 82:23,24
**fatally** 90:22
**fear** 36:2
**feature** 108:9,12
**features** 108:3
**feel** 16:7 41:20 56:12 82:25 105:8,14 109:21
**feet** 46:21,22,25 47:5 48:9 76:4,8,19 81:16 82:5,9,20,22,23 83:19
**felon** 50:7
**felony** 50:1,6 72:3 73:7,13,14 74:20 100:18
**felt** 82:1 86:19
**field** 30:17,20
**fight** 44:1 45:7
**fighter** 45:6
**fighting** 12:14 16:25
**figure** 71:25 86:18
**filed** 12:2,5,16 111:1,7, 9
**filings** 9:5
**final** 21:10 111:24
**find** 16:14 18:19,23 65:3 90:24 91:21,22
**finding** 17:15
**fine** 4:15 98:24 108:16
**fingerprint** 103:9
**fingerprints** 103:4,16
**finish** 5:7,9
**fire** 40:8,10,11 47:9 51:19 84:20 86:19 87:21 89:9,17,24 99:19, 21 100:3 102:7
**firearm** 50:16,22 100:17,23 101:10 102:8,11
**fired** 46:17 84:18 85:12,25 92:15 94:12

**firefighters** 100:10
**firing** 86:25 87:6
**flags** 66:9
**flee** 87:11
**fleeing** 16:24
**focus** 17:14 45:6 94:5
**folding** 108:7
**folks** 28:23 62:20
**foot** 56:14 83:20
**footage** 96:23 97:13,18 103:23 104:2
**Foothill** 28:3
**force** 13:2 32:1,6,10, 14,20,23 33:1,10 34:13, 22 35:5,8,22,25 36:7 40:6 49:10 53:22,24 86:21 101:15 102:8,22 109:14 110:18
**forgiving** 75:9
**forked** 19:22
**form** 65:3,16
**formal** 24:9
**forward** 38:18 83:21
**found** 19:16 51:12 72:1,2 107:12
**foundation** 32:15
**Fox** 7:16 9:22 67:9,15, 16 68:4 70:11,19 71:20 75:21 77:1 78:22 80:5,9 81:5,13,14 84:20 85:8, 11 86:13 87:21 88:1,2, 11,14,15 89:10,13,16 91:16,20,23,25 92:23 93:7,20 99:13,17,19 104:15 105:20 106:3,10
**Fox's** 88:12
**frames** 13:24
**friend** 51:2,3,4 100:24 105:15
**friends** 67:16 69:15,23 71:1
**front** 39:14 58:19 61:17,19 75:23 78:22 80:2,7,24 83:20 88:11 101:12 102:9
**fuck** 86:14
**fucking** 89:20,21
**full** 101:17
**fun** 60:1
**function** 11:3 14:12 41:4,6,7,15

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1229   Page 36 of 44

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    6

functioning 14:17
functions 43:2
fundamental 22:22
fundamentally 22:2
  34:19
funding 25:7,9,11

**G**

gain 52:17 71:22 82:12,
  15,18
gave 31:9 51:15 64:16,
  17,18,23,25 71:17
  104:11
gear 36:10
general 6:9 28:21 34:9
Generally 6:5
gentleman's 12:9
gentlemen 53:6
geo 51:6
geographic 24:19
gesture 41:18
girlfriend 51:14,17
girls 70:6
give 5:13 17:24 18:6,14
  20:1 23:19 31:15 53:9
  54:5,18 55:19 76:11
  93:14 97:15
giving 25:9 50:11
  63:16 97:18
goal 82:14
good 4:8 47:6 84:4
  98:12
Goose 15:17,24,25
  16:1,16
gotta 63:1
grab 54:22 55:9
Graham 33:20 34:2,4
Gras 77:24
grass 81:10
grassy 62:24
graveyard 57:17
Graveyards 57:14
great 21:15 49:5 112:9
greater 35:22
ground 5:3 47:12 54:8
  88:1,10,16 89:1 90:12
  96:20 103:1
group 48:10

groups 47:25
guess 22:9 26:25 82:17
guessing 8:14
guide 31:1
guidelines 33:15
gun 35:9 45:8 51:19
  53:10 54:17 81:14
  101:20
guy 18:20,21
guys 27:24 68:20 93:5

**H**

hair 12:17
half 5:22 46:5 95:25
  97:1
hand 37:10 38:3,9,16,
  21 39:5 58:18 101:25
  107:16
handbook 31:5
handcuff 79:21
handcuffs 13:1 35:5
  36:14 44:11 78:6,10
  79:17,20,25 80:2 88:3
handful 16:1
handle 22:12 108:6
handled 15:25
handler 20:21 109:18
handlers 17:18,19
  20:11
handling 29:17
hands 56:15 77:9,16
  79:24 85:3,15 87:15
  102:16,21
happen 6:7
happened 50:23 57:21
  60:1,20 71:13 87:20,25
  91:17 104:16 105:7
  106:4 109:15
hard 11:2 18:4 108:11
harm 53:12
Harmon 4:18,19 23:20
  57:10 58:6,14 59:1
  60:22 63:11 64:19,20
  65:20 66:14 74:19,25
  75:13,19,22 77:2,4
  78:5,22 79:3 80:2,6,8,
  19,22,24,25 81:8,9,14,
  15,22 85:5,17,18,24
  86:2 87:1,23 88:10,15,
  19 89:10,14 90:10
  92:22,24 93:1,7,22

95:13 96:23 103:1
  104:15
Harmon's 9:14,20
  71:14 78:24 79:2,5,10,
  11,16,24 80:25 81:11
  85:3,14 88:22
Hatch 29:19
hazard 50:13
head 5:17 37:12 79:15
  86:17 103:17
hear 19:23 51:11
heard 51:13 60:18
  85:20 86:12 106:13,23
hearing 85:22
hearings 9:7
held 11:20
helpful 5:10 24:18
hey 18:13 21:14 31:16
  54:3 63:1 66:19 71:22
  74:6,13 77:7 91:21,22
  106:23
hiding 17:18 18:23
high 45:1,4 50:13 62:7
  91:3
higher 35:20,21 94:5
highest 25:14 26:8
hit 47:11 51:20,24 52:2
  76:16 88:10 90:24 91:4
Hm-mm 99:12
hold 13:2 43:7
holding 29:14 54:10
  55:7 101:24
holds 102:13
holes 91:23
holster 101:16,18
home 68:18
homeless 61:19 62:18,
  20
homelessness 62:16
honest 75:8,9
honestly 33:8 82:3
hospital 99:6,9 110:12,
  15
hospitalization 110:10
hostile 64:5 87:1
hound 15:18
hour 49:2 69:21
house 14:13 27:13
  28:2 68:9,12

housing 11:21 61:18
Huh-uh 99:10,14 107:9
hundred 101:1,4
hundreds 8:19 50:4
hung 51:1
hypothetical 45:16
  53:21
hypothetically 45:11
  53:15
hypotheticals 53:4

**I**

IA 108:25 111:25
ID 64:12 65:15 66:8
  75:13
idea 8:7 21:4 82:1
  92:17 99:13,16 111:1
ideally 48:13
identification 65:3,16
identified 60:22
identify 18:18 65:20
  66:3
identifying 98:21
identity 66:10 71:19
  75:10
ignore 106:24
illnesses 6:19
illustration 47:14
image 39:14 47:4
imagine 16:3 26:7 33:9
  70:13 98:5 99:20
impact 44:22 83:4
  87:23
implementation 49:8
implemented 34:16
important 5:4,6,12,16
  37:17 55:6
impressive 17:10
inappropriately 30:25
incapacitate 43:24
  44:4 47:25
incapacitation 40:25
  44:17,22,23 45:12
  47:15 48:3,7
inch 95:25
inches 48:4 95:24
  96:12
incident 21:6 24:5
  96:23 97:16 104:15

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022

7

**incidents** 24:14 26:15
109:7 110:2,9
**including** 32:10
**increases** 47:22
**incredibly** 18:20 46:10
**indicating** 15:21 95:9
96:4 101:23 108:12
**individual** 12:13 17:25
18:7 19:1 34:10 40:15,
18 41:19 43:24 51:2,14
53:5 55:4 72:18,22,25
73:17 74:4,22 88:5 94:4
101:19
**individual's** 40:13,22
94:6
**individuals** 46:9 58:10
61:19
**inflict** 53:12
**influence** 6:22
**information** 29:10
51:11 55:19 63:15 64:9,
13 65:2,9,14 71:15,17,
22,24
**informed** 111:8
**infraction** 59:9,12,14,
16,17 63:19
**initially** 61:11 75:14
90:25 93:2
**initiated** 109:5,8,12
**initiates** 78:20
**injured** 36:4 110:2
**injuries** 110:4
**injury** 44:1,2 72:4
**inmate** 11:25 12:21
**inmates** 12:3,4
**inside** 15:3 95:5
**instructs** 6:6
**intend** 60:6
**intense** 26:11
**intentions** 87:1
**interaction** 64:3 85:13
86:7 87:10 95:12
**intercom** 60:10,13
**interim** 21:20
**internal** 109:22
**International** 39:3
48:20
**intervene** 33:13
**interview** 98:4,14

**interviewed** 97:24
**interviews** 24:1 111:25
**intoxicated** 12:13
46:10
**introduced** 4:16
**investigate** 24:6
**investigates** 24:16
**investigating** 7:23
**investigation** 23:20,21,
24 24:10 98:3
**investigations** 23:14
103:12
**investigators** 97:15,22
98:14 104:12 106:5
**involuntary** 44:24
**involved** 11:24 17:10,
17 20:2,3,5 24:8 27:7
44:2 103:18,20
**involves** 24:16
**involving** 23:22
**issue** 52:22,25 98:8,10,
21 104:9 109:18
**issued** 36:16 42:25
46:24 72:8 109:6
**issues** 73:11
**issuing** 52:11
**item** 18:6 33:21 54:17
94:9

**J**

**Jack** 16:20
**Jagdterrier** 15:21
**jail** 12:6 27:24 28:5,6
59:16 69:3 73:8,10,11,
15 74:1,9 75:12 78:16
87:12,13 110:12,16
**job** 10:2 14:11 15:5
16:14 21:15 30:23
49:10 55:1,2
**jobs** 11:1
**judge** 72:19,22 77:14
**jumps** 53:6
**JUNE** 4:1
**jurisdiction** 24:20
**justification** 20:18
**justify** 105:13,16

**K**

**K-R-I-S** 4:23
**Katie** 98:12 104:1
**keeping** 101:20
**kids** 69:12,13 70:1
**kill** 35:14 51:3 89:21
**kind** 9:1 11:4 13:18
16:19 24:11 28:22
29:12 31:1,9 36:10 51:9
56:8 61:12 68:8 73:14
90:20 100:11 101:25
**kit** 36:14
**knees** 84:10
**knew** 22:12 91:2
**knife** 54:17 86:17 89:1,
3,14 91:25 93:8,11,13,
16,21 100:13 102:25
103:3,10 104:21 105:18
107:2,5,10,20,23 108:4,
7
**knoll** 62:24
**knowledge** 42:12
**Kris** 4:3,22

**L**

**lab** 103:6,8,20
**labeled** 39:8
**laced** 64:2
**lack** 19:18,22 22:4
34:25 63:25
**Lake** 4:1,9 8:6 10:1,7,
17 11:10 13:11 18:11
19:5 20:5,7 24:6,13,21,
22 25:1,15 26:6,7,13,23
30:6 32:13 42:19 45:22
46:24 49:17,18 62:17
67:19 69:2,5,10 72:24
73:10 108:23
**lane** 58:24
**lanes** 58:17,19 59:2
63:21
**language** 5:15 33:14
52:15 87:5,8,14
**lapel** 96:2,12
**large** 22:11 47:25 91:2
**late** 26:4
**latent** 103:4,9
**law** 9:24 10:2,4 26:8
45:24

**lawyers** 6:11
**lay** 54:7 88:7
**laying** 90:12
**layout** 95:2
**leadership** 19:7,11,17
**learn** 111:5
**learned** 110:24
**leave** 20:19 21:7 63:1
**left** 13:22 20:2 21:20
22:12 37:10 38:14 58:2
79:1,2,14,17 80:10,14,
15,25 81:14 84:2 87:16
88:11 91:8 93:15
**leg** 52:2 91:1,6,12 92:3
110:8
**legal** 9:5 59:19
**lessening** 101:21
**lethal** 36:18 54:10
101:14 102:22
**letting** 16:23 17:19
**level** 45:1 53:23,24,25
57:6 59:8,11 73:6 96:6
97:5
**liaison** 11:23
**Liberty** 14:12 23:7
27:13,21,22 28:2,4 58:2
**license** 66:5
**lie** 75:11
**lied** 74:25
**lieutenant** 23:2,6,8
**lieutenants** 23:2
**life** 36:3 94:7
**light** 58:17
**lightly** 60:3
**lights** 60:12,21,25
61:11
**likelihood** 47:11 82:9
91:3
**liking** 26:1
**limit** 45:13 102:8,10
**limitations** 101:1,6
**limited** 24:22
**limits** 24:23
**lines** 5:12 47:15 52:16
77:12
**list** 24:15 33:21
**listen** 9:7
**lit** 80:19
**literally** 20:9

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    8

litigation 106:1,9,21
live 26:20 34:25 68:7
  69:21 103:23
lived 51:22
living 26:22 62:20
locate 17:16,20 65:15
located 100:6
location 14:25 48:8
  51:7
long 5:23 8:16 10:9
  29:14 30:13 42:23,25
  67:18 68:25 76:5 78:8
  92:15 95:25 98:22
longer 93:4
looked 23:22 27:1
loose 43:9
lost 86:11
lot 5:1 8:14 11:12 14:14
  16:4,6 17:14 18:3 23:23
  24:1 29:1 30:3,11,12
  34:24 56:20 62:15 73:5,
  10
loud 60:18
love 16:8
low 82:10
low-level 59:14,15
lower 40:21 47:9 53:25
  82:8
lowest 59:11
lucky 11:15
lumped 20:12 21:1
Lutz 4:7,17 9:16 11:8
  21:6 22:6 23:19 26:4,7
  32:18 33:15,23 38:6
  39:8,25 41:21 45:19
  49:3,7 54:11 56:1,19,22
  58:5 59:21 71:1 81:21
  87:20 94:19 98:6,12,13,
  17,21 99:1 105:12
  107:18 108:8,19,22
  111:19,24 112:2,7
lying 65:24 88:16

— M —

made 10:16 27:23
  28:10 58:9 60:22 71:20
  80:22 86:15
magnet 95:7 96:3
maintain 42:13 94:6
maintaining 101:21

major 24:12
majority 31:13 46:7
  50:20 87:10
make 6:19,23 19:20
  27:6,18 30:24 34:21
  40:13 44:5 54:20,21
  56:9,13 73:3,5 95:21
makes 44:8 80:12
  81:16
making 28:13 37:8
  48:11 60:24 74:16
  80:16 90:17 94:8
man 77:13
managers 62:25
manifest 87:1
manipulate 56:15
manual 31:12 32:22
  39:9,15 44:21
Mardi 77:24
mark 39:6
marked 39:7 107:17
marriage 70:7
material 100:16
matter 6:11 23:20
  72:14
matters 6:7 11:25
meaning 18:6,11 47:25
  50:25 101:17
means 14:21,22 15:11
  16:23 72:17,21
media 97:8
medical 6:19 92:22
  93:6
medications 6:22
medicine 91:18
meet 28:6
mellow 26:6
memory 84:25
mention 93:7,11,13,15,
  23 107:2
mentioned 8:10,25
  49:9 52:9
message 51:4
met 7:4 8:25 69:3
  103:25 104:1
metal 40:20
meters 51:9
method 17:21,22
middle 18:22 44:15

Mike 19:15 22:10,15
miles 25:23
Miller 52:5
mine 37:7
minors 29:1
minutes 108:19
misdemeanor 59:11,
  14,15 73:21,24 74:7
misheard 65:11
missed 46:15
missing 46:13
misstates 81:19
mm-hms 5:14
moaned 90:20
model 38:25 39:2,12,
  18
module 95:10
moment 26:18 87:16
moments 87:6
momentum 83:21
Money 10:17 25:6
months 30:1,2,16,18,
  19 69:18
morning 4:8 57:20
motel 61:18 62:25
motivation 21:7
motor 44:7,25
mouth 80:19 86:6
move 10:14 11:15 19:5
  44:5,9,10 54:6,16,19
  55:6 79:10 85:5,8
moved 10:17 13:11
  19:2 25:17 69:10,11,19
  92:6 96:17
movement 11:18
Moves 79:16
movies 17:24
moving 56:11 69:11
  82:14 83:6,13 94:3
multiple 55:1
municipal 59:22
muscle 47:25
muscles 48:10

— N —

nail 40:4
name's 4:17
named 15:24

names 13:8
narcotic 16:11 46:10
narcotics 15:20 16:13,
  15,17 28:25 62:11
narrative 39:23 57:24
nature 6:23 12:8 58:11
  78:6 100:19 106:2,17
nearby 61:14
necessarily 35:10
neck 95:8
necklace 77:24
needed 5:24 16:19,21
  27:10,16,18,23
nerves 44:24,25
neuromuscular 44:16,
  22,23 47:14
news 88:24 107:12
nice 48:18 93:24
Nichols 6:3,10 7:10
  9:1,11 10:25 21:3 22:1
  23:18 26:2 32:15 33:2,
  18 38:5 39:22 41:18,20
  45:15 49:1,5 53:19
  55:24 57:23 59:19
  70:23 81:17 98:7,24
  103:25 105:10 108:5,20
  111:16,20,22 112:1,5,9
Nick 4:17 20:22
night 7:6 18:23 57:25
  63:6,9 67:25 68:2 70:9
  104:12 106:6
nightly 49:25
nipple 84:9,14
nodding 5:14
nods 5:17 79:15
noises 90:17
nondominant 37:10
  38:12
nonlethal 38:3 40:7
nonviolent 73:22
normal 56:6
north 25:23 61:25
notifications 106:1
number 28:20 39:12
  45:23 66:2,3,5,6,8,9
  76:6 98:23 106:24

— O —

oath 6:14,15

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022

9

**object** 6:4 33:2 112:6
**objection** 9:11 10:25 21:3 22:1 23:18 26:2 32:15 33:18 38:5 39:22 45:15 53:19 57:23 59:19 70:23 81:17 105:10 108:5
**obligation** 105:8,14
**observe** 84:3 85:14
**observed** 58:15
**obtain** 47:24 101:22
**obvious** 24:7
**OC** 36:14,20,24
**occasionally** 6:4
**occurred** 15:3 49:15 84:4 105:24
**occurs** 24:14 44:23
**odor** 18:8
**odors** 18:17,18
**offense** 50:10 59:18 73:9 74:4,6,8
**offenses** 74:17
**office** 10:8 25:2,3,10, 21
**officer** 4:8,11,14 7:23 9:21,24 10:8,20,21 11:6,21,22,23 13:15,20 14:18,23,24 20:6,13,20 25:16 26:19,24 28:6 29:6,8 30:22 31:2 34:9 35:24 36:9 37:7 38:10 50:15 52:4,5,6,10 54:20 62:6 66:20 67:3,9,15,16 68:4,22 69:7,17 70:5,19 71:10,20,21 72:4 75:17, 21 76:23 77:1 78:9,12, 21,22 79:1,2,13,16,23 80:1,5,9,23 81:1,3,4,5, 6,7,9,13,14 84:20 85:8, 11 87:21 88:1,2,6,11,15 89:10,11,13,14,16 91:16,20,23,25 92:23 93:7,10,13,20 98:19 99:13,15,17,19 104:14 105:20 106:3,10,20 107:1,4
**officer's** 30:23
**officers** 7:14,16 11:12 13:5 14:20 15:2,12 20:4,6 22:11,25 33:11 36:5 37:5,20,25 38:7 44:2,10 51:12,18,24 52:3 54:9,24 60:17

67:6,11 70:11,19 71:5,7 78:4 88:7 90:10 92:1,5 93:20 97:12 98:1,18
**oftentimes** 27:3 73:11 96:16
**Ogden** 26:14
**older** 15:19
**on-duty** 23:2 92:4
**one's** 59:23
**open** 28:25 89:23 110:13 112:4
**opening** 89:9,17
**operates** 24:4
**opportunities** 10:19 11:3
**opportunity** 53:15 54:22 55:8 65:13 84:5 101:21
**opposite** 40:22
**optimal** 84:11
**option** 36:19 47:2
**options** 43:20 102:9
**org** 22:23
**original** 13:13
**outcome** 8:7
**overcrowding** 73:11
**overhead** 59:3 60:11
**owners** 62:25
**owns** 48:20

---

**P**

**p.m.** 57:18,22 58:6 108:21 111:21 112:10
**pack** 95:4,11
**pain** 44:25 45:1,4,6,7 68:8
**painful** 48:4
**pair** 12:19
**pairs** 28:11
**pant** 91:1
**pants** 91:23
**paper** 36:14
**parameters** 55:21
**paraphernalia** 28:25
**park** 14:13 27:13,21,22 28:2,4,19,24
**parked** 76:16
**parks** 14:12,13,15 15:4,6 27:5

**part** 21:7
**partner** 28:7
**partners** 28:9
**parts** 56:6
**passenger** 76:23
**past** 63:8,9 80:9 81:16
**Patrick** 4:18,19 57:10 58:6
**patrol** 13:15,20,21,22 14:16,17,20,22,24 15:2, 8,9,23,24 16:17 19:3 22:25 23:12 26:25 27:15,19,24 28:4,8,12 29:2,3,6,8,22 49:25 57:15 65:1
**patrolling** 14:12 58:4 62:4
**paying** 10:18
**Peace** 64:18,19,22,25
**Pearce** 20:22
**penalty** 6:16 59:15
**pending** 6:2 29:12
**Pens** 36:14
**people** 16:15,18 17:15 18:2,3,19 64:1 66:4 92:19
**perceived** 86:16
**percent** 7:15
**perfect** 54:23 94:2
**perfectly** 5:20
**period** 93:10
**periodically** 31:14
**perjury** 6:16
**permanent** 21:21
**person** 16:8 18:13,23 29:24 42:9 45:5 53:13 54:24 56:25 74:9
**person's** 44:7 54:12,14
**personal** 70:21 77:14
**personally** 70:21
**perspective** 21:24 22:8 98:25
**peruses** 108:13
**phenomenal** 20:8
**photo** 72:1 98:19
**photograph** 89:5
**photos** 98:17
**phrase** 42:12
**physical** 12:24,25 40:18 61:21 78:9 95:1

102:17
**physically** 16:23 44:9 56:16
**pick** 18:16,17 20:17
**picking** 56:16
**picture** 89:4 107:14,20
**piece** 103:15 105:12
**Pioneer** 23:5,6
**pistol** 36:13 37:13,22 38:2,9,11 41:2 50:11 51:15 53:7 54:4 86:20 101:2,4 102:16,18
**pivot** 83:19 85:7
**pivoted** 83:23 87:16
**place** 78:18
**placing** 78:10
**plaintiffs** 4:18
**plan** 52:19
**plans** 26:17
**plant** 83:15,17
**planted** 83:23 85:7
**play** 98:10
**player's** 35:2
**playing** 69:13
**pocket** 56:17
**pocketknife** 100:14,15
**pockets** 85:18
**point** 43:21 53:7,22 63:2 65:17 67:18 71:2 81:7 85:13 88:18 91:20 93:5 95:12
**pointing** 50:11 52:10 96:19 101:18
**points** 35:9
**police** 4:9,11 10:1,17, 20 13:11 19:6 21:17,19 23:17,22 24:13 25:4,11, 15 30:6 31:1,4 32:13 58:2 60:18 72:24 97:25 108:23
**policies** 31:4,9 32:20 34:12,16 57:5 108:24
**policy** 31:12,16,18,20, 22 32:12,14,19,22,25 33:4,9,14,16,20,22,24 36:17 52:13,14 55:14, 15 57:2 72:25 95:17 109:3 110:21
**poor** 19:7,11,16
**pop** 62:23,24

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    10

popped 27:4 63:5
portion 40:22 86:7
pose 55:9
posed 101:8
position 10:10 19:3
22:18 25:24 29:5 38:17,
18 54:7 97:3
positioned 76:14
positioning 32:9
positions 11:16,19
13:16,25 14:7
possession 28:24 29:1
54:13 55:11 88:19,23
possibly 63:8
potentially 8:20 27:8
62:13 81:18
practice 55:20,21
Precinct 23:5,7
prep 111:6
preparation 7:11,18
prepare 7:2
prescribed 52:13
presence 107:2
present 13:6 50:15
63:6
presented 74:17 75:13
109:1
presenting 101:17
102:22
presents 50:13 53:4
101:14
pretty 5:21 17:10 18:4,
8 26:14 29:25 31:10
34:17 62:12 66:4 67:14
68:24 71:12 89:25 90:8
92:17 96:5 97:5
prevent 16:24 44:1,2
previous 21:22 22:14
29:10 70:7 99:18
previously 55:7
Price 99:2,3
primary 9:10 14:11
15:5 17:14
printout 98:18
prior 52:25 58:5,9
66:13 86:25 87:6,17
89:9,16 97:18 106:4
priority 94:6
privilege 6:8
proactive 15:5

probe 40:17,23
probes 40:12,14 41:11,
14 43:5 46:18,19
procedure 24:3 50:7
52:12 55:13 95:17
procedures 92:22 93:6
proceedings 87:19
112:10
process 30:14 105:7
processing 24:2 85:22
produce 37:10
produced 45:13 98:9
produces 40:12 44:6
53:6 54:2
profanity 64:2
program 30:17,18,21
31:19
progression 13:19
prohibition 32:23
promoted 10:12
prone 54:6
prong 41:7 47:9,11
48:7,9,13,14
prongs 41:25 42:3
46:13,15 47:8,16,21
48:1,3
proper 32:8 101:10
properties 62:25
property 12:16 63:2
proportionality 35:18
prostitution 62:11
protect 35:12
protocol 110:11
protocols 5:3
provide 64:13 65:9
66:7 97:21
provided 64:10 65:14
providing 71:24
proximity 93:7
prudent 52:17
psychological 45:5
public 34:9 36:5
published 88:25
pull 41:11 43:6 64:1
74:2,10 76:13 91:24
pulled 79:24 96:18
pulling 35:10 37:13
61:1
purpose 15:20 16:15,
16 43:22 112:4

push 31:17 66:19
pushed 25:9
put 12:15 34:24 38:9
44:11 48:24 49:17
70:10 77:8,16 83:20
95:4 98:22 101:19
112:7
puts 66:21,23
putting 35:4 49:14
56:17

Q

question 5:8,9,13 6:2,6
21:5 32:17 70:9
questioning 60:7
questions 6:4 65:25
94:19 111:18,22
quick 92:17
quickly 37:18

R

radio 66:17 70:12 88:3
raises 66:9
ran 18:21 81:2,4
range 46:19 51:7,8
70:2
rank 25:14
re-approached 71:15,
16
reach 37:14 88:15
reaching 79:20 80:1
81:13 85:18,19 92:24
93:21
reacquire 94:9
reactionary 76:12
read 9:2,5 31:10,12
111:23
rear 58:16 76:15
rearresting 74:5
reason 11:11 55:10
60:4,15 64:3 86:18
93:25
reasonable 32:14
35:21 43:13
reasons 24:7 60:23
63:16
recall 8:5 11:19 12:4
13:24 33:8,13,19 38:25
47:3 50:23 52:3 57:11
58:24 60:14 61:14,23

62:19 64:15,20 72:10,
12 77:19 85:21 89:12,
15,19 91:7,12 98:16
receive 29:10 34:20
received 43:10 100:22
recent 72:1
recently 111:2,5
recess 49:6 94:18
108:21 111:21
recognize 35:6 53:9,10
107:23 108:3,9
recollection 33:7 62:15
record 4:16,21 41:16
42:14 98:23 112:7
recorded 98:3,4
recovered 107:21
recurring 55:23
red 66:9
refer 4:13 41:24
reflect 41:16
regard 102:10 105:11
regular 14:20
regularly 5:21 49:23
50:3 62:4 69:14 100:17
rehash 7:4 9:1
reholstering 102:14
reiterated 77:14
related 109:18
relation 80:5 109:1
relationship 23:16 24:3
70:21 92:13
release 29:16 74:15
released 12:5 62:12
97:8,14 107:12 110:15
relinquished 56:24
93:19
reloadable 42:10
remember 6:25 8:3
13:7,8 14:1 15:16 20:20
21:12 22:16,17 33:3,10,
25 34:6 39:2,4 45:23
46:7 48:18 52:14 59:10
61:24 62:1 63:14 64:17,
18,21 67:20 69:4 71:11,
15 76:3,9,18 77:11,21,
25 79:19 81:4 82:3
85:22 86:4,8 87:18
88:17 91:5,11,14,20
92:2 93:12 98:1 100:5
104:21 107:3 109:10
111:3

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1234   Page 41 of 44

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    11

**remind** 13:10
**remove** 12:20 41:8 54:16 56:7 63:1 90:23
**removed** 12:14 72:20
**removes** 79:5
**render** 94:4,13
**rendering** 92:5
**rephrase** 82:18
**report** 22:25 23:2 60:17 103:8 104:9,13
**reporter** 5:5
**reports** 103:6
**represent** 47:16
**require** 110:9
**required** 42:20 58:18
**requires** 41:8
**res** 20:3
**rescue** 20:3 100:13
**residences** 61:22
**resist** 87:11
**resistance** 53:25
**resisting** 34:10
**resources** 27:7
**respond** 14:25 67:3,6 70:11 77:10
**responded** 60:25 70:20
**responds** 70:15
**response** 35:2 63:22
**responsive** 14:20,22
**rest** 62:2
**result** 46:13
**retail** 73:22 74:11
**retiring** 15:19
**retreated** 51:16
**retrieve** 37:9
**return** 26:17
**returned** 65:8,14 71:18
**review** 7:7 9:1 31:14 109:22
**reviewed** 7:5 96:22 109:20
**rib** 101:25
**ride** 14:15 27:12,13,22 30:23 59:1
**riding** 28:10 58:15,18, 19
**rights** 9:14,20
**Riley** 87:19 98:20 108:18

**risk** 102:3
**river** 20:3
**road** 11:7 65:11 80:13
**roadway** 61:13
**robberies** 62:12
**Robinson** 7:16 67:10 68:22 69:7,17 70:5,11, 19 71:21 72:4 75:17 76:23 79:1,2,13,17,24 80:1,23 81:2,3,4,6,7,10 88:2,6,11,14 89:11,14 91:21 92:23 93:11 99:15,18 106:20 107:1, 4
**role** 7:22 34:12 35:2
**roles** 11:4
**rolled** 90:25
**rotation** 24:12
**rough** 76:6
**roughly** 67:21
**rounded** 108:15
**rounds** 101:19
**rudeness** 110:25
**rule** 6:9
**rules** 5:4 12:11 14:11
**run** 5:23 43:6,8 81:8 82:24 95:5
**running** 46:16 80:3,14, 16 82:24 83:18 85:17 87:8
**runs** 43:4 80:8,25 81:1, 9

---

**S**

**S-M-I-T-H** 4:23
**sad** 90:19
**Salt** 4:1,9 8:6 10:1,7,17 11:10 13:11 18:11 19:5 20:5,7 24:6,13,21,22 25:1,15 26:6,7,13,23 30:6 32:13 42:18 45:22 46:24 49:17 62:17 67:19 69:2,5,10 72:24 73:10 108:23
**sat** 95:8 96:3,17
**scenario** 30:11 35:1,6 43:15 52:9 54:2 55:18, 20,22,24 57:3,8 82:11 94:2 102:23
**scenarios** 34:25 55:17 56:23

**scene** 24:1 88:7 93:15 105:13 107:10
**scent** 17:25 18:3,5,11
**scheduled** 5:22
**schedules** 69:20
**scissors** 12:19
**Scott** 67:9
**scratch** 35:16
**screw** 64:2
**search** 13:3 17:16
**searching** 16:18
**seatbelt** 108:10
**seconds** 43:3,4,7 79:23 90:2,4,5
**secure** 54:12,21 55:3, 11 56:3 94:1
**securing** 56:13,23 93:19 94:7
**security** 34:8 66:2,3,5, 9
**send** 31:17 66:19
**senior** 30:22,23
**sense** 11:13 70:18 84:22
**sensory** 44:24
**separate** 25:10
**separated** 25:3
**separation** 48:2
**September** 109:11
**sergeant** 15:22,23 22:25 23:1 29:12,18,19, 20,21 30:2 92:8,11,16
**seriousness** 74:17
**served** 72:17
**service** 15:4 29:17 36:13,25 37:18 38:2,13 49:12,19 50:11 52:10 53:1 85:12
**set** 37:8 43:14
**shape** 41:2
**sheriff** 25:7,12
**sheriffs** 10:7 24:25 25:2,3,10,21
**shift** 29:10 57:13,17
**shifts** 30:1 94:5
**shirt** 95:5,6
**shoot** 41:13 89:21
**shooters** 101:3
**shooting** 51:18 101:7 105:14,16

**short** 19:7 40:10 80:9
**shot** 9:22 51:17 52:4 53:11 88:5
**shots** 84:20 86:13 87:23 92:15
**show** 92:1
**showed** 51:9 92:4
**shows** 72:17,21
**shuts** 43:5
**side** 23:10 36:25 37:2, 4,8 38:11,12,13 61:1 65:11 70:8 76:21,23 78:24 79:1,2 81:14 101:20
**sides** 20:17,18
**sidewalk** 80:15 90:12
**sign** 111:23
**signal** 58:18
**signaling** 63:20
**significant** 36:2
**similar** 21:14 26:14 34:17 64:20 93:3
**similarly** 17:5
**simply** 35:4 94:3
**Simpson** 52:6
**Simultaneous** 85:2
**single** 15:20 16:15 30:2 42:6,7 52:20
**sits** 96:2
**situation** 15:1 34:22 50:23 52:20 53:14 101:15 102:3
**situations** 33:24 52:21
**size** 12:10,15
**SLCPD** 8:16 23:17,22 31:12 34:16,20 35:24 36:10 52:13 55:13 107:19
**SLPD** 21:18
**Smith** 4:3,8,14,19,22 98:19
**smoking** 28:24
**social** 66:2,3,5,8 68:19 92:13
**socially** 68:4 69:7
**softballs** 12:10,15
**sole** 30:23
**solely** 86:23
**somebody's** 35:13 65:24

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                                 12

someplace 17:18
sort 5:2 9:1 11:14
   19:24 20:18 22:6 25:9
   27:9 28:22 29:10 35:17
   37:25 46:10 54:10,25
   59:17 65:3 66:11 71:14
   94:8 100:8 109:3,4
sorts 62:9
sounds 22:6 35:17
   98:12 112:9
south 26:23 58:15,23
   61:8,20 80:16,25 81:1,
   8,9 88:9
space 76:11
speak 7:9 72:22
speaker 60:18
speaking 6:5 22:21
specific 14:25 18:6
   27:11 29:13 33:21,22,
   23 42:18 43:14 47:3
   56:23 57:3 77:22
specifically 15:3 16:11
   21:12 50:24 52:15
   59:10 62:19 77:20
   85:21 94:7 99:22
spectrum 82:8
speculation 21:3 38:5
   45:15 53:20 70:23
spell 4:20
spelled 4:22
spellings 65:9
spend 68:4,15 69:6
spent 68:20
spine 19:18
spoken 7:17
spray 36:14,24
squad 13:21,22,23
   14:2,3,5,9,10 49:24
   67:25 70:25
squad's 14:11
Sr 4:19
stab 85:20,21 86:3
stain 20:10
stance 75:7
stand 19:21
standard 24:2 50:7
standards 36:6
standing 101:12
stands 48:16
start 5:8 29:16 58:3

85:19 88:4 91:21 92:1
started 15:17 51:18
   58:3,19 67:19,20 69:4
   77:11 83:24 84:1,17,18
   86:10 90:23 91:1 92:3
   95:15
starting 26:25 49:24
   109:9
starts 79:17 80:6 82:20
   91:23
state 4:20 26:9 58:1,16
   59:23 65:2
stated 64:12
statement 97:15,19,21
   104:12 106:4,6
statements 20:15
   60:16
states 52:15
stay 10:9
stayed 61:5
step 30:5 44:10 108:17
stepdaughter 70:7
stepping 56:14 92:21
stepsons 70:8
stimulation 44:24
stimulus 35:2
stole 50:8
stolen 50:2 62:12
stood 20:2,4,9
stop 43:8 49:3 50:6
   53:5,13 59:4 63:16
   76:10,14 78:18 82:15
   83:11,13,21
stopped 58:10 61:12,
   15,17 62:3 63:18 64:6
stopping 61:1
stops 50:1 53:6 100:18
straight 47:9
strangling 51:14
straw 21:10
street 58:1,16 61:1
   62:1
strikes 13:3
strip 95:7
strive 20:7
structure 22:24
struggle 51:13
stun 40:8,11 41:3,6,10,
   12,14 45:8

subject 45:3 46:16
   47:10,12 105:23
   110:17,20
subject's 41:3
subjects 45:1
submitted 109:22
subsidized 61:18
substantially 34:15
successful 45:18 65:5
suffering 6:18
Sugar 14:13 27:13 28:2
suing 9:14
suited 71:8
supervising 29:20,21
supervisor 22:19 92:4,
   6,7
supervisors 29:11
supervisory 22:24
support 22:4
suppose 28:15 39:25
   53:14
supposed 18:8 95:18
survivability 91:3
survived 52:1
suspect 16:24 17:6,24
   39:25 40:5,8 43:11
   45:12,21 51:20 52:11
   53:1,2,16 55:6 56:1,2
   90:22 100:23 101:10
   102:4,7
suspect's 52:17 56:24
   101:12 103:16 110:10
suspects 93:19 100:18
   109:17 110:2
sustained 111:12
Sweeney 92:8,11,16
sworn 4:5
system 72:7,20

                T

T-BONE 15:18 16:13
tackle 102:12,15
tactics 32:8 34:23
tagged 27:5
taillight 59:6 63:19
   74:11
takes 18:25
taking 5:5 30:5 50:12
   94:8

talk 5:6 9:23 38:24
   45:19 46:6 57:10 60:1,2
   67:15 111:24 112:5
talked 100:17 102:24
   104:17 106:8,12,18
   109:19
talking 19:12 22:7 41:1
   42:25 44:19 49:8 55:25
   66:24 69:1 76:17 89:3
   95:15
tall 96:1
target 46:14 84:4,7,11
tase 43:16
tased 85:11
taser 36:13,20,23,24
   37:3,9,13,18,23 38:4
   39:1,3,9,14,18 40:7,16,
   18,19 41:2,9,24 42:13,
   20,21 43:1,2,23 45:11,
   13,20 47:2,24 48:1,11,
   19,20,21 81:15,23,24
   82:9 83:1,2,7,11 84:6,
   12,18,21,22 85:25
   86:25 87:6,17 102:13
taser's 44:6 82:21
tasers 38:25 45:17
   49:8
Tasha 4:18
task 27:11 54:21
tasks 27:3
taught 43:13,15 76:13
   100:24,25 101:15
teach 18:4,9 30:24
team 100:12
technical 98:7
technician 103:21
techniques 32:9 34:24
telling 73:15 91:20
tells 72:16
ten 25:2 54:24 76:8
tendency 96:18
tents 62:20
term 19:22 34:25 63:25
terrier 15:21
test 103:9
tested 103:3
testified 4:5 6:12 8:10,
   18 103:15,21
testify 6:20
testimony 8:22

Case 2:19-cv-00553-HCN-CMR   Document 80-5   Filed 10/28/22   PageID.1236   Page 43 of 44

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                        13

testing 103:19
text 51:4
texted 51:2
theft 73:22 74:11
theory 18:3
thigh 48:14
thing 43:19 79:13
  99:15 104:17 106:22
  108:11
things 5:13 11:5,6
  21:13 28:22 30:25
  33:16 50:2 62:9 72:15
  78:6 100:18 106:1,16,
  24 110:14
thinking 38:1
thought 111:24
thousand 51:9
threat 34:9 35:21 53:3,
  9,12 55:9 101:8
three-inch 48:2
three-minute 111:16
throwing 56:17
time 5:25 10:22 13:16,
  24 15:14 17:15 19:14,
  24 21:18 23:3 24:5
  25:7,8 26:24 29:14,18,
  21 30:11 36:2,17 42:18,
  19,23 46:18 51:6 53:8,
  10 57:17,19 59:16 61:4
  62:22,23 66:25 68:4,15,
  19 69:6 71:3,12 75:21
  77:17 80:18 81:13,15
  84:21 85:1,9,14,25
  86:2,21,24 90:6,7,8,9,
  21 92:4,21 93:1,5,10,22
  95:3,14,15 97:10
  103:22 107:11 109:9
  111:7
times 8:11 17:3,8 23:11
  29:24 43:16 45:20,23
  46:1,3,8 49:15,22 50:4,
  18 68:5,11 73:23 87:21
  90:20 96:25
tip 41:24
tired 11:12 21:16
today 5:22 6:20 7:3
  50:15 69:17 98:15
  111:15 112:3
told 64:22,24 72:4
  75:17 77:4 98:15
  104:22 106:14

tolerance 45:2,4
ton 92:4
tongue 19:23
tool 17:16 43:17 82:2,
  11,13,20
tools 100:8
top 12:20 24:15 39:9
  103:17
touch 40:21
touched 79:20
touching 41:2
tourniquet 92:3
town 23:10 100:7
track 17:6 18:8
tracking 16:14
traded 15:22
trades 16:20
traditional 45:8
traditionally 73:21
  78:20
traffic 7:21 53:5,13
  58:17 59:2,4 63:21
  76:13
trails 27:14
train 31:3 55:17
trained 31:8,25 34:4
  35:16 45:6 47:1 56:23
training 17:11,17 30:5,
  12,13,17,18,20 31:3,23
  32:5 34:20 35:20 43:10
  55:14,15 100:16,21
transcript 5:14
transient 27:4
transients 27:6
transport 28:5
travel 58:19
Trespassing 28:24
trial 111:6
trigger 40:24 41:11
  43:3,6,7,9
triple 17:9
trouble 105:16
truth 6:16 22:7
Truthfully 86:14
turn 21:15 44:12 46:17
  80:12,23 83:11,12,15,
  20 111:15
turned 61:11,12 80:15
  84:15 87:16

turning 84:1,5
turns 64:2 80:9,14
TV 17:23
type 34:7 50:10 74:23
types 26:15 65:25
  73:12
typically 18:22 27:20
  28:10 36:21 62:9 66:24
  71:4 78:19 96:14

─────────
        U
─────────

Uh-huh 41:23 63:12
  76:22,25 77:5 78:23
  79:4 81:25 90:11,13
  99:4 100:20 103:2
ultra 46:11
unable 44:5,8 56:7
  66:7
uncommon 66:4
underneath 18:24
understand 6:14 9:13,
  16 24:11 32:16 37:23
  59:24
understanding 9:9
  17:23 28:22 32:12
  101:6
Unified 23:17,22 24:13,
  23 25:10 97:25 98:8
  100:3
unit 67:1,2
unite 16:9
unnecessary 60:8
unpack 32:19
unreasonable 32:23,25
  33:10,12,17 34:13
untreated 110:13
unwise 38:8 102:15
UPD 98:15
UPDS 24:20
upset 63:25 75:3
user 39:9
usual 55:23
Utah 4:1 24:4 99:3

─────────
        V
─────────

vague 9:11 10:25 17:23
  22:1 23:18 26:2 39:22
  57:23 81:17 105:10
  108:5

valid 75:13
Valley 24:13 26:14
variables 55:18 56:5,
  20
varies 37:7
vehicle 14:14 27:25
  50:8 65:1
vehicles 50:2 62:12
verbal 5:13,15
verbiage 34:18
verify 64:14 65:2,9
verifying 71:18
version 104:18,19
  105:15
versions 96:8
vest 36:11
video 11:22 89:18,25
  91:22 97:7
view 96:11 97:2
violated 9:14,20
violating 108:24
violation 109:3 110:21
violations 9:15 27:9
  109:21
visible 15:6
volume 26:8,15 28:18
volunteer 99:19,21

─────────
        W
─────────

waist 85:19
wait 5:7,9
waiting 17:19
Wal-mart 74:5
walk 13:18 26:25 29:7
  39:20 57:21 76:6 77:1
  78:24 91:17
walks 79:1
wall 13:2
wandering 51:10
wanted 19:23 37:22
  46:17
warrant 66:11 72:3,7,
  16,19,20 73:1,7,8,14,18
  74:12,13,23 75:16,18
  77:4,8,15
warrants 73:12 74:3,7
watch 23:3 97:12
  104:2,6

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
KRIS SMITH - 06/16/2022                                                    14

**watched** 83:11 89:18
103:22
**watching** 89:25
**ways** 30:24
**weak** 38:11
**weapon** 12:12 35:13
37:1,18 38:13 45:12,14
49:13,20 50:8 52:10,12
53:1,11,16 54:3,6,11,21
55:3,7,11 56:3,8,11,14,
24 85:12 87:21 88:22,
24 89:11 94:7 101:22
102:14 103:15
**weapons** 48:22 88:19
93:19
**wearing** 77:17,19
94:24
**Weber** 25:21 45:25
49:16
**Wednesday** 103:24
**week** 28:12,17 104:1
**weeks** 20:9 88:25
**west** 23:4,5 24:12
26:13 80:14
**when's** 106:13,14
**whoever's** 78:15
**whosever** 29:14
**wide** 80:22 95:25
**wider** 48:8,10
**wife's** 70:8
**wildland** 100:9
**window** 51:13 52:5
71:21
**winter** 63:3,4
**wire** 95:5 96:16,18
**wise** 26:15
**wondering** 24:2
**word** 34:18 48:20
69:20
**worded** 23:11
**words** 86:2
**work** 11:8 16:4,6,17
17:14 40:7 66:18 67:22
68:15 69:2 70:24,25
78:10 92:12
**worked** 10:7 26:11
78:7 99:13,18,23
**working** 16:8 24:6 36:9
51:11 57:13 82:9 91:24
**works** 22:24 39:21 99:8

**world** 54:23 101:2
**worse** 22:4
**wounded** 90:22
**wounds** 110:14
**written** 33:14 58:10
104:9,13
**wrong** 43:17 65:12
96:17,18,21
**wrongdoing** 109:4
**wrote** 65:11

---

**X**

**X26p** 39:10,20

---

**Y**

**yard** 18:24
**yards** 101:2,4
**year** 13:10 14:3 25:17
**years** 8:3,17 10:11
14:3,4 25:2 67:21 68:2,
20 109:20 111:4