In the Matter of:

# ESTATE OF PATRICK HARMON, SR., et al.

## vs

# SALT LAKE CITY CORPORATION, et al.

## SCOTT ROBINSON

## June 16, 2022



P.O. BOX 3265
SALT LAKE CITY, UT 84110
385.707.7254

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1239   Page 2 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022

## Page 3

```
 1  SCOTT ROBINSON, WITNESS
 2  INDEX OF EXAMINATION                              PAGE
 3
    Examination by Ms. Nichols                         81
 4
    Further Examination by Mr Lutz                     82
 5
    Reporter Certificate                               83
 6
    Witness Certificate                                84
 7
 8  INDEX OF EXHIBITS
    EXHIBIT                                           PAGE
 9
    No. 3    Color Photo                               27
10
    No. 4    Color Photo Bates-stamped SLCC001767      52
11
    No. 5    Color Photo Bates-stamped SLCC001768      53
12
    No. 6    Color Photo Bates-stamped SLCC001639      53
13
    No. 7    Crime Lab Analysis Report Latent Print    71
14           Processing
15
16
17
18
19
20
21
22
23
24
25
```

## Page 1

```
              IN THE UNITED STATES DISTRICT COURT
                 STATE OF UTAH, CENTRAL DIVISION

                        — — —

ESTATE OF PATRICK HARMON,   )
SR.; PATRICK HARMON II,     )  No. 2:19-cv-00553-HCN-CMR
as Personal Representative  )
of the Estate of Patrick    )
Harmon, Sr., and heir of    )  District Judge:
Patrick Harmon Sr., TASHA   )  Howard C. Nielsen, Jr.
SMITH, as heir of Patrick   )
Harmon, Sr.,                )  Magistrate Judge:
                            )  Cecilia M. Romero
     Plaintiffs,            )
                            )
vs.                         )
                            )
SALT LAKE CITY CORPORATION, )
a municipality; and OFFICER )
CLINTON FOX, in his         )
individual capacity,        )
                            )
     DEFENDANTS.            )
----------------------------

                DEPOSITION OF
                SCOTT ROBINSON
                  DEISS LAW
              SALT LAKE CITY, UTAH
                JUNE 16, 2022
```

## Page 2

```
 1  APPEARANCES OF COUNSEL:
 2  FOR PLAINTIFFS:
 3        Nicholas A. Lutz
          RATHOD MOHAMEDBHAI, LLC
 4        2701 Lawrence Street, Suite 100
          Denver, Colorado 80205
 5        303.578.4400
          Nl@rmlawyers.com
 6
          Corey D. Riley
 7        DEISS LAW PC
          10 West 100 South, Suite 425
 8        Salt Lake City, Utah 84101
          801.433.0226
 9        801.433.0226
10
11  FOR DEFENDANTS:
12        Katherine Nichols
          SALT LAKE CITY ATTORNEY'S OFFICE
13        35 East 500 South, Second Floor
          Salt Lake City, Utah 84111
14        385.468.7900
          Katherinenichols@slcgov.com
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1       SALT LAKE CITY, UTAH, JUNE 16, 2022, 2:01 P.M.
 2                        — — —
 3                    SCOTT ROBINSON,
 4   called as a witness herein, having been first duly
 5      sworn, was examined and testified as follows:
 6                     EXAMINATION
 7  BY MR. LUTZ:
 8       Q.  Afternoon, Officer Robinson.  Like I said off
 9  record, my name's Nick.  I'm an attorney for the
10  Plaintiffs in this case which is Patrick Harmon, Tasha
11  Smith, and the Estate of Patrick Harmon.  To my left is
12  Corey Riley, another attorney for the Plaintiffs.
13           Have you ever been deposed before?
14       A.  No.
15       Q.  So I will just kind of explain the process.
16  It's not dissimilar to an interview, right, which I'm
17  sure you're very familiar with.  The most important
18  part is that everything is being taken down by our
19  court reporter word for word, so it's really important
20  that we don't talk over each other, so please wait for
21  me to finish whatever I'm saying or whatever question
22  I'm asking before you answer.  I'll do the same thing
23  and let you finish your answer before I follow up.
24           Similarly, verbal answers are important
25  because it's really hard to take down gestures, head
```

Case 2:19-cv-00553-HCN-CMR Document 80-6 Filed 10/28/22 PageID.1240 Page 3 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                        5 to 8

**Page 5**

1  nods, or colloquial things like uh-huh or uh-uh.  So
2  yes, no, that kind of thing.
3       You've testified in court before; right?
4  **A.  Yes.**
5       Q.  So the court reporter just swore you in.  You
6  understand that's the same oath that you take to tell
7  the truth as you would in a court --
8  **A.  Yes.**
9       Q.  -- any other court of law?
10 **A.  Yes.**
11      Q.  Are you suffering from any illness or
12 condition that would make it difficult to testify
13 today?
14 **A.  No.**
15      Q.  Under the influence of anything that would
16 make it difficult for you to remember and fully
17 testify?
18 **A.  No.**
19      Q.  While we talk today, Ms. Nichols will likely
20 be objecting to some questions.  I ask that you still
21 answer the question unless she instructs you not to
22 answer.  Usually when that comes up it's a matter of
23 attorney-client privilege, so I never want to know what
24 you guys talk about.
25 **A.  Understood.**

**Page 6**

1       MR. LUTZ:  Actually, can you just for the record,
2  I don't think we've talked about this, but are you
3  representing --
4       MS. NICHOLS:  Yeah.
5       Q.  (BY MR. LUTZ) -- Officer Robinson and --
6       MS. NICHOLS:  I am, yeah.
7       MR. LUTZ:  -- Smith?  Okay.
8            Smith's a former employee; right?
9       MS. NICHOLS:  Yeah, but our position is that, you
10 know, he has -- as to this incident, has the ability to
11 bind the city in certain ways.
12      MR. LUTZ:  Okay.
13      Q.  (BY MR. LUTZ) Did you do anything to prepare
14 for today?
15 **A.  Yes.**
16      Q.  Can you tell me what?
17 **A.  I met with Ms. Nichols.**
18      Q.  Okay.  Did you review any documents?
19 **A.  No.**
20      Q.  Have you reviewed any materials from the
21 case?
22 **A.  I reviewed body cam footage and my interview.**
23      Q.  Which body cam footage did you review?
24 **A.  All three of them.**
25      Q.  Okay.  And the interview you're talking

**Page 7**

1  about, is that the interview you gave to the Unified
2  Police Department?
3  **A.  Yes.**
4       Q.  Did you talk to anybody else?
5  **A.  No.**
6       Q.  Okay.  Not Officer Fox or Officer Robinson?
7  **A.  No.  And that's me, Sergeant Robinson.**
8       Q.  Oh, I'm sorry.
9  **A.  No, you're good.  But you meant Officer**
10 **Smith.**
11      Q.  I did.  Thank you for catching that.
12 **A.  No, you're good.  Yes, I did talk to myself**
13 **about it.**
14      Q.  There's probably no better way to prepare.
15      Did you come from work?
16 **A.  No.**
17      Q.  Are you working later?
18 **A.  No.**
19      Q.  Is there a reason you came in uniform?
20 **A.  The case is about when I was on duty.**
21      Q.  Okay.  So you're still with SLCPD?
22 **A.  Yes.**
23      Q.  Sorry.  Just give me a second.
24      So you've never been deposed before?
25 **A.  No.**

**Page 8**

1       Q.  But I assume you've testified in court?
2  **A.  Yes.**
3       Q.  How often have you testified in court?
4  **A.  Maybe a dozen times.**
5       Q.  Okay.  And in what capacity?
6  **A.  Everything from a prelim to a jury trial.**
7       Q.  Okay.  All cases where you were --
8  **A.  Involved somehow.**
9       Q.  Yeah.
10 **A.  Yes.**
11      Q.  As an officer?
12 **A.  Yes.**
13      Q.  How long have you been with Salt Lake City?
14 **A.  Since September of 2015.**
15      Q.  Okay.  Is that your first job in law
16 enforcement?
17 **A.  No.**
18      Q.  Can you walk me through your law enforcement
19 background.
20 **A.  I started in 2013 with Salt Lake City County**
21 **Sheriffs Department in the jail and I got hired by Salt**
22 **Lake City in September 2015.**
23      Q.  What was your title with the sheriffs
24 department?
25 **A.  Corrections Officer.**

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID.1241  Page 4 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                              9 to 12

Page 9

1    Q.   So you stayed in that for about two years?
2    A.   Yes.
3    Q.   What made you seek out SLCPD?
4    A.   Just what I've always wanted to do.
5    Q.   Always wanted to have a career in law
6    enforcement?
7    A.   Uh-huh.  Specifically with Salt Lake City.
8    Q.   Okay.  Did you grow up here?
9    A.   Yes.
10   Q.   Where about?
11   A.   Rose Park.
12   Q.   How far away are we from that?
13   A.   It's on the west side of town.  The ghetto as
14   some call it.
15   Q.   So you've never been deposed before.  Have
16   you ever been named as a party in a lawsuit?
17   A.   No.
18   Q.   Don't know?
19   A.   I don't know, no.
20   Q.   Okay.
21   A.   There you go.
22   Q.   Okay.  Have you reviewed anything else from
23   the litigation in this case like filings or transcripts
24   or anything like that?
25   A.   No.

Page 10

1    Q.   Okay.  And you understand you're not a
2    defendant in this case?
3    A.   Yes.
4    Q.   You're not being sued?
5    A.   Yes.
6    Q.   Okay.  So other than the -- so you went
7    straight from the sheriffs office to SLCPD?
8    A.   Uh-huh, yes.
9    Q.   What's your current title?
10   A.   Sergeant On Patrol.
11   Q.   Okay.  And does that mean you were promoted
12   at some point?
13   A.   Yes.
14   Q.   From?
15   A.   Officer to Sergeant.
16   Q.   When was that?
17   A.   March.
18   Q.   Okay.
19   A.   Of this year.
20   Q.   Just recently.  Congratulations.
21   A.   Thank you.
22   Q.   How have your duties changed?
23   A.   Now I'm in charge of people.
24   Q.   Enjoying it?
25   A.   Yes.

Page 11

1    Q.   Was the supervisory aspect something that
2    you've been looking to do?
3    A.   Yes.
4    Q.   Do you mind if I ask how old you are?
5    A.   34.  Sorry.  That always takes me a minute.
6    Q.   Is that young for a sergeant?
7    A.   I think so.
8    Q.   I think it seems like it would be to me.
9    A.   We have one or two that are younger though.
10   Q.   Okay.  How many are in the department?
11   Sergeants.
12   A.   I think 70.
13   Q.   You're definitely on the younger end.
14   A.   Sure.  I would imagine.
15   Q.   Prior to -- what did you do prior to joining
16   the sheriffs department?
17   A.   I was in the military.
18   Q.   What branch?
19   A.   Army.
20   Q.   And what was your -- what's the highest rank
21   you achieved?
22   A.   Sergeant.
23   Q.   Any deployments?
24   A.   Yes.  I was deployed to Iraq and Afghanistan.
25   Q.   How many times?

Page 12

1    A.   Once each.
2    Q.   I think I knew this about you, but I don't
3    actually know how I know that.
4    A.   That seems odd.
5    Q.   It's in the files somewhere.
6         How old were you when you joined?
7    A.   17.
8    Q.   So you've had either military or law
9    enforcement jobs forever?
10   A.   That's my life.
11   Q.   Okay.  Where did you go to high school?
12   A.   West.
13   Q.   Is that in -- what was that?
14   A.   West High.  It's over on 300 West.
15   Q.   So now -- so you're sergeant now.  Before
16   that you were a patrol officer?
17   A.   Yes.
18   Q.   That was for about five years?  How long was
19   that?
20   A.   I was on patrol for about four years and then
21   on bikes for about two years.
22   Q.   Okay.  And in 2017?
23   A.   On graveyard patrol.
24   Q.   Okay.  So not on a bike, you were in a car?
25   A.   Yes.

Case 2:19-cv-00553-HCN-CMR Document 80-6 Filed 10/28/22 PageID.1242 Page 5 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                          13 to 16

Page 13

1    Q.  Okay.  Can you walk me through kind of what
2  an average day looked like in that time as a patrol
3  officer.
4    A.  I started at 9:30 p.m., do lineup until about
5  10:00 p.m.  We start at 9:30 p.m., do lineup until
6  about 10:00 p.m. and go take calls for the rest of the
7  nightly, try to do what we call on view if we get a
8  chance.  On view is traffic stops, pedestrian stops,
9  searching for drugs, guns, and warrants.
10   Q.  Okay.  Do you know Clint Fox?
11   A.  Yes.
12   Q.  Are you friends?
13   A.  Yes.
14   Q.  How long have you guys been working?
15   A.  I believe he started working for Salt Lake in
16  about 2017, maybe 2016.  Since he started we became
17  friends pretty quickly.
18   Q.  How often do you work together?
19   A.  Never anymore.
20   Q.  What period of time in the past were you
21  working together?
22   A.  That period.  That was about it.  After he
23  came back from leave, we didn't work together again
24  after that.
25   Q.  So between 2015 and 2017?

Page 14

1    A.  Yeah.
2    Q.  Okay.  Did you and Officer Fox spend time
3  socially?
4    A.  Yes.
5    Q.  Have you ever been to his house?
6    A.  Yes.
7    Q.  Has he been to yours?
8    A.  I can't remember if he's been to mine.
9    Q.  Any other social events outside of work?
10   A.  We went to a bar together one time.
11   Q.  So not working together anymore.  Are you
12  spending any social time with him today?
13   A.  I have not hung out with him in a while.
14   Q.  And what about Kris Smith?
15   A.  We are good friends.
16   Q.  How long have you guys been friends?
17   A.  I knew him from the jail, so since 2013.
18   Q.  Okay.  Do you spend any time together today?
19   A.  No.  We talked on the phone today.
20   Q.  Okay.  Did he let you know how his deposition
21  went?
22   A.  No.  We were not going to play that game.  He
23  asked me about my daughter's birthday party on Saturday
24  that he's coming to.
25   Q.  I assume he would have told you it was

Page 15

1  painless.
2    A.  Yeah, if he was going to say anything, I'm
3  sure that's what he would have said.  I'm sure he would
4  have said I would have rather spent my Thursday morning
5  no other way.
6    Q.  That's -- yeah, that's --
7    A.  That's word for word I think exactly what he
8  would have said.
9    Q.  So now you're a sergeant.  Can you walk me
10  through what your day to day looks like.
11   A.  Show up at 9:30 p.m., I conduct lineup, and
12  then my guys go out and handle calls and they call me
13  if they need me.
14   Q.  What is lineup?
15   A.  It's the daily briefing.
16   Q.  Okay.
17   A.  Things to look out for.
18   Q.  What does that usually involve?
19   A.  A Power Point of a daily briefing that admin
20  puts together.
21   Q.  What sort of things does the briefing
22  discuss?
23   A.  Talks about past events that have happened
24  over the last few days, covers all of the significant
25  events of the last few days, then safety concerns.  For

Page 16

1  example, if there's people that are claiming they're
2  going to shoot it out with law enforcement, then that's
3  in there.
4    Q.  Okay.  How many folks are you supervising?
5    A.  Five right now.
6    Q.  All patrol officers?
7    A.  Yes.
8    Q.  People stay with the department longterm?
9    A.  Yes.
10   Q.  Well, I know this isn't fun, but I appreciate
11  you being here.  We'll just kind of cut to the chase.
12   A.  Thanks.
13   Q.  Do you remember August 13th, 2017?
14   A.  I remember the day we're talking about.  I
15  don't remember the actual date.
16   Q.  The incident involving Patrick Harmon?
17   A.  The incident, yes.
18   Q.  Okay.  So I think you told me that -- what
19  was your title that day?
20   A.  Officer.
21   Q.  Patrol Officer?
22   A.  Graveyard Patrol Officer, yes.
23   Q.  And did you only work graveyards as a patrol
24  officer?
25   A.  Yes, unless you working overtime.  If you're

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID 1243  Page 6 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022
17 to 20

Page 17

1  working overtime, you can work different shifts, but my
2  primary function then was graveyard patrol officer.
3      Q.   Okay.  So starting when you clocked in that
4  day in August 2017, can you kind of walk me through
5  what happened.
6      MS. NICHOLS:  Objection, calls for a narrative.
7      You can answer.
8      THE WITNESS:  I remember I would have went to
9  lineup.  I don't recall what lineup was about.  I
10 remember Fox and I were sitting next to each other
11 BSing and then Officer Smith called for a back.
12     Q.   (BY MR. LUTZ) Okay.  Where were you when you
13 got the -- and by back you mean call for backup?
14     A.   Yes.
15     Q.   Where were you when you received that call
16 for backup?
17     A.   At the public safety building.
18     Q.   All right.  What's that address?
19     A.   475 South 300 East.
20     Q.   Okay.  And where was the call requesting
21 backup?
22     A.   10th South and State Street.
23     Q.   About how far apart is that?
24     A.   Three or four-minute drive.
25     Q.   So what did you do after you received that

Page 18

1  call for backup?
2      A.   I left the police station and went to his
3  location.
4      Q.   And did you go with Officer Fox?
5      A.   Yes.
6      Q.   Did you and Officer Fox discuss the call
7  before you --
8      A.   No.
9      Q.   -- you took it?
10     A.   Not that I recall.
11     Q.   Did you discuss going together?
12     A.   It was what we did.  We would always back
13 each other up.
14     Q.   Okay.  Were you -- so you mentioned that you
15 were friends with Officer Smith.  Were you concerned
16 that he was calling for backup?
17     A.   Not concerned.
18     Q.   Was it -- was the fact that the call came
19 from Officer Smith one of the reasons you decided to
20 pick up on it?
21     MS. NICHOLS:  Objection, vague ambiguous and
22 confusing.
23     THE WITNESS:  No.
24     Q.   (BY MR. LUTZ) So you would have gone if any
25 of the officers called for backup?

Page 19

1      A.   Yes.
2      Q.   Okay.  So you took the call on the radio,
3  then what did you do?
4      A.   Drove there and got on the scene and called
5  dispatch I arrived.
6      Q.   Okay.  What happened next?
7      A.   I walked up to Officer Smith's vehicle and
8  asked him what he had.
9      Q.   And what did he tell you?
10     A.   He told me that the guy that he had stopped
11 on the bike was not giving him a correct name and he
12 was looking for him and trying to identify him.
13     Q.   What did you -- what, if anything, did you do
14 with that information?
15     A.   I don't think I did anything.
16     Q.   Okay.  What happened next?
17     A.   He -- Officer Smith stated that he found him
18 in the system, that his name was Patrick Harmon and
19 that he had a felony 2 warrant.
20     Q.   Okay.  And at this point had you seen Patrick
21 Harmon?
22     A.   Yes.
23     Q.   What was he doing?
24     A.   I think when we arrived he was sitting on his
25 bike.

Page 20

1      Q.   Was Officer Fox there?
2      A.   Yes.  Officer Fox and I arrived at the same
3  time.
4      Q.   What was Officer Fox doing while you had a
5  discussion with Officer Smith?
6      A.   He walked up and began speaking with Patrick.
7      Q.   Okay.  And just to clarify, you were speaking
8  with Officer Smith at his car while Officer Fox is with
9  Mr. Harmon?
10     A.   Yes.
11     Q.   Not part of that discussion?
12     A.   Yes.
13     Q.   Okay.  After Officer Smith identified who
14 Mr. Harmon was, did he tell you what he wanted to do?
15     A.   I can't recall if he stated specifically, but
16 I would have known that we were going to arrest him.
17     Q.   Why is that?
18     A.   Because he had a second degree felony
19 warrant.
20     Q.   Okay.  And were you able to see that
21 independently on the computer?
22     A.   No.  Not as far as I recall.  It's possible,
23 but I don't recall.
24     Q.   Okay.  But Officer Smith told you?
25     A.   Yes.

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID.1244  Page 7 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022
21 to 24

Page 21

1    Q.    Okay.
2    A.    He said he had a 99 Fox 2 were his words
3  which means felony 2 warrant.
4    Q.    99 Fox 2 means -- fox means felony?
5    A.    Uh-huh.
6    Q.    Can you just break that down for me.
7    A.    And 99 means that he's got warrants, Fox
8  felony, 2 felony 2.
9    Q.    Okay.  So then what did you do?
10    A.    I put on my gloves at the car, we walked up
11  to Mr. Harmon and Officer Smith explained to him, he
12  said you know you've got a warrant, he said I know.
13  And I can't remember the exact words that were used,
14  but we told him to put his hands behind his back, and
15  he had taken off his backpack, and grabbed a hold of
16  his left wrist.
17    Q.    And he is Mr. Harmon?
18    A.    Yes.
19    Q.    Okay.  Can you describe your position in
20  relation to Mr. Harmon?
21    A.    I was standing on his left side.
22    Q.    And where was Officer Smith?
23    A.    On his right side.
24    Q.    And where was Officer Fox?
25    A.    In front of Mr. Harmon, but behind

Page 22

1  Mr. Harmon's bike.  So the bike was in between
2  Mr. Harmon and Fox.
3    Q.    Okay.  And what direction was Officer Fox
4  facing?
5    A.    Towards Mr. Harmon.
6    Q.    Okay.  What was Officer Smith doing as you
7  were handling Mr. Harmon's left arm?
8    A.    He was grabbing his right arm and putting it
9  behind his back.
10    Q.    Okay.  And what did you do next?
11    A.    I think I sat down his backpack and kind of
12  passed his left arm to Officer Smith.
13    Q.    And did you have handcuffs out?
14    A.    No.
15    Q.    Did Officer Smith?
16    A.    I don't recall.
17    Q.    Okay.  All right.  So you -- at this point
18  between you and Officer Smith, you have Mr. Harmon's
19  hands behind his back; right?
20    A.    Yes.
21    Q.    What did Mr. Harmon do next?
22    A.    He ran towards the iron gate right there.
23    Q.    Where was this iron gate?
24    A.    It's the iron gate that surrounds the
25  property of Palmer Court where we were at.

Page 23

1    Q.    So this would be --
2    A.    It ran west around.
3    Q.    And which direction was he running in
4  relation to you?
5    A.    Away west.
6    Q.    Okay.  And did he keep going in that
7  direction?
8    A.    No.
9    Q.    What did he do?
10    A.    At that point I had made the plan in my mind
11  that I was going to tackle him to the ground because we
12  were on grass, but as I went to tackle him, I heard him
13  say I'll stab or I'll cut or I'll fucking stab you,
14  something to that effect, which made me not want to
15  tackle him.  And so he was running out of room, kind of
16  hung a left which would have been heading southbound,
17  and kind of gave me a shove, and I fell to the ground.
18    Q.    Okay.  So at some point did you place
19  yourself in his path, in Mr. Harmon's path?
20    A.    I was chasing him and I grabbed a hold of his
21  clothing.  And even though I was behind him, he needed
22  to turn because the iron gate was there and so we kind
23  of got tangled up right there.
24    Q.    Okay.  And you ended up on the ground?
25    A.    Yes.

Page 24

1    Q.    What's the next thing you remember?
2    A.    I recovered from the ground pretty quickly
3  and began chasing after, running towards where they
4  were, Officer Smith, Officer Fox, and Mr. Harmon, and
5  began drawing my firearm.
6    Q.    And what could you see at that point?
7    A.    I could see that Mr. Harmon had turned back
8  towards Officer Fox.
9    Q.    And where was Officer Fox in relation to
10  Mr. Harmon?
11    A.    In front of him.
12    Q.    And where was Officer Smith?
13    A.    To the left of Officer Fox I believe.
14  Actually, I don't recall entirely.
15    Q.    Okay.  And were Officers Fox and Smith still
16  moving when you looked up?
17    A.    No.  They -- I believe that they had stopped
18  moving because Mr. Harmon turned around.
19    Q.    Okay.  And at that point did you see
20  Mr. Harmon moving back in the direction of either
21  Officer Fox or Officer Smith?
22    A.    Yes.  He had turned back towards Officer Fox.
23    Q.    But was he moving towards them?
24    A.    I don't recall.
25    Q.    Were they moving towards him?

Case 2:19-cv-00553-HCN-CMR Document 80-6 Filed 10/28/22 PageID 1245 Page 8 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                           25 to 28

Page 25

1    A.    I don't recall.  I feel like everybody just
2  stopped --
3    Q.    Okay.  What's the next thing?
4    A.    -- except me.  I was running towards because
5  I was a little bit behind.
6    Q.    And who were you moving towards?
7    A.    The group of them.
8    Q.    So did you have the other officers on your
9  left and Mr. Harmon on your right?
10   A.    Yes.  No.  Mr. Harmon would have been in
11  front of me.
12   Q.    Right in front of you?
13   A.    Not right in front because I was behind.
14   Q.    What was the -- about how far apart were you
15  from Mr. Harmon?
16   A.    30 feet maybe.
17   Q.    Okay.  And what's the next thing you saw?
18   A.    I think the next thing was shots fired.
19   Q.    And who did you see fire?
20   A.    Officer Fox.
21   Q.    Did you actually see Officer Fox taking
22  shots?
23   A.    I don't recall if I actually saw it or if I
24  just knew that it was him because he was right next to
25  me and -- I don't recall exactly.

Page 26

1    Q.    Did you hear the shots?
2    A.    Yes.
3    Q.    How many were there?
4    A.    Three.
5    Q.    Did you see what happened to Mr. Harmon?
6    A.    He fell to the ground.
7    Q.    What did Officer Fox say before firing?
8    A.    I don't recall.
9    Q.    Do you recall if he said anything?
10   A.    No.  I don't recall if he said anything.
11   Q.    Do you recall if Officer Smith said anything?
12   A.    The next words that I remember being spoke
13  were Officer Smith saying priority shots fired on the
14  radio.
15   Q.    Okay.  Were you surprised to hear gunshots?
16   A.    As surprised as anybody would be to hear
17  gunshots I think.
18   Q.    Had you expected one of the other officers to
19  fire on Mr. Harmon up to that point?
20   A.    I don't -- expect, it would be the wrong
21  word, but was ready for it, yes.  As I said, I was
22  drawing my firearm as well, so.
23   Q.    Did you succeed in drawing your firearm?
24   A.    No.  I was drawing out, then shots fired.
25   PLAINTIFF2:  For the record, can we get a

Page 27

1  response.  I didn't hear.
2    THE WITNESS:  Drawing out.  Shots fired.
3    Q.    (BY MR. LUTZ) Okay.  What did you do after
4  you heard priority shots fired?
5    A.    I knew that we needed to get medical
6  attention to Mr. Harmon immediately, so I asked Officer
7  Fox to cover me as I moved up to place him in handcuffs
8  so that we could secure him and give him medical aid.
9    Q.    Okay.  And did you physically approach
10  Mr. Harmon?
11   A.    Yes.
12   Q.    What did you do then?
13   A.    Placed him in handcuffs.
14   Q.    Did you -- what did you notice about his
15  condition?
16   A.    On my approach I saw a knife laying on the
17  ground and I noticed bright red blood which indicates
18  massive bleeding typically.
19   I'm going to hand you.
20   (Exhibit 3 marked.)
21   Q.    (BY MR. LUTZ) Okay.  So I'm handing you
22  Exhibit 3.  It's a photograph.  Do you recognize what's
23  in that photograph?
24   A.    Yes.
25   Q.    And what is it?

Page 28

1    A.    That's the knife that I saw laying next to
2  Mr. Harmon's body.
3    Q.    Okay.  When you saw that knife, what did you
4  say to the other officers?
5    A.    I don't think I said anything about the
6  knife.  I said something about we needed to get him
7  aid.
8    Q.    Why didn't you say anything about the knife?
9    A.    I was placing Mr. Harmon into custody, so the
10  knife was no longer an issue.
11   Q.    And was -- was Mr. Harmon alive at that time?
12   A.    Yes.
13   Q.    And at that point did you believe that
14  proximity of the knife to him still could have
15  presented a risk to your safety?
16   A.    Yes.  That's why I placed him in handcuffs.
17   Q.    What were the officers doing at that point in
18  time?
19   MS. NICHOLS:  Objection to the extent it calls for
20  speculation.
21   THE WITNESS:  Once he was in handcuffs I know -- I
22  believe Officer Fox ran back towards his car to get
23  gloves.  None of us had latex gloves.  And I cannot
24  recall what Officer Smith was doing.  I personally was
25  looking for entry and exit wounds so that he could be

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID.1246  Page 9 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                    29 to 32

Page 29

1  treated and trying to get him to help him to roll over
2  and onto his left side which is the recovery position.
3      Q.   (BY MR. LUTZ) Do you recall if prior to
4  Officer Fox running back to his car, he also approached
5  close to Mr. Harmon?
6      A.   I don't recall.
7      Q.   What about Officer Smith?
8      A.   I don't recall.
9      Q.   Okay.  Let's go back.  From the time that you
10  began placing Mr. Harmon's hands in handcuffs, to the
11  time that you approached him on the ground after he had
12  been shot, did you see anything in his hands?
13      A.   I don't recall seeing anything in his hands.
14  I recall seeing him reaching in his right pocket,
15  towards his right pocket for.
16      Q.   Did you see his hand go into his right
17  pocket?
18      A.   I don't recall.
19      Q.   Did you ever see the knife in Exhibit 3 in
20  his hand?
21      A.   I don't recall.
22      Q.   Do you recall if you had seen a knife in his
23  hand?
24      MS. NICHOLS:  Objection, vague and ambiguous.
25      Q.   (BY MR. LUTZ) It seems like it's something

Page 30

1  you would remember.
2      A.   It's five years ago.
3      Q.   It's a significant event.
4      A.   I've had a few.
5      Q.   So you just don't remember?
6      A.   Everything happened really, my understanding,
7  within like six seconds.  So I recall him reaching
8  towards his pocket.  I recall him saying I'll stab or
9  I'll cut or I'll fucking stab you, something along
10  those lines, but I don't recall if I saw anything in
11  his hand or not.
12      Q.   Okay.  I'm not being critical.  I'm just
13  trying to figure out --
14      A.   You're fine.
15      Q.   -- the complete picture.
16      A.   It was a chaotic six seconds.
17      Q.   It was.  Was there any discussion with the
18  other officers after Mr. Harmon was shot about him
19  having a knife?
20      A.   Yes.
21      Q.   Tell me about that discussion.
22      A.   And I guess this is also part of what leads
23  me to believe that I did see it, I just don't recall
24  sitting here today, because afterwards I approached
25  Officer Fox and Officer Smith and said something to the

Page 31

1  effect of did someone secure the knife.
2      Q.   Was your body cam on during that discussion?
3      A.   Somebody's was.  I don't recall if it was
4  mine.
5      Q.   Okay.  Did you review the body camera footage
6  prior to today's deposition?
7      A.   Yes.
8      Q.   Your own?
9      A.   Yes.
10      Q.   Did you also review the other officers'?
11      A.   Yes.
12      Q.   And in your most recent viewing, do you
13  recall hearing your own statement did somebody secure
14  the knife?
15      A.   Yes.
16      Q.   But you don't recall on whose footage it was?
17      A.   I think it was Officer Fox's, but I don't —
18  I can't be certain.
19      Q.   Can you explain to me, I asked you earlier if
20  Mr. Harmon potentially still presented a threat to you
21  when he was laying on the ground and this knife was
22  apparently nearby.  Why did you make the decision to
23  handcuff him rather than secure the knife?
24      A.   I don't know.  In that moment, that split
25  second, handcuffs were the option that I was going

Page 32

1  with.
2      Q.   Is there something in your training that
3  would have led you to make that decision?  That's a bad
4  question.
5      Were you trained to handcuff someone as
6  opposed to securing a nearby weapon?
7      A.   I'd say our primary focus is to secure
8  whatever person that we're dealing with.
9      Q.   And that's to place in handcuffs?
10      A.   Yes.
11      Q.   Can you handcuff a person and still reach out
12  and grab a knife?
13      A.   I've never seen it.
14      Q.   Probably depends on the position of the
15  handcuffs.
16      A.   I would imagine.
17      Q.   Were you going to handcuff him behind his
18  back?
19      A.   Yes.
20      Q.   Did you succeed in handcuffing him?
21      A.   Yes.
22      Q.   And what position did you place his arms when
23  you handcuffed him?
24      A.   Behind his back.
25      Q.   Okay.  And you got both wrist cuffs on?

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1247   Page 10 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                33 to 36

Page 33

1    A.   Yes.
2    Q.   Okay.  I'm going to be done with this at the
3  moment.  Want to take a quick break?
4    MS. NICHOLS:  That would be great.
5    **THE WITNESS:  Sure.**
6    (Recess taken from 2:42 p.m. to 2:59 p.m.)
7    Q.   (BY MR. LUTZ) Officer, earlier did you -- you
8  told me that you had listened to your interview with
9  UPD just recently, so do you have access to that?
10   MS. NICHOLS:  Yeah, we produced it.
11   MR. LUTZ:  It's produced?
12   MS. NICHOLS:  Uh-huh.
13   MR. LUTZ:  Do you know what the Bates number is?
14   MS. NICHOLS:  Oh, gosh.  No is the short answer
15  and my paralegal is out with surgery right now.
16   MR. LUTZ:  I don't think I've seen that or.
17   MS. NICHOLS:  It's on a -- it's a smart player
18  .exe file.
19   MR. LUTZ:  Okay.  I have to recheck that.
20   MS. NICHOLS:  And it's from, my understanding,
21  UPD, so we took what we had from UPD and gave you that
22  stuff is my understanding.
23   MR. LUTZ:  I'll go back and look to make sure, but
24  I haven't seen it.
25   MS. NICHOLS:  Okay.  And I can double check on my

Page 34

1  end too.  I just can't right now because my paralegal
2  who handled the production is out.
3    MR. LUTZ:  Okay.  Let's figure it out when we can.
4  I think we need both of those to have run.
5    Q.   (BY MR. LUTZ) Okay.  Officer Robinson, let's
6  go back.  You mentioned that you were drawing your
7  weapon after you were on the ground.  Did you ever get
8  your weapon out of your holster?
9    **A.   No.**
10   Q.   Why not?
11   **A.   Didn't have time before shots were fired.**
12   Q.   Is there a reason you stopped trying to
13  retrieve it once shots were fired?
14   **A.   Because Patrick fell down.**
15   Q.   So did you just think it was no longer
16  necessary?
17   **A.   I knew that I was in the best position to go
18  secure him.**
19   Q.   Have you been trained on this situation where
20  you have a downed suspect within arm's reach of a
21  weapon?
22   **A.   Yes.**
23   Q.   And what are you trained to do in that
24  situation?
25   **A.   Handcuff the suspect.**

Page 35

1    Q.   And not secure the weapon?
2    **A.   I don't think we're trained to not secure the
3  weapon.**
4    Q.   So is all --
5    **A.   The primary focus is securing the suspect.**
6    Q.   Okay.  According to your training?
7    **A.   Uh-huh.**
8    Q.   So that's Salt Lake City Police Department's
9  procedure?
10   **A.   I don't think -- I don't know.**
11   Q.   But you were trained on it?
12   **A.   That's based on my training and experience
13  that I've had.**
14   Q.   So you were trained to secure the suspect,
15  but you don't know what you're supposed to do with the
16  weapon based on your training?
17   **A.   That's not what I said.**
18   Q.   What did you say?
19   **A.   The primary focus is to secure the suspect.**
20   Q.   Is there a secondary focus to secure the
21  weapon?
22   **A.   Typically, yes, we like to get the weapon out
23  of play.**
24   Q.   So why didn't you?
25   **A.   Because at that point my secondary focus was**

Page 36

1  to try and save Mr. Harmon's life.
2    Q.   Because he was alive at that time?
3    **A.   Yes.**
4    Q.   So he couldn't present a risk?
5    **A.   Not after I handcuffed him.**
6    Q.   Is there anything dangerous to you about
7  attempting to perform emergency medical procedures
8  while there's an open knife sitting at your knees?
9    **A.   Yes.**
10   Q.   But that didn't motivate you to secure it?
11   **A.   No.**
12   Q.   Why not?
13   **A.   Because I was focused on trying to render aid
14  to him.**
15   Q.   If it had been a gun, would you have secured
16  it?
17   **A.   Maybe.**
18   Q.   What would your training have dictated that
19  you do?
20   **A.   Probably secure the firearm.**
21   Q.   Why is it different?
22   **A.   My focus was to a save his life.  It wasn't a
23  conscious thought to secure or not secure.  My focus
24  was to secure him and then render medical aid because
25  it was clear that he needed it.**

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID 1248  Page 11 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                    37 to 40

Page 37

1    Q.   Can you describe the medical aid that you
2 rendered.
3    A.   I attempted to locate entry and exit wounds,
4 as I said, and once we located one, I directed another
5 officer that was there to apply pressure.  And then
6 shortly after that an officer showed up with a
7 tourniquet that was placed on him, and then I was
8 removed from the scene.
9    Q.   Who removed you from the scene?
10   A.   My supervisor.
11   Q.   Who was that?
12   A.   Sergeant Sweeney.
13   Q.   Alma?
14   A.   Alma, yes.
15   Q.   As you approached Mr. Harmon -- so you were
16 the first to approach Mr. Harmon; right?
17   A.   Yes.
18   Q.   And did Officer Fox warn you that there was a
19 knife in his possession?
20   A.   No.
21   Q.   Did Officer Smith?
22   A.   No.
23   Q.   Why do you think that is?
24   MS. NICHOLS:  Objection, calls for speculation.
25   THE WITNESS:  If I was in Fox's position, I would

Page 38

1 be focused on covering the suspect like I asked him to.
2    Q.   (BY MR. LUTZ) But at this point you don't
3 know about this knife?
4    MS. NICHOLS:  Objection, foundation.  I think
5 misstates testimony.
6    THE WITNESS:  I feel like I've answered that.
7    Q.   (BY MR. LUTZ) Is it a yes or a no?  As you
8 approached, Mr. Harmon --
9    A.   I saw the knife on the ground, yes.
10   Q.   By the time you got really close to him?
11   A.   I don't recall my proximity to him when I saw
12 the knife on the ground.  I knew that he had been
13 reaching for something.  I don't recall whether or not
14 I could see what was in his hand.
15   Q.   It just seems surprising to me that Officer
16 Fox allowed you to get that close to him while he was
17 still alive and there was a knife apparently in his
18 hand just prior and not tell you about that.  Did it
19 surprise you?
20   A.   Things happened quickly.
21   Q.   What would you have done if you were in
22 Officer Fox's shoes?
23   A.   In a perfect world where there's zero stress
24 and nothing happening I would -- sure, I would like to
25 say hey, there's a knife next to him, be careful.

Page 39

1    Q.   And why would you do that?
2    A.   Because of the danger associated with the
3 knife.
4    Q.   Okay.  I'm a little stuck on the aspect of
5 your training that doesn't seem to address what you do
6 with a weapon that's near a suspect.
7    A.   Our training addresses secure the suspect,
8 secure the weapon.
9    Q.   Okay.  In this case you secured the suspect
10 and not the weapon?
11   A.   Because I decided it was more important to
12 render medical aid.
13   Q.   Okay.  Would you say that you were acting in
14 conformity with your training --
15   A.   Yes.
16   Q.   -- in not securing the weapon?
17   A.   Yes.
18   Q.   Does your training -- in the way that you've
19 been trained, are you permitted to make that call?
20   A.   I think there's a misunderstanding happening
21 that it was a conscious decision on my part whether or
22 not to secure the weapon.  There wasn't a conscious
23 decision whether or not to secure the weapon.  The
24 conscious decision was secure the suspect and then
25 render medical aid.

Page 40

1    Q.   So not securing may not have been in
2 conformity with the way you've been trained?
3    MS. NICHOLS:  Objection, misstates testimony.
4    THE WITNESS:  Yeah, that's not what I said, but I
5 don't know how to rephrase it to answer your question
6 the way that you want me to.  I made the decision to
7 secure him and then render medical aid.  The decision
8 to secure the weapon or not secure the weapon was not a
9 conscious decision.  The weapon was there, there was a
10 lot going on, I rendered medical aid.
11   Q.   (BY MR. LUTZ) I guess what I'm asking then is
12 what is the by-the-book version of Salt Lake City
13 Police Department's training in this situation?  What's
14 that one, two, and three?
15   A.   Every situation is different.  Every single
16 situation is different, so I can't -- I mean, yeah.
17 Like I said, secure the suspect.  You want to secure
18 the weapon, it's is an important part for sure, but
19 also performing medical aid is a certain -- is a very
20 important part, and there is no one, two, three.
21   Q.   So have you been trained that you have that
22 discretion to decide what you're going to do with a
23 weapon?
24   A.   No, not specifically.  We've been trained
25 that those are the steps that you take.

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1249   Page 12 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                            41 to 44

Page 41

1    Q.   Which steps?
2    A.   Secure the suspect and secure the weapon and
3    perform medical aid.
4    Q.   Okay.  None of -- you didn't secure the
5    weapon, Officer Smith didn't secure the weapon,
6    Officer Fox didn't secure the weapon.  None of you
7    applied those three steps that your training dictates;
8    correct?
9    A.   I made the decision to render medical aid to
10   try and save his life because I felt like that was more
11   important.
12   Q.   I understand, but none of you secured the
13   weapon?
14   A.   None of us secured the weapon, yes, which is
15   why I asked about it.
16   Q.   So you participated in an investigation in
17   this case after the incident; right?
18   A.   Yes.
19   Q.   You gave an interview?
20   A.   Yes.
21   Q.   Who interviewed you?
22   A.   I don't recall.  A detective.
23   Q.   You don't remember his name?
24   A.   Huh-uh.
25   Q.   Just one?

Page 42

1    A.   There was two in the room.
2    Q.   Did they reveal their names?
3    A.   No.
4    Q.   Did you listen to this interview?
5    A.   A few days ago.
6    Q.   Did they say their names on it?
7    A.   I can't recall.
8    Q.   Okay.  Did anyone ask you -- when you were
9    being interviewed about this incident, did anyone ask
10   you why you failed to secure the knife?
11   A.   No.
12   Q.   Did anyone question the decision to leave a
13   knife on the ground?
14   A.   No.
15   Q.   Did anyone accuse you of not acting in
16   conformity with your training?
17   A.   No.
18   Q.   Okay.  I want to go back to something you
19   said earlier which I'm not entirely clear on.  I asked
20   you if you saw a knife in Mr. Harmon's hand and you
21   told me you don't remember; right?
22   A.   Yes.
23   Q.   But you reviewed the video from your own body
24   camera --
25   A.   Uh-huh.

Page 43

1    Q.   -- just days ago?
2    A.   Uh-huh.
3    Q.   And that didn't refresh your memory as to
4    whether or not you saw a knife in his hand?
5    A.   Sitting here today, I do not recall if I saw
6    a knife in his hand or not.
7    Q.   I don't understand how that fact wouldn't
8    stick out to you.
9    MS. NICHOLS:  Objection, argumentative.
10   THE WITNESS:  Sitting here today, I do not recall
11   if he had the knife in his hand or not.
12   Q.   (BY MR. LUTZ) Why were you reaching for your
13   gun?
14   A.   Looking back I would guess because I saw
15   something and heard something that made me think that I
16   needed my gun, including I'll fucking stab or I'll cut
17   or whatever he was saying, reaching for his pocket.
18   Those are the things that I remember very clearly.
19   Q.   So you reached for your gun because you heard
20   Mr. Harmon say I'll fucking stab you?
21   A.   Something along those lines.  I can't
22   remember if that was the exact words used.
23   Q.   Was it immediately after you heard words to
24   that effect that you began reaching for your gun?
25   A.   As quickly as I could, yes.

Page 44

1    Q.   At that point were you already on the ground?
2    A.   He was saying that kind of continually.  I
3    hit the ground and then as I was coming up is when I
4    began reaching for my weapon.
5    Q.   Okay.  Let's return to this interaction.  And
6    correct my language if I'm misstating what you said,
7    but this kind of impact between you and Mr. Harmon, I'm
8    just referring to when you guys got close and then what
9    happened next.
10   A.   Sure.  Yes.
11   Q.   So you said you wanted to tackle him; right?
12   A.   Uh-huh.
13   Q.   What I'd like to clarify is I think you said
14   you wanted to tackle him and then you heard something
15   like I'll fucking stab you and you're like I'm not
16   going to tackle this guy because I'm going to get
17   stabbed.
18   A.   Yes.
19   Q.   Is that accurate?
20   A.   Yes.
21   Q.   Okay.  So did you pull off of him when you
22   heard that?  Were you trying to engage with him and
23   then backed off?
24   A.   That's really difficult to explain because
25   it's such a quick encounter, but I didn't full oven

Case 2:19-cv-00553-HCN-CMR  Document 80-6  Filed 10/28/22  PageID.1250  Page 13 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                        45 to 48

Page 45

1  entirely, but I gave up on the idea of tackling him, so
2  I still wanted to stop him.
3      Q.  And did his body push against yours?
4      A.  Yes, I believe so.
5      Q.  Were you pushing into his body?
6      A.  I had grabbed onto his clothing and so I was
7  trying to pull him, and he turned.  And after -- and we
8  kind of collided and I ended up on the ground.
9      Q.  Okay.  Did he shove you to the ground?
10     A.  I believe so.
11     Q.  Okay.  So when this transpired, roughly,
12  you're on his right side I suppose?
13     A.  Before the --
14     Q.  Right before you end up on the ground, you're
15  on the right side of him; right?
16     A.  I think I was more in front of him.
17     Q.  Okay.
18     A.  Because he kind of turns, I had grabbed a
19  hold of his clothing, we kind of swung around, and then
20  I think he shoved and, like, we were face to face when
21  I hit the ground I think.
22     Q.  Okay.  Where was Officer Fox?
23     A.  I don't know.  I don't recall exactly where
24  they were.
25     Q.  Do you know if Officer Fox was trying to also

Page 46

1  grab Mr. Harmon at that point in time?
2      A.  I don't.
3      Q.  Did you ever see a cigarette in Mr. Harmon's
4  mouth?
5      A.  Yes.  He still had it in his mouth when he
6  took off running.
7      Q.  So it was in his mouth when you heard him say
8  words to the effect of I'll fucking stab you?
9      A.  I don't know if his cigarette was still in
10  his mouth.
11     Q.  Okay.  Sorry.  Bear with me.
12     A.  You're good.
13     Q.  Thanks for your patience.
14     A.  Of course.
15     Q.  You remember wearing a body camera that day?
16     A.  Yes.
17     Q.  What kind is it?
18     A.  It was an Axion camera.  I don't remember the
19  brand or the model.  Sorry.
20     Q.  Do you -- is there only one model the
21  department was using at that time?
22     A.  I don't -- I don't know for sure.  I know
23  that there might have been newer models circulating
24  that were in trial.  I don't recall though.
25     Q.  Okay.  Where is the camera mounted?

Page 47

1      A.  I believe it was mounted on my right
2  shoulder.
3      Q.  Is it on your shoulder or your collar or
4  lapel?
5      A.  I don't recall because I used all of them
6  trying to find which one I liked best, so I don't
7  recall specifically where it was at.
8      Q.  Okay.  Somewhere on your right shoulder?
9      A.  Yes.
10     Q.  Neck level?
11     A.  Yes.
12     Q.  Okay.  And where do you control it from?
13     A.  That one I can't remember if I had it mounted
14  on my chest or if I had it mounted on my belt.
15     Q.  It could have been either way?
16     A.  Yeah, it could have been either one.
17     Q.  And was your camera functioning normally that
18  day?
19     A.  I learned later that the audio had been
20  messed up.
21     Q.  How was it messed up?
22     A.  We can't hear hardly anything on my camera.
23  I actually learned that in a different case reviewing a
24  different body cam.
25     Q.  In having reviewed the other officers' body

Page 48

1  camera footage from that night, was their audio better
2  than the audio that was coming from yours?
3      A.  Yes.  It seems that way.
4      Q.  Interesting.
5          Would you mind if we break for two minutes
6  while I grab an exhibit.
7      MS. NICHOLS:  Yeah.
8      (Recess taken from 3:19 p.m. to 3:32 p.m.)
9      Q.  (BY MR. LUTZ) You had mentioned earlier when
10  we were talking about, you know, the drama, the
11  rapidness of the situation with Harmon and Smith that,
12  you know, it's not the first -- your first incident
13  like that.  What did you mean by that?
14     A.  It was my first incident like that.  I've
15  since been involved in multiple other critical
16  incidents.
17     Q.  That was the first time you were ever
18  involved in an officer involved shooting?
19     A.  Yes.
20     Q.  Have you been involved in an officer involved
21  shooting since?
22     A.  Yes.
23     Q.  How many?
24     A.  I think three.
25     Q.  Okay.  When -- can you give me the dates of

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1251   Page 14 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                49 to 52

Page 49

1  those?
2      A.   No.  I don't recall.  There's one -- the only
3  one that I recall is my own that was in July of 2019.
4      Q.   When you say your own, do you mean that you
5  were the shooter?
6      A.   Yes.
7      Q.   Can you describe that situation for me.
8      A.   Knocked on a door, the guy opened the door
9  with a gun.
10     Q.   What led up to that?  Was there a warrant?
11     A.   We were called there on a psych issue.
12     Q.   Can you tell me where?
13     MS. NICHOLS:  Objection.  Vague, calls for a
14  narrative.
15     THE WITNESS:  We responded to a psych issue at a,
16  like a apartment complex that houses mental health
17  subjects and has on site social workers and whatnot.
18  They called us for assistance because he was being
19  violent and erratic, making threats.  We had to go make
20  contact, knocked on the door, he opened the door with a
21  gun.
22     Q.   (BY MR. LUTZ) What kind of gun?
23     A.   Paintball gun.  He had modified it to look
24  like a real gun.
25     Q.   What did he do after he opened the door?

Page 50

1      A.   Point the gun at my partner's head.
2      Q.   How did you respond?
3      A.   I shot him three times.
4      Q.   Where?
5      A.   The side.
6      Q.   Is it like the torso?
7      A.   Yeah.
8      Q.   Rib cage?
9      A.   Yeah.  The lower torso area.
10     Q.   Did the suspect survive?
11     A.   No.
12     Q.   Sorry.
13     A.   Thanks.  Me too.
14     Q.   You said the Harmon incident was your first
15  officer involved shooting or critical incident?
16     A.   Yes.
17     Q.   And you were only 29, 28?
18     A.   2017.  30.  Close to 30.
19     Q.   So the incident that you just told me about
20  you said was in 2020, July 2020?
21     A.   2019.
22     Q.   2019.  What were the other?
23     A.   There was one in Tooele.  Officers chased a
24  guy all the way out to Tooele, they had just shot
25  somebody else, and it was an officer involved critical

Page 51

1  there.  And then another one where I guess it wasn't an
2  officer involved critical incident, but a guy was
3  shooting rounds off in his motel room.
4      Q.   And both of those you responded and another
5  officer fired on the --
6      A.   Not the second one.
7      Q.   -- suspect?
8      A.   The first one, yes.  The one in Tooele, yes,
9  and another officer fired, but the one at the hotel
10  officers didn't end up firing.  It wasn't a critical
11  incident because he was popping off rounds inside his
12  room.
13     Q.   I'm not sure how to say that.  Tooele?
14     A.   Tooele.
15     Q.   And in that incident --
16     A.   Or "Toolie" if you're a true Utahan.
17     Q.   Was that -- did that result in a fatality?
18     A.   I believe so.
19     Q.   How many instances of fatal officer involved
20  shootings are you aware of since you've been a part of
21  the Salt Lake City Police Department?
22     A.   I don't know.  I can't give you an answer on
23  that.
24     Q.   Dozens?
25     A.   No.  I -- honestly, I don't know.  Maybe, I

Page 52

1  could speculate, one --
2      Q.   Personally?
3      A.   -- a year-ish.
4      Q.   You were involved in three.
5      A.   Yeah.  Maybe one a year.  One to two year
6  maybe.
7      Q.   Do you think it's more than 7 or 8 since
8  you've been on the force?
9      A.   Maybe.
10     Q.   Is that something that officers talk about
11  after it happens?
12     A.   What?
13     Q.   Officer involved shootings.  Is that -- is it
14  news in the department?
15     A.   The department -- the department's well aware
16  of when there's an officer involved shooting.
17     Q.   I'm handing you what we're going to mark as
18  Exhibit 4.
19          (Exhibit 4 marked.)
20     Q.   (BY MR. LUTZ) Okay.  Do you recognize the
21  image, Exhibit 4?
22     A.   Yes.
23     Q.   What are you seeing there?
24     A.   My handcuffs, Patrick Harmon's knife.
25     Q.   How do you know it's Patrick Harmon's?

Case 2:19-cv-00553-HCN-CMR Document 80-6 Filed 10/28/22 PageID 1252 Page 15 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                    53 to 56

Page 53

1    A.   It's my assumption based on proximity to his
2  body.
3    Q.   You didn't drop it there?
4    A.   What was the question?
5    Q.   You didn't drop this knife there?
6    A.   No, I did not drop it.
7    Q.   Did drop your handcuffs there?
8    A.   No.  I put the handcuffs on him.
9    Q.   Oh.  Another officer later took his handcuffs
10 off?
11   A.   That's what I would assume.
12   Q.   At that time you had been escorted out of the
13 situation?
14   A.   Yes.
15   Q.   Okay.  I'm going to hand you what's going to
16 be marked as Exhibit 5.
17        (Exhibit 5 marked.)
18   Q.   (BY MR. LUTZ) Do you recognize Exhibit 6?
19   A.   Yes.
20 THE REPORTER:  5.
21 MR. LUTZ:  I'm sorry, 5 thank you.
22 THE WITNESS:  Those are my handcuffs.
23   Q.   (BY MR. LUTZ) Okay.  I'm going to hand you
24 what will be marked as Exhibit 6.
25        (Exhibit 6 marked.)

Page 54

1    Q.   (BY MR. LUTZ) Do you recognize Exhibit 6?
2    A.   It's a much skinnier version of myself, yes.
3    Q.   Is this a accurate -- this an image of you on
4  the day of the officer involved shooting?
5    A.   Yes.
6    Q.   And when was this photo taken?
7    A.   Much later.  I don't recall exactly when, but
8  you can see -- you asked me about my body camera.  I
9  had it mounted to my belt (indicating).
10   Q.   Can you circle on here for me where the body
11 camera lens is.
12   A.   It was like right collar.
13   Q.   Great.  Thank you.  That's all.
14        Is there a reason that you're in a slightly
15 different uniform than Officers Fox and Smith were?  Is
16 that just a matter of preference?
17   A.   If I am in a different uniform, then yes.  I
18 think the only difference that I had was I was wearing
19 shorts trying to look like a post office worker.
20   Q.   Okay.  You can put it aside if you want.
21   A.   (Complies.)
22   Q.   Do you have any disciplinary history at the
23 SLCPD?
24   A.   I have nothing sustained.
25   Q.   Have there been allegations in the past?

Page 55

1    A.   Yes.
2    Q.   Can we walk through those.
3    A.   Walk you through what I remember?
4    Q.   Sure.  When was the first allegation?
5    A.   I don't recall when the first allegation was.
6  The most recent that I can recall is an excessive use
7  of the force complaint for ordering one of my officers
8  to use a less lethal shotgun with a lady that was
9  harming herself.
10   Q.   When did that happen?
11   A.   January-February.  Maybe February-March.
12 Somewhere in there.
13   Q.   This year --
14   A.   Yes.
15   Q.   -- 2022?
16        All right.  Tell me about that incident.
17   A.   The lady was cutting herself with something
18 in her hand, so an officer had the less lethal shotgun
19 and I told him to deploy it.
20   Q.   Were you there on the scene?
21   A.   Yes.
22   Q.   Why were you called there?
23   A.   Because of a suicidal female.
24   Q.   What were you trying to accomplish by
25 ordering deployment of the shotgun?

Page 56

1    A.   Get her to drop the weapon so we could move
2  up and secure her.
3    Q.   And the officer did in fact fire on her?
4    A.   Uh-huh.
5    Q.   Did it hit her?
6    A.   Yes.
7    Q.   Where did it hit her?
8    A.   I think in the leg.
9    Q.   And did that have the intended effect?
10   A.   No.
11   Q.   What happened?
12   A.   She went and sat down.
13   Q.   But maintained control of the knife?
14   A.   Yes.
15   Q.   What happened next?
16   A.   She dropped it at some point and we moved up
17 with a ladder and pinned her against the wall.  The
18 officer moved in grabbed each arm, placed her in
19 handcuffs, transported her to the hospital.
20   Q.   Can you explain the ladder?
21   A.   It's called a standoff tool because we still
22 weren't sure if she had something in her hands.  We
23 used the ladder to pin her up against the wall so all
24 officers can move in and grab her arms.
25   Q.   I see.  So were you able to take her into

Case 2:19-cv-00553-HCN-CMR Document 80-6 Filed 10/28/22 PageID 1253 Page 16 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                   57 to 60

Page 57

1  custody for that?
2      A.   Yes.
3      Q.   And was it her who filed a complaint against
4  her?
5      A.   It was her son.
6      Q.   Okay.  How do you -- did he witness the
7  event?
8      A.   She was on the phone with him during the
9  event.
10     Q.   Okay.  So you were made aware of that
11 complaint, but never received any disciplinary action
12 from the department?
13     A.   No.
14     Q.   Okay.
15     A.   I was exonerated.
16     Q.   How many other excessive force complaints
17 have been filed against you?
18     A.   I don't know.  I don't know if any
19 others that I can recall right now.
20     Q.   None sustained?
21     A.   No.
22     Q.   But you don't recall if there have been?
23     A.   Never -- no.  I've never had a complaint or
24 any type of IA disciplinary action sustained.
25     Q.   You don't remember the circumstances of any

Page 58

1  other allegations against you?
2      A.   There was one I think in 2018 maybe -- maybe
3  '19.  I instructed a group of individuals to move off
4  the sidewalk and one of them called and filed a
5  complaint about me.  Or against me.
6      Q.   For what?
7      A.   For telling him to move off the sidewalk.
8      Q.   Did they phrase that as a discourtesy or
9  something of that nature?
10     A.   No.  He said that I didn't have any authority
11 to tell him to move off the sidewalk.
12     Q.   Okay.  I want to talk a little bit about the
13 department's use of force policies and your training
14 related to that.  Did you attend academy, training
15 academy with SLCPD?
16     A.   Yes.
17     Q.   What did your training regarding the use of
18 force consist of at the academy?
19     A.   It's a very broad question.  There's a lot
20 involved in use of force.  Weeks of training, months of
21 training.
22     Q.   How many hours would you say?
23     A.   I don't know.
24     Q.   Where does that training start?  How do they
25 introduce the concept?

Page 59

1      A.   Reviewing state law regarding use of force,
2  reviewing department policy, and then moving on to
3  scenarios.
4      Q.   Can you summarize for me what the department
5  policy says about use of force?
6      MS. NICHOLS:  I'm going to object to the extent
7  that, you know, we can see the document and discuss it.
8      But you can testify as to what you can recall
9  at this point.
10     THE WITNESS:  That would be what's reasonable and
11 necessary.
12     Q.   (BY MR. LUTZ) Is permitted?
13     A.   Yes.
14     Q.   That which is -- under Salt Lake City Police
15 Department policy, when is use of deadly force
16 justified?
17     A.   If you have a reasonable belief that your
18 life is in danger or -- your life is in danger or
19 you're in danger of serious bodily injury or that of
20 someone else.
21     Q.   Are you trained on federal law on the Fourth
22 Amendment excessive force standard?
23     A.   I don't think specifically --
24     Q.   Do you know --
25     A.   -- if we're trained on the Fourth Amendment.

Page 60

1      Q.   What do you know about the Fourth Amendment
2  standard?
3      A.   I know that the Fourth Amendment deals with
4  the right to search and seizure.
5      Q.   And is it your understanding that use of
6  force is seizure?
7      A.   Yes.
8      Q.   Are you trained on the Graham factors?
9      A.   Yes, Graham v. Connor.
10     Q.   Can you tell what those factors are?
11     A.   Yes.
12     Q.   What are they?
13     A.   Severity of the crime, subject actions, and
14 is it likelihood to flee?  I can't recall the third one
15 right now.  Or the last two I guess.
16     Q.   So you were taught on that subject --
17     A.   Yes.
18     Q.   -- the Graham factors in the academy?
19     Have you done -- is there continual
20 training --
21     A.   Yes.
22     Q.   -- on the subject?
23     What does that look like?  How often?
24     A.   We have to complete at least 40 hours of
25 training every year to maintain our certification.

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1254   Page 17 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                              61 to 64

Page 61

1    Q.   Certification for what?
2    A.   Your law enforcement officer certification.
3    Q.   Okay.  I assume you also receive training on
4  less than lethal --
5    A.   Yes.
6    Q.   -- use of force?  And is that training
7  continuous?
8    A.   Yes.
9    Q.   How many hours a year?
10   A.   It's in that 40 hours.  I don't know exactly
11 how many hours a year, but all of it is something that
12 we continually train on.  I just did a line of training
13 the other day on the use of taser.
14   Q.   Could you tell me in general when under
15 departmental policy you would be -- an officer would be
16 justified in using a taser?
17   A.   Yes.  If the subject is violent -- is violent
18 or hurting themselves.
19   Q.   What about if the suspect is fleeing, but
20 nonviolent?
21   A.   Near flight without any other factors is not
22 sufficient to tase.
23   Q.   Would other less lethal force options be
24 permitted?
25   A.   Yes.

Page 62

1    Q.   Like what?
2    MS. NICHOLS:  Sorry.  Do you mean in flight?
3    MR. LUTZ:  Yeah.  In the circumstance that you
4  have a nonviolent, fleeing suspect.
5    THE WITNESS:  If the only information that you
6  have is flight, no other factors, no.  I don't see
7  anything that would be reasonable to use in that
8  circumstance.
9    Q.   (BY MR. LUTZ) How many use of force incidents
10 do you think you've been involved in in your career
11 with SLCPD?
12   A.   Not a clue.
13   Q.   More than 50?
14   A.   I, honestly, have no idea.
15   Q.   Those aren't significant to you in any way?
16   A.   That's not what I said.
17   Q.   Well, so don't they stand out in your mind?
18   A.   Some, yes.  But when you've been doing the
19 job for seven years or almost seven years, nine years,
20 including the jail, it's a lot of use of force
21 incidents.
22   Q.   Is it possible it's hundreds?
23   A.   It's possible.  I don't -- I honestly could
24 not tell you.  If you told me it was 40, I'd agree with
25 you.  If you told me it was 200, I'd agree with you.  I

Page 63

1  don't know.
2    Q.   Can you see how I'm struggling with that?
3    A.   No.
4    Q.   Are they so common that they don't stand out
5  in your mind?
6    A.   Just a regular use of force, yes, happens a
7  couple times a week.  Probably or two times a week.
8    Q.   Over a nine-year career?
9    A.   Yeah.
10   Q.   Okay.
11   A.   Maybe -- I don't know.  I don't know.  I
12 don't know what the average nine-year officer uses.
13 Like, I don't know.  I don't have any idea.
14   Q.   Does policy require that you report use of
15 force incidents?
16   A.   Yes.
17   Q.   In any instance?
18   A.   Yes.
19   Q.   So in every instance that you've used force
20 against a suspect or individual you've written a report
21 of that?
22   A.   Yes.
23   Q.   Okay.
24   A.   It has been reported and this incident I
25 didn't write a report about.  My testimony was taken

Page 64

1  orally.
2    Q.   Okay.
3    A.   Maybe I did report it.  Have I reported it?
4  I can't remember.
5    Q.   In your career as a deputy in the jail?
6    A.   Uh-huh.
7    Q.   Were you ever subject to any inmate
8  grievances?
9    A.   One.
10   Q.   What were the allegations there?
11   A.   The inmate claimed that I sexually assaulted
12 him while he was walking up the stairs.
13   Q.   And what was the result of that
14 investigation?
15   A.   My lieutenant watched the video camera and it
16 was clear that that did not happen.
17   Q.   Okay.  So unsustained?
18   A.   Unsustained.  Exonerated.
19   Q.   Any other inmate grievances?
20   A.   Not that I recall.
21   MR. LUTZ:  You guys want to take a break?
22   MS. NICHOLS:  Sure.
23   MR. LUTZ:  We should not have terribly much more.
24   (Recess taken from 3:55 p.m. to 4:12 p.m.)
25   Q.   (BY MR. LUTZ) Going back to your military

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1255   Page 18 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                        65 to 68

Page 65

1  history, were you ever subject to discipline in the
2  military?
3      A.   No.
4      Q.   Okay.  Ever accused of any disciplinary
5  infractions?
6      A.   No.
7      Q.   Were you involved in any shootings in the
8  military?
9      A.   No.
10     Q.   Did you ever discharge your weapon outside of
11 a military training setting?
12     A.   No.
13     Q.   Going back to the Harmon shooting, before you
14 heard Fox's shots were you aware that Fox had drawn his
15 gun?
16     A.   No.
17     Q.   You didn't see Fox draw his gun?
18     A.   No.  Not that I recall.
19     Q.   When you spoke with Officer Smith about the
20 warrant that existed --
21     A.   Uh-huh.
22     Q.   -- did he tell you what the crime was?
23     A.   I don't recall.  I know he said it was a
24 felony 2 and I know now -- or I believe now that it was
25 aggravated assault, but I can't recall if that was,

Page 66

1  like, brought up during that time or not.
2      Q.   So you don't recall if he told you?
3      A.   No.
4      Q.   Did you tell Officer Fox that the warrant was
5  for felony assault?
6      A.   I don't think so, but I don't recall.  I
7  don't think so.
8      Q.   That would be on your body cam?
9      A.   Yeah, I don't think that it's said on the
10 body cam.
11     Q.   Okay.  You mentioned earlier that you learned
12 that the microphone on your Axon on camera was not
13 functioning well on the night of the Harmon shooting?
14     A.   Yes.
15     Q.   How did you learn that?
16     A.   I can't recall exactly, but I was -- I think
17 I was reviewing another case before going to court and
18 the volume was all jumbled and so I went and had to
19 replace my camera.  I can't remember if I replaced the
20 camera or replaced the cord or what, but I had to go
21 get that fixed because I couldn't hear anything on my
22 body cam.
23     Q.   Why were you reviewing a case?
24     A.   Before court.
25     Q.   Okay.  What was the name of the defendant --

Page 67

1      A.   I don't have any -- I don't recall.
2      Q.   -- to case?
3      A.   I don't know.
4      Q.   Could we find that out?
5      A.   Probably not.  I honestly don't have any idea
6  how we would find out.
7      Q.   What was the court date?
8      A.   I don't have any idea.
9      Q.   How far back in time was this?
10     A.   This would have been sometime after that, so
11 sometime in -- well, yeah, I don't know.  I can't
12 remember how long after this incident that I replaced
13 my body camera.  It was -- as soon as I replaced it
14 would have been when I learned about it.  I mean, it
15 might not have even been reviewing for court.  It could
16 have been reviewing for a report or something.  I don't
17 know.  I just remember that I was reviewing body cam
18 and learned that my audio was distorted.
19     Q.   Okay.  Approximately how long after?
20     A.   I honestly don't know.
21     Q.   At all?
22     A.   No.
23     Q.   Could it have been years?
24     A.   No.  Within years we upgrade our body cameras
25 to different ones.

Page 68

1      Q.   I'm just wondering how long you were walking
2  around with a broken body camera.
3      A.   Yeah, I don't know.  I would hope not very
4  long.
5      Q.   Because that would impact a lot of cases
6  potentially?
7      A.   Potentially.
8      Q.   Going hands on twice a week?
9      A.   Potentially.
10     Q.   So --
11     A.   Once I learned of it, I got it remedied.
12     Q.   So that could have been anywhere between
13 weeks, months, years?
14     A.   A couple weeks, a couple months.  I would
15 guess something like that.  I don't know.  It was a
16 long time ago.
17     Q.   Is there any requirement that you check the
18 condition of your equipment before you go out, or
19 periodically?
20     MS. NICHOLS:  Sorry.  By equipment do you mean
21 body cams or any equipment?
22     MR. LUTZ:  I'm really referring to any equipment,
23 but let's just talk about your body cam.
24     Q.   (BY MR. LUTZ) Do you have to make sure it's
25 working at any point?

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1256   Page 19 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                             69 to 72

Page 69

1    A.   Yes.  And when I turned it on, it was
2  working.
3    Q.   How do you tell?
4    A.   Because it beeps at you and then there's a
5  little red light that flashes that says it's recording.
6    Q.   But you're not reviewing footage or audio?
7    A.   Not very often.
8    Q.   Under what circumstance would you?
9    A.   Like I said before, court or if I needed
10 something specific from a case, something specific that
11 a person said on scene, but back then we didn't have
12 the app that we have now, so back then it wasn't easy
13 to do.  Now we have an app.  You pull it up, you watch
14 the video.  Back then you had to plug it into your
15 computer and go through -- I can't even remember what
16 the process was, but it was a big process to be able to
17 review your body cam.
18   Q.   Are you aware that the district attorney's
19 office reviewed Mr. Harmon's shooting?
20   A.   Yes.
21   Q.   Did you ever review the district attorney's
22 office findings?
23   A.   I don't recall.
24   Q.   Do you know what they were?
25   A.   I know that -- or my understanding was that

Page 70

1  Sim cleared Officer Fox, but then later passed it on to
2  the FBI.
3    Q.   Sim is Sim Gill --
4    A.   Yes.
5    Q.   -- district attorney?
6         But you don't ever remember reading that?
7    A.   I might have.
8    Q.   Do you agree with the district attorney's
9  decision?
10   MS. NICHOLS:  Objection to the extent it calls for
11 a legal conclusion.
12   THE WITNESS:  Do I answer?
13   MS. NICHOLS:  Yeah.
14   THE WITNESS:  Yes.
15   Q.   (BY MR. LUTZ) Why?
16   A.   Because I would have done the same thing if I
17 was him in Fox's position.
18   Q.   So you believe Officer Fox was justified in
19 shooting Mr. Harmon?
20   MS. NICHOLS:  Objection, calls for a legal
21 conclusion.
22        You can answer.
23   THE WITNESS:  Yes.
24   Q.   (BY MR. LUTZ) Based on what?
25   A.   Based on my understanding of what he saw, and

Page 71

1  combine that with what I was observing and knew to be
2  going on, it was very reasonable to believe that
3  Patrick Harmon was turning back towards us with a knife
4  and was going to stab or try to kill or try to do
5  serious bodily injury to one of us.
6    Q.   But as you said before, you never saw a knife
7  in his hand?
8    MS. NICHOLS:  Objection, misstates testimony.
9    THE WITNESS:  My understanding is that Fox did, so
10 if I was in Fox's shoes and I saw him turn back towards
11 me with a knife, then yes, I would have done the same
12 thing.
13   Q.   (BY MR. LUTZ) Are you basing that on what
14 Officer Fox told you?
15   A.   I'm basing that on what I know of the case.
16   Q.   Which is the statements and the proximity of
17 the knife to him on the ground?
18   A.   Yes.
19   Q.   Are you aware that they tested the knife that
20 you're talking about for DNA and latent fingerprints?
21   A.   No.
22        (Exhibit 7 marked.)
23   Q.   (BY MR. LUTZ) I'm handing you Exhibit 7.
24   MS. NICHOLS:  Can I have a copy?
25   MR. LUTZ:  Yes.  Thanks.

Page 72

1    Q.   (BY MR. LUTZ) Have you ever seen one of these
2  reports before?
3    A.   No.
4    Q.   I'll represent to you it's titled Crime Lab
5  Analysis Report Latent Print Processing.  Did you read
6  that bottom paragraph?
7    A.   Yes.
8    Q.   So on the bottom paragraph here the analyst
9  responsible for authoring this report writes swabbed
10 the handle -- "I first swabbed the handle of the knife
11 for any potential touch DNA.  Processed knife with
12 black powder.  Nothing of value is recovered."
13        What do you take that to mean?
14   MS. NICHOLS:  Objection, vague.  It calls for
15 speculation.
16   THE WITNESS:  That nothing of value was recovered.
17   Q.   (BY MR. LUTZ) If I represent to you that this
18 indicates that there were no fingerprints or DNA
19 recovered on that knife, would that surprise you?
20   MS. NICHOLS:  Objection, vague, calls for
21 speculation.
22   THE WITNESS:  Are you asking if it would surprise
23 me that that's what this says or surprise me that that
24 was the case?
25   Q.   (BY MR. LUTZ) I suppose that that was the

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1257   Page 20 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                    73 to 76

Page 73

1   case, presuming that this is accurate.
2       A.   I guess yes and no.  But I would assume
3   that -- well, I know, based on my knowledge of law
4   enforcement, that, you know, sometimes DNA and
5   fingerprints aren't found, sometimes they are.  So yes
6   and no.
7       Q.   Okay.  So you wouldn't draw any conclusion --
8   you wouldn't draw any conclusion from that?
9       A.   No.  Well, yeah, I don't know.
10      Q.   Okay.  Did you ever communicate -- and you
11  don't have to -- don't tell me what, but did you ever
12  communicate with a police union attorney about this
13  case?
14      A.   Hold on.  I'm trying to remember.  I don't
15  think so.
16      Q.   Any other attorneys other than from the city
17  attorneys office?
18      A.   I don't think so.
19      Q.   We talked earlier about --
20           You can put that aside.
21      A.   (Complies.)
22      Q.   -- about the extensive training you've
23  received on use of force, and I believe you mentioned
24  that you had studied many different use of force areas.
25  Is that accurate?

Page 74

1       A.   We -- yes.
2       Q.   Have you been specifically trained on how to
3   respond to a knife wielding suspect?
4       A.   Yes.
5       Q.   What are the takeaways from that training?
6           MS. NICHOLS:  Objection, vague.
7           THE WITNESS:  There's a few.  Yeah, if -- it
8   starts with verbal deescalation.  If you have the time
9   and opportunity, there's also what's called the 21-foot
10  rule that was -- that we've learned that we were taught
11  a lot.  The idea being that if a suspect wielding a
12  knife is within 21 feet of you, they can make it to you
13  and do harm to you before you have the option to draw
14  out and fire your weapon.
15           Obviously things like standoff tools when
16  necessary, when reasonable and available.  Kind of like
17  I told you about the other lady.  You know, tasers if
18  reasonable.  But we are very well aware that a knife is
19  a lethal weapon.
20      Q.   (BY MR. LUTZ) Can you describe for me any
21  specific scenarios you've been trained on that involve
22  a knife wielding subject?
23      A.   A scenario of a male walking around with a
24  knife to his throat or a subject walking around with a
25  knife to their throat.  And, you know, you're given

Page 75

1   that scenario, what do you do.  Set up, you know, you
2   make sure you put a barrier between yourself and them,
3   establish communications, use less lethal options if
4   possible.
5       Q.   In addition to that scenario, have you role
6   played other scenarios with a suspect you think has a
7   knife?
8       A.   Another scenario is if a suspect with a knife
9   charges at you.  I've done it in an area that we can
10  measure, so we've been able to test the 21-foot rule.
11      Q.   Have you received any training or guidance in
12  distinguishing a weapon in a suspect's possession
13  versus an innocent object?
14      A.   Yes.
15      Q.   Tell me more.
16           MS. NICHOLS:  Objection, vague.
17           THE WITNESS:  We've had scenarios where somebody
18  pulled up a cellphone or a wallet really quickly, you
19  know.  When you can't see their hands you just yell let
20  me see your hands, let me see your hands, let me see
21  your hands.  They really quickly pull up an object
22  that's not a weapon.  And the idea of that is to teach
23  you that even though it's only a split second, you have
24  to be kind of able to judge correctly.
25      Q.   (BY MR. LUTZ) And have you role played that

Page 76

1   scenario --
2       A.   Yes.
3       Q.   -- in training?
4       A.   Yes.
5       Q.   Many times?
6       A.   I'd say many times, yeah.
7       Q.   Have you followed the news on this case?
8       A.   No.
9       Q.   Have you seen any news reports?
10      A.   Not since it first happened.
11      Q.   Did you when it first happened?
12      A.   I saw them, but I didn't follow them.
13      Q.   Do you recall how seeing those made you feel?
14           MS. NICHOLS:  Objection, vague.
15           THE WITNESS:  No.  I don't recall.
16      Q.   (BY MR. LUTZ) Were you ever worried that you
17  were going to be disciplined for your involvement in
18  the Harmon incident?
19      A.   No.
20      Q.   Were you ever worried that you might be
21  involved in a lawsuit because of the Harmon incident?
22      A.   Not worried, aware.
23      Q.   What did you think about that?
24      A.   It's part of the job.
25      Q.   You haven't been involved in other lawsuits;

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID 1258   Page 21 of 31
ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                          77 to 80

Page 77

1  right?
2      A.    Not as far as I'm aware, but I think that the
3  potential is still there.  So yes, all of us as
4  officers are aware that we could potentially be
5  involved in lawsuits.
6      Q.    Did you ever speak with Detective Bench about
7  the facts of this case?
8      A.    Is that a Unified guy or a Salt Lake guy?
9      Q.    I believe that he's a detective with the UPD.
10     A.    Then that might have been the guy that I
11  talked to that interviewed me.
12     Q.    I asked you earlier why you came in uniform
13  if you're not on duty.
14     A.    Because I look good in uniform.
15     Q.    Fair enough, but I'm not going to disagree.
16  I notice you're also armed.  Why did you come armed?
17     A.    Because I drove my police car.
18     Q.    Does it require you to be armed to drive your
19  police car?
20     A.    Yes.
21     Q.    Was it important for us to know that you were
22  armed today?  Did you want us to know that you were
23  armed?
24     A.    I would assume that you know that any police
25  officer is always armed.

Page 78

1      Q.    I'm just going to say we deposed police a
2  lot.  Most of them don't bring their guns.
3      A.    If they show up in uniform — well, I
4  guarantee they bring their guns.  I'll tell you that
5  right now.
6      Q.    If they show it?
7      A.    No.  Even if they don't, they have a gun
8  concealed on them somewhere guaranteed.
9      Q.    I forgot to put it in the deposition notice.
10     A.    Yeah.
11     Q.    Okay.  Have you ever reviewed your own
12  training records?
13     A.    No.
14     Q.    To your knowledge, are you up to date on all
15  of your trainings?
16     A.    Yes.  In everything except for the
17  intoxilyzer.
18     Q.    Okay.
19     A.    Which is the blow in the machine for DUI.
20     Q.    Do you just not do that anymore because
21  you're a sergeant?
22     A.    Yes.
23     Q.    I wanted to ask you the area where Officer
24  Fox shot Mr. Harmon right around 1000 — 1050 State
25  Street.  How would you describe that area in terms of

Page 79

1  crime rate, basically?
2      A.    High crime.
3      Q.    What types of criminal activity would be
4  common to find around there in 2017?
5      A.    Everything from trespass, drug possession,
6  assaults, aggravated assaults, shootings, stabbings.
7  Everything.
8      Q.    Officer Smith stopped Mr. Harmon he says
9  because Mr. Harmon didn't have a taillight on his bike
10  and ran across all six lanes of I guess State Street.
11  Have you ever stopped someone for not having a
12  taillight on a bike?
13     A.    I've stopped someone for not having a
14  headlight at night many, many, many times.
15     Q.    On a bicycle?
16     A.    Uh-huh.
17     Q.    Not a taillight though?
18     A.    I don't — I don't think so.  Headlight or
19  crossing lanes of traffic many times.
20     Q.    In your experience patrolling with other
21  officers seeing somebody with — seeing a civilian
22  riding around without a taillight on their bicycle,
23  would most officers respond to that by stopping that
24  civilian?
25     MS. NICHOLS:  Objection, calls for speculation.

Page 80

1      THE WITNESS:  Most officers on that shift at that
2  time, yes.
3      Q.    (BY MR. LUTZ) Have you ever been involved in
4  stopping somebody for a missing taillight?
5      A.    I can't say for sure.
6      Q.    Okay.  I have to return one more time to
7  something that we've talked about already.  I'll
8  probably get an objection here.
9          You don't recall whether or not you saw a
10  knife in Mr. Harmon's hands.  That's your testimony;
11  right?
12     MS. NICHOLS:  Objection, asked and answered.
13     THE WITNESS:  Yes.
14     Q.    (BY MR. LUTZ) You understand that if that was
15  true — whether or not that was true, that there was a
16  knife in his hand, and whether or not Officer Fox saw
17  that could be the difference between him being
18  justified and not justified; right?
19     MS. NICHOLS:  Objection, calls for a legal
20  conclusion.
21     THE WITNESS:  I understand that on a general
22  basis, yes.
23     Q.    (BY MR. LUTZ) And it not being justified
24  could have enormous consequences for Officer Fox?
25     MS. NICHOLS:  Objection, calls for a legal

Page 81

1  conclusion.
2      THE WITNESS:  Sure.
3      Q.  (BY MR. LUTZ) And Officer Fox is your friend?
4      A.  Yes.
5      Q.  And your colleague --
6      A.  Yes.
7      Q.  -- of many years?  And I presume you care
8  about what happens to him?
9      A.  Of course.
10     Q.  Why would the facts that determine what was
11 going to happen to him, the determinative fact, not
12 stand out in your mind?
13     MS. NICHOLS:  Objection, argumentative and asked
14 and answered.
15     THE WITNESS:  Sitting here today, I don't recall.
16     MR. LUTZ:  Okay.  That's all I have for you right
17 now.
18     MS. NICHOLS:  Can I take five minutes --
19     MR. LUTZ:  Absolutely.
20     MS. NICHOLS:  -- and double check?
21     (Recess taken from 4:36 p.m. to 4:40 p.m.)
22                  EXAMINATION
23 BY MS. NICHOLS:
24     Q.  Sergeant Robinson, you testified, I believe,
25 that you didn't believe use of force would be

Page 82

1  appropriate when a suspect is fleeing.  Is that the
2  case in all circumstances?
3      A.  No.  What I was referring to is the use of
4  specifically taser or additional tools may not be
5  necessary based on mere flight, however, physical force
6  would require to tackle the suspect.  However,
7  circumstances change.  If the suspect produces a weapon
8  or something changes, then, you know, that would change
9  the level of force that we're allowed to use.  Or that
10 would be reasonable.
11     MS. NICHOLS:  I don't have any other questions.
12     MR. LUTZ:  Can I ask one more.
13                  FURTHER EXAMINATION
14 BY MR. LUTZ:
15     Q.  Referring back to the night of August 13,
16 2017, were you wearing any protective armor --
17     A.  Yes.
18     Q.  -- on your uniform?
19     MS. NICHOLS:  I'm going to object.  That's not
20 within the scope of my question.
21     MR. LUTZ:  Fair enough.  Okay.  We're done.
22     THE WITNESS:  Okay.
23     MS. NICHOLS:  The witness would like to read and
24 sign, please.
25     (The proceedings ended at 4:42 p.m.)

Page 83

1  STATE OF UTAH        )
                        ) ss.
2  COUNTY OF SALT LAKE  )
3                  REPORTER'S CERTIFICATE
4      I, Amanda Richards, certified shorthand reporter
5  for the State of Utah, certify:
6      That the deposition of the witness herein was
7  taken before me at the time and place herein set forth,
8  at which time the witness was by me duly sworn to
9  testify the truth; that the testimony of the witness
10 and all objections made and all proceedings had of
11 record at the time of the examination were
12 stenographically reported and transcribed by me.
13     That the foregoing transcript, as transcribed by
14 me, is a full, true and correct record of my
15 stenographic notes so taken; that review of the
16 transcript by the witness was requested pursuant to
17 Rule 30(e) of the Utah Rules of Civil Procedure.
18     I further certify that I am neither counsel for
19 nor related to any party to said action, nor in anywise
20 interested in the outcome thereof.
21     IN WITNESS WHEREOF, I have subscribed my name
22 below this 5th day of July 2022.
23
                  _Amanda Richards_
24
                  Amanda Richards, CSR
25

Page 84

1                  WITNESS CERTIFICATE
2      I, SCOTT ROBINSON, HEREBY DECLARE:
3      That I am the witness referred to in the
4  foregoing deposition, and that I have read the
5  foregoing deposition testimony and have made any
6  changes/corrections I deem necessary below and
7  together the same truly and accurately reflect my
8  testimony.
9  PAGE-LINE:    CHANGE/CORRECTION        REASON:
10 ____-_____   _____    _____
11 ____-_____   _____    _____
12 ____-_____   _____    _____
13 ____-_____   _____    _____
14 ____-_____   _____    _____
15 ____-_____   _____    _____
16 ____-_____   _____    _____
17 ____-_____   _____    _____
18 ____-_____   _____    _____
19     I, SCOTT ROBINSON, hereby declare under the
20 penalties of perjury of the laws of the United States
21 of America and the laws of the State of Utah that the
22 foregoing is true and correct.
23     DATED _____, 20_____.
24              _____
                  SCOTT ROBINSON
25

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                    1

---

**Exhibits**

**Exhibit 04** 52:18,19,21
**Exhibit 05** 53:16,17
**Exhibit 06** 53:18,24,25
54:1
**Exhibit 07** 71:22,23

---

**1**

**1000** 78:24
**1050** 78:24
**10:00** 13:5,6
**10th** 17:22
**13** 82:15
**13th** 16:13
**16** 4:1
**17** 12:7
**19** 58:3

---

**2**

**2** 19:19 21:2,3,4,8
65:24
**200** 62:25
**2013** 8:20 14:17
**2015** 8:14,22 13:25
**2016** 13:16
**2017** 12:22 13:16,25
16:13 17:4 50:18 79:4
82:16
**2018** 58:2
**2019** 49:3 50:21,22
**2020** 50:20
**2022** 4:1 55:15
**21** 74:12
**21-foot** 74:9 75:10
**28** 50:17
**29** 50:17
**2:01** 4:1
**2:42** 33:6
**2:59** 33:6

---

**3**

**3** 27:20,22 29:19
**30** 25:16 50:18
**300** 12:14 17:19
**34** 11:5

---

**3:19** 48:8
**3:32** 48:8
**3:55** 64:24

---

**4**

**4** 52:18,19,21
**40** 60:24 61:10 62:24
**475** 17:19
**4:12** 64:24
**4:36** 81:21
**4:40** 81:21
**4:42** 82:25

---

**5**

**5** 53:16,17,20,21
**50** 62:13

---

**6**

**6** 53:18,24,25 54:1

---

**7**

**7** 52:7 71:22,23
**70** 11:12

---

**8**

**8** 52:7

---

**9**

**99** 21:2,4,7
**9:30** 13:4,5 15:11

---

**A**

**ability** 6:10
**Absolutely** 81:19
**academy** 58:14,15,18
60:18
**access** 33:9
**accomplish** 55:24
**accurate** 44:19 54:3
73:1,25
**accuse** 42:15
**accused** 65:4
**achieved** 11:21
**acting** 39:13 42:15
**action** 57:11,24

---

**actions** 60:13
**activity** 79:3
**actual** 16:15
**addition** 75:5
**additional** 82:4
**address** 17:18 39:5
**addresses** 39:7
**admin** 15:19
**Afghanistan** 11:24
**Afternoon** 4:8
**aggravated** 65:25 79:6
**agree** 62:24,25 70:8
**aid** 27:8 28:7 36:13,24
37:1 39:12,25 40:7,10,
19 41:3,9
**alive** 28:11 36:2 38:17
**allegation** 55:4,5
**allegations** 54:25 58:1
64:10
**allowed** 38:16 82:9
**Alma** 37:13,14
**ambiguous** 18:21
29:24
**Amendment** 59:22,25
60:1,3
**Analysis** 72:5
**analyst** 72:8
**answers** 4:24
**anymore** 13:19 14:11
78:20
**apartment** 49:16
**app** 69:12,13
**apparently** 31:22 38:17
**applied** 41:7
**apply** 37:5
**approach** 27:9,16
37:16
**approached** 29:4,11
30:24 37:15 38:8
**Approximately** 67:19
**area** 50:9 75:9 78:23,25
**areas** 73:24
**argumentative** 43:9
81:13
**arm** 22:7,8,12 56:18
**arm's** 34:20
**armed** 77:16,18,22,23,
25
**armor** 82:16

---

**arms** 32:22 56:24
**Army** 11:19
**arrest** 20:16
**arrived** 19:5,24 20:2
**aspect** 11:1 39:4
**assault** 65:25 66:5
**assaulted** 64:11
**assaults** 79:6
**assistance** 49:18
**assume** 8:1 14:25
53:11 61:3 73:2 77:24
**assumption** 53:1
**attempted** 37:3
**attempting** 36:7
**attend** 58:14
**attention** 27:6
**attorney** 4:9,12 70:5
73:12
**attorney's** 69:18,21
70:8
**attorney-client** 5:23
**attorneys** 73:16,17
**audio** 47:19 48:1,2
67:18 69:6
**August** 16:13 17:4
82:15
**authoring** 72:9
**authority** 58:10
**average** 13:2 63:12
**aware** 51:20 52:15
57:10 65:14 69:18
71:19 74:18 76:22 77:2,
4
**Axion** 46:18
**Axon** 66:12

---

**B**

**back** 13:23 17:11,13
18:12 21:14 22:9,19
24:7,20,22 28:22 29:4,9
32:18,24 33:23 34:6
42:18 43:14 64:25
65:13 67:9 69:11,12,14
71:3,10 82:15
**backed** 44:23
**background** 8:19
**backpack** 21:15 22:11
**backup** 17:13,16,21
18:1,16,25

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1261   Page 24 of 31

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                    2

**bad** 32:3
**bar** 14:10
**barrier** 75:2
**based** 35:12,16 53:1
70:24,25 73:3 82:5
**basically** 79:1
**basing** 71:13,15
**basis** 80:22
**Bates** 33:13
**Bear** 46:11
**beeps** 69:4
**began** 20:6 24:3,5
29:10 43:24 44:4
**belief** 59:17
**belt** 47:14 54:9
**Bench** 77:6
**bicycle** 79:15,22
**big** 69:16
**bike** 12:24 19:11,25
22:1 79:9,12
**bikes** 12:21
**bind** 6:11
**birthday** 14:23
**bit** 25:5 58:12
**black** 72:12
**bleeding** 27:18
**blood** 27:17
**blow** 78:19
**bodily** 59:19 71:5
**body** 6:22,23 28:2
31:2,5 42:23 45:3,5
46:15 47:24,25 53:2
54:8,10 66:8,10,22
67:13,17,24 68:2,21,23
69:17
**bottom** 72:6,8
**branch** 11:18
**brand** 46:19
**break** 21:6 33:3 48:5
64:21
**briefing** 15:15,19,21
**bright** 27:17
**bring** 78:2,4
**broad** 58:19
**broken** 68:2
**brought** 66:1
**BSING** 17:11
**building** 17:17

## C

**by-the-book** 40:12

**cage** 50:8
**call** 9:14 13:7 15:12
17:13,15,20 18:1,6,18
19:2 39:19
**called** 4:4 17:11 18:25
19:4 49:11,18 55:22
56:21 58:4 74:9
**calling** 18:16
**calls** 13:6 15:12 17:6
28:19 37:24 49:13
70:10,20 72:14,20
79:25 80:19,25
**cam** 6:22,23 31:2 47:24
66:8,10,22 67:17 68:23
69:17
**camera** 31:5 42:24
46:15,18,25 47:17,22
48:1 54:8,11 64:15
66:12,19,20 67:13 68:2
**cameras** 67:24
**cams** 68:21
**capacity** 8:5
**car** 12:24 20:8 21:10
28:22 29:4 77:17,19
**care** 81:7
**career** 9:5 62:10 63:8
64:5
**careful** 38:25
**case** 4:10 6:21 7:20
9:23 10:2 39:9 41:17
47:23 66:17,23 67:2
69:10 71:15 72:24 73:1,
13 76:7 77:7 82:2
**cases** 8:7 68:5
**catching** 7:11
**cellphone** 75:18
**certification** 60:25
61:1,2
**chance** 13:8
**change** 82:7,8
**changed** 10:22
**chaotic** 30:16
**charge** 10:23
**charges** 75:9
**chase** 16:11
**chased** 50:23

**chasing** 23:20 24:3
**check** 33:25 68:17
81:20
**chest** 47:14
**cigarette** 46:3,9
**circle** 54:10
**circulating** 46:23
**circumstance** 62:3,8
69:8
**circumstances** 57:25
82:2,7
**city** 4:1 6:11 8:13,20,22
9:7 35:8 40:12 51:21
59:14 73:16
**civilian** 79:21,24
**claimed** 64:11
**claiming** 16:1
**clarify** 20:7 44:13
**clear** 36:25 42:19 64:16
**cleared** 70:1
**Clint** 13:10
**clocked** 17:3
**close** 29:5 38:10,16
44:8 50:18
**clothing** 23:21 45:6,19
**clue** 62:12
**collar** 47:3 54:12
**colleague** 81:5
**collided** 45:8
**colloquial** 5:1
**combine** 71:1
**common** 63:4 79:4
**communicate** 73:10,12
**communications** 75:3
**complaint** 55:7 57:3,
11,23 58:5
**complaints** 57:16
**complete** 30:15 60:24
**complex** 49:16
**Complies** 54:21 73:21
**computer** 20:21 69:15
**concealed** 78:8
**concept** 58:25
**concerned** 18:15,17
**concerns** 15:25
**conclusion** 70:11,21
73:7,8 80:20 81:1
**condition** 5:12 27:15
68:18

**conduct** 15:11
**conformity** 39:14 40:2
42:16
**confusing** 18:22
**Congratulations** 10:20
**Connor** 60:9
**conscious** 36:23
39:21,22,24 40:9
**consequences** 80:24
**consist** 58:18
**contact** 49:20
**continual** 60:19
**continually** 44:2 61:12
**continuous** 61:7
**control** 47:12 56:13
**copy** 71:24
**cord** 66:20
**Corey** 4:12
**correct** 19:11 41:8 44:6
**Corrections** 8:25
**correctly** 75:24
**County** 8:20
**couple** 63:7 68:14
**court** 4:19 5:3,5,7,9
8:1,3 22:25 66:17,24
67:7,15 69:9
**cover** 27:7
**covering** 38:1
**covers** 15:24
**crime** 60:13 65:22 72:4
79:1,2
**criminal** 79:3
**critical** 30:12 48:15
50:15,25 51:2,10
**crossing** 79:19
**cuffs** 32:25
**current** 10:9
**custody** 28:9 57:1
**cut** 16:11 23:13 30:9
43:16
**cutting** 55:17

## D

**daily** 15:15,19
**danger** 39:2 59:18,19
**dangerous** 36:6
**date** 16:15 67:7 78:14
**dates** 48:25

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1262   Page 25 of 31

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                3

daughter's 14:23
day 13:2 15:10 16:14, 19 17:4 46:15 47:18 54:4 61:13
days 15:24,25 42:5 43:1
deadly 59:15
dealing 32:8
deals 60:3
decide 40:22
decided 18:19 39:11
decision 31:22 32:3 39:21,23,24 40:6,7,9 41:9 42:12 70:9
deescalation 74:8
defendant 10:2 66:25
degree 20:18
department 7:2 8:21, 24 11:10,16 16:8 46:21 51:21 52:14,15 57:12 59:2,4,15
department's 35:8 40:13 52:15 58:13
departmental 61:15
depends 32:14
deploy 55:19
deployed 11:24
deployment 55:25
deployments 11:23
deposed 4:13 7:24 9:15 78:1
deposition 14:20 31:6 78:9
deputy 64:5
describe 21:19 37:1 49:7 74:20 78:25
detective 41:22 77:6,9
determinative 81:11
determine 81:10
dictated 36:18
dictates 41:7
difference 54:18 80:17
difficult 5:12,16 44:24
directed 37:4
direction 22:3 23:3,7 24:20
disagree 77:15
discharge 65:10
disciplinary 54:22 57:11,24 65:4

discipline 65:1
disciplined 76:17
discourtesy 58:8
discretion 40:22
discuss 15:22 18:6,11 59:7
discussion 20:5,11 30:17,21 31:2
dispatch 19:5
dissimilar 4:16
distinguishing 75:12
distorted 67:18
district 69:18,21 70:5,8
DNA 71:20 72:11,18 73:4
document 59:7
documents 6:18
door 49:8,20,25
double 33:25 81:20
downed 34:20
dozen 8:4
Dozens 51:24
drama 48:10
draw 65:17 73:7,8 74:13
drawing 24:5 26:22,23, 24 27:2 34:6
drawn 65:14
drive 17:24 77:18
drop 53:3,5,6,7 56:1
dropped 56:16
drove 19:4 77:17
drug 79:5
drugs 13:9
DUI 78:19
duly 4:4
duties 10:22
duty 7:20 77:13

E

earlier 31:19 33:7 42:19 48:9 66:11 73:19 77:12
East 17:19
easy 69:12
effect 23:14 31:1 43:24 46:8 56:9
emergency 36:7

employee 6:8
encounter 44:25
end 11:13 34:1 45:14 51:10
ended 23:24 45:8 82:25
enforcement 8:16,18 9:6 12:9 16:2 61:2 73:4
engage 44:22
Enjoying 10:24
enormous 80:24
entry 28:25 37:3
equipment 68:18,20, 21,22
erratic 49:19
escorted 53:12
establish 75:3
Estate 4:11
event 30:3 57:7,9
events 14:9 15:23,25
exact 21:13 43:22
EXAMINATION 4:6 81:22 82:13
examined 4:5
excessive 55:6 57:16 59:22
exe 33:18
exhibit 27:20,22 29:19 48:6 52:18,19,21 53:16, 17,18,24,25 54:1 71:22, 23
existed 65:20
exit 28:25 37:3
exonerated 57:15 64:18
expect 26:20
expected 26:18
experience 35:12 79:20
explain 4:15 31:19 44:24 56:20
explained 21:11
extensive 73:22
extent 28:19 59:6 70:10

F

face 45:20
facing 22:4

fact 18:18 43:7 56:3 81:11
factors 60:8,10,18 61:21 62:6
facts 77:7 81:10
failed 42:10
Fair 77:15 82:21
familiar 4:17
fatal 51:19
fatality 51:17
FBI 70:2
February-march 55:11
federal 59:21
feel 25:1 38:6 76:13
feet 25:16 74:12
fell 23:17 26:6 34:14
felony 19:19 20:18 21:3,4,8 65:24 66:5
felt 41:10
female 55:23
figure 30:13 34:3
file 33:18
filed 57:3,17 58:4
files 12:5
filings 9:23
find 47:6 67:4,6 79:4
findings 69:22
fine 30:14
fingerprints 71:20 72:18 73:5
finish 4:21,23
fire 25:19 26:19 56:3 74:14
firearm 24:5 26:22,23 36:20
fired 25:18 26:13,24 27:2,4 34:11,13 51:5,9
firing 26:7 51:10
fixed 66:21
flashes 69:5
flee 60:14
fleeing 61:19 62:4 82:1
flight 61:21 62:2,6 82:5
focus 57:3 35:5,19,20, 25 36:22,23
focused 36:13 38:1
folks 16:4
follow 4:23 76:12

Case 2:19-cv-00553-HCN-CMR   Document 80-6   Filed 10/28/22   PageID.1263   Page 26 of 31

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                    4

footage 6:22,23 31:5, 16 48:1 69:6
force 52:8 55:7 57:16 58:13,18,20 59:1,5,15, 22 60:6 61:6,23 62:9,20 63:6,15,19 73:23,24 81:25 82:5,9
forever 12:9
forgot 78:9
found 19:17 73:5
foundation 38:4
four-minute 17:24
Fourth 59:21,25 60:1,3
fox 7:6 13:10 14:2 17:10 18:4,6 20:1,2,4,8 21:2,4,7,24 22:2,3 24:4, 8,9,13,15,21,22 25:20, 21 26:7 27:7 28:22 29:4 30:25 37:18 38:16 41:6 45:22,25 54:15 65:14, 17 66:4 70:1,18 71:9,14 78:24 80:16,24 81:3
Fox's 31:17 37:25 38:22 65:14 70:17 71:10
friend 81:3
friends 13:12,14,17 14:15,16 18:15
front 21:25 24:11 25:11,12,13 45:16
fucking 23:13 30:9 43:16,20 44:15 46:8
full 44:25
fully 5:16
fun 16:10
function 17:2
functioning 47:17 66:13

**G**

game 14:22
gate 22:22,23,24 23:22
gave 7:1 23:17 33:21 41:19 45:1
general 61:14 80:21
gestures 4:25
ghetto 9:13
Gill 70:3
give 7:23 27:8 48:25 51:22

giving 19:11
gloves 21:10 28:23
good 7:9,12 14:15 46:12 77:14
gosh 33:14
grab 32:12 46:1 48:6 56:24
grabbed 21:15 23:20 45:6,18 56:18
grabbing 22:8
Graham 60:8,9,18
grass 23:12
graveyard 12:23 16:22 17:2
graveyards 16:23
great 33:4 54:13
grievances 64:8,19
ground 23:11,17,24 24:2 26:6 27:17 29:11 31:21 34:7 38:9,12 42:13 44:1,3 45:8,9,14, 21 71:17
group 25:7 58:3
grow 9:8
guarantee 78:4
guaranteed 78:8
guess 30:22 40:11 43:14 51:1 60:15 68:15 73:2 79:10
guidance 75:11
gun 36:15 43:13,16,19, 24 49:9,21,22,23,24 50:1 65:15,17 78:7
guns 13:9 78:2,4
gunshots 26:15,17
guy 19:10 44:16 49:8 50:24 51:2 77:8,10
guys 5:24 13:14 14:16 15:12 44:8 64:21

**H**

hand 27:19 29:16,20, 23 30:11 38:14,18 42:20 43:4,6,11 53:15, 23 55:18 71:7 80:16
handcuff 31:23 32:5, 11,17 34:25
handcuffed 32:23 36:5
handcuffing 32:20

handcuffs 22:13 27:7, 13 28:16,21 29:10 31:25 32:9,15 52:24 53:7,8,9,22 56:19
handing 27:21 52:17 71:23
handle 15:12 72:10
handled 34:2
handling 22:7
hands 21:14 22:19 29:10,12,13 56:22 68:8 75:19,20,21 80:10
happen 55:10 64:16 81:11
happened 15:23 17:5 19:6,16 26:5 30:6 38:20 44:9 56:11,15 76:10,11
happening 38:24 39:20
hard 4:25
harm 74:13
harming 55:9
Harmon 4:10,11 16:16 19:18,21 20:9,14 21:11, 17,20,25 22:2,5,21 24:4,7,10,18,20 25:9, 10,15 26:5,19 27:6,10 28:9,11 29:5 30:18 31:20 37:15,16 38:8 43:20 44:7 46:1 48:11 50:14 65:13 66:13 70:19 71:3 76:18,21 78:24 79:8,9
Harmon's 22:1,7,18 23:19 28:2 29:10 36:1 42:20 46:3 52:24,25 69:19 80:10
head 4:25 50:1
heading 23:16
headlight 79:14,18
health 49:16
hear 26:1,15,16 27:1 47:22 66:21
heard 23:12 27:4 43:15,19,23 44:14,22 46:7 65:14
hearing 31:13
hey 38:25
high 12:11,14 79:2
highest 11:20
hired 8:21
history 54:22 65:1

hit 44:3 45:21 56:5,7
hold 21:15 23:20 45:19 73:14
holster 34:8
honestly 51:25 62:14, 23 67:5,20
hope 68:3
hospital 56:19
hotel 51:9
hours 58:22 60:24 61:9,10,11
house 14:5
houses 49:16
Huh-uh 41:24
hundreds 62:22
hung 14:13 23:16
hurting 61:18

**I**

IA 57:24
idea 45:1 62:14 63:13 67:5,8 74:11 75:22
identified 20:13
identify 19:12
illness 5:11
image 52:21 54:3
imagine 11:14 32:16
immediately 27:6 43:23
impact 44:7 68:5
important 4:17,19,24 39:11 40:18,20 41:11 77:21
incident 6:10 16:16,17 41:17 42:9 48:12,14 50:14,15,19 51:2,11,15 55:16 63:24 67:12 76:18,21
incidents 48:16 62:9, 21 63:15
including 43:16 62:20
independently 20:21
indicating 54:9
individual 63:20
individuals 58:3
influence 5:15
information 19:14 62:5
infractions 65:5

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                          5

injury 59:19 71:5
inmate 64:7,11,19
innocent 75:13
inside 51:11
instance 63:17,19
instances 51:19
instructed 58:3
instructs 5:21
intended 56:9
interaction 44:5
Interesting 48:4
interview 4:16 6:22,25
  7:1 33:8 41:19 42:4
interviewed 41:21 42:9
  77:11
intoxilyzer 78:17
introduce 58:25
investigation 41:16
  64:14
involve 15:18 74:21
involved 8:8 48:15,18,
  20 50:15,25 51:2,19
  52:4,13,16 54:4 58:20
  62:10 65:7 76:21,25
  77:5 80:3
involvement 76:17
involving 16:16
Iraq 11:24
iron 22:22,23,24 23:22
issue 28:10 49:11,15

J

jail 8:21 14:17 62:20
  64:5
January-february
  55:11
job 8:15 62:19 76:24
jobs 12:9
joined 12:6
joining 11:15
judge 75:24
July 49:3 50:20
jumbled 66:18
JUNE 4:1
jury 8:6
justified 59:16 61:16
  70:18 80:18,23

K

kill 71:4
kind 4:15 5:2 13:1
  16:11 17:4 22:11 23:15,
  17,22 44:2,7 45:8,18,19
  46:17 49:22 74:16
  75:24
knees 36:8
knew 12:2 14:17 25:24
  27:5 34:17 38:12 71:1
knife 27:16 28:1,3,6,8,
  10,14 29:19,22 30:19
  31:1,14,21,23 32:12
  36:8 37:19 38:3,9,12,
  17,25 39:3 42:10,13,20
  43:4,6,11 52:24 53:5
  56:13 71:3,6,11,17,19
  72:10,11,19 74:3,12,18,
  22,24,25 75:7,8 80:10,
  16
knocked 49:8,20
knowledge 73:3 78:14
Kris 14:14

L

Lab 72:4
ladder 56:17,20,23
lady 55:8,17 74:17
Lake 4:1 8:13,20,22 9:7
  13:15 35:8 40:12 51:21
  59:14 77:8
lanes 79:10,19
language 44:6
lapel 47:4
latent 71:20 72:5
latex 28:23
law 5:9 8:15,18 9:5
  12:8 16:2 59:1,21 61:2
  73:3
lawsuit 9:16 76:21
lawsuits 76:25 77:5
laying 27:16 28:1 31:21
leads 30:22
learn 66:15
learned 47:19,23 66:11
  67:14,18 68:11 74:10
leave 13:23 42:12
led 32:3 49:10

left 4:11 18:2 21:16,21
  22:7,12 23:16 24:13
  25:9 29:2
leg 56:8
legal 70:11,20 80:19,25
lens 54:11
lethal 55:8,18 61:4,23
  74:19 75:3
level 47:10 82:9
lieutenant 64:15
life 12:10 36:1,22 41:10
  59:18
light 69:5
likelihood 60:14
lines 30:10 43:21
lineup 13:4,5 15:11,14
  17:9
listen 42:4
listened 33:8
litigation 9:23
locate 37:3
located 37:4
location 18:3
long 8:13 12:18 13:14
  14:16 67:12,19 68:1,4,
  16
longer 28:10 34:15
longterm 16:8
looked 13:2 24:16
lot 40:10 58:19 62:20
  68:5 74:11 78:2
lower 50:9
LUTZ 4:7 6:1,5,7,12,13
  17:12 18:24 27:3,21
  29:3,25 33:7,11,13,16,
  19,23 34:3,5 38:2,7
  40:11 43:12 48:9 49:22
  52:20 53:18,21,23 54:1
  59:12 62:3,9 64:21,23,
  25 68:22,24 70:15,24
  71:13,23,25 72:1,17,25
  74:20 75:25 76:16 80:3,
  14,23 81:3,16,19 82:12,
  14,21

M

machine 78:19
made 9:3 23:10,14 40:6
  41:9 43:15 57:10 76:13
maintain 60:25

maintained 56:13
make 5:12,16 31:22
  32:3 33:23 39:19 49:19
  68:24 74:12 75:2
making 49:19
male 74:23
March 10:17
mark 52:17
marked 47:20 52:19
  53:16,17,24,25 71:22
massive 27:18
materials 6:20
matter 5:22 54:16
means 21:3,4,7
meant 7:9
measure 75:10
medical 27:5,8 36:7,24
  37:1 39:12,25 40:7,10,
  19 41:3,9
memory 43:3
mental 49:16
mentioned 18:14 34:6
  48:9 66:11 73:23
mere 82:5
messed 47:20,21
met 6:17
microphone 66:12
military 11:17 12:8
  64:25 65:2,8,11
mind 11:4 23:10 48:5
  62:17 63:5 81:12
mine 14:8 31:4
minute 11:5
minutes 48:5 81:18
missing 80:4
misstates 38:5 40:3
  71:8
misstating 44:6
misunderstanding
  39:20
model 46:19,20
models 46:23
modified 49:23
moment 31:24 33:3
months 58:20 68:13,14
morning 15:4
motel 51:3
motivate 36:10
mounted 46:25 47:1,

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                        6

13,14 54:9
**mouth** 46:4,5,7,10
**move** 56:1,24 58:3,7,11
**moved** 27:7 56:16,18
**moving** 24:16,18,20,
23,25 25:6 59:2
**multiple** 48:15

**N**

**name's** 4:9
**named** 9:16
**names** 42:2,6
**narrative** 17:6 49:14
**nature** 58:9
**nearby** 31:22 32:6
**Neck** 47:10
**needed** 23:21 27:5
28:6 36:25 43:16 69:9
**newer** 46:23
**news** 52:14 76:7,9
**Nichols** 5:19 6:4,6,9,17
17:6 18:21 28:19 29:24
33:4,10,12,14,17,20,25
37:24 38:4 40:3 43:9
48:7 49:13 59:6 62:2
64:22 68:20 70:10,13,
20 71:8,24 72:14,20
74:6 75:16 76:14 79:25
80:12,19,25 81:13,18,
20,23 82:11,19,23
**Nick** 4:9
**night** 48:1 66:13 79:14
82:15
**nightly** 13:7
**nine-year** 63:8,12
**nods** 5:1
**nonviolent** 61:20 62:4
**notice** 27:14 77:16
78:9
**noticed** 27:17
**number** 33:13

**O**

**oath** 5:6
**object** 59:6 75:13,21
82:19
**objecting** 5:20
**objection** 17:6 18:21
28:19 29:24 37:24 38:4

40:3 43:9 49:13 70:10,
20 71:8 72:14,20 74:6
75:16 76:14 79:25 80:8,
12,19,25 81:13
**observing** 71:1
**odd** 12:4
**office** 10:7 54:19
69:19,22 73:17
**officer** 4:8 6:5 7:6,9
8:11,25 10:15 12:16
13:3 14:2 16:20,21,22,
24 17:2,11 18:4,6,15,19
19:7,17 20:1,2,4,5,8,13,
24 21:11,22,24 22:3,6,
12,15,18 24:4,8,9,12,
13,21,22 25:20,21 26:7,
11,13 27:6 28:22,24
29:4,7 30:25 31:17 33:7
34:5 37:5,6,18,21
38:15,22 41:5,6 45:22,
25 48:18,20 50:15,25
51:2,5,9,19 52:13,16
53:9 54:4 55:18 56:3,18
61:2,15 63:12 65:19
66:4 70:1,18 71:14
77:25 78:23 79:8 80:16,
24 81:3
**officers** 16:6 18:25
24:15 25:8 26:18 28:4,
17 30:18 50:23 51:10
52:10 54:15 55:7 56:24
77:4 79:21,23 80:1
**officers'** 31:10 47:25
**open** 36:8
**opened** 49:8,20,25
**opportunity** 74:9
**opposed** 32:6
**option** 31:25 74:13
**options** 61:23 75:3
**orally** 64:1
**ordering** 55:7,25
**oven** 44:25
**overtime** 16:25 17:1

**P**

**p.m.** 4:1 13:4,5,6 15:11
33:6 48:8 64:24 81:21
82:25
**painless** 15:1
**Paintball** 49:23
**Palmer** 22:25

**paragraph** 72:6,8
**paralegal** 33:15 34:1
**Park** 9:11
**part** 4:18 20:11 30:22
39:21 40:18,20 51:20
76:24
**participated** 41:16
**partner's** 50:1
**party** 9:16 14:23
**passed** 22:12 70:1
**past** 13:20 15:23 54:25
**path** 23:19
**patience** 46:13
**Patrick** 4:10,11 16:16
19:18,20 20:6 34:14
52:24,25 71:3
**patrol** 10:10 12:16,20,
23 13:2 16:6,21,22,23
17:2
**patrolling** 79:20
**pedestrian** 13:8
**people** 10:23 16:1,8
**perfect** 38:23
**perform** 36:7 41:3
**performing** 40:19
**period** 13:20,22
**periodically** 68:19
**permitted** 39:19 59:12
61:24
**person** 32:8,11 69:11
**personally** 28:24 52:2
**phone** 14:19 57:8
**photo** 54:6
**photograph** 27:22,23
**phrase** 58:8
**physical** 82:5
**physically** 27:9
**pick** 18:20
**picture** 30:15
**pin** 56:23
**pinned** 56:17
**place** 23:18 27:7 32:9,
22
**placing** 28:9 29:10
**PLAINTIFF2** 26:25
**Plaintiffs** 4:10,12
**plan** 23:10
**play** 14:22 35:23

**played** 75:6,25
**player** 33:17
**plug** 69:14
**pocket** 29:14,15,17
30:8 43:17
**point** 10:12 15:19
19:20 22:17 23:10,18
24:6,19 26:19 28:13,17
35:25 38:2 44:1 46:1
50:1 56:16 59:9 68:25
**police** 7:2 18:2 35:8
40:13 51:21 59:14
73:12 77:17,19,24 78:1
**policies** 58:13
**policy** 59:2,5,15 61:15
63:14
**popping** 51:11
**position** 6:9 21:19 29:2
32:14,22 34:17 37:25
70:17
**possession** 37:19
75:12 79:5
**post** 54:19
**potential** 72:11 77:3
**potentially** 31:20 68:6,
7,9 77:4
**powder** 72:12
**Power** 15:19
**preference** 54:16
**prelim** 8:6
**prepare** 6:13 7:14
**present** 36:4
**presented** 28:15 31:20
**pressure** 37:5
**presume** 81:7
**presuming** 73:1
**pretty** 13:17 24:2
**primary** 17:2 32:7 35:5,
19
**Print** 72:5
**prior** 11:15 29:3 31:6
38:18
**priority** 26:13 27:4
**privilege** 5:23
**procedure** 35:9
**procedures** 36:7
**proceedings** 82:25
**process** 4:15 69:16
**Processed** 72:11

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                          7

**Processing** 72:5
**produced** 33:10,11
**produces** 82:7
**production** 34:2
**promoted** 10:11
**property** 22:25
**protective** 82:16
**proximity** 28:14 38:11 53:1 71:16
**psych** 49:11,15
**public** 17:17
**pull** 44:21 45:7 69:13 75:21
**pulled** 75:18
**push** 45:3
**pushing** 45:5
**put** 21:10,14 53:8 54:20 73:20 75:2 78:9
**puts** 15:20
**putting** 22:8

**Q**

**question** 4:21 5:21 32:4 40:5 42:12 53:4 58:19 82:20
**questions** 5:20 82:11
**quick** 33:3 44:25
**quickly** 13:17 24:2 38:20 43:25 75:18,21

**R**

**radio** 19:2 26:14
**ran** 22:22 23:2 28:22 79:10
**rank** 11:20
**rapidness** 48:11
**rate** 79:1
**reach** 32:11 34:20
**reached** 43:19
**reaching** 29:14 30:7 38:13 43:12,17,24 44:4
**read** 72:5 82:23
**reading** 70:6
**ready** 26:21
**real** 49:24
**reason** 7:19 34:12 54:14
**reasonable** 59:10,17

62:7 71:2 74:16,18 82:10
**reasons** 18:19
**recall** 17:9 18:10 20:15, 22,23 22:16 24:14,24 25:1,23,25 26:8,9,10,11 28:24 29:3,6,8,13,14, 18,21,22 30:7,8,10,23 31:3,13,16 38:11,13 41:22 42:7 43:5,10 45:23 46:24 47:5,7 49:2,3 54:7 55:5,6 57:19,22 59:8 60:14 64:20 65:18,23,25 66:2, 6,16 67:1 69:23 76:13, 15 80:9 81:15
**receive** 61:3
**received** 17:15,25 57:11 73:23 75:11
**recent** 31:12 55:6
**recently** 10:20 33:9
**recess** 33:6 48:8 64:24 81:21
**recheck** 33:19
**recognize** 27:22 52:20 53:18 54:1
**record** 4:9 6:1 26:25
**recording** 69:5
**records** 78:12
**recovered** 24:2 72:12, 16,19
**recovery** 29:2
**red** 27:17 69:5
**referring** 44:8 68:22 82:3,15
**refresh** 43:3
**regular** 63:6
**related** 58:14
**relation** 21:20 23:4 24:9
**remedied** 68:11
**remember** 5:16 14:8 16:13,14,15 17:8,10 21:13 24:1 26:12 30:1,5 41:23 42:21 43:18,22 46:15,18 47:13 55:3 57:25 64:4 66:19 67:12, 17 69:15 70:6 73:14
**removed** 37:8,9
**render** 36:13,24 39:12, 25 40:7 41:9

**rendered** 37:2 40:10
**rephrase** 40:5
**replace** 66:19
**replaced** 66:19,20 67:12,13
**report** 63:14,20,25 64:3 67:16 72:5,9
**reported** 63:24 64:3
**reporter** 4:19 5:5 53:20
**reports** 72:2 76:9
**represent** 72:4,17
**representing** 6:3
**requesting** 17:20
**require** 63:14 77:18 82:6
**requirement** 68:17
**respond** 50:2 74:3 79:23
**responded** 49:15 51:4
**response** 27:1
**responsible** 72:9
**rest** 13:6
**result** 51:17 64:13
**retrieve** 34:13
**return** 44:5 80:6
**reveal** 42:2
**review** 6:18,23 31:5,10 69:17,21
**reviewed** 6:20,22 9:22 42:23 47:25 69:19 78:11
**reviewing** 47:23 59:1,2 66:17,23 67:15,16,17 69:6
**Rib** 50:8
**riding** 79:22
**Riley** 4:12
**risk** 28:15 36:4
**Robinson** 4:3,8 6:5 7:6,7 34:5 81:24
**role** 75:5,25
**roll** 29:1
**room** 23:15 42:1 51:3, 12
**Rose** 9:11
**roughly** 45:11
**rounds** 51:3,11
**rule** 74:10 75:10
**run** 34:4

**running** 23:3,15 24:3 25:4 29:4 46:6

**S**

**safety** 15:25 17:17 28:15
**Salt** 4:1 8:13,20,21 9:7 13:15 35:8 40:12 51:21 59:14 77:8
**sat** 22:11 56:12
**Saturday** 14:23
**save** 36:1,22 41:10
**scenario** 74:23 75:1,5, 8 76:1
**scenarios** 59:3 74:21 75:6,17
**scene** 19:4 37:8,9 55:20 69:11
**school** 12:11
**scope** 82:20
**SCOTT** 4:3
**search** 60:4
**searching** 13:9
**secondary** 35:20,25
**seconds** 30:7,16
**secure** 27:8 31:1,13,23 32:7 34:18 35:1,2,14, 19,20 36:10,20,23,24 39:7,8,22,23,24 40:7,8, 17 41:2,4,5,6 42:10 56:2
**secured** 36:15 39:9 41:12,14
**securing** 32:6 35:5 39:16 40:1
**seek** 9:3
**seizure** 60:4,6
**September** 8:14,22
**sergeant** 7:7 10:10,15 11:6,22 12:15 15:9 37:12 78:21 81:24
**Sergeants** 11:11
**Set** 75:1
**setting** 65:11
**Severity** 60:13
**sexually** 64:11
**sheriffs** 8:21,23 10:7 11:16
**shift** 80:1

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                    8

**shifts** 17:1
**shoes** 38:22 71:10
**shoot** 16:2
**shooter** 49:5
**shooting** 48:18,21
  50:15 51:3 52:16 54:4
  65:13 66:13 69:19
  70:19
**shootings** 51:20 52:13
  65:7 79:6
**short** 33:14
**shortly** 37:6
**shorts** 54:19
**shot** 29:12 30:18 50:3,
  24 78:24
**shotgun** 55:8,18,25
**shots** 25:18,22 26:1,
  13,24 27:2,4 34:11,13
  65:14
**shoulder** 47:2,3,8
**shove** 23:17 45:9
**shoved** 45:20
**show** 15:11 78:3,6
**showed** 37:6
**side** 9:13 21:21,23 29:2
  45:12,15 50:5
**sidewalk** 58:4,7,11
**sign** 82:24
**significant** 15:24 30:3
  62:15
**Sim** 70:1,3
**Similarly** 4:24
**single** 40:15
**site** 49:17
**sitting** 17:10 19:24
  30:24 36:8 43:5,10
  81:15
**situation** 34:19,24
  40:13,15,16 48:11 49:7
  53:13
**skinnier** 54:2
**SLCPD** 7:21 9:3 10:7
  54:23 58:15 62:11
**slightly** 54:14
**smart** 33:17
**Smith** 4:11 6:7 7:10
  14:14 17:11 18:15,19
  19:17 20:5,8,13,24
  21:11,22 22:6,12,15,18
  24:4,12,15,21 26:11,13

28:24 29:7 30:25 37:21
  41:5 48:11 54:15 65:19
  79:8
**Smith's** 6:8 19:7
**social** 14:9,12 49:17
**socially** 14:3
**Somebody's** 31:3
**son** 57:5
**sort** 15:21
**South** 17:19,22
**southbound** 23:16
**speak** 77:6
**speaking** 20:6,7
**specific** 69:10 74:21
**specifically** 9:7 20:15
  40:24 47:7 59:23 74:2
  82:4
**speculate** 52:1
**speculation** 28:20
  37:24 72:15,21 79:25
**spend** 14:2,18
**spending** 14:12
**spent** 15:4
**split** 31:24 75:23
**spoke** 26:12 65:19
**stab** 23:13 30:8,9
  43:16,20 44:15 46:8
  71:4
**stabbed** 44:17
**stabbings** 79:6
**stairs** 64:12
**stand** 62:17 63:4 81:12
**standard** 59:22 60:2
**standing** 21:21
**standoff** 56:21 74:15
**start** 13:5 58:24
**started** 8:20 13:4,15,16
**starting** 17:3
**starts** 74:8
**state** 17:22 59:1 78:24
  79:10
**stated** 19:17 20:15
**statement** 31:13
**statements** 71:16
**station** 18:2
**stay** 16:8
**stayed** 9:1
**steps** 40:25 41:1,7

**stick** 43:8
**stop** 45:2
**stopped** 19:10 24:17
  25:2 34:12 79:8,11,13
**stopping** 79:23 80:4
**stops** 13:8
**straight** 10:7
**Street** 17:22 78:25
  79:10
**stress** 38:23
**struggling** 63:2
**stuck** 39:4
**studied** 73:24
**stuff** 33:22
**subject** 60:13,16,22
  61:17 64:7 65:1 74:22,
  24
**subjects** 49:17
**succeed** 26:23 32:20
**sued** 10:4
**suffering** 5:11
**sufficient** 61:22
**suicidal** 55:23
**summarize** 59:4
**supervising** 16:4
**supervisor** 37:10
**supervisory** 11:1
**suppose** 45:12 72:25
**supposed** 35:15
**surgery** 33:15
**surprise** 38:19 72:19,
  22,23
**surprised** 26:15,16
**surprising** 38:15
**surrounds** 22:24
**survive** 50:10
**suspect** 34:20,25 35:5,
  14,19 38:1 39:6,7,9,24
  40:17 41:2 50:10 51:7
  61:19 62:4 63:20 74:3,
  11 75:6,8 82:1,6,7
**suspect's** 75:12
**sustained** 54:24 57:20,
  24
**swabbed** 72:9,10
**Sweeney** 37:12
**swore** 5:5
**sworn** 4:5
**swung** 45:19

**system** 19:18

———————

**T**

**tackle** 23:11,12,15
  44:11,14,16 82:6
**tackling** 45:1
**taillight** 79:9,12,17,22
  80:4
**takeaways** 74:5
**takes** 11:5
**taking** 25:21
**talk** 4:20 5:19,24 7:4,12
  52:10 58:12 68:23
**talked** 6:2 14:19 73:19
  77:11 80:7
**talking** 6:25 16:14
  48:10 71:20
**Talks** 15:23
**tangled** 23:23
**tase** 61:22
**taser** 61:13,16 82:4
**tasers** 74:17
**Tasha** 4:10
**taught** 60:16 74:10
**teach** 75:22
**telling** 58:7
**terms** 78:25
**terribly** 64:23
**test** 75:10
**tested** 71:19
**testified** 4:5 5:3 8:1,3
  81:24
**testify** 5:12,17 59:8
**testimony** 38:5 40:3
  63:25 71:8 80:10
**thing** 4:22 5:2 24:1
  25:3,17,18 70:16 71:12
**things** 5:1 15:17,21
  38:20 43:18 74:15
**thought** 36:23
**threat** 31:20
**threats** 49:19
**throat** 74:24,25
**Thursday** 15:4
**time** 13:2,20 14:2,10,
  12,18 20:3 28:11,18
  29:9,11 34:11 36:2
  38:10 46:1,21 48:17
  53:12 66:1 67:9 68:16

ESTATE OF PATRICK HARMON, SR., et al. vs SALT LAKE CITY CORPORATION, et al.
SCOTT ROBINSON - 06/16/2022                                                    9

**74:**8 **80:**2,6
**times** 8:4 11:25 50:3 63:7 76:5,6 79:14,19
**title** 8:23 10:9 16:19
**titled** 72:4
**today** 5:13,19 6:14 14:12,18,19 30:24 43:5, 10 77:22 81:15
**today's** 31:6
**told** 14:25 16:18 19:10 20:24 21:14 33:8 42:21 50:19 55:19 62:24,25 66:2 71:14 74:17
**Tooele** 50:23,24 51:8, 13,14
**tool** 56:21
**Toolie** 51:16
**tools** 74:15 82:4
**torso** 50:6,9
**touch** 72:11
**tourniquet** 37:7
**town** 9:13
**traffic** 13:8 79:19
**train** 61:12
**trained** 32:5 34:19,23 35:2,11,14 39:19 40:2, 21,24 59:21,25 60:8 74:2,21
**training** 32:2 35:6,12, 16 36:18 39:5,7,14,18 40:13 41:7 42:16 58:13, 14,17,20,21,24 60:20, 25 61:3,6,12 65:11 73:22 74:5 75:11 76:3 78:12
**trainings** 78:15
**transcripts** 9:23
**transpired** 45:11
**transported** 56:19
**treated** 29:1
**trespass** 79:5
**trial** 8:6 46:24
**true** 51:16 80:15
**truth** 5:7
**turn** 23:22 71:10
**turned** 24:7,18,22 45:7 69:1
**turning** 71:3
**turns** 45:18
**type** 57:24

**types** 79:3
**typically** 27:18 35:22

---

**U**

**uh-huh** 5:1 9:7 10:8 21:5 33:12 35:7 42:25 43:2 44:12 56:4 64:6 65:21 79:16
**uh-uh** 5:1
**understand** 5:6 10:1 41:12 43:7 80:14,21
**understanding** 30:6 33:20,22 60:5 69:25 70:25 71:9
**Understood** 5:25
**Unified** 7:1 77:8
**uniform** 7:19 54:15,17 77:12,14 78:3 82:18
**union** 73:12
**unsustained** 64:17,18
**UPD** 33:9,21 77:9
**upgrade** 67:24
**UTAH** 4:1
**Utahan** 51:16

---

**V**

**vague** 18:21 29:24 49:13 72:14,20 74:6 75:16 76:14
**vehicle** 19:7
**verbal** 4:24 74:8
**version** 40:12 54:2
**versus** 75:13
**video** 42:23 64:15 69:14
**view** 13:7,8
**viewing** 31:12
**violent** 49:19 61:17
**volume** 66:18

---

**W**

**wait** 4:20
**walk** 8:18 13:1 15:9 17:4 55:2,3
**walked** 19:7 20:6 21:10
**walking** 64:12 68:1 74:23,24
**wall** 56:17,23

**wallet** 75:18
**wanted** 9:4,5 20:14 44:11,14 45:2 78:23
**warn** 37:18
**warrant** 19:19 20:19 21:3,12 49:10 65:20 66:4
**warrants** 13:9 21:7
**watch** 69:13
**watched** 64:15
**ways** 6:11
**weapon** 32:6 34:7,8,21 35:1,3,16,21,22 39:6,8, 10,16,22,23 40:8,9,18, 23 41:2,5,6,13,14 44:4 56:1 65:10 74:14,19 75:12,22 82:7
**wearing** 46:15 54:18 82:16
**week** 63:7 68:8
**weeks** 58:20 68:13,14
**west** 9:13 12:12,14 23:2,5
**whatnot** 49:17
**wielding** 74:3,11,22
**wondering** 68:1
**word** 4:19 15:7 26:21
**words** 21:2,13 26:12 43:22,23 46:8
**work** 7:15 13:18,23 14:9 16:23 17:1
**worker** 54:19
**workers** 49:17
**working** 7:17 13:15,21 14:11 16:25 17:1 68:25 69:2
**world** 38:23
**worried** 76:16,20,22
**wounds** 28:25 37:3
**wrist** 21:16 32:25
**write** 63:25
**writes** 72:9
**written** 63:20
**wrong** 26:20

---

**Y**

**year** 10:19 52:5 55:13 60:25 61:9,11
**year-ish** 52:3

**years** 9:1 12:18,20,21 30:2 62:19 67:23,24 68:13 81:7
**yell** 75:19
**young** 11:6
**younger** 11:9,13