Katherine R. Nichols (#16711)
SALT LAKE CITY CORPORATION
P.O. Box 145478
451 South State Street, Suite 505A
Salt Lake City, Utah 84114-5478
Telephone: (801) 535-7788
Facsimile: (801) 535-7640
katherine.nichols@slcgov.com

*Attorneys for Defendants Salt Lake City and Officer Clinton Fox*

## IN THE UNITED STATES DISTRICT COURT
## STATE OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ESTATE OF PATRICK HARMON SR.; PATRICK HARMON II, as Personal Representative of the Estate of Patrick Harmon Sr., and heir of Patrick Harmon Sr., TASHA SMITH, as heir of Patrick Harmon, Sr., <br><br> Plaintiffs, <br><br> vs. <br><br> SALT LAKE CITY, a municipality; and OFFICER CLINTON FOX, in his individual capacity, <br><br> Defendants. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 2:19-cv-00553-HCN-CMR <br><br> District Judge Howard C. Nielson, Jr. <br> Magistrate Judge Cecilia M. Romero <br><br> **Oral Argument Requested** |

Pursuant to Federal Rule of Civil Procedure 56, Defendants Salt Lake City Corporation

and Officer Clinton Fox submit this *Reply* in support of their *Motion for Summary Judgment*.

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................................ 2

I.      Patrick Harmon's Criminal History ............................................................................... 2

II.     Officer Fox's Extensive Military and Law Enforcement Background. .............................. 3

III.    The Subject Incident. ...................................................................................................... 4

        A.      The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony
                Aggravated Assault Warrant ................................................................................. 4

        B.      Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and
                Threatens the Officers. ......................................................................................... 6

        C.      Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife... 10

        D.      Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm.................... 17

        E.      Procedural History. ............................................................................................. 20

PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS.................................................... 20

ARGUMENT ...................................................................................................................... 30

I.      PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW......... 30

        A.      The Undisputed Evidence Establishes Officer Fox's Use of Force Was
                Objectively Reasonable Under the Circumstances ............................................... 31

                1.      Plaintiffs do not dispute the first and third Graham factors weigh in favor
                        of Officer Fox .......................................................................................... 31

                2.      Mr. Harmon posed an immediate threat of safety to the Officers ............ 32

                        a.      Once Mr. Harmon produced the knife, it was not feasible to give a
                                warning ......................................................................................... 32

                        b.      The record evidence establishes it was objectively reasonable for
                                Officer Fox to believe Mr. Harmon was armed with the knife..... 33

                                i.      Officer Fox's belief was objectively reasonable............... 34

ii.     No reasonable jury could conclude Mr. Harmon was not armed with the knife ........................................................ 35

c.     The undisputed evidence shows Officer Fox reasonably believed Mr. Harmon made hostile motions with the knife ........................ 40

d.     Plaintiffs concede the short distance between Officer Fox and Mr. Harmon weighs against them ........................................................ 41

e.     The undisputed evidence shows Officer Fox reasonably believed Mr. Harmon's manifest intentions were to harm him with the knife ................................................................................................................ 41

f.     That Officer Fox was forced to make a split-second life-or-death decision weighs in favor of his use of force ................................. 42

B.     Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time .................... 43

II.     PLAINTIFFS' MONELL CLAIM FAILS AS A MATTER OF LAW ............................ 45

III.     PLAINTIFFS' STATE-LAW CLAIMS FAILS AS A MATTER OF LAW .................. 45

A.     Plaintiffs' Wrongful Death Claim Fails as a Matter of Law ................................. 45

1.     Plaintiffs did not allege a wrongful death claim against the City ............ 45

2.     Plaintiffs' statutory cause of action is subject to governmental immunity 46

3.     Plaintiffs' wrongful death claim is barred by governmental immunity .... 46

4.     Officer Fox's use of force did not constitute a wrongful or neglectful act 48

B.     Plaintiffs' Unnecessary Rigor Claim Fails as a Matter of Law ............................ 48

1.     The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights ........................................................... 48

2.     Officer Fox's use of force did not constitute a flagrant violation of Mr. Harmon's constitutional rights ................................................................. 49

CONCLUSION ..................................................................................................................... 50

## **TABLE OF AUTHORITIES**

### **Cases**

*Bott v. DeLand*, 922 P.2d 732 (Utah 1996)..................................................................... 49

*Brown v. Larsen*, 653 F. App'x 577 (10th Cir. 2016)....................................................... 49

*Brown v. United States*, 256 U.S. 335 (1921) ................................................................. 50

*Carabajal v. City of Cheyenne*, 847 F.3d 1203 (10th Cir. 2017).................................... 30

*Christensen v. Salt Lake Cnty.,* 2022 UT App 51, 510 P.3d 299..................................... 49

*City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600 (2015)................................... 43

*Cordova v. City of Albuquerque*, 816 F.3d 645 (10th Cir. 2016) ..................................... 3

*Coronado v. Olsen*, No. 20-4118, 2022 WL 152124 (10th Cir. 2022)........................... 40

*Dexter v. Bosko*, 2008 UT 29, 184 P.3d 592................................................................... 49

*Est. of Harmon v. Salt Lake City*,
  No. 20-4085, 2021 WL 5232248 (10th  Cir. 2021)....................................... 9, 16, 31, 32, 33, 43

*Est. of Larsen v. Murr*, 511 F.3d 1255 (10th Cir. 2008)................................................. 34

*Est. of Taylor v. Salt Lake City*, 16 F.4th 744 (10th Cir. 2021)............................... 34, 42

*Est. of Valverde v. Dodge*, 967 F.3d 1049 (10th Cir. 2020) ................................ 31, 33, 36, 42, 43

*GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183 (10th Cir. 2022)............................. 35, 36

*Helget v. City of Hays, Kan.,* 844 F.3d 1216 (10th Cir. 2017) ....................................... 17

*Henry v. Storey*, 658 F.3d 1235 (10th Cir. 2011) .......................................................... 32

*Jensen v. Cunningham*, 2011 UT 17, 250 P.3d 465........................................................ 49

*Larsen v. Davis Cnty. Sch. Dist.,* 2017 UT App 221, 409 P.3d 114 ........................ 47, 48

*Ledfors v. Emery Cnty. Sch. Dist.,* 849 P.2d 1162 (Utah 1993) ..................................... 47

*Lennen v. City of Casper*, No. 21-8040, 2022 WL 612799 (10th Cir. 2022) ................. 42

*Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.,* 358 F.3d 736 (10th Cir. 2004) ......................................... 17

*Ostler v. Harris*, No. 2:18-CV-00254-BSJ, 2019 WL 4259652 (D. Utah Sept. 9, 2019) ........... 46

*Stella v. Davis Cnty.,* No. 1:18-CV-002-JNP, 2022 WL 3043092 (D. Utah Aug. 1, 2022) ........ 46

*Tennessee v. Garner*, 471 U.S. 1 (1985) ............................................................................. 33

*Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015) ....................................................... 44

*Thomas v. Durastanti*, 607 F.3d 655 (10th Cir. 2010) ................................................... 36

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) .................................................................. 3

*Thomson v. Salt Lake Cnty.*, 584 F.3d 1304 (10th Cir. 2009) ........................................ 33, 43, 48

*Tindley v. Salt Lake City Sch. Dist.,* 2005 UT 30, 116 P.3d 295 ................................... 46

*Van de Grift v. State*, 2013 UT 11, 299 P.3d 1043 ....................................................... 48

*Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154 (10th Cir. 2021) ............................... 31

*Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006) ............................................... 44

**Statutes**

Utah Code Ann. § 63G-7-201 ......................................................................................... 47

Utah Code Ann. § 63G-7-202 ......................................................................................... 46

Utah Code Ann. § 76-2-408 ........................................................................................... 19

## INTRODUCTION

There is no dispute: a knife was lying in the ground right next to Patrick Harmon's hand when he fell. Plaintiffs offer no evidence, not even an argument, about where that knife came from, if not Mr. Harmon. Nonetheless, they resolutely maintain Mr. Harmon was never armed with that knife, and ask the Court to join them in the same implausible speculation. It cannot do so.

At the motion to dismiss stage, the Tenth Circuit was compelled to accept Plaintiffs' allegation that Mr. Harmon was unarmed, recognizing that fact discovery could yield additional evidence about the knife. But fact discovery has now closed, and all the evidence in the record only further *confirms* the knife belonged to Mr. Harmon. There is no evidence suggesting otherwise. At summary judgment, it was Plaintiffs' burden to come forward with evidence—not speculation—to create a genuine dispute of fact. They failed to do so. The evidence confirms, and no reasonable jury could hold otherwise, that Mr. Harmon was armed with a knife.

The Parties also devote much ink to describing the key evidence in this case—the bodycam videos from the Officers. Ultimately, however, the Court can view the video for itself. Careful analysis of those videos shows that Mr. Harmon was not continuing to flee but had stopped and turned his whole body back toward the Officers with his right arm raised in the air. This is corroborated by the Officers' testimony and the autopsy report that describes the bullet trajectories.

Of course, Officer Fox did not have the benefit of a careful analysis, of reviewing the situation hundreds of times frame-by-frame before deciding whether to pull the trigger. He had only an instant to react when he saw the knife in Mr. Harmon's hand. Officer Fox believed, and believes to this day, that Mr. Harmon was going to stab him. Given the totality of the circumstances, that belief was reasonable. On this record, each of Plaintiffs' claims fails and should be dismissed with prejudice.

1

## <u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

### I.     <u>Patrick Harmon's Criminal History.</u>

<u>Fact No. 1</u>: In the 1990s, in his home state of Missouri, Mr. Harmon was charged and pled guilty to felony stealing, and was sentenced to five years in prison.[1]

<u>Fact No. 2</u>: In Utah, from 2000 to 2015, Mr. Harmon was arrested and charged with numerous crimes, including felony burglary and felony robbery involving a firearm, and served several years in prison as a result. After being released, Mr. Harmon was charged with several more crimes; he pled guilty to felon in possession of a firearm, was convicted of assault, and was sentenced to 51 months in federal prison.[2]

<u>Fact No. 3</u>: In 2015 and 2016, Mr. Harmon was again charged with multiple crimes. In particular, in October 2016, Mr. Harmon was charged with second-degree felony aggravated assault and providing false information to a peace officer. Mr. Harmon twice struck an individual in the face, such that the individual sustained multiple facial fractures and required reconstructive surgery. Mr. Harmon pled guilty to the former charge in exchange for the latter being dismissed. After receiving his guilty plea, the Court released Mr. Harmon from custody; however, Mr. Harmon failed to appear for his sentencing hearing in April 2017, and the Court issued a $10,000 cash-only warrant for his arrest. Mr. Harmon faced a sentence of 1-15 years.[3]

<u>Fact No. 4</u>: On August 13, 2017, Mr. Harmon had three active warrants, including for the felony aggravated assault, two counts of providing false identity, and six class A and B misdemeanor drug charges.[4]

<u>Plaintiffs' Response to Fact Nos. 1–4</u>: **Admit.** Plaintiffs object that this recitation of Mr. Harmon's criminal history prior to the incident is not supported by admissible evidence. Mr. Harmon's criminal history was unknown to the officers at the scene of August 13, 2017, killing of Mr. Harmon, with the exception of the felony warrant described in SUMF ¶ 4. As such, the facts alleged in RSUMF ¶¶ 1-4 have no probative value and constitute impermissible character evidence under Fed. R. Evid. 404(a).

<u>Defendants' Reply</u>: The evidence is not character evidence. Rather, Mr. Harmon's criminal history is

relevant to Plaintiffs' assertion—without evidence—that Mr. Harmon did not possess the knife that

Officer Fox saw in his hand and which landed next to his body. (*See* Opp'n at 27–31.) In particular,

Mr. Harmon's prior felony convictions (including for felon in possession) are relevant to that question

because as a felon he was precluded from possessing a firearm, which makes Mr. Harmon's

---

[1] Docket, Case No. 22901-02614-01 (Mo. 21st Cir. Ct.), <u>Exhibit 1</u>.
[2] *See* Docket, Case No. 001901372 (Utah 2d Dist. Ct.), Docket, Case No. 001902478 (Utah 2d Dist. Ct.); Docket, Case No. 061906238 (Utah 3d Dist. Ct.), Docket, Case No. 1:07-CR-00113 (D. Utah), <u>Exhibit 2</u>.
[3] Criminal Information & Docket, Case No. 161402877 (3d Dist. Ct.), <u>Exhibit 3</u>.
[4] Active Warrants, Aug. 14, 2017 (SLCC_001327), <u>Exhibit 4</u>.

possession of the knife even more likely. The additional fact that Mr. Harmon had failed to appear

for his sentencing hearing in which he faced 1-15 years in prison is also relevant to his behavior when

the Officers attempted to arrest him. The evidence is thus admissible because it is not character

evidence to show that Mr. Harmon acted in accordance with the character, but to show the increased

likelihood that he would carry a knife on his person and would attempt to avoid arrest. *See Cordova*

*v. City of Albuquerque*, 816 F.3d 645, 659 (10th Cir. 2016) (holding it was not error to consider

evidence officers were not aware of at the time where it corroborated officer testimony), *abrogated*

*on other grounds by Thompson v. Clark*, 142 S. Ct. 1332 (2022).

## II.      Officer Fox's Extensive Military and Law Enforcement Background.

Fact No. 5: In 1999, after graduating high school, Officer Fox enlisted in the Marines. He served six years active duty and one year in the reserves. Officer Fox deployed four times— including twice to Ramadi, Iraq—for a total of two years and was engaged in active combat.[5]

Fact No. 6: Upon retirement from the military, Officer Fox joined law enforcement, serving in the Tooele County Sheriff's Office for nearly seven years as a dispatcher, corrections officer, and deputy sheriff on patrol.[6]

Fact No. 7: Officer Fox participated in sniper school and joined the Tooele County sniper cadre. He also trained to become a firearms instructor and developed and ran a firearms training program for Tooele County's correctional officers. He continues to serve as a firearms instructor.[7]

Fact No. 8: Officer Fox then served as a patrol officer in West Valley City from June 2013 until joining the Salt Lake City Police Department ("**SLCPD**") in March 2016, where he served on patrol and continues to do so. Officer Fox also volunteers for the SWAT team.[8]

Fact No. 9: At the time of the incident, Officer Fox had served in the military and law enforcement for 17 years.[9] The present incident is the only time Officer Fox has ever fired his weapon as a law enforcement officer.[10]

Plaintiffs' Response to Fact Nos. 5–9: Admit.

---

[5] Deposition of Officer Fox, June 17, 2022 ("**Fox Deposition**"), at 10:5–11:20, Exhibit 5.
[6] *Id.* at 19:15–25, 22:7–21, 29:6–13.
[7] Declaration of Officer Fox ("**Fox Declaration**"), ¶ 3, Exhibit 6.
[8] Ex. 5, Fox Deposition at 38:18–39:21, 48:2–6, 56:21–57:7.
[9] *Id.* at 10:16–19, 20:15–19.
[10] *Id.* at 26:10–14, 47:5–7, 61:12–62:9; *see also id.* at 61:25–62:2 (Officer Fox's only other use of his service weapon in law enforcement was to dispatch an injured deer).

### III.      The Subject Incident.

#### A.      The Officers Attempt to Arrest Mr. Harmon for an Outstanding Felony Aggravated Assault Warrant.

Fact No. 10: On the evening of August 13, 2017, SLCPD Officer Kris Smith was on patrol in downtown Salt Lake City. Just after 10:00 p.m., Officer Smith observed Mr. Harmon commit traffic violations on his bicycle; in particular, Mr. Harmon crossed all six lanes of traffic and the median without using a hand signal and without having the required rear taillight on his bicycle. In fact, Officer Smith nearly struck Mr. Harmon with his vehicle. Officer Smith therefore initiated a stop with Mr. Harmon on the west side of State Street at approximately 1000 South.[11]

Fact No. 11: Officer Smith asked Mr. Harmon his name. Mr. Harmon gave Officer Smith several incorrect names, including the first name "Peace." Each time, Officer Smith returned to his vehicle to run a warrant check in the electronic database against the name Mr. Harmon provided.[12]

Fact No. 12: After several unsuccessful attempts to identify Mr. Harmon, Officer Smith requested backup. Within approximately two minutes, Officers Fox and Scott Robinson arrived.[13]

Fact No. 13: Officer Robinson went to the passenger-side window of Officer Smith's vehicle while Officer Fox proceeded directly to speak with Mr. Harmon, who at the time was straddling his bicycle next to the curb in front of Officer Smith's vehicle.[14]

Fact No. 14: As Officers Smith and Robinson attempted to identify Mr. Harmon in the database, Officer Fox asked Mr. Harmon to step off his bike and he put the bike's kickstand down.[15]

Plaintiffs' Response to Fact Nos. 10–14: Admit.

Fact No. 15: Officer Fox engaged Mr. Harmon in a discussion. Mr. Harmon told Officer Fox he was trying to get right with God and was trying to take care of his warrants. Officer Fox noted that Mr. Harmon appeared "normal" at first but then became more "anxious or agitated."[16]

Plaintiffs' Response: **Admit in part.** Officer Fox engaged Mr. Harmon in a discussion. The video exhibit speaks for itself as to Mr. Harmon's demeanor which Officer Fox characterizes as "normal" then "anxious or agitated."

Defendants' Reply: The videos do not capture the beginning of the conversation between Officer Fox

---

[11] Deposition of Officer Smith, June 16, 2022 ("**Smith Deposition**"), at 58:5–61:5, Exhibit 7; Declaration of Officer Smith ("**Smith Declaration**"), ¶ 4, Exhibit 8; *see also* Officer Smith Body-worn Camera ("**Smith BWC**") at 0:00, Exhibit 9. For each of the bodycam videos, there is no audio recording during the first 30 seconds. This is because each bodycam takes video (not audio) continuously, and when an officer activates the bodycam, it then stores the 30 seconds of video that occurred prior to activation and begins recording audio at the time of activation.

[12] Ex. 7, Smith Deposition at 64:8–65:16; Ex. 9, Smith BWC at 0:00–4:00.

[13] Ex. 9, Smith BWC at 4:05–6:50.

[14] *Id.* at 6:50; Officer Robinson Body-worn Camera ("**Robinson BWC**") at 0:00–0:30, Exhibit 10.

[15] Ex. 5, Fox Deposition at 123:1–10; Ex. 9, Smith BWC at 6:58–7:40; Ex. 10, Robinson BWC at 0:00–0:05.

[16] Ex. 5, Fox Deposition at 124:13–125:16.

and Mr. Harmon, and thus Officer Fox's impression of Mr. Harmon's demeanor is relevant.

<u>Fact No. 16</u>: Mr. Harmon asked Officer Fox if he could have a cigarette, to which Officer Fox agreed. In Officer Fox's experience, it is common for individuals who believe they are going to be arrested to attempt to have a last cigarette before being taken to jail.[17]

<u>Plaintiffs' Response</u>: **Admit in part deny in part.** Mr. Harmon did request to have a cigarette. Deny as to any implication that this is true as Officer Fox has not been qualified as an expert to opine on the common behavior of individuals who are being taken to jail.

<u>Fact No. 17</u>: Officer Smith eventually located an outstanding second-degree felony warrant for aggravated assault for Mr. Harmon. He informed Officer Robinson, "We're going to go 82, 99, Fox 2," indicating they would take Mr. Harmon into custody for a second-degree felony warrant.[18]

<u>Fact No. 18</u>: Both Officers Smith and Robinson put on their patrol gloves and walked back to where Officer Fox and Mr. Harmon were standing.[19]

<u>Plaintiffs' Response to Fact Nos. 17–18</u>: Admit.

<u>Fact No. 19</u>: When they came alongside him, Officer Fox noted the two Officers had put on their patrol gloves, which Officer Fox understood to mean the Officers were going to put Mr. Harmon in handcuffs and arrest him. Officer Fox was also aware that, at this time, the county jail was only accepting arrests for felony warrants.[20]

<u>Plaintiffs' Response</u>: **Admit.** Critically, however, even if Officer Fox was assumed [sic] that his fellow officers believed that Mr. Harmon was being arrested due to a felony warrant, he was never informed and never knew what alleged crime the warrant related to. *See* Statement of Additional Disputed Facts ("SADF") at ¶ 2.

<u>Defendants' Reply</u>: To the extent Plaintiffs suggest Officer Fox did not know Mr. Harmon was being

arrested for a felony warrant, such suggestion is contradicted by the evidence.[21]

<u>Fact No. 20</u>: Officer Smith informed Mr. Harmon he was under arrest for the outstanding warrant. Mr. Harmon became visibly upset and begged the officers to let him go.[22]

<u>Plaintiffs' Response</u>: Admit.

---

[17] Ex. 5, Fox Deposition at 124:13–125:16; Ex. 6, Fox Declaration ¶ 4.
[18] Ex. 7, Smith Deposition at 74:1–6; Ex. 9, Smith BWC at 6:50–7:15; Ex. 10, Robinson BWC at 0:12–25; Deposition of Officer Robinson, June 16, 2022 ("**Robinson Deposition**"), at 21:2–8, <u>Exhibit 11</u>.
[19] Ex. 9, Smith BWC at 7:20–26.
[20] Ex. 6, Fox Declaration ¶ 6.
[21] Ex. 6, Fox Declaration ¶ 6 (Officer Fox affirming he knew Mr. Harmon's outstanding warrant was for a felony).
[22] Ex. 9, Smith BWC at 6:50–7:15; Officer Fox BWC ("**Fox BWC**") at 0:22–1:01, <u>Exhibit 12</u>.

**B.     Mr. Harmon Breaks Free and Flees, Throws Officer Robinson to the Ground, and Threatens the Officers.**

Fact No. 21: Officer Smith asked Mr. Harmon to take off his backpack, and Officer Robinson helped Mr. Harmon place the backpack on the ground.[23]

Fact No. 22: Officers Smith and Robinson moved into position behind Mr. Harmon to place him in handcuffs. Officer Smith ordered Mr. Harmon to place his hands behind his back, and Mr. Harmon initially complied.[24]

Fact No. 23: Officer Robinson grabbed Mr. Harmon's left hand and Officer Smith grabbed his right hand. As Officers Robinson and Smith were bringing Mr. Harmon's hands together behind his back to apply handcuffs, Mr. Harmon suddenly broke free of their grasp and ran north, toward the sidewalk and away from the Officers.[25]

Plaintiffs' Response to Fact Nos. 21–23: Admit.

Fact No. 24: All three Officers gave chase.[26] Officer Fox initially believed he could get to Mr. Harmon in time to tackle him.[27]

Plaintiffs' Response: **Admit in part, deny in part.** While Officer Fox claimed in his deposition that he believed he could reach Mr. Harmon in time to tackle him, the video evidence shows that Officer Fox drew his service weapon almost immediately after Mr. Harmon broke free from Officers Smith and Robinson, demonstrating his intent to use lethal force merely because Mr. Harmon began to flee. Nor did Officer Fox actually attempt to tackle Mr. Harmon. *See* **Ex. 1**, *Fox Deposition* at 206:14-17; **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:16; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

Defendants' Reply: Plaintiffs' assertion that Officer Fox had an "intent to use lethal force merely because Mr. Harmon began to flee" is not supported by any evidence. The video evidence demonstrates that Officer Fox reached for his service weapon only after Mr. Harmon physically engaged with Officer Robinson, just as he stated in his testimony.[28]

Fact No. 25: As Mr. Harmon ran, Officer Fox saw him reach for his right pocket.[29]

Plaintiffs' Response: **Deny.** Officer Fox claims to have seen Mr. Harmon reach for his right pocket.

---

[23] Ex. 9, Smith BWC at 7:55–8:10; Combined Officers Body-worn Cameras ("**Combined BWC**") at 0:00–0:12, Ex. 13.
[24] Ex. 9, Smith BWC at 8:10–8:13; Ex. 12, Fox BWC at 0:55–1:01; Ex. 10, Robinson BWC at 1:10–1:15; Ex. 13, Combined BWC at 0:12–0:15.
[25] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[26] Ex. 9, Smith BWC at 8:13–8:20; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:22; Ex. 13, Combined BWC at 0:15–0:22.
[27] Ex. 5, Fox Deposition at 206:14–22.
[28] *See* Ex. 9, Smith BWC at 8:15.
[29] Ex. 5, Fox Deposition at 133:11–17.

Mr. Harmon did not reach for his right pocket. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:19*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:22.

<u>Defendants' Reply</u>: Due to the video quality, speed, and angles, the videos do not show Mr. Harmon's right hand or right pocket for the entirety of the chase. Plaintiffs thus failed to dispute Officer Fox's testimony with evidence as required by Rule 56. In fact, still-frames from the BWCs indicate Mr. Harmon *was* reaching toward his right pocket, as shown below:



**Ex. 12, Fox BWC at 1:02-03 (brightness increased 30%).**

<u>Fact No. 26</u>: Officer Robinson also saw Mr. Harmon reach toward his right pocket.[30]

<u>Plaintiffs' Response</u>: **Deny.** Officer Robinson claims to have seen Mr. Harmon reach for his right pocket. Mr. Harmon did not reach for his right pocket. **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:17. The video does not show Mr. Harmon reaching for his right pocket. *Id.* Officer Robinson then fell to the ground and was not in a position to see if Mr. Harmon reached for his right pocket thereafter. *Id.* at 1:17-1:22.

<u>Defendants' Reply</u>: *See* Defendants' Reply to Fact No. 25.

<u>Fact No. 27</u>: Officer Smith saw Mr. Harmon reach toward his waist as he ran.[31]

---

[30] Ex. 11, Robinson Deposition at 29:13–15, 30:6–11.
[31] Ex. 7, Smith Deposition at 85:17–23.

Plaintiffs' Response: **Deny.** Officer Smith claims to have seen Mr. Harmon reach toward his waist as he ran. However, Mr. Harmon cannot clearly be seen reaching toward his waist on Officer Smith's body camera footage. **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20.

Defendants' Reply: *See* Defendants' Reply to Fact No. 25.

Fact No. 28: Officer Fox heard Mr. Harmon use the word "cut" and say something to the effect of "I'll cut you."[32]

Plaintiffs' Response: **Deny.** Officer Fox claims that he heard Mr. Harmon use words to the effect of "cut" or "stab." Such statements cannot be heard on any of the body camera videos because Mr. Harmon did not in fact say any such words. *See* **Ex. 2,** *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,** *Fox Body Camera Footage* at 0:29-3:15. Moreover, numerous other statements and comments from Mr. Harmon and the Officers can be clearly heard and easily discerned in all of the officers' body-camera footage, which shows that there was no failure in the body camera to pick up audio. *See* SADF at ¶¶ 4-6.

Defendants' Reply: That the BWCs did not pick up all audio during the chase is not evidence that the Officers did not hear Mr. Harmon make statements. The BWCs were mounted on the Officers, and thus the Officers' statements are much clearer than Mr. Harmon's, even when in conversation only a few feet away.[33] In fact, the videos *do* pick up audio during the chase, but it is difficult to discern.[34]

Plaintiffs thus failed to adduce evidence to dispute the Officers' testimony.

Fact No. 29: Officer Smith heard Mr. Harmon say, "I'm going to stab or cut," but could not remember whether Mr. Harmon said "stab" or "cut" first. Officer Smith did not process Mr. Harmon's statement until after the fact.[35]

Plaintiffs' Response: **Deny.** *See supra*, RSUMF at ¶ 28.

Defendants' Reply: *See* Defendants' Reply to Fact No. 28.

Fact No. 30: Officer Robinson heard Mr. Harmon say, "I'll stab or I'll cut or I'll fucking stab you, something along those lines."[36]

Plaintiffs' Response: **Deny.** *See supra*, RSUMF at ¶ 28.

---

[32] Ex. 5, Fox Deposition at 133:12–14.
[33] *Compare* Ex. 9, Smith BWC at 7:57-59 (Officer Smith's commands are audible and clear on the video), *with id.* at 8:00-08 (Mr. Harmon's rely is muffled and inaudible); *see also* Ex. 12, Fox BWC at 0:42-59 (same); *see also* Ex. 9, Smith BWC at 8:18-19 (announcement on Officer Smith's radio at the exact moment Mr. Harmon said, "I'll fucking stab you"); Ex. 10, Robinson BWC at 1:19-21 (failing to capture Officer Fox's statement, "I'll fucking shoot you").
[34] *See* Ex. 9, Smith BWC at 8:15-16, 8:18-19; Ex. 10, Robinson BWC at 1:17-18.
[35] Ex. 7, Smith Deposition at 85:16–23.
[36] Ex. 11, Robinson Deposition at 30:6–11.

Defendants' Reply: *See* Defendants' Reply to Fact No. 28.

Fact No. 31: Officer Robinson managed to grab Mr. Harmon's shirt as he fled. As a result, Mr. Harmon spun around to his left and faced Officer Robinson.[37]

Plaintiffs' Response: Admit.

Fact No. 32: Officer Robinson attempted to grab Mr. Harmon around the neck, but Mr. Harmon shoved Officer Robinson, causing Officer Robinson to fall backward approximately ten feet onto the grass to the west of the sidewalk.[38]

Plaintiffs' Response: **Deny.** Mr. Harmon did not shove Officer Robinson causing him to fall to the ground. Rather, Officer Robinson fell. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:04*;* **Ex. 2,** *Smith Body Camera Footage* at 8:12-8:15*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:16-1:19. *See also* **Ex. 1,** *Fox Deposition* at 133:14-17 ("At some point whatever Scott [Robinson] had going on, he ends up falling down. . . ."); 133:23-25 ("[E]ither he Scott [Robinson] fell or he pushed Scott, or however that happened, I don't know."); **Ex. 5,** *Smith Deposition* at 81:1-8 (Mr. Harmon "runs south, but I think Officer Robinson – so when he ran, I don't know where – how Officer Robinson ended up, where he did, but after he ran in between us all, I remember Officer Robinson being behind him and – it was me, Officer Fox, and then Officer Robinson. So I don't know how he ended up there, but at some point Officer Robinson falls and then that's when Mr. Harmon continue to run south.").

Although Officer Robinson testified that he believed Mr. Harmon had shoved him, **Ex. 6,** *Robinson Deposition* at 23:15-17, he also described his physical encounter as more complicated than simply being shoved to the ground. Officer Robinson testified, "At that point I had made the plan in my mind that I was going to tackle [Mr. Harmon] to the ground because we were on grass, but as I went to tackle him, I heard him say I'll stab or I'll cut or I'll fucking stab you, something to that effect, which made me not want to tackle him. And so he was running out of room, kind of hung a left which would have been heading southbound, and kind of gave me a shove, and I fell to the ground. . . . I was chasing him and I grabbed a hold of his clothing. And even though I was behind him, he needed to turn because the iron gate was there and so we kind of got tangled up right there." **Ex. 6,** *Robinson Deposition* at 23:10-23. Finally, the Tenth Circuit Court of Appeals held, "One can hardly conclude that the encounter could only be characterized as an assault based on the body-cam footage." *Est. of Harmon*, 2021 WL 5232248 at *3.

Defendants' Reply: The Officers' testimony corroborates what the videos show. The videos demonstrate that after Officer Robinson grabbed Mr. Harmon's shirt with his left hand and attempted to grab near Mr. Harmon's neck with his right hand, Mr. Harmon brought his right hand up toward Officer Robinson's shoulder, and then Mr. Harmon lowered his head and drove his body weight

---

[37] Ex. Smith BWC at 8:15–16; Ex. 10, Robinson BWC at 1:15–17; Ex. 11, Robinson Dep. at 23:9–23, 45:5–21.
[38] Ex. 9, Smith BWC at 8:15–8:17; Ex. 12, Fox BWC at 1:02–1:04; Ex. 10, Robinson BWC at 1:16–1:19; Ex. 11, Robinson Deposition at 23:9–17.

toward Officer Robinson, shoving him to the ground:



**Ex. 9, Smith BWC at 8:15-16 (non-consecutive still-frames) (brightness increase 30%).**

Fact No. 33: Because Officer Fox saw Mr. Harmon reaching for his pocket and heard him say he would "cut," he believed Mr. Harmon intended to stab Officer Robinson with a knife.[39]

Plaintiffs' Response: **Deny.** Officer Fox did not see Mr. Harmon reaching for his pocket. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06; **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20; **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Officer Fox did not hear Mr. Harmon issue any threats, including the word, "cut." *See supra* RSUMF, ¶ 28.

Defendants' Reply: *See* Reply to Fact Nos. 25, 28.

Fact No. 34: Officer Fox therefore drew his weapon and was determining how to fire without harming Officer Robinson. When Officer Robinson fell to the side and Mr. Harmon kept running, Officer Fox was relieved because he believed he would not have to use his weapon.[40]

Plaintiffs' Response: **Admit in part, deny in part.** Plaintiff is not in a position to agree or disagree with Officer Fox's mental state or that he was "relieved" at this particular moment. Officer Fox did not actually re-holster his weapon after Mr. Harmon began running. **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06.

Defendants' Reply: Plaintiffs' evidence does not dispute the statement, which is deemed admitted.

### C.   Mr. Harmon Stops Fleeing and Turns Back Toward the Officers with a Knife.

Fact No. 35: After shoving Officer Robinson, Mr. Harmon started running again, heading south on

---

[39] Ex. 6, Fox Declaration ¶¶ 7–9; Ex. 5, Fox Deposition at 206:14–22.
[40] Ex. 6, Fox Declaration ¶¶ 9–10; Ex. 5, Fox Deposition at 135:9–12.

the sidewalk. Officers Fox and Smith pursued while Officer Robinson got up off the ground.[41]

Plaintiffs' Response: **Admit in part, deny in part.** Mr. Harmon did not shove Officer Robinson. *See supra* RUSMF at ¶ 32. Admit the remainder of paragraph 35.

Defendants' Reply: *See* Reply to Fact No. 32.

Fact No. 36: Officer Fox observed Mr. Harmon continuing to reach for his right pocket.[42]

Plaintiffs' Response: **Deny.** Mr. Harmon did not reach for his right pocket and cannot be seen on any of the body camera videos reaching for his right pocket. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:00-1:06*;* **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Defendants only cite Officer Fox's deposition testimony for this assertion. *See* SUMF, ¶ 36.

Defendants' Reply: *See* Reply to Fact No. 25.

Fact No. 37: As he ran, Mr. Harmon started turning back toward the Officers. He then slowed and started to side-shuffle south along the sidewalk as he turned his head and shoulders back in the direction of the Officers.[43]

Plaintiffs' Response: **Admit in part.** As a point of clarification, Mr. Harmon was side-shuffling **away** from the direction of the officers.

Fact No. 38: Mr. Harmon brought both his hands together in front of his chest.[44]

 

**Ex. 15, Smith still-frame photo (SLCC_002715); Ex. 14, Fox still-frame photo (SLCC_002607).**

Fact No. 39: Mr. Harmon side-shuffled several more steps to the south and continued rotating his torso back toward the Officers. Mr. Harmon dropped his left arm and kept his right arm raised at

---

[41] Ex. 9, Smith BWC at 8:15–18; Ex. 12, Fox BWC at 1:03–1:05.
[42] Ex. 5, Fox Deposition at 134:13–16.
[43] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Officer Fox BWC still-frame photos, Exhibit 14; Officer Smith BWC still-frame photos, Exhibit 15.
[44] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.

chest-height with his elbow bent.[45]

Plaintiffs' Response to Fact Nos. 38–39: Admit.

Fact No. 40: Mr. Harmon then planted his right foot perpendicular to the sidewalk, so that his right foot was in a 9 o'clock position from the Officers and his left foot was at a 7 o'clock position. Mr. Harmon bent his knees slightly into a crouching position.[46]

 

**Ex. 15, Smith still-frame photo (SLCC_002744); Ex. 14, Fox still-frame photo (SLCC_002640).**

Plaintiffs' Response: **Admit in part, deny in part.** While Mr. Harmon's feet turned and he turned his torso to look backward at Officers Robinson and Fox, Mr. Harmon did not assume a "crouching position." **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06; **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20; **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.

Defendants' Reply: The cited evidence from the videos shows that Mr. Harmon had rotated his feet

and body back toward the direction of the Officers with his knees bent.

Fact No. 41: Officer Fox, who had been pursuing Mr. Harmon, saw Mr. Harmon plant his right foot and begin turning back toward him. In response, Officer Fox also came to a quick stop approximately five feet away from Mr. Harmon.[47]

Plaintiffs' Response: **Admit in part, deny in part.** 2 It is not clear from the body-camera video that Mr. Harmon ever stopped moving away from the officers. **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06; **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20; **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Mr. Harmon turned his body and slowed down. Admit that Officer Fox came to a quick stop. Admit that there was a distance of approximately five to seven feet between Officer Fox and Mr. Harmon. Officer Fox shot Mr. Harmon and Officer Smith fired his taser at Mr. Harmon before Mr. Harmon had a chance to change direction. **Ex. 5,** *Smith Deposition* at 85:5-12.

---

[45] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[46] Ex. 9, Smith BWC at 8:16–8:18; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[47] Ex. 5, Fox Deposition at 136:15–22; Ex. 12, Fox BWC at 1:05–1:06; Ex. 14, Fox still-frames.

<u>Defendants' Reply</u>: Plaintiffs' assertion that Mr. Harmon did not stop moving away from the Officers is not supported by evidence. The uncontroverted videos show that Mr. Harmon had planted his right foot and stopped moving away from the Officers.[48] This is corroborated by the Officers' testimony.[49]

<u>Fact No. 42</u>: Officer Smith likewise saw Mr. Harmon plant his foot and begin turning back toward him. Because Mr. Harmon was no longer running away and had presented his chest toward Officer Smith, Officer Smith determined he could prevent Mr. Harmon from fleeing again by utilizing his Taser. He therefore drew his Taser.[50]

<u>Plaintiffs' Response</u>: Admit.

<u>Fact No. 43</u>: At this point, Officer Robinson was still getting up off the ground, and he saw Officers Smith and Fox stop moving "because Mr. Harmon had turned around" and "had turned back towards Officer Fox."[51]

<u>Plaintiffs' Response</u>: **Admit in part, deny in part.** Mr. Harmon had turned his upper body towards the officers, not his lower body. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

<u>Defendants' Reply</u>: Plaintiffs' assertion is not supported by evidence. The videos show that Mr. Harmon's his right foot was in a 9 o'clock position from the Officers and his left foot was at a 7 o'clock position.[52] Furthermore, the autopsy report establishes that two bullets entered Mr. Harmon's lower *left* back/buttocks area and travelled through to the front *right* pelvic region,[53] confirming that Mr. Harmon had indeed turned his lower body back toward Officer Fox.

<u>Fact No. 44</u>: Officer Robinson began drawing his firearm. He testified he did so "because I saw something and heard something that made me think that I needed my gun, including I'll fucking stab or I'll cut or whatever he was saying, reaching for his pocket. Those are the things that I remember very clearly."[54]

<u>Plaintiffs' Response</u>: **Admit in part, deny in part.** Officer Robinson did not hear Mr. Harmon say,

---

[48] Ex. 9, Smith BWC at 8:18–19; Ex. 12, Fox BWC at 1:06–1:07.
[49] Ex. 5, Fox Deposition at 136:15–22; Ex. 7, Smith Deposition at 83:6–84:19.
[50] Ex. 7, Smith Deposition at 83:6–84:19.
[51] Ex. 11, Robinson Deposition at 24:1–22.
[52] *See* Fact No. 40.
[53] Medical Examiner Report, Oct. 20, 2017 (SLCC_000202-06), <u>Exhibit 21</u>. In particular, the bullet that struck the femoral artery and vein causing significant blood loss entered 7¼ inches *left* of the midline and exited 5½ inches *right* of the midline. *Id.* at -202, 204.
[54] Ex. 11, Robinson Deposition at 24:1–5, 26:18–24, 43:12–44:4.

"'I'll fucking stab' or 'I'll cut' or whatever he was saying." *See supra* RSUMF at ¶ 28.

Defendants' Reply: *See* Reply to Fact No. 28.

Fact No. 45: Officer Fox believed Mr. Harmon had stopped and was turning back because he had retrieved the object he had been reaching for in his pocket. He scanned Mr. Harmon and located Mr. Harmon's hands in front of his body. At that moment, Officer Fox saw that Mr. Harmon had a knife in his right hand pointed toward Officer Fox:

> So as soon as he planted his right foot, as he was doing that, he yelled at me and he said I'll fucking stab you. As he planted that right foot and he said that, I thought oh, no, whatever was in his pocket, he got out. So from seeing his foot, I looked, I was trying to see if his hand was still in his pocket, it wasn't. By the time I was able to track and find his hand, his hand was up somewhere chest to shoulder heighth and he was holding a knife.[55]

Plaintiffs' Response: **Deny.** Officer Fox did not observe a knife in Mr. Harmon's hands because there was no knife in Mr. Harmon's hands. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. *See Est. of Harmon, 2021 WL 5232248* at \*11 ("There was no knife visible in the video . . . ."). Officer Fox had not seen Mr. Harmon reaching for his right pocket. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21.

Defendants' Reply: Plaintiffs' cited evidence does not create a genuine dispute of fact. That the videos do not clearly show the knife in Mr. Harmon's hand is not evidence that he did not have a knife. At the moment Mr. Harmon was threatening Officer Fox with the knife, the video also does not clearly depict any of Mr. Harmon's facial features. *See infra* Part I.A.2.b.ii. Additionally, Plaintiffs failed to present any evidence (or argument) regarding the provenance of the knife. When asked at his deposition if it was his position that Mr. Harmon did not have a knife in his hand, Plaintiff Patrick Harmon II testified, "That, I couldn't see or tell you."[56] Plaintiffs similarly testified "I don't know" and "That . . . I couldn't tell you" when asked if they had any position where the knife came from or whether one of the Officers planted it.[57] When asked through interrogatories to identify their

---

[55] Ex. 5, Fox Deposition at 137:12–20.
[56] Deposition of Plaintiff Patrick Harmon II (Nov. 8, 2022), at 30:18-21, <u>Exhibit 22</u>.
[57] *Id.* at 30:22-31:5; Deposition of Plaintiff Tasha Smith (Nov. 10, 2022), at 26:14-27:18, <u>Exhibit 23</u>.

contentions regarding the provenance of the knife, Plaintiffs refused to provide responsive answers.[58]

Fact No. 46: Officer Fox was a "[h]undred percent" certain he saw a knife in Mr. Harmon's right hand.[59]

Plaintiffs' Response: **Deny.** Officer Fox did not observe a knife in Mr. Harmon's hands because there was no knife in Mr. Harmon's hands. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21; *see also* SADMF at ¶¶ 18-23, 26-35. *Est. of Harmon*, 2021 WL 5232248 at *11 ("There was no knife visible in the video . . . .").

Defendants' Reply: *See* Reply to Fact No. 45.

Fact No. 47: At this point, Mr. Harmon was around five to seven feet away from Officer Fox.[60]

Plaintiffs' Response: Admit.

Fact No. 48: Officer Fox believed Mr. Harmon intended to use the knife to harm him and using his firearm was "[p]robably the only option to defend myself to stop him from stabbing me."[61]

Plaintiffs' Response: **Deny.** Officer Fox could not have believed that Mr. Harmon was armed as he had not observed a knife in Mr. Harmon's hands and such a knife is not visible from his or the other officers body camera footage. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. *See also Est. of Harmon v. Salt Lake City*, No. 20-4085, 2021 WL 5232248, at *4 (10th Cir. Nov. 10, 2021) (unpublished). ("There was no knife visible in the video."). Moreover, Mr. Harmon had not threatened Officer Fox or the other officers. *See supra* RSUMF at ¶ 28.

Defendants' Reply: *See* Reply to Fact Nos. 28, 45.

Fact No. 49: Officer Fox also believed that neither Officer Smith nor Officer Robinson was aware Mr. Harmon had a knife. Officer Fox was afraid one of the other Officers would attempt to tackle Mr. Harmon and that Mr. Harmon would stab him with the knife.[62]

Plaintiffs' Response: **Deny.** Officer Fox could not have believed that Mr. Harmon was armed as he had not observed a knife in Mr. Harmon's hands and such a knife is not visible from his or the other officers' body camera footage. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. Moreover, Mr. Harmon had not threatened Officer Fox or the other officers. *See supra* RSUMF at ¶ 28. Therefore, Officer Fox had no reasonable basis to believe that Mr. Harmon was armed, and the other officers were unaware of that fact.

---

[58] Plaintiffs' Responses to Interrogatory Nos. 1–5 (Nov. 30, 2022), Exhibit 24.
[59] Ex. 5, Fox Deposition at 137:23–138:6.
[60] Ex. 9, Smith BWC at 8:19–8:20; Ex. 12, Fox BWC at 1:05–1:07; Ex. 10, Robinson BWC at 1:20–1:22; Ex. 13, Combined BWC at 0:23–0:23; Ex. 14, Fox still-frames; Ex. 15, Smith still-frames.
[61] Ex. 5, Fox Deposition at 172:6–15.
[62] *Id.* at 140:4–7; Ex. 6, Fox Declaration ¶ 12.

Defendants' Reply: *See* Reply to Fact Nos. 28, 45.

Fact No. 50: Officer Fox heard Mr. Harmon say, "I'll fucking stab you."[63]

Plaintiffs' Response: **Deny.** Mr. Harmon did not say "I'll fucking stab you," and that statement is not audible on any of the officers' body-camera footage. *See* **Ex. 3,** *Fox Body Camera Footage* at 1:01-1:06*;* **Ex. 2,** *Smith Body Camera* Footage at 8:14-8:20*;* **Ex. 4,** *Robinson Body Camera Footage* at 1:15-1:21. *See also supra* RSUMF at ¶ 28. *See also Est. of Harmon, 2021 WL 5232248* at *4 ("No verbal threats made by Mr. Harmon can be heard on the video.").

Defendants' Reply: *See* Reply to Fact No. 28.

Fact No. 51: Officer Fox reflexively shouted, "I'll fucking shoot you" and fired three shots in quick succession.[64]

Plaintiffs' Response: **Admit in part, deny in part**. Admit that Officer Fox shouted, "I'll fucking shoot you!" and fired three shots in quick succession. Deny that Officer Fox acted "reflexively."

Defendants' Reply: Plaintiffs failed to adduce evidence to dispute the statement, and it is therefore

deemed admitted. Fed. R. Civ. P. 56(c)(1).

Fact No. 52: At the same time, Officer Smith fired his Taser.[65] Officer Fox did not learn Officer Smith had fired his taser until later that night.[66]

Fact No. 53: When asked if he intended the statement, "I'll fucking shoot you" to be an opportunity for Mr. Harmon to surrender, Officer Fox testified:

> I did not intend for it to be anything. I think it was more of a response to the "I'll fucking stab you," and I think that it was just something that through the split second it was happening hearing that, it was just, as I'm trying to perceive everything, just what came out.[67]

Fact No. 54: Officer Fox testified he did not give Mr. Harmon more time to surrender because Mr. Harmon "was turning back at me with a knife in his hand and he said he would stab me."[68]

Fact No. 55: From the time Mr. Harmon broke free to the time Officer Fox fired his weapon, approximately six seconds elapsed.[69]

---

[63] Ex. 5, Fox Deposition at 137:12–14, 140:8–15.
[64] Ex. 9, Smith BWC at 8:18–8:20; Ex. 12, Fox BWC at 1:05–1:06.
[65] Ex. 9, Smith BWC at 8:18–8:20.
[66] Ex. 5, Fox Deposition at 141:13–18, 139:3–4.
[67] *Id.* at 140:8–15.
[68] *Id.* at 140:4–7.
[69] Ex. 9, Smith BWC at 8:13–8:19; Ex. 12, Fox BWC at 1:01–1:07; Ex. 10, Robinson BWC at 1:15–1:21; Combined BWC at 0:15–0:21.

Fact No. 56: Officer Robinson testified, "It was a chaotic six seconds."[70]

Plaintiffs' Response to Fact Nos. 52–56: Admit.

Fact No. 57: Even with over 15 years of law enforcement experience, the encounter with Mr. Harmon was the scariest situation Officer Fox has faced.[71]

Plaintiffs' Response: **Admit in part, deny in part.** Paragraph 57 accurately summarizes the self-serving statement contained in Officer Fox's declaration. Plaintiffs are not in a position to comment on Officer Fox's true subjective beliefs. This is a matter of credibility that must be submitted to a jury.

Defendants' Reply: Officer Fox's declaration is admissible evidence on summary judgment. Because Plaintiffs failed to dispute the assertion with evidence, it is deemed admitted pursuant to Rule 56. *See Helget v. City of Hays, Kan.,* 844 F.3d 1216, 1224 n.3 (10th Cir. 2017) (holding a nonmovant "must do more than merely assert that the jury might disbelieve the testimony of [movant]; [s]he must present h[er] own affirmative evidence of those facts which are contradicted by the interested testimony") (citations omitted) (second, third alterations in original)); *Nat'l Am. Ins. Co. v. Am. Re-Ins. Co.,* 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").

### D.    Mr. Harmon's Knife Is Laying in the Grass Next to His Right Arm.

Fact No. 58: After Officer Fox fired his weapon, Mr. Harmon spun to the right and fell to the ground with his right arm outstretched.[72]

Fact No. 59: Officer Smith immediately radioed, "Priority, shots fired. Start medical."[73]

Fact No. 60: Officer Robinson cautiously approached Mr. Harmon and told Officer Fox, "Hey cover him, I'm going to go in [inaudible] assist." Officer Fox responded, "I got him," and remained in position with his weapon trained on Mr. Harmon.[74]

Fact No. 61: As Officer Robinson approached Mr. Harmon, he passed an open knife lying in the grass

---

[70] Ex. 11, Robinson Deposition at 30:16.
[71] Ex. 6, Fox Declaration ¶ 14.
[72] Ex. 12, Fox BWC at 1:06–1:10; Ex. 10, Robinson BWC at 1:22–1:37; Ex. 13, Combined BWC at 0:22–0:25.
[73] Ex. 9, Smith BWC at 8:20–8:25; Ex. 12, Fox BWC at 1:10–1:12.
[74] Ex. 10, Robinson BWC at 1:28–1:31; Ex. 9, Smith BWC at 8:27–8:30; Ex. 12, Fox BWC at 1:14–1:16; Ex. 13, Combined BWC at 0:24–0:31.

a few inches from where Mr. Harmon's right hand landed as he fell.[75] The knife next to Mr. Harmon's right hand is depicted in still-frame photos from Officer Robinson's bodycam:



**Ex. 16, Robinson still-frames with knife circled (SLCC_002669, SLCC_002689).**

Fact No. 62: Officer Robinson applied handcuffs to Mr. Harmon, observed that he was bleeding from his arm, and rolled him onto his side in a recovery position.[76]

Fact No. 63: The Officers began to administer aid to Mr. Harmon, repeatedly telling Mr. Harmon to "stay with us." Officer Fox ran back to his patrol car to retrieve medical gloves and his knife, which he used to remove Mr. Harmon's clothes to expose the gunshot wounds.[77]

Fact No. 64: When additional officers responded to the scene, they asked who had fired the shots and instructed Officer Fox to go wait by his patrol car while they took his place rendering aid to Mr. Harmon. Officer Fox complied and exhorted the other officers to "[g]o help, go help." Officer Fox then walked to his car and placed his knife on the hood.[78]

Fact No. 65: While rendering aid to Mr. Harmon, Officer Robinson told an officer who had just arrived "[t]here was a knife somewhere" that should be collected for evidence and that "he pulled out the knife." A little while later Officer Robinson asked Officer Fox, "Did you grab the knife?" to which Officer Fox responded, "No, I have my knife where I tried to cut his pants off. They were covered in blood, so I just left my knife on the hood of my car."[79]

Fact No. 66: At the time of his deposition—nearly five years after the incident—Officer Robinson could not recall whether he saw the knife in Mr. Harmon's hand. He recalled observing the knife lying next to Mr. Harmon's right hand when he approached Mr. Harmon.[80]

Fact No. 67: Mr. Harmon later died from the gunshot wounds.

Fact No. 68: After the incident, a team from the Unified Police Department ("**UPD**") arrived at the

---

[75] Ex. 10, Robinson BWC at 1:33–35; Ex. 13, Combined BWC at 0:35–0:36; Robinson BWC still-frame photos, Ex. 16.
[76] Ex. 10, Robinson BWC at 1:34–2:05.
[77] Ex. 12, Fox BWC at 1:49–3:12; Ex. 9, Smith BWC at 8:44–10:30; Ex. 10, Robinson BWC at 1:46–5:50.
[78] Ex. 12, Fox BWC at 3:12–3:18; Ex. 9, Smith BWC at 10:22–45.
[79] Ex. 10, Robinson BWC at 3:55–4:03; Ex. 9, Smith BWC at 13:19–29; Ex. 12, Fox BWC at 6:06–19.
[80] Ex. 11, Robinson Deposition at 29:19–31:1.

scene to perform an investigation of the officer-involved critical incident ("**OICI**").[81] They observed and documented a knife near where Mr. Harmon fell in the grass area.[82]

Plaintiffs' Response to Fact Nos. 58–68: Admit.

Fact No. 69: UPD submitted its OICI report to the Salt Lake County District Attorney to screen for criminal charges. The DA concluded that "Officer Fox's use of deadly force was 'justified' under Utah State law."[83] The Federal Bureau of Investigation in concert with the Civil Rights Section of the U.S. Department of Justice also reviewed the incident and "determined the evidence did not establish a prosecutable violation of federal criminal civil rights statutes."[84]

Plaintiffs' Response: **Admit.** Plaintiffs object that the District Attorney documents referenced in paragraph 69 are inadmissible and are irrelevant to the determination of this matter.

Fact No. 70: While pursuing Mr. Harmon, Officer Smith did not know Mr. Harmon had a knife, and he did not learn Mr. Harmon had a knife until finding out from the media weeks later.[85]

Plaintiffs' Response: **Admit in part, deny in part**. Admit that Officer Smith did not believe that Mr. Harmon was armed and never observed a knife in Mr. Harmon's hands or even at the scene. Deny that Officer Smith later learned that Mr. Harmon "had a knife." *See* **Ex. 5**, *Smith Deposition* at 85:24-86:1; 86:12-20; 86:21-24; 88:22-25; 89:1-8.

Defendants' Reply: *See* Reply to Fact No. 45.

Fact No. 71: When asked what went through his mind at the moment he heard Officer Fox fire his weapon, Officer Smith testified: "Truthfully? What the fuck."[86]

Fact No. 72: Officer Smith explained: "[W]hat I perceived was different than what he [Officer Fox] saw and in my head I had not seen a knife or any other reason, so I was trying to figure out exactly what he saw and why he felt it was appropriate to fire his pistol."[87]

Fact No. 73: If Officer Smith had known Mr. Harmon had a knife, he would have used his service weapon instead of his Taser.[88]

Fact No. 74: A toxicology report indicated that at the time of his death, Mr. Harmon had THC (the

---

[81] *See* Unified Police Department OICI Report (excerpts due to length and file size), Exhibit 17. UPD is a separate department from SLCPD. It serves eight cities and communities but does not have jurisdiction over Salt Lake City, which is instead served by the SLCPD. *See* Unified Police Department, *About UPD*, *available at* https://www.updsl.org/page_about.php. Utah law requires an outside agency to conduct the OICI investigation. Utah Code Ann. § 76-2-408.
[82] *See, e.g.*, Ex. 17, UPD OICI Rep. at SLCC_001093–94 (report that "[n]ear the blood was a folding silver colored knife"); *id.* at SLCC_001105–12 (Forensic Investigator Ryan Andrews reporting that he photographed "a silver 'Castleview Hospital' brand folding knife" in the "lawn area," which was marked as evidence item number 12); *id.* at SLCC_001887–89 (OICI investigator's photograph of the knife near where Mr. Harmon fell).
[83] District Attorney Screening Letter, Oct. 4, 2017 (SLCC_000653), Exhibit 18.
[84] F.B.I. Screening Letter, Dec. 8, 2017 (SLCC_000646), Exhibit 29.
[85] Ex. 7, Smith Deposition at 85:24–86:24, 88:22–25.
[86] *Id.* at 86:12–14.
[87] *Id.* at 86:15–20.
[88] Ex. 8, Smith Declaration ¶ 5.

active ingredient in marijuana), amphetamine, and methamphetamine in his system. According to the independent lab that performed the analysis, "[b]lood levels of 200 - 600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior." Mr. Harmon's methamphetamine blood level was 270 ng/mL.[89]

<u>Plaintiffs' Response to Fact Nos. 71–74</u>: Admit.

### E.   Procedural History.

<u>Fact No. 75</u>: Plaintiffs filed the Complaint in state court, asserting five causes of action. Defendants removed the matter to this Court.[90]

<u>Fact No. 76</u>: The Court granted Defendants' motion to dismiss, dismissing Plaintiffs' claims for excessive force, equal protection, and municipal liability, and declining to exercise supplemental jurisdiction over the state-law claims. The Court remanded the state-law claims to state court.[91]

<u>Fact No. 77</u>: Plaintiffs appealed their claims for excessive force and municipal liability, and the Tenth Circuit reversed and remanded those claims to this Court.[92]

<u>Fact No. 78</u>: On May 16, 2022, the Court vacated its order of remand and exercised supplemental jurisdiction over Plaintiffs' state-law claims.[93]

<u>Plaintiffs' Response to Fact Nos. 75–78</u>: Admit.

## <u>PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS</u>

<u>Plaintiffs' Fact No. 1</u>: After being stopped by Officer Smith, Mr. Harmon volunteered to Officer Fox that he probably had an outstanding warrant for his arrest. **Ex 1**, *Fox Deposition* at 124:13-18.

<u>Defendants' Response</u>: No dispute.

<u>Plaintiffs' Fact No. 2</u>: Officer Fox was never aware of the type of warrant for which Mr. Harmon was being placed under arrest. **Ex. 1**, *Fox Deposition* at 129:8-130:1.

<u>Defendants' Response</u>: Plaintiffs' assertion is contradicted by the evidence. Officer Fox knew Mr.

Harmon had a felony warrant.[94]

<u>Plaintiffs' Fact No. 3</u>: Mr. Harmon complied with all of the officers' orders including pulling over for Officer Smith, stepping off of his bicycle, removing his backpack, and placing his hands behind his back to be handcuffed. **Ex. 2**, *Smith Body Camera Footage* at 7:45-8:12; **Ex. 4**, *Robinson Body Camera Footage* at 0:56-1:13; **Ex. 3**, *Fox Body Camera Footage* at 0:42- 1:00.

---

[89] NMS Labs Toxicology Report, Aug. 29, 2017 (SLCC_000207), <u>Exhibit 20</u>.
[90] ECF Nos. 2-1, 2.
[91] ECF Nos. 29, 34.
[92] ECF No. 40. Plaintiffs did not appeal the equal protection claim. *See id.*
[93] ECF Nos. 60, 61.
[94] Ex. 6, Fox Declration ¶ 6.

Defendants' Response: No dispute that Mr. Harmon complied with the orders noted in Plaintiffs' statement. However, the videos Mr. Harmon did not comply with the order to identify himself nor was he complying with the Officers' orders when he fled.[95]

Plaintiffs' Fact No. 4: Many statements by all three officers and Mr. Harmon are audible and discernible. *See* **Ex. 2,** *Smith Body Camera Footage* at 2:00-2:30 (Officer Smith asks Mr. Harmon to spell his last name for him because he spelled it wrong and Mr. Harmon spells his name out multiple times and provides his birthday), 4:40-4:50 (Officer Smith tells Mr. Harmon that he cannot find his ID and asks Mr. Harmon how he spells his name on his ID. Mr. Harmon responds by spelling his name), 4:52-4:58 (Mr. Harmon tells Officer Smith "I think I got a warrant"), 5:05-5:32 (Officer Smith asks Mr. Harmon what his warrant is for and Mr. Harmon replies that it was for drug charges. Officer Smith asks if it was a misdemeanor and Mr. Harmon replies that he thought it was a felony), 6:52-6:55 (Officer Smith tells Officer Robinson he was having a hard time identifying Mr. Harmon), 7:45-8:13 (Officer Smith says, "Patrick, you know you already know about your warrant, right . . . I need you to take your backpack off for me, okay?" Mr. Harmon pleads "please man" to the officers before being arrested), 8:18-8:20 (Officer Fox states, "I'll fucking shoot you"), 8:22-8:54 (Officer Smith makes a call to dispatch that shots were fired. Mr. Harmon is moaning and crying on the ground after being shot. Officer Robinson states twice that Mr. Harmon had one shot in the arm), 8:56-9:08 (Officer Robinson tells Mr. Harmon to "roll on your left side, bro" and repeats again to roll on his left side. **Ex. 4,** *Robinson Body Camera Footage* at 0:56-0:59 (Officer Smith tells Mr. Harmon, "I need you to take your backpack off for me, okay?", 1:11-1:14 (Officer Smith says "Put your hands behind your back for me"), 1:24-1:26 (Officer Smith making a call to dispatch that shots were fired), 1:33-1:53 (Mr. Harmon crying and moaning after being shot and Officer Robinson states twice, "One shot in the arm"), 1:56-2:07 (Officer Robinson says, "Roll on your left side, bro . . . Stay with me. Roll on your left side." Officer Robinson tells Mr. Harmon to "stay with us" and repeats to him to roll on his left side), **Ex. 3,** *Fox Body Camera Footage* at 0:34-1:00 (Officer Smith says, "Patrick you know about your warrant, right . . . I need you to take your backpack off for me, okay?" Mr. Harmon pleads, "please man" to the officers before being arrested), 1:05-1:07 (Officer Fox states, "I'll fucking shoot you"), 1:09-1:12 (Officer Smith makes a call to dispatch that shots were fired), 1:14-1:28

Defendants' Response: No dispute that many of the Officers' statements are audible and discernable. The evidence shows, however, that many of Mr. Harmon's statements are *not* audible or discernable, even before he fled and the Officers chased.[96] The videos capture a significant amount of audio

---

[95] *See* Fact Nos. 11, 20, 22–23.
[96] Ex. 9, Smith BWC at 2:26-29 (Mr. Harmon's statement providing his birthdate is inaudible); *id.* at 4:33-38 (Mr. Harmon's statements to Officer Smith are inaudible despite Officer Smith clearly hearing them); *id.* at 7:58-8:12 (Mr. Harmon's statements with a cigarette in his mouth are not discernable).

interference due to the camera movement as the Officers chased Mr. Harmon.[97]

Plaintiffs' Fact No. 5: None of the three officers' body-worn cameras capture Mr. Harmon stating any words to the effect of "stab" or "cut" or issuing any other threat at any point during the incident. *See* **Ex. 2**, *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,** *Fox Body Camera Footage* at 0:29-3:15.

Defendants' Response: *See* Response to Plaintiffs' Fact No. 4, Reply to Fact No. 28.

Plaintiffs' Fact No. 6: Mr. Harmon did not threaten the officers. *See* **Ex. 2,** *Smith Body Camera Footage* at 2:03-2:33, 4:36-6:01, 7:40-10:28; **Ex. 4,** *Robinson Body Camera Footage* at 0:40-5:50; **Ex. 3,** *Fox Body Camera Footage* at 0:29-3:15; *see also Est. of Harmon v. Salt Lake City*, 2021 WL 5232248, at \*4. ("No verbal threats made by Mr. Harmon can be heard on the video.").

Defendants' Response: *See* Response to Plaintiffs' Fact No. 4, Reply to Fact No. 28.

Plaintiffs' Fact No. 7: Only two seconds after Mr. Harmon began to flee, Officer Fox drew his service weapon. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:16.

Defendants' Response: No dispute that Officer Fox drew his weapon approximately two seconds into

the chase when Mr. Harmon assaulted Officer Robinson. Officer Fox did not begin to draw his

weapon until Mr. Harmon had turned back and physically engaged with Officer Robinson.[98]

Plaintiffs' Fact No. 8: Once Officer Fox drew his service weapon with his right hand, he only had his left hand to attempt use in subduing Mr. Harmon. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:22.

Defendants' Response: No dispute.

Plaintiffs' Fact No. 9: Officer Robinson attempted to tackle Mr. Harmon and placed himself in Mr. Harmon's way. *See* **Ex. 2,** *Smith Body Camera Footage* at 8:15-8:18.

Defendants' Response: No dispute that Officer Robinson attempted to tackle Mr. Harmon. To the

extent Plaintiffs attempt to fault Officer Robinson for doing so, the evidence establishes he was a

sworn police officer attempting to subdue a man evading arrest for a second-degree felony warrant.[99]

Plaintiffs' Fact No. 10: Officer Robinson collided with Mr. Harmon and fell backward. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:15-8:18.

Defendants' Response: Plaintiffs' cited evidence does not support their assertion that Officer

---

[97] *See, e.g.*, Ex. 12, Fox BWC at 1:01-05; Ex. 10, Robinson BWC at 1:16-20; Ex. 9, Smith BWC at 8:15-18.
[98] Ex. 9, Smith BWC at 8:16.
[99] *See* Fact Nos. 17–20, 24.

Robinson merely collided with Mr. Harmon. *See* Reply to Fact No. 32.

Plaintiffs' Fact No. 11: Mr. Harmon did not assault Officer Robinson. *See generally* **Ex. 4,** *Robinson Body Camera* footage; *see also Est. of Harmon*, 2021 WL 5232248, at *3 (based on *de novo* review of all three body-camera videos).

Defendants' Response: The evidence does not support Plaintiffs' assertion. *See* Reply to Fact No. 32.

Plaintiffs' Fact No. 12: While Officer Robinson attempted to tackle Mr. Harmon, he had a view of Mr. Harmon's hands, which were empty. **Ex. 4**, *Robinson Body Camera* at 1:15-1:19.

Defendants' Response: The evidence does not support Plaintiffs' assertion. Officer Robinson's

bodycam does not show Mr. Harmon's right hand after Mr. Harmon shoves him to the ground.[100]

Plaintiffs' Fact No. 13: As Mr. Harmon ran northward after colliding with Officer Robinson, Officer Smith had a clear view of Mr. Harmon's right hand, which was empty. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:18.

Defendants' Response: Officer Smith's video shows Mr. Harmon's right hand only for an instant after he shoved Officer Robinson to the ground, and indicates his hand is curled around an object:



**Ex. 9, Smith BWC at 8:16 (brightness increased 30%).**

Plaintiffs' Fact No. 14: Officer Fox took aim at Mr. Harmon while Mr. Harmon was rapidly moving away from the officers in a southward direction. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:19; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

Defendants' Response: The evidence does not support Plaintiffs' assertion. The videos show Officer

drew his weapon when Mr. Harmon assaulted Officer Robinson but did not aim it because he saw

Officer Robinson had been shoved to the ground. Officer Fox then chased after Mr. Harmon with his

gun in his hand but not aimed at Mr. Harmon. It was only when Mr. Harmon began pivoting back

---

[100] *See* Ex. 10, Robinson BWC at 1:18.

toward him that Officer Fox brought his weapon up and took aim.[101]

Plaintiffs' Fact No. 15: Officer Fox intentionally and purposefully closed the distance between himself and Mr. Harmon after drawing his service weapon, without the ability to safely tackle Mr. Harmon, and without providing any warning that he might use deadly force. *See* **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18; **Ex. 3**, *Fox Body Camera Footage* at 1:03-1:06.

Defendants' Response: No dispute that Officer Fox intentionally and purposefully chased after a man

evading arrest on an outstanding felony warrant.

Plaintiffs' Fact No. 16: Mr. Harmon began to turn backward to after [sic] hearing Officers Fox and Smith behind him. **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

Defendants' Response: No dispute that Mr. Harmon began to turn backward toward the Officers.

Plaintiffs' Fact No. 17: Mr. Harmon slowed and appeared to brace for impact. **Ex. 2**, *Smith Body Camera Footage* at 8:18-8:20; **Ex. 3**, *Fox Body Camera Footage* at 1:05-1:07.

Defendants' Response: No dispute that Mr. Harmon slowed. No dispute that Mr. Harmon also bent

his knees in a partial-crouch position with his right elbow and arm raised.

Plaintiffs' Fact No. 18: Officer Smith had an unimpeded view of Mr. Harmon's torso and both of Mr. Harmon's hands. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18.

Defendants' Response: No dispute. This blatantly contradicts Plaintiffs' contention that Mr. Harmon

was running away from the Officers if Officer Smith could in fact see both hands and his torso.

Plaintiffs' Fact No. 19: From that vantage point, Officer Smith observed that Mr. Harmon was unarmed. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:18.

Defendants' Response: No dispute that Officer Smith did not see the knife. He testified that he

intended to use his Taser to stop Mr. Harmon from fleeing and that he was focused on the target-area

(from the knees to the nipple line) rather than Mr. Harmon's hands when he fired his Taser.[102]

Plaintiffs' Fact No. 20: Of the three officers, Officer Smith had the best vantage point to observe Mr. Harmon's hands in the moments before he shot was and killed. **Ex. 2,** *Smith Body Camera Footage* at 8:14-8:18; **Ex. 5**, *Smith Deposition* at 84:3-11.

Defendants' Response: The evidence does not support Plaintiffs' assertion. Officer Fox had a clear

---

[101] Ex. 12, Fox BWC at 1:04-05.
[102] Ex. 7, Smith Deposition at 82:4-84:17.

view of Mr. Harmon's hands:



**Ex. 12, Fox BWC at 1:05-06 (non-consecutive still-frames) (brightness increased 30%).**

Additionally, Officer Smith testified he could not remember what Mr. Harmon was doing with his hands or arms at the moment Mr. Harmon pivoted.[103] In contrast, Officer Fox testified that when Mr. Harmon "planted that right foot" and said "I'll fucking stab you," he thought, "[O]h, no, whatever was in his pocket, he got out." For that reason, Officer Fox went to "track and find his hand" and discovered "his hand was up somewhere chest to shoulder height and he was holding a knife."[104]

Plaintiffs' Fact No. 21: Officer Fox was also able to view Mr. Harmon's torso and both of his hands when Mr. Harmon turned, as Officer Fox rapidly closed the distance between them. **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:06.

Defendants' Response: No dispute.

Plaintiffs' Fact No. 22: No weapons are visible in Mr. Harmon's hands from Officer Fox's body

---

[103] Ex. 7, Smith Deposition at 87:15-18.
[104] Ex. 5, Fox Deposition at 137:10-20.

camera footage. **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:06.

Defendants' Response: No dispute that the image is too blurry to clearly see, among other things, the

knife, Mr. Harmon's fingers, or any features on Mr. Harmon's face.

Plaintiffs' Fact No. 23: After Mr. Harmon turned towards the officers, Officer Smith did not believe
that Mr. Harmon represented a threat to the officers justifying the use of deadly force. **Ex. 5**, *Smith
Deposition* at 86:21-24.

Defendants' Response: No dispute. Officer Smith testified he had not seen the knife that was in Mr.

Harmon's hand and though he heard Mr. Harmon's verbal threats about "cutting" or "stabbing," he

had not processed them.[105]

Plaintiffs' Fact No. 24: After Mr. Harmon turned towards the officers, Officer Smith elected to use
his TASER on Mr. Harmon. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:20; **Ex. 5**, *Smith Deposition*
at 84:15-19. Officer Smith observed Mr. Harmon's torso turn towards him. *Id.* at 83:9-84:2. Officer
Smith was able to see Mr. Harmon's torso "below the nipple line and above the knees," *id.* at 84:7-
10, which he identified as an "optimal target area" for deploying his TASER. *Id.* at 84:10-11. Having
a clear view of the "optimal target area" of Mr. Harmon's body "below the nipple line and above the
knees" and aiming at "his chest in his nipple line," Officer Smith deployed his TASER. *Id.* at 84:7-
19.

Defendants' Response: Officer Smith did not testify he had a clear view of the entire area from the

nipple line to knees. Rather, he testified the "optimal target area" is between the "nipple line and

above the knees," and he saw a "good target area" for Mr. Harmon before firing his Taser.[106]

Plaintiffs' Fact No. 25: Officer Smith fired his taser virtually simultaneously to Officer Fox firing his
service weapon at Mr. Harmon. **Ex. 2**, *Smith Body Camera Footage* at 8:16-8:18; **Ex. 3**, *Fox Body
Camera Footage* at 1:01-1:07.

Defendants' Response: No dispute.

Plaintiffs' Fact No. 26: Officer Smith never observed any weapon in Mr. Harmon's hands. **Ex. 2**,
*Smith Body Camera Footage* at 8:14-8:19; **Ex. 5**, *Smith Deposition* at 85:3-23. When asked, "Did you
believe that Mr. Harmon was armed at the time that you fired your taser?" Officer Smith responded,
"I did not." **Ex. 5**, Smith Deposition at 85:24-86:1 (emphasis added). When asked to explain what
went through his mind when he heard Officer Fox's gunshots, Officer Smith testified, "Truthfully?
What the fuck. . . . [I]n my head I had not seen a knife or any other reason, so I was trying to figure

---

[105] Ex. 7, Smith Deposition at 85:16–86:24, 88:22–25.
[106] *Id.* at 83:23-84:14.

out exactly what [Officer Fox] saw and why he felt that it was appropriate to fire his pistol." *Id.* at 86:12-20. When asked whether he thought deadly force was necessary, Officer Smith testified, "If I was basing it solely off of what I could see at that time, no." *Id.* at 86:21-24.

Defendants' Response: No dispute.

Plaintiffs' Fact No. 27: Despite his post-incident statements to the contrary, Officer Fox never observed a weapon in Mr. Harmon's hands. **Ex. 2**, *Smith Body Camera Footage* at 8:14-8:19; **Ex. 3**, *Fox Body Camera Footage* at 1:01-1:07.

Defendants' Response: *See* Reply to Fact No. 45.

Plaintiffs' Fact No. 28: In the immediate moments after he shot and killed Mr. Harmon, Officer Fox made no mention of a knife to his fellow officers. **Ex. 2**, *Smith Body Camera Footage* at 8:20 – 9:19; **Ex. 3**, *Fox Body Camera Footage* at 1:06-1:53; **Ex. 5**, *Smith Deposition* at 89:13-15; **Ex. 1**, *Fox Deposition* at 143:8-10, 144:22-145:3, 147:9-11. Only after the emergency had abated and there was time for contemplation was there mention of a knife. **Ex. 6**, *Robinson Deposition* at 30:17-31:1.

Defendants' Response: No dispute that Officer Fox did not discuss the knife while the Officers were

all actively engaged in securing Mr. Harmon and rendering him immediate aid.

Plaintiffs' Fact No. 29: Officer Fox testified that despite his total certainty that he saw a knife in Mr. Harmon's hands, he was not sure why did not warn Officers Robinson or Smith about such knife as they approached Mr. Harmon, who remained alive. **Ex. 1**, *Fox Deposition* at 143:5-7, 144:22-145:17.

Defendants' Response: Officer Fox testified:

> So I think everything had happened so fast that I was still trying to process what happened. As Kris was giving the communications and Scott said that, Patrick was, I believe, had fallen over and was almost completely face down, was not moving, his breathing was not normal, and so in that particular moment he was not a threat. He was not moving.
>
> It's definitely a tactical error on my part where I maybe should have said something, but other than it happened so quick, he seemed incapacitated, and I didn't see in the moment where there was any further danger to Scott. If there was I think I would have tried to stop him from moving up, but in that moment I didn't see that that was necessary.[107]

Plaintiffs' Fact No. 30: As Officer Robinson approached Mr. Harmon, he made no efforts to look for or secure a knife. **Ex. 3**, *Fox Body Camera Footage* at 1:13-1:48 and 2:22-3:15; **Ex. 4**, *Robinson Body Camera Footage* at 1:18- 5:49; **Ex. 6**, *Robinson Deposition* at 30:17-31:1; 31:19-32:1; 36:6-14.

Defendants' Response: The evidence does not support Plaintiffs' assertion. The video shows the knife

---

[107] Ex. 5, Fox Deposition at 145:3-17.

was directly next to Mr. Harmon's hand, thus there was no need for Officer Robinson to look about for it.[108] Officer Robinson requested Officer Fox "cover" him as he approached, and Officer Fox responded in the affirmative.[109] Officer Robinson testified he saw the knife laying in the grass next to Mr. Harmon's hand and immediately moved to secure Mr. Harmon in handcuffs.[110] After Officer Robinson secured him in handcuffs, Mr. Harmon was no longer a risk and Officer Robinson's focus became rendering aid.[111]

Plaintiffs' Fact No. 31: At his deposition, Officer Robinson testified that he could not remember whether or not he saw a knife in Harmon's hands before Officer Fox opened fire. **Ex. 6**, *Robinson Deposition* at 29:22-30-11; 38:13-14; 43:10-11.

Defendants' Response: No dispute.

Plaintiffs' Fact No. 32: While a knife can be seen laying in the grass near Mr. Harmon as Officer Robinson approached, Officer Robinson had not seen it prior to that point, and he did not react to it if he indeed noticed it on the ground. **Ex. 4**, *Robinson Body Camera Footage* at 1:31-1:35; **Ex. 6**, *Robinson Deposition* at 27:14-18; 30:17-31:1; 31:19-32:1; 36:6-14.

Defendants' Response: No dispute the knife can be seen laying in the grass near Mr. Harmon's right hand as Officer Robinson approached. Plaintiffs' further assertion misstates the evidence. Officer Robinson testified he could not recall whether he had seen the knife in Mr. Harmon's hand. He further testified he saw the knife laying in the grass next to Mr. Harmon's hand and immediately moved to secure Mr. Harmon in handcuffs after having asked Officer Fox to cover him.[112]

Plaintiffs' Fact No. 33: Mr. Harmon's DNA was **not** present on the knife. Following the shooting death of Mr. Harmon, the Unified Police Department conducted a forensic examination of the scene and the physical evidence. *See generally* **Ex. 7**, *Unified Police Department Investigation Report*. As part of that forensic investigation, the Castleview hospital knife collected from the scene, was processed with UPD forensic Investigator Brobeck to search for the presence of DNA. **Ex. 8**, *Laboratory Analysis Report*. According to Investigator Brobeck, "I first swabbed the handle of the knife for any potential touch DNA (item 1)[.] I then processed the knife with black powder. Nothing

---

[108] Ex. 10, Robinson BWC at 1:34; *see also* Plaintiffs' Fact No. 32.
[109] Ex. 11, Robinson Deposition at 27:3-8; Ex. 12, Fox BWC at 1:06.
[110] Ex. 11, Robinson Deposition at 27:14-28:16.
[111] *Id*. at 31:19-32:13, 34:19-36:25.
[112] *Id.* at 27:3-28:16.

of value was recovered." *Id.*

Defendants' Response: No dispute that no DNA was recovered from the knife.

Plaintiffs' Fact No. 34: The knife found at the scene is a manually opening folding-style knife that requires two hands to open. **Ex. 9**, Castleview Knife Photo.

Defendants' Objection and Response: Defendants object to Plaintiffs' assertion because it is not

supported by any evidence. The only evidence cited in support is a photograph of the knife. The

photograph does not establish it is "manually opening" or that it "requires two hands to open."

Plaintiffs' Fact No. 35: The knife found at the scene is a tactical style knife often used by law enforcement and first responders. **Ex. 9**, Castleview Knife Photo.

Defendants' Objection and Response: Defendants object to Plaintiffs' assertion because it is not

supported by any evidence. The only evidence cited in support is a photograph of the knife. To the

extent Plaintiffs attempt to suggest *only* law enforcement or first responders could possibly possess

this particular knife, they likewise failed to adduce any evidence in support.

Plaintiffs' Fact No. 36: All three officers were and are close colleagues and friends with one another. *See* **Ex. 1**, *Fox Deposition* at 74:20-78:23; **Ex. 5**, *Smith Deposition* at 67:15-70:8; **Ex. 6**, *Robinson Deposition* at 13:10-14:19.

Defendants' Response: No dispute. To the extent Plaintiffs attempt to infer that Officers Smith or

Robinson lied to protect Officer Fox, Plaintiffs adduced no evidence in support. To the contrary, the

best way to protect Officer Fox would have been for them to lie and state they recalled having seen

the knife in Mr. Harmon's hand—something both Officers refused to do:

| | |
|---|---|
| Counsel: | Did you feel any obligation to look out for him [Officer Fox]? |
| [Objection] | |
| Smith: | Look out for him in what regard? |
| Counsel: | I mean, if there's a piece of evidence on the scene that could presumably justify a shooting had he seen it, did you feel any obligation as his friend to go with that version of events that would justify the shooting keep him out of trouble? |

Smith:       If I did, I would have said that I saw the knife.[113]

<u>Plaintiffs' Fact No. 37</u>: Only Officer Fox describes Mr. Harmon as making hostile motions towards him, and Officer Smith affirmatively testified that Mr. Harmon did not make hostile motions towards Officer Fox or the other officers. *See* **Ex. 5**, *Smith Deposition* at 86:25-87:4 (Mr. Harmon did not manifest hostile intentions toward any of the officers); 87:15-18 (Officer Smith does not remember if Mr. Harmon was doing anything with his hands before he fired his taser).

<u>Defendants' Response</u>: To the extent Plaintiffs suggest Officer Robinson did not believe Mr. Harmon had made hostile motions, Plaintiffs cite no evidence in support. Officer Robinson testified he saw "Mr. Harmon had turned back towards Officer Fox,[114] and that as he was getting up off the ground, he was drawing his service weapon out as well because he believed Mr. Harmon to be a threat.[115]

## **ARGUMENT**

## I.    **PLAINTIFFS' EXCESSIVE FORCE CLAIM FAILS AS A MATTER OF LAW.**

Plaintiffs' excessive force claim should be dismissed because they failed to carry their "heavy burden" to overcome qualified immunity on summary judgment. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017). As to the first prong of the analysis, Plaintiffs claim there are factual disputes that preclude judgment. But they have failed to come forward with evidence to create a genuine dispute. Fact discovery has closed, and the evidence before this Court on summary judgment is primarily the bodycam videos of the Officers and their testimony. This evidence establishes that Officer Fox reasonably feared for his safety and that of his fellow Officers when he fired his weapon. As to the second prong, Plaintiffs rely on caselaw that bears little resemblance to this case as it exists at summary judgment. Thus, their excessive force claim must be dismissed.

---

[113] Ex. 7, Smith Deposition at 105:8-18; *see also* Ex. 11, Robinson Deposition at 80:14-81:15 (Officer Robinson maintaining that he could not recall if he saw the knife in Mr. Harmon's hand even after Plaintiffs' counsel asserted that whether he saw the knife in Mr. Harmon's hand "could be the difference between [Officer Fox] being justified and not justified" and that "not being justified could have enormous consequences for Officer Fox").

[114] Ex. 11, Robinson Deposition at 24:6-22.

[115] *Id.* at 24:1-5, 26:18-24, 34:5-14.

A.    **The Undisputed Evidence Establishes Officer Fox's Use of Force Was Objectively Reasonable Under the Circumstances.**

Plaintiffs contend summary judgment is inappropriate because there are factual disputes that must be resolved by a jury. Plaintiffs err in two ways. The undisputed evidence, detailed below and in the Motion, establishes there are no genuine factual disputes. Additionally, Plaintiffs' argument neglects to acknowledge the governing standard, which is not what actually occurred (even though there is no dispute), but what a reasonable officer in Officer Fox's position could believe occurred. *See Est. of Valverde v. Dodge*, 967 F.3d 1049, 1062 (10th Cir. 2020) ("The district court's . . . error was that it failed to appreciate that the facts must be viewed from the perspective of the officer."). Based on the record facts at summary judgment, it was objectively reasonable for Officer Fox to believe Mr. Harmon presented an immediate threat of serious injury. Officer Fox's use of force in those circumstances, considered under the *Graham* factors, was not a constitutional violation.

1.    **Plaintiffs do not dispute the first and third *Graham* factors weigh in favor of Officer Fox.**

The first and third *Graham* factors consider the severity of the crime at issue and whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989). Plaintiffs do not dispute that these factors weigh in favor of Officer Fox.

As to the first factor, there is no dispute Mr. Harmon was being arrested for a felony warrant.[116] Based on that evidence alone, the first *Graham* factor weighs in favor of Officer Fox's use of force.[117] *See Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021) ("[O]ur binding precedent indicates the first *Graham* factor weighs against the plaintiff when the crime at

---

[116] *See* Fact Nos. 17–19.
[117] *See Est. of Harmon*, 2021 WL 5232248, at *3 (holding this factor weighs in Officer Fox's favor).

issue is a felony . . . .").  Thus, the Court need go no further.[118]

As to the third factor, there is no dispute that Mr. Harmon was actively resisting arrest or attempting to evade arrest by flight. Plaintiffs did not make any argument regarding this factor, and they admitted Mr. Harmon broke free and fled while the Officers attempted to handcuff him.[119]

### 2.    Mr. Harmon posed an immediate threat of safety to the Officers.

Plaintiffs contend there are material disputes of fact regarding whether Mr. Harmon presented a threat of serious physical harm to the Officers. (Opp'n at 26–36.) However, the undisputed evidence shows a reasonable officer in Officer Fox's position could believe Mr. Harmon posed an immediate and serious threat. Additionally, Plaintiffs failed to present evidence from which a reasonable jury could conclude that Mr. Harmon was not armed with the knife that was found right next to his hand. The second *Graham* factor, evaluated under the *Larsen* test, weighs heavily in favor of Officer Fox.

a.    Once Mr. Harmon produced the knife, it was not feasible to give a warning.

Plaintiffs assert the first *Larsen* factor weighs in their favor because the Officers never ordered Mr. Harmon to drop his weapon. (Opp'n at 27.) But Plaintiffs failed to address governing precedent that a warning need not be given when not feasible to do so. (*See* Mot. at 21.) Instead, Plaintiffs

---

[118] In any event, Officer Fox had probable cause to believe Mr. Harmon committed a number of other crimes. *See Henry v. Storey*, 658 F.3d 1235, 1239 (10th Cir. 2011) (recognizing the court considered crimes that the officers had probable cause to believe had been committed). Plaintiffs concede Mr. Harmon committed traffic violations and fled from the Officers. (Opp'n at 25.) Officer Fox also had probable cause to believe Mr. Harmon assaulted Officer Robinson. The video shows Mr. Harmon fending off Officer Robinson's attempt to stop him and Mr. Harmon thrusting his body weight into Officer Robinson, who falls to the ground. Plaintiffs rely on the Tenth Circuit statement disagreeing that "the encounter could only be characterized as an assault *based on the body-cam footage*." (Opp'n at 25 (quoting *Est. of Harmon*, 2021 WL 5232248 at *8) (emphasis added).) But on summary judgment, this Court does not have only the body-cam but also testimony: Officer Robinson testified Mr. Harmon shoved him. Ex. 11, Robinson Deposition at 23:15-17. Finally, Officer Fox had probable cause to believe Mr. Harmon committed first-degree felony aggravated assault. (*See* Mot. at 19.) Plaintiffs also contend there are factual disputes about whether Mr. Harmon was armed or made hostile motions. (*See* Opp'n at 26.) As shown below, Officer Fox was not only reasonable, but in fact correct, in his belief that Mr. Harmon was armed with a knife and had turned back toward him with that knife. *Infra* Part I.A.2.

[119] Plaintiffs' Resp. to Fact No. 23.

merely contend the Tenth Circuit "did not credit" this argument. (Opp'n at 27 (citing *Est. of Harmon*, 2021 WL 5232248, at \*4).) Not so. The Tenth Circuit never considered or analyzed whether a warning was feasible; it only noted that no warning was given. *See Est. of Harmon*, 2021 WL 5232248, at \*4.

Governing precedent establishes that "[a] warning is not invariably required even before the use of deadly force," *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1321 (10th Cir. 2009), but is required only "where feasible," *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). For example, in *Valverde v. Dodge*, the Tenth Circuit reversed the district court and held the officer's use of deadly force without a warning and less than a second after the suspect pulled a gun was reasonable. 967 F.3d at 1062. Here, as in *Valverde*, the undisputed evidence establishes that a warning was not feasible. Officer Fox had only a split-second to react when Mr. Harmon suddenly stopped fleeing, planted his right foot, and turned back toward Officer Fox with what Officer Fox believed to be, and was in fact, a knife.[120] Officer Fox testified he reacted quickly because Mr. Harmon "was turning back at me with a knife in his hand and said he would stab me."[121] He further stated, "[E]verything happened very, very quick," that it "was the first time as a cop that I thought I might die," and that today he still "believe[s] Mr. Harmon intended to stab me and would have done so if I hadn't fired my weapon."[122] This factor is neutral.

       b.    <u>The record evidence establishes it was objectively reasonable for Officer Fox to believe Mr. Harmon was armed with the knife.</u>

Plaintiffs contend there are factual disputes regarding the second *Larsen* factor—whether Mr. Harmon made hostile motions with a weapon—because they assert Mr. Harmon was unarmed.

---

[120] Ex. 12, Fox BWC at 1:05-06.
[121] Ex. 5, Fox Deposition at 140:4-15. It is also plain why Officers Smith and Robinson did not give a command to drop the knife. Officer Smith did not realize Mr. Harmon had a knife, and Officer Robinson was still getting off the ground approximately 30 feet away. Ex. 7, Smith Deposition at 86:16-17; Ex. 11, Robinson Deposition at 25:8-16.
[122] Ex. 6, Fox Declaration ¶¶ 13, 15.

(Opp'n at 27–31.) Plaintiffs' argument, however, focuses on the wrong inquiry. As in every excessive force case, the question before the Court is whether the use of force was objectively reasonable, judging it from the perspective of a reasonable officer on scene. *Graham*, 490 U.S. at 396; *Est. of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008). In other words, the Court is not charged with determining *what actually occurred*, but rather with determining if *the officer's belief* was reasonable. In any event, Plaintiffs also failed to adduce evidence from which a reasonable jury could conclude Mr. Harmon was not armed with the knife that Officer Fox saw and that was found right next to his hand when he fell. For either reason, Plaintiffs' argument fails.

###### i.      *Officer Fox's belief was objectively reasonable.*

Officer Fox had probable cause to believe Mr. Harmon was armed with a knife in light of the evidence on summary judgment. *See Est. of Taylor v. Salt Lake City*, 16 F.4th 744, 762 (10th Cir. 2021) (holding "[p]robable cause doesn't require an officer's suspicion . . . be more likely true than false" but only a "fair probability," meaning "something more than a 'bare suspicion' but less than a preponderance") (citations omitted) (second alteration in original). This evidence included the following: (1) Officers Fox and Robinson saw Mr. Harmon reach for his right pocket or his waist[123]; (2) the Officers heard Mr. Harmon make threats about "cutting" or "stabbing"[124]; (3) Mr. Harmon stopped running away from the Officers and began side-shuffling[125]; (4) as he was side-shuffling, Mr. Harmon brought his hands together in front of his chest[126]; (5) Mr. Harmon dropped his left arm and kept his right arm raised at chest-height with his elbow bent[127]; (6) Mr. Harmon then planted his right

---

[123] Fact Nos. 25–27.
[124] Fact Nos. 28–30, 50.
[125] Fact No. 37.
[126] Fact No. 38.
[127] Fact No. 39.

foot perpendicular to the sidewalk, so that his right foot was in a 9 o'clock position from the Officers and his left foot was at a 7 o'clock position[128]; (7) Mr. Harmon bent his knees slightly into a crouching position[129]; (8) Officer Fox saw a knife in Mr. Harmon's hand[130]; (9) Mr. Harmon was approximately five to seven feet away[131]; (10) after Mr. Harmon was shot, a knife lay in the ground next to where his right hand fell[132]; (11) Officer Robinson informed investigating officers to collect the knife for evidence[133]; and (12) while on scene, Officer Robinson asked Officer Fox if he got the knife and Officer Fox responded, "No, I have *my* knife," confirming his knowledge about the existence of Mr. Harmon's knife.[134] Considered together, this evidence establishes an officer in Officer Fox's position would believe there was a "fair probability" Mr. Harmon had a knife.

> ii.   *No reasonable jury could conclude Mr. Harmon was not armed with the knife.*

Alternatively, no reasonable jury could conclude that Mr. Harmon was unarmed in light of this evidence. Plaintiffs go to much effort to argue the knife was not in Mr. Harmon's hand. But they have failed to carry their summary judgment burden to create a genuine dispute of fact. "For there to be a 'genuine' dispute of fact, there must be more than a mere scintilla of evidence, and summary judgment is properly granted if the evidence is merely colorable or is not significantly probative." *GeoMetWatch Corp. v. Behunin*, 38 F.4th 1183, 1200–01 (10th Cir. 2022) (citation omitted). Additionally, "while we draw all reasonable inferences in favor of the non-moving party, an inference is unreasonable if it requires a degree of *speculation* and conjecture that renders [the factfinder's]

---

[128] Fact Nos. 40–43.
[129] Fact No. 40.
[130] Fact Nos. 45–46.
[131] Fact No. 47.
[132] Fact Nos. 58, 61.
[133] Fact No. 65.
[134] Fact No. 65.

findings *a guess or mere possibility*.'" *Id.* (citation omitted) (emphasis and alteration in original). Plaintiffs have made no effort to present *any* evidence about where the knife came from, if not Mr. Harmon. Their assertions that Mr. Harmon was unarmed thus amount to "statements of mere belief" that "must be disregarded at the summary judgment stage." *Id.* (citation omitted); *see also id.* (holding a nonmovant cannot "defeat summary judgment by relying on ignorance of the facts, on speculation, or on suspicion"). No reasonable jury could conclude that Mr. Harmon was not armed with the knife that Officer Fox saw and that was next to Mr. Harmon's hand on the ground. And each of Plaintiffs' attempts to create a factual dispute, discussed below, is unavailing.

First, Plaintiffs argue that because the video does not clearly depict a knife in Mr. Harmon's hand, summary judgment must be defeated. (Opp'n at 27.) Such argument is insufficient because it ignores the wealth of evidence in the record, detailed above. And notably, Plaintiffs do *not* argue that the videos show Mr. Harmon's hands were *empty*; rather, they argue—as they must—only that a knife is not visible in the videos.[135] (*Id.*) The Tenth Circuit has recognized that "an HDTV-quality image is not necessary for our purposes" and can be sufficient even when the video "is grainy" or taken from a "significant distance." *Valverde*, 967 F.3d at 1062. For example, in *Thomas v. Durastanti*, the Tenth Circuit relied on video evidence, even as it "acknowledg[ed] that it did not capture everything." 607 F.3d 655, 659 (10th Cir. 2010). In particular, the Court held "[t]here seems to be no room for genuine disagreement" as to key facts, even though "the video does not capture the entire episode" and there was contradictory witness testimony. *Id.* at 664–65. Here, like in *Thomas*, while the video may "fail[]

---

[135] For this reason, the Tenth Circuit concluded that on a motion to dismiss, it had to accept as true the allegation in the Complaint that Mr. Harmon was unarmed. *Est. of Harmon*, 2021 WL 5232248 at *3. The Tenth Circuit decision was full of qualifiers based on the motion to dismiss standard, including use of the phrase "at this stage" five times. *See, e.g.*, *id.* (analyzing the motion "at this stage," "consistent with the standard for ruling on a motion to dismiss," and "[a]ccepting these facts [from the Complaint] as true"); *id.* at *4 (holding that "[a]t this stage, acknowledging that further discovery could clarify these issues, we must conclude that the second *Graham* factor favors the Estate").

to show other critical events," it does show that Mr. Harmon stopped fleeing, planted his right foot, pivoted back toward Officer Fox, and positioned his arm as if grasping a knife, and that the knife lay in the ground next to him. On this evidence, there is "no room for genuine disagreement" that Mr. Harmon was armed.

Furthermore, Plaintiffs made no effort to identify—let alone adduced any evidence to support—where the knife came from, if not Mr. Harmon. Plaintiffs agree that the knife was lying on the ground next to Mr. Harmon when he fell.[136] Yet they offer absolutely no explanation or evidence for how it got there if it was not in Mr. Harmon's hand. When asked at deposition where the knife came from, Plaintiffs answered "I don't know" or they "couldn't tell."[137] In their interrogatory responses, they flatly refused to even answer where they contend it came from.[138] Without any plausible argument supported by evidence that the knife came from somewhere else, no reasonable jury could conclude the knife was not in Mr. Harmon's possession.

Second, Plaintiffs argue that because only Officer Fox saw the knife in Mr. Harmon's hand, there is a dispute of fact as to whether Mr. Harmon possessed the knife. (Opp'n at 27–29.) This too is insufficient to create a dispute. Officer Robinson testified that while he recalled seeing the knife next to Mr. Harmon's hand on the ground, he could not recall whether he saw the knife in Mr. Harmon's hand when Officer Fox fired. This testimony is not at all surprising given that Mr. Harmon had his back to Officer Robinson when he turned on Officer Fox and Officer Robinson was approximately 30 feet away.[139] Officer Robinson also testified he began to draw his weapon as he got off the ground "because I saw something and heard something that made me think that I needed my

---

[136] *See* Fact No. 61, Plaintiffs' Fact No. 32.
[137] Ex. 22, Harmon II Deposition at 30:18-31:5; Ex. 23, Tasha Smith Deposition at 26:18-27:18.
[138] Ex. 24, Plaintiffs' Responses to Interrogatory Nos. 1–5.
[139] *See* Ex. 10, Robinson BWC at 1:20:06; Ex. 11, Robinson Deposition at 25:10-16.

gun, including I'll fucking stab or I'll cut or whatever he was saying, reaching for his pocket. Those are the things that I remember very clearly."[140]

It is also not surprising that Officer Smith did not see the knife because he testified he did not process that Mr. Harmon had said "cut" and "stab" during the chaotic scene.[141] Rather, Officer Smith testified that he intended to use his Taser while chasing Mr. Harmon, and then when Mr. Harmon turned back toward the Officers, Officer Smith saw that he had presented his torso as a viable target for the Taser.[142] In contrast, Officer Fox testified that when Mr. Harmon planted his right foot—and given what he had heard and processed—he believed Mr. Harmon had retrieved the object from his pocket. Officer Fox therefore scanned Mr. Harmon "to track and find his hand" and identified that "he was holding a knife."[143] In other words, because of what they managed to process in those frantic seconds, Officer Smith focused on a target for his Taser to stop Mr. Harmon from fleeing and Officer Fox focused on what was in Mr. Harmon's hand. Thus, there is no genuine dispute of fact.

Third, Plaintiffs suggest Mr. Harmon was unarmed because the Officers did not discuss the knife while they were trying to save Mr. Harmon's life. (Opp'n at 30.) Plaintiffs' contention is absurd on its face and misstates the evidence. Officer Fox had just fired his weapon for the first time in his 10-year career as a police officer. He did not warn the other Officers about the knife because "everything had happened so fast that I was still trying to process what happened."[144] He testified that Mr. Harmon "had fallen over and was almost completely face down, was not moving, his breathing was not normal, and so in that particular moment he was not a threat," which the videos confirm.[145]

---

[140] Ex. 11, Robinson Deposition at 24:1–5, 26:18–24, 43:12–44:4.
[141] Ex. 7, Smith Deposition at 85:16-23.
[142] *Id*. at 82:4-84:17.
[143] Ex. 5, Fox Deposition at 137:7-24.
[144] Ex. 5, Fox Deposition at 145:4-17.
[145] *Id.*; Ex. 9, Smith BWC at 8:24-50; Ex. 12, Fox BWC at 1:07-48; Ex. 10, Robinson BWC at 1:23-51.

Additionally, contrary to Plaintiffs' assertion that Officer Robinson could not "offer a cogent explanation" for his actions, (Opp'n at 30), he explained exactly why he did not secure the knife. He testified that because Mr. Harmon needed immediate medical attention, "I asked Officer Fox to cover me as I moved up to place him in handcuffs so that we could secure him and give him medical aid."[146] Officer Robinson did not say anything about the knife because "I was placing Mr. Harmon into custody, so the knife was no longer an issue," and Mr. Harmon was a risk with the knife next to him, "That's why I placed him in handcuffs."[147] The video evidence again confirms this.[148]

Importantly, Plaintiffs ignore crucial evidence establishing Officer Fox *did* see the knife in Mr. Harmon's hand. Shortly after being removed from rendering aid, the first thing Officer Robinson asked Officer Fox was, "Did you grab the knife?" to which Officer Fox responded, "*No, I have my knife where I tried to cut his pants off.*"[149] Officers Fox and Robinson thus contemporaneously confirmed knowledge of another knife. In sum, no reasonable jury could conclude Mr. Harmon was unarmed based on the Officers' focus to save Mr. Harmon's life rather than searching for evidence.

Fourth, Plaintiffs suggest the knife was not Mr. Harmon's by asserting it was a "tactical rescue knife commonly carried by law enforcement personnel and first responders."[150] (Opp'n at 30.) Plaintiffs cite no evidence for this allegation, and thus the Court cannot consider it.[151] In any event, that the knife could *not* have been Mr. Harmon's solely based on its style and marking is beyond any

---

[146] Ex. 11, Robinson Deposition at 27:5-8.
[147] *Id.* at 28:11-16.
[148] Ex. 9, Smith BWC at 8:24-50; Ex. 12, Fox BWC at 1:07-48; Ex. 10, Robinson BWC at 1:23-51.
[149] Ex. 10, Robinson BWC at 3:55-4:03; Ex. 9, Smith BWC at 13:19-29; Ex. 12, Fox BWC at 6:06-19.
[150] Despite claiming such a knife had to belong to law enforcement or first responders, Plaintiffs also asserted the knife had to have belonged to an employee of Castleview Hospital due to its engraving. (Opp'n at 31.)
[151] *See* Response to Plaintiffs' Fact No. 35.

reasonable inference that the Court could draw on summary judgment.[152]

Fifth, Plaintiffs point to the fact that no DNA was detected on the knife. (Opp'n at 31.) Again, however, Plaintiffs provide no admissible evidence to permit the Court to conclude that the mere absence of recoverable DNA *from anyone* indicates Mr. Harmon did not possess the knife.

In sum, from the evidence presented, it was objectively reasonable for Officer Fox to believe Mr. Harmon was armed with a knife. Moreover, Plaintiffs failed to present any evidence at summary judgment from which a trier of fact could conclude Mr. Harmon was not armed. For either reason, this factor weighs heavily in favor of Officer Fox.

   c. <u>The undisputed evidence shows Officer Fox reasonably believed Mr. Harmon made hostile motions with the knife.</u>

Plaintiffs claim there is a genuine dispute as to whether Mr. Harmon made hostile motions toward the Officers. (Opp'n at 31–32.) Plaintiffs' argument again focuses on the wrong inquiry by failing to consider what a reasonable officer could believe. *See Coronado v. Olsen*, No. 20-4118, 2022 WL 152124, at *4 (10th Cir. 2022) ("We do not look at whether [the suspect] actually intended to harm the officers . . . , but rather whether a reasonable officer could have believed a threat of serious physical harm existed at the time.").

Here, the undisputed evidence establishes Officer Fox's belief that Mr. Harmon made hostile motions with a knife was reasonable. As detailed above, Mr. Harmon knew he had an outstanding felony warrant, begged the Officers not to arrest him, and eventually fled from them.[153] Officer Fox saw Mr. Harmon physically engage with Officer Robinson and believed Mr. Harmon intended to stab

---

[152] Additionally, it is undisputed that Mr. Harmon was prohibited from owning firearms due to his prior felony convictions; in fact, Mr. Harmon had previously served time in federal prison for being a felon in possession of a firearm. *See* Fact No. 2. This is yet further evidence supporting Mr. Harmon's possession of the knife.
[153] Fact Nos. 15, 17, 20–24.

him, such that Officer Fox drew his weapon and was determining how to fire without striking Officer Robinson.[154] Then, as Mr. Harmon continued fleeing, he began to slow and turn back toward the Officers, eventually planting his right foot and pivoting toward Officer Fox.[155] It was objectively reasonable, based on these movements, for Officer Fox to believe Mr. Harmon was *not* continuing to run *away* him. Moreover, the videos show Mr. Harmon raised his right arm in a manner consistent with holding a knife.[156] He did not, for example, have both arms up in a traditional boxing stance to prepare to punch. Thus, it was plainly reasonable for Officer Fox to believe Mr. Harmon was making hostile motions.[157] This factor heavily weighs in Officer Fox's favor.

>    d.    Plaintiffs concede the short distance between Officer Fox and Mr. Harmon weighs against them.

The third *Larsen* factor is the distance between the men. Plaintiffs did not argue this factor weighs in their favor, and they admitted there was only five to seven feet between the two men at the time Officer Fox fired his weapon.[158] This factor weighs heavily in favor of Officer Fox.

>    e.    The undisputed evidence shows Officer Fox reasonably believed Mr. Harmon's manifest intentions were to harm him with the knife.

As with their arguments related to Mr. Harmon's hostile motions, Plaintiffs' argument that there are disputes of fact regarding Mr. Harmon's manifest intentions focuses on the wrong inquiry, addressing what they contend actually occurred rather than what Officer Fox could have reasonably

---

[154] Fact Nos. 31–34.
[155] Fact Nos. 37–39.
[156] Fact Nos. 39–40.
[157] The belief's reasonableness is corroborated by yet further evidence, including that Mr. Harmon had served multiple previous prison sentences and was currently facing a sentence of up to 15 years, and that he had methamphetamine in his system at a level that can cause "violent and irrational behavior." Fact Nos. 1–5, 74. *See Cordova v. Albuquerque*, 816 F.3d 645, 659 (10th Cir. 2016) (holding evidence outside officer's knowledge is admissible "of the plaintiff's actions and psychological state prior to a police encounter since it made the officer's version of events—that the plaintiff had been the aggressor—more likely"), *abrogated on other grounds by Thompson v. Clark*, 142 S. Ct. 1332 (2022).
[158] Plaintiffs' Resp. to Fact No. 41.

believed. (Opp'n at 32–34.) Mr. Harmon's manifest intentions are determined from his "actions, demeanor, and body language." *Lennen v. City of Casper*, No. 21-8040, 2022 WL 612799, at *8 (10th Cir. 2022). For example, in *Estate of Taylor*, the Tenth Circuit held a reasonable officer could believe a suspect's manifest intentions were hostile and malevolent when the suspect disobeyed commands, was walking away, then turned around, and made a draw stroke motion as if retrieving a gun from his waistband, even though he turned out to be unarmed. 16 F.4th at 770.

Similar to *Estate of Taylor*, and given the evidence presented above, Officer Fox reasonably assessed that the manifest indicators of Mr. Harmon's intentions—begging the Officers not to arrest him, fleeing from them, physically engaging with Officer Robinson, and then planting his foot and pivoting back toward the Officers with his armed raised and a knife in his hand—showed an intention to harm Officer Fox with a weapon. Whether Mr. Harmon may have subjectively intended to do so is irrelevant. The Court's inquiry is whether Officer Fox was reasonable in his assessment. The undisputed evidence establishes that he was. *See Valverde*, 967 F.3d at 1063 (recognizing deadly force can be reasonable "even when the actions of the person shot were ambiguous" and citing cases).

> f.   That Officer Fox was forced to make a split-second life-or-death decision weighs in favor of his use of force.

Plaintiffs did not address the rapidly evolving and uncertain circumstances Officer Fox faced. (*See* Mot. at 25–26.) The Tenth Circuit is clear that "Officers cannot be mind readers and must resolve ambiguities immediately," and thus it has reversed district courts that failed to consider that "allowance needs to be made for the fact that the officer must make a split-second decision." *Valverde*, 967 F.3d at 1062. Nor do they need to "wait until they see the gun's barrel or the knife's blade before using deadly force to protect themselves." *Est. of Taylor*, 16 F.4th at 747. Therefore, "it is reasonable for police to move quickly if delay would gravely endanger their lives or

the lives of others," "even when, judged with the benefit of hindsight, the officers may have made some mistakes." *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 612 (2015) (citation omitted). "The Constitution is not blind to the fact that police officers are often forced to make split-second judgments." *Id.* Because Officer Fox had only a split-second to assess the risk once Mr. Harmon pivoted, this is yet another factor that weighs in favor of his use of force.

*   *   *

"[T]he Constitution simply does not require police to gamble with their lives in the face of a serious threat of harm." *Valverde*, 967 F.3d at 1064. Yet that is the result Plaintiffs' argument would compel. They contend Officer Fox could not and should not have used deadly force. But doing so asks this Court to do exactly what it cannot—"to second-guess using the 20/20 hindsight found in the comfort of a judge's chambers." *Thomson*, 584 F.3d at 1318. The record before this Court on summary judgment establishes "a reasonable officer could have reacted in the manner [Officer Fox] did, and therefore he is entitled to qualified immunity." *Thomas*, 607 F.3d at 659.

**B.**    **Officer Fox Is Entitled to Qualified Immunity Because Any Alleged Constitutional Violation Was Not Clearly Established at the Time.**

Plaintiffs' excessive force claim against Officer Fox fails for the independent reason that they did not carry their burden as to the second prong of the qualified immunity analysis. Plaintiffs rely on the cases the Tenth Circuit cited in the decision at the motion to dismiss stage. (Opp'n at 36–37.) But we are no longer at that procedural stage. Fact discovery has closed, and the Court is presented with summary judgment. Plaintiffs cannot rest on the allegations of their Complaint[159] but must instead

---

[159] In particular, the Tenth Circuit determined that—at the motion to dismiss stage—it was bound to accept as true Plaintiffs' allegations in the Complaint that "Mr. Harmon was unarmed and did not start back toward the officers." *Est. of Harmon*, 2021 WL 5232248, at *3. On summary judgment, those allegations cannot be considered.

come forward with admissible evidence sufficient to create a genuine dispute of material fact. As detailed above, they failed to do so.

Each of the cases Plaintiffs relied on to carry their second-prong burden is inapposite to the summary judgment record before this Court. In particular, in *Walker v. City of Orem*, officers pursued a suspect reported to be suicidal and who had stolen a vehicle. 451 F.3d 1139, 1144 (10th Cir. 2006). The suspect exited his vehicle and held a small knife against his own wrist. From a distance of 28 feet and without warning, an officer shot the suspect twice. *Id.* While the suspect was lying on the ground, a second officer shot him two more times from a distance of 25 feet. *Id.* at 1144–45. The Tenth Circuit affirmed denial of the officers' motion for summary judgment. *Id.* at 1143. In *Tenorio v. Pitzer*, officers responded to an emergency call that a suspect was intoxicated and holding a knife to his own throat, and that others were in the home. 802 F.3d 1160, 1161–62 (10th Cir. 2015). Officers arrived and did not hear a disturbance; they ordered everyone to exit the kitchen, and the suspect walked out of the kitchen at an average speed holding a knife loosely in his hand with his arm hanging by his side. *Id.* at 1162–63. The officers ordered him to drop the knife but did not give him enough time to do so before firing, even though he was not within striking distance. *Id.* Importantly, neither case had bodycam evidence and turned instead on disputed witness testimony.

Neither *Walker* nor *Tenorio* bears resemblance to the record facts before this Court on summary judgment. In *Walker*, the suspect exited his vehicle, held a knife against his own wrist, and was over *twenty* feet away from the officers when they first fired (and *on the ground* when they fired again). In *Tenorio*, the suspect had threatened only himself, calmly obeyed the officers' orders to exit the room, held a knife loosely in his hand with his arm by his side, and was out of striking distance. Here, in contrast, Plaintiffs admit Mr. Harmon had turned back toward the Officers, there was a

distance of only five to seven feet between Mr. Harmon and Officer Fox, Mr. Harmon raised his right arm to chest-height with his elbow bent, and the knife was recovered right next to Mr. Harmon's hand on the ground.[160] The evidence further establishes that Officer Fox saw Mr. Harmon had a knife in his hand and heard him make verbal threats, which the other Officers heard as well.[161] Plaintiffs therefore failed to carry their burden to show violation of a clearly established right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021).

## II.     PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW.

The City moved for summary judgment on Plaintiffs' *Monell* claim on the basis that they failed to establish a constitutional violation. (Mot. at 28–29.) Plaintiffs do not dispute that summary judgment is proper if the Court holds there was no violation. (*See* Opp'n at 37–38.) Because Plaintiffs failed to carry their burden to show a constitutional violation, *supra* Part I, the Court should dismiss their *Monell* claim against the City.

## III.    PLAINTIFFS' STATE-LAW CLAIMS FAILS AS A MATTER OF LAW.

### A.     <u>Plaintiffs' Wrongful Death Claim Fails as a Matter of Law.</u>

Plaintiffs' Utah statutory wrongful death claim is barred by the Governmental Immunity Act of Utah ("**GIAU**") and fails on the merits in any event.

#### 1.     **Plaintiffs did not allege a wrongful death claim against the City.**

Plaintiffs assert "the City is not entitled to sovereign immunity." (Opp'n at 39.) But there is no wrongful death claim against the City. Plaintiffs' Complaint alleged a statutory wrongful death

---

[160] *See* Plaintiffs' Resp. to Facts No. 39, 41.
[161] Fact Nos. 28–30, 45–46, 50.

claim against only "Defendant Fox" and made allegations only as to his conduct.[162] Thus, the Opposition's arguments regarding the City are irrelevant.

### 2.      Plaintiffs' statutory cause of action is subject to governmental immunity.

Plaintiffs also erroneously argue that governmental immunity is inapplicable because their statutory cause of action is premised on violation of a constitutional right. (Opp'n at 40.) But a statutory wrongful death claim (for injury to the heirs) and a constitutional claim (for injury to the decedent) are separate causes of action. *See Stella v. Davis Cnty.,* No. 1:18-CV-002-JNP, 2022 WL 3043092, at *2 (D. Utah Aug. 1, 2022). Plaintiffs cannot conflate the two separate injuries to avoid governmental immunity. *See id.* (recognizing "prosecuting a statutory wrongful death claim would have involved compliance with the [GIAU]"); *Ostler v. Harris,* No. 2:18-CV-00254-BSJ, 2019 WL 4259652, at *3 (D. Utah Sept. 9, 2019) (recognizing Utah precedent does not permit plaintiffs to avoid governmental immunity by alleging violations of another's constitutional rights). Additionally, to the extent Plaintiffs argue Utah's constitutional wrongful death provision prohibits application of the GIAU to the statutory cause of action, (Opp'n at 40–41), the Utah Supreme Court has expressly rejected such argument, *Tindley v. Salt Lake City Sch. Dist.,* 2005 UT 30, ¶ 36, 116 P.3d 295 (holding GIAU does not violate article XVI, section 5).

### 3.      Plaintiffs' wrongful death claim is barred by governmental immunity.

Plaintiffs' statutory wrongful death claim (whether against Officer Fox or the City) is barred by the GIAU. As to Officer Fox, the GIAU is clear that a plaintiff's sole recourse is against the governmental entity, not against an employee. Utah Code Ann. § 63G-7-202(3). The only relevant exception to this rule is if the employee acted through "willful misconduct." *Id.* Plaintiffs made no

---

[162] Compl. ¶¶ 181–88.

response to Defendants' argument and evidence that Officer Fox did not act with "willful misconduct," and have thus waived their opportunity to do so. (*See* Opp'n at 38–41; Mot. at 30.) The claim against Officer Fox must be dismissed.

As to the City (even if Plaintiffs had pled a claim against it), Plaintiffs argue immunity is waived for any injury caused by a negligent act or omission of an employee within the scope of their duties. (Opp'n at 39.) But Plaintiffs failed to undertake the required three-part GIAU analysis: (1) "whether the activity undertaken is a governmental function"; (2) "whether governmental immunity was waived for the particular activity"; and (3) "whether immunity has been reinstated through a statutory exception to the immunity waiver." *Larsen v. Davis Cnty. Sch. Dist.,* 2017 UT App 221, ¶ 10, 409 P.3d 114 (citation omitted). There is no dispute the first two parts are met. But, as required by the third step of the test, there is an exception to the waiver of immunity. Section § 63G-7-201(4)(b) provides that "immunity is not waived" if the alleged injury "arises out of or in connection with, or results from," among other things, "assault, battery, . . . , infliction of mental anguish, or violation of civil rights." That is what occurred here. Plaintiffs alleged their injury arises out of or in connection with or results from Officer Fox's use of force against Mr. Harmon.[163] Whether construed as an assault, battery, or civil rights violation, Plaintiffs' injury is barred by the GIAU.

Plaintiffs assert this exception is inapplicable because their cause of action is based on unnecessary rigor. (Opp'n at 40.) But, as the Utah Supreme Court has explained on numerous occasions, this provision does not depend on the *cause of action* but on the *type of injury. See Ledfors v. Emery Cnty. Sch. Dist.,* 849 P.2d 1162, 1166 (Utah 1993) (explaining the provision "focuses on the conduct or situation out of which the injury arose, not on the theory of liability crafted by the plaintiff

---

[163] *See* Compl. ¶¶ 182–88.

or the type of negligence alleged"); *Van de Grift v. State*, 2013 UT 11, ¶ 21, 299 P.3d 1043 ("[W]e have consistently rejected claims that have reflected attempts to evade these statutory categories by recharacterizing the supposed cause of the injury."). Thus, where "an immunity-invoking condition (e.g., assault or battery) is at least 'a proximate cause' of the claimed injury," the governmental entity is immune. *Larsen,* 2017 UT App 221, ¶ 27. Here, there is no dispute that the assault or battery to Mr. Harmon is at least a proximate cause of Plaintiffs' alleged statutory injury. As the Tenth Circuit has confirmed, Plaintiffs' claim is therefore barred. *See Thomson v. Salt Lake Cnty.*, 584 F.3d at 1323 (holding "the injury complained of—Mr. Thomson's death—arose out of the battery that occurred when he was shot," which "falls within one of the listed exceptions" that "restores governmental immunity").

### 4.    Officer Fox's use of force did not constitute a wrongful or neglectful act.

Finally, Plaintiffs' claim also fails on the merits because they cannot establish Officer Fox committed a wrongful or neglectful act, as required by the statute's plain language. The wrongful or neglectful act Plaintiffs rely on is unnecessary rigor. (Opp'n at 40.) For the reasons stated below and in the Motion, Plaintiffs cannot show Officer Fox's conduct constitute unnecessary rigor. For each of these reasons, the statutory wrongful death claim should be dismissed.

### B.    Plaintiffs' Unnecessary Rigor Claim Fails as a Matter of Law.

Plaintiffs' claim for unnecessary rigor under the Utah Constitution fails because the evidence establishes Officer Fox did not violate Mr. Harmon's unnecessary rigor rights, and because Plaintiffs failed to establish a flagrant violation sufficient to sustain a monetary claim.

### 1.    The undisputed evidence establishes Defendants did not violate Mr. Harmon's unnecessary rigor rights.

"[W]hen the claim of unnecessary rigor arises from an injury, a constitutional violation is

made out only when the act complained of presented a substantial risk of serious injury for which there was no reasonable justification at the time." *Christensen v. Salt Lake Cnty.,* 2022 UT App 51, ¶ 44, 510 P.3d 299 (quoting *Dexter v. Bosko*, 2008 UT 29, ¶ 19, 184 P.3d 592)). The Utah appellate courts have explained that "[t]his standard is 'difficult . . . to prove.'" *Id.* (quoting *Bott v. DeLand*, 922 P.2d 732, 744 (Utah 1996)) (second alteration in original). Here, the record evidence demonstrates there was "reasonable justification" for Officer Fox's act—namely, his reasonable belief that he was in immediate, serious danger given the circumstances he faced. (*See* Mot. at 32.) In response, Plaintiffs' Opposition merely asserts in conclusory fashion that "there is no reasonable justification for shooting an unarmed arrestee." (Opp'n at 42.) This argument ignores the substantial evidence that Officer Fox reasonably believed Mr. Harmon was armed and intended to hurt him.

### 2.  Officer Fox's use of force did not constitute a flagrant violation of Mr. Harmon's constitutional rights.

Plaintiffs' state constitutional claim also fails because any alleged violation was not flagrant, as required by Utah law. "[T]o establish the 'flagrant violation' element, the complainant must show 'the conduct violates clearly established constitutional rights of which a reasonable person would have known.'" *Brown v. Larsen*, 653 F. App'x 577, 578 (10th Cir. 2016) (unpublished) (quoting *Jensen v. Cunningham*, 2011 UT 17, ¶ 66, 250 P.3d 465). "In the absence of clear, on point precedent recognizing the claimed right, the defendant's conduct must be egregious and unreasonable." *Id.*

Plaintiffs pointed to no Utah precedent at all, instead relying on federal cases and the federal right to "be free from excessive force." (Opp'n at 42.) This alone is fatal to their claim. Similarly, Plaintiffs made no argument that their claim survived in "the absence of clear, on point precedent," as was required. In any event, Plaintiffs cannot establish, on the record facts before the Court, that Officer Fox's conduct was not only unreasonable but also egregious. Their claim should be dismissed.

49

## **CONCLUSION**

> Detached reflection cannot be demanded in the presence of an uplifted knife. Therefore in this Court, at least, it is not a condition of immunity that one in that situation should pause to consider whether a reasonable man might not think it possible to fly with safety or to disable his assailant rather than to kill him.

*Brown v. United States*, 256 U.S. 335, 343 (1921) (Holmes, J.). Officer Fox was placed in just that situation—forced to decide in a split-second whether he could evade harm or would have to defend himself. Tenth Circuit and United States Supreme Court caselaw is clear that Officer Fox was not required to take that gamble with his life. The evidence at summary judgment shows Officer Fox's use of force was objectively reasonable, and Plaintiffs have failed to come forward with evidence to show a genuine dispute of fact to preclude that determination. Defendants request the Court grant summary judgment and dismiss Plaintiffs' remaining claims with prejudice and on the merits.

DATED: December 9, 2022.

SALT LAKE CITY CORPORATION


/s/ *Katherine R. Nichols*
Katherine R. Nichols

*Attorney for Defendants Salt Lake City and Officer Clinton Fox*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 9, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Court, which sent notice to:

Andrew G. Deiss
Corey D. Riley
DEISS LAW PC
10 West 100 South, Suite 425
Salt Lake City, UT 84101
adeiss@deisslaw.com
criley@deisslaw.com

Qusair Mohamedbhai
Nicholas A. Lutz
RATHOD MOHAMEDBHAI LLC
2701 Lawrence Street, Suite 100
Denver, CO 80205
qm@rmlawyers.com
nl@rmlawyers.com

*Attorneys for Plaintiffs*

/s/ Heidi Medrano